

The INSTITUTE for Behavioral Sciences and the Law

Office  (954) 766-8826
Fax     (954) 764-3486

11760 W. Sample Road, #103
Cora Springs, Florida 33065

**Forensic Psychological Evaluation**

**Examinee:**           Genet Rembert
**Case #**              12-60312-Cr-Cohn
**Date of Evaluation:** 07-07-13
**Date of Report:**     07-20-13
**Attorney:**           Daryl Wilcox, Esquire
**Examiner:**           Michael P. Brannon, Psy.D.

**Referral Information:** The examinee was evaluated at the request of her attorney, Mr. Daryl Wilcox, in order to assess for possible mitigating factors. She was evaluated on the above date at Federal Detention Center in Miami, Florida.

**Sources of Information:** Clinical Interview; Mental Status Examination; Petition for Termination of Parental Rights and Permanent Commitment of a Minor Child; Comprehensive Behavioral Health Assessment; Suitability Assessment by Dr. Charles Winick; Individualized Mental Health / Substance Abuse Treatment Plan / Review and Progress Summary; Comprehensive Behavioral Health Assessment; Minnesota Multiphasic Personality Inventory – Second Edition (MMPI-2); Substance Abuse Subtle Screening Inventory – 3 (SASSI-3); Beck Depression Inventory – II (BDI-II); and Miller-Forensic Assessment of Symptoms Test (M-FAST).

**Relevant History:** The examinee is a 21 year-old (D.O.B. – 03/06/92), married, black female who was born in Jacksonville, Florida. She reported that she resided with her mother and father until their separation when she was a baby. She reported that her biological parents never married. She remained with her mother at that time and she did not maintain contact with her father. She reported that her mother married when she (examinee) was a baby although they divorced when she was approximately five years of age. She reported that she was sent to live with relatives in Alabama when she was six years of age due to her mother's mental health problems. She reported that she subsequently resided in five different foster homes. She reported that she resided "on the streets and in programs" from the ages of 14 to 18. She reported that she was physically abused by her mother during her formative years. She further reported that she was sexually abused during her childhood by two of her mother's boyfriends, an uncle, and by a male teenager in a foster home. She reported that she was physically and emotionally abused by her aunt including "making me sleep in a dog house, get into an ice cold bath, and slap myself in the face." She reported that she observed domestic violence between her mother and two of her boyfriends. She reported that she has never had a consistent father figure in any of her residences. She reported a family history of mental illness (mother, brother, sister, uncle). She was not aware of any family history of drug/alcohol abuse. She reported a "close relationship" with her mother. She described her childhood as "happy and unhappy." She reported that she ran away on numerous occasions during her childhood and adolescence.

The examinee reported that she has been married for the past two years to the co-defendant in her current case. She reported that her marriage has been her longest exclusive relationship. She reported that her husband has been her pimp since she was 18 years of age. She reported the occurrence of domestic violence in her marriage and all of her prior exclusive relationships. She reported that she does not have any children. She reported that she was residing with her husband in Hollywood, Florida at the time of her arrest. She reported that she was homeless on several occasions as a juvenile.

Academically, the examinee reported that she completed 11th grade in Severely Emotionally Disturbed and Emotionally Handicapped classes. She reported that she earned above average grades in school. She reported ongoing behavioral problems in school including numerous suspensions and an expulsion. She reported that she was often involved in physical altercations while in school. She reported that she experienced problems with inattentiveness and hyperactivity in school. She reported that she was diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD) while in school and she was prescribed stimulant medication for the symptoms of that condition. She reported that she was the victim of bullying, excessive teasing, and rejection by her peers while in school. She reported that she has never attempted to earn her General Equivalency Diploma (GED).

Occupationally, the examinee reported that she has "worked as a prostitute since I was 13 years of age although I was doing sexual things for things I wanted since I was 10 years of age." She further reported that she has "had a lot of pimps and most of them beat me up trying to break me down." She reported that she was sexually assaulted and beaten up on numerous occasions by "tricks" while working as a prostitute. She reported that she has never been employed in a part-time or full-time job. She reported that she has never received Social Security disability benefits. She reported that she has never served in the United States military.

Socially, the examinee reported that she does not have any friends in the community ("Pimps don't like you to have friends. They want to you be working or being with them"). Recreationally, she reported that she enjoys writing and reading poetry.

Legally, the examinee reported that she was arrested as a juvenile on charges including Disorderly Conduct and Armed Robbery. She reported that she was incarcerated in Juvenile Detention Center on two occasions. She reported that she was never a member of a delinquent youth gang or cult. As an adult, she reported that she was previously arrested on several counts of Prostitution, Aggravated Battery with a Firearm, and Possession of Cannabis. She reported that she has never been sentenced to prison.

In regard to her mental health history, the examinee reported that she was placed into a dual diagnosis program for 18 months when she was 15 years of age. She reported that she was eventually stepped-down to a less restrictive environment (Omega Group Home) although she eventually ran from that facility. The examinee reported that she has been psychiatrically hospitalized on numerous occasions with her last placement occurring in 2012. She reported that she received counseling services for several years while in DCF custody. She reported that she has been prescribed various psychotropic medications and she was taking Geodon (antipsychotic) and Zoloft (antidepressant) at the time of this assessment. She reported that she has attempted suicide several times beginning at the age of eight. She reported that her last

suicide attempt occurred when she was 19 years of age. She reported a history of "cutting" behaviors beginning when she was eight years of age. She reported that her last incident of "cutting" occurred in 2013. She reported that she has also pulled out the hair on her head on more than one occasion. She reported a history of severe mood fluctuations. She reported the occurrence of auditory and visual hallucinations. For example, she reported that she has "heard voices telling me that I was no good and to hurt myself" and that she has "seen a girl in a white nightgown standing there and looking at me." She did not report the occurrence of any command hallucinations to harm other people. She reported that she has been exposed to multiple traumatic events (see above) and she has experienced numerous symptoms of posttraumatic stress since that time. For example, she reported nightmares, reliving of abuse, avoidance behaviors, "triggers" for traumatic memories, and dissociative experiences. She reported anger control problems which she described as "rage" since she was a child.

The examinee reported that she has used marijuana, alcohol, and MDMA. However, she reported that her use of those substances was minimal and she further stated, "I never had a problem with drugs or alcohol." Conversely, she reported a possible sex addiction as she stated, "I was having sex everyday with my pimps since I was 13 or 14. I could never get enough. I saw it as my reward for my hard day working the streets." She reported that she has never received treatment for an addictive disorder.

Medical health was reported as remarkable due to chronic asthma and a head injury with loss of consciousness in 2011. She reported that she sustained the latter injury after "getting knocked out by my pimp." She did not report any current gross neurological symptoms such as headaches, dizziness, or memory loss.

**Mental Status Examination:** The examinee was appropriately groomed and attired in the standard jail uniform. She was of average height and stocky build with visible tattoos on her wrist, neck, and upper chest. She was oriented to time, place, person, and situation. Her general clinical presentation was cooperative and her demeanor was pleasant and courteous. Eye contact was direct and unremarkable. Motor responses were direct. Attention span was within normal limits as she was not easily distracted by extraneous stimuli. Memory functions were intact on brief measures of those cognitive skills. Responses to examiner inquiries were appropriate in volume, pacing, and word production. Affect was expressed in a full range and mood was congruent with the content of the interview. She did not appear to be attending to imaginary internal stimuli (hallucinations). In addition, she did not verbalize any statements that were suggestive of an active delusional belief system. Functional intelligence was grossly estimated in the Average range based upon her use of vocabulary and general fund of knowledge. Judgment and insight were good. She did not report suicidal or homicidal plans.

**Psychological Testing:** The Minnesota Multiphasic Personality Inventory – Second Edition (MMPI-2) is the most frequently administered personality test in clinical and forensic settings. It has several Validity Scales to assess for response bias and numerous Clinical Scales to assess for the possible presence of a major mental disorder or substance abuse disorder. Validity Scales did not reveal any significant elevations that would suggest exaggeration, fabrication, denial, or minimization of symptom severity. In addition, there were no indications of random responding to test items. As a result, Clinical Scales were determined to be valid and interpretable. Clinical Scales revealed significant elevations on test scales designed to assess for mania, depression, and antisocial personality traits. Individuals who score in a similar manner often report severe mood

fluctuations including symptoms of sadness, lethargy, irritability, hyperactivity, insomnia, racing thoughts, and rapid speech. During times of severe or prolonged stress they may consider or attempt suicide as a viable solution to their problems. They frequently display problems with authority figures and difficulty adhering to established rules and regulations. As a result, they often engage in behaviors that violate the law and lead to subsequent arrests. There were no indications of drug or alcohol abuse on test scales designed to assess for those problem areas.

The Beck Depression Inventory – Second Edition (BDI-II) is one of the most commonly used brief assessment scales for symptoms of depression. The examinee's pattern of responses did not reflect random responding to test items. Therefore, the BDI-II was determined to be valid and therefore interpretable. The examinee obtained a total score of 36 on the BDI-II which falls in the Moderate range of depressive symptomatology. Individuals who score in the above range are reporting numerous symptoms of depression during the two weeks prior to and including the test date.

The Substance Abuse Subtle Screening Inventory - 3 (SASSI-3) is a substance abuse assessment tool that was designed to provide information regarding the possible presence and severity of drug and/or alcohol problems. It provides Validity Scales to assess for random and defensive responding. It also contains numerous scales designed to assess for the possible presence of drug and alcohol problems. Validity Scales did not reveal any indications of response distortion as discussed above. Test results revealed a significant elevation on the Drug Abuse Scale. Individuals who score in a similar manner often report occasional drug use. They are usually at an increased risk for legal difficulties due to their lifestyles that include the occasional use of drugs. They may at times experience negative consequences due to their use of drugs.

The Miller Forensic Assessment of Symptoms Test (M-FAST) is a brief structured interview designed to assess an individual's probability of malingering psychiatric illness. Scores that exceed the established Total score cutoff of 6 are suggestive of malingered psychopathology. The examinee obtained a Total Score of 4 on the M-FAST. Individuals who score in a similar manner are rarely diagnosed with Malingering on more comprehensive measures such as the Structured Interview of Reported Symptoms - 2 (SIRS-2).

**Collateral Documents:** In a Comprehensive Behavioral Health Assessment dated 04-06-01 by Kids in Distress it was reported that the examinee was diagnosed with Dysthymic Disorder and R/O Adjustment Disorder. Several recommendations were offered including remaining at her current foster home, receive individual counseling, participate in extracurricular activities, and receive a developmental assessment to determine if additional services were needed.

In a Petition for Termination of Parental Rights and Permanent Commitment of a Minor Child dated 01-25-02 it was reported that the examinee was placed in the permanent custody of the Department of Children and Families for adoption due to abuse and neglect in her home. In addition, the examinee's mother was reported to have not completed her case treatment plan.

In a Comprehensive Behavioral Health Assessment dated 07-05-07 by Smith Community Mental Health Center the examinee was diagnosed with Bipolar Disorder, by history and Cannabis Abuse. It was reported that she was previously diagnosed with Depression (2001), Attention Deficit Disorder (2005), and Bipolar Disorder Type I (2005). She was prescribed Abilify (antipsychotic), Focalin (stimulant), and Zoloft (antidepressant) for the symptoms of the above

4

conditions. It was reported that the examinee initially came to the attention of the Florida child welfare system when she was eight years of age. She was reported to have been removed from her home at that time due to allegations of sexual abuse, exposure to domestic violence, and exposure to substance abuse. It was further reported that the examinee was subsequently charged as a teenager with Armed Robbery and that she had been working as a prostitute for an undetermined period of time prior to her arrest. It was recommended that upon her release from incarceration that the examinee be placed into a therapeutic foster home, receive individual counseling, receive a substance abuse evaluation, receive education regarding sexual health, and participate in activities that would expand her interests in writing and acting.

In an Individualized Mental Health/Substance Abuse Treatment Plan/Review and Progress Summary dated 06-08-08 it was reported that the examinee was diagnosed with Bipolar I Disorder, Posttraumatic Stress Disorder, R/O Reactive Attachment Disorder, Conduct Disorder, Cannabis Abuse, and Attention Deficit Disorder. She was reported to have been prescribed Zoloft and Abilify.

In a Suitability Assessment dated 07-27-09 by Dr. Charles Winick, the examinee was diagnosed with Bipolar Disorder NOS, Attention Deficit Hyperactivity Disorder, Combined Type, and Conduct Disorder. The suitability assessment recommends the examinee continue the treatment plan with Alternate Family Care. It was further reported that the examinee continues to meet the need for specialized therapeutic group home placement and less restrictive alternatives may not meet the treatment needs of the examinee.

**DSM–5 Diagnostic Impressions:**

Bipolar I Disorder
Posttraumatic Stress Disorder
Attention-Deficit/Hyperactivity Disorder
Cannabis Use – Mild (based upon self-report only)
Amphetamine Use Mild (based upon self-report only)
Alcohol Use – Mild (based upon self-report only)
Head Injury with Loss of Consciousness
Asthma

**Conclusions:** The examinee reported numerous symptoms of a major mental disorder. Psychological testing and prior treatment records corroborated her self-reported symptoms. Tests and test scales designed to assess for response distortion did not reveal any indications of Malingering. If the Court were to consider treatment in the current case, the examinee would require placement into a long-term, residential, dual diagnosis program followed by extensive aftercare services in the community. She is unlikely to change her destructive behavioral patterns if she were to remain in the community, especially in her most recent living arrangement. As part of her residential treatment, the examinee should receive specialized treatment for symptoms of PTSD. In addition, she should be required to undergo a psychiatric evaluation to assess for the possible efficacy of psychotropic medication. Although this examination did not reveal active substance abuse problems, the examinee is at-risk for developing problems in that area due to her use of drugs and alcohol and association with negative peers. The examinee also should be required to obtain and maintain a full-time job during the re-entry phase of her treatment. In the absence of appropriate treatment interventions

5

as outlined above, the examinee's mental health problems are likely to worsen in the foreseeable future and her risk for substance abuse problems would significantly increase. .

Thank you for the opportunity to participate in this evaluation and please feel free to telephone me if you require additional information in this matter.

*Michael P. Brannon, Psy.D.*

Michael P. Brannon, Psy.D.
Licensed Psychologist
PY0004289