```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                       FT. LAUDERDALE DIVISION
3                        Case 12-60312-CR-COHN
4
    UNITED STATES OF AMERICA,
5
                 Plaintiff,
6                                        FT. LAUDERDALE, FLORIDA
       vs.
7                                        May 14, 2013
    MACKENLEY DESIR and GENET REMBERT,
8
                 Defendants.
9   ------------------------------------------------------------
10                          VOLUME 3
11              TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE JAMES I. COHN,
12                  UNITED STATES DISTRICT JUDGE
13  APPEARANCES:
14  FOR THE GOVERNMENT:      FRANCIS VIAMONTES, A.U.S.A.
                             VANESSA JOHANNES, A.U.S.A.
15                           99 NE 4th Street, Suite 400
                             Miami, Fl 33132
16
    FOR DEFENDANT DESIR:     DERIC ZACCA, ESQ.
17                           ERGIO FERNANDEZ, ESQ.
                             12781 Miramar Parkway
18                           Suite 303
                             Miramar, Fl 33027-2908
19
    FOR DEFENDANT REMBERT:   DARYL WILCOX, A.F.P.D.
20                           One East Broward Boulevard
                             Suite 1100
21                           Ft. Lauderdale, Fl 33301
22  REPORTED BY:             PAULINE A. STIPES, RPR-CM
                             Official United States Court Reporter
23                           Federal Courthouse
                             299 E. Broward Boulevard
24                           Ft. Lauderdale, FL  33301
                                           954-769-5496
25
```

```
1                    TABLE OF CONTENTS

2                                                    Page
```

Lisa Hubbard ........................................... 322

    Direct Examination by Ms. Johannes ................... 322

    Cross-Examination by Mr. Zacca ...................... 337

    Cross-Examination by Mr. Wilcox ..................... 346

    Redirect Examination by Ms. Johannes ................ 360

Aaron Johnson ......................................... 365

    Direct Examination by Ms. Viamontes ................. 365

    Cross-Examination by Mr. Zacca ...................... 397

    Cross-Examination by Mr. Wilcox ..................... 409

    Redirect Examination by Ms. Viamontes ............... 422

Jackson Louis-Charles ................................. 427

    Direct Examination by Ms. Viamontes ................. 427

    Cross-Examination by Mr. Zacca ...................... 441

    Cross-Examination by Mr. Wilcox ..................... 447

    Redirect Examination by Ms. Viamontes ............... 451

Nathan Yockey ......................................... 460

    Direct Examination by Ms. Johannes ................. 460

    Cross-Examination by Mr. Zacca ...................... 472

C.J. .................................................. 485

    Direct Examination by Ms. Viamontes ................ 485

```
23

24                       EXHIBITS

25                          Marked for          Received
                          Identification      in Evidence
```

| Description | Page | Line | Page | Line |
|---|---|---|---|---|
| Government Exhibit 22 ............................ | | | 432 | 10 |
| Government Exhibits 8 and 9 ...................... | | | 498 | 2 |
| Government Exhibit 10 ............................ | | | 529 | 15 |
| Government Exhibit 11 ............................ | | | 531 | 9 |
| Government Exhibits 14 and 15 .................... | | | 533 | 19 |

1          THE COURT:  The matter before the Court is Mackenley

2    Desir and Genet Rembert.

3          Mr. Desir is present represented by Deric Zacca and

4    Ergio Fernandez.

5          Ms. Rembert is present represented by Daryl Wilcox.

6          And the Government is represented by Frances Viamontes

7    and Vanessa Johannes.

8          The Court deferred ruling on several motions, and

9    after considering the arguments and the legal authorities

10   cited, first of all, with respect to Ms. Rembert's objection to

11   the admissibility of Mr. Desir's post arrest letter to her, the

12   Court finds that the letter would not qualify as hearsay as it

13   is a co-conspirator declaration made in furtherance of the

14   conspiracy.

15         The focus of the letter was to explain to Ms. Rembert

16   how to beat the charges, and to instruct her not to talk to law

17   enforcement.

18         In addition, Crawford versus Washington would not

19   apply to a co-conspirator declaration.

20         Now, with respect to Mr. Desir's motion for specific

21   Brady, which was docket entry 183, he essentially proffers

22   evidence of victim B.V.'s relationship with a gentleman by the

23   name of Edwin who allegedly introduced B.V. to defendant Desir

24   in November or December of 2007.

25         THE COURT:  The record will reflect that both

 1 | Mr. Desir and Ms. Rembert are present represented by counsel.
 2 |     Are there any matters to come before the Court this
 3 | morning?
 4 |     MR. ZACCA:  Yes, Judge.  That is why you are the
 5 | judge, you see ahead, and there are a couple of issues I would
 6 | like to raise.
 7 |     THE COURT:  Flattery will get you everywhere.
 8 |     MR. ZACCA:  Judge, a couple of matters.  I spoke to
 9 | the Government about it.  There is a reference -- I believe
10 | C.J. will reference it, I don't know if it is in B.V.'s.  C.J.
11 | will reference it, that she knew Mr. Desir to be a member of a
12 | gang, gang affiliation, a member of Zoe Pound and a member of
13 | the Haitian Mafia.
14 |     Those are references that I think, under 403, are
15 | overly prejudicial and outweigh any probative value they may
16 | carry.
17 |     THE COURT:  How did she learn of it?  If Mr. Desir
18 | told her that he was a member of these, then I would think it
19 | was relevant.
20 |     How did she learn it?
21 |     MS. VIAMONTES:  The victims believe he was related to
22 | gangs.
23 |     THE COURT:  What was the basis of it?
24 |     MS. VIAMONTES:  He led them to believe it.  He was
25 | called Zoe, he had a lot of foot soldiers out there.  This is

1  one of the reasons why C.J. didn't leave and just walk out the

2  door that led to the exterior.  She saw men out there and she

3  believed they were associated with Mr. Desir and would prevent

4  her from leaving.

5          She called him Zoe, and what she believed that meant

6  would not allow the jury to understand why C.J. didn't leave.

7  That is part and parcel of our case.

8          MR. ZACCA:  It is one thing for Mr. Desir, according

9  to the victims, to say he called himself Zoe.  It is another

10  thing for him to reach their own conclusion that Zoe means Zoe

11  Pound.

12          I haven't heard anything from the Government that

13  Mr. Desir called himself a member of the Haitian Mafia.  To the

14  extent that it is conclusions they drew, opinions that they

15  drew, I think it goes too far.

16          To the extent that he is Zoe and has foot soldiers,

17  and they didn't leave the home, I could understand the

18  relevancy of that.  To form conclusions on their own and

19  opinions on their own, that goes too far.

20          THE COURT:  This Haitian Mafia, where did that come

21  from?

22          MS. VIAMONTES:  That came from B.V.  B.V. believed he

23  was a member of Zoe Pound and the Haitian Mafia because the

24  defendant led her to believe that.

25          THE COURT:  What did he say or do that led her to

1  believe that?

2          MS. VIAMONTES:  One second, Your Honor.

3          Your Honor, I don't know if he specifically told her,

4  "I'm a member of Zoe Pound."

5          He led her to believe he had a lot of foot soldiers.

6          THE COURT:  That is fine.  If he said something

7  indicating that he had men out there that work for him or were

8  affiliated with him, that is fine, but when you start

9  interjecting conclusions such as he was a member of the Haitian

10 Mafia or Zoe Pound, if he didn't say it and this is just a

11 conclusion or speculation on her part, I don't find a basis for

12 admitting that.

13         MS. VIAMONTES:  Understood, Your Honor.

14         THE COURT:  Whatever he told her, you know, Haitian

15 Mafia, Zoe Pound -- I've never heard of those terms before, but

16 then again, I don't travel in the same circles.

17         Mr. Wilcox, is there something you want to add?

18         MR. WILCOX:  Zoe, that phrase, is something that

19 Haitians routinely call each other.  They call each other Zoe

20 as a term of endearment similar to the Jamaicans call each

21 other dread, dread here, dread there.

22         I don't have authority other than my own knowledge.

23         THE COURT:  Well, that is something that is subject to

24 cross-examination.  But the fact that he called himself Zoe,

25 that is admissible --

```
 1              THE DEFENDANT:  I never called myself --

 2              THE COURT:  Sir, you have lawyers representing you.

 3              It is a credibility issue.

 4              MR. WILCOX:  The other thing -- if we are through with

 5    this issue, there is another issue I would like to raise

 6    related to housekeeping matters.

 7              THE COURT:  Go ahead.

 8              MR. WILCOX:  There was an article today in the Sun

 9    Sentinel about this trial, and I ask the court inquire of the

10    jury as to --

11              THE COURT:  I will do so.  Granted.

12              MR. ZACCA:  It was also in the Herald, also, Judge.

13              THE COURT:  I will inquire.

14              MR. ZACCA:  I believe the Government is calling Aaron

15    Johnson, the father of C.J..  In one statement he says he

16    witnessed the shooting while he was, I guess, surveilling the

17    Beach and Town looking for his daughter and witnessed a girl

18    getting shot.

19              In the second 302 he references when he went to the

20    Hollywood Police Department he heard of a shooting.

21              I don't know if the Government plans to elicit a

22    shooting.  That is not part of the case and clearly that is a

23    403 objection.

24              THE COURT:  First of all, does the Government intend

25    to offer that evidence?
```

```
 1          MS. VIAMONTES:  Yes, Your Honor.  This is why.

 2          THE COURT:  What is the relevance?

 3          MS. VIAMONTES:  The witness was in Hollywood looking

 4   for his daughter.  He saw Mackenley Desir exit the hotel, he

 5   saw Mr. Desir pull a weapon from the small of his back, a

 6   firearm, and leave it in an alleyway.

 7          After, as he informs Mr. Desir that he was looking for

 8   his daughter, he said, oh, your daughter was shot last night.

 9   That is relevant.  It goes to the conversation of Mr. Desir.

10          THE COURT:  Whatever Mr. Desir told Aaron Johnson is

11   certainly admissible.

12          MS. VIAMONTES:  Mr. Johnson for a moment thought that

13   his daughter was the one shot.  He sees police officers

14   responding after Mr. Desir goes into the alleyway with the

15   firearm drawn.

16          He follows --

17          THE COURT:  How is that relevant, the fact that he

18   thought his daughter was shot?

19          How is that relevant?

20          MS. VIAMONTES:  It becomes relevant once the defendant

21   leads him to believe the daughter was shot.

22          THE COURT:  What the defendant says is admissible.

23          Any conclusion that Aaron Johnson may have had that

24   Mr. Desir shot his daughter, I would say, certainly the

25   prejudicial effect would substantially outweigh the probative
```

```
 1  value.  Anything Desir told Johnson is admissible.
 2          MS. VIAMONTES:  The Government is not going to elicit
 3  any testimony that Mr. Desir shot anyone, just Mr. Johnson's
 4  observations that he saw Mr. Desir with the firearm.
 5          THE COURT:  That is admissible.
 6          MS. VIAMONTES:  And furthermore, the conversations.
 7          THE COURT:  The conversation is fine, but any
 8  conclusions are not relevant.
 9          MS. VIAMONTES:  Your Honor, there is one thing that I
10  wanted to address.  We are referring to the victims by
11  initials.  I am asking for permission that the Court reporter
12  be allowed to redact the transcript to initials.
13          THE COURT:  Any objection?
14          MR. ZACCA:  No.
15          THE COURT:  Any objection by the Defendant Rembert?
16          You may do it.  I will order the Court stenographer to
17  use initials as opposed to the legal names.
18          MS. VIAMONTES:  Your Honor, may I be excused for two
19  minutes?
20          THE COURT:  You can be excused for five minutes.
21          MR. WILCOX:  Your Honor, while it is on my mind, I see
22  people in the courtroom and I don't know whether they are
23  witnesses or not, but I will invoke the Rule.
24          THE COURT:  The Court will invoke the Rule of
25  Sequestration.
```

```
 1          If there are any witnesses other than parties and a
 2   case agent, you are instructed to exit the courtroom.  Do not
 3   discuss your testimony with anyone other than the attorneys
 4   outside the presence of any other witness, and I instruct
 5   counsel for all parties to advise your respective witnesses of
 6   the invocation of the Rule and its legal effect.
 7          MS. VIAMONTES:  Thank you.
 8          THE COURT:  Okay.
 9          MS. JOHANNES:  Your Honor, one procedural -- one happy
10   note.
11          The parties have reached stipulations on some of the
12   matters.  We haven't formally drafted them.  I wanted to put it
13   in the record.  We all agree.
14          THE COURT:  Okay.  Counsel for the respective parties,
15   listen up.  The Government is about to read stipulations into
16   the record, and I want to make sure that both parties agree.
17          MS. JOHANNES:  The formal stipulations I will do
18   tonight and we will sign.
19          We have an agreement with respect to the records of
20   AT&T, that they are authentic and admissible, Government
21   Exhibits 23 and 24.
22          The records pertaining to Krome Detention Center, jail
23   calls and any mail sent from Krome Detention Center is
24   authentic and admissible, Government's 61 through 65, as well
25   as the letter that was written, which is Government Exhibits 56
```

1    and 57, Your Honor.

2         The jail calls that were made from Broward Detention

3    Center, the main jail, there is just one, Your Honor.  Hold on

4    one moment.  That would be Government's Exhibit 66.

5         And then the 911 calls are also authentic and

6    admissible, we don't need to be calling a witness to

7    authenticate them.  That is Government's 47 and 48.

8         And last, Your Honor, the parties agreed as to the hot

9    mail e-mails, hot mail e-mails, Government Exhibit 60, and

10   those would be authentic and admissible.  And we agreed to that

11   this weekend so the United States didn't --

12        THE COURT:  Who is the subscriber on the hot mail?

13        MS. JOHANNES:  Firestarter92@hotmail.com.  I will read

14   that email, F-I-R-E starter, and that is phonetic,

15   92@hotmail.com.

16        THE COURT:  Okay.  Both defendants agree?

17        MR. ZACCA:  Judge, I want to clarify a couple of

18   things, though.

19        With regard to 23 and 24, I don't believe that those

20   subscriber phone calls relate to the defendant, so -- I think

21   those are the phone calls for C.J. and her father.

22        MS. JOHANNES:  Yes.

23        MR. ZACCA:  No objection to 23 and 24.

24        With regard to 61 through 65, Judge, those are the

25   Krome phone calls.  No objection to requiring the

1   representative from Krome to authenticate the phone calls.

2          With regard to 56 and 57, okay, that -- Judge, I

3   explained to the Government --

4          THE COURT:  We have all the jurors here.  We will

5   continue this discussion later.

6          Let's bring in the jury, please.

7          (Thereupon, the jury returns to the courtroom.)

8          THE COURT:  Counsel may be seated.

9          Good morning.

10          THE JURY:  Good morning.

11          THE COURT:  I want to commend you for being punctual.

12   It is a courtesy, to your fellow jurors, the lawyers and the

13   Court.  Keep up the good work throughout the trial.

14          When you are here on time, everybody is here on time,

15   we start on time, and we are able to complete the trial in a

16   much more expeditious and efficient manner.

17          Now, I start court every morning by asking three

18   questions of you.

19          The first question:  Have any of you discussed this

20   case or otherwise communicated with anyone regarding the case?

21          THE JURY:  No.

22          THE COURT:  I see no affirmative responses.

23          Have any of you received any information regarding the

24   case other than that which you have received here in the

25   courtroom?

1           Again, I see no affirmative responses.

2           And I might add that there was an article in both the

3   Sun Sentinel -- actually, the same article in both the Sun

4   Sentinel and the Herald this morning about this case.

5           Did anybody read that article?

6           I see no affirmative responses.

7           Don't look at it, if you take the paper.  Put it aside

8   and wait until you have a verdict and then you go back and read

9   whatever you like.

10          Lastly, have any of you formed any fixed opinions on

11  the merits of the case?

12          The record will reflect there are no affirmative

13  responses.

14          I will ask those questions every morning, and the

15  reason I do so, that gives us a stenographic record that

16  everybody is following the Court's admonition not to discuss

17  the case, no independent research, and keep an open mind.

18          So you all are doing a great job and we are ready to

19  begin.

20          The Government may call its first witness.

21          MS. JOHANNES:  Yes, Your Honor.  The United States

22  calls Ms. Lisa Hubbard, H-U-B-B-A-R-D.

23          THE COURT:  Is Lisa Hubbard on your witness list?

24          MS. JOHANNES:  Yes, she is L.D., mother of C.J.

25          THE COURT:  I see it.  Thank you.

```
 1            Ms. Hubbard, would you please step right over there to

 2   the left of the witness stand.

 3            And if you would, remain standing, and raise your

 4   right hand.

 5            LISA HUBBARD, GOVERNMENT'S WITNESS, SWORN.

 6            THE COURT:  Would you please be seated.  Please pull

 7   your chair up close to the microphone and make sure you speak

 8   into the microphone.

 9            Would you give us your name and spell your last name

10   for the record.

11            THE WITNESS:  Lisa Hubbard, H-U-B-B-A-R-D.

12            THE COURT:  Ms. Johannes, you may inquire.

13            MS. JOHANNES:  Thank you, Your Honor.

14                          DIRECT EXAMINATION

15   BY MS. JOHANNES:

16   Q.  Ma'am, good morning.

17   A.  Good morning.

18   Q.  Where are you from?

19   A.  Rutland, Vermont.

20   Q.  How long have you lived in Vermont?

21   A.  26 years.

22   Q.  Do you have a daughter by the name of C.J.?

23   A.  Yes, I do.

24   Q.  She is your younger daughter?

25   A.  Yes, she is.
```

1  Q.  How old is C.J.?

2  A.  21.

3  Q.  Was she born in Vermont?

4  A.  Yes, she was.

5  Q.  Did there come a time when you and C.J.'s father, Aaron

6  Johnson, got a divorce?

7  A.  Yes.

8  Q.  When was that, ma'am?

9  A.  1997.

10 Q.  If my math is right, C.J. would have been 7?

11 A.  Yes.

12 Q.  Who did she live with primarily after the divorce?

13 A.  Her father and I both had joint custody, but she was with

14 me most of the time.

15 Q.  Would you tell the jury what type of child C.J. was?

16 A.  C.J. was -- she is a delight, she is a wonderful girl,

17 um-m-m, easy going.  She is quiet, a quiet girl.

18 Q.  Now, did there come a time when you found out that C.J. was

19 using illegal drugs?

20 A.  Yes.

21 Q.  When did you find that out, ma'am?

22 A.  Um-m-m, probably a few years ago.

23 Q.  Now, what is your current relationship like with C.J.?

24 A.  Right now, we have a good relationship.  Um-m-m, it is

25 good.

324

```
 1  Q.  When she started using drugs, what was your relationship
 2  like then?
 3  A.  Distant.
 4  Q.  What do you mean by distant?
 5  A.  Distant.  We didn't talk as much, see each other as much.
 6  Q.  Now, in April of 2012, this last year, was C.J. in a drug
 7  program?
 8  A.  Yes.
 9  Q.  Where was that program?
10  A.  Here in Florida.
11  Q.  Who organized for her to attend that?
12  A.  Her father did.
13  Q.  Were you supportive of her coming here for that program?
14  A.  No, I wasn't.
15  Q.  Why not?
16  A.  Um-m-m, Florida just being so far away from Vermont, I
17  didn't like the idea of her being so far away.
18  Q.  And to your knowledge, had C.J. ever been to Florida?
19  A.  No -- she came -- I'm sorry, she did come one time for a
20  vacation a long time ago.
21  Q.  Had she ever lived here?
22  A.  No.
23  Q.  Now, when she was in Florida for that drug program, did you
24  two communicate?
25  A.  Yes, we did.
```

1   Q.  Was that via cell phone?

2   A.  Yes.

3   Q.  What is your cell phone number?

4   A.  802-683-6374.

5   Q.  Now, did C.J. have her own cell phone?

6   A.  Yes.

7   Q.  And how often would you say you guys spoke to each other?

8   A.  At least once a week.

9   Q.  Who would call whom?

10  A.  Either way.  I would call her or she would call me, call

11  and text each other back and forth.

12  Q.  And when she came down here for the drug program, what was

13  her disposition like, if you can remember?

14  A.  When she came in April?

15  Q.  Correct.

16  A.  She was excited to come and get better, to go to rehab.

17  Q.  Now, did there come a time when you found out that she had

18  relapsed?

19  A.  Yes.  She called me on Mother's Day and said happy Mother's

20  Day.  She had to leave the rehab because she used.

21  Q.  And she told you this?

22  A.  Yes.

23  Q.  Okay.  I am assuming you weren't very happy with that news?

24  A.  No.  No, I wasn't.

25  Q.  What did she sound like at that point, last Mother's Day?

```
 1    A.   She sounded -- she was upbeat.  She said she was working,
 2    you know, staying busy.  She was moving in with a friend.
 3    Q.   Did she tell you what type of work she was doing?
 4    A.   Restaurant work.
 5    Q.   Waitress?
 6    A.   Yes.
 7    Q.   Now, did you guys keep talking?
 8    A.   Yes, we had talked a few times after that.
 9    Q.   And --
10    A.   And then all of a sudden it stopped.  There was no more
11    phone calls, and I couldn't get ahold of her on her cell phone.
12    Q.   You talked a few more times and all of a sudden it stopped?
13    A.   Yes.  I tried to call her, text her, and I couldn't reach
14    her.
15    Q.   Okay.  It was dead silence?
16    A.   Yes.
17    Q.   Do you recall when that happened?
18    A.   When that happened, it was within a couple of weeks from
19    the Mother's Day call.
20    Q.   And was this typical of C.J. to not call you, for there to
21    be dead silence?
22    A.   No.
23    Q.   Now, what were you like at this time?  Were you worried?
24    A.   Yes.  When I hadn't heard from her, I always notice in my
25    heart that something is wrong.
```

327

1   Q.   Now, were you in touch with -- I know you guys were

2   divorced, but were you in touch with Aaron Johnson, C.J.'s

3   father, at this time?

4   A.   Yes.

5   Q.   Do you know that he was trying to get ahold of C.J.?

6   A.   Yes.

7   Q.   Do you know if he was successful?

8   A.   He was not successful.

9   Q.   Did there come a time you ultimately heard from C.J. again?

10  A.   She did, she called me one morning.  I don't have the exact

11  date.  It was towards the end of June.  She called me pretty

12  early in the morning which was very, very odd for her.  It was

13  like 7:30 and she did call me.

14  Q.   Why was that odd, 7:30?

15  A.   Too early for her.

16  Q.   She is usually sleeping?

17  A.   Yes.

18  Q.   Now, tell us about that conversation.

19  A.   Actually, it wasn't her phone number, it was a weird phone

20  number that came up.  So, not hearing from C.J. in so long, I

21  answered that phone number.  Normally, I would just ignore it,

22  but I hadn't heard from her in so long, I did answer it.  Thank

23  goodness.

24  Q.   What was her voice like?

25  A.   She was very quiet.  Her voice was very quiet and timid.

```
 1   That is all I can say, quiet.
 2   Q.   Now, I know you previously told us she was a quiet girl.
 3   A.   Yes.
 4   Q.   Was this abnormal, how she was speaking to you?
 5   A.   Yes.
 6   Q.   How long did that conversation last, ma'am?
 7   A.   It was only a few minutes long.
 8           She said --
 9           MR. ZACCA:  Objection, hearsay.
10           THE COURT:  Sustained.
11           MS. JOHANNES:  Your Honor, if I may -- I will try
12   another --
13   BY MS. JOHANNES:
14   Q.   After that conversation, what did you do?
15   A.   After my phone call with C.J.?
16   Q.   Yes.
17   A.   I called her father and told -- I called her father.
18   Q.   Why?
19   A.   Because what she said to me scared me and it sounded like
20   she needed help.  So, I called her father to come down here and
21   get her, find her.
22   Q.   Okay.  Now, what did she say that prompted you to call her
23   father?
24           MR. WILCOX:  Objection, hearsay.
25           MS. JOHANNES:  It shows why she acted the way she did
```

1     and why the family responded the way they did, the next steps.

2                 THE COURT:  Counsel, approach.

3                 (Proceedings at sidebar.)

4                 MS. JOHANNES:  It comes in one of two ways; one, an

5     excited utterance of C.J., and the other thing is to give

6     context.  The reason why the family did the next steps they did

7     and acted the way they did is because of the call they

8     received.

9                 It comes in one of three ways.

10                MR. ZACCA:  Judge, she can't possibly lay a predicate,

11    her on the other side of the phone, for presence sense or

12    excited utterance.  She wasn't there, she doesn't know what

13    C.J. just witnessed.

14                So, being on the other side of a phone call is no way

15    to lay a proper predicate to excited utterance.  It is to back

16    door in hearsay testimony, Judge.

17                Also, Judge, at this point, I would like to move that

18    one objection for the defense is an objection for all.  We

19    adopt any objection Mr. Wilcox makes on behalf of Ms. Rembert,

20    and I believe he will do the same.

21                MR. WILCOX:  That is correct.

22                MR. FERNANDEZ:  And also, what the mother has said

23    doesn't lay the predicate for excited utterance.  She said she

24    was excited on the phone --

25                THE COURT:  Let's deal with one thing at a time.

1      MR. FERNANDEZ:  How the family --

2      THE COURT:  Excuse me.  There was a request that

3  objections by one defendant be adopted by the other.

4      You join in that, Mr. Wilcox?

5      MR. WILCOX:  Yes, Your Honor.

6      THE COURT:  Unless there are specific standing issues,

7  that request is granted.

8      MR. ZACCA:  Thank you.

9      THE COURT:  All right.  What is the Government's

10  position with respect to the predicate for excited utterance

11  under 803?

12      MS. JOHANNES:  Your Honor, it doesn't have to be

13  screaming, it doesn't have to be loud.  It could be state of

14  mind.

15      It has to be something shocking, her calling her

16  mother to say something -- that she is in distress and she is

17  in a situation where she is speaking to her really rapidly.

18  She said the phone call was quick, she wanted to get off the

19  phone, she wanted to tell her everything.

20      I understand Mr. Zacca's point as to state of mind as

21  to C.J. in this case, and to tell the story why her family took

22  the next steps they did in coming to Florida abruptly, leaving

23  Vermont and coming here to get this girl, would make no sense

24  without the context of what they heard.

25      It would make no sense why they acted the way they did

1  and took the next steps they did, their state of mind in doing

2  that if you don't have the conversation and context for what

3  C.J. told them.

4          MR. WILCOX:  Your Honor.

5          THE COURT:  Yes.

6          MR. WILCOX:  Thank you, Your Honor.

7          They wouldn't have this problem if they didn't choose

8  the witnesses in this order.  If they called C.J. first, they

9  wouldn't be faced with this problem.  They have to live with

10  it.

11          THE COURT:  Let me ask this question.  Could you

12  proffer to me what Ms. Hubbard would testify as to what C.J.

13  said?

14          MS. JOHANNES:  Certainly, Your Honor.  She is going to

15  say my daughter spoke very quickly to me, she said, mom, I am

16  alive, I am calling to tell you I am being kept by a man.  I

17  don't want to be here.  I am going to try to find a way out.  I

18  want you to know I am alive.  Please do not call back this

19  number, do not call back this number.

20          The daughter hangs up the phone and she calls her

21  husband, and she gets her current husband, and stepfather.

22  That is why her ex-husband and stepfather come to Florida.  The

23  next witness we are going to call is C.J.'s father.

24          THE COURT:  All right.  Excited utterance is a

25  statement relating to a startling event or condition made while

1  the declarant was under the stress of the excitement that it

2  caused.

3       The question is, can the declaration itself be used as

4  a predicate?

5       MR. ZACCA:  I don't think it can, Judge, because in

6  the classic way to introduce that, direct examination questions

7  are asked about, okay, what just happened before that statement

8  was made, what was the state, was the person crying, was the

9  person angry, was the person bleeding.

10      There is usually a predicate showing the state of the

11 condition of the person and that way it allows the statement to

12 come in, and there is no establishment of that, just the

13 statement itself.

14      MS. JOHANNES:  Your Honor, here is the thing -- can I

15 say this?  In a realistic way, how this is going to pan out,

16 C.J. is going to be called and she is going to be able to talk

17 about this.

18      The reason the Government didn't call her first is,

19 frankly, the parents are from Vermont and they have a three

20 o'clock flight to leave.

21      THE COURT:  Ms. Hubbard already testified that it was

22 unusual for C.J. to call early in the morning.  She said that

23 this call was received at approximately 7:30 a.m.  C.J. relates

24 a condition which certainly is stressful by the nature of what

25 she said.

```
 1           I think under these circumstances, the time of the
 2   call, the tone of her voice and the declaration itself,
 3   establishes a sufficient predicate for admission under 803-2 as
 4   excited utterance.  The objection will be overruled.
 5           (Sidebar concluded.)
 6   BY MS. JOHANNES:
 7   Q.  Now, Ms. Hubbard, we just left off talking about receiving
 8   a call from your daughter, C.J.?
 9   A.  Yes.
10   Q.  And you told us what her voice was like.  It was very
11   abnormal?
12   A.  Yes, whispering type of quiet.
13   Q.  It was a brief call?
14   A.  Yes.
15   Q.  Can you tell us about that call?
16   A.  First thing she said was I -- hi, mom, I just want to let
17   you know I'm alive, and thank God.  Okay, what are you doing?
18   What are you up to?
19           And she said that she got herself into some trouble.
20   There was a man that was -- she was with, and he -- you know,
21   he had her and a couple of other girls that, you know, he keeps
22   and wouldn't let them go.  Um-m-m.
23   Q.  Ms. Hubbard, I know this is hard for you.  If you want to
24   take water, you can.  I need you to finish if you can.
25   A.  I said, C.J., what do I do?  What can I do?  She said,
```

334

1   don't do anything, I will think of something to get out of

2   this.

3   Q.  Did she say anything else in the conversation before you

4   two hung up?

5   A.  She said -- a few times within the conversation she said

6   don't ever call this cell phone number that she called me on.

7   Q.  Now, did you get to say anything to her?

8   A.  She hung up briefly.  She said, I got to go, and she hung

9   up.

10  Q.  What were you like after this phone call?

11  A.  I was freaking out.  I didn't know what to do.  I was

12  scared for her.  It sounded like she was in a lot of trouble

13  and she needed some help, so I called her father.

14  Q.  And that would be Aaron Johnson, right?

15  A.  Yes.

16  Q.  What did you call Aaron Johnson for?

17  A.  I called him to tell him that C.J. was in some trouble, she

18  needs -- you've got to go down to Florida and save her.

19  Q.  Now, after you speak to C.J.'s father, did you talk to your

20  current husband?

21  A.  I did.  I waited a couple of days to tell him about it.

22  Q.  Now, at some point, did C.J.'s father, Aaron Johnson, go to

23  Florida?

24  A.  Yes.

25  Q.  When was that?

1  A.  It was a couple of days later, two, three days later, Aaron

2  and my husband Tom came down here to Florida to find her and

3  bring her home.

4  Q.  Okay.

5        So, your husband along with Aaron, her father, came

6  here?

7  A.  Yes.

8  Q.  Do you know if they made contact with C.J. once they

9  reached Florida?

10  A.  It took a few days to find her.

11  Q.  Did they eventually find her?

12  A.  Yes.

13  Q.  When they found C.J., were you able to see her?

14  A.  When they flew back to Vermont I saw her.  She came to my

15  home.

16  Q.  Okay.  Now, without going into the conversations you had

17  with her when she came back, when she came back to Vermont, and

18  to your home, what was she like?

19  A.  Oh, she was very, very quiet, timid.  She was worn out.

20  She was battered.  She had bruises all over her body.  She was

21  sick.

22  Q.  Did you have to take her to the ER at some point?

23  A.  I took her to the emergency room, she had strep throat.

24  Q.  You said she was tired and very timid.  Did she sleep all

25  the time?

1   A.   She did, she slept all day, and she would come out of her

2   bedroom to come eat and watch some TV with us and go back and

3   go to bed, and she just stayed right by my side like a little

4   girl.

5          Everywhere I went, she went.  She didn't want to be

6   home alone.

7   Q.   Now, had you ever seen your daughter like this before?

8   A.   No, I haven't.

9   Q.   Now, you know that your daughter had used drugs

10  significantly in the past?

11  A.   Yes.

12  Q.   Even when she used drugs, had you ever seen her like this?

13  A.   No.

14  Q.   Now, you said she was also very timid, correct?

15  A.   Yes.

16  Q.   I believe you said before she was known to be quiet, right?

17  A.   Yes, she is not a loud person.  She is quiet and it is not

18  like she doesn't have friends or anything, but I mean she is

19  just a quiet person.

20  Q.   But this person you saw that came back to Vermont was

21  different?

22  A.   Yes.

23          MS. JOHANNES:  Thank you, ma'am.  I don't have any

24  further questions for you.

25          THE COURT:  Cross, Mr. Zacca.

```
 1                      CROSS EXAMINATION
 2  BY MR. ZACCA:
 3  Q.  Good morning, Mrs. Hubbard.
 4  A.  Good morning.
 5  Q.  Mrs. Hubbard, you mentioned about your daughter, Ms. C.J.,
 6  abusing drugs some years back; is that right?
 7  A.  Yes.
 8  Q.  The drugs that -- approximately when?  When you say a few
 9  years back --
10           THE COURT:  Excuse me.  Somebody has a cell phone or
11  electronic device on.
12           MR. ZACCA:  It is not me, Judge.
13           THE COURT:  It needs to be powered off if you have it.
14           THE WITNESS:  Sorry.
15           THE COURT:  All right.  Ready?
16           THE WITNESS:  Sorry about that.
17  BY MR. ZACCA:
18  Q.  No, it is quite all right, Mrs. Hubbard.
19           You stated a few years back when you mentioned that
20  your daughter was abusing drugs.  When you say a few years
21  back, how long are we talking about?
22  A.  I don't know for sure.  I couldn't tell you exactly.  I
23  just know she had a boyfriend that she was with and they used
24  drugs.  I am saying a few years because that's how long ago she
25  was with him.
```

1    Q.   That is about five years ago?

2    A.   No.  It wasn't that long ago.

3    Q.   Would you say three years ago?

4    A.   Yes.

5    Q.   You said a boyfriend.

6         Who is this boyfriend?

7    A.   His name is Nick Young.

8    Q.   And she used drugs with Nick Young; is that right?

9    A.   Yes.

10   Q.   And she used drugs with Nick Young for a prolonged period

11   of time; is that right?

12   A.   Off and on, I believe off and on.  At points they would --

13   I would say off and on.  They tried to get off them, lead a

14   normal life, and they would use drugs again.

15   Q.   She was living with Mr. Young, wasn't she?

16   A.   Yes.

17   Q.   How old was Mr. Young?

18   A.   Um-m-m, he was 18, 19.

19   Q.   And when you say off and on, it is fair to say,

20   Mrs. Hubbard, it was more often that she was abusing drugs than

21   not; is that right?

22   A.   I couldn't tell you for sure.  I am saying off and on

23   because she would go about getting a job and go to school.  I

24   know that is when she wouldn't be using drugs.

25   Q.   The type of drugs that she abused was heroin, was it not?

1  A.  I do not know for sure.

2        I think -- I don't even know for sure.  I couldn't

3  tell you.  I know that they did -- they call them 30's, they

4  are pills or something like that.

5  Q.  Did you know that she was also abusing crack cocaine?

6  A.  No, I didn't.

7  Q.  You know that now, right?

8  A.  I don't know what kind of drugs she has been -- when she

9  was here what she was using.

10  Q.  As you sit here today in front of this jury, do you know if

11  she ever abused heroin?

12  A.  Um-m-m, I was told, I was told that.

13  Q.  She would lie about her drug abuse, correct, over the

14  years?

15  A.  Yes.

16  Q.  She would hide it, right?

17  A.  Yes.

18  Q.  She entered a drug treatment program in Vermont in the

19  early part of 2012; is that right?

20  A.  She was -- she went to the hospital in Rutland.  It was

21  just like a regular hospital.  I don't recall her ever checking

22  into a rehab in Vermont.

23  Q.  She wasn't at a drug treatment center in Vermont prior to

24  her coming to Florida?

25  A.  No.  Not that I know of.

```
 1  Q.  Not that you know of?
 2  A.  No.
 3  Q.  So then, it is possible she was, you just weren't aware of
 4  it?
 5  A.  Well, I guess so.
 6          I just know that she was in the hospital.  It wasn't a
 7  rehab, though, it was a regular hospital.
 8  Q.  How many times did she, that you know of, enter a drug
 9  treatment program prior to coming to Florida?
10  A.  Zero.
11  Q.  Zero that you know of?
12  A.  That I know of.
13  Q.  You described your relationship with her prior to coming to
14  Florida as distant, did you not?  Did you say that on your
15  direct testimony?
16  A.  Prior to coming to Florida?
17  Q.  Prior to coming to Florida.
18  A.  We would hang out and talk to each other.  We, you know --
19  she -- we didn't hang out every day.
20  Q.  Obviously, you disapproved of her drug abuse, correct?
21  A.  Yes.
22  Q.  And you disapproved of her living with Mr. Young, right?
23  A.  Yes.  Any mother would.
24  Q.  Any mother would, but it was her choice to live with
25  Mr. Young, wasn't it?
```

1   A.   Yes.

2   Q.   It was her choice to abuse drugs, was it not?

3   A.   Yes.

4   Q.   She came to Florida in April 2012, right?

5   A.   Yes.

6   Q.   She went to a drug recovery center called The Bridge,

7   right?

8   A.   Yes.

9   Q.   Do you know that now or did you know that then?

10  A.   I don't understand what you mean.

11  Q.   I will rephrase the question.

12       When she came to Florida, did you know that she was

13  coming to Florida to go to a drug recovery center?

14  A.   Yes.

15  Q.   There are drug recovery centers in Vermont, are there not?

16  A.   Yes.

17  Q.   But she chose to come to Florida, right?

18  A.   Yes.

19  Q.   It was her decision to come to Florida, right?

20  A.   Yes.

21  Q.   She was kicked out of that program May 12, 2012; isn't that

22  right?

23  A.   Yes.

24  Q.   You didn't know she was kicked out when she got kicked out,

25  you later learned about it, correct?

1   A.   Correct.

2   Q.   She got kicked out because she was abusing drugs at the

3   program, right?

4   A.   Yes, that is what she told me.

5   Q.   No one forced her to take any drugs.  She was abusing

6   drugs, right?

7   A.   Yes.

8   Q.   Did she tell you what type of drugs she was using?

9   A.   No.

10  Q.   Prior to April 2012, how many times did you catch her lying

11  about her drug abuse?

12  A.   It was -- not that I ever caught her lying.  I don't

13  understand the question, really.  I am not sure how to really

14  answer it.

15  Q.   Well, you testified earlier that she would lie about

16  abusing drugs, correct, she would deny it?

17  A.   Right.

18  Q.   All right.  Her denying the use of drugs when she, in fact,

19  is abusing drugs is a lie, is it not?

20  A.   Yes.

21  Q.   How many times did she deny it, deny using drugs in the

22  years leading up to 2012, when, in fact, you learned that she

23  was using drugs?

24  A.   I really just don't know how to answer that because I don't

25  understand the question.  Because it is not like we had -- it

```
 1   is not like it was ever determined, you know, are you lying to
 2   me, are you not lying to me, are you using, not using.
 3   Q.  But you knew she was lying?
 4   A.  I -- if I didn't ask her the question, then she wasn't
 5   lying to me.
 6   Q.  When she was kicked out of the drug program, I believe you
 7   said she called you on Mother's Day; is that right?
 8   A.  Yes.
 9   Q.  On Mother's Day when she called you, what did she
10   specifically tell you that she was doing to earn money down in
11   Florida?
12   A.  She said she was staying with a friend and they worked at a
13   restaurant.  She was hostessing, I think, tables.
14   Q.  That is what she told you?
15   A.  Yes.
16   Q.  At that point, knowing that she was a drug addict and that
17   she got kicked out of the program -- let me ask you this:  I
18   think you testified earlier you know she was kicked out of the
19   program because she was abusing drugs, correct?
20   A.  That is what she told me.
21   Q.  So, as a concerned mother, you didn't want her living on
22   her own abusing drugs in Florida, right?
23   A.  No.  I wouldn't want that.
24   Q.  Did you tell her to come back home to Vermont, come back
25   home?
```

344

```
 1    A.   No.
 2    Q.   Weren't you concerned that after being kicked out of the
 3    drug program, that she would continue abusing drugs, living on
 4    her own in Florida?
 5    A.   Ask me that again.
 6    Q.   When she told you she was kicked out of the program because
 7    she was abusing drugs, right --
 8    A.   Right.
 9    Q.   -- were you concerned as a mother that she would continue
10    to abuse drugs?
11    A.   Yes.
12    Q.   Did you tell her to come back home to Vermont instead of
13    staying in Florida living on her own?
14    A.   No, I didn't.
15    Q.   But that was a concern of yours, right?
16    A.   Yes.
17    Q.   She chose to stay in Florida, right?
18    A.   Yes.
19    Q.   She told you she was working at a restaurant, right?
20    A.   Yes.
21    Q.   Did she ever tell you that she was prostituting herself for
22    money to get drugs?
23    A.   No, she didn't ever tell me that.
24    Q.   It would be something embarrassing to say; would you agree?
25    A.   Yes.
```

```
 1   Q.  As you sit here now, your expression when I asked you that
 2   question, you had some surprise in your expression.  Is this
 3   the first time ever hearing about that?
 4   A.  No.  No.  Her prostituting?
 5   Q.  Herself.
 6   A.  No, this is not the first time I have heard that.
 7   Q.  Did she ever tell you that she willingly prostituted
 8   herself for money to buy drugs?
 9   A.  No.
10   Q.  She has never told you that?
11   A.  She never said, I prostituted to get money for drugs.
12   Q.  Did she ever tell that you she prostituted herself in any
13   way?
14          MS. JOHANNES:  Objection, Your Honor.  This is all
15   hearsay.
16          THE COURT:  Sustained.
17   BY MR. ZACCA:
18   Q.  When she came back to Vermont after -- you testified that
19   your ex-husband went down and brought her back to Vermont,
20   right?
21   A.  Yes.
22   Q.  And that was in July of 2012?
23   A.  The end of June.
24   Q.  End of June?
25   A.  Yes, yes.
```

```
 1   Q.   Okay.

 2             Has she remained in Vermont since coming back in June

 3   2012?

 4   A.   Yes.

 5   Q.   She continues to abuse drugs, does she not?

 6   A.   She has.

 7   Q.   She has?

 8   A.   She has.

 9   Q.   And she continues to abuse drugs as recently as last month,

10   correct?

11   A.   Yes.

12   Q.   And again, no one is forcing her to abuse drugs, that is

13   her choice, is it not?

14   A.   That would be her choice.

15             MR. ZACCA:   Thank you.   No further questions.

16             THE COURT:   Mr. Wilcox.

17             MR. WILCOX:   Thank you, Judge.   Give me a moment, Your

18   Honor.

19             THE COURT:   Yes, sir.

20                        CROSS EXAMINATION

21   BY MR. WILCOX:

22   Q.   How are you doing, ma'am?

23   A.   Okay, thank you.

24   Q.   Just so I am clear, when you-- C.J., that is who we are

25   talking about, C.J.?
```

1   A.   Yes.

2   Q.   She is 20 years old now?

3   A.   21.

4   Q.   21 years old now.  When she called you in this hushed

5   voice, did she tell you about being kept by anyone else other

6   than a man?

7   A.   No.

8   Q.   She only mentioned she was being kept by one person?

9   A.   Yes.

10   Q.   Did she mention anything about a female that was involved

11   in keeping her when she first called you that day?

12   A.   No.  No.

13   Q.   I want to ask you, is it correct you are from Rutland,

14   Vermont?

15   A.   Yes.

16   Q.   Is that a county or a city?

17   A.   City.

18   Q.   Okay.  What is the temperature like there?

19   A.   It was warm.  It recently got cold again.

20   Q.   About 43 degrees?

21   A.   Yes.

22   Q.   I just want to ask you about C.J.'s childhood.

23        Normal childhood, would you say?

24   A.   Yes.

25   Q.   You indicated on direct examination that you and her

1  father -- you and her father, Aaron Johnson, divorced when she

2  was about 7?

3  A.  Yes.

4  Q.  Was that a traumatic experience or was that pretty much --

5  A.  I don't think it was traumatic.

6  Q.  Good.

7  A.  Everything seemed pretty normal.

8  Q.  She didn't react abnormally to you and your husband then?

9  A.  No.

10  Q.  Okay.  Did she attend school?

11  A.  She did.

12  Q.  Did she graduate high school?

13  A.  No, she hasn't.

14  Q.  What was the last grade she completed?

15  A.  11th grade.

16  Q.  Okay.  Does she have any activity?  Does she play softball

17  or lacrosse?

18  A.  Growing up she did sports.

19  Q.  Okay.

20       How about anything else, take music lessons, anything

21  like that?

22  A.  She used to take dance lessons.

23  Q.  How long did she do that?

24  A.  They did that, her and her sisters, for, I don't know, like

25  three, four years.

1    Q.  Did she get fairly good at it?

2    A.  Yes.

3    Q.  What type of dance?

4    A.  She liked jazz.

5    Q.  Do you know what prompted her to drop out of high school in

6    11th grade?

7    A.  I would say her first boyfriend.  Her first boyfriend just

8    was not a very good boyfriend.

9    Q.  I am not following you.

10   A.  Maybe like rephrase the question.

11   Q.  I am just trying to determine, you know, what caused her to

12   quit.

13           Do you have any insight into why she would drop out of

14   high school in the 11th grade?

15   A.  I don't know how to answer it.

16           MS. JOHANNES:  Objection, Your Honor.  I think it

17   calls for speculation.

18           MR. WILCOX:  She is her mother.

19           THE WITNESS:  She --

20           THE COURT:  Hold on, ma'am, there is an objection.

21           THE WITNESS:  Okay.

22           THE COURT:  If you know.  If you know, you can answer

23   it.  If you don't know, say you don't know.

24           THE WITNESS:  I don't know.

25           MR. WILCOX:  Okay.

```
 1   BY MR. WILCOX:
 2   Q.  But you know she had a boyfriend at the time she dropped
 3   out.  Was it the same gentleman, Mr. Young?
 4   A.  No.
 5   Q.  Okay, another boyfriend.
 6           Do you know if she started using drugs about that time
 7   she dropped out of high school?
 8   A.  Are you asking me?
 9   Q.  Yes.  I am asking you, do you know if her drug use started
10   approximately the same time she dropped out of high school?
11   A.  Approximately.  No, I don't know.
12   Q.  You don't know.  And your best guess is that it started a
13   couple of years ago; is that right?
14   A.  Her using drugs?
15   Q.  Yes.
16   A.  It has been a few years.
17   Q.  You say a few --
18   A.  Two, three years.
19   Q.  Two, three years.  So we are talking about around 2010; is
20   that right?  She would have been around 18 years old?
21   A.  Yes.
22   Q.  When she dropped out of high school, was she working?
23   A.  She has had jobs on and off.  I don't think she was working
24   at that time, no.
25   Q.  What type of jobs?
```

1   A.   She has worked at Burger King, McDonalds.   McDonalds was

2   her first job.

3   Q.   Any clerical work?

4   A.   No.

5   Q.   She never did any secretarial work, answering phones,

6   anything like that?

7   A.   No.

8   Q.   No type?

9   A.   No.

10   Q.   Did she express any interest of obtaining some type of

11   vocational license or anything after she dropped out of high

12   school?

13   A.   What do you mean?

14   Q.   Did she say, I want to go be a dental hygienist?

15   A.   Oh, okay.   Yes, she talked about wanting to go to

16   cosmetology school.

17   Q.   Beauty school?

18   A.   Yes.

19   Q.   Did she ever follow up on it?

20   A.   No, she didn't.

21   Q.   As far as you know, she doesn't have any skills other than

22   fast food work and restaurant work in general?

23   A.   Correct.

24   Q.   I want to ask you about -- you said she was in a hospital,

25   but you weren't sure whether or not that hospital was to help

1   her with her drug problem?

2   A.   It wasn't a rehab.  It was just a -- I don't know what it

3   was for -- now what it was for.  It is for people that are

4   having a hard time and she stayed there for about a week or so.

5   Q.   A hard time with what, ma'am?  People generally go to the

6   hospital because you are sick.  I am trying to find out how she

7   was sick.

8   A.   Her and her boyfriend had a falling out and she checked

9   herself into the hospital.

10   Q.   You don't know what was the ailment she was trying to

11   resolve?

12   A.   They got into some kind of fight, and she hurt herself

13   and --

14          MS. JOHANNES:  Objection, Your Honor.  I think this is

15   all hearsay.

16          THE COURT:  It would have to be hearsay unless she

17   witnessed it herself.

18          Did you witness this yourself, ma'am?

19          THE WITNESS:  I went to visit her in the hospital.

20          THE COURT:  But the events that led to the

21   hospitalization, you didn't witness that?

22          THE WITNESS:  No, I didn't witness them.

23          THE COURT:  Sustained.

24   BY MR. WILCOX:

25   Q.   That hospital stay, can you tell us when that was, what

1  time frame?  Was it 2012?

2  A.  No.  It was not 2012.

3  Q.  Excuse me?

4  A.  I said it was not 2012.

5  Q.  Was it 2011?

6  A.  I don't know the exact date.

7  Q.  Now, I want to take you to the time around April 16, 2012,

8  when she was in the Bridge program.  Does that date sound right

9  to you?

10  A.  Yes.

11  Q.  Her father paid for this; is that right?

12  A.  Yes.

13  Q.  Her father encouraged this?

14  A.  Yes.

15  Q.  Okay.  And you were opposed to it?

16  A.  Yes.

17  Q.  And you were opposed to it because you thought she would be

18  too far away?

19  A.  Yes.

20  Q.  But you understood that the purpose of her going through

21  this program in Boca Raton was to kick the habit?

22  A.  Yes.

23  Q.  Okay.  And you understood that she used pills -- I think

24  you called them 30's?

25  A.  That is what I have heard.  That is what they called them.

```
1   Q.  So, did she abuse alcohol as well?

2   A.  No.

3   Q.  No?

4   A.  No.

5   Q.  And you don't know whether she used cocaine?

6   A.  I don't know.

7   Q.  You need to speak into the microphone.

8   A.  I don't know.

9   Q.  And you are not sure what specific drug she used?

10  A.  No.  I don't.

11  Q.  Did you ever see her high?

12  A.  No.  Not that I know of.

13  Q.  She left.  Now, do you know, when she was at The Bridge,

14  whether or not she was in contact with her father?

15  A.  I do not.  I don't know.

16  Q.  But she did call you on Mother's Day?

17  A.  Yes.

18  Q.  2012?

19  A.  Yes.

20  Q.  And she told you that she had gotten removed from The

21  Bridge?

22  A.  Yes.

23  Q.  Okay.  Did you encourage her to come home at that point or

24  no?

25  A.  No, I didn't.
```

```
 1   Q.  And she told you she was working at a restaurant with a
 2   friend?
 3   A.  Yes.
 4   Q.  Did she indicate whether it was a male friend or female
 5   friend?
 6   A.  She didn't say.
 7           MS. JOHANNES:  Objection, Your Honor.  Again, this is
 8   all hearsay.
 9           THE COURT:  Sustained.
10   BY MR. WILCOX:
11   Q.  And after Mother's Day, the next phone call you got was the
12   hushed phone call; is that right?
13   A.  No.  I heard from her a few times inbetween that time.
14   Q.  And, so, this would be -- one second -- between the middle
15   of May and the middle of June that you heard from her a couple
16   of times, 2012?
17   A.  After she left the rehab, I heard from her a few times
18   within a couple of weeks.
19   Q.  I see.  And there is nothing about those calls that alarmed
20   you?
21   A.  No.
22   Q.  As far as you could tell from those calls, everything
23   seemed to be going okay?
24   A.  Yes.
25   Q.  There was nothing from those calls that would indicate to
```

1  you that she was abusing drugs?

2  A.  No.

3  Q.  And then there was -- there was a phone call on Mother's

4  Day and two more phone calls inbetween that and the hushed

5  phone call from a number you didn't recognize?

6  A.  Yes.

7  Q.  Okay.  During that hushed call, she told you that a man was

8  keeping her?

9  A.  Yes.

10  Q.  Okay.  That is the only thing she said, right?

11  A.  No.  She said a man was keeping her and he had a couple of

12  other girls, too.   Also, she --

13  Q.  Go ahead.

14  A.  She just mentioned don't ever call this phone number, I am

15  going to think of something to get out of here, to get away.

16  Q.  When she said a man was keeping her, what did you take that

17  to mean?

18  A.  I -- somebody is holding her against her will.  Keeping --

19  Q.  But -- go ahead.

20  A.  I'm sorry.  At that time, it sounded like she was in some

21  real trouble, probably with like prostitution.

22  Q.  Okay.

23       Now, going back to when she was in school, did she

24  have any mental defects that you are aware of?

25  A.  No.

```
 1   Q.  Was she ever diagnosed with any other psychological
 2   condition?
 3            MS. JOHANNES:  Objection, Your Honor, relevance.
 4            THE COURT:  Overruled.
 5   BY MR. WILCOX:
 6   Q.  Has she ever been sent to a psychologist for anything?
 7   A.  She did counseling growing up, family counseling.
 8   Q.  As --
 9   A.  We all did as a family.
10   Q.  I see.  Was she designated with some type of psychological
11   condition that would impair her judgment?
12   A.  No.
13   Q.  Did she have a below average IQ or anything?
14   A.  No.
15   Q.  As far as you know, she was capable of exercising rational
16   decisions, right?
17   A.  She could.
18   Q.  Okay.
19            Except when she was using drugs?
20   A.  Right.
21   Q.  Now, you indicated that after you received the hushed phone
22   call, or you testified that after you received the hushed phone
23   call, that you contacted your ex-husband and asked him to go
24   get her?
25   A.  Yes.
```

```
 1   Q.   And a couple of days later you contacted your current
 2   husband --
 3   A.   I told my current husband what was going on.
 4   Q.   And he went with him?
 5   A.   Yes.
 6   Q.   So, after you received the hushed phone call, a couple of
 7   days went by before anyone wet to get her; is that right?
 8   A.   Yes.
 9   Q.   How did they go, drove?
10   A.   They flew.
11   Q.   Flew, okay.
12           Eventually she was brought back?
13   A.   Yes.
14   Q.   To Vermont?
15   A.   Yes.
16   Q.   And that would be somewhere around the end of June, June
17   29th, July 1st.  Is it somewhere around there?
18   A.   Yes.
19   Q.   Okay.  Is she living with you now?
20   A.   No.
21   Q.   Where does she live now?
22   A.   Before she came to Florida just now, she was living in
23   Burlington, Vermont.
24   Q.   Burlington?
25   A.   Vermont.
```

1  Q.  In an apartment?

2  A.  Yes.

3  Q.  Is she working now?

4  A.  No.

5  Q.  How is she paying her rent?

6  A.  Um-m-m, she was living in a shelter, a woman's shelter type

7  of home in Burlington.

8  Q.  As far as you know, she is still using drugs?

9  A.  No.  I don't know.  I don't.

10  Q.  But she's used drugs since she has been back to Vermont; do

11  you know?

12  A.  Yes.

13  Q.  Has she been employed since she come back to Vermont from

14  Florida?

15  A.  No.

16  Q.  She hasn't had a job?

17  A.  Oh, she worked at a coffee cafe' for a little while.

18  Q.  About how long?

19  A.  Not very long.  A couple of weeks.

20  Q.  So, from -- you indicated that she got back around July 1,

21  2012, or somewhere between June 29th and July 1, 2012, and she

22  has only worked -- this is almost a year later; is that right?

23  Let's say 10 months later; is that right?

24  A.  Yes.

25  Q.  Okay.

```
 1            From the day she got back to Vermont to ten months
 2  later you say she only worked for a couple of weeks?
 3  A.  Yes.
 4            MS. JOHANNES:  Objection, Your Honor.  I don't know
 5  the relevance.
 6            THE COURT:  Sustained.  Sustained.
 7            MR. WILCOX:  Judge -- one moment, Your Honor.
 8            No further questions, Your Honor.
 9            THE COURT:  Any redirect?
10            MS. JOHANNES:  Yes, Your Honor.
11                      REDIRECT EXAMINATION
12  BY MS. JOHANNES:
13  Q.  Ms. Hubbard, now, dealing with a child with an addiction is
14  not an easy thing, is it, ma'am?
15  A.  No, it is not.
16  Q.  Now, you were asked by both defense counsel about your
17  knowledge of what type of drugs your daughter C.J. used.  Do
18  you recall that?
19  A.  Yes.
20  Q.  Now, you guys didn't have every-day conversations about
21  drugs, did you?
22  A.  No, we didn't.
23  Q.  Is it fair to say you didn't know all the details?
24            MR. WILCOX:  Objection to leading.
25            MR. ZACCA:  Objection to leading.
```

```
 1           THE COURT:  Sustained.
 2  BY MS. JOHANNES:
 3  Q.  Did you know all of the details?
 4  A.  No, I didn't.
 5  Q.  Did you want to know all of the details?
 6  A.  No, I didn't.
 7  Q.  And you were asked by Mr. Zacca whether or not C.J. lied to
 8  you about her drug use.  Do you remember that?
 9  A.  Yes.
10  Q.  It is fair to say she did?
11  A.  Yes.
12  Q.  Now, both Mr. Zacca and Mr. Wilcox asked you about if you
13  had ever heard of C.J. in the context of prostitution.  Do you
14  remember Mr. Zacca talking to you about it?
15  A.  Yes.
16  Q.  You said, quote, "not the first time."  Do you remember?
17  A.  I'm not sure what you are saying.
18  Q.  He asked you why you looked so shocked when he said the
19  word "prostitution," and you said it is not the first time I am
20  hearing that, correct?
21  A.  The word prostitution, you don't want to refer that to your
22  daughter.
23  Q.  You have heard it in the context of this case, ma'am?
24  A.  Yes.
25  Q.  And with respect to the situation we have here?
```

```
 1  A.  Yes.
 2  Q.  Now, the call that you received from your daughter in June
 3  I am assuming was very difficult?
 4  A.  Yes, it was.
 5  Q.  It seemed that your daughter was speaking --
 6          MR. WILCOX:  Objection to leading, Your Honor.
 7          THE COURT:  Sounds like it is a leading question.
 8          MS. JOHANNES:  I will rephrase, Judge, not a problem.
 9  BY MS. JOHANNES:
10  Q.  Now, you said C.J. spoke as if she was very timid?
11  A.  Yes.
12  Q.  And I believe you expressed to Mr. Zacca that you were
13  worried after that call?
14          MR. WILCOX:  Objection, leading.
15          THE COURT:  Sustained.
16  BY MS. JOHANNES:
17  Q.  Did you call your ex-husband immediately after?
18  A.  Yes, I did.
19  Q.  Do you know why it took a few days for him to get down to
20  Florida?
21  A.  He was trying to find her.
22  Q.  So, things were being done in Vermont?
23  A.  Yes.
24  Q.  Now, ma'am, Mr. Wilcox asked you about the call you had
25  with C.J. prior to your husband and ex-husband coming to South
```

1  Florida, and I believe you said that you thought she was in

2  some trouble with prostitution.

3          Is that what you said to Mr. Wilcox?

4  A.  Yes.

5  Q.  Why did you think that?

6  A.  Because when somebody -- a man is holding you against your

7  will, and she says she is in some trouble and she is going to

8  try to get away, that is what I thought.

9  Q.  Did the C.J. you know sound like she wanted to be there?

10 A.  No.

11         MS. JOHANNES:  Thank you, ma'am, no further questions.

12         THE COURT:  Thank you, Ms. Hubbard, you may step down.

13         Folks, we will take a ten-minute break now and we will

14 take another ten-minute break later in the morning to give you

15 an idea of what the schedule is like, and if you recall, we

16 will break for lunch at 12:30.

17         We will take a ten-minute break now.  Remember, don't

18 discuss the case, and continue to keep an open mind.

19         (Thereupon, the jury leaves the courtroom.)

20         MS. JOHANNES:  Your Honor, the Government would ask if

21 she could be permanently excused, if that is okay.

22         THE COURT:  Anybody intend to call Ms. Hubbard?

23         Ma'am, you are excused.

24         We will be in recess for ten minutes.

25         (Thereupon, a short recess was taken.).

```
 1              (Thereupon, trial reconvened after recess.)
 2              THE COURT:  All right.  The record will reflect that
 3   both defendants are present represented by counsel.
 4              Let's bring in the jury.
 5              (Thereupon, the jury returns to the courtroom.)
 6              THE COURT:  Folks, you all can be seated.
 7              The Government, Ms. Viamontes, you may call your next
 8   witness.
 9              MS. VIAMONTES:  Thank you, Your Honor.
10              At this time the United States of America calls Aaron
11   Johnson.
12              THE COURT:  Mr. Johnson, would you please remain
13   standing and raise your right hand.
14              AARON JOHNSON, GOVERNMENT'S WITNESS, SWORN.
15              THE COURT:  Would you please be seated.
16              Please pull your chair close to the microphone.  If
17   you need to adjust the microphone, please do so.
18              Please give us your name and spell your last name for
19   the record.
20              THE WITNESS:  Aaron Johnson, J-O-H-N-S-O-N.
21              THE COURT:  All right.  Ms. Viamontes, you may
22   inquire.
23              MS. VIAMONTES:  Thank you, Your Honor.
24                            DIRECT EXAMINATION
25   BY MS. VIAMONTES:
```

1   Q.  Good morning, Mr. Johnson.

2   A.  Good morning.

3   Q.  Would you tell the members of the jury where you are from?

4   A.  Rutland, Vermont.

5   Q.  How long have you lived in Vermont?

6   A.  All my life, except for the military.

7   Q.  What do you do?

8   A.  I work for Telecom Communications.

9   Q.  Do you have children?

10  A.  I have three children.

11  Q.  What are their names?

12  A.  Amanda, Danielle and C.J.

13  Q.  You mentioned C.J.  How old is C.J.?

14  A.  She is 21 now.

15  Q.  Tell us what kind of child C.J. was.

16  A.  She was kind of shy, I guess, liked to have fun, laugh a

17  lot.

18  Q.  Do you and C.J. have a good relationship?

19  A.  Yeah, we do.  We have been pretty close.

20  Q.  You mentioned that you were in the military.  Could you

21  tell us about that?

22  A.  Um-m-m, yes, I was in the Signal Company Special Forces

23  Group, Fort Lewis, Washington.

24  Q.  How long were you in the military?

25  A.  Six years total.

366

1   Q.   What branch?

2   A.   U.S. Army and then National Guard.

3   Q.   Did there come a time that you and C.J. decided that she

4   should come to Florida for drug rehab?

5   A.   Yes.  She had just gotten out of a rehab facility in

6   Vermont and they don't have any, like, halfway houses per se in

7   Vermont and people suggested to come down to Florida, and that

8   is what she chose, and I helped her come down here.

9   Q.   Tell us a little bit about Rutland.  Is it a small town?

10  A.   It is a large town in Vermont, but in comparison, it is a

11  small town.

12  Q.   Compared to Fort Lauderdale, Florida, it is a small town?

13  A.   Yes.

14  Q.   Mr. Johnson, would you tell us your cell phone number?

15  A.   802-747-8272.

16  Q.   And can you tell us your home phone?

17  A.   802-333-4990.

18  Q.   When C.J. came to Florida, where was she going?

19  A.   Um-m-m, it was -- I can't remember the name of the place.

20  The Bridges in the Boca Raton area.

21  Q.   And what was the purpose of her going to The Bridge in Boca

22  Raton?

23  A.   To maintain sobriety and get a job and potentially go back

24  to school and finish her high school diploma.

25  Q.   Did you discuss those goals with C.J.?

1   A.   Yes, we talked about that quite frequently.

2   Q.   While C.J. was at The Bridge, would you stay in contact

3   with her via the phone?

4   A.   Yes.

5   Q.   Do you remember speaking to her on Father's Day last year?

6   A.   Um-m-m, actually I don't specifically remember that.

7   Q.   Did there come a time that you stopped hearing from C.J.?

8   A.   Yes.  I actually had come down to Florida and visited her,

9   and shortly thereafter she stopped calling.

10   Q.   When did you come to Florida to visit C.J.?  How long had

11   she been in Florida?

12   A.   I believe a month.  I believe a little over a month.  I

13   don't know if I saw her twice.  I know I came down one time.

14   Q.   And when you saw C.J. how was she doing?

15   A.   She was doing well.  She showed me the apartment and

16   restaurant she was working at.

17   Q.   And what type of work was she doing at the restaurant?

18   A.   Busing tables.

19   Q.   After you visited C.J., did you return back to Vermont?

20   A.   Not right away.  We were visiting my girlfriend's son as

21   well and granddaughter.

22   Q.   Eventually, you went back to Vermont?

23   A.   Yes, correct.

24   Q.   After awhile, did the phone calls with C.J. cease or stop?

25   A.   Yes, they just stopped.

1   Q.   Did that worry you?

2   A.   Yes.

3   Q.   At some point, did you receive a call from C.J. from a

4   jail?

5   A.   I didn't personally get the call, but my girlfriend -- I

6   don't know if she picked up the phone or the answer machine or

7   something.  I think she did answer and talked to her.

8   Q.   Did you learn whether C.J. was trying to reach you?

9   A.   Yes.

10  Q.   What did you do after you learned that C.J. was in jail and

11  needed your assistance?

12  A.   Well, I was calling the jail and police department and

13  trying to find out any information about what had happened and

14  what was going on.

15  Q.   Were you able to locate her initially?

16  A.   It took some doing before I finally got ahold of her.

17  Actually, I think she was out by the time she called.  A friend

18  of hers had bailed her out.

19  Q.   Did there come a time that your ex-wife called you and

20  informed you that C.J. was in trouble and you needed to come to

21  Florida?

22  A.   Yes.  I was in the process of trying to find out what was

23  going on, and my ex-wife had received a phone call of some sort

24  and said bad things were happening, she was being beat up and

25  go to Florida to rescue her.

1  Q.  Once you got the phone call from your ex-wife, what did you

2  do?

3  A.  I got in touch with an officer at the Broward County

4  Sheriff Department and located her and had an idea where she

5  was arrested, and I told my ex-wife's now husband, and we

6  booked airfare and we headed right down.

7  Q.  Who did you believe C.J. was with when you first initiated

8  this trip to Florida?

9  A.  Um-m-m, actually from the phone number she called from, I

10  traced it, and it was registered to a John Paul from Miami.

11  Q.  How did you trace that phone number?

12  A.  Via the internet.

13  Q.  So, you thought you were looking for somebody named John

14  Paul?

15  A.  Correct.

16  Q.  You said you booked a flight to Florida; is that true?

17  A.  Yes.

18  Q.  Who did you come to Florida with?

19  A.  Tom Hubbard.

20  Q.  Did you take the time in booking the flight and making your

21  arrangements?

22  A.  No.

23  Q.  Why not?

24  A.  I figured I had to get here right away.

25  Q.  Did you get her as fast as you could?

1    A.   Yes.

2    Q.   What did you do when you got to Florida?

3    A.   On the trip down I got a phone call saying she was in the

4    hospital --

5              MR. ZACCA:   Objection, hearsay.

6              THE COURT:   Sustained.

7    BY MS. VIAMONTES:

8    Q.   Did you learn of the first place you could go look for C.J.

9    once you arrived?

10             MR. ZACCA:   Objection, calls for hearsay, Judge.

11             THE COURT:   Sustained.

12   BY MS. VIAMONTES:

13   Q.   Once you arrived in Florida, where did you go looking for

14   C.J.?

15   A.   At the hospital, a Fort Lauderdale hospital.  I don't

16   remember the name.  There were quite a few hospitals.

17   Q.   What happened when you went to the hospital?

18   A.   At this particular hospital I had to check in, photograph,

19   whatever, ID card, and we went up to the receptionist and asked

20   if there was a C.J. there, and they said there was.  They gave

21   us the room number, and we went there and it wasn't my C.J.  We

22   went back to the receptionist and talked with her again, and

23   she found that C.J. had been there and was released.

24             There was a police officer there from the Hollywood

25   Police Department, and we talked with him and he called the

1  barracks, whatever, and finally we ended up leaving there and

2  going to the Hollywood Police Department and talked with some

3  officers there.

4  Q.  When you went to the police department, did you tell the

5  police officers what your concerns were?

6  A.  Yeah.  And they were a little skeptical at first of what we

7  were trying to do, and then they ended up getting the arrest

8  records, whatever, and they came out with an ID, a mug shot of

9  John Paul, whoever he was, and we had a picture of C.J.

10        Then they were trying to get ahold of the arresting

11  officer and she was fairly new and she didn't come on until the

12  next day.

13  Q.  Okay.

14        Once you went to the police department and the police

15  officers assisted you doing the research, did you learn where

16  you could go find C.J.?

17  A.  Yes.

18  Q.  Okay.

19        Do you recall where that was, what city?

20  A.  I think it was still in Hollywood.

21  Q.  So you are in Hollywood, Florida, and what type of location

22  did you go to?

23  A.  It was a hotel.

24  Q.  Do you remember the name of the hotel?

25  A.  Town something.  I really can't --

1  Q.  Town was in the title?

2  A.  Yes, something like that.

3  Q.  Once you arrived at the motel that had --

4  A.  Beach and Town.

5  Q.  Beach and Town Motel?

6  A.  Yes.

7  Q.  Once you arrived at the Beach and Town, what did you do?

8  A.  We drove up and down the road to check out what kind of

9  surroundings we had, trying to figure out what we are going to

10  do, if we are going to pull into the hotel.  We tried to see if

11  we could see C.J.  If she were out and about we were going to

12  grab her and go.

13        After a couple of trips up and down, we pulled into a

14  parking lot right across the street from the hotel so we could

15  see down the parking lot, the entrance.

16  Q.  You are saying "we."  Who were you with?

17  A.  Tom Hubbard.

18  Q.  That is your exwife's husband?

19  A.  Correct.

20  Q.  You are driving up and down and do you see C.J.?

21  A.  No.

22  Q.  Did you call the phone number that C.J. had used to reach

23  out to her mother initially when you were driving up and down?

24  A.  No.  I was told not to call that number --

25        MR. ZACCA:  Objection, hearsay, what he was told.

```
 1            THE COURT:  Sustained.
 2   BY MS. VIAMONTES:
 3   Q.  Did you call the number?
 4   A.  No.
 5   Q.  Without telling us what you were told, why didn't you call
 6   the number?
 7   A.  I was afraid that C.J. would be abused in some way.
 8   Q.  At some point, do you just park your car and begin to do
 9   surveillance?
10   A.  Yes.
11   Q.  Describe what you did.
12   A.  We pulled into the parking lot and basically it wasn't much
13   of a surveillance, we were not incognito.  We were out in the
14   open.  We sat there for a little while and two black guys came
15   out on the side of the road way down, leaning against the
16   hedges, and they kept staring at us.
17            People were passing by here and there, and then after
18   a little while, the guy, John Paul, comes -- Tom saw him.  I
19   was looking to the left.  Tom had seen him come out somewhere.
20   I looked, and he crosses the road into the light, into the
21   parking lot of the hotel, and reaches behind his back and pulls
22   out a pistol and goes out behind the parked cars and
23   disappeared.
24   Q.  You said this person that you believed was named John Paul
25   reached out behind his back?
```

374

1   A.   Yes.

2   Q.   Can you tell where he was reaching to?

3   A.   Right in the small of his back, in the belt line.

4   Q.   Are you familiar with pistols?

5   A.   I am.

6   Q.   And describe what that pistol looked like.

7   A.   It appeared to be an automatic pistol, I don't know what

8   caliber it is, too far away to see, semiautomatic.

9   Q.   What color was it?

10  A.   Black.

11  Q.   When you saw that person you knew as John Paul reach and

12  pull the pistol out of the small of his back, did he come

13  toward you or where did he go?

14  A.   No, he went in back of the hotel.

15  Q.   Shortly after you saw that man reach for a pistol and go to

16  the back of the hotel, did you see police officers respond?

17  A.   Yes.  A little while later, this other black guy walks by,

18  and he did a hand signal and everybody started moving.  We said

19  it was getting uncomfortable and we were going to get out of

20  there.  We pulled out and a line of police officers went down

21  the alleyway.

22  Q.   The person you refer to as John Paul, do you see him in the

23  courtroom today?

24  A.   Yes.

25  Q.   Would you point him out and mention an article of clothing

1  he is wearing?  Point and mention what he is wearing.

2  A.  A black coat.

3       MS. VIAMONTES:  May the record reflect the witness

4  positively identified the Defendant Mackenley Desir?

5       THE COURT:  The record will so reflect.

6  BY MS. VIAMONTES:

7  Q.  Once the commotion was over with, the police responding,

8  what did you do to try to get ahold of C.J. or rescue C.J.?

9  A.  Could you repeat that?

10 Q.  Yes.  You mentioned police responded and you saw the

11 defendant run to an alleyway.  When that commotion was over,

12 what did you do to try to rescue C.J.?

13 A.  The next day, we went back to the police department and we

14 got ahold of the arresting officers, and we met them down by

15 the -- there is a store down the street from this Beach and

16 Town, and there was three officers.  We met with them and went

17 back into the hotel and started pressing the people, you know,

18 if they knew C.J., showed the picture, and they kept pointing

19 to the room upstairs.

20      I was emphatic, no, out back, something is out back.

21 Q.  Why did you think it was out back?  You thought C.J. was

22 being held out back?

23 A.  I seem to remember seeing him walk out back.  I thought

24 that is where it was at.

25 Q.  The hotel staff pointed to the top room?

1   A.   Yes.

2   Q.   Did you leave any notes for Mackenley Desir, the defendant?

3   A.   Yes, I did.

4   Q.   Could you please tell the members of the jury what sort of

5   notes you left?

6   A.   I left my phone number to call me.  I don't remember

7   exactly what I said, it may not have been very nice.

8   Q.   You kind of chuckled when I asked you about the notes.  Why

9   are you chuckling about that?

10   A.   I was pretty upset, angry.

11   Q.   All right.  So you say the notes weren't too nice, were

12   they?

13   A.   I don't believe.

14   Q.   Do you recall where you left the notes?

15   A.   I left them on the door of a room out back that we found.

16   Knocking on the door, this one lady said she had seen C.J. in

17   that room.  I left it on that and on his car.

18   Q.   How did you know which was his car?

19   A.   The police had a description of it and license plate

20   number.

21   Q.   Can you describe that car?

22   A.   It was a black Crown Victoria.  I don't remember the

23   license plate number now.

24   Q.   After leaving the notes on the car that you believed

25   belonged to Mackenley Desir and the apartments that he may have

1  been holding C.J. in, did you eventually get a phone call from

2  Mr. Desir?

3  A.  Yes.

4  Q.  What number did that phone call -- what number did you

5  receive that phone call on?  What cell phone?

6  A.  My cell phone, 802-747-8272.

7  Q.  Did you recognize the number that was calling you?

8  A.  Yes.  I programmed it in my phone.

9  Q.  Was that the same number C.J. reached out to her mother on?

10 A.  To her mother?  I believe so.

11 Q.  Is that the number you had cross checked?

12 A.  Yes, yes.

13 Q.  Tell the members of the jury about that conversation you

14 had with the person that you believed to be Mackenley Desir.

15         MR. ZACCA:  Objection, lack of predicate.  At this

16 point it is hearsay.

17         THE COURT:  Counsel, approach sidebar.

18         (Proceedings at sidebar.)

19         THE COURT:  Okay.

20         MS. VIAMONTES:  Your Honor, the witness has

21 established that he left notes.  In response to the notes, he

22 receives a phone call from the number which C.J. had reached

23 out to the family on.  I can establish a foundation that -- as

24 to the accent on the phone and that it was clear that the

25 person had read the note.

1          So, I can establish that foundation to show it was in

2   response to the note he left.

3          MR. ZACCA:  How does he know the person he is talking

4   to is Desir?  That is the issue.

5          MS. VIAMONTES:  He could cross-examine him on that.

6          MR. ZACCA:  They have to authenticate the voice.  In

7   order for it to come in as an admission of a party opponent the

8   Government has to establish that in fact it is -- the declarant

9   is the defendant.

10          MS. JOHANNES:  Your Honor, we can listen to one of the

11   jail calls.  They are stipulating they are admissible.  We can

12   listen to one of the jail calls and he can identify the voice.

13          MS. VIAMONTES:  It is clearly in response to the notes

14   that the witness leaves on the defendant's vehicle.

15          MR. ZACCA:  It could be anybody calling in response to

16   the note, Your Honor.  I don't think that establishes that.

17          MR. WILCOX:  I want to know what you are looking at.

18          MS. JOHANNES:  There is case law, I dealt with this

19   before.  Yes, the Government does have to establish that is the

20   person's voice, the same thing with jail calls.  One of the

21   ways the Government can establish it is known recordings of the

22   person's voice.

23          THE COURT:  Don't we have two separate issues here?

24   Number one is the admissibility of what the witness heard on

25   the phone, and number two is the identity of the person who

1  made the declarations.

2        MS. VIAMONTES:  Yes, Your Honor, you are correct.

3        The admissibility is an admission by a party opponent,

4  the statement by the Defendant.

5        As to identity, the witness can be cross-examined --

6        THE COURT:  You are putting the cart before the horse.

7        You are saying that in order for the declarations to

8  be admissible, that the identity of the declarant as the

9  defendant must be shown.

10        MS. VIAMONTES:  Your Honor, then --

11        THE COURT:  Has Mr. Johnson listened to any of the

12  recorded conversations from jail?

13        MS. VIAMONTES:  No.

14        THE COURT:  Is it clear from what the declarant said

15  that the declarant had read the notes --

16        MS. VIAMONTES:  Yes, Your Honor.

17        THE COURT:  -- that Mr. Johnson left?

18        MS. VIAMONTES:  Yes.

19        THE COURT:  Then the Court finds, under Rule 104, by a

20  preponderance of the evidence that it is sufficient -- that a

21  sufficient predicate has been laid that the declarant was in

22  fact the defendant, and therefore, the statements come in as

23  statements by a party opponent.

24        MS. VIAMONTES:  Thank you.

25        (Sidebar concluded.)

1  BY MS. VIAMONTES:

2  Q.  Mr. Johnson, you stated you left the note on the door and

3  the vehicle that you believe belonged to the defendant and then

4  you received a phone call.

5       Tell us about that phone call.  Did you answer the

6  phone?

7  A.  I did answer the phone and he was asking who I was and I

8  told him I was C.J.'s father, and he kept saying, why do you

9  disrespect me, why do you disrespect me.  He kept repeating

10 that.

11 Q.  You are saying, why are you disrespecting me.  Is that at

12 the beginning of the conversation?

13 A.  It was pretty much throughout the whole conversation.

14 Q.  Okay.

15 A.  He wanted to know who I was and why I disrespected him.  I

16 told him I was C.J.'s father, and I wanted to talk to her.  And

17 I said, what do you mean disrespect you?  And he said bringing

18 the police there and messing up his business and that C.J. had

19 been shot.

20      In the beginning, when I said I was C.J.'s father, he

21 said she was shot the night before, and I said that wasn't

22 true.  I said I wanted to speak to her, and I don't know how it

23 ended up, and I said I wanted to get her back and he could go

24 about his business.  I wanted to speak to her and see her in

25 person.

1  Q.  Let's take that step by step.

2         What did you request of Mr. Desir during that phone

3  conversation?

4  A.  At first, I was saying I wanted to talk to her and I was

5  thinking about that, and he could put the phone up and let her

6  talk, and I thought that wasn't kosher.  I wanted to physically

7  see her and he was saying she wanted to stay with him.

8  Q.  Did he let you see C.J.?

9  A.  No.

10  Q.  Did he say anything about your family?

11  A.  Yes.  He said she tried to call me and I wouldn't help her

12  out, bail her out.  I don't remember him saying anything about

13  her mother.

14  Q.  And did he tell you what he was doing with C.J.?

15  A.  No.

16  Q.  Did he try and convince you that C.J. was okay?

17  A.  Yes.

18  Q.  What did he say?

19  A.  At that point, he said she was at the hotel or something.

20  He wasn't at the hotel.

21  Q.  Initially, he tells you C.J. was shot and toward the end of

22  the conversation he tells you she is okay.  Does he tell you

23  whether he is providing for her or helping her out?

24  A.  He kept saying he was helping her.  He bailed her out of

25  jail.  That is how the conversation kind of concluded, he

1  bailed her out and he was going to return her back to jail to

2  get his bail back.

3  Q.  Did you express your concern that C.J. wasn't safe to

4  Mr. Desir?

5  A.  I can't say if I did that directly.

6         I wanted to talk to her and make sure she was safe.  I

7  guess that would be a yes.

8  Q.  Did he tell you where C.J. was and where you could find

9  her?

10 A.  No.

11 Q.  You mentioned that toward the end of the conversation you

12 came to some sort of agreement what he was going to do with

13 C.J.; is that true?

14 A.  Yes.

15 Q.  What did he tell you he did with C.J.?

16 A.  Well, either -- it was kind of up in the air, he was going

17 to give her back to me or bring her back and get his bail back

18 and turn her back into jail at that point.

19 Q.  Was he concerned that he posted bail for her?

20 A.  Yes.

21 Q.  What did he say about that?

22 A.  He said he put up money, and I -- he said, I put up the

23 money, and I said I would give him the money.  I don't know how

24 much it was, $2200, whatever.  That was the end of the

25 conversation.  I don't think there is any definitive answer of

1  what was going to happen.

2  Q.  At the conclusion of that conversation, what did you expect

3  to happen next?

4  A.  I thought he was supposed to call me to let me know what

5  was going to happen in a short period of time, a set time, and

6  at that time I was on my way to Boca Raton to talk to her

7  friends.  So, we turned around and came back to Hollywood to

8  wait and find out what he was going to do, and when he was

9  going to call.

10  Q.  How long did you wait?

11  A.  Probably four, five hours or more.

12  Q.  During those four or five hours, how were you feeling?

13  A.  Very anxious.

14  Q.  Aside from speaking with Mr. Desir, can you describe the

15  tone of his voice and his accent, if any?

16  A.  Yes.  To me, it sounded like a Jamaican accent, and at

17  times it was difficult to understand him.

18  Q.  Could you describe the tone of his voice?

19  A.  As far -- what do you mean, tone?

20  Q.  Was he speaking to you calmly, was he yelling?  How was he

21  speaking to you?

22  A.  He actually sounded irritated.

23  Q.  You mentioned at the beginning that throughout it all he

24  kept mentioning respect?

25  A.  Correct.

1  Q.  Describe that to the members of the jury.  What was he

2  referring to?

3  A.  I guess I disrespected him by bringing the police to mess

4  up his business.

5  Q.  Once you waited for a number of hours, did you go back to

6  the Beach and Town Motel?

7  A.  Yes, we drove by and I noticed the car was gone.

8  Q.  And by the car, are you referring to the black Crown

9  Victoria?

10 A.  Correct.

11 Q.  As you are waiting, and you said you are getting anxious at

12 this point, do you send Mr. Desir any text messages?

13 A.  Yes.

14 Q.  Do you send the text messages from your cell phone?

15 A.  Correct.

16 Q.  Did you send them to the phone he communicated with you on?

17 A.  Yes.

18      MS. VIAMONTES:  Your Honor, permission to approach?

19      THE COURT:  Yes, ma'am.

20 BY MS. VIAMONTES:

21 Q.  Sir, I am going to approach and show you Government 26 for

22 identification which is in the trial binder.

23      Mr. Johnson, I direct your attention to the very last

24 page at the bottom.  Do you see a column with your phone

25 number?

```
 1   A.   Yes.
 2   Q.   And do you see a column with the phone number you sent a
 3   text message to?
 4   A.   Yes.
 5   Q.   Does that record help refresh your recollection of the text
 6   messages you sent to Mr. Desir?
 7   A.   Yes, it does.
 8        MR. ZACCA:   Objection.   I don't believe the witness
 9   indicated he needed his recollection refreshed.
10        THE COURT:   Sustained.
11   BY MS. VIAMONTES:
12   Q.   Sir, do you recall the exact text messages you sent to
13   Mr. Desir?
14   A.   Um-m-m, reading these --
15        MR. ZACCA:   Judge, objection.   He is now reading from
16   the text message.
17        The question needs to be asked -- improper predicate,
18   Judge.
19        THE COURT:   Well, the question pending is a proper
20   question, but the response -- the question was, does that
21   record -- sir, do you recall the exact text message you sent to
22   Mr. Desir?   Without looking at the document in front of you, do
23   you recall it?
24        THE WITNESS:   Not verbatim.
25        THE COURT:   Okay.   Would something refresh your
```

1  recollection?

2  BY MS. VIAMONTES:

3  Q.  Would looking at the phone records refresh your

4  recollection?

5  A.  Yes.

6  Q.  Look at it, and once your recollection is refreshed, you

7  may look up.

8  A.  All right.

9  Q.  Now that you refreshed your recollection, what text message

10  did you send to Mr. Desir?

11  A.  Um-m-m, I saw that the car was gone and I figured he bolted

12  and left me hanging and took off with C.J.

13  Q.  So, what did you write in the text message?

14  A.  Would you like me to read it?

15  Q.  If you need to refresh your recollection, look down, and

16  look up when your recollection is refreshed.

17       Did you ask him to see C.J.?

18  A.  No, I did not ask -- I said I see that he -- the first text

19  message, that was earlier, "The sooner I see C.J., the better."

20  I was getting anxious.  Later on I got angry.  I saw the car

21  was gone, so I figured he had taken off.

22  Q.  Okay.

23       When you see the car is gone and you start getting

24  anxious and angry, what do you write in the text message to

25  Mr. Desir?

1   A.   Should I read it?

2   Q.   Just tell me what you remember.

3   A.   To be explicit, I was pissed off and kind of challenging

4   him, trying to get a response from him.

5   Q.   Okay.

6   A.   And felt he lied to me and he took off.

7   Q.   Did you let him know you saw the car was missing?

8   A.   Yes.

9   Q.   And you -- do you see say you are still waiting to hear

10   from C.J., to hear from her?

11   A.   Yes.

12   Q.   Other than C.J., how do you refer to your daughter in that

13   message?

14   A.   Star.

15   Q.   Why do you call her Star?

16   A.   That is what I heard her nickname was or was given to her.

17   Q.   Do you tell him, "Did you chicken out, you lying MF"?

18        MR. ZACCA:   Objection to the leading nature of the

19   question.

20        THE COURT:   Sustained.

21   BY MS. VIAMONTES:

22   Q.   Sir, what do you recall putting in the text message?

23   A.   I can read it --

24        MR. ZACCA:   Objection, Judge, to him reading a

25   document not entered into evidence.

```
 1          THE COURT:  Let me ask this:  Is the text message
 2  contained in Government Exhibit 26, is it going to be
 3  introduced later?
 4          MS. VIAMONTES:  Yes, it is.
 5          MR. ZACCA:  Judge, I have argument as to that as well.
 6          THE COURT:  You have argument as to its admissibility
 7  later?
 8          MR. ZACCA:  Yes, sir.
 9          THE COURT:  Well, it seems like to me that perhaps I
10  should hear that argument at sidebar now.
11          MR. ZACCA:  Very well, Judge.
12          (Proceedings at sidebar.)
13          THE COURT:  Okay, what about Exhibit 26?
14          MR. ZACCA:  Judge, I guess later on the Government is
15  going to call somebody from MetroPCS to introduce that record,
16  because I haven't stipulated to that.
17          THE COURT:  As a business record?
18          MR. ZACCA:  It doesn't come back to Mackenley Desir,
19  it comes back to some other name.  I think MetroPCS, if I can
20  proffer past experience, they don't require a license or any
21  type of identification when somebody gets a phone.  It is kind
22  of a loosey-goosey number to Jean Paul that can't specifically
23  be tied to my client.
24          I think the MetroPCS representative will admit to
25  that.  They don't require a license, specific identification
```

```
 1    before handing out a phone or opening an account.

 2            I don't know how they are going to tie it up.

 3            THE COURT:  Let me hear from the Government.

 4            MS. VIAMONTES:  It is going to come in as a business

 5    record, MetroPCS kept it in the normal course of business.  The

 6    reason it is going to become relevant, C.J. will look at the

 7    messages and -- text messages and indicate this is the phone

 8    she used to reach out to the family and this is a phone which

 9    he gave her and it will become relevant.

10            THE COURT:  Sounds like to me that is sufficient under

11    104 for the document, that coupled with the testimony of the

12    MetroPCS representative establishing that Exhibit 26 is a

13    business record, and this comes in under 803.6.

14            I think insofar as admissibility, it meets the

15    preponderance of the evidence test.

16            MR. ZACCA:  Very well.

17            THE COURT:  I will allow testimony regarding that.

18            MS. VIAMONTES:  Your Honor, at this time, I would ask

19    that the Court allow me to publish it with the caveat that if I

20    do not prove that it is relevant and get it in as a business

21    record, that the jury be instructed to disregard it.

22            MR. WILCOX:  I would think that the better practice

23    would be to let her introduce that portion only because if

24    there is some problem where it doesn't come in, then -- I am

25    assuming that it probably would come in.  If it doesn't come in
```

1  later, if it doesn't come in, we have all these text messages

2  in there.

3          THE COURT:  What are you seeking to publish?  I know

4  exhibit 26 is several pages.

5          MS. VIAMONTES:  It's four pages, just the last page

6  where the text messages between the witness and the defendant

7  are detailed.

8          MR. WILCOX:  Four pages of text messages?

9          THE COURT:  She is seeking to publish only the last

10 page.

11         MR. WILCOX:  At this point, that is going to be all

12 right.

13         MR. ZACCA:  Judge, I didn't realize how the Government

14 was going to link it up until the proffer now with C.J.

15 Obviously, C.J. hasn't testified yet.  I can understand how

16 they can publish what this witness texted, but as to what -- as

17 to what he received, I would like the Government to link it

18 through and complete the predicate through C.J.  I would like

19 to ask her questions about it.

20         That is my concern, Judge.  I don't want anything

21 published prematurely, before the Government fulfills its

22 proffer.

23         MR. WILCOX:  Judge, if I may.  Judge, right now it is

24 my understanding she is only trying to introduce the message

25 Johnson sent to Mackenley about him being angry about C.J. not

```
 1  turning in the daughter.
 2         Is there any way you could give that --
 3         MS. VIAMONTES:  We can cover the previous text
 4  messages, not a problem.  They are the last four, cover the top
 5  of the page.
 6         THE COURT:  The Government has requested permission to
 7  publish the last page of Exhibit 26?
 8         MS. VIAMONTES:  Correct, the last four messages.
 9         THE COURT:  All on the last page?
10         MS. VIAMONTES:  Yes.
11         (Sidebar concluded.)
12         THE COURT:  All right.  Ms. Viamontes, you may
13  proceed.
14         Do you want to use the --
15         MS. VIAMONTES:  Yes.
16         THE COURT:  Ladies and gentlemen, there is a monitor
17  to your right and left.  Hopefully everybody can see.
18  BY MS. VIAMONTES:
19  Q.  Mr. Johnson, do you see the text messages you sent to
20  Mr. Desir?
21  A.  Yes.
22  Q.  You are familiar with military time, right, having been in
23  the military?
24  A.  Yes.
25  Q.  On June 30, 2012, 1715:54, what time is that?
```

```
1   A.  5:15.
2   Q.  At 5:15, do you see your phone number, 802-747-8272, sent a
3   text message to 786-332-0154?
4   A.  Yes.
5   Q.  And please tell the members of the jury what that text
6   message reads.
7   A.  "The sooner I see C.J., the sooner things will go back to
8   normal."
9   Q.  What do you mean by that?
10  A.  I won't keep harassing him with the police or -- period.
11  Q.  You will leave him alone?
12  A.  Yeah.
13  Q.  What did you want?
14  A.  C.J.
15  Q.  Okay.
16          Then on June 30th, the same day, at 2037:19, do you
17  see another text message?
18  A.  Yes.
19  Q.  And 2037, what time is that?
20  A.  That is eight o'clock.
21  Q.  8:37?
22  A.  Yes.
23  Q.  20 is 8:00 p.m., correct?
24  A.  Correct.
25  Q.  A few hours have gone by and you sent another text message.
```

1  Could you read that?

2  A.  "I see you picked up your car.  Still waiting to hear from

3  C.J. 'Star'.  Did you chicken out, you lying motherfucker.  If

4  you had a daughter, wouldn't you want to make sure she is safe?

5  That is right, you don't give a fuck about anyone but you."

6  Q.  That is all one message?

7  A.  All one.

8  Q.  Okay.  Sir, let me direct your attention to the same date,

9  the time is 2052:43.  Do you see a last text message to

10  Mr. Desir's phone number?

11  A.  Yes.

12  Q.  And what does that read?

13  A.  "Thank you."

14  Q.  Why did you say thank you?

15  A.  Because I got a call and he said that he had dropped her

16  off at jail.

17  Q.  You learn now that C.J. was safe?

18  A.  Yes.

19  Q.  Once you learned that C.J. was in jail and safe, what did

20  you do?

21  A.  I contacted the bail bonds to bail her out.

22  Q.  How did it make you feel, knowing that C.J. was in jail?

23  A.  Bitter sweet.

24  Q.  Were you relieved?

25  A.  Relieved and thankful we would be able to get her.  I

1  expected to run right up there and get her right then and

2  there, but that wasn't the case.

3  Q.   How long did it take to get C.J. out?

4  A.   I guess it was six, eight hours, something like that.

5  Q.   Six to eight hours later, when you actually get to see

6  C.J., tell us what happens when C.J. is released from the jail

7  and comes home.

8  A.   Well, she was very excited, I guess.  You could see her,

9  she was so relieved to see me and kind of headed for me and

10  hugged me and started crying and pleading for me to get her out

11  of there, take her home.

12  Q.   Once C.J. walks out, you mentioned she is crying, and her

13  knees seem weak.  What do you do?

14  A.   I run up and grab ahold of her.

15  Q.   And where did you go?

16  A.   I hugged her and headed to the car and went to the hotel

17  and booked our flight out immediately, packed our stuff and

18  headed back as soon as we could.

19  Q.   You were in sunny South Florida.  You didn't decide to

20  stick around for awhile?

21       MR. WILCOX:  Leading the witness, Your Honor.  It is

22  not really relevant.

23       THE COURT:  Sustained.

24  BY MS. VIAMONTES:

25  Q.   How quickly did you book that flight out?

```
 1   A.  I booked the next flight to Manchester, New Hampshire.
 2   Q.  Why did you book the next flight out?
 3   A.  Well, we kind of didn't know what was going to happen.  We
 4   had death threats, so we were trying to --
 5           MR. ZACCA:  Objection, hearsay, Judge.
 6           THE COURT:  Depends on the source.  It depends on who
 7   made the threats.
 8   BY MS. VIAMONTES:
 9   Q.  Who made the death threats?
10   A.  John Paul, Mackenley, whatever he goes by.
11   Q.  The person you identified in the courtroom?
12   A.  Yes.
13   Q.  John Paul, known as Mackenley Desir?
14   A.  Yes.
15   Q.  How did you get the death threats?
16   A.  Via phone call conversations we had.
17   Q.  Describe your daughter's demeanor as you are driving away
18   from the jail toward the hotel.
19   A.  She was just sobbing and thankful we finally found her and
20   got to her, just relief that she was safe.  She kept saying get
21   me out of here.
22   Q.  She didn't want to stay in Florida?
23   A.  (Witness shakes no.)
24           MR. WILCOX:  Your Honor, this is getting cumulative at
25   this point.  I think the point has been made.
```

```
 1              THE COURT:  There is no question pending right now.
 2   BY MS. VIAMONTES:
 3   Q.  Describe the way your daughter looked once you saw her
 4   released from the jail?
 5   A.  Um-m-m, she didn't look very well.  She looked sickly.  She
 6   had been through hell.  She had black and blues from her ear
 7   lobe down to her ankles.
 8   Q.  Once you returned to Vermont, can you describe C.J.'s
 9   demeanor once you returned to Vermont?
10   A.  Um-m-m, well, she was very emphatic about getting to rehab
11   and getting cleaned out.  At that particular moment, she went
12   home to her mother.  She didn't come with me that night.
13   Q.  Is C.J. Different now than when she came to Florida?
14   A.  Yes --
15              MR. WILCOX:  Objection, Judge.
16              THE COURT:  Sustained.
17              MS. VIAMONTES:  One moment, Your Honor.
18              No further questions at this time, Your Honor.
19              THE COURT:  Cross.
20              MR. ZACCA:  Judge, may I go sidebar on an issue raised
21   on direct?
22              THE COURT:  Yes, sir.
23              (Proceedings at sidebar.)
24              MR. ZACCA:  We will go back.  We will go back, Judge.
25              (Sidebar concluded.)
```

```
 1          THE COURT:  Folks, I promised another break.  Does
 2   anybody need another break?
 3          Mr. Zacca.
 4                     CROSS EXAMINATION
 5   BY MR. ZACCA:
 6   Q.  Good morning, Mr. Johnson.
 7   A.  Good morning.
 8   Q.  You testified about these phone conversations that you had
 9   with a John Paul in your direct testimony, correct?
10   A.  Correct.
11   Q.  Just to clarify, you had never heard Mr. Desir speak
12   before, correct?
13   A.  Correct.
14   Q.  All right.  You are assuming the person you spoke to on the
15   phone is, in fact, Mr. Desir; isn't that right?
16   A.  Correct.
17   Q.  Mr. Johnson, I want to ask you some questions that were
18   elicited on direct examination about your daughter.
19          Your daughter, prior to coming to Florida, had a
20   history of abusing drugs; is that not right?
21   A.  Yes.
22   Q.  She -- she, in fact, abused drugs for several years prior
23   to coming to Florida, right?
24   A.  Yes.
25   Q.  She was a heavy abuser, correct?
```

1   A.   That I don't know.

2   Q.   Well, she abused heroin, correct?

3   A.   That is what I learned of, yes.

4   Q.   You learned of.  When did you learn of that?

5   A.   I'm not sure exactly when.

6   Q.   Well, did you learn it this year?

7   A.   I don't know if it was this year or last year.  I don't

8   really recall.

9   Q.   But she hid it from you, correct?

10  A.   Yes.

11  Q.   For a period of time, correct?

12  A.   Yes.

13  Q.   She used crack cocaine, correct?

14  A.   That I don't know.

15  Q.   As you sit here today, is that the first time you are

16  hearing that she used crack cocaine?

17  A.   Yes.

18  Q.   Prior to coming to Florida, she was in a drug treatment

19  center, right, up in Vermont?

20  A.   Prior to, yes.

21  Q.   How long was she there?

22  A.   That one, I believe, was 21 days.

23  Q.   Was it a residential program?

24  A.   Yes.

25  Q.   Meaning she actually spent the night there?

1   A.   Yes.

2   Q.   And that would have been March 2012?

3   A.   Probably about, correct, yeah.

4   Q.   All right.  How many times had she been in drug treatment

5   prior to March of 2012?

6   A.   Um-m-m, I'm not sure if she was.  Once or twice, maybe.

7   Once prior to March, I think.

8   Q.   So -- I am sorry.

9   A.   I am not sure if those were residential.  I don't recall.

10  Q.   Okay.

11          But at this point, what you can say is that, at a

12  minimum, she has gone to drug treatment on at least two

13  separate occasions, correct?

14  A.   Yeah, I think that is correct.

15  Q.   And, of course, that doesn't include the time that she came

16  to Florida in April of 2012; is that right?

17  A.   It does not include, no.

18  Q.   It does not include.  Because the place she stayed at in

19  April 2012, in Florida was a recovery center, right?

20  A.   Yes.  It was after care from the March treatment facility.

21  Q.   It was called The Bridge, right?

22  A.   Down here, yes.

23  Q.   How old was she when she first started abusing drugs?

24  A.   That I don't know.

25  Q.   Was it with a particular boyfriend that she had?

400

```
 1  A.  That seems to be about the right time.  He was a drug user.
 2  Q.  He was a drug user?
 3  A.  Yes.
 4  Q.  The person that we are talking about, is that person named
 5  Nick Young?
 6  A.  That is a particular person, yeah, but there was another
 7  guy before him.
 8  Q.  And who is he?
 9  A.  His name was Brennan.
10  Q.  What is his full name, sir?
11  A.  Brennan Bigalow.
12  Q.  When did that relationship start?
13  A.  I am sorry?
14  Q.  When did that relationship start with Brennan Bigalow?
15  A.  I am not sure.  I had gone to Oregon for a period.  I am
16  not sure when that started, 15, maybe.  When she was 15.
17  Q.  In fact, that relationship lasted a few years; isn't that
18  right?
19  A.  Yes.
20  Q.  At one point, she started living with Brennan Bigalow;
21  isn't that right?
22  A.  Yes.
23  Q.  She lived with Brennan Bigelow for a few years; isn't that
24  right?
25  A.  She lived with him for a brief period, it wasn't a couple
```

1  of years.  She was with him, but not living with him.

2  Q.  We are talking about the years 2007, 2008?

3  A.  Yeah, that would be about the right time.

4  Q.  And that is when she began abusing drugs, correct?

5  A.  That would be about right.

6  Q.  And all this time, when she was with Nick Young -- excuse

7  me, Brennan Bigelow, the first boyfriend you described, she

8  abused drugs because she chose to abuse drugs, correct?

9  A.  Yeah.  Well, peer pressure, I am sure, yeah, she chose.

10  Q.  When she was with Nick Young, again, she chose to abuse

11  drugs, correct?

12         MS. VIAMONTES:  Objection, asked and answered.

13         THE COURT:  Sustained.

14  BY MR. ZACCA:

15  Q.  In May of 2012, last year, she was kicked out of The Bridge

16  program, correct?

17  A.  She was kicked out?  That I am unaware of.  As far as I

18  know, she was not paying her rent, so maybe that is what

19  happened.  I don't know if being kicked out --

20  Q.  As you sit here today, you don't know why she no longer

21  stayed in the recovery center in Vero Beach --

22         MS. VIAMONTES:  Judge, objection, calls for hearsay,

23  speculation.

24         THE COURT:  Sustained.

25  BY MR. ZACCA:

```
 1   Q.  Do you know what she did in May 2012?
 2            MS. VIAMONTES:  Objection, speculation, hearsay.
 3            THE COURT:  Sustained.
 4   BY MR. ZACCA:
 5   Q.  Did you ever speak to her in May 2012?
 6   A.  I am sure I did.
 7   Q.  Did she tell you what she was doing?
 8            MS. VIAMONTES:  Objection, hearsay.
 9            THE COURT:  Sustained.
10   BY MR. ZACCA:
11   Q.  When she moved to Florida, how often did you speak with
12   her?
13   A.  Pretty much daily or every couple of days.
14            I was actually down here quite a bit.  I do a lot of
15   scuba diving down here.
16   Q.  You visited her?
17   A.  Yes.
18   Q.  Did you visit her at the program?
19   A.  No, I did not visit her at the program.  She was out of
20   that.  She was living with a couple of other women from the
21   program.
22   Q.  Do you recall when is the last time you spoke with her in
23   May relative to the first time you saw her in June 2012?
24   A.  The last time I talked to her in May?
25   Q.  Yes.
```

```
 1  A.  I don't have a specific date.
 2  Q.  Now, during your direct testimony, you mentioned that --
 3  you were asked questions about being notified by your ex-wife,
 4  Lisa Hubbard, that your daughter called Nick -- Nick Young; is
 5  that right?
 6  A.  Yes.
 7  Q.  Okay.
 8          Her boyfriend?
 9  A.  Ex, at that time.
10  Q.  Ex-boyfriend?
11  A.  Ex, at that time.
12  Q.  Okay.  And you were told --
13          MS. VIAMONTES:  Objection, hearsay.
14          MR. ZACCA:  I am going over the direct testimony,
15  Judge.  I will rephrase the question.
16  BY MR. ZACCA:
17  Q.  In direct testimony, did you not say that you heard a
18  friend of hers bailed her out of jail?
19  A.  Yes.
20  Q.  A friend of her bailed her out of jail?
21  A.  Yes.
22  Q.  So, at that point, she described the person who you say is
23  Mackenley Desir as a friend?
24          MS. VIAMONTES:  Objection, hearsay.
25          THE COURT:  Sustained.
```

```
 1              MR. ZACCA:  Judge, if I could have one moment.
 2    BY MR. ZACCA:
 3    Q.  Mr. Johnson, we have never spoken before, correct?
 4    A.  Correct.
 5    Q.  This is the first time we have spoken, right?
 6    A.  Correct.
 7    Q.  Prior to her coming to Florida -- strike that.
 8              You would agree that your daughter had a tendency to
 9    lie about her drug abuse, correct?
10              MS. VIAMONTES:  Objection, Your Honor, improper
11    impeachment, character.
12              THE COURT:  Sustained.
13              MR. ZACCA:  Judge, may I be heard sidebar on the
14    ruling?
15              THE COURT:  No, sir.
16    BY MR. ZACCA:
17    Q.  Do you have an opinion as to your daughter's credibility
18    with regard to her drug abuse?
19    A.  Rephrase that.
20    Q.  Yes, okay.
21              Do you have an opinion as to your daughter's
22    credibility about admitting drug use?
23    A.  Do I have an opinion --
24              MS. VIAMONTES:  Objection, Your Honor, irrelevant.
25              MR. ZACCA:  Judge, it goes to Rule 6 -- I believe 608.
```

```
 1                THE COURT:  The objection is relevancy.

 2                MR. ZACCA:  Well, I can argue the relevance sidebar,

 3    Judge.

 4                THE COURT:  All right.

 5                (Proceedings at sidebar.)

 6                MR. ZACCA:  Judge, the rule I am relying upon is Rule

 7    608.  The relevancy of this, our theory of defense is not only

 8    she lied about her prior drug abuse, but that it is

 9    inextricably aligned with lying about prostitution and getting

10    drugs.

11                She lied about drugs because it is embarrassing.  It

12    is also embarrassing to lie to your parents and family that you

13    have to prostitute for drugs.

14                THE COURT:  That is argument.  You can argue that to

15    the jury.

16                MR. ZACCA:  I can proffer to the Court he admits that

17    his daughter had a tendency to lie about her drug abuse and

18    using drugs, which lends itself to lying about prostitution and

19    it being forced upon her.

20                Here he testifies about when the daughter says help

21    me, I am being kept here, I need help, I am in bad shape, well,

22    it lends itself to the issue of is she lying about that as

23    well, just as she lied about her drug abuse.  She has a

24    tendency, and he has an opinion as to it.

25                THE COURT:  What rule did you cite?
```

```
 1              MR. ZACCA:  608, Judge, reputation or opinion
 2   evidence.
 3              THE COURT:  What say the Government?
 4              MS. VIAMONTES:  Your Honor, the way defense counsel
 5   couched the question, what is her reputation -- do you have an
 6   opinion as to her credibility as to drugs, Your Honor, that is
 7   not relevant.
 8              She is not on trial or being judged on her veracity
 9   for whether she uses drugs or not.  And then they are going to
10   make the leap that because she has been untruthful about the
11   drug usage, therefore the jury can hear she is untruthful about
12   being forced to prostitute.
13              If he wants to limit it to drug use and make that
14   leap, the way he couched it, I don't think it is relevant.
15              MR. ZACCA:  I can make it broader, what in your
16   opinion is her credibility.  It is in the rules.
17              THE COURT:  Reputation for having a character for
18   truthfulness or untruthfulness is admissible under 608.
19              MS. VIAMONTES:  Correct.
20              THE COURT:  You just think the question should be
21   broader as opposed to limited to drugs?
22              MS. VIAMONTES:  Correct, Judge.  The way the question
23   is couched it is not relevant.  He is saying is she truthful
24   about drugs.  If you attack credibility, is she a truthful
25   person or not truthful person, he can describe that.
```

```
 1              MR. ZACCA:  Naturally, when I say what areas is she
 2    untruthful about --
 3              MS. VIAMONTES:  No, you don't get to that.
 4              MR. ZACCA:  There is no limitation as to that.
 5              MS. VIAMONTES:  Not areas, what specific instances.
 6              MR. ZACCA:  It is a natural question, what areas --
 7              THE COURT:  But do you get to go into specific
 8    instances?
 9              MS. VIAMONTES:  No, you do not, Your Honor.
10              MS. JOHANNES:  It is general reputation and character.
11              THE COURT:  Extrinsic evidence is not admissible to
12    prove specific instances of the witness' conduct in order to
13    attack or support a witness' character for truthfulness.
14              MR. ZACCA:  Subsection B allows cross-examination.  I
15    reviewed the rule last night in anticipation of this.
16              THE COURT:  I think 608 allows reputation evidence
17    regarding truthfulness or lack of truthfulness, so I am going
18    to permit Mr. Zacca to get into that.
19              Insofar as the specific area relating to drugs, I
20    think we've kind of touched on that before with Ms. Hubbard.  I
21    am going to allow it.
22              (Sidebar concluded.)
23    BY MR. ZACCA:
24    Q.  Mr. Johnson --
25    A.  Yes.
```

408

1    Q.    -- what is your opinion on your daughter's reputation for

2    being truthful?

3    A.   What is my opinion?

4    Q.   Yes.

5    A.   Normally she is truthful.

6           She has a problem not telling the truth about drugs.

7    Q.   In fact, she has a tendency to lie regarding her drug

8    abuse; isn't that right?

9    A.   Yes.

10   Q.   Has she ever lied about being physically abused?

11          MS. VIAMONTES:  Objection, Your Honor, specific

12   instances.

13          MR. ZACCA:  608(b).

14          THE COURT:  Doesn't B allow for it on

15   cross-examination?

16          MS. VIAMONTES:  It is irrelevant, Your Honor.

17          THE COURT:  I am going to overrule.  Go ahead.

18   BY MR. ZACCA:

19   Q.   Has she ever lied about being physically abused?

20   A.   Not that I know of.

21          MR. ZACCA:  Judge, if I could have one moment.

22   BY MR. ZACCA:

23   Q.   I just asked you your opinion with regard to her reputation

24   for truthfulness, and you testified that she has a tendency to

25   lie about her drug use.

1        Would you agree that she lied about her drug use

2   because of the embarrassment and shame of continuing to be

3   addicted to drugs?

4   A.  I really can't say that unless it is my opinion.

5   Q.  Yes.

6   A.  But I know that --

7        MS. VIAMONTES:  Objection, calls for speculation, Your

8   Honor.

9        THE COURT:  Sustained.

10       MR. ZACCA:  No further questions.

11       THE COURT:  Mr. Wilcox, cross-examination.

12                   CROSS EXAMINATION

13  BY MR. WILCOX:

14  Q.  Good morning, Mr. Johnson.  How are you?

15  A.  I'm fine, thank you.

16  Q.  You love C.J.; is that correct?

17  A.  That is correct.

18  Q.  That is understandable.

19       C.J.'s childhood, how would you characterize it?

20  A.  Her childhood?  For the most part, it was very good,

21  whatever.  There were problems with me and my ex-wife.

22  Q.  And those problems occurred when she was about 7?

23  A.  Yes, somewhere around there.

24  Q.  Somewhere around there.

25       Even though you and your wife divorced when she was

1  about 7, would you characterize her childhood as normal?

2  A.  Yes.

3  Q.  And she participated in activities?

4  A.  Yes.

5  Q.  She attended school regularly?

6  A.  Yes.

7  Q.  She took dance for about three years?

8  A.  I am sorry?

9  Q.  She took dance?

10  A.  Dance, yes.

11  Q.  For about three years; is that right?

12  A.  Yes.

13  Q.  And are you aware of any psychological problems that she

14  had?  Had she been diagnosed with any mental defects?

15  A.  Not that I am aware of.

16  Q.  Do you have any reason to believe that she had a below

17  average IQ?

18  A.  Do I have a reason to believe that?  I am sorry.

19  Q.  That was the question.

20  A.  No.  No reason.

21  Q.  Based on your observations of her from the time she was

22  born, would it be fair to say she is of normal intelligence or

23  average intelligence?

24  A.  I would say normal.

25  Q.  Her drug addiction, you indicated -- I couldn't kind of

411

1    make out the year, but she was about 17 years old.  Does that

2    sound right?

3    A.  Maybe 16, 17.

4    Q.  Maybe 16, 17?

5    A.  I don't know exactly when her drug use started.

6    Q.  But you indicated she was living with a young man in her

7    teen-age years?

8    A.  Yes.  She stayed with him for like a summer or something.

9    Q.  How old was she when she was staying with him?

10           MS. VIAMONTES:  Objection, relevance.

11           THE COURT:  Sustained.

12   BY MR. WILCOX:

13   Q.  You indicated she started living with this guy around the

14   same time -- correct me if I am wrong -- that her drug use

15   started about the same time she started living with

16   Mr. Bigelow?

17           MS. VIAMONTES:  Objection, relevance, Your Honor.

18           THE COURT:  Sustained.

19           Somebody has an electronic device on that needs to be

20   powered off.

21           Do you have a cell phone?

22           Apparently whatever it was is off now.  Apparently

23   not.  You all have been in the courtroom for trials before.

24           Okay, apparently it is resolved.

25   BY MR. WILCOX:

1  Q.  About April of this year C.J. was sent to Boca and entered

2  this Bridge program; is that correct?

3  A.  No.  You said this year.

4  Q.  I am sorry, last year.  I apologize.

5  A.  Yes.

6  Q.  You paid for that?

7  A.  Yes.

8  Q.  What exactly did you pay for?

9  A.  What exactly did I pay for?

10  Q.  Well, you paid a deposit?

11  A.  No.  I paid for one month.

12  Q.  You paid one month?

13  A.  Housing and meals.

14  Q.  How long was she supposed to stay there?

15  A.  There was no set time, just you stay there and go through

16  the rehabilitation.

17  Q.  So the stay was indefinite?

18  A.  As long as she wanted to.

19  Q.  I see.  She was supposed to pay the rest of the amount

20  herself?

21  A.  Yes.  She was going to get a job, and I was going to help

22  her along with it.

23  Q.  Now, you were in contact with her while she was at The

24  Bridge?

25  A.  Yes.

1  Q.  How often were you in contact with her?

2  A.  I was there, and then every couple of days, and it stopped,

3  it was after my visit.

4  Q.  She did call you in June of 2012; is that correct?

5  A.  Yeah.

6  Q.  She called you -- well, before the jail call, she had two

7  prior calls with you in June of 2012?

8  A.  That could be correct.

9  Q.  All right.  In June, were you aware she was no longer

10 living at The Bridge?

11 A.  Yes, she was staying at a house with a couple of girls that

12 were from the rehab program.

13 Q.  She wasn't in the rehab program in June?

14 A.  She was with the girls from the rehab.

15 Q.  But you knew she wasn't at the rehab place in June?

16 A.  Yes.

17 Q.  And it was your understanding that she was living with some

18 girls from the rehab place in June 2012?

19 A.  Yes.

20 Q.  How did you get that understanding?

21 A.  That is what she told me.

22 Q.  C.J. told you that.

23        And then June 22nd, you came to pick her up -- that is

24 not correct.  Around June 29th you came down and picked her up?

25 A.  Yes.

1    Q.   And you went to the hospital?

2    A.   Yes.

3         Thinking back, are you talking about where she lived

4    in June?  I wasn't 100 percent sure where she was then.  I

5    don't know.  When I came down to visit her, she was staying

6    with people in Boca.

7    Q.   When you came down to visit her in May or early June -- you

8    came down to visit her in May.

9         She was no longer in the halfway house?

10   A.   No.  I came down in June to visit her.

11   Q.   In June?

12   A.   Yes.

13   Q.   She was no longer in the halfway house?

14   A.   Yeah.

15   Q.   And did you go to the place where she was living?

16   A.   I picked her up there, yes.

17   Q.   Where was that place?  Do you recall what kind of place it

18   was?

19   A.   It was just a house.

20   Q.   A house.  When you came down to retrieve her, you went to

21   the house first?

22   A.   Yes.

23   Q.   Did you speak with any doctors as to her condition?

24   A.   It was determined she had strep throat.

25   Q.   At some point, you talked to the Hollywood Police,

1   correct -- the Broward Sheriff's Office?

2   A.   I talked to the Broward Sheriff's Office before I came

3   here.

4   Q.   You talked to the Hollywood Police; is that correct?

5   A.   Yes, at the hospital.

6   Q.   How did the police get to the hotel -- there was a

7   conversation about Mackenley telling you that you are

8   disrespecting him to get the police in his business.

9            How did you get the police in his business?

10  A.   We spoke to the police department and spoke to the police

11  officers there, and they sent police over that night before we

12  got there, and the next day we got back, and I had been with

13  the arresting officer and went back and was pounding on the

14  doors and looking for him.

15  Q.   You mentioned about a girl had been shot, did you not?

16  A.   Some -- inside?

17  Q.   No, a girl being shot.

18  A.   Yes.

19  Q.   Did it come to find out a girl had been shot, but it wasn't

20  C.J.?

21  A.   Yes.

22  Q.   Did you ever find out what that girl's name was?

23  A.   No.

24  Q.   Okay.

25            And when Mr. Desir -- you also testified that

1  Mr. Desir told you C.J. had been shot?

2  A.  Correct.

3  Q.  Would it be fair to say that he may not have known exactly

4  who you were talking about at that point?

5  A.  I mentioned C.J.  I assume he knew who I was talking about.

6  Q.  Okay.

7         He told you C.J. had been shot?

8  A.  Correct.

9  Q.  Now, Mr. Desir turned C.J. in to a bail bondsman; that is

10 your understanding?

11 A.  That is my understanding.  I don't know exactly how it --

12 Q.  After you had these conversations that you testified to?

13 A.  Uh-hum.

14 Q.  Before we go any further, did you have any contact with a

15 female that worked with Mr. Desir?

16 A.  Did I have contact?

17 Q.  Yes.

18 A.  Only at the hotel.

19 Q.  Okay.

20        And do you remember who that female was?

21 A.  (Indicating.)

22 Q.  You had contact with this woman you are pointing at?

23 A.  Yes.

24 Q.  Describe that contact.

25 A.  She was at the hotel, either appearing to be a cleaning

1   lady or receptionist at the hotel.

2   Q.   And that was it?

3   A.   She was the one telling me the room that C.J. was in was

4   upstairs, kept directing me that way.

5   Q.   This woman did?

6   A.   Yeah.  I believe so.

7   Q.   And is that the only contact you had with her?

8   A.   Yes.

9   Q.   Now, you picked her up, C.J. up from jail and you got back

10  to Vermont.  Did C.J. go back to using drugs?

11  A.   Yes, she had a couple of relapses.

12  Q.   Okay.

13       And let's go back.  You don't know what type of drug

14  she uses?

15  A.   I do believe it is heroin now, heroin or pills.  I don't

16  know.  I am assuming heroin.

17  Q.   Do you know how long she has been using heroin?

18  A.   I do not know that.

19  Q.   Do you know how she pays for her heroin?

20  A.   I do not know that either.

21  Q.   Is she working now?

22  A.   Is she working now?

23  Q.   Yes.

24  A.   Not currently, no.

25  Q.   How is she paying for heroin if she is not working?

```
 1              MS. VIAMONTES:  Objection, Your Honor, speculation.

 2              THE COURT:  Sustained.

 3              MR. WILCOX:  One moment, Your Honor.

 4  BY MR. WILCOX:

 5  Q.  Sir, you mentioned that she went by the name Star.  You

 6  referred to her as Star when you were addressing Mr. Desir,

 7  when you were texting him?

 8  A.  Yes.

 9  Q.  How did you find out she was going by the name Star?

10  A.  I don't recall.  I don't remember.

11  Q.  And you understand Star was to be her stage name?

12              MS. VIAMONTES:  Objection, Your Honor, calls for

13  hearsay and the witness said he doesn't know.

14              THE COURT:  Sustained.

15  BY MR. WILCOX:

16  Q.  You indicated when -- that Ms. Rembert -- I am sorry, C.J.,

17  your daughter, okay, that she changed since she left South

18  Florida.  How so?

19  A.  How so?  She seems to be happier.  She is trying to do the

20  right things.

21  Q.  What do you mean by doing the right things?

22  A.  Get her life back in order, going to school, she is looking

23  for employment.

24              MR. WILCOX:  Your Honor, may I have a sidebar?

25              THE COURT:  Yes.
```

```
1              (Proceedings at sidebar.)

2              THE COURT:  I kept expecting the Government to object

3  to these questions.

4              MS. VIAMONTES:  I didn't see where he was headed.

5              He cannot open his own door to violate a court order.

6  He cannot say she is doing the right thing to get out stuff the

7  Court has already ruled not admissible.

8              THE COURT:  Mr. Wilcox, what say the defense?

9              MR. WILCOX:  Judge, he has -- the door is opened.

10             THE COURT:  But you opened the door.

11             MR. WILCOX:  Yes, I opened the door.  I don't see how

12  that affects the ruling.

13             THE COURT:  I've ruled that subsequent acts of

14  prostitution are not admissible, under 412, it only goes to

15  show propensity.

16             The Government should have objected to this line of

17  questioning, but I don't interject.

18             The bottom line is, it is not admissible.  Sustained.

19             (Sidebar concluded.)

20  BY MR. WILCOX:

21  Q.  Mr. Johnson, you indicated that she relapsed a couple of

22  times.  Is she in treatment again?

23             MS. VIAMONTES:  Objection, relevance.

24             THE COURT:  Sustained.

25             MR. WILCOX:  One moment, Your Honor.
```

```
 1            THE COURT:  Let me revisit the last objection.
 2            Whether she is currently in rehab I think is
 3   admissible.  I will overrule the objection.
 4   BY MR. WILCOX:
 5   Q.  You can answer that question.  Is she currently in rehab or
 6   do you know?
 7   A.  She is not.  She is in recovery.
 8   Q.  And --
 9   A.  She -- there is a program you have to go to, AA and NA, and
10   she attends that.
11   Q.  How long has she had been doing that?
12   A.  How long has she been doing that?
13   Q.  Yes.  How long has she been in recovery since she got back
14   from Vermont -- I mean got back from South Florida?
15   A.  Recovery is forever.
16   Q.  Okay.  I understand, okay.  I think I understand what you
17   mean.
18            What I am asking, is she in a specific program like a
19   house, is she receiving --
20   A.  No, she is not.
21   Q.  She is not.
22            When you say she is in recovery, she is trying to kick
23   on her own?
24   A.  Well, yes.
25   Q.  Okay.
```

1       She is not getting any help?

2   A.  No.  She is getting help.

3   Q.  From whom?

4   A.  From AA and NA programs.

5   Q.  She goes to NA meetings?

6   A.  Yes.

7   Q.  But even with those meetings, she occasionally relapses?

8       MS. VIAMONTES:  Objection, relevance.

9       THE COURT:  Overruled.

10  BY MR. WILCOX:

11  Q.  Even though she attends AA meetings and NA meetings, she

12  still has the occasional relapse?

13  A.  Yes.

14  Q.  And how often does she go to AA and NA meetings?

15      MS. VIAMONTES:  Objection, calls for speculation and

16  hearsay.

17      MR. WILCOX:  If he knows.

18      THE COURT:  Unless he takes her to all the meetings,

19  then it would be based on hearsay.  So --

20  BY MR. WILCOX:

21  Q.  Now, you indicated that you saw Ms. Rembert the day that

22  you were looking for C.J., the defendant sitting over here, my

23  client?

24  A.  Yep.

25  Q.  Now, you did give two interviews with FBI agents; is that

1  right?

2  A.  Pardon me?

3  Q.  You have been interviewed twice by FBI agents as to the

4  events surrounding this case, right?

5  A.  Yes.

6  Q.  Okay.  At any time did you mention her in those interviews?

7        MS. VIAMONTES:  Objection, improper impeachment, Your

8  Honor.

9        THE COURT:  Sustained.

10        MR. WILCOX:  No further questions, Your Honor.

11        THE COURT:  Redirect.

12        MS. VIAMONTES:  Yes, Your Honor.

13                    REDIRECT EXAMINATION

14  BY MS. VIAMONTES:

15  Q.  Mr. Johnson, when you arrived at the Beach and Town Hotel

16  interacting with people you believed to be staff members, can

17  you get into that in a little more detail?

18  A.  Um-m-m, it seemed kind of funny.  Nobody really had any

19  direction.  There was nobody in -- a boss or in control of

20  anything, so I didn't know who to talk to, and the people who I

21  did talk to were directing me to go to the room upstairs, and I

22  preferred to go out back.  That is where I saw him go, and they

23  said there is nothing out back.

24  Q.  Who is the person who directed you to the upstairs room?

25  A.  I believe it was her right there.

1   Q.   Was there somebody else in the reception area or office?

2   A.   There were two or three other people, and the cops were in

3   there.   Tom was in there as well.

4   Q.   The person that directed you to the upstairs room in the

5   motel, do you see the person in the courtroom today?

6   A.   I believe it was her.

7   Q.   You said you believe it was her?

8   A.   Yes.   I am not 100 percent.   There was two or three other

9   people that were there.

10  Q.   Those two or three other people, could you describe them to

11  me?

12  A.   They were similar looking, heavy set black women, heavy

13  set.

14  Q.   And you recall one pointing upstairs?

15  A.   Yes.

16  Q.   Did you have a conversation with the person that pointed

17  upstairs?

18  A.   No.

19  Q.   You mentioned that you banged on doors looking for C.J.

20  Were you there when -- did you observe officers also banging on

21  doors?

22  A.   Yes.   Actually the officers were banging on the doors.   We

23  were following the officers around.

24  Q.   Can you describe where in the Beach and Town complex the

25  officers were looking for C.J., Banging on doors?

1   A.   Initially, we did go upstairs in that room, and it was

2   empty.   Then we went around back, saw his car and then just

3   looked around.   Down the back alleyway there is a fence line

4   and there is doors in there and there is like another separate

5   building.   I think it had two or four rooms in that, and we

6   were banging on those doors and down that whole back alley as

7   well.

8   Q.   Did anyone answer the doors?

9   A.   One lady answered the door and we showed her a picture of

10  C.J., and she said they had been there, and she wasn't really

11  sure when.

12          MR. ZACCA:   I object to hearsay as to this lady,

13  Judge.

14          THE COURT:   Sustained.

15  BY MS. VIAMONTES:

16  Q.   Mr. Johnson, without telling us what people said, that is

17  hearsay --

18  A.   Okay.

19  Q.   -- did anyone -- did Mackenley Desir answer a door when the

20  police were knocking?

21  A.   No.

22  Q.   Did Genet Rembert, the lady to your left, did she answer

23  the door when police were knocking?

24  A.   No.   I believe -- I think it was her standing in the room

25  like cleaning the room or something.

1  Q.  Before coming to Florida, did C.J. have the nickname Star?

2  A.  No.

3  Q.  Mr. Johnson, you said on cross you love your daughter, C.J.

4  Is that true?

5  A.  Correct.

6  Q.  Do you feel you have a good relation with her?

7  A.  Yes.

8  Q.  On cross-examination, you talked about how in order --

9  relating to drugs she has been untruthful to you.  Is that

10  true?

11  A.  She has been untruthful?

12  Q.  Correct, relating to drugs.

13  A.  Yes.

14  Q.  Can you tell when your daughter is trying to pull the wool

15  over your eyes?

16  A.  Yes.

17  Q.  What sort of signs do you see?

18  A.  Usually she asks for money, and she acts different, kind of

19  standoffish.

20  Q.  When you went to that jail to bond her out, to rescue her,

21  did you see any of the signs you had seen before?

22  A.  No.

23        MS. VIAMONTES:  No further questions, Your Honor.

24        THE COURT:  All right.  Thank you, Mr. Johnson, you

25  may step down.

426

```
 1              Ms. Viamontes, how long is the next Government
 2   witness?  Is it a lengthy witness?
 3              MS. VIAMONTES:  No.
 4              THE COURT:  Okay, we will go ahead and hear the next
 5   witness.
 6              Let's take a five-minute restroom break.  Remember,
 7   don't discuss the case.
 8              (Thereupon, the jury leaves the courtroom.)
 9              (Thereupon, a short recess was taken.)
10              (Thereupon, trial reconvened after recess.)
11              THE COURT:  Let's bring in the jury.
12              The record will reflect that Mr. Desir and Ms. Rembert
13   are present represented by counsel.
14              (Thereupon, the jury returns to the courtroom.)
15              THE COURT:  How is the blood pressure today?
16              THE JUROR:  Okay.
17              THE COURT:  You are not stressed out?
18              THE JUROR:  Not yet.
19              THE COURT:  All right.  The Government may call your
20   next witness.
21              MS. VIAMONTES:  Your Honor, we call Jackson Charles.
22              THE COURT:  Okay.  We could have had him here in the
23   courtroom.
24              There was one other juror who had a blood pressure
25   problem.  I don't see her.
```

```
 1              THE JUROR:  You sent her home.
 2              THE COURT:  I sent her home?
 3              THE JUROR:  Yeah, you did.
 4              THE COURT:  Mr. Charles, would you come up to the
 5    witness stand.
 6              JACKSON LOUIS-CHARLES, GOVERNMENT'S WITNESS, SWORN.
 7              THE COURT:  Please be seated.  Pull your chair up
 8    close to the microphone and give us your name and spell your
 9    last name for the record.
10              THE WITNESS:  My name is Jackson Louis-Charles,
11    L-O-U-I-S, dash, C-H-A-R-L-E-S.
12              THE COURT:  You may inquire, Ms. Viamontes.
13              MS. VIAMONTES:  Thank you.
14                         DIRECT EXAMINATION
15    BY MS. VIAMONTES:
16    Q.  Mr. Charles, what do you do for a living?
17    A.  Bail bondsman.
18    Q.  Besides being a bail bondsman, do you have another job?
19    A.  Yes, I am a volunteer firefighter.
20    Q.  How long have you been a bondsman?
21    A.  Seven, eight years now.
22    Q.  Do you own your own company?
23    A.  Yes.
24    Q.  What is the name of the company?
25    A.  Jackson's Bail Bonds.
```

1  Q.  Would you describe the procedure for bonding someone out of

2  jail?

3  A.  Okay.  A family member or friend of the defendant that is

4  in jail would normally call me and I would normally have them

5  sign the contract, and they pay the premium, usually 10 percent

6  of the bail for the defendant, and I basically bail them out of

7  jail.

8  Q.  Do you bail out every person that you are called about?

9  A.  No, ma'am.

10 Q.  Do you decline some clients?

11 A.  Yes, ma'am.

12 Q.  What sort of things do you take into consideration when you

13 are determining whether to bond somebody out or not?

14 A.  A lot of things, you know, how long a person is living in

15 Florida, their priors, basically their priors, how long they

16 have been living here in Florida.

17        Basically, I have to feel comfortable knowing the

18 person I am bailing out of jail is going to go to court.

19 Q.  Why is that?

20 A.  If they don't go to court, I am out of my money.

21 Q.  If they don't go to court, you are responsible to the

22 court?

23 A.  That is correct.

24 Q.  Do you know somebody by the name of Mackenley Desir?

25 A.  Yes.

1   Q.  Do you know somebody by the name of Genet Rembert?

2   A.  Yes, ma'am.

3   Q.  Do you see Mackenley Desir here in the courtroom today?

4   A.  Yes, ma'am.

5   Q.  Could you please identify him and mention an article of

6   clothing he is wearing?

7   A.  He is wearing a black suit, sunglasses.

8         MS. VIAMONTES:  For the record, the witness is

9   identifying the defendant, Mackenley Desir.

10         THE COURT:  The record will reflect.

11  BY MS. VIAMONTES:

12  Q.  Do you see Genet Rembert?

13  A.  Yes.

14  Q.  Could you point to her and mention an article of clothing

15  she is wearing?

16  A.  She is wearing a black top and -- black top.

17         MS. VIAMONTES:  Your Honor, may the record reflect the

18  witness positively identified the defendant Genet Rembert?

19         THE COURT:  The record will so reflect.

20  BY MS. VIAMONTES:

21  Q.  Without telling us the specifics of the charges, had

22  Mr. Desir called you about bonding out people before?

23  A.  Yes, ma'am.

24  Q.  Has he called you to bond out females for prostitution

25  charges?

430

1          MR. ZACCA:  Objection -- I withdraw the objection,

2     Judge.

3     BY MS. VIAMONTES:

4     Q.  Has he called you to bond out females for prostitution

5     charges?

6     A.  Not that I remember, ma'am.

7     Q.  You don't remember?

8     A.  Prostitution charges?

9     Q.  Yes.

10    A.  For just prostitution charges?

11    Q.  I am not asking you if you bonded women out for

12    prostitution.  Has he called you requesting you to bond out

13    women for prostitution?

14    A.  No, ma'am.  For prostitution?

15    Q.  Yes.

16    A.  Could you repeat the question, please, to make sure I

17    understand exactly what you are asking me.

18    Q.  Absolutely.

19          Has Mr. Mackenley Desir called you requesting you

20    assist him bonding out women for prostitution charges?

21    A.  Not that I recall.

22          MS. VIAMONTES:  Your Honor, may I approach?

23          THE COURT:  You may.

24          MS. VIAMONTES:  Sir, I am going to approach with

25    Government Exhibit 22 for identification in the trial binder.

```
 1              MR. WILCOX:  Government what?
 2              MS. VIAMONTES:  22.
 3   BY MS. VIAMONTES:
 4   Q.  Mr. Charles, do you recognize Government Exhibit 22?
 5   A.  Yes, ma'am.
 6   Q.  And how do you recognize it?
 7   A.  This is the contract, premium receipt and addendum
 8   agreement that me and Mr. Mackenley had.
 9              THE COURT:  Sir, you need to speak into the
10   microphone.
11              THE WITNESS:  I am sorry.  This is the agreement that
12   Mackenley Desir signed and the contract he signed for me.
13   BY MS. VIAMONTES:
14   Q.  Do you keep that document in the regular course of your
15   business?
16   A.  Do I keep the document?
17   Q.  Is that a document that you keep in your business, the
18   contract?
19   A.  Yes, ma'am.
20   Q.  Was it signed and created on or about June 18, 2012?
21   A.  Repeat that one more time, please.
22   Q.  Was it signed or created on or about June 18, 2012?
23   A.  Yes.
24   Q.  And you kept it in the regular course of your business?
25   A.  Yes, ma'am.
```

```
 1            MS. VIAMONTES:  Your Honor, at this time I move
 2   Government Exhibit 22 into evidence.
 3            THE COURT:  Any objection?
 4            MR. ZACCA:  No.
 5            MR. WILCOX:  No, Your Honor.
 6            THE COURT:  Government's 22 will be received.
 7            MS. VIAMONTES:  Permission to publish, Your Honor?
 8            THE COURT:  Granted.
 9            [Government Exhibit 22 received in evidence.]
10   BY MS. VIAMONTES:
11   Q.  Sir, is this your company, Action Jackson?
12   A.  Yes, ma'am.
13   Q.  What is this here?  Received from, what does that mean?
14   A.  Received from the client.
15   Q.  That is your client, Mackenley Desir?
16   A.  Correct.
17   Q.  The defendant was whom?
18   A.  C.J.
19   Q.  And the charge was what?
20   A.  Possession of hydromorphone, and premium due, 300.
21   Q.  I am sorry?
22   A.  300.
23   Q.  And who fills out this portion here?  On page two of the
24   document where the first line says "Mackenley Desir," who fills
25   that out?
```

433

```
 1  A.  I fill it out sometimes or the client fills it out.
 2  Q.  Is this your handwriting?
 3  A.  I believe so.
 4  Q.  And where do you get the information from to fill this out?
 5  A.  From the client himself.
 6  Q.  Okay.
 7          And you listed the address as 1065 Southwest 2nd
 8  Street, Hallandale, Florida?
 9  A.  Yes.
10  Q.  Occupation -- why didn't you list an occupation?
11  A.  He wasn't employed, didn't have a job at the time from what
12  I recall.
13  Q.  Black Crown Victoria, does he tell you that is his car?
14  A.  Yes, ma'am.
15  Q.  You also list Genet Rembert.  Is that true?
16  A.  Yes.
17  Q.  Toward the bottom of this page, you have the defendant,
18  C.J., and another person, Molly Rosenthal.  Do you see that?
19  A.  Yes.
20  Q.  And in parentheses next to Molly Rosenthal you have
21  Sapphire.  Do you see that?
22  A.  Yes.
23  Q.  What is that in parentheses?  What does that mean,
24  "Sapphire" next to Molly Rosenthal?
25  A.  Honestly, I don't remember.
```

1  Q.  What would you normally put next to somebody's name in

2  parentheses?

3  A.  What would I normally what?  Excuse me.

4  Q.  What would you put next to someone's name in parentheses?

5  Would you be describing what he is wearing or a nickname?

6  A.  Usually, that is something, I guess, to remind me of

7  something.  I don't remember what Sapphire means right now.

8  Q.  And above Molly Rosenthal, Flavors on Atlantic Boulevard?

9  A.  Oh, that is probably --

10 Q.  Do you see it?  Do you need me to zoom in?

11 A.  No.  I see it, I see it.

12        That is probably a club.

13 Q.  Okay.

14        Are you familiar with the club Flavors?

15 A.  No, I am not.

16 Q.  I am not saying you personally have been there.

17 A.  No.

18 Q.  Why do you think it is a club named Flavors?

19 A.  It sounds like a club.

20 Q.  Were you asked to process a bond for Molly Rosenthal for

21 prostitution?

22 A.  For prostitution?  What I remember, she had charges, and I

23 believe one of the charges was soliciting, but he didn't call

24 me to bail her out specifically for prostitution.

25 Q.  He called you to bail her out for everything she is charged

1    with?

2    A.   Correct.

3    Q.   And in the State of Florida, what is prostitution called,

4    when somebody is arrested for prostitution, solicitation?

5    A.   Prostitution or solicitation.

6    Q.   Were you asked by Mackenley Desir to bail out Molly

7    Rosenthal for solicitation?

8    A.   One of the charges was solicitation, if I remember.  I

9    would have to have that in front of me, the charges I bailed it

10   out.  Is it possible that you can pull it up?

11   Q.   Do you remember that?

12   A.   I remember being asked to bond her out, but I didn't bond

13   her out.

14   Q.   You declined to bond her out.  Is that true?

15   A.   That is correct.

16   Q.   And what are the reasons you declined to bond her out?

17           MR. ZACCA:  Objection, relevance, talking about

18   another person, Molly Rosenthal.

19           THE COURT:  Overruled.

20   BY MS. VIAMONTES:

21   Q.   What are the reasons you declined to bond out Molly

22   Rosenthal?

23   A.   Maybe because one of the charges was probably solicitation.

24   Q.   What is the risk of bonding someone out for solicitation?

25   A.   They may not appear back in court.

```
 1   Q.  Did you bond out C.J.?

 2   A.  Yes, ma'am.

 3   Q.  When you bonded out C.J., did you believe she was from

 4   South Florida?

 5   A.  From my understanding, yes.

 6   Q.  If you had known that she was from Vermont and had arrived

 7   here shortly before her arrest, a couple of months before her

 8   arrest, would you have bonded her out?

 9             MR. ZACCA:  Objection, calls for speculation.

10             THE COURT:  Sustained.

11   BY MS. VIAMONTES:

12   Q.  Did you know she was from Vermont?

13   A.  No, I did not.

14   Q.  Are those some of the things you asked the defendant,

15   Mackenley Desir, when he asked you to bond out C.J., where she

16   was from?

17   A.  To be honest, I bail people out from different states, but

18   if he would have told me she was from Vermont originally, and

19   she has been living in South Florida for awhile, for years, I

20   probably would have still bonded her out.

21             If he told me she was her from Vermont and down here

22   for a couple of weeks, I would not have bonded her out.

23   Q.  Is it a question you regularly ask, where the defendant

24   resides and where they are from?

25   A.  That is what I regularly ask.  That is what I regularly
```

1  normally ask, honestly, that is what I normally ask.  I just

2  don't remember if I asked him that, but I normally ask that.

3  Q.  After you drafted the bond paperwork for C.J., did there

4  come a time she was returned to you?

5  A.  Yes, ma'am.

6  Q.  Can you tell the members of the jury about that?

7  A.  I remember him calling me and saying that he wants to

8  revoke her bond, and I remember me being upset.

9  Q.  Why were you upset?

10  A.  Because I don't really like to revoke people's bond, you

11  know, because it is time consuming.  I have to put them back in

12  jail.  So, I remember me being upset and I had just bonded her

13  out shortly before, and I told him to, bring her to my office.

14  Q.  Do you remember what day of the week it was?

15  A.  No, ma'am, I don't.

16  Q.  Okay.

17         So, once you asked him to return her to your office,

18  what did you do?

19  A.  Okay, when she came to the office, I remember -- okay, they

20  dropped her off in the vehicle.

21  Q.  You say they dropped her off.  Who?

22  A.  I believe they were driving and I believe Genet Rembert was

23  there as well.

24  Q.  When you say he was driving, who are you referring to?

25  A.  I can't say he was driving for sure.  I remember he was

438

1  there.

2  Q.  Sure, no problem.  I want the record to be clear.

3      When you are saying "he," are you referring to

4  Mackenley Desir?

5  A.  Yes, he is the one who revoked her bond.

6  Q.  And "she," who is she?

7  A.  I remember Genet Rembert being in the car.

8  Q.  Describe what Mackenley Desir told you about the reasons

9  why he wanted her bond to be revoked.

10 A.  From what I remember, I remember him telling me that he

11 didn't trust her going to court and he wanted to revoke her

12 bond, and I pretty much was -- I was upset and I was, okay,

13 bring her to the office, you have one hour.  Meet me in the

14 office in an hour.

15 Q.  Were you at your office when he called you?

16 A.  No, I was not.

17 Q.  Where were you?

18 A.  I don't remember.

19 Q.  Was it like your day off?

20 A.  I'm never off.  I am always on the clock.

21 Q.  Did you have to make a special trip to the office to get

22 her?

23 A.  Yes, I did.  It probably was on the weekend.

24 Q.  All right.  Did Mr. Desir tell you, hey, her dad is in

25 town, he can take over this bond?

439

```
 1   A.   No.   I don't remember that.

 2   Q.   Have you done that before, just switched the person

 3   responsible for the bond from one family member to another?

 4   A.   I've done that before, but it is very rare.  I have done it

 5   before.

 6   Q.   But Mr. Desir didn't ask you to do that?

 7   A.   Not that I remember.

 8   Q.   Did you tell C.J. when she arrived her bond was being

 9   revoked?

10   A.   Not as soon as she arrived.  We went up stairs and I told

11   her to follow me upstairs.  I believe I told her that her

12   fingerprints had to be rebooked or something like that.  I gave

13   her some kind of false information so she wouldn't be

14   combative, and then I arrested her in the office.

15   Q.   And then do you walk her over to the jail?

16   A.   Yes, I did.  My office is right across the street from the

17   jail.

18   Q.   Is it easier for you to revoke somebody's bond and take

19   them to the jail, or transfer the paperwork from one family

20   member to another?

21   A.   Repeat that one more time, please.

22   Q.   Sure.  Is it easier for you to revoke the defendant's bond

23   and take them back to jail or to transfer the bond paperwork

24   from one family member to another?

25   A.   Usually, if I have to transfer the paperwork from one
```

1    family to another, you know, I don't normally trust the bond,

2    you know, so I would rather revoke the bond, even though

3    revoking the bond would be more time consuming.

4          But if there is a problem when somebody signs for

5    bail, and they want to be off and have another family member on

6    there, then my signature is on the bail.  If that person is not

7    comfortable with it, I am not comfortable with it.  I rarely

8    switch names on the bonds.

9    Q.  How long did it take Mr. Desir to arrive with C.J. after

10   your conversation with him?

11   A.  For about an hour, hour and a half.

12   Q.  You said you believed this was over the weekend.  Why

13   couldn't you just wait until Monday to do it?  Could you just

14   wait until Monday?

15   A.  Well, from what I remember, when he called me to revoke her

16   bond he had to fill in -- I think he had a feeling she was

17   going to take off immediately.  So, it was one of those things

18   where it had to be done like urgently, like right now.

19   Q.  Did Mr. Desir make it seem like it was an emergency, I need

20   to return her right now?

21   A.  Yes, from basically -- my understanding was she was going

22   to take off, and he wasn't going to know her whereabouts, so I

23   had to revoke her bond immediately.

24          MS. VIAMONTES:  No further questions, Your Honor.

25          THE COURT:  Cross.

```
 1            MR. ZACCA:  Yes, sir.

 2            THE COURT:  Folks, whenever we complete

 3   Mr. Louis-Charles' testimony we will take our lunch break, and

 4   we will take a full hour and 15 minutes.

 5            So, don't think because we are taking it after 12:30

 6   that you are going to be cheated on your lunch time, because

 7   you will not be.

 8            MR. ZACCA:  Judge, I request permission for

 9   examination here at the ELMO.

10            THE COURT:  Sure, of course.

11                         CROSS EXAMINATION

12   BY MR. ZACCA:

13   Q.  I want to ask you a few questions with regard to Government

14   Exhibit 22.  This is the bond paperwork you were just asked

15   questions about.  Okay?

16   A.  Yes, sir.

17   Q.  All right.  With regard -- you were asked some questions

18   about the general nature of your occupation of bonding people

19   out, and you referenced the contract; is that right?

20   A.  Yes, sir.

21   Q.  And when you say it is a contract, what does that mean to

22   the person signing the contract, in this case Mackenley Desir?

23   A.  He is responsible for the person I am bailing out of jail.

24   Q.  And if that person fails to go to court when they are

25   required to go to court, is the person signing the contract
```

1  responsible to you for paying the amount of the bond?

2  A.  Yes.

3  Q.  How much is the amount of the bond in this case?

4  A.  Can you pull --

5  Q.  Yes, sir.  I believe it is on the top.

6  A.  2100.

7  Q.  $2100?

8  A.  Yes.

9  Q.  What was the nature of the charge that you bonded her out

10 on?

11 A.  I believe hydromorphone.  I believe she had three drug

12 charges.

13 Q.  Felony drug charges?

14 A.  Yes.

15 Q.  The amount of the bond in this case was $2100?

16 A.  Yes, sir.

17 Q.  When somebody you describe as a friend or family member

18 bonds somebody out, they sign this contract with the bondsman,

19 and in this case you?

20 A.  Yes, sir.

21 Q.  The person signing the bond is responsible for that person

22 going to court, correct?

23 A.  Yes.

24 Q.  If that person fails to go to court, they will go after you

25 for $2100, and you go after the surety for the $2100.  That is

443

1  the basic way it works, right?

2  A.  Yes.

3  Q.  All right.  Now, you bonded C.J. out on 6/18/2012, correct?

4  A.  Yes, sir.

5  Q.  And that is after Mr. Desir signed this document, correct?

6  A.  Yes, sir.

7  Q.  All right.  You then testified that sometime after

8  Mr. Desir called you and told you he was concerned about her

9  not showing up for court, right?

10  A.  Yes, sir.

11  Q.  He was concerned that if she didn't show up for court, he

12  would have to owe you money, correct?

13  A.  Yes, sir.

14  Q.  Because that is the contract, right?

15  A.  Yes, sir.

16  Q.  I think you said it on direct examination, if the surety is

17  not comfortable -- I want to the make sure the jury

18  understands.  Surety means the person bonding the person out?

19  A.  Yes, sir.

20  Q.  In this case the surety is Mackenley Desir.  If the surety

21  is uncomfortable, you are uncomfortable, correct?

22  A.  Yes, sir.

23  Q.  Mr. Desir tells you he is uncomfortable remaining on the

24  bond, correct?

25  A.  Yes.

```
 1   Q.   That makes you uncomfortable?

 2   A.   Yes, sir.

 3   Q.   When he tells you, I don't think she is going to show up

 4   for court, at that point you revoke the bond?

 5   A.   Yes, sir.

 6   Q.   You have concerns as well, right?

 7   A.   Yes, sir.

 8   Q.   You don't want to owe money to the Court, right?

 9   A.   No, sir.

10   Q.   So, do you recall the day she shows up in your office,

11   C.J.?

12   A.   Yes, sir.

13   Q.   What day was that?

14   A.   Do I recall the date?

15   Q.   Yes, the date.

16   A.   No, I don't recall the date.

17   Q.   The day she shows up to your office, she has drugs on her,

18   does she not?

19   A.   Yes, sir.

20   Q.   The drugs were in her purse, correct?

21   A.   Yes, sir.

22   Q.   When she showed up, she appeared to be under the influence

23   of drugs, did she not?

24   A.   She appeared, yes.  That I remember, yes.

25   Q.   And when you surrender somebody on the bond, you use the
```

1  word "arrest."  You have the power as a bondsman to arrest

2  somebody, correct?

3  A.  Yes, sir.

4  Q.  To arrest somebody and take them to the jail; is that

5  right?

6  A.  Yes, sir.

7  Q.  When you arrest somebody, you search them before bringing

8  them to the jail; is that right?

9  A.  Yes, sir.

10 Q.  And in this case, you searched C.J., correct?

11 A.  Yes, sir.

12 Q.  When you searched her, you found drugs on her, correct?

13        MS. VIAMONTES:  Objection, asked and answered.

14        THE COURT:  Sustained.

15 BY MR. ZACCA:

16 Q.  You threw away the drugs?

17 A.  I didn't throw away the drugs, she threw it away.  I had

18 her throw it away.

19 Q.  You had her throw it away?

20 A.  Yes.

21 Q.  Now, there was an objection, asked and answered.  You said

22 there were drugs in her purse, right?

23 A.  Yes, sir.

24 Q.  In addition to drugs in her purse, were there drugs on her

25 person?

1   A.   Not that I remember.

2   Q.   Do you recall ever saying that when interviewed in the past

3   by the FBI in relation to this case?

4   A.   Remember saying what?

5   Q.   That in addition to the drugs in her purse, there were

6   drugs on her person?

7   A.   No.

8   Q.   At any point in time, did she ask for an opportunity to

9   take some more drugs before you surrendered her into the jail?

10          MS. VIAMONTES:   Objection, calls for hearsay.

11          THE COURT:   Sustained.

12          MR. ZACCA:   Judge, if I could have a moment.

13   BY MR. ZACCA:

14   Q.   I have a few more questions, Mr. Charles.

15          When you arrested her in your office, at some point

16   Mr. Desir left your office, correct?

17   A.   Yes, sir.

18   Q.   And at some point, Ms. Rembert left your office; isn't that

19   right?

20   A.   Yes, sir.

21   Q.   At that point, I think you said -- I think you said you

22   arrested her and you walked her across to the jail, correct?

23   A.   Yes, sir.

24   Q.   It was just you and C.J., correct?

25   A.   I believe so.  I usually have another partner with me, but

1   I believe it was just me at the time.

2   Q.  It was just you at the time?

3   A.  I believe so, yes.

4   Q.  How long is that walk?

5   A.  Maybe one minute.

6   Q.  When you arrested her and when Mackenley Desir and Genet

7   Rembert left your office, at any point in time did she tell

8   you--

9            MS. VIAMONTES:  Objection, hearsay.

10           THE COURT:  Sustained.

11           MR. ZACCA:  No further questions.

12           THE COURT:  Mr. Wilcox, any questions?

13           MR. WILCOX:  Very few.

14                     CROSS EXAMINATION

15  BY MR. WILCOX:

16  Q.  Mr. Jackson, is that correct?

17  A.  Yes, sir.

18  Q.  Good afternoon.

19  A.  Good afternoon.

20  Q.  Do you remember the day that you bonded her out?

21  A.  June 18th.

22  Q.  Can you remember the day she was surrendered?

23  A.  I don't remember the date she was surrendered.

24  Q.  Can you approximate how many days from the date that she

25  was bonded out until the date she was surrendered?

1  A.  A few days, less than a week.

2  Q.  Approximately a week, can we say that?

3  A.  Approximately a week.

4  Q.  Approximately a week?

5  A.  Yes, we can say that.

6  Q.  And you indicated that she came to the bail bonds, your

7  office -- C.J. I mean when I say "she" -- with Mr. Desir and

8  Ms. Rembert; is that right?

9  A.  Yes.

10  Q.  Were they dragging her to your office?

11  A.  Dragging?  No.

12  Q.  Did she resist coming into your office, C.J. I mean, did

13  she resist coming into your office?

14  A.  No, ma'am -- no, sir.

15  Q.  Did she lodge any protest?

16  A.  No, sir.

17  Q.  You said you found drugs on her before you took her to the

18  jail, C.J.?

19  A.  There were drugs in her purse.

20  Q.  You searched her purse?

21  A.  Yes.

22  Q.  Why did you do that?

23  A.  Why did I search her purse?

24  Q.  Yes.

25  A.  To make sure she doesn't have any weapons, things like

1 that, when I take her into custody.

2 Q.  Can you describe the drugs that you took from her purse?

3 A.  No, I can't.  I don't remember what kind of drugs it was.

4 Q.  Do you remember telling the FBI agent what kind of drugs

5 they were?

6          MS. VIAMONTES:  Objection, improper impeachment,

7 hearsay.

8          THE COURT:  Overruled.

9 BY MR. WILCOX:

10 Q.  Do you remember telling this agent about bonding her out?

11 Were you interviewed by the FBI?

12 A.  Yes, I was.

13 Q.  Was it this agent here?

14 A.  Yes.

15 Q.  Okay.

16          And do you remember whether or not you told her what

17 kind of drugs you thought she had?

18 A.  I told her I thought -- I said, I think it was heroin, but

19 I don't remember it.

20 Q.  Why did you say you think it was heroin?

21 A.  Because I remember seeing a spoon in there and some

22 syringes.  I said I think it was heroin.

23 Q.  I know you are not -- not a chemist.

24 A.  I said I think it was heroin.

25 Q.  But you saw --

1  A.  I saw drugs in the purse.

2  Q.  And you saw paraphernalia, like a spoon and a syringe

3  generally associated with heroin, right?

4  A.  Right.

5  Q.  Okay.

6  A.  She was arrested for --

7        MS. VIAMONTES:  Objection, Your Honor, no question

8  pending.

9        THE COURT:  Sustained.

10  BY MR. WILCOX:

11  Q.  She was arrested for prostitution?

12  A.  No.  She was arrested for several different drugs, drugs I

13  have never heard of.  That is why I said I don't know exactly

14  what the drugs were.

15  Q.  Okay.

16        You said she appeared to be under the influence.  Why

17  do you say that?

18  A.  Because she appeared that way.

19  Q.  What was it about her appearance that led you to say that?

20  A.  Her demeanor, her eyes.

21  Q.  When you say demeanor, that is kind of general.  I need to

22  know exactly.

23  A.  She didn't care, she was just, I don't know, sluggish,

24  slow, like she didn't care, and, you know, I don't know, you

25  can tell when somebody looks like they are under the influence

1  by her eyes, the way she was talking, smiling, nothing didn't

2  really matter.  She looked like she was under the influence.

3  Q.  Okay.

4          Did she express any anger at any time about being --

5  A.  No, sir.

6          MS. VIAMONTES:  Objection, hearsay.

7          MR. WILCOX:  I didn't ask -- you can express anger --

8          THE COURT:  Overruled.

9  BY MR. WILCOX:

10 Q.  Was there anything about her demeanor that would suggest to

11 you that she was angry about being brought to you?

12 A.  No, sir.

13         MR. WILCOX:  Excuse me, Your Honor.

14         I don't have anything -- let me check with my client.

15         No further questions, Your Honor.

16         THE COURT:  Any redirect?

17         MS. VIAMONTES:  Briefly, Your Honor.

18                     REDIRECT EXAMINATION

19 BY MS. VIAMONTES:

20 Q.  Anything about C.J.'s demeanor that led you to believe she

21 was a flight risk?

22         MR. WILCOX:  I didn't hear the question.  Would you

23 repeat that, please?

24 BY MS. VIAMONTES:

25 Q.  Sure.  Anything about C.J.'s demeanor that led you to

1  believe she was an immediate flight risk?

2  A.  Um-m-m, the question is real broad.  Like what would her

3  demeanor show?

4  Q.  She wasn't reluctant to go to you?

5  A.  No.

6  Q.  She wasn't running away from Mackenley Desir --

7       MR. WILCOX:  Objection to the leading.  It is her

8  witness.

9       THE COURT:  Sustained.

10  BY MS. VIAMONTES:

11  Q.  Was she running away from you?

12  A.  No.  She didn't appear to be -- people that are a flight

13  risk don't appear to be flight risks sometimes.

14  Q.  Was she being cooperative?

15  A.  She was being very cooperative.  She wasn't combative at

16  all, she was very cooperative.  In that aspect, no, she didn't

17  appear to be a flight risk because she wasn't combative.

18  Q.  What did you believe the relationship was between Mackenley

19  Desir and C.J.?

20  A.  What did I believe?

21       MR. ZACCA:  Objection.

22       MR. WILCOX:  Objection.

23       THE COURT:  Sustained.

24  BY MS. VIAMONTES:

25  Q.  What did Mackenley Desir tell you was the relationship

1  between him and C.J.?

2  A.  Just a friend.

3  Q.  Do you recall previously telling law enforcement that he

4  told you that was his ex-girlfriend --

5         MR. ZACCA:  Objection -- well, I withdraw the

6  objection.

7         THE WITNESS:  I don't remember.

8  BY MS. VIAMONTES:

9  Q.  You didn't think they were family, right?

10  A.  No.

11         MR. ZACCA:  Objection to leading, Judge.

12         THE COURT:  Overruled.

13  BY MS. VIAMONTES:

14  Q.  Do you recall where C.J.'s purse was when she first came

15  into your office when she was being returned to you?

16  A.  Do I recall where it was?

17  Q.  Yes.

18  A.  I believe it was in the car.

19  Q.  And who went back to retrieve that purse and bring it to

20  you?

21  A.  It was one of them.  I don't remember.

22  Q.  By one of them, you mean either of the defendants?

23  A.  Yes.

24  Q.  Okay.

25         And do you know why they went back to retrieve her

```
 1  purse?

 2          MR. WILCOX:  Objection, calls for speculation.

 3          THE COURT:  Sustained.

 4  BY MS. VIAMONTES:

 5  Q.  Did you ask them for any documentation?

 6          MR. ZACCA:  Objection.  Who is "them"?

 7          THE COURT:  Sustained.

 8          MS. VIAMONTES:  Sure.

 9  BY MS. VIAMONTES:

10  Q.  Did you ask C.J. for her identification?

11  A.  Yes, I did.

12  Q.  Did she have it with her?

13  A.  No.

14  Q.  When you asked C.J. for her identification and she didn't

15  have it with her, who went to retrieve that identification?

16  A.  It was one of them.  I don't remember.

17  Q.  And where did they go to get that identification?

18  A.  It was in her purse in the car, that is when they brought

19  me her purse.

20  Q.  Sir, I asked you on direct if Mr. Desir had requested for

21  you to post bond for females for prostitution out of Palm Beach

22  County.

23          Do you remember speaking with FBI agent Susan Funk

24  Romash?

25  A.  Yes.
```

1  Q.  Did he, in fact, ask you to bond out females for

2  prostitution charges, among others, out of Palm Beach County?

3  A.  Yes, among others, yes, one of them.  I don't remember him

4  to bond out a female for just prostitution.  I don't bond

5  females out for just prostitution.

6  Q.  Had you made Mr. Desir aware of that, you don't just bond

7  females out for prostitution?

8  A.  I am sure I told him I don't do prostitution bonds.

9  Q.  Mr. Desir was your client, correct?

10  A.  Yes, ma'am.

11  Q.  Do you like testifying in a criminal trial against your

12  client?

13          MR. ZACCA:  Objection to what he feels.

14          THE COURT:  Sustained as to the form of the question.

15  BY MS. VIAMONTES:

16  Q.  Does it impact you in any way -- does it impact your

17  business testifying against one of your clients in a criminal

18  case?

19  A.  Does it impact me?

20  Q.  Yes.

21  A.  I don't want to be here, you know what I mean.

22  Q.  Puts you in a bad position?

23  A.  Yes, I guess, of course.

24          MS. VIAMONTES:  Nothing further, Your Honor.

25          THE COURT:  All right.  We are going to break for

1  lunch.  We will reconvene at 2:15 p.m.  Remember, don't discuss

2  the case, don't do any independent research, and continue to

3  keep an open mind.

4          (Thereupon, the jury leaves the courtroom.)

5          THE COURT:  Sir, you are excused.

6          THE WITNESS:  I am excused?

7          THE COURT:  Yes.

8          THE WITNESS:  I don't have to come back?

9          THE COURT:  No, you don't have to come back.

10         THE WITNESS:  Thank you.

11         (Thereupon, a recess was taken at 1:00 p.m.)

12         (Thereupon, trial reconvened after recess.)

13         THE COURT:  All right.  The record will reflect the

14  defendants are present represented by counsel.

15         Ms. Viamontes, you said you have something you want to

16  bring up before we bring in the jury?

17         MS. VIAMONTES:  Yes.  Based on the questions from

18  defense counsel on cross-examination, it seems to me they may

19  get into prior allegations that C.J. had made against a

20  boyfriend.

21         We learned of him today and I asked her because of the

22  questions that were asked in court, and the fact that they were

23  hospitalized and they believed she was suicidal back then, that

24  is dated back three years ago, it is not relevant to when this

25  crime was committed.  We would move outside the presence of the

1  jury that testimony of the events not be elicited by defense

2  counsel.

3        MR. ZACCA:  Judge, I can proffer to the Court that

4  C.J. made accusations that she was -- let me get the right

5  information here.  I want to be accurate --

6        THE COURT:  Why didn't we address it this morning?

7        MS. VIAMONTES:  We Didn't know about it.  I didn't

8  know about it at all.

9        THE COURT:  You weren't aware of this hospitalization

10 three years ago?

11       MS. VIAMONTES:  No.

12       MR. ZACCA:  This is what I can proffer to the Court:

13 With regard to her ex-boyfriend, Brennen Bigalow, which we

14 heard testimony about him, it was the first boyfriend she did

15 drugs with.

16       She, through her mother, signed off on a petition and

17 got a restraining order against Brennan Bigelow claiming that

18 she was strangled, claiming that her nose -- she had a stab

19 wound in her knee, that she had physical signs of abuse, that

20 basically this man abused her, physically abused her, and that

21 was in May 11, 2008.

22       Subsequently, in January 2009, she sought -- she

23 petitioned Vermont State Court to rescind the restraining

24 order, basically saying her mom made her get it, it wasn't

25 true.  She had been living with Brennan Bigelow and Brennan

1  Bigelow takes very good care of her, and has supported her --

2  Brennan Bigelow and Brennan Bigelow's parents have supported

3  her.

4       Here is an allegation she made of physical abuse and

5  six months later recanted saying her mom made her get it.

6       I've done some preliminary research, Judge, and the

7  closest analogy I can make -- Judge, I am going to cite this

8  case, a District Court case out of the Eastern District of

9  Michigan.  I actually pulled this last night.  I only have one

10  copy.  I am happy to give the Government a copy of mine.

11       M-A-T-H-I-S versus --

12       THE COURT:  When is C.J. going to testify?

13       MS. VIAMONTES:  Hopefully this afternoon.  We have one

14  witness before her.

15       THE COURT:  Go ahead.

16       MR. ZACCA:  202 F.Supp. 2d, 715, Mathis versus

17  Berghuis.

18       Basically, the District Court in that case admitted a

19  false accusation of rape in a case where the complainant

20  complained of rape and the District Court allowed the accused,

21  the defendant, to bring out evidence that this woman who

22  complained of rape against him made false accusations about

23  rape in the past.

24       In this case, she made complaints about physical

25  abuse.  The Government argued in opening statement that she was

1  abused and threatened by Mr. Desir.  Quite frankly, it was a

2  surprise to me.  I didn't know she was doing drugs with Brennan

3  Bigelow.

4        Again, you have a claim of physical abuse, a claim of

5  abusing drugs.  It's commingled, it was commingled in this case

6  with Brennen Bigelow when she said she was physically abused

7  and then recanted.

8        In this case -- fast forward to this case; the

9  Government made its case that my client has physically abused

10  her, forced her, coerced her to prostitute herself and gave her

11  drugs to do so.

12        Our whole defense is that is not true, she prostituted

13  herself, but wasn't coerced to do so.  She did it because she

14  wanted to.  It was her free choice to take the drugs in

15  exchange to prostitute herself.  She was an addict.

16        I am using that case as an analogy to bring this

17  forward in this case.  It is our intention to cross-examine her

18  on this issue, this false accusation in the past.

19        THE COURT:  So, you would be offering this under what

20  provision of the Federal Rules of Evidence?

21        MR. ZACCA:  It would be 608(b), Judge.

22        Judge, I admit the petition at this point, but it is

23  extrinsic evidence of a specific incident of untruthfulness,

24  not being truthful.

25        THE COURT:  Why don't we do this, let the Government

```
1   put on the next witness and now we have a proffer of where the

2   defense is headed and we will address it before C.J. testifies.

3            MS. VIAMONTES:  May I see the documents that you

4   intend to use?

5            THE COURT:  Let's bring in the jury.

6            (Thereupon, the jury returns to the courtroom.)

7            THE COURT:  All right.  The Government may call your

8   next witness.

9            MS. JOHANNES:  The Government calls Nathan Yockey.

10           THE COURT:  Sir, would you stand to the left.

11           Would you raise your right hand.

12           NATHAN YOCKEY, GOVERNMENT'S WITNESS, SWORN.

13           THE COURT:  Please give us your name and spell your

14   last name for the record.

15           THE WITNESS:  Nathan Yockey, Y-O-C-K-E-Y.

16           THE COURT:  All right.  Ms. Johannes, you may inquire.

17           MS. JOHANNES:  Thank you, Your Honor.

18                        DIRECT EXAMINATION

19   BY MS. JOHANNES:

20   Q.  Mr. Yockey, what do you do for a living?

21   A.  I work for backpage.com.

22   Q.  What is backpage.com?

23   A.  An online web site.

24   Q.  Similar to Craig's List?

25   A.  Yes.
```

1   Q.  You said it is an online web site.  Does it solely function

2   over the internet?

3   A.  Yes.

4   Q.  Do people post ads there?

5   A.  Yes.

6   Q.  What kind of ads?

7   A.  Being similar to Craig's List, a wide range, used cars,

8   real estate, musical instruments.  We also have an adult

9   section of the web site.

10  Q.  People can post goods and services?

11  A.  Yes.

12  Q.  Is backpage.com like Amazon, can you buy something?

13  A.  No.

14  Q.  It is like a broker site for people to buy and sell?

15  A.  Yes.

16  Q.  Where is backpage.com based?

17  A.  Dallas, Texas.

18  Q.  What do you do?

19  A.  Custodian of records.

20  Q.  What does that mean?

21  A.  I process subpoena requests on a daily basis, and in this

22  case, I will verify the validity of the records supplied by

23  backpage.com.

24  Q.  How long have you been custodian of records for

25  backpage.com?

1   A.   A little over two years now.

2   Q.   How long have you worked for Backpage?

3   A.   Three years.

4   Q.   What did you do prior to custodian of records?

5   A.   I worked in fraud prevention as well as moderation.

6   Q.   I would like you to walk us through the process someone

7   would go through to post an ad on to backpage.com.

8   A.   It's a fairly simple process, go to the backpage.com web

9   site, and there is an option to post an ad.

10          From there, you can choose what category you would

11   like to post the ad under, what you are posting the ad for,

12   create the ad itself, and add the text for the title of the ad,

13   what the ad is, the body of it, describing what is being sold.

14          You could add pictures to the ad.  If you would like

15   to repost the ad, you can pay a small fee to do that, and that

16   pretty much wraps up the posting process at that point.

17   Q.   We will get into the reposting in just a moment.

18          Is there anything anyone needs to -- information

19   someone would have to give to Backpage before posting ads?

20   A.   Yes.  If you are going to set up an account you need to

21   give us a name, phone number, address, email address and valid

22   credit card.

23   Q.   Name, phone number, email and credit card?

24   A.   Yes.

25   Q.   Do you have to have an account in order to post an ad on

1  Backpage?

2  A.  If it is a paid ad, yes.

3  Q.  The information that is put into an account, the name,

4  phone number, email and credit card information, does any of

5  that have to be real?

6  A.  The credit card number and the CV, the three digit code

7  needs to be valid.

8  Q.  Someone can make up a name, correct?

9  A.  Correct.

10  Q.  What about the phone number, can that also be made up?

11  A.  Yes.

12  Q.  Now, the email address serves as the user's ID, if you

13  will?

14  A.  That would be the account name, yes.

15  Q.  And does Backpage send e-mails to account holders through

16  the email account provided?

17  A.  Yes.

18  Q.  Now, you mentioned that someone could repost an ad if they

19  pay a fee.  Did I hear that correctly?

20  A.  Yes.

21  Q.  What do you mean by that?

22  A.  Because of the fact that Backpage has a number of ads

23  placed all across their markets every single day, as more ads

24  come in, the ad when it was initially placed filters down to

25  the bottom of the listing.  If an individual pays for

1  reposting, that will boost the ad to the top of the list at the

2  time of reposting.

3  Q.  So, every time you pay money towards an ad you already

4  placed it gets on top?

5  A.  Yes.

6  Q.  Someone who logs on to Backpage will see it first?

7  A.  Yes.

8  Q.  How much does it cost to repost your ads?

9  A.  It varies.

10  Q.  Varies from what amount?

11  A.  I really wouldn't be able to say.  I don't deal with that

12  portion.

13  Q.  Okay.

14        Do you know what it varies on?

15  A.  Location.

16  Q.  What are the various methods that you pay to have an ad

17  reposted?

18  A.  Electronic, debit card, credit card,

19  Q.  Where are they processed?

20  A.  Through the payment process server located in California.

21  Q.  Not in Florida, sir?

22  A.  No.

23  Q.  Now, once an ad is placed on to backpage.com, where is it

24  kept?

25  A.  On Backpage servers.

```
 1   Q.   What do you mean when you say server?
 2   A.   That is where all the data is, electronic storage,
 3   basically.
 4   Q.   Where are the Backpage servers?
 5   A.   Tucson, Arizona.
 6   Q.   Not in Florida?
 7   A.   No.
 8   Q.   If I post an ad in Backpage, that ad is physically kept in
 9   Tucson?
10   A.   Yes.
11   Q.   Now, once an ad is posted on to Backpage, does it
12   automatically go on the internet?
13   A.   No.
14   Q.   What happens?
15   A.   After the individual has set up the process and goes
16   through the steps of posting, a verification email is sent to
17   the user and from there, the ad goes basically to a moderation
18   queue to be reviewed by Backpage employees to make sure that it
19   is within the guidelines of our terms of use.
20          Once it has been cleared, it goes live on to our site.
21   That is generally 30 minutes after the posting process has been
22   completed.
23   Q.   You said the first thing that is done is there is a
24   verification of email sent to the user.  Is that sent to the
25   email address for the account?
```

1  A.  Yes.

2  Q.  What does the email account holder have to do?

3  A.  Nothing.  If it is sent in error, the user has the option

4  to delete the ad, otherwise it will go into the moderation

5  queue and be reviewed and released.

6  Q.  In the moderation queue, what is the ad reviewed for?

7  A.  Making sure that it is adhering to our terms of use.

8  Q.  Now, you do -- backpage.com does have an adult section?

9  A.  Yes.

10  Q.  Is this also for the escort section?

11  A.  Yes.

12  Q.  Now, in this section girls are commonly posted for dates;

13  is that right?

14  A.  Yes.

15  Q.  What does backpage.com do to review those ads?

16  A.  Make sure there is no illegal activity being advertised.

17  Q.  What do you mean by that?

18  A.  As long as there is no blatant prostitution or otherwise in

19  the ads, the ads will be released.

20  Q.  Okay.

21      Is there a disclaimer that someone clicking on to the

22  escort section would see before reviewing the ads?

23  A.  Yes.

24  Q.  Please tell us what that is.

25  A.  It says if the user sees anything that might be illegal or

1    anything of that sort to report it to Backpage or proper

2    authorities.

3    Q.  Okay.

4          Now, you were sent a subpoena -- when I say "you," I

5    am sorry, your company, backpage.com -- a subpoena by the

6    United States in conjunction with this case?

7    A.  Yes.

8    Q.  Do you recall the subpoena subpoenaed records related to

9    firestarter92@hotmail.com?

10   A.  Yes.

11   Q.  Do you know what the time period was in the subpoena?

12   A.  I do not.

13   Q.  Okay.  When I provide them to you, maybe you will remember.

14          Did your company find any records in response to that

15   subpoena?

16   A.  Yes.

17   Q.  And did you produce those records to the Government?

18   A.  Yes.

19   Q.  Now, where were those records kept?

20   A.  On the servers in Tuscon, Arizona.

21   Q.  Was it kept by backpage.com in the normal course of

22   business?

23   A.  Yes.

24   Q.  I would like to show you what is marked for identification

25   as Government Exhibit 73.

1        MR. ZACCA:  Judge, may I have a moment to look at the

2   exhibit?  It is not in the notebook here.

3        Judge, can we go sidebar on this issue?

4        THE COURT:  Yes.

5        (Proceedings at sidebar.)

6        MR. ZACCA:  Um-m-m, we had a pretrial conference on

7   Friday, Judge, where I met with the Government and we reviewed

8   the exhibits and I had no objection to the Backpage ads that

9   were posted within the charged period time of the indictment,

10  June 11th to July 1st; however, these ads go -- cover a broader

11  time period.  They go after and before.

12        So, to the extent they carry posts or advertising

13  prostitution outside the indictment, I object.

14        MS. JOHANNES:  The ads when they are placed, they can

15  be reposted for different women and different girls and

16  reposted on different dates.  The dates in the conspiracy are

17  dates the ads were posted.  Some of the dates may reflect a

18  date after.  It reflects it in the reposting time here.

19        So, it is part of the time, yes.  He can explain --

20        THE COURT:  That would explain ads that are dated

21  prior to the dates in the indictment, but how would that

22  explain dates subsequent to the indictment?

23        MS. VIAMONTES:  Some of the ones posted after the

24  dates in the indictment put the ones prior in context because

25  defendant Rembert actually uses her name to post one of the

1    ads, so it puts the entire packet in context and the ads during

2    the conspiracy in context.

3              THE COURT:  I don't understand what you mean.

4              MS. JOHANNES:  For example, this is a ad that looks

5    like it was placed the end of May, right?  The ad was reposted

6    several times.

7              The witness will say sometimes it is automatic, it

8    reposts automatically if it is set to do that.

9              THE COURT:  What I am getting at, I can understand the

10   reposting with respect to ads that were --

11             MS. JOHANNES:  Before --

12             THE COURT:  -- published on the web site prior to the

13   dates alleged in the indictment.

14             MS. JOHANNES:  Uh-hum.

15             THE COURT:  But how would reposting after -- ads after

16   the dates in the indictment, that is what I am having a

17   difficult time understanding.

18             MS. JOHANNES:  How, or how is it relevant?

19             THE COURT:  How is it relevant?

20             MS. JOHANNES:  I can redact those dates, if that is

21   the concern.  I can redact the dates.

22             THE COURT:  Mr. Zacca is objecting to it coming in

23   generally.

24             MS. JOHANNES:  I can take out the dates.

25             THE COURT:  No.  You explained that some of the ads

 1  are reposted, but the ads subsequent to the time of reposting,

 2  I would think you already have them.

 3          MS. JOHANNES:  I could redact that.

 4          THE COURT:  So it is like a duplication.

 5          MS. JOHANNES:  I can redact the dates afterwards.

 6          MR. ZACCA:  That is fine.  I understand the relevancy

 7  with the posting of the charged time period, because they are

 8  reposted, that is fine.  The ones afterward, if they are

 9  redacted, that is fine.

10          THE COURT:  That is the problem I had.

11          MS. JOHANNES:  I can redact it.

12          MR. ZACCA:  Fine.

13          MS. JOHANNES:  At this time I will admit it through

14  him and only show the jury something that comes within the time

15  frame.

16          I am not going to put it up there so -- I don't have

17  time to redact this.

18          MR. ZACCA:  You are going to publish the dates within

19  the time period?

20          THE COURT:  All right.

21          (Sidebar concluded.)

22  BY MS. JOHANNES:

23  Q.  Now, Mr. Yockey, your company, backpage.com, relating to

24  the email address, firestarter92.com --

25  A.  Yes.

1   Q.  I will show you what is marked for identification as

2   Government Exhibit 73.

3           Sir, do you know what that is?

4   A.  Backpage.com screen shots, advertisements.

5   Q.  And that packet that I handed to you, was that produced to

6   the United States in response to the subpoena?

7   A.  Yes.

8   Q.  And those documents you know were kept in the course of

9   Backpage's business?

10  A.  Yes.

11          MS. JOHANNES:  I move to Exhibit 73 in evidence with

12  the caveat the Government will redact it.

13          MR. ZACCA:  No objection based on that redaction.

14          MR. WILCOX:  No objection.

15          THE COURT:  All right.  Government Exhibit 73 will be

16  received in evidence.

17          [Government Exhibit 73 received in evidence.]

18  BY MS. JOHANNES:

19  Q.  Now, if I could have that back.

20          Now I would like to go over one of the ads.

21          MS. JOHANNES:  Your Honor, if I could publish.

22          THE COURT:  You may.

23  BY MS. JOHANNES:

24  Q.  What am I looking at?

25  A.  This is an ad in the escort section from an administrative

1   point of view.

2   Q.   How is this ad from an administrative point of view?

3   A.   The information contained directly below the header there

4   within the yellow box, as well as the information contained at

5   the bottom of the page there titled administrative data, is

6   only viewable to individuals who work for Backpage with the

7   right to view it from that point of view.

8   Q.   Okay.

9        Just so you understand, your screen is a touch screen,

10  and if you touch it, everyone will see what you are talking

11  about.

12  A.   Okay.

13  Q.   I believe you said the top below the inscription?

14  A.   This area here.

15  Q.   And the bottom portion?

16  A.   Administrative data.

17  Q.   All of that information in the yellow boxes are only

18  available to Backpage?

19  A.   Correct.

20  Q.   Now, if we could zoom in on this, sir, what does the top of

21  this say?

22  A.   This ad is not live, expired.

23  Q.   What does that mean?

24  A.   That means the ad had run its course and is now expired.

25  Q.   That is something internal for backpage.com?

1  A.  Correct.

2  Q.  And below that, it has 80 and a dollar sign and 80.  Do you

3  see that?

4  A.  Yes.

5  Q.  Who writes the information contained on that line?

6  A.  The user.

7  Q.  And when was this ad posted, sir?

8  A.  June 15, 2012.

9  Q.  And it has a time there?

10  A.  7:08 a.m.

11  Q.  Is that Eastern Standard Time, Pacific?  What time is that?

12  A.  That would be local to Fort Lauderdale, so Eastern.

13  Q.  In the yellow box we see white listed.  Do you see that?

14  A.  Yes.

15  Q.  What does that mean?

16  A.  That means the ad was paid for.

17  Q.  Do you know how much was paid for this ad?

18  A.  If I could see in the administrative portion, I could tell

19  you.

20  Q.  Okay, we will get to that in a moment.

21       In the bottom portion we see some text.  Who writes

22  the text?

23  A.  That would be the user as well.

24  Q.  Now, moving to the bottom portion which deals with the

25  administrative side of things, I want to focus your attention

1   on the right-hand column, where it says name, it says FBDD.

2       Who puts that name in there, sir?

3   A.  The user.

4   Q.  What time is that name put there?

5   A.  At the time of this ad update, so if this ad has multiple

6   invoices, the latest invoice created and paid for, the

7   information paid for, name, phone number would reflect in the

8   administrative data box there.

9   Q.  And the name could change there as the invoices continue?

10  A.  Correct.

11  Q.  Every time a person makes a payment, they could change the

12  name?

13  A.  Correct.

14  Q.  The phone number is not listed clearly as a phone number,

15  it is FL it appears?

16  A.  Correct.

17  Q.  And the email address, what is that?

18  A.  Firestarter92@hotmail.com.

19  Q.  Does the email of the account change?

20  A.  Being it is the account name, no.

21  Q.  The email always remains consistent?

22  A.  Yes.

23  Q.  Depending on different ads, it always remains the same?

24  A.  Yes.

25  Q.  User created, that is when it was created on to

1  backpage.com?

2  A.  Yes.

3  Q.  To the left, it says view all ads by the user on the site,

4  44.

5          What does that mean?

6  A.  If you put on the hyperlink it will take to you a page with

7  the listed adds, if you click on the website you see 44 adds

8  listed by the user.

9  Q.  Now, at the bottom it says invoices for this add, do you

10  see that?

11  A.  Yes.

12  Q.  What does that relate to?

13  A.  The invoices

14  A.  The invoices?

15  Q.  Correct.

16  A.  There would be a series of invoices attached to this ad

17  generated every time there was a reposting of this ad.

18  Q.  Okay.

19          I see on the second page for this ad it says deleted

20  images.

21  A.  Yes.

22  Q.  Who deletes these images?  Is this by the user or Backpage?

23  A.  It would be by the moderators.

24  Q.  Who is that?

25  A.  People reviewing the ads.

1   Q.  Somebody from Backpage deleted this?

2   A.  Yes.

3   Q.  Now, every time an invoice is sent to a user, is a receipt

4   generated?

5   A.  I'm sorry?

6   Q.  Is a receipt generated?

7   A.  That would be invoices only reviewable to Backpage.

8   Q.  The invoices, does the user get anything in their email?

9   A.  If they did an update, they would have to okay that and

10  release that they are updating it.

11  Q.  What would the user get in the account?

12  A.  Verification.

13  Q.  The documents we are talking about, the email that would be

14  firestarter92@hotmail.com, they get a verification?

15  A.  Correct.

16  Q.  I want to show you another page on Government 73, it

17  follows the ad we just reviewed.

18          Sir, what am I looking at?

19  A.  This is a portion of an invoice generated by Backpage.

20  Q.  Okay.

21          And is this an invoice that would reflect someone

22  adding more money on to an ad?

23  A.  It would reflect an update, yes.

24  Q.  And here the price that was being added looks like -- is

25  that $7?

1   A.  Yes.

2   Q.  Who fills out the customer information?

3   A.  The user.

4   Q.  And this is for the email address we are discussing,

5   firestarter92@hotmail.com?

6   A.  Yes.

7   Q.  What do you see for a name?

8   A.  Genet Rembert.

9   Q.  And what address?

10  A.  1 ST Hallandale, Florida, 33000.

11  Q.  Genet Rembert and an address in Florida, South Florida?

12  A.  Yes.

13  Q.  Who would put in that information?

14  A.  The user.

15  Q.  So the person using the firestarter92@hotmail.com is who is

16  posting this ad?

17  A.  Correct.

18          MS. JOHANNES:  One moment, Your Honor.

19          THE COURT:  Sure.

20          MS. JOHANNES:  Thank you, Mr. Yockey.

21          THE COURT:  Cross, Mr. Zacca.

22          MR. ZACCA:  Yes, Judge.

23                  CROSS EXAMINATION

24  BY MR. ZACCA:

25  Q.  Mr. Yockey, good afternoon.

1    A.   Good afternoon.

2    Q.   I just have a few questions for you.   Okay?

3    A.   Okay.

4    Q.   You are the custodian of records for backpage.com?

5    A.   Yes.

6    Q.   It is your responsibility to respond to subpoenas?

7    A.   Yes.

8    Q.   And you responded to a Government subpoena in this case,

9    correct?

10   A.   Yes.

11   Q.   And the records that we started looking at today were

12   records that you assembled, correct?

13   A.   Correct.

14   Q.   Records you assembled in response to the Government

15   subpoena, correct?

16   A.   Correct.

17   Q.   In assembling these records, did you review these records?

18   A.   Yes.

19   Q.   You wanted to make sure the records were responsive to the

20   subpoena?

21   A.   Correct.

22   Q.   In reviewing the records, you never saw the name Mackenley

23   Desir, correct?

24   A.   No.

25   Q.   No, you did, or no, you didn't?

1   A.   I did not.

2          MR. ZACCA:  No further questions.

3          MR. WILCOX:  No questions.

4          THE COURT:  Any redirect?

5          MS. JOHANNES:  No, Your Honor.

6          THE COURT:  Thank you, Mr. Yockey, you may step down.

7          All right.  Your next witness is C.J.?

8          MS. JOHANNES:  Yes.

9          THE COURT:  Folks, I need a couple of minutes with the

10  lawyers.  I ask you to step back in the jury room.  Don't

11  discuss the case.

12          (Thereupon, the jury leaves the courtroom.)

13          THE COURT:  All right.  Folks, you all can be seated.

14          Mr. Zacca, had you completed your argument?

15          MR. ZACCA:  I believe so, Judge.  I am arguing by

16  analogy this Berghuis opinion.  I am arguing -- Judge, if I

17  could have a moment.

18          THE COURT:  Sure.

19          MR. ZACCA:  Judge, Mr. Fernandez read the opinion.

20  Could he make the argument?  He has a good command of the facts

21  of this case.

22          THE COURT:  He may do so.

23          MR. FERNANDEZ:  Thank you, Your Honor.

24          Judge, in the Mathis versus Berghuis, B-E-R-G-H-U-I-S,

25  case out of the Eastern District of Michigan, a 2002 case, this

1   was a habeas position, 2255 essentially, where the defendant

2   had been convicted in Michigan of rape of one victim.

3           Even though it was a Brady violation claim, the

4   analysis did take into account the relevancy of the Brady

5   violation and ultimately agreed with granting the defendant's

6   habeas.

7           The Brady violation was the Government -- or the State

8   of Michigan failed to disclose two prior incidents in which the

9   victim not lied, and this is crucial -- the victim was not

10  proven to have lied, but law enforcement did not find enough

11  corroboration of the two prior complaints, therefore they

12  closed the case.

13          These two prior complaints consisted of, seven years

14  prior to the defendant's conviction, she accused the man of

15  raping her.  The police investigated the case.  They found no

16  corroboration whatsoever of her story.

17          They, after many times trying to get her in trying to

18  get more facts about the story, they got her in.  She actually

19  picked a guy out of a lineup.

20          The police never found this so-called rapist, and

21  eventually dropped the case or closed the investigation as

22  inconclusive.  That was incident number one seven years prior

23  to the sentencing and conviction of this particular defendant.

24          The second incident was earlier in time to the

25  conviction.  That was three years prior.  I believe the

1   conviction was in 1995.  This second incident was in 1992.

2           This second incident had to do with an armed robbery

3   in which she was a victim.

4           There was no sexual connotation to that incident.  She

5   had not been raped according to her, essentially an armed

6   robbery, investigated, inconclusive.  She was prompted for more

7   details, she may have even be confronted with some

8   inconsistencies, and once again, no corroboration, therefore

9   case closed.

10          Now this defendant goes on trial for rape, the

11  Government does not disclose these two prior incidents.  It

12  goes up and gets affirmed, eventually goes to the District

13  Court on habeas, and the District Court says, number one, there

14  is a Brady violation, and goes into the analysis of why and the

15  relevancy of that evidence and what the defendant could have

16  done with that evidence.

17          The District Court specifically stated that as of

18  those two instances of prior allegations made by this victim,

19  the defendant would have had a right to explore that evidence

20  during his trial.

21          In fact, the Court went on to assess in case there was

22  any doubt about any dissimilarity between the robbery and the

23  rape seeing how these were two different cases, and the

24  District Court still found that the robbery, because it was a

25  crime of violence, and the rape, because it is another crime of

1 violence, possessed such close similarities in terms of it

2 being crimes of violence, the defendant should have been

3 afforded an opportunity to know that information and to defend

4 himself using that information whether it would have been

5 through cross-examination or in his case in chief.

6         Now, I will submit to the Court that in a flip note

7 the District Court does say and -- gives a disclaimer and says

8 we are assessing and interpreting Michigan law.

9         Let me read to the Court what it says about Federal

10 law and the rape shield law.  This is in a footnote, Footnote

11 Number 6.  Again, the Court had been interpreting Michigan law

12 up to this point and it says:

13         "Although the Michigan Supreme Court decided Wilson, a

14 case they relied upon before the advent of Michigan's rape

15 shield statute, Wilson remains good law because Wilson concerns

16 admissibility of evidence that the complainant made false

17 accusations of rape in the past and not evidence of the

18 complainant's sexual history."

19         In case there is any doubt it has to do with rape

20 shield, it has nothing to do with the victim's sexual history,

21 just the fact that she made false accusations, and goes on to

22 talk about in Footnote Number 7 that there is authority on the

23 Federal level and particularly cites Lemon versus Ohio, another

24 District Court case from Ohio, Northern District, 1992, cited

25 at 1192 WL, 551565, for the proposition that at the Federal

1   level there is authority to suggest this kind of evidence is

2   admissible.

3        The incident we are trying to get introduced, although

4   not having to do with prostitution, does have to do with drugs

5   and does have to do with a false accusation that she has

6   recanted.

7        That is important because all these Federal cases do

8   discuss is there evidence that the prior accusation is false.

9        THE COURT:  How do we know it is a false accusation?

10        MR. FERNANDEZ:  She recanted.

11        THE COURT:  That makes it false?

12        MR. FERNANDEZ:  Let me explain what this says.

13        THE COURT:  This case that you are citing, is it a

14   District Court case?

15        MR. FERNANDEZ:  A District Court case.

16        THE COURT:  In Michigan?

17        MR. FERNANDEZ:  Yes.  What the District Court says,

18   they care because it has been proven, or an indicia of

19   falsehood.  In this District Court case, the Court goes to

20   great length to say we know the victim in this case did not

21   recant.  We know there is no evidence, positive evidence that

22   the past allegations of the robbery and the rape were false,

23   however, there is enough indicia in the police report of those

24   investigations that had the defendant been able to expose that,

25   it shows to the Court's satisfaction that a jury could conclude

1   that the victim lied.

2           THE COURT:  All right.  You agree the Court is not

3   bound by that Michigan case.

4           MR. FERNANDEZ:  Absolutely, it is just an analogy.

5           MR. ZACCA:  Judge, perhaps it would educate or provide

6   illumination for the Court to actually look at the petition and

7   recantation.

8           THE COURT:  What concerns me here is, how do we know

9   whether she lied or not?  Just because she recanted, doesn't

10  mean she lied.

11          MR. ZACCA:  I agree with that, Judge, but the fact

12  that she recanted is enough for the jury to assess because

13  here, if she said that she was forced to recant or whatever

14  reason that she recanted, she can say that on

15  cross-examination.

16          THE COURT:  But certainly there was enough -- there

17  were sufficient injuries for her to be hospitalized.

18          MR. ZACCA:  That is unclear to me.  I don't know if

19  this incident resulted in a hospitalization.

20          THE COURT:  I am talking about in this case.  We know

21  she was hospitalized back in 2008, as a result of the injuries.

22          MR. ZACCA:  My understanding of the evidence -- and

23  the Government can correct me -- I think that is relating to an

24  old boyfriend.

25          THE COURT:  I thought that is what you told me.

1    MR. ZACCA:  No, this is relating to her first

2  boyfriend, Brennan Bigelow, that predates Mr. Young.

3    The mother spoke of Mr. Young as the most recent

4  boyfriend, and that boyfriend she did drugs with according to

5  Ms. Hubbard.  Then we enter the testimony of Mr. Johnson, the

6  father.  He then conceded that she also had a boyfriend that

7  predated Mr. Young by the name of Brennan Bigelow.

8    Honestly, Judge, I didn't know he was going to say

9  that she did drugs with Mr. Bigelow.  That came as a surprise

10  to me.  I didn't have an opportunity to depose.  I did some

11  fishing there and I am surprised he said that.

12    THE COURT:  Was she hospitalized?

13    MR. ZACCA:  I don't know the answer to that.  All I

14  have is the petition initially filed for the restraining order

15  and her subsequent petition --

16    THE COURT:  I thought you told me she was hospitalized

17  three years ago and I have 5/11/08.

18    MR. ZACCA:  That hospitalization is something the

19  Government mentioned which they believed what I was going at,

20  and that is not what I was going at.  I have no idea of this

21  hospitalization three years ago.  I don't know anything about

22  that.

23    THE COURT:  What is the date of this petition?

24    MR. ZACCA:  The initial petition -- she signs it May

25  11, 2008, and her petition to rescind it is January 30, 2009.

1    THE COURT:  Okay.  What evidence is there that she

2  lied?

3    MR. ZACCA:  I quote -- this is her handwriting -- I

4  don't want to say it is her handwriting, but she signs it, it

5  is an affidavit.  "At the time of the restraining order I had

6  been living with Mr. and Mrs. Bigelow, Brennen's parents, and

7  they took very good care of me and supported me.  I would like

8  this restraining order taken off because I feel my mother and

9  stepfather put it on me and I was not of the right mind to

10  understand what they were doing.  They did it because my mother

11  thought Brennen and I were going to leave the state."

12    Compare what she said there, basically her mother and

13  stepfather pushed her into to doing that or make that

14  accusation, and her accusation approximately six months prior

15  was that -- actually, in the mother's handwriting she says, "My

16  daughter, C.J., has come to me this afternoon and she has

17  opened up her abuse by Mr. Brennen.  There is physical bruises,

18  stab wounds in her knee, and bruised nose bridge, and he put a

19  blanket over her head and was strangling her.  This is all

20  recent."

21    That is what the mother says C.J. told her when she

22  filed the petition on behalf of C.J. because at the time she

23  was 16, but she signs it on the bottom.  And you have what I

24  read to you earlier, Judge, with regard to her saying, you

25  know, her mother and stepfather put her up to it.

1   So, if in fact it happened, let her be cross-examined

2   on it, and she can certainly explain the situation, but I think

3   it is fair game, especially when the Government is saying, and

4   the Government's case is built upon abuse, threats of violence,

5   and coercion.

6   It just seems like it is fair.

7   THE COURT:  I assume the Government can tell me -- I

8   assume you've got pictures of the black and blue marks when she

9   was finally reunited with her father.

10   MS. VIAMONTES:  In fact, Your Honor, the Government

11   has pictures before she was reunited with her father, when she

12   was arrested by law enforcement on the prostitution charge

13   three days after Ms. Rembert beat the daylights out of her, we

14   have photographs of the victim.

15   Your Honor, there is nothing showing that what is in

16   the affidavit written by Mrs. Hubbard is false, nothing at all.

17   Defense is trying to make this case everything about

18   C.J. being a horrible child and a horrible person to detract

19   this jury from the fact that these two defendants beat her and

20   forced her to commit prostitution.  They are trying to make

21   this case about everything but the facts of this case.

22   This three years ago has nothing to do -- three years

23   prior to the acts alleged in the case has nothing to do with

24   whether the two defendants forced C.J. to engage in commercial

25   sex acts by force, fraud and coercion.

```
 1            It is just to show the jury, you know what, this girl
 2   gets herself into trouble all the time.  She is promiscuous,
 3   living with these boyfriends' at a young age, look, he beat her
 4   before, to show bad character.  It's improper character
 5   evidence, and there's nothing to show it is false.
 6            The mere mention of this in front of the jury is
 7   unfairly prejudicial and prevents the Government from having a
 8   fair trial.
 9            MR. ZACCA:  I obviously disagree.  The issue is
10   credibility and the fact that she wrote and signed an affidavit
11   that her mother and stepfather put her mind to it and she
12   didn't have the right mind, that is the issue.  That is the
13   issue, it is her credibility.  This entire case rests on her
14   credibility.
15            MS. JOHANNES:  Your Honor, if I may, I pulled up the
16   Eleventh Circuit criminal handbook which probably has more
17   precedent in this Court than this case.
18            608(b), let's not muck up the case law, they are
19   trying to get this under 608(b).  608(b) specifically says --
20   relates to acts of truthfulness, not trying to impeach
21   someone's character, not trying to go to bad character.  It
22   goes to a specific act of untruthfulness.
23            Here, if you read the petition -- I don't know if
24   Mr. Zacca was able to hand it up to you -- what this says is
25   this is a minor child.  C.J. was under 18 when this restraining
```

1  order was filed.  As parents you have a right to file a

2  restraining order for your child if you believe they are in

3  danger of someone else, which is what her parents did.

4         She must have written something saying I would like

5  the restraining order taken off.  That doesn't go to, hey, I

6  was lying, hey, my parents were lying, someone else was lying.

7  That goes to a minor child being confused, apparently, and

8  saying I want the restraining order taken off.

9         There is nothing that says I lied, it was untrue, my

10 parents lied.  It is just not on this paper.  I don't

11 understand how this could possibly be relevant.

12        THE COURT:  All right.  The Court finds that the

13 proffered evidence regarding the recantation of a petition for

14 a restraining order back in 2008 does not establish the

15 untruthfulness of C.J.

16        The Court further finds that the evidence is not

17 relevant and that any possible probative value that could be

18 gleaned from the evidence is substantially outweighed by the

19 prejudicial effect.

20        So the Government's objection will be sustained.

21        All right.  Let's bring in the jury.

22        MR. WILCOX:  Judge --

23        THE COURT:  You need a restroom break?

24        MR. WILCOX:  Yes.

25        THE COURT:  Ma'am, I'm sorry, five minutes.

1          (Thereupon, a short recess was taken.)

2          THE COURT:  All right.  The record will reflect that

3   both defendants are present represented by counsel.

4          Mr. Culuffo, would you bring in the jury.

5          (Thereupon, the jury returns to the courtroom.)

6          THE COURT:  All right.  The Government may call your

7   next witness.

8          MS. VIAMONTES:  Thank you, your Honor.

9          At this time, United States of America calls C.J..

10          THE COURT:  Ms. C.J., if you would please step over

11   there.  When you get there remain standing and raise your right

12   hand.

13          C.J., GOVERNMENT'S WITNESS, SWORN.

14          THE COURT:  Would you please be seated.  Pull your

15   chair close to the microphone.

16          Please give us your name and spell your last name for

17   the record.

18          THE WITNESS:  C.J.

19          THE COURT:  Ms. Viamontes, you may inquire.

20          MS. VIAMONTES:  Thank you, your Honor.

21                    DIRECT EXAMINATION

22   BY MS. VIAMONTES:

23   Q.  How old are you, C.J.?

24   A.  21.

25   Q.  When did you turn 21?

1   A.   January 26, 1992.

2   Q.   Where are you from?

3   A.   Rutland, Vermont.

4   Q.   Did you grow up in Vermont?

5   A.   Yes.

6   Q.   Before April 2012, did you come to Florida before?

7   A.   Once on vacation.

8   Q.   Did you ever live in Florida?

9   A.   No.

10   Q.   Back in mid-2012, did you move to South Florida?

11   A.   Yes, I did.

12   Q.   And what was the purpose of you coming to South Florida?

13   A.   To go to a sober living house in Boca Raton.

14   Q.   Do you recall the name of the sober living house?

15   A.   The Bridge.

16   Q.   Why did you choose to go to the Bridge?

17   A.   I chose -- I was on line, and looking up places to go for

18   sober living and sober comfortable for me and I found the

19   Bridge on line.

20   Q.   Are recovery programs expensive?

21   A.   Yeah.

22   Q.   Who was helping you pay for the Bridge?

23   A.   My dad helped me.

24   Q.   Your dad helped you?

25   A.   Yeah.

1   Q.   Why did you feel you needed to go into a recovery program?

2   A.   I just wanted some more support in my life to help me get

3   on my feet.

4   Q.   Did you have a drug addiction problem?

5   A.   Yes, I did.

6   Q.   Prior to coming to Florida, which drugs were you addicted

7   to?

8   A.   I was addicted to heroin and coke.

9   Q.   And when you say coke, do you mean powder cocaine or crack

10   cocaine?

11   A.   Powder.

12   Q.   Before coming to Florida, had you ever done crack cocaine?

13   A.   A couple times, yes.

14   Q.   Where is the Bridge?

15   A.   The Bridge is in Boca Raton.

16   Q.   Prior to going to Boca Raton to participate in the Bridge's

17   program, were you familiar with South Florida?

18   A.   No.

19   Q.   Prior to coming to South Florida, had you ever used the

20   drug Dilaudid?

21   A.   No.

22   Q.   I am sorry?

23   A.   No.

24   Q.   You had not?

25   A.   No, I hadn't.

1  Q.  Please tell the members of the jury what Dilaudid is?

2  A.  Dilaudid is a pain pill, prescribed to people who had

3  surgery done.

4  Q.  And when did you first use Dilaudid?

5  A.  Um-m-m, here in Florida when I was in the Bridge.

6  Q.  How does Dilaudid make you feel?

7  A.  Um-m-m, it numbs your whole body, makes you feel nothing.

8  It clears your mind and relaxes you, relaxes all your muscles

9  so you can't feel anything.

10  Q.  Why did you leave the Bridge?

11  A.  I left because I was -- I had used and relapsed.

12  Q.  While you were at the Bridge, were you working?

13  A.  Yes, I was.

14  Q.  Where were you working?

15  A.  I was working at two restaurants in Delray.

16  Q.  What were you doing at the restaurants?

17  A.  Waitressing and hostessing.

18  Q.  And how long were you at the Bridge?

19  A.  I'm not sure on the exact time limit.

20  Q.  While you were at the Bridge, would you communicate with

21  your mom and dad by phone?

22  A.  Yeah, I would.

23  Q.  Tell us about how it came up or how you were expelled from

24  the Bridge?

25  A.  They do random drug screens and they came in to do drug

1  screens for everyone in the house and they asked me if I would

2  be able to do it and I told them that I couldn't, in that I

3  relapsed.

4  Q.  And what drug had you used while you were at the Bridge?

5  A.  Dilaudid.

6  Q.  Did there come a time that you met somebody that is now

7  known to you by the name of Mackenley Desir?

8  A.  Yes.

9  Q.  Please tell the members of the jury how you met Mackenley

10  Desir.

11  A.  I met him, I was at a hotel and I was looking for drugs and

12  I ran into somebody who had mentioned that their cousin could

13  get drugs for me just to wait.  So, I waited and he had pulled

14  up and I got into the car.

15  Q.  So you run into somebody, that first person you run into

16  that says he is going to introduce you to his cousin, do you

17  know his name?

18  A.  No.

19  Q.  Okay.  Do you ask that first person for drugs?

20  A.  Yes.

21  Q.  You said he pulled up in his car.  Who are you referring to

22  when you say he?  Who pulled up in his car?

23  A.  Zoe.

24  Q.  Did you know another name for Zoe?

25  A.  Yes.

1  Q.  What would you call him?

2  A.  Daddy.

3  Q.  C.J., do you see Zoe or Daddy here in the courtroom today?

4  A.  Yes.

5  Q.  Could you please point him out and mention an article of

6  clothing he is wearing?

7  A.  He is wearing the black suit.

8        MS. VIAMONTES:  Your Honor, for the record, the

9  witness positively identified the Defendant Mackenley Desir.

10        THE COURT:  The record will so reflect.

11 BY MS. VIAMONTES:

12 Q.  Now, C.J., once Daddy arrived in his car, what did you do?

13 A.  I got into the car and waited for the drugs.  I asked him

14 if he was the one who had them.

15 Q.  Okay.  And was that out of the ordinary and is this

16 something that is normal to get into a car if you are looking

17 for drugs?

18 A.  Yes.

19 Q.  Tell us, before you get in the car and meet Mackenley

20 Desir, describe what you were doing and your demeanor --

21 A.  Would you repeat that?

22 Q.  It is a bit of a compound question.

23        Can you describe to the jury your state of mind before

24 you met Mackenley Desir?

25 A.  I was very emotional.  I had been using a lot of drugs and

1  I was coming down from the drugs and I was in a desperate

2  search to find more.

3  Q.  Was it visible that you were emotional and distraught?

4  A.  Yes.

5          MR. WILCOX:  Visible by who, judge?  Objection.  It

6  necessarily goes into the mind of whoever was observing her,

7  improper.

8          THE COURT:  Overruled.

9  BY MS. VIAMONTES:

10  Q.  Could anybody looking at you see that you were distraught?

11         THE COURT:  Sustained to that question, the other one

12  I didn't find objectionable.

13         She can't say as to how other people viewed her.

14  BY MS. VIAMONTES:

15  Q.  What visible signs were you showing about your emotional

16  state?

17  A.  I was crying.

18  Q.  What were you wearing?

19  A.  I was wearing, um-m-m, a large T-shirt and sandals.

20  Q.  By a large T-shirt, how far did that go down, that T-shirt?

21  A.  To my knees.

22  Q.  Like a cover --

23  A.  No, a guy's T-shirt.

24  Q.  So, you get into the car.  Where is the car located when

25  you get into the car?

1  A.   In the parking lot.

2  Q.   In the parking lot of what?

3  A.   Of the hotel we were -- I was at.

4  Q.   Do you recall the name of that hotel?

5  A.   I think it was the Homing Inn.

6  Q.   So you get into the car, what do you do?

7  A.   I get the drugs.

8  Q.   What drugs are you given?

9  A.   Cocaine, crack cocaine.

10 Q.   And are you given the drugs immediately when you get into

11 the car?

12 A.   Yes.

13 Q.   Why don't you just step out of the car and go back into the

14 Homing Inn?

15 A.   Because he told me to wait a minute and he started driving

16 around.

17 Q.   Where was he going?

18 A.   I figured he was going around the block to not have any

19 attention.

20 Q.   Is that out of the ordinary for a drug transaction, to go

21 around the block?

22 A.   No.

23 Q.   So you get into the car, he gives you the crack.  You drive

24 off.  What happens then, where do you go?

25 A.   We go to a neighborhood.  We stop in front of a house.

1  Q.  Do you know where you are at at this point?

2  A.  Not really.

3  Q.  Who else is in the car besides you and Daddy?

4  A.  There was another guy, I know him as Zoe, too, Zoe.

5  Q.  Once you get the crack cocaine, do you ingest it right

6  away?  Did you use it?

7  A.  I tried to.

8         I took one hit and the guy that was in the car told me

9  not to do that.

10  Q.  Okay.  Where were you when you took a hit from the crack

11  cocaine?

12  A.  I was sitting in the back seat.

13  Q.  And was Daddy in the car when that happened?

14  A.  No.

15  Q.  Where were you-- Where was the car?

16  A.  Parked outside the house.

17  Q.  So, when you get to the house, what does Daddy do?

18  A.  He gets out of the car and goes inside to the house where

19  we were parked in front of.

20  Q.  Do you stay alone in the car or does someone stay with you?

21  A.  The other guy in the passenger seat, he stayed in the car.

22  Q.  Did you pay for these drugs?

23  A.  No, not yet.

24  Q.  Was that abnormal to not pay for the drugs right away?

25  A.  I was thinking I was going to pay the guy that was at the

1  hotel.

2  Q.  C.J., tell us what belongings you had with you when you got

3  into Daddy's car?

4  A.  I had my purse with my phone and my wallet with my

5  identification and Social Security card.

6  Q.  You mentioned you had a cell phone, a cell phone, correct?

7  A.  Yes.

8  Q.  Do you recall the number for that cell phone?

9  A.  It was 802-353-1793.

10  Q.  And do you recall the service provider or the company you

11  had the phone with?

12  A.  It was AT&T.

13  Q.  Can you describe the car that Daddy was driving you in?

14  A.  It was a black car with tinted windows.

15  Q.  The AT&T cell phone that you mentioned, cell number 802

16  353-1793, where did you get that cell phone, C.J.?

17  A.  I got it in Vermont.

18  Q.  Who paid for that phone?

19  A.  My grandmother.

20  Q.  Do you know whose name it was under?

21  A.  I don't think that there is a name that has to be provided

22  with it because it is pay-as-you-go phone.

23  Q.  Okay.  How long are you outside that house while Mackenley

24  Desir or Daddy, as you knew him, went inside the house?  How

25  long were you waiting for him?

1  A.  I can't remember exactly the time.

2  Q.  Does he eventually come back?

3  A.  Yes, he does, after a little while.

4  Q.  When he comes back, does he take you back to where he got

5  you from, the Homing Inn in Boynton?

6  A.  No.

7  Q.  Where did you go?

8  A.  We start driving and I don't recognize any of the places

9  around me.

10  Q.  Does it seem like you are driving for awhile?

11  A.  Yeah.

12  Q.  Does it seem like you go pretty far?

13  A.  Yeah, it does.

14  Q.  Where did you end up?

15  A.  I ended up at a motel.

16  Q.  Do you recall the name of it?

17  A.  The Beach and Town.

18  Q.  The Beach and Town Motel?

19      Where is the Beach and Town Motel located, C.J?

20  A.  I don't know that.

21  Q.  Tell the members of the jury what happens when you arrive

22  at the Beach and Town Motel.

23  A.  When we pull up to the Beach and Town, I had my phone taken

24  away and he had put it up in the center console of the car and

25  him and his friend got out of the car and went into the hotel.

1  Q.  Do you know why Daddy took the cell phone away from you?

2  A.  No, I don't.  I don't.

3  Q.  Were you trying to use it?

4  A.  Yeah, I was.

5  Q.  When you arrived at the Beach and Town Motel, where did the

6  car pull up to?

7  A.  We pulled up to a parking lot, a small parking lot

8  inbetween the motel and it was kind of like an alley kind of

9  parking lot.

10 Q.  Let me ask you, C.J., as this car ride is going on and you

11 are driving for awhile, seems like a long distance, do you

12 inquire, do you ask, where are we going, what is going on?

13 A.  Yeah, I did ask several times.

14 Q.  And were your questions answered?

15 A.  No.

16 Q.  What did Daddy say in response to your question of where

17 are we going?

18 A.  He didn't respond to me.  He just turned the music up

19 louder.

20 Q.  Did you then begin to get concerned?

21 A.  Yes, I did.

22 Q.  When you arrived at the Beach and Town Motel, did you get

23 out of the car and accompany Daddy into the motel?

24 A.  No.

25 Q.  Why not?

1   A.  I don't know.

2   Q.  You stayed in the car?

3   A.  Yeah.

4   Q.  Were you asked to stay in the car?

5   A.  I was asked to wait there.

6   Q.  While you are waiting in the car, what were you doing?

7   A.  I was just sitting there waiting.

8   Q.  Did you try to reach out to anyone?

9   A.  I made a couple text messages saying where I was didn't

10  feel right, I didn't feel safe.

11  Q.  And after you used your cell phone to make those text

12  messages, did you see Daddy, also known as, Mackenley Desir

13  appear again?

14  A.  Yes.

15  Q.  What did he say?

16  A.  He told me that it was a trick and that he was testing me.

17  Q.  Did he let you keep your phone?

18  A.  No.

19  Q.  What did he do?

20  A.  He took it and put it back in the center console.

21          MS. VIAMONTES:  Your Honor, may I approach?

22          THE COURT:  You may.

23  BY MS. VIAMONTES:

24  Q.  C.J., I am showing you what is pre-marked Government

25  Exhibit 8 and 9 for identification.

503

1          Let's take Exhibit 8 first.

2          What is it?

3  A.   It's a picture of the motel.

4  Q.   Is that a true and accurate depiction of the Beach and Town

5  Motel back in June 2012?

6  A.   Yes.

7  Q.   Now let me direct your attention to Government Exhibit 9

8  for identification.  Do you recognize that?

9  A.   Yes.

10 Q.   And what is it?

11 A.   The side parking.

12 Q.   And does that photograph truly and accurately depict the

13 side parking area of the Beach and Town Motel back in June

14 2012?

15 A.   Yes.

16          MS. VIAMONTES:  At this time, the Government moves

17 Government 8 and 9 into evidence.

18          THE COURT:  Any objection?

19          MR. ZACCA:  No objection.

20          MR. WILCOX:  No, your Honor.

21          THE COURT:  Government's 8 and 9 will be received.

22          (Government Exhibits 8 and 9 received in evidence.]

23          MS. VIAMONTES:  Permission to publish, your Honor.

24          THE COURT:  Granted.

25 BY MS. VIAMONTES:

504

1  Q.  C.J., is this the motel where you arrived back in June 2012

2  with Mackenley Desir?

3  A.  Yes, it is.

4  Q.  Now, C.J., tell the members of the jury --

5          Did Mr. Desir or Daddy as you knew him return to the

6  car and take you into the motel?

7  A.  Yes.

8  Q.  Do you know how long you were waiting for him to return?

9  A.  I can't remember the time.

10 Q.  When he took your phone away from you as you are waiting in

11 that car for him to return, do you continue to get concerned?

12 A.  Yes, I was very worried.

13 Q.  C.J., why didn't you just open the door and leave at that

14 point?

15          Could you open the door to the car and leave?

16 A.  I could have, yes, but I was also -- I didn't know where I

17 was and I was hoping to get more drugs.

18 Q.  Did you expect stay at the Beach and Town for a long period

19 of time?

20 A.  No.

21 Q.  What did you think was going to happen?

22 A.  I wasn't sure.

23 Q.  Were you expecting to be returned to Boynton Beach?

24 A.  Yes, I was.

25 Q.  Once Mr. Desir, the Defendant, got out, came back into the

1  car and took you out of the car, where did you go?

2  A.  We went to one of the downstairs room.

3  Q.  Tell the jury what happened when you got in the room.

4  A.  He told me to get comfortable, take a shower, whatever I

5  needed to do.

6  Q.  Was he nice to you?

7  A.  Yes.

8  Q.  I am sorry, the microphone is having trouble --

9  A.  Yes.

10  Q.  Did you get any more drugs from Mr. Desir shortly after

11  arriving?

12  A.  Yes, I did.

13  Q.  What did he give you?

14  A.  More Dilaudid and crack.

15  Q.  Is Dilaudid addictive?

16  A.  Highly addictive.

17  Q.  How do you ingest or use Dilaudid?

18  A.  I would inject it.

19  Q.  And the jurors may not understand how a pill is injected,

20  can you tell us?

21  A.  You crush it up, break the pill down to a powder and put it

22  in a spoon and put the water in the spoon with the crushed up

23  pill and mix it together and then you put a piece of cotton in

24  with the liquid that is in the spoon and you pull it back into

25  the needle.

```
 1   Q.   How did --
 2            Strike that.
 3            Did you and the Defendant Desir have a conversation
 4   about what drugs you wanted?
 5   A.   No, not exactly.
 6   Q.   Okay.  Did he just offer Dilauded to you or did you ask
 7   him?
 8   A.   I can't remember.
 9   Q.   Aside from Dilaudid, what other drugs did he give you
10   shortly after arriving at the motel?
11   A.   Crack.
12   Q.   So, would you take both drugs simultaneously?
13   A.   Yes, yes, I would.
14   Q.   And why would you take both drugs simultaneously?
15   A.   It's just more effective way to get high.
16   Q.   Did the Defendant Desir have to go out looking for these
17   drugs or did he have them at his disposal?
18   A.   He had them.
19   Q.   Now, at this point, in the room shortly after arriving, do
20   you have your cell phone with you?
21   A.   No, I don't have it.
22   Q.   Were you allowed to use your phone?
23   A.   No.
24   Q.   And shortly after you arrive, after using the drugs, do you
25   start having a conversation with Mr. Desir?
```

1   A.   Yes, I do.

2   Q.   What are you talking about?

3   A.   Just personal conversation about -- he was asking me

4   questions about my family and what I was doing in Florida and

5   just asking me questions like that.

6   Q.   So, Mr. Desir or Daddy, as you knew him, was asking you

7   questions about your personal life?

8   A.   Yeah.

9   Q.   Did you tell him you were from Vermont?

10  A.   Yes, I did.

11  Q.   What did he ask you about your family?

12  A.   I can't remember.

13  Q.   Okay.  Did you talk about why you came to South Florida?

14  A.   Yes, I did.

15  Q.   What did you tell him about your drug addiction?

16  A.   That I had gone to rehab and tried getting clean and

17  relapsed and I came to -- I told him why I came to Florida.

18  Q.   Did you confide in him anything about your living situation

19  back in Vermont and your parents?

20  A.   Yes.

21  Q.   What do you remember telling him?

22  A.   I told him that I wasn't able to live with my parents.

23  Q.   And in response to you telling him about your living

24  situation in Vermont and drug addiction problems, does he make

25  you any promises or does he tell you anything?

1  A.  Yes.  He tells me that he could help me get a place to

2  live.  I could get an apartment and a job and to have a car,

3  and finish school.

4  Q.  Does he tell you what kind of work he wants you to do for

5  him at this point?

6  A.  No.

7  Q.  What does he generally tell you about working for him?

8  A.  I thought it was like a secretary, answering phones.

9  Q.  Why did you believe that?

10 A.  I don't know.

11 Q.  What did he tell you about himself?

12 A.  Nothing.

13 Q.  Did he tell you whether he worked?

14 A.  No.  No.

15 Q.  Did he tell you whether owned any businesses?

16        MR. WILCOX:  Objection, judge, leading.

17        THE COURT:  Sustained.

18 BY MS. VIAMONTES:

19 Q.  Did he tell you if any others worked for him?

20 A.  Yes, he did.

21 Q.  What did he tell you about that?

22 A.  He told me that they had a lot of people working for him.

23 He had security.

24 Q.  He had security?

25 A.  Yeah.

1  Q.  Did he specify what type business or why people were

2  working for him?

3  A.  No, I was making assumptions.

4  Q.  But he did tell you people were working for him.

5          MR. ZACCA:  Objection, leading.

6          THE COURT:  Sustained.

7  BY MS. VIAMONTES:

8  Q.  How long were you in the downstairs apartment?

9  A.  I'm not sure on how long the time was.

10 Q.  Was it more than a day, more than a week, just give us a

11 ballpark.

12 A.  It was a few hours.

13 Q.  And after a few hours, where are you taken?

14 A.  I am brought upstairs.

15 Q.  What happens when you get upstairs?

16 A.  Um-m-m -- I'm sorry, I'm having a hard time now.

17 Q.  Let me ask you this:  When you are taken upstairs, were you

18 given a key to the room?

19 A.  No, I am not.

20 Q.  Are you given any more drugs?

21 A.  Yes.

22 Q.  What drugs?

23 A.  I was getting more crack and Dilaudid.

24 Q.  Give us an idea how much you were given, how much Dilaudid

25 you were given, how much crack?

510

1  A.  It was more than what I have been used to taking, what I

2  had been doing, and I can't really give an estimate how much.

3  Q.  You said it was more than you were used to?

4  A.  Yes.

5  Q.  What is the street value for one pill, Dilaudid?

6  A.  About 25 to $30.00.

7  Q.  Do you know how many you were given that first day?

8  A.  Not the exact number.

9  Q.  How long does that Dilaudid high last?

10  A.  About an hour.

11  Q.  Who was initiating you getting more drugs?  Was it you or

12  Mr. Desir?

13  A.  Both.

14  Q.  At this point, is he withholding any drugs from you?

15  A.  The drugs stopped, yeah, coming.

16  Q.  At this point?  At the very beginning?

17  A.  I can't remember.

18  Q.  Okay.  Aside from the Dilaudid, were you also taking crack

19  in this upstairs apartment?

20  A.  Yes.

21  Q.  How does the crack make you feel?

22  A.  Um-m-m, it physically numbs you and physically -- it

23  physically numbs you and just makes you not feel.

24  Q.  So you testified that you are given these drugs.

25          Is the Defendant still being nice to you at this

```
 1  point?
 2        MR. ZACCA:  I object to the leading nature of the
 3  questioning.
 4        I have been somewhat withholding on it, but they are
 5  not open ended questions, judge.
 6        THE COURT:  As to the question pending, overruled.
 7  BY MS. VIAMONTES:
 8  Q.  Is Defendant Desir, known as Daddy, is he still being nice
 9  to you at this point?
10        MR. WILCOX:  At what point, judge?
11  BY MS. VIAMONTES:
12  Q.  In the upstairs apartment, a few hours after you arrived,
13  was he still being nice to you?
14  A.  Not exactly.
15  Q.  Okay.  Shortly after you arrive at the Beach and Town
16  Motel, after a few hours, do the things begin to change?
17  A.  Yes.
18  Q.  Tell the members of the jury about that.
19  A.  He was starting to tell me rules of how I should act.
20        I wasn't allowed to call anybody or talk to anybody.
21  I couldn't answer the door.  I couldn't leave the room.  To be
22  respectful.
23  Q.  To be respectful of whom?
24  A.  Of him.
25  Q.  Did he tell you what you had to call him?  What name you
```

1  had to call him?

2  A.   Yes.  He told me to call him Daddy.

3  Q.   Before he told you to call him Daddy, what name were you

4  referring to him by?

5  A.   Zoe.

6  Q.   Why?

7  A.   That is what I had heard.

8  Q.   You had heard other people call him Zoe?

9  A.   Yeah.

10  Q.   Did he tell you why you had to call him Daddy?

11  A.   Not exactly.  He said that is what the other girls call

12  him.

13  Q.   How did you feel about calling him Daddy?

14  A.   Very uncomfortable.

15  Q.   Why?

16  A.   Because it's weird.

17  Q.   Did you, in fact, call Mackenley Desir Daddy?

18  A.   Yes.

19  Q.   Why?

20  A.   Because that is what he asked me to do.

21  Q.   What would he do if you didn't call him Daddy?

22  A.   I don't remember.

23  Q.   What other rules did he tell you you had to now abide by,

24  C.J.?

25  A.   Um-m-m --

513

```
 1   Q.  Let's go over them again.
 2        Tell me some of the rules you remember, even if you
 3   repeat ones you have already answered.
 4        MR. ZACCA:  Judge, this is asked and answered.
 5        THE COURT:  Sustained.
 6   BY MS. VIAMONTES:
 7   Q.  Other than not answering the door, not talking to anyone,
 8   calling Mackenley Desir Daddy and being respectful, were there
 9   any other rules that you recall?
10   A.  I can't remember.
11   Q.  C.J., was there a telephone, a land line, inside the motel
12   room?
13   A.  Yes, there was.
14   Q.  Could you use it?
15   A.  I tried to use it and they said you had to pay for it.
16   Q.  Could you make calls from the phone inside the motel room?
17   A.  No.
18   Q.  Does there come a time he introduces you to somebody who
19   became known to you as Fire?
20   A.  Yes.
21   Q.  Tell the members of the jury how that came about.
22   A.  Um-m-m, he had made a phone call and was talking on the
23   phone with somebody and told me her name was Fire and that she
24   was going to ask me a few personal questions just so she has
25   the information; and, so, I got on the phone with her and she
```

1 asked me for my name, my birthday, my Social Security number

2 and --

3 Q.  You said that Fire asked you for your name, your date of

4 birth and Social Security number?

5 A.  Yeah.

6 Q.  Did she tell you why she was asking you for these things?

7 A.  She said it was for -- so she would have all my information

8 in case something happened to me.

9 Q.  Other than your name, date of birth and Social Security

10 number, did she ask you any other questions about yourself?

11 A.  Not that I recall.

12 Q.  While you were in the upstairs motel room, do you recall

13 any other things that Daddy said to you about your appearance?

14 A.  Um-m-m, he told me that I was pretty.

15 Q.  Did he instruct you how to interact with clients?

16         MR. ZACCA:  Objection, leading, judge.

17         THE COURT:  Overruled.

18 BY MS. VIAMONTES:

19 Q.  Did he tell you how to interact with clients?

20 A.  Yes.

21 Q.  What do you recall him telling you about that?

22 A.  Um-m-m, he told me to wear a condom with all the clients.

23 Q.  I am talking about at the very beginning.

24         Do you remember at the beginning before even talking

25 to Fire, do you remember what he told you about clients?

1    A.   No, I can't remember.

2    Q.   Does Mackenley take any photographs of you?

3    A.   Ah, yeah, yes.

4    Q.   Tell the members of the jury about the photographs he asked

5    you to pose for.

6    A.   He took pictures of my tattoos and he took pictures of me

7    in shorts and a tank top and my face wasn't in it.

8    Q.   Did you have a conversation with Fire toward the beginning

9    of you being at Beach and Town about your appearance?

10   A.   Yes.

11   Q.   What do you recall about that conversation with Fire?

12   A.   I told her-- she asked me for my height and weight and my

13   heritage, my hair color.

14   Q.   Did she ask you for any pictures of yourself?

15   A.   She asked me if Daddy had taken any pictures.

16   Q.   When she asked you that, at that point, had he taken any

17   pictures of you yet?

18   A.   No.

19   Q.   What did Daddy tell you about Fire's role in his business?

20   A.   That she was answering phone calls --

21            MR. WILCOX:  Objection, your Honor, as to him as --

22            It is hearsay with respect to my client.

23            THE COURT:  She is subject to cross-examination by

24   you, so the objection is overruled.

25   BY MS. VIAMONTES:

1  Q.  What did Daddy tell you about Fire's role?

2  A.  That she was the secretary.  She answered phones for him

3  and took care of most of his personal stuff.

4  Q.  When he told you that Fire was like his secretary, what

5  started going through your mind?

6  A.  I was confused.

7  Q.  Why?

8  A.  Because I thought that is what I was going to be doing.

9  Q.  Why did you think you were going to be his secretary?

10  A.  Because he said there is a lot of phone answering.  It

11  happens he gets a lot of phone calls for a lot of different

12  things.

13  Q.  Do you know what those things were that you were going to

14  be answering the phone about at the beginning?

15  A.  No, I didn't.

16  Q.  What else -- aside from asking you about your biographical

17  data and what you looked like, what else did Fire ask you

18  during that first phone conversation, or what did she tell you?

19  A.  I can't remember.

20  Q.  Did she tell you what you would be doing?

21  A.  Yes.

22  Q.  What did she say?

23  A.  She told me that there is going to be dates and clients

24  that I would be working with and she would call Daddy's phone

25  when she had a phone call for me.

1   Q.   You mentioned that when you arrived at the Beach and Town

2   Motel all you had was a long T-shirt and stuff in your purse.

3   Were you provided with any clothes?

4   A.   Later on I was, but --

5   Q.   What kind of clothes?

6   A.   A pair of shorts and a tank top.

7   Q.   Did you have access to any other clothes other than a pair

8   of shorts and tank top?

9   A.   No, not yet.

10   Q.   How long were you without other clothes?

11   A.   Days.  It was a long time for me.

12   Q.   Were you allowed to go out and purchase clothes?

13   A.   No.

14   Q.   Eventually, were you provided with other clothes?

15   A.   Yes.

16   Q.   How were you provided with other clothes?

17   A.   Um-m-m, there were suitcases of other girls' clothing and

18   he told me to go through it and pick what fits me if I like it.

19   Q.   Who told you to go through it and pick what fit you?

20   A.   Daddy.

21   Q.   Do you know how long after you were at the Beach and Town

22   Motel with Daddy he told you to go through the suitcases and

23   find what fit you?

24   A.   I would say approximately like maybe a week or more.

25   Q.   Did he tell you who the suitcases belonged to?

1  A.   No, he didn't.

2  Q.   What did he tell you about the suitcases?

3  A.   He told me -- I had seen like a girl's driver's license in

4  one of the bags, and he told me -- I asked him about it, and he

5  told me that they used to work for him.

6  Q.   Were you given any instructions about money and what to do

7  with the money?

8  A.   I was to take the money and put it away somewhere where

9  they wouldn't see.

10 Q.   And who instructed you to put the money away so they

11 wouldn't see it?

12 A.   Daddy.

13 Q.   Were you given a nickname by Daddy or by Fire?

14 A.   Yeah, they nicknamed me Angel.

15 Q.   Who gave you that name?

16 A.   Daddy told me about it but I think Fire was the one who

17 made it up.

18 Q.   Why do you think Fire made it up?

19       MR. WILCOX:  Objection, judge.

20       THE COURT:  Sustained.

21 BY MS. VIAMONTES:

22 Q.   Do you know why you were given the name Angel?

23 A.   I can't remember.

24 Q.   Did you ask Daddy, the girls that these suitcases belong

25 to, where are these girls?

1  A.  Yes.

2  Q.  And what did he tell you?

3  A.  That he fired them.  Their --

4  Q.  How did that make you feel?

5  A.  Uncomfortable.

6  Q.  Why?

7  A.  Because I didn't know exactly what that meant.  If there

8  was more behind it.

9  Q.  Did you ever meet any other girls that worked for Daddy?

10  A.  Yes, I did.

11  Q.  Tell us about that?

12  A.  I met, um-m-m, a few girls and either the first or second

13  night that I was there we went out, me and two of the other

14  girls.

15  Q.  Did you go out on your own?

16  A.  No.  He brought us to a restaurant.

17  Q.  And do you remember the other girls' names?

18  A.  I know one girl's name, her real name was Annie but her

19  nickname was Diamond.

20  Q.  Who else went to that restaurant you and Annie?

21  A.  There was another girl, she was blond.

22  Q.  And were either of the Defendants there?

23  A.  And Daddy.

24  Q.  Had you yet paid Daddy back for the drugs he had given you

25  when you arrived at the Beach and Town?

1  A.  No, I haven't.

2  Q.  Did he tell you anything about paying him back for the

3  drugs?

4  A.  He told me that I would pay him off by the -- by working

5  with the clients.

6  Q.  At some point, did it become clear to you what you would be

7  doing with the clients?

8  A.  Yes, it did.

9  Q.  How?

10  A.  Just by being around the other girls and just hanging

11  around and seeing what was going on, just a lot of, like,

12  talking on the phone and in and out, and talking to Fire about

13  clients and dates.

14  Q.  And we refer to her as Fire, do you see Fire in the

15  courtroom today?

16  A.  Yes, I do.

17  Q.  Could you please point to her and mention an article of

18  clothing she is wearing?

19  A.  She is wearing a black top.

20        MS. VIAMONTES:  Your Honor, may the record reflect the

21  witness positively identified the Defendant, Genet Rembert?

22        THE COURT:  Yes, the record are so reflect.

23  BY MS. VIAMONTES:

24  Q.  C.J., prior to meeting Mr. Desir, had you engaged in

25  prostitution?

1   A.   Yes.

2   Q.   How many times?

3   A.   Twice.

4   Q.   When was that?

5   A.   A few days before I met Daddy.

6   Q.   And where was it?

7   A.   At the Homing Inn.

8   Q.   Were you forced to do it then?

9   A.   No, I wasn't forced.

10   Q.   Tell us about, did the Defendant ever get violent with you,

11   Mackenley Desir?

12   A.   Yes, he did.

13   Q.   Tell us about the first time you recall him being violent

14   with you.

15   A.   Um-m-m, it was when we were staying in the upstairs room at

16   the Beach and Town and I had not followed the rules.

17   Q.   Which rule had you broken?

18   A.   I left the room and I got drugs from another person and I

19   spent the money that I had made.

20   Q.   Okay.  So, you said you got drugs from another person.  How

21   did you have money to buy those drugs?

22   A.   I was with a client.

23   Q.   How come you still had the money that the client had given

24   you?

25   A.   Daddy had left to go, I don't know what he was doing, but

522

1   he left for a minute and said he would be right back.

2   Q.   Did you wait for him to come back?  Did you wait for awhile

3   for him to come back?

4   A.   What do you mean?

5   Q.   Did it take a long time for him to come back?

6   A.   Yes.

7   Q.   As you are waiting, what do you do?

8   A.   I opened the door and it doesn't, like, close all the way.

9   I left it a little open and I went out and kind of sat on,

10  like, a bench or chair out front of my hotel room and I had

11  seen somebody next to me who, he was talking on the phone, I

12  heard him talking, and I wanted to do drugs and I knew that

13  Daddy wasn't going to be back for a little while, so I

14  confronted the man next to me.

15  Q.   Did you ask him for drugs?

16  A.   Yes, I did.

17  Q.   Did you get drugs from him?

18  A.   Yes.

19  Q.   After you got the drugs from this man, what did you do?

20  A.   I went back into my room and I did drugs.

21  Q.   Did Daddy come then?

22  A.   No.

23  Q.   Okay.  What did you do after you did the drugs in your

24  room?

25  A.   I went back and I got more.

1   Q.   What happened after you got the second round of drugs?

2   A.   When I was getting the second part of it, he had come back

3   and I was in the other person's room.

4   Q.   What happened when he came back?

5   A.   He started searching for me in the guy's room that I was in

6   before he went outside and sat down and he was trying to figure

7   out, you know, what was going on, and I was scared and I wasn't

8   sure what I was going to do.  I was trying to think of

9   something I could say so I wouldn't get in trouble.

10  Q.   How did Daddy react to you not being in the room that you

11  were supposed to be in?

12  A.   He was mad.

13  Q.   Tell the members of the jury what happened once he had

14  come.

15  A.   He had taken me down the stairs to the parking lot that we

16  pulled up into when I first got there.

17  Q.   And what happened in the parking lot?

18  A.   He was telling me that he was going to give me another

19  chance, that I broke all the rules, but he was going to be nice

20  and let me stay, and he had slapped me and told me not to

21  disrespect him.

22  Q.   C.J., the Beach and Town Motel, does it have a pool?

23  A.   Yes, it does.

24  Q.   Do you like to go swimming?

25  A.   Yes, I like to swim.

1  Q.  Were you allowed to go in the pool when you were with

2  Mr. Desir?

3  A.  There was one time he brought me down to the pool area and

4  let me swim for a little while.

5  Q.  Tell us about that.  How did you get to go in the pool?

6  A.  He brought me down to the pool area.

7  Q.  Did you ask him if you could go to the pool?

8  A.  Yes.

9  Q.  What were you wearing?

10  A.  I was wearing my shorts and tank top.

11  Q.  How long were you allowed to stay in the pool?

12  A.  I don't know.  He was down there with me.  He didn't say

13  how long I could.

14  Q.  How did you decide to go back upstairs from the pool?

15  A.  Um-m-m, he told me to go.

16  Q.  Was it your decision to get out of the pool and go back

17  upstairs?

18  A.  No.

19  Q.  Whose decision was it?

20  A.  His.

21  Q.  His meaning who?

22  A.  Daddy's.

23  Q.  Did you know whether Daddy had a gun at that time?

24  A.  I'm not sure --

25  Q.  Did you ever see him with a gun?

1    A.   Yes, I did.

2    Q.   When did you see him with a gun?  When was the first time

3    you saw him with a gun?

4    A.   Um-m-m, I was in the upstairs motel room and he would come

5    back and he would either put the gun underneath like a cushion

6    on one of the sofas or the chair, underneath the mattress.

7    Q.   Was that soon after you arrived at the Beach and Town or

8    toward the end of your stay?

9    A.   Fairly soon after I got there.

10   Q.   During the incident after you went and bought the drugs

11   from the other person when Daddy slapped you in the face, did

12   he tell you anything about having to slap you or slapping you?

13   A.   I can't remember.

14   Q.   You mentioned at the beginning that he was nice, did that

15   change?

16   A.   Yes.

17   Q.   How?

18   A.   Just the feeling that I was getting from him, the eyes, the

19   look in the eyes, it is not a friendly look.

20   Q.   Did he tell you things that made you feel bad?

21   A.   Yes, but I can't remember.  Um-m-m --

22        Can I have a break or something?

23        THE COURT:  Yes.

24        Folks, let's take a 10 minute break.  Do not discuss

25   the case and continue to keep an open mind.

```
 1              (Thereupon, the jury leaves the courtroom.).

 2              THE COURT:  All right.  We will reconvene at 4:30.

 3              We will stand in recess.

 4              (Thereupon, a short recess was taken.).

 5              THE COURT:  All right.  The record will reflect the

 6  defendants are present represented by counsel.

 7              Mr. Culuffo, would you please bring in the jury.

 8              (Thereupon, the jury returns to the courtroom.)

 9              THE COURT:  Folks, you may be seated.

10              I believe one juror inquired are we recessing at 5?

11  Yes, we will be recessing at 5.

12              I won't keep you past 5 any day.

13              I know one of our jurors has kids to pick up.

14              We will be out of here 5.

15              Ms. Johnson, let me remind you you are still under

16  oath.  We will continue with direct examination by

17  Ms. Viamontes.

18              MS. VIAMONTES:  Thank you, your Honor.

19  BY MS. VIAMONTES:

20  Q.  C.J., before the break you said you had seen Mr. Desir with

21  a gun.

22              What went through your mind?

23  A.  It made me feel afraid.

24  Q.  Were you ever asked to or told to carry the gun?

25  A.  Yes.
```

527

1  Q.  Tell us about that.

2  A.  There was a time that he said if there is an incident with

3  any of the clients and I had the gun to shoot, he said to

4  shoot.

5  Q.  Did you ever leave the hotel, the Beach and Town Motel,

6  when you were with Mackenley Desir?

7  A.  Yes, I did.

8  Q.  Would you leave on your own?

9  A.  No.

10  Q.  Who would you leave with?

11  A.  He would take me and bring me to the car and we would go.

12  Q.  What are some of your hobbies, C.J.?

13  A.  I journal a lot and I go running and I just enjoy peace and

14  quiet.

15  Q.  When you were at the Beach and Town Motel, did you know you

16  were near the ocean, near the beach?

17  A.  No, I didn't.

18  Q.  Were you able to go running when you were at the Beach and

19  Town Motel?

20  A.  No.

21  Q.  Why not?

22  A.  I wasn't allowed to leave the room or to go anywhere so I

23  couldn't go.

24  Q.  Did you ever ask if you could go running?

25  A.  No, I didn't.

1   Q.   Was there food to eat at the Beach and Town hotel in your

2   room?

3   A.   There wasn't any food.

4   Q.   Were you provided with food?

5   A.   He would bring back food sometimes.

6   Q.   Would you choose the type of food you wanted to eat?

7   A.   No.

8   Q.   Did there come a time you were given a phone to use while

9   you were with Mackenley Desir and Genet Rembert?

10  A.   Yes.

11  Q.   Who gave you the phone?

12  A.   Either -- I am not sure.

13  Q.   You said either, either who?

14  A.   Either Fire or Daddy gave it to me.

15  Q.   Why do you think it could have been Fire that gave you the

16  phone?

17  A.   Because she helped him a lot.

18  Q.   How?  How did she help him?

19  A.   She was doing, doing things that he asked.

20  Q.   Can you give us examples?

21  A.   Ah, I don't know, he would just ask her to do things

22  like -- I'm sorry, I can't remember.

23  Q.   Okay.  C.J., when you were given the phone, were you given

24  any instructions about the phone?

25  A.   I was told that I can't make any phone calls, personal

1  phone calls, only use it for answering Fire or if Daddy called.

2  Q.  Why didn't you call the phone to have some help?

3  A.  I couldn't take it any more.  I had a phone that could

4  actually make phone calls.

5  Q.  Did you have complete control of the phone at all times,

6  the phone you were given?

7  A.  Yes.  He would -- Daddy would take the phone sometimes and

8  switch the phones around.

9  Q.  Did there come a time when you were arrested for possession

10  of drugs when you were with Mackenley Desir?

11  A.  Yes.

12  Q.  I'm sorry?

13  A.  Yes.

14  Q.  Tell the members of the jury, that day, what happened that

15  day?

16  A.  Um-m-m, it was early any the morning and I had been doing a

17  lot of dates, seeing a lot of clients, and one of the clients

18  got angry because I had to cut his time short.

19  Q.  Why did you have to cut his time short?

20  A.  Because Fire was calling me telling me to hurry up because

21  there was another client coming.

22  Q.  Who was it setting up these dates for you?

23  A.  Fire was.

24  Q.  The client is there, he gets upset, and then what happens?

25  A.  He runs out of the room and he was just -- he was yelling

1   and screaming, and saying I paid money for this, I deserve what

2   I paid for.

3   Q.  Had he, in fact, given you money?

4   A.  Yes, he did.

5   Q.  Do you remember how much money he gave you?

6   A.  I don't.

7   Q.  What did he pay you money for?

8   A.  For sex.

9   Q.  Did you, in fact, have sex with that man?

10  A.  For a few minutes.

11  Q.  Once he left the room, what did you see?

12  A.  I saw -- I closed the door and then, when I opened it, he

13  was already out of the area of the motel getting into his truck

14  and I saw Daddy running after him.

15  Q.  What was Daddy doing after he was running after him?

16  A.  Um-m-m, I don't remember.

17  Q.  Did the police arrive?

18  A.  Yes, they did.

19  Q.  Did you call the police?

20  A.  I called the police, yeah.

21  Q.  Why did you call the police?

22  A.  Daddy told me to call the police and to tell them that this

23  guy tried to rape me and he wanted me to call to tell them that

24  because he didn't want the other guy to call the cops.

25  Q.  Do you know why the other guy would call the cops?

1  A.  Because he was angry that he was ripped off.

2  Q.  C.J., I don't know whether we touched upon this already, I

3  don't believe so.  Shortly after meeting Daddy, did you have

4  consensual sex with him?

5  A.  Yes, I did.

6  Q.  What did he tell you about that, or why did you have sex?

7  A.  I don't know.  He told me not to say anything to the other

8  girls or tell anybody.

9  Q.  Why?  Did he tell you why?

10  A.  Not that I remember.

11  Q.  So, let me direct your attention now to June 16, 2012.

12          Do you remember being arrested after the police

13  responded when that upset customer left?

14  A.  Yes, I do.

15  Q.  Tell us why you were arrested?

16  A.  I was arrested because I had drug paraphernalia in my

17  makeup bag and they found drugs in the room.

18  Q.  Were all the drugs in the room yours?

19  A.  No.

20  Q.  I am sorry, your mike is not working.

21          Judge, may I approach?

22          THE COURT:  Yes.

23  BY MS. VIAMONTES:

24  Q.  C.J., were all of the drugs in the room yours?

25  A.  No, they weren't.

```
 1   Q.   Did you give permission to search the motel room?

 2   A.   No.

 3   Q.   Who stayed -- did you stay in the motel room by yourself?

 4   A.   Sometimes Daddy would stay with me.

 5   Q.   So, were you then arrested?

 6   A.   Yes, I was.

 7   Q.   What happened after you were arrested?  Were you booked

 8   into the jail?

 9   A.   Yes.

10   Q.   Were you given a phone call?

11   A.   I was.

12   Q.   Who did you call?

13   A.   I called my dad.

14   Q.   And were you able to contact your dad?

15   A.   No.  His girlfriend had answered, and it was only a 30

16   second phone call because it was long distance.

17   Q.   What did you do after you tried calling your dad in the

18   morning and couldn't reach him?

19   A.   I called Daddy to see what was going on.

20   Q.   And did you have a conversation with Daddy when you were

21   arrested -- once you reached him from the jail?

22   A.   Yes.

23   Q.   What did he tell you?

24   A.   That he was going to bail me out.

25   Q.   And did he, in fact, bail you out?
```

1   A.   Yes, he did.

2   Q.   Once he bailed you out --

3        Strike that.

4        Who actually came to greet you once you were released

5   from the jail upon that first arrest?

6   A.   He came to pick me up.

7   Q.   Was he alone?

8   A.   Yes.

9   Q.   Okay.  Do you know how many days you were in jail before

10  Daddy bonded you out?

11  A.   Um-m-m, I was there for a while.  It was hard to tell how

12  long I was there.

13  Q.   Did you have a conversation with Daddy and Fire about the

14  phone calls you made from the jail?

15  A.   With Daddy, when he picked me up, he talked to me.

16  Q.   Tell the members of the jury about that.

17  A.   Do not call the cell phones they have with the jail phones

18  and that's all.  That is all I recall.

19  Q.   Did you tell him whether you tried to reach out to your

20  dad?

21  A.   No, I didn't.

22  Q.   After you were released and bonded out, did you go back to

23  the same motel room?

24  A.   I was brought to a different room, to a house right next to

25  them.

```
 1   Q.  Was it in the same location where the motel was?
 2   A.  Yeah.
 3           MS. VIAMONTES:  May I approach, your Honor?
 4           THE COURT:  Yes, ma'am.
 5   BY MS. VIAMONTES:
 6   Q.  C.J., I hand you Government Exhibit 10 through 17 for
 7   identification.  Do you recognize those?
 8           Government Exhibit 10 through 17, what are those?
 9   A.  Um-m-m, pictures of the house that I was in.
10   Q.  Do those photographs accurately show the way that the house
11   looked back in June of 2012?
12   A.  Um-m-m, kind of.  There's -- in the first picture there --
13   Q.  What was the difference -- Government Exhibit 10, what do
14   you recall differently back in June 2012?
15   A.  There was a be aware of dog or no trespassing sign.
16   Q.  Aside from that, anything else different?
17   A.  No.  Just -- No, there was a deadbolt in the door.
18   Q.  Well, let's take them one at a time.
19           Government Exhibit 10, do you recognize that?
20   A.  Yes.
21   Q.  And what is it?
22   A.  It's the front of the house.
23   Q.  Does that photograph accurately show the way the front of
24   the house looked minus the be ware of dog sign and no trespass
25   sign back in 2012?
```

1  A.  Yes.

2          MS. VIAMONTES:  Your Honor, at this time the

3  Government moves Exhibit 10 into evidence.

4          THE COURT:  Any objection?

5          MR. ZACCA:  No.

6          MR. WILCOX:  No objection.

7          MS. VIAMONTES:  Permission to publish, your Honor.

8          THE COURT:  10 will be receive, and yes, you may

9  publish.

10          [Government Exhibit 10 received in evidence.]

11  BY MS. VIAMONTES:

12  Q.  C.J., do you see this door here in Government Exhibit 10?

13  A.  Yes.

14  Q.  Is that the main door of the house?

15  A.  Um-m-m, that door was never used.

16  Q.  I'm sorry?

17  A.  That door was never used.

18  Q.  You would not go in that door?

19  A.  No.

20  Q.  Okay.  If you touch your screen, you could actually write

21  on the screen, can you point to where the efficiency was?

22  A.  Yes, there (indicating).

23  Q.  To the right side of the photograph?

24  A.  Yeah.

25  Q.  Can you describe that room for us?

1   A.   Um-m-m, yeah.  It was a -- there was a bed and a

2   refrigerator and a desk to the left of the room and there was a

3   TV and there was a bathroom, and the bathroom had a closet in

4   it with a shower.

5   Q.   You mentioned, C.J., a deadbolt lock.  Where was that

6   deadbolt lock?

7   A.   It was on the door that connected into the main part of the

8   house.

9   Q.   So, how many doors did the efficiency have?

10  A.   There were two doors.

11  Q.   Did one door lead to the exterior, like the parking lot

12  area?

13  A.   It led to like a fenced-in side of the house.

14  Q.   Okay.  Could you turn to Government's Exhibit 11.  Do you

15  have that in front of you?

16        What is that, Government Exhibit 11?

17  A.   I'm not -- um-m-m, I can see the door to the efficiency.

18  Q.   Does that area depict the rear towards the efficiency of

19  the fence area?

20  A.   Yes.

21  Q.   Does that depict the way the area looked in 2012?

22  A.   Yes.

23        MS. VIAMONTES:  Your Honor, at this time the

24  Government moves Government 11 into evidence.

25        THE COURT:  Any objection?

537

```
 1              MR. ZACCA:  No objection.

 2              MR. WILCOX:  No objection.

 3              THE COURT:  11 will be received.

 4              [Government Exhibit 11 received in evidence.]

 5   BY MS. VIAMONTES:

 6   Q.  C.J., could you point to the fenced-in area?

 7   A.  Right there (indicating).

 8   Q.  Are you pointing to here (indicating)?

 9   A.  Yeah.

10   Q.  All right.  C.J., there is an exterior door to this

11   efficiency, why don't you open that door, walk right out into

12   the City of Hollywood and get help?

13   A.  I was afraid to even go outside because he said he had

14   security people working for him.

15   Q.  Did you really believe that that was true, he had security

16   people working for him?

17   A.  Yes.

18   Q.  Why?

19   A.  Um-m-m, I mean, at times I would see people walking around

20   outside.  I didn't know if they were working with him or not.

21   Q.  Any of the people that you saw walking around outside, had

22   you seen them before?  Did you recognize them?

23   A.  No.

24   Q.  The first day that you met Mackenley Desir, did you meet

25   another person named Zoe, as well?
```

```
 1   A.   Yes.

 2   Q.   Did you ever see him again after that first day?

 3   A.   Yeah, I saw him.

 4   Q.   Where would you see him?

 5   A.   He would walk back and forth.  I only saw him a couple

 6   times, but he was there, sometimes he sat out on the steps in

 7   front of the house on the side where the door was.

 8   Q.   Right outside your door?

 9   A.   Yeah.

10   Q.   The door that led into the house, were you able to open

11   that and go inside the house?

12   A.   No.

13   Q.   Why not?

14   A.   It would be locked.

15   Q.   C.J., let me direct your attention to Government Exhibit

16   14.

17           Do you recognize it?

18   A.   Yes.

19   Q.   What is it?

20   A.   It's the door that led into the house and to the

21   efficiency.

22   Q.   Back in June of 2012, was there anything different about

23   this door than what you see in this picture?

24   A.   Just that there was a deadbolt in it.

25   Q.   In this photograph, is the door knob removed?
```

1  A.  Yes.

2  Q.  Other than that, does the photograph accurately depict the

3  way the door looked in June 2012?

4  A.  Yes.

5       MS. VIAMONTES:  Your Honor, the Government moves --

6  BY MS. VIAMONTES:

7  Q.  Also, as to Government 15, is that a close up of that door?

8  A.  Yes.

9       MS. VIAMONTES:  At this time, the Government moves 14

10 and 15 into evidence.

11      MR. ZACCA:  No objection.

12      MR. WILCOX:  No objection, your Honor.

13      THE COURT:  14 and 15 will be received.

14      [Government Exhibits 14 and 15 received in evidence.]

15      MS. VIAMONTES:  That's Government 14 and then

16 Government's 15.

17 BY MS. VIAMONTES:

18 Q.  Is this where the deadbolt was, C.J., (indicating)?

19 A.  Yes.

20 Q.  Were you allowed to freely walk into the house any time you

21 wanted?

22 A.  No.

23 Q.  Why not?

24 A.  Because it was locked and I was told not to go through that

25 door.

1  Q.  C.J., did there ever come a time that you told Mackenley

2  Desir I don't want to do this any more?

3  A.  Yes.

4  Q.  Tell the members of the jury about that.

5  A.  I was just getting really, really worn out and frustrated

6  and I mentioned to Daddy that I don't think that I want to do

7  this any more, were my exact words, and this was after I had

8  been arrested and he told me that I can't leave, that he

9  legally has a hold on me.

10 Q.  What else did he tell you about legally having a hold on

11 you?  Why did he have a legal hold on you?

12 A.  Because him and his bondsman bailed me out, and he made me

13 believe that -- well, he had said, um-m-m, that he can legally

14 come after me if I tried to run away.

15 Q.  Did he specify exactly how he could legally come after you

16 if you tried to leave?

17 A.  Yes, he said he could legally come and kill me.

18 Q.  Did he tell you how he could kill you?

19 A.  Not that I remember.

20 Q.  And, at that point, did you believe that to be true what he

21 was telling you, that he could legally kill you?

22 A.  Yes, I did.

23 Q.  Why?  What made that credible?

24 A.  Just the fear I had of him, everything I had seen and

25 heard.  I just was intimidated and scared.

1   Q.   What, specifically, tell us specifically what you saw and

2   made you scared and led you to believe that he would kill you

3   if you left?

4   A.   Um-m-m, I am -- I can't remember.

5             THE COURT:   All right.   We are going to have to break

6   for the evening.

7             We will reconvene at 9:00 a.m. tomorrow morning.

8             Tomorrow, though, we will be taking our lunch recess

9   at 12 noon instead of 12:30.

10             I have a Judges' committee meeting that I am on

11   meeting at 12 noon, so we will break from 12 noon to 1:15

12   tomorrow.

13             Remember the Court's continuing admonition.  Don't

14   discuss the case or otherwise communicate with anyone regarding

15   the case.   Don't do any independent research, including the

16   internet or read any newspaper articles and by all means

17   continue to keep an open mind until the case is submitted to

18   you to begin your deliberations.

19             We will stand in recess until 9:00 a.m. tomorrow

20   morning.

21             (Thereupon, the jury leaves the courtroom.).

22             THE COURT:   All right.  Ms. C.J., you may step down.

23             Are there any matters that we need to address before

24   we leave?

25             MS. VIAMONTES:  Nothing from the Government, thank

1  you.

2       MR. ZACCA:  No, nothing from the defense, on behalf of

3  Mr. Desir.

4       THE COURT:  We will see everybody at 8:45 tomorrow

5  morning.

6       (Thereupon, the court recessed at 5:00 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A**

AA 420:9 421:4,11,14
Aaron 309:8 315:14 316:10,23
  323:5 327:2 334:14,16,22 335:1
  335:5 348:1 364:10,14,20
abide 512:23
abide 320:15 332:16 335:13 368:15
  393:25 464:11 483:24 488:24
  494:2 507:22 527:18 532:14
  538:10
abnormal 328:4 333:11 498:24
abnormally 348:8
abruptly 330:22
Absolutely 493:18 484:4
abuse 339:13 340:20 341:2 342:11
  344:10 346:5,9,12 354:1 401:8
  401:10 404:9,18 405:8,17,23
  408:8 457:19 458:4,25 459:4
  486:17 487:4
abused 338:25 339:11 373:7
  397:22 398:2 401:8 408:10,19
  457:20,20 459:1,6,9
abuser 397:25
abusing 337:6,20 338:20 339:24
  342:2,5,16,19 343:19,22 344:3,7
  356:1 397:20 399:23 401:4 459:5
accent 377:24 383:15,16
access 517:7
accompany 501:23
account 389:1 462:20,25 463:3,14
  463:15,16 465:25 466:2 474:19
  474:20 476:11 480:4
accurate 457:5 503:4
accurately 503:12 534:10,23 539:2
accusation 458:19 459:18 483:5,8
  483:9 486:14,14
accusations 457:4 458:22 482:17
  482:21
accused 458:20 480:14
act 488:22 511:19
acted 328:25 329:7 330:25
Action 432:11
activities 410:3
activity 348:16 466:16
acts 419:13 425:18 487:23,25
  488:20
ad 462:7,9,11,11,12,12,13,14,15,25
  463:2,18,24 464:1,3,16,22 465:8
  465:8,11,17 466:4,6 469:4,5
  471:25 472:2,22,24 473:7,16,17
  474:5,5 475:16,17,19 476:17,22
  477:16
add 314:17 321:2 462:12,14 475:9
added 476:24
addendum 431:7
addict 343:16 459:15
addicted 409:3 492:6,8
addiction 360:13 410:25 492:4
  507:15,24
addictive 505:15,16
adding 476:22
addition 311:18 445:24 446:5
address 317:10 433:7 457:6 460:2
  462:21,21 463:12 465:25 470:24
  474:17 477:4,9,11 541:23
addressing 418:6
adds 475:7,7
adhering 466:7
adjust 364:17
administrative 471:25 472:2,5,16
  473:18,25 474:8
admissibility 311:11 378:24 379:3
  388:6 389:14 482:16
admissible 314:25 316:11,22 317:1
  317:5 318:20,24 319:6,10 378:11
  379:8 406:18 407:11 419:7,14,18
  420:3 483:2
admission 333:3 378:7 379:3
admit 388:24 459:22 470:13
admits 405:16
admitted 458:18
admitting 314:12 404:22
admonition 321:16 541:13
adopt 329:19
adopted 330:3
ads 461:4,6 462:19 463:22,23
  464:8 466:15,19,19,22 468:8,10
  468:14,17,20 469:1,1,10,15,25
  470:1 471:20 474:23 475:3,25

---

**A**

adult 461:8 466:8
advent 482:14
advertised 466:16
advertisements 471:4
advertising 468:12
advise 318:15
affidavit 486:5 487:16 488:10
affiliated 314:8
affiliation 312:12
affirmative 320:22 321:1,6,12
affirmed 481:12
afforded 482:3
afraid 373:7 526:23 537:13
afternoon 447:18,19 458:13 477:25
  478:1 486:16
afterward 470:8
age 488:3
agent 318:2 449:4,10,13 454:23
agents 421:25 422:3
ago 323:22 324:20 337:24 338:1,2
  338:3 350:13 456:24 457:10
  485:17,21 487:22
agree 318:13,16 319:16 344:24
  404:8 409:1 484:2,11
agreed 319:8,10 480:5
agreement 318:19 382:12 431:8,11
Ah 515:3 528:21
ahead 312:5 315:7 356:13,19
  408:17 426:4 458:15
ahold 326:11 327:5 368:16 371:10
  375:8,14 394:14
ailment 352:10
air 382:16
airfare 369:6
alarmed 350:25
alcohol 354:1
aligned 405:9
alive 331:16,18 333:17
allegation 458:4
allegations 456:19 481:18 483:22
alleged 469:13 487:23
allegedly 311:23
alley 424:6 501:8
alleyway 316:6,14 374:21 375:11
  424:3
allow 313:6 389:17,19 407:21
  408:14
allowed 317:12 458:20 506:22
  511:20 517:12 524:1,11 527:22
  539:20
allows 332:11 407:14,16
Amanda 365:12
Amazon 461:12
America 308:4 364:10 490:9
amount 412:19 442:1,3,15 464:10
analogy 458:7 459:16 479:16 484:4
analysis 480:4 481:14
Angel 318:14,22
anger 451:4,7
angry 332:9 376:10 386:20,24
  390:25 451:11 529:18 531:1
ankles 396:7
Annie 519:18,20
answer 327:22 342:14,24 349:15
  349:22 368:6,7 380:5,7 382:25
  420:5 424:8,19,22 485:13 511:21
answered 327:21 401:12 424:9
  445:13,21 501:14 513:3,4 516:2
  532:15
answering 351:5 508:8 513:7
  515:20 516:10,14 529:1
anticipation 407:15
anxious 383:13 384:11 386:20,24
anybody 321:5 366:22 378:15
  397:2 496:10 511:20,20 531:8
apartment 359:1 367:15 508:2
  509:8 510:19 511:12
apartments 376:25
apologize 412:4
apparently 411:22,22,24 489:7
appear 435:25 452:12,13,17 502:13
appearance 450:19 514:13 515:9
APPEARANCES 310:18
appeared 374:7 444:22,24 450:16
  450:18
appearing 416:25
appears 474:15
apply 311:19
approach 329:2 377:17 384:18,21
  430:22,24 502:21 531:21 534:3

---

**A**

approximate 447:24
approximately 332:23 337:8
  350:10,11 448:2,3,4 486:14
  517:24
April 324:6 325:14 341:4 342:10
  353:7 399:16,19 412:1 491:6
area 366:20 407:19 423:1 472:14
  503:13 524:3,6 530:13 536:12,18
  536:19,21 537:6
areas 407:1,5,6
argue 405:2,14
argued 458:25
arguing 479:15,16
argument 388:5,6,10 405:14
  479:14,20
arguments 311:9
Arizona 465:5 467:20
armed 481:2,5
Army 366:22
arrangements 369:21
arrest 311:11 371:7 436:7,8 445:1
  445:1,4,7 533:5
arrested 369:5 435:4 439:14
  446:15,22 447:6 450:6,11,12
  487:12 529:9 531:12,15,16 532:5
  532:7,21 540:8
arresting 371:10 375:14 415:13
arrive 440:9 500:21 506:24 511:15
  530:17
arrived 370:9,13 372:3,7 422:15
  436:6 439:8,10 495:12 501:5,22
  504:1 511:12 517:1 519:25 525:7
arriving 505:11 506:10,19
article 315:8 321:2,3,5 374:25
  429:5,14 495:5 520:17
articles 541:16
aside 321:7 383:14 506:9 510:18
  516:16 534:16
asked 332:7 345:1 357:23 360:16
  361:7,12,18 362:24 370:19 376:8
  385:17 401:12 403:3 408:23
  434:20 435:6,12 436:14,15 437:2
  437:17 441:14,17 445:13,21
  454:14,20 456:21,22 494:1
  495:13 502:4,5 512:20 513:4
  513:4 515:4,12,15,16 518:4
  526:24 528:19
asking 317:11 320:17 350:8,9
  380:7 420:18 430:11,17 507:3,5
  507:6 514:6 516:16
asks 425:18
aspect 452:16
assembled 478:12,14
assembling 478:17
assess 481:21 484:12
assessing 482:8
assist 430:20
assistance 368:11
assisted 371:15
associated 313:3 450:3
assume 416:5 487:7,8
assuming 325:23 362:3 389:25
  397:14 417:10
assumptions 509:3
Atlantic 434:8
attached 475:16
attack 406:24 407:13
attend 324:11 348:10
attended 410:5
attends 420:10 421:11
attention 384:23 393:8 473:25
  497:19 503:7 531:11 538:15
attorneys 318:3
AT&T 318:20 499:12,15
authentic 318:20,24 319:5,10
authenticate 319:7 320:1 378:6
authorities 311:9 467:2
authority 314:22 482:22 483:1
automatic 374:7 469:7
automatically 465:12 469:8
available 472:18
average 357:13 410:17,23
aware 340:3 356:24 410:13,15
  413:9 455:6 457:9 534:15
awhile 367:24 394:20 436:19
  500:10 501:11 522:2
A.F.P.D 308:19
a.m 332:23 473:10 541:7,19
A.U.S.A 308:14,14

---

**B**

B 407:14 408:14
Backpage 462:2,19 463:1,15,22
  464:6,25 465:4,8,11,18 467:1
  468:8 472:6,18 475:22 476:1,7
  476:19
Backpage's 471:9
backpage.com 460:21,22 461:12
  461:16,23,25 462:7,8 464:23
  466:8,15 467:5,21 470:23 471:4
  472:25 475:1 478:4
bad 368:24 405:21 455:22 488:4,21
  525:20
bag 531:17
bags 518:4
bail 381:12 382:2,17,19 393:21,21
  416:9 427:17,18,25 428:6,6,8
  434:24,25 435:6 436:17 440:5,6
  448:6 532:24,25
bailed 368:18 381:24 382:1 403:18
  403:20 435:9 533:2 540:12
bailing 428:18 441:23
ballpark 509:11
banged 423:19
banging 423:20,22,25 424:6
barracks 371:1
based 410:21 421:19 456:17
  461:16 471:13
basic 443:1
basically 373:12 428:6,15,17
  440:21 457:20,24 458:18 465:3
  465:17 486:12
basis 312:23 314:11 461:21
bathroom 536:3,3
battered 335:20
beach 315:17 372:4,5,7 375:15
  384:6 401:21 422:15 423:24
  454:21 455:2 500:17,18 519,22,23
  501:5,22 503:4,13 504:18,23
  511:15 515:9 517:1,21 519:25
  521:16 523:22 525:7 527:5,15,16
  527:18 528:1
beat 311:16 368:24 487:13,19
  488:3
Beauty 351:17
bed 336:3 536:1
bedroom 336:2
began 401:4
beginning 380:12,20 383:23
  510:16 514:23,24 515:8 516:14
  525:14
behalf 329:19 486:22 542:2
believe 312:9,21,24 313:24 314:1,5
  315:14 316:21 319:19 329:20
  336:16 338:12 343:6 362:12
  363:1 367:12,12 369:7 376:13
  377:10 380:3 385:8 398:22
  404:25 410:16,18 417:6,15
  422:25 423:6,7 424:24 433:3
  434:23 436:3 437:22,22 439:11
  442:5,11,11 446:25 447:1,3
  451:20 452:1,18,20 453:18
  472:13 479:15 480:25 489:2
  508:9 526:10 531:3 537:15
  540:13,20 541:2
believed 313:3,5,22 373:24 376:24
  377:14 422:16 440:12 456:23
  485:19
belong 518:24
belonged 376:25 380:3 517:25
belongings 499:2
belt 374:3
bench 522:10
Berghuis 458:17 479:16,24
best 350:12
better 325:16 386:19 389:22
Bigalow 400:11,14,20 457:13
Bigelow 400:23 401:7 411:16
  457:17,25 458:1,2 459:3,6 485:2
  485:7,9 486:6
Bigelow's 458:2
binder 384:22 430:25
biographical 516:16
birth 514:4,9
birthday 514:1
bit 366:9 402:14 495:22
Bitter 393:23
black 373:14 374:10,17 375:2
  376:22 384:8 396:6 423:12 429:7

---

429:16,16 433:13 487:8 495:7
499:14 520:19
**blanket** 486:19
**blatant** 466:18
**bleeding** 332:9
**block** 497:18,21
**blond** 519:21
**blood** 426:15,24
**blue** 487:8
**blues** 396:6
**Boca** 353:21 366:20,21 383:6 412:1
414:6 491:13 492:15,16
**body** 335:20 462:13 493:7
**bolted** 386:11
**bond** 425:20 428:13 429:24 430:4
430:12 434:20 435:12,12,14,16
435:21 436:1,15 437:3,8,10
438:5,9,12,25 439:3,8,18,22,23
440:1,2,3,16,23 441:14 442:1,3
442:15,21 443:24 444:4,25
454:21 455:1,4,4,6
**bonded** 430:11 436:3,8,20,22
437:12 442:9 443:3 447:20,25
533:10,22
**bonding** 428:1 429:22 430:20
435:24 441:18 443:18 449:10
**bonds** 393:21 427:25 440:8 442:18
448:6 455:8
**bondsman** 416:9 427:17,18,20
442:18 445:1 540:12
**book** 394:25 395:2
**booked** 369:6,16 394:17 395:1
532:7
**booking** 369:20
**boost** 464:1
**born** 323:3 410:22
**boss** 422:17
**bottom** 384:24 419:18 433:17
463:25 472:5,15 473:21,24 475:9
486:23
**bought** 525:10
**Boulevard** 308:20,23 434:8
**bound** 484:3
**box** 472:4 473:13 474:8
**boxes** 472:17
**boyfriend** 337:23 338:5,6 349:7,7,8
350:2,5 352:8 399:25 401:7
403:8 456:20 457:14 484:24
485:2,4,4,6
**boyfriends** 488:3
**Boynton** 500:5 504:23
**Brady** 311:21 480:3,4,7 481:14
**branch** 366:1
**break** 363:13,14,16,17 397:1,2
426:6 441:3 455:25 489:23
505:21 525:22,24 526:20 541:5
541:11
**Brennan** 400:9,11,14,20,23 401:7
457:17,25,25 458:2,2 459:2
485:2,7
**Brennen** 457:13 459:6 486:11,17
**Brennen's** 486:12
**bridge** 341:6 353:8 354:13,21
366:21 367:2 399:21 401:15
412:2,24 413:10 486:18 491:15
491:16,19,22 492:14,15 493:5,10
493:12,18,20,24 494:4
**Bridges** 366:20
**Bridge's** 492:16
**brief** 333:13 400:25
**briefly** 384:8 451:17
**bring** 320:6 335:3 364:4 382:17
426:11 437:13 438:13 453:19
456:16,16 458:21 459:16 460:5
489:21 490:4 526:7 527:11 528:5
**bringing** 380:17 384:3 445:7
**broad** 452:2
**broader** 406:15,21 468:10
**broke** 523:19
**broken** 521:17
**broker** 461:14
**brought** 345:19 358:12 451:11
454:18 509:14 519:16 524:3,6
533:24
**Broward** 320:23 319:2 369:3
415:1,2
**bruised** 486:18
**bruises** 325:20 486:17
**building** 424:5
**built** 487:4

**Burger** 351:1
**Burlington** 358:23,24 359:7
**business** 380:18,24 384:4 388:17
389:4,5,13,20 415:8,9 431:15,17
431:24 455:17 467:22 471:9
509:1 515:19
**businesses** 508:15
**Busing** 367:18
**busy** 326:2
**buy** 345:8 461:12,14 521:21
**B-E-R-G-H-U-I-S** 479:24
**B.V** 311:22,23 312:10 313:22,22

**C**

**cafe** 359:17
**caliber** 374:8
**California** 464:20
**called** 312:25 313:5,9,13 314:24
315:1 325:19 327:10,11 328:17
328:17,20 331:8 332:16 334:6,13
334:17 341:6 343:7,9 347:4,11
353:24,25 368:17,19 369:9
370:25 399:21 403:4 413:6 428:8
429:22,24 430:4,12,19 434:25
435:3 438:15 440:15 443:8 529:1
530:20 532:13,19
**calling** 315:14 319:6 330:15 331:16
367:9 368:12 377:7 378:15 437:7
512:13 513:8 529:20 532:17
**calls** 318:23 319:2,5,20,21,25
320:1 321:22 326:11 331:20
349:17 355:19,22,25 356:4
364:10 367:24 370:10 378:11,12
378:20 401:22 409:7 413:7
418:12 421:15 436:9 446:10
454:2 460:9 490:9 513:16 515:20
516:11 528:25 529:1,4 533:14
**calmly** 383:20
**can't** 329:10 366:19 371:25 382:5
388:22 409:4 437:25 449:3 493:9
496:13 500:1 504:9 506:8 507:12
510:2,17 513:10 515:1 516:19
518:23 525:13,21 528:22,25
540:8 541:4
**capable** 357:15
**car** 373:8 376:17,18,21,24 384:7,8
386:11,20,23 387:7 393:2 394:16
424:2 433:13 438:7 453:18
454:18 494:14,21,22 495:12,13
495:16,19 496:24,24,25 497:6,11
497:13,23 498:3,8,13,15,18,20
498:21 499:3,13,14 500:24,25
501:6,10,23 502:2,4,6 504:6,11
504:15 505:1,1 508:2 527:11
**card** 370:19 462:22,23 463:4,6
464:18,18 499:5
**care** 399:20 450:23,24 458:1
483:18 486:7 516:3
**carry** 312:16 468:12 526:24
**cars** 373:22 461:7
**cart** 379:6
**case** 308:3 313:7 315:22 318:2
320:20,20,24 321:4,11,17 330:21
361:23 363:18 378:18 394:2
422:4 426:7 441:22 442:3,15,19
443:20 445:10 446:3 455:18
456:2 458:8,8,18,19,24 459:5,8,8
459:9,16,17 461:22 467:6 478:8
479:11,21,25,25 480:12,15,21
481:9,21 482:5,14,19,24 483:13
483:14,15,19,20 484:3,20 487:4
487:17,21,21,23 488:13,17,18
514:8 525:25 541:14,15,17
**cases** 481:23 483:7
**catch** 342:10
**category** 462:10
**caught** 342:12
**caused** 332:2 349:11
**caveat** 389:19 471:12
**cease** 367:24
**cell** 325:1,3,5 326:11 334:6 337:10
366:14 377:5,6 384:14 411:21
499:6,6,8,15,16,16 501:1 502:11
506:20 533:17
**center** 308:22,23 319:3 339:23
341:6,13 398:19 399:19 401:21
500:24 502:20
**centers** 341:15
**certainly** 316:11,24 331:14 332:24

484:16 487:2
**chair** 322:7 364:16 427:7 490:15
522:10 525:6
**challenging** 387:3
**chance** 523:19
**change** 474:9,11,19 511:16 525:15
**changed** 418:17
**character** 404:11 406:17 407:10,13
488:4,4,21,21
**characterize** 409:19 410:1
**charge** 432:19 442:9 487:12
**charged** 434:25 468:9 470:7
**charges** 311:16 429:21,25 430:5,8
430:10,20 434:22,23 435:8,9,23
442:12,13 455:2
**Charles** 426:21 427:4,16 431:4
446:14
**cheated** 441:6
**check** 370:18 372:8 451:14
**checked** 352:8 377:11
**checking** 339:21
**chemist** 449:23
**chicken** 387:17 393:3
**chief** 482:5
**child** 323:15 360:13 365:15 487:18
488:25 489:2,7
**childhood** 347:22,23 409:19,20
410:1
**children** 365:9,10
**choice** 340:24 341:2 346:13,14
459:14
**choose** 331:7 462:10 491:16 528:6
**chose** 341:17 344:17 366:8 401:8,9
401:10 491:17
**chuckled** 376:8
**chuckling** 376:9
**circles** 314:16
**Circuit** 488:16
**circumstances** 333:1
**cite** 405:25 458:7
**cited** 311:10 482:24
**cites** 482:23
**citing** 483:13
**city** 347:16,17 371:19 537:12
**claim** 459:4,4 480:3
**claiming** 457:17,18
**clarify** 319:17 397:11
**classic** 332:6
**clean** 507:16
**cleaned** 396:11
**cleaning** 416:25 424:25
**clear** 346:24 377:24 379:14 438:2
520:6
**cleared** 465:20
**clearly** 315:22 378:13 474:14
**clears** 493:8
**clerical** 351:3
**click** 475:7
**clicking** 466:21
**client** 388:23 421:23 432:14,15
433:1,5 451:14 455:9,12 459:9
515:22 521:22,23 529:21,24
**clients** 428:10 455:17 514:15,19,22
514:25 516:23 520:5,7,13 527:3
529:17,17
**clock** 438:20
**close** 322:7 364:16 365:19 427:8
482:1 490:15 522:8 539:7
**closed** 480:12,21 481:9 530:12
**closest** 458:7
**closet** 536:3
**clothes** 517:3,5,7,10,12,14,16
**clothing** 374:25 429:6,14 495:6
517:17 520:18
**club** 434:12,14,18,19
**coat** 375:2
**cocaine** 339:5 354:5 398:13,16
492:9,10,12 497:9,9 498:5,11
**code** 463:6
**coerced** 459:10,13
**coercion** 487:5,25
**coffee** 359:17
**COHN** 308:11
**coke** 492:8,9
**cold** 347:19
**color** 374:9 515:13
**column** 384:24 385:2 474:1
**combative** 439:14 452:15,17
**come** 312:2 313:20 323:5,18
324:19 325:16,17 327:9 328:20

331:22 332:12 336:1,2 341:17,19
343:24,24 344:12 354:23 359:13
366:3,4,7,8 367:7,8,10 368:19,20
369:18 371:11 373:19 374:12
378:7 379:22 388:18 389:4,24,25
389:25 390:1 396:12 415:19
427:4 437:4 456:8,9 463:24
486:16 491:6 494:6 500:2 513:18
521:23 522:2,3,5,21 523:2,14
525:4 528:8 529:9 540:1,14,15
540:17
**comes** 329:4,9 373:18 388:19
389:13 394:7 470:14 500:4
**comfortable** 428:17 440:7,7 443:17
491:18 505:4
**coming** 324:13 330:22,23 339:24
340:9,13,16,17 341:13 346:2
362:25 397:19,23 398:18 404:7
425:1 448:12,13 469:22 491:12
492:6,12,19 496:1 510:15 529:21
**command** 479:20
**commend** 320:11
**commercial** 487:24
**commingled** 459:5,5
**commit** 487:20
**committed** 456:25
**committee** 541:10
**commonly** 466:12
**commotion** 375:7,11
**communicate** 324:24 493:20
541:14
**communicated** 320:20 384:16
**Communications** 365:8
**company** 365:22 427:22,24 432:11
467:5,14 470:23 499:10
**Compare** 486:12
**Compared** 486:12
**comparison** 366:10
**complainant** 458:19 482:16
**complainant's** 482:18
**complained** 458:20,22
**complaints** 458:24 480:11,13
**complete** 320:15 390:18 441:2
529:5
**completed** 348:14 465:22 479:14
**complex** 423:24
**compound** 495:22
**conceded** 485:6
**concern** 344:15 382:3 390:20
469:21
**concerned** 343:21 344:2,9 382:19
443:8,11 501:20 504:11
**concerns** 371:5 444:6 482:15
484:8
**conclude** 483:25
**concluded** 333:5 379:25 381:25
391:11 396:25 407:22 419:19
470:21
**conclusion** 313:10 314:11 316:23
383:2
**conclusions** 313:14,18 314:9
317:8
**condition** 331:25 332:11,24 357:2
357:11 414:23
**condom** 514:22
**conduct** 407:12
**conference** 468:6
**confide** 507:18
**confronted** 481:7 522:14
**confused** 489:7 516:6
**conjunction** 467:6
**connected** 536:7
**connotation** 481:4
**consensual** 531:4
**consideration** 428:12
**considering** 311:9
**consisted** 480:13
**consistent** 474:21
**console** 500:24 502:20
**conspiracy** 311:14 468:16 469:2
**consuming** 437:11 440:3
**contact** 335:8 354:14 367:2 412:23
413:1 416:14,16,22,24 417:7
532:14
**contacted** 357:23 358:1 393:21
**contained** 388:2 472:3,4 473:5
**CONTENTS** 309:1
**context** 329:6 330:24 331:2 361:13
361:23 468:24 469:1,2
**continue** 320:5 344:3,9 363:18

456:2 474:9 504:11 525:25
526:16 541:17
continues 346:5,9
continuing 409:2 541:13
contract 428:5 431:7,12,18 441:19
441:21,22,25 442:18 443:14
control 422:19 529:5
conversation 316:9 317:7 327:18
328:6,14 331:2 334:3,5 377:13
380:12,13 381:3,22,25 382:11,25
383:2 415:7 423:16 440:10 506:3
505:25 507:3 515:8,11 516:18
532:20 533:13
conversations 317:6 335:16
360:20 379:12 395:16 397:8
416:12
convicted 480:2
conviction 480:14,23,25 481:1
convince 381:16
cooperative 452:14,15,16
cops 423:2 530:24,25
copy 458:10,10
correct 325:15 329:21 336:14
339:13 340:20 341:25 342:1,16
343:19 346:10 347:13 351:23
361:20 367:23 369:15 372:19
379:2 383:25 384:10,15 391:8
392:23,24 397:9,10,12,13,16,25
398:2,9,11,13 399:3,13,14 401:4
401:8,11,16 404:3,4,6,9 406:19
406:22 409:16,17 411:14 412:2
413:4,8,24 415:1,4 416:2,8 425:5
425:12 428:23 432:16 435:2,15
442:22 443:3,5,12,21,24 444:20
445:2,10,12 446:16,22,24 447:16
455:9 463:8,9 472:19 473:1
474:10,13,16 475:15 476:15
477:17 478:9,12,13,15,16,21,23
484:23 499:6
correctly 463:19
corroboration 480:11,16 481:8
cosmetology 351:16
cost 464:8
cotton 505:23
couched 406:5,14,23
couldn't 326:11,13 337:22 338:22
339:2 410:25 440:13 494:2
511:21,21 527:23 529:3 532:18
counsel 312:1 318:5,14 320:8
329:2 360:16 364:3 377:17 406:4
426:13 456:14,18 457:2 490:3
526:6
counseling 357:7,7
county 347:16 369:3 454:22 455:2
couple 312:5,8 319:17 326:18
333:21 334:21 335:1 350:13
355:15,18 356:11 358:1,6 359:19
360:2 372:13 400:25 402:13,20
413:2,11 417:11 419:21 436:7,22
479:9 492:13 502:9 538:5
coupled 389:11
course 389:5 399:15 431:14,24
441:10 455:23 467:21 471:8
472:24
courtesy 320:12
Courthouse 308:23
courtroom 317:22 318:2 320:7,25
363:19 364:5 374:23 395:11
411:23 423:5 426:8,14,23 429:3
456:4 460:6 479:12 490:5 495:3
520:15 526:1,8 541:21
Court's 321:16 483:25 541:13
cousin 494:12,16
cover 391:3,4 468:10 496:22
co-conspirator 311:13,19
crack 339:5 398:13,16 492:9,12
497:9,23 498:5,10 505:14 506:11
509:23,25 510:18,21
Craig's 460:24 461:7
Crawford 311:18
create 462:12
created 431:20,22 474:6,25,25
credibility 315:3 404:17,22 406:6
406:16,24 488:10,13,14
credible 540:23
credit 462:22,23 463:4,6 464:18
crime 456:25 481:25,25
crimes 482:2
criminal 455:11,17 488:16
cross 336:25 337:1 346:20 377:11

396:19 397:4 409:12 425:3
440:25 441:11 447:14 477:21,23
crosses 373:20
cross-examination 309:5,6,10,11
309:15,16,20 314:24 407:14
408:15 409:11 425:8 456:18
482:5 484:15 515:23
cross-examine 378:5 459:17
cross-examined 379:5 487:1
Crown 376:22 384:8 433:13
crucial 480:9
crush 505:21
crushed 505:22
crying 332:8 394:10,12 496:17
Culuffo 490:4 526:7
cumulative 395:24
current 323:23 331:21 334:20
358:1,3
currently 417:24 420:2,5
cushion 525:5
custodian 461:19,24 462:4 478:4
custody 323:13 449:1
customer 477:2 531:13
cut 529:18,19
CV 463:6
C-H-A-R-L-E-S 427:11

D

dad 438:24 491:23,24 493:21
532:13,14,17 533:20
Daddy 495:2,3,12 498:3,13,17
499:13,24 501:1,16,23 502:12
504:5 507:6 511:8 512:2,3,10,13
512:17,21 513:8 514:13 515:15
515:19 516:1 517:20,22 518:12
518:13,16,24 519:9,23,24 521:5
521:25 522:13,21 523:10 524:23
525:11 528:14 529:1,7 530:14,15
530:22 531:3 532:4,19,20 533:10
533:13,15 540:6
Daddy's 499:3 516:24 524:22
daily 402:13 461:21
Dallas 461:17
dance 348:22 349:3 410:7,9,10
danger 489:3
Danielle 365:12
Daryl 308:19 311:5
dash 427:11
date 326:5 472:5,16 474:8 516:17
date 327:11 353:6,8 393:8 403:1
444:14,15,16 447:23,24,25
468:18 485:23 514:3,9
dated 456:24 468:20
dates 466:12 468:16,16,17,17,21
468:22,24 469:13,16,20,21,24
470:5,18 516:23 520:13 529:17
529:22
daughter 315:17 316:4,8,8,13,18
316:21,24 322:22,24 331:15,20
333:8 336:7,9 337:5,20 360:17
361:22 362:2,5 387:12 391:1
393:4 396:3 397:18,19 403:4
404:8 405:17,20 418:17 425:3,14
486:16
daughter's 395:17 404:17,21 408:1
day 325:19,20,25 326:19 336:1
340:19 343:7,9 347:11 354:16
355:11 356:4 360:1 367:5 371:12
375:13 392:16 415:12 421:21
437:14 438:19 444:10,13,17
447:20,22 463:23 509:10 510:7
526:12 529:14,15 537:24 538:2
daylights 481:17
days 334:21 335:1,1,10 358:1,7
362:19 398:22 402:13 413:2
447:24 448:1 487:13 517:11
521:5 533:9
dead 326:15,21
deadbolt 534:17 536:5,6 538:24
539:18
deal 329:25 464:11
dealing 360:13
deals 473:24
dealt 378:18
death 395:4,9,15
debit 464:18
December 311:24
decide 394:19 524:14
decided 366:3 482:13

decision 341:19 524:16,19
decisions 357:16
declarant 332:1 378:8 379:8,14,15
379:21
declaration 311:13,19 332:3 333:2
declarations 379:1,7
decline 428:10
declined 435:14,16,21
defects 356:24 410:14
defend 482:3
defendant 308:16,19 311:23
313:24 315:1 316:20,22 317:15
319:20 330:3 375:4,11 376:2
378:9 379:4,9,22 380:3 390:6
421:22 428:3,6 429:9,18 432:17
433:17 436:14,23 458:21 468:25
480:1,23 481:10,15,19 482:2
483:24 495:9 504:25 506:3,16
510:25 511:8 520:21 521:10
defendants 308:8 319:16 364:3
453:22 456:14 487:19,24 490:3
519:22 526:6
defendant's 378:14 439:22 480:5
480:14
defense 329:18 360:16 405:7 406:4
419:8 456:18 457:1 459:12 460:2
487:17 542:2
deferred 311:8
definitive 382:25
degrees 347:20
delete 466:4
deleted 475:19 476:1
deletes 475:22
deliberations 541:18
delight 323:16
Delray 493:15
demeanor 395:17 396:9 450:20,21
451:10,20,25 452:3 495:20
dental 351:14
deny 342:16,21,21
denying 342:18
department 315:20 368:12 369:4
370:25 371:2,4,14 375:13 415:10
Depending 474:23
depends 395:6,6
depict 503:12 536:18,21 539:2
depiction 503:4
depose 485:10
deposit 412:10
Deric 308:16 311:3
describe 373:11 374:6 376:21
383:14,18 384:1 395:17 396:3,8
406:25 416:24 423:10,24 428:1
438:8 442:17 449:2 495:20,23
499:13 535:25
described 340:13 401:7 403:22
describing 434:5 462:13
description 310:1 376:19
deserve 530:1
designated 357:10
Desir's 311:11,20 393:10
desk 536:2
desperate 496:1
detail 422:17
detailed 390:7
details 360:23 361:3,5 481:7
Detention 318:22,23 319:2
determine 349:11
determined 343:1 414:24
determining 428:13
detract 487:18
device 337:11 411:19
diagnosed 357:1 410:14
Diamond 519:19
didn't 313:1,6,17 314:10 319:11
324:5,17 331:7 332:18 334:11
336:5 339:6 340:19 341:24 343:4
343:21 344:14,23 348:8 351:20
352:21,22 354:25 355:6 356:5
360:20,22,23 361:4,6 368:5
371:11 373:5 390:13 394:19
395:3,22 396:5,12 419:4 422:20
433:10,11 434:23 435:12 438:11
439:6 443:11 445:17 450:23,24
451:1,7,22 452:12,16 453:9
454:14 457:6,7,7 459:2 478:25
485:8,10 488:12 496:12 501:18
502:9,10 504:13,16 512:21
516:15 518:1 519:7 524:12
527:17,25 529:2 530:24 533:21

537:20
difference 534:13
different 336:21 396:13 425:18
436:17 450:12 468:15,15,16
474:23 481:23 516:11 533:24
534:16 538:22
differently 534:14
difficult 362:3 383:17 469:17
digit 463:6
Dilauded 506:6
Dilaudid 492:20 493:1,2,4,6 494:5
505:14,15,17 506:9 509:23,24
510:5,9,18
diploma 366:24
direct 309:4,9,14,19,22 322:14
332:6 340:15 347:25 364:24
384:23 393:8 396:21 397:9,18
403:2,14,17 427:14 443:16
454:20 460:18 490:21 503:7
526:16 531:11 538:15
directed 422:24 423:4
directing 417:4 422:21
direction 422:19
directly 382:5 472:3
disagree 488:9
disappeared 373:23
disapproved 340:20,22
disclaimer 466:21 482:7
disclose 480:8 481:11
discuss 318:3 321:16 363:18
366:25 426:7 456:1 479:11 483:8
525:24 541:14
discussed 320:19
discussing 477:4
discussion 320:5
disposal 506:17
disposition 325:13
disregard 389:21
disrespect 380:9,9,17 523:21
disrespected 380:15 384:3
disrespecting 380:11 415:8
dissimilarity 481:22
distance 501:11 532:16
distant 324:3,4,5 340:14
distraught 496:3,10
distress 330:16
District 308:1,1,12 458:8,8,18,20
479:25 481:12,13,17,24 482:7,24
482:24 483:14,15,17,19
diving 402:15
DIVISION 308:2
divorce 323:6,12
divorced 327:2 348:1 409:25
docket 311:21
doctors 414:23
document 385:22 387:25 389:11
431:14,16,17 432:24 443:5
documentation 454:5
documents 460:3 471:8 476:13
doesn't 329:12,23 330:12,13
336:18 351:21 388:18 389:24,25
390:1 399:15 408:14 418:13
448:25 484:9 489:5 522:8
dog 534:15,24
doing 321:18 326:3 331:1 333:17
343:10 346:22 367:14,15,17
368:16 371:15 381:14 402:7
418:21 419:6 420:11,12 459:2
486:10,13 493:16 495:20 502:6
507:4 510:2 516:8,20 520:7
521:25 528:19,19 529:16 530:15
dollar 473:2
door 313:2 329:16 376:15,16 380:2
419:5,9,10,11 424:9,19,23
504:13,15 511:21 513:7 522:8
530:12 534:17 535:12,14,15,17
535:18 536:7,11,17 537:10,11
538:7,8,10,20,23,25 539:3,7,25
doors 415:14 423:19,21,22,25
424:4,6,8 536:9,10
doubt 481:22 482:19
downstairs 505:2 509:8
drafted 518:19
dragging 448:10,11
drawn 316:15
dread 314:21,21,21
drew 313:14,15
drive 497:23
driver's 518:3
driving 372:20,23 395:17 437:22

437:24,25 497:15 499:13 500:8
500:10 501:11
drop 349:5,13
dropped 350:2,7,10,22 351:11
393:15 437:20,21 480:21
drove 358:9 372:8 384:7
drug 324:6,23 325:12 339:13,18,23
340:8,20 341:6,13,15 342:11
343:6,16 344:3 350:9 352:1
354:9 361:8 366:4 398:18 399:4
399:12 400:1,2 404:9,18,22
405:8,17,23 406:11,13 408:7,25
409:1 410:25 411:5,14 417:13
442:11,13 492:4,20 493:25,25
494:4 497:20 507:15,24 531:16
due 432:20
duplication 470:4

**E**

E 308:23
ear 396:6
earlier 342:15 343:18 386:19
480:24 486:24
early 327:12,15 332:22 339:19
414:7 529:16
earn 343:10
easier 439:18,22
East 308:20
Eastern 458:8 473:11,12 479:25
easy 323:17 360:14
eat 336:2 528:1,6
educate 484:5
Edwin 311:23
effect 316:25 318:6 489:19
effective 506:15
efficiency 535:21 536:9,17,18
537:11 538:21
efficient 320:16
eight 392:20 394:4,5 427:21
either 325:10 382:16 416:25 417:20
453:22 519:12,22 525:5 528:12
528:13,13,14
electronic 337:11 411:19 464:18
465:2
Eleventh 488:16
elicit 315:21 317:2
elicited 397:18 457:1
ELMO 441:9
email 319:14 462:21,23 463:4,12
463:16 465:16,24,25 466:2
470:24 474:17,19,21 476:8,13
477:4
embarrassing 344:24 405:11,12
embarrassment 409:2
emergency 335:23 440:19
emotional 495:25 496:3,15
emphatic 375:20 396:10
employed 359:13 433:11
employees 465:18
employment 418:23
empty 424:2
encourage 354:23
encouraged 353:13
endearment 314:20
ended 371:1,7 380:23 500:15 511:5
enforcement 311:17 453:3 480:10
487:12
engage 487:24
engaged 520:24
enjoy 527:13
enter 340:8 485:5
entered 339:18 387:25 412:1
entire 469:1 488:13
entrance 372:15
entry 311:21
ER 335:22
Ergio 308:17 311:4
error 466:3
escort 466:10,22 471:25
especially 487:3
ESQ 308:16,17
essentially 311:21 480:1 481:5
establish 377:23 378:1,8,19,21
489:14
established 377:21
establishes 333:3 378:16
establishing 389:12
establishment 332:12
estate 461:8

estimate 510:2
evening 541:6
event 331:25
events 352:20 422:4 457:1
eventually 335:11 358:12 367:22
377:1 480:21 481:12 500:2
517:14
everybody 320:14 321:16 374:18
391:17 542:4
every-day 360:20
evidence 309:25 311:22 315:25
379:20 387:25 389:15 400:2
407:11,16 432:2,9 458:21 459:20
459:23 471:11,16,17 481:15,16
481:19 482:16,17 483:1,8,21,21
484:22 486:1 488:5 489:13,16,18
503:17,22 535:3,10 536:24 537:4
539:10,14
Ex 403:9,11
exact 327:10 353:6 385:12,21
419:5 510:8 540:7
exactly 327:22 376:7 398:5 411:5
412:8,9 416:3,11 430:17 450:13
450:22 500:1 506:5 511:14
512:11 519:7 540:15
examination 309:4,7,9,12,14,17,19
309:22 322:14 332:6 337:1
346:20 347:25 360:11 364:24
397:4,18 409:12 422:13 427:14
441:9,11 443:16 447:14 451:18
460:18 477:23 490:21 526:16
example 469:4
examples 528:20
exchange 459:15
excited 325:16 329:5,12,15,23,24
330:10 331:24 333:4 394:8
excitement 332:1
excuse 330:2 337:10 353:3 401:6
434:3 451:13
excused 317:18,20 363:21,23
456:5,6
exercising 357:15
exhibit 310:2,4,5 319:4,9 388:2,13
389:12 390:4 391:7 430:25 431:4
432:2,9 441:14 467:25 468:2
471:2,11,15,17 502:25 503:1,7
534:6,8,13,19 535:3,10,12
536:14,16 537:4 538:15
exhibits 309:24 310:3,6 318:21,25
468:8 503:22 539:14
exit 316:4 318:2
expect 383:2 504:18
expected 394:1
expecting 419:2 504:23
expeditions 320:16
expelled 493:23
expensive 491:20
experience 348:4 388:20
expired 472:22,24
explain 311:15 468:19,20,22
483:12 487:2
explained 320:3 469:25
explicit 387:3
explore 481:19
expose 483:24
express 351:10 382:3 451:4,7
expressed 362:12
expression 345:1,2
extent 313:14,16 468:12
exterior 313:2 536:11 537:10
extrinsic 407:11 459:23
exwife's 372:18
ex-boyfriend 403:10 457:13
ex-girlfriend 453:4
ex-husband 331:22 345:19 357:23
362:17,25
ex-wife 368:19,23 369:1 403:3
409:21
ex-wife's 369:5
eyes 425:15 450:20 451:1 525:18
525:19
e-mails 319:9,9 463:15

**F**

face 515:7 525:11
faced 331:9
facility 366:5 399:20
fact 314:24 316:17 342:18,22 378:8
379:22 397:15,22 400:17 408:7

455:1 456:22 463:22 481:21
482:21 484:11 487:1,10,19
488:10 512:17 530:3,9 532:25
facts 479:20 480:18 487:21
failed 480:8
fails 441:24 442:24
fair 338:19 360:23 361:10 410:22
416:3 487:3,6 488:8
fairly 349:1 371:11 462:8 525:9
falling 352:8
false 439:13 458:19,22 459:18
482:16,21 483:5,8,9,11,22
487:16 488:5
falsehood 483:19
familiar 374:4 391:22 434:14
492:17
family 329:1,6 330:1,21 357:7,9
377:23 381:10 389:8 405:12
428:3 439:3,19,24 440:1,5
442:17 453:9 507:4,11
far 313:15,19 324:16,17 351:21
353:18 355:22 357:15 369:8
374:8 383:19 401:17 496:20
500:12
fast 351:22 369:25 459:8
father 315:15 319:21 323:5,13
324:12 327:3 328:17,17,20,23
331:23 334:13,19,22 335:5 348:1
348:1 353:11,13 354:14 380:8,16
380:20 485:6 487:9,11
Father's 367:5
FBDD 474:1
FBI 421:25 422:3 446:3 449:4,11
454:23
fear 540:24
Federal 308:23 459:20 482:9,23,25
483:7
fee 462:15 463:19
feel 393:22 425:6 428:17 486:8
492:1 493:6,7,9 502:10,10
510:21,23 512:13 519:4 525:20
526:23
feeling 383:12 440:16 525:18
feels 455:13
feet 492:3
fell 322:10
felony 442:13
felt 387:6
female 347:10 355:4 416:15,20
455:4
females 429:24 430:4 454:21 455:1
455:5,7
fence 424:3 536:19
fenced-in 536:13 537:6
Fernandez 308:17 311:4 329:22
330:1 479:19,23 483:10,12,15,17
484:4
fight 352:12
figure 372:9 523:6
figured 369:24 386:11,21 497:18
file 489:1
filed 485:14 486:22 489:1
fill 433:1,4 440:16
fills 432:23,24 433:1 477:2
filters 463:24
finally 368:16 371:1 395:19 487:9
find 314:11 323:21 328:21 331:17
335:2,10,11 352:6 362:21 368:13
368:22 371:16 382:8 383:8
415:19,22 418:9 467:14 480:10
490:12 521:22
finds 311:12 379:19 489:12,16
fine 314:6,8 317:7 409:15 470:6,8,9
470:12
fingerprints 439:12
finish 333:24 366:24 508:3
Fire 513:19,23 514:3,25 515:8,11
516:4,17 518:13,16,18 520:12,14
520:14 528:14,15 529:1,20,23
533:13
firearm 316:6,15 317:4
fired 519:3
firefighter 427:19
firestarter92.com 470:24
firestarter92@hotmail.com 319:13
467:9 474:18 476:14 477:5,15
Fire's 515:19 516:1
first 311:10 315:24 320:19 321:20
331:8 332:18 333:16 345:3,6
347:11 349:7,7 351:2 361:16,19

369:7 370:8 371:6 381:4 386:18
398:15 399:23 401:7 402:23
404:5 414:21 432:24 453:14
457:14 464:6 465:23 485:1 493:4
494:15,19 503:1 510:7 516:18
519:12 521:13 523:16 525:2
533:5 534:12 537:24 538:2
fishing 485:11
fit 517:19,23
fits 517:18
five 317:20 338:1 383:11,12 489:25
five-minute 426:6
fixed 321:10
Fl 308:15,18,21,24 474:15
Flattery 312:7
Flavors 434:8,14,18
flew 335:14 358:10,11
flight 332:20 369:16,20 394:17,25
395:1,2 451:21 452:1,12,13,17
flip 482:6
Florida 308:1,6 324:10,16,18,23
330:22 331:22 334:18,23 335:2,9
339:24 340:9,14,16,17 341:4,12
341:13,17,19 343:11,22 344:4,13
344:17 358:22 359:14 362:20
363:1 366:4,7,12,18 367:8,10,11
368:21,25 369:8,16,18 370:2,13
371:21 394:19 395:22 396:13
397:19,23 398:18 399:16,19
402:11 404:7 418:18 420:14
425:1 428:15,16 433:8 435:3
436:4,19 464:21 465:6 477:10,11
477:11 491:6,8,10,12 492:6,12
492:17,19 493:5 507:4,13,17
focus 311:15 473:25
folks 363:13 364:6 397:1 441:2
479:9,13 525:24 526:5
follow 351:19 439:11
followed 521:16
following 321:16 349:9 423:23
follows 316:16 476:17
food 351:22 528:1,3,4,5,6
foot 312:25 313:16 314:5
footnote 482:10,10,22
force 487:25
forced 342:5 405:19 406:12 459:10
484:13 487:20,24 521:8,9
Forces 365:22
forcing 366:12
forever 420:15
form 313:18 455:14
formal 318:17
formally 318:12
formed 321:10
Fort 365:23 366:12 370:15 473:12
forth 325:11 538:5
forward 459:8,17
found 323:18 325:17 335:13
370:23 376:15 395:19 445:12
448:17 480:15,20 481:24 491:18
531:17
foundation 377:23 378:1
four 348:25 383:11,12 390:5,8
391:4,8 424:5
frame 353:1 470:15
Frances 311:6
FRANCIS 308:14
frankly 332:19 459:1
fraud 462:5 487:25
freaking 334:11
free 459:14
freely 539:20
frequently 367:1
Friday 468:7
friend 326:2 343:12 355:2,4,5
368:17 403:18,20,23 428:3
442:17 453:2 500:25
friendly 525:19
friends 336:18 383:7
front 339:10 385:22 435:9 488:6
497:25 498:19 522:10 534:22,23
536:15 538:7
frustrated 540:5
Ft 308:2,6,21,24
fuck 393:5
fulfills 390:21
full 400:10 441:4
fun 365:16
function 461:1
Funk 454:23

funny 422:18

**further** 336:24 346:15 360:8 363:11
396:18 409:10 416:14 422:10
425:23 440:24 447:11 451:15
455:24 479:2 489:16
**furtherance** 311:13
**furthermore** 317:6
**F-I-R-E** 319:14
**F.Supp** 458:16

**G**

**game** 487:3
**gang** 312:12,12
**gangs** 312:22
**general** 351:22 407:10 441:18
450:21
**generally** 352:5 450:3 465:21
469:23 508:7
**generated** 475:17 476:4,6,19
**Genet** 308:7 311:2 424:22 429:1,12
429:18 433:15 437:22 438:7
447:6 477:8,11 520:21 528:9
**gentleman** 311:22 350:3
**gentlemen** 391:16
**getting** 315:18 338:23 371:7
374:19 384:11 386:20,23 395:24
396:10,11 405:9 421:1,2 469:9
507:16 509:23 510:11 523:2
525:18 530:13 540:5
**girl** 315:17 323:16,17 328:2 330:23
336:4 415:15,17,19 488:1 519:21
**girlfriend** 368:5 532:15
**girlfriend's** 367:20
**girls** 333:21 356:12 413:11,14,18
466:12 468:15 512:11 517:17
518:24,25 519:9,12,14,17 520:10
531:8
**girl's** 415:22 518:3 519:18
**give** 322:9 329:5 346:17 363:14
364:18 382:17,23 391:2 393:5
421:25 427:8 458:10 460:13
462:19,21 490:16 505:13 506:9
509:10,24 510:2 523:18 528:20
532:1
**given** 387:16 497:8,10 509:18,20
509:24,25 510:7,24 518:6,13,22
519:24 521:23 528:8,23,23 529:6
530:3 532:10
**gives** 321:15 482:7 497:23
**gleamed** 489:18
**goals** 366:25
**God** 333:17
**goes** 313:15,19 316:9,14 373:22
395:10 404:25 419:14 421:5
465:15,17,20 481:10,12,12,14
482:21 483:19 488:22 489:7
496:6 498:18
**going** 317:2 323:17 331:14,17,23
332:15,16,16 335:16 353:20
355:23 356:15,23 358:3 363:7
366:18,21 368:14,23 371:2 372:9
372:10,11 374:19 382:1,12,16
383:1,5,8,9 384:21 388:2,15
389:2,4,6 390:11,14 395:3
403:14 406:9 407:17,21 408:17
412:21,21 418:9,22 428:18
430:24 438:11 440:17,21,22
441:6 442:22 444:3 455:25 458:7
458:12 462:20 470:16,18 485:8
485:19,20 486:11 492:16 494:16
497:17,18 498:25 501:10,12,12
501:17 504:21 513:24 516:5,8,9
516:13,23 520:11 522:13 523:7,8
523:18,19 532:19,24 541:5
**good** 320:9,10,13 322:16,17
323:24,25 337:3,4 348:6 349:1,8
365:1,2,18 397:6,7 409:14,20
425:6 447:18,19 458:1 477:25
478:1 479:20 482:15 486:7
**goodness** 327:23
**goods** 461:10
**gotten** 354:20 366:5
**Government** 308:14 310:2,3,4,5,6
311:6 312:9 313:12 315:14,21,24
317:2 318:15,20,25 319:9 320:3
321:20 332:18 363:20 364:7
378:8,19,21 384:21 388:2,14
389:3 390:13,17,21 391:6 406:3
419:2,16 426:1,19 430:25 431:1

431:4 432:2,9 441:13 458:10,25
459:9,25 460:7,9 467:17,25
468:7 471:2,12,15,17 476:16
478:8,14 480:7 481:11 484:23
485:19 487:3,7,10 488:7 490:6
502:24 503:7,16,17 522:24 534:8
534:13,19 535:3,10,12 536:16,24
536:24 537:4 538:15 539:5,7,9
539:14,15 541:25
**Government's** 318:24 319:4,7
322:5 330:9 364:14 427:6 432:6
460:12 487:4 489:20 490:13
503:21 536:14 539:16
**grab** 372:12 394:14
**grade** 348:14,15 349:6,14
**graduate** 348:12
**granddaughter** 367:21
**grandmother** 499:19
**granted** 315:11 330:7 432:8 503:24
**granting** 480:5
**great** 312:18 483:20
**greet** 533:4
**Group** 365:23
**grow** 491:4
**growing** 348:18 357:7
**Guard** 366:2
**guess** 315:16 340:5 350:12 365:16
382:7 384:3 388:14 394:4,8
434:6 455:23
**guidelines** 465:19
**gun** 524:23,25 525:2,3,5 526:21,24
527:3
**guy** 373:18 374:17 400:7 411:13
480:19 498:4,8,21,25 530:23,24
530:25
**guys** 325:7 326:7 327:1 360:20
373:14
**guy's** 496:23 523:5

**H**

**habeas** 480:1,6 481:11
**habit** 353:21
**hadn't** 326:24 327:22 492:25
**hair** 515:13
**Haitian** 312:13 313:13,20,23 314:9
314:14
**Haitians** 314:19
**half** 440:11
**halfway** 366:6 414:9,13
**Hallandale** 433:8 477:10
**Hampshire** 395:1
**hand** 322:4 364:13 374:18 460:11
488:24 490:12 534:6
**handbook** 488:16
**handed** 471:5
**handing** 389:1
**handwriting** 433:2 486:3,4,15
**hang** 340:18,19
**hanging** 386:12 520:10
**hangs** 331:20
**happen** 383:1,3,5 395:3 504:21
**happened** 326:17,18 332:7 368:13
370:17 401:19 487:1 498:13
505:3 514:8 523:1,4,13,17
529:14 532:7
**happening** 368:24
**happens** 394:6 465:14 497:24
500:21 509:15 516:11 529:24
**happier** 418:19
**happy** 318:9 325:19,23 458:10
**harassing** 392:10
**hard** 333:23 352:4,5 509:16 533:11
**hasn't** 348:13 359:16 390:15
**haven't** 313:12 318:12 336:8
388:16 520:1
**head** 486:19
**headed** 369:6 394:9,16,18 419:4
460:2
**header** 472:3
**hear** 387:9,10 388:10 389:3 393:2
406:11 426:4 451:22 463:19
**heard** 313:12 314:15 315:20 326:24
327:9,22 330:24 345:6 353:25
355:13,15,17 361:13,23 378:24
387:16 397:11 403:17 404:13
450:13 457:14 512:7,8 522:12
540:25
**hearing** 327:20 345:3 361:20 367:7
398:16

**hearsay** 311:12 328:9,24 329:16
345:15 352:15,16 355:8 370:5,10
372:25 377:16 395:5 401:22
402:2,8 403:13,24 418:13 421:16
421:19 424:12,17 446:10 447:9
449:7 451:6 515:22
**heart** 326:25
**heavy** 397:25 423:12,12
**hedges** 373:16
**height** 515:12
**held** 375:22
**hell** 396:6
**help** 328:20 334:13 351:25 381:11
385:5 405:20,21 412:21 421:1,2
492:2 508:1 528:18 529:2 537:12
**helped** 366:8 491:23,24 528:17
**helping** 381:23,24 491:22
**Herald** 315:12 321:4
**heritage** 515:13
**heroin** 338:25 339:11 398:2 417:15
417:16,16,17 419:25 449:18,20,22
449:24 450:3 492:8
**hey** 438:24 489:5,6
**hi** 333:16
**hid** 398:9
**hide** 399:16
**high** 348:12 349:5,14 350:7,10,22
351:11 354:11 366:24 506:15
510:9
**Highly** 505:16
**history** 397:20 482:18,20
**hit** 498:8,10
**hobbies** 527:12
**hold** 319:3 349:20 540:9,10,11
**holder** 466:2
**holders** 463:15
**holding** 356:18 363:6 377:1
**Hollywood** 315:20 316:3 370:24
371:2,20,21 383:7 414:25 415:4
537:12
**home** 313:17 335:3,15,18 336:6
343:24,25 344:12 354:23 359:7
366:16 394:7,11 396:12 427:1,2
**Homing** 497:5,14 500:5 521:7
**honest** 436:17
**honestly** 433:25 437:1 485:8
**Honor** 314:2,3,13 316:1 317:9,18
317:21 318:9 319:1,3,8 321:21
322:13 328:11 330:5,12 331:4,6
331:14 332:14 345:14 346:18
349:16 352:14 355:7 357:3 360:4
360:7,8,10 362:6 363:20 364:9
364:23 377:20 378:10,16 379:2
379:10,16 384:18 389:18 394:21
395:24 396:17,18 404:10,24
406:4,6 407:9 408:11,16 409:8
411:17 418:1,3,12,24 419:25
422:8,10,12 425:23 426:21
429:17 430:22 432:1,5,7 440:24
450:7 451:13,15,17 455:24
460:17 471:21 477:18 479:5,23
487:10,15 488:15 490:8,20 495:8
502:21 503:20,23 515:21 520:20
526:18 534:3 535:2,7 536:23
539:5,12
**HONORABLE** 308:11
**Hopefully** 391:17 458:13
**hoping** 504:17
**horrible** 487:18,18
**horse** 379:6
**hospital** 339:20,21 340:6,7 351:24
351:25 352:6,9,19,25 370:4,15
370:15,17,18 414:1 415:5
**hospitalization** 352:21 457:9
484:19 485:18,21
**hospitalized** 456:23 484:17,21
485:12,16
**hospitals** 370:16
**hostessing** 343:13 493:17
**hot** 319:8,9,12
**hotel** 316:4 371:23,24 372:10,14
373:21 374:14,16 375:17,25
381:19,20 394:16 395:18 415:6
416:18,25 417:1 422:15 494:11
497:3,4 499:1 500:25 522:10
527:5 528:1
**hour** 438:13,14 440:11,11 441:4
510:10
**hours** 383:11,12 384:5 392:25
394:4,5 509:12,13 511:12,16

**house** 413:11 414:9,13,19,20,21
420:19 491:13,14 494:1 497:25
498:16,17,18 499:23,24 533:24
534:9,10,22,24 535:14 536:8,13
536:7,10,11,20 539:20
**housekeeping** 315:6
**houses** 366:6
**Housing** 412:13
**Hubbard** 309:3 321:22,23 322:1,5
322:11 331:12 332:21 333:7,23
337:3,5,18 338:20 360:13 363:12
363:22 369:19 372:17 403:4
407:20 485:5 487:16
**hugged** 394:10,16
**hung** 334:4,8,8
**hurry** 529:20
**hurt** 352:12
**husband** 331:21,21 334:20 335:2,5
348:8 358:2,3 362:25 369:5
372:18
**hushed** 347:4 355:12 356:4,7
357:21,22 358:6
**hydromorphone** 432:20 442:11
**hygienist** 351:14
**hyperlink** 475:6
**H-U-B-B-A-R-D** 321:22 322:11

**I**

**idea** 324:17 363:15 369:4 485:20
509:24
**identification** 309:25 384:22
388:21,25 430:25 454:10,14,15
454:17 467:24 471:1 499:5
502:25 503:8 534:7
**identified** 375:4 395:11 429:18
495:9 520:21
**identify** 378:12 429:9
**identifying** 429:9
**identity** 378:25 379:5,8
**ignore** 327:21
**illegal** 323:19 466:16,25
**illumination** 484:6
**images** 475:20,22
**immediate** 452:1
**immediately** 362:17 394:17 440:17
440:23 497:10
**impact** 455:16,16,19
**impair** 357:11
**impeach** 488:20
**impeachment** 404:11 422:7 449:6
**important** 483:7
**improper** 385:17 404:10 422:7
449:6 488:4 496:7
**inbetween** 355:13 356:4 501:8
**incident** 459:23 480:22,24 481:1,2
481:4 483:3 484:19 525:10 527:2
**incidents** 480:8 481:11
**include** 399:15,17,18
**including** 541:15
**incognito** 373:13
**inconclusive** 480:22 481:6
**inconsistencies** 481:8
**indefinite** 412:17
**independent** 321:17 456:2 541:15
**indicate** 355:4,25 389:7
**indicated** 347:25 357:21 359:20
385:9 410:25 411:6,13 418:16
419:21 421:21 448:6
**indicating** 314:7 416:21 535:22
537:7,8 539:18
**indicia** 483:18,23
**indictment** 468:9,13,21,22,24
469:13,16
**individual** 463:25 465:15
**individuals** 472:6
**inextricably** 405:9
**influence** 444:22 450:16,25 451:2
**information** 320:23 368:13 433:4
439:13 457:5 462:18 463:3,4
472:3,4,17 473:5 474:7 477:2,13
482:3,4 513:25 514:7
**informed** 368:20
**informs** 316:7
**ingest** 498:5 505:17
**initial** 485:24
**initially** 368:15 372:23 381:21
424:1 463:24 485:14
**initials** 317:11,12,17
**initiated** 369:7

initiating 510:11
inject 505:18
injected 505:19
injuries 484:17,21
Inn 497:5,14 500:5 521:7
inquire 315:9,13 322:12 364:22
427:12 460:16 490:19 501:12
inquired 526:10
inscription 472:13
inside 415:16 498:18 499:24
513:11,16 538:11
insight 419:13
insofar 389:14 407:19
instances 407:5,8,12 408:12
481:18
instruct 311:16 318:4 514:15
instructed 318:2 389:21 518:10
instructions 518:6 528:24
instruments 461:8
intelligence 410:22,23
intend 315:24 363:22 460:4
intention 459:17
interact 514:15,19
interacting 422:16
interest 351:10
interject 419:17
interjecting 314:9
internal 472:25
internet 369:12 461:2 465:12
541:16
interpreting 482:8,11
interviewed 422:3 446:2 449:11
interviews 421:25 422:6
intimidated 540:25
introduce 332:6 388:15 389:23
390:24 494:16
introduced 311:23 388:3 483:3
introduces 513:18
investigated 480:15 481:6
investigation 480:21
investigations 483:24
invocation 318:6
invoice 474:6 476:3,19,21
invoices 474:6,9 475:9,13,14,16
476:7,8
invoke 317:23,24
involved 347:10
IQ 357:13 410:17
irrelevant 404:24 408:16
irritated 383:22
isn't 341:21 397:15 400:17,21,23
408:8 446:18
issue 315:3,5,5 378:4 396:20
405:22 459:18 468:3 488:9,12,13
issues 312:5 330:6 378:23
it's 390:5 459:5 462:8 488:4 503:3
506:15 512:16 534:22 538:20
I'm 314:4 324:19 333:17 356:20
361:17 398:5 399:6 409:15
438:20 476:5 489:25 493:19
509:9,16,16 524:24 528:22
529:12 535:16 536:17
I've 314:15 419:13 439:4 458:6

J

Jackson 309:13 426:21 427:6,10
432:11 447:16
Jackson's 427:25
jail 318:22 319:2,3 368:4,10,12
378:11,12,20 379:12 381:25
382:1,18 393:16,19,22 394:6
395:18 396:4 403:18,20 413:6
417:9 425:20 428:2,4,7,18
437:12 439:15,17,19,23 441:23
445:4,8 446:9,22 448:18 532:8
532:21 533:5,9,14,17
Jamaican 383:16
Jamaicans 314:20
JAMES 308:11
January 457:22 485:25 491:1
jazz 349:4
Jean 388:22
job 321:18 338:23 351:2 359:16
366:23 412:21 427:18 433:11
508:2
jobs 350:23,25
Johannes 308:14 309:4,7,19 311:7
318:9,17 319:13,22 321:21,24
322:12,13,15 328:11,13,25 329:4

K

keep 320:13 321:17 326:7 363:18
392:10 431:14,16,17 456:3
502:17 525:25 526:12 541:17
keeping 347:11 356:8,11,16,18
keeps 333:21
kept 331:16 347:5,8 373:16 375:18
380:8,9 381:24 383:24 389:5
395:20 405:21 417:4 419:2
431:24 464:24 465:8 467:19,21
471:8
key 509:18
kick 353:21 420:22
kicked 341:21,24,24 342:2 343:6
343:17,18 344:2,6 401:15,17,19
kids 526:13
kill 540:17,18,21 541:2
kind 339:8 352:12 365:15,16 372:8
376:8 381:25 382:16 387:3
388:21 394:9 395:3 407:20
410:25 414:17 422:18 425:18
439:13 449:3,4,17 450:21 461:6
483:1 501:8,8 508:4 517:5 522:9
534:12
King 351:1

knee 457:19 486:18
knees 394:13 496:21
knew 312:11 343:3 374:11 375:18
413:15 416:5 499:24 504:5 507:6
522:12
knob 538:25
knocking 376:16 424:20,23
knowing 343:16 393:22 428:17
knowledge 314:22 324:18 360:17
known 316:16 378:21 395:13 416:3
436:6 494:7 502:12 511:8 513:19
knows 421:17
kosher 381:6
Krome 318:22,23 319:25 320:1

L

lack 377:15 407:17
lacrosse 348:17
Ladies 391:16
lady 376:16 417:1 424:9,12,22
laid 379:21
land 513:11
large 366:10 496:19,20
lasted 400:17
Lastly 321:10
latest 474:6
Lauderdale 308:2,6,21,24 366:12
370:15 473:12
laugh 365:16
law 311:16 378:18 453:3 480:10
482:8,10,10,11,15 487:12 488:18
lawyers 315:2 320:12 479:10
lay 329:10,15,23
lead 338:13 536:11
leading 342:22 360:24,25 362:6,7
362:14 387:18 394:21 452:7
453:11 508:16 509:5 511:2
514:16
leads 316:21
leaning 373:15
leap 406:10,14
learn 312:17,20 368:8 370:8 371:15
393:17 398:4,6
learned 341:25 342:22 368:10
393:19 398:3,4 456:21
leave 313:1,6,17 316:6 325:20
332:20 376:2 392:11 486:11
493:10 504:13,15 511:21 527:5,8
527:10,22 540:8,16 541:24
leaves 363:19 378:14 426:8 456:4
479:12 526:1 541:21
leaving 313:4 330:22 371:1 376:24
led 312:24 313:2,24,25 314:5
352:20 450:19 451:20,25 536:13
538:10,20 541:2
left 322:2 333:7 354:13 355:17
373:19 376:5,6,14,15,17 377:21
378:2 379:17 380:2 386:12
391:17 418:17 424:22 446:16,18
447:7 460:10 475:3 493:11
521:18,25 522:1,9 530:11 531:13
536:2 541:3
legal 311:9 317:17 318:6 540:11
legally 540:10,13,15,17,21
Lemon 482:23
lends 405:18,22
length 483:20
lengthy 426:2
lessons 348:20,22
letter 311:11,12,15 318:25
let's 320:6 329:25 359:23 364:4
381:1 417:13 426:6,11 460:5
448:18 489:21 503:1 513:1
525:24 534:18
level 482:23 483:1
Lewis 365:23
license 351:11 376:19,23 388:20
388:25 518:3
lie 339:13 342:15,19 404:9 405:12
405:17 408:7,25
lied 361:7 387:6 405:8,11,23
408:10,19 409:1 480:9,10 484:1
484:9,10 486:2 489:9,10
life 338:14 365:6 418:22 492:2
507:7
light 373:20
liked 343:25 346:16
limit 406:13 493:19
limitation 407:4

limited 406:21
line 310:1,1 374:3,20 419:16,18
424:3 432:24 473:5 491:17,19
513:11
lineup 480:19
link 390:14,17
liquid 505:24
Lisa 309:3 321:22,23 322:5,11
403:4
list 321:23 433:10,15 460:24 461:7
464:1
listed 433:7 473:13 474:14 475:7,8
listen 315:15 378:10,12
listened 379:11
listing 463:25
little 336:3 359:17 366:9 367:12
371:6 373:14,18 374:17 422:17
462:1 500:3 522:9,13 524:4
live 323:12 331:9 340:24 358:21
465:20 472:22 491:8 507:22
508:2
lived 322:20 324:21 365:5 400:23
400:25 414:3
living 338:15 340:22 343:21 344:3
344:13 358:19,22 359:6 400:20
401:1 402:20 411:6,13,15 413:10
413:17 414:15 427:16 428:14,16
436:19 457:25 460:20 486:6
488:3 491:13,14,18 507:18,23
lobe 396:7
local 473:12
locate 368:15
located 369:4 464:20 496:24
500:19
location 371:21 464:15 534:1
lock 536:5,6
locked 538:14 539:24
lodge 448:15
logs 464:6
long 322:20 324:20 327:20,22
328:6,7 337:21,24 338:2 348:23
359:18,19 365:5,24 367:10
383:10 394:3 398:21 412:14,18
417:17 420:11,12,13 426:1
427:20 428:14,15 440:9 447:4
461:24 462:2 466:18 493:18
499:23,25 501:11 504:8,18 509:8
509:9 510:9 517:2,10,11,21
522:5 524:11,15 532:16 533:12
longer 401:20 413:9 414:9,13
look 321:7 370:8 386:6,7,15,16
389:6 396:5 468:1 484:6 488:3
525:19,19
looked 361:18 373:20 374:6 396:3
396:5 424:3 451:2 516:17 534:11
534:24 536:21 539:3
looking 315:17 316:3,7 369:13
370:13 373:19 378:17 385:22
386:3 415:14 418:22 421:22
423:12,19,25 471:24 476:18
478:11 491:17 494:11 495:16
490:10 506:16
looks 450:25 469:4 476:24
loosey-goosey 388:22
lot 312:25 314:5 334:12 365:17
372:14,15 373:12,21 402:14
428:14 495:25 497:1,2 501:7,7,9
508:22 516:10,11,11 520:11
523:15,17 527:13 528:17 529:17
529:17 536:11
loud 330:13 336:17
louder 501:19
Louis-Charles 309:13 427:6,10
441:3
love 409:16 425:3
lunch 363:16 441:3,6 456:1 541:8
lying 342:10,12 343:1,2,3,5 387:17
393:3 405:9,18,22 489:6,6,6
L-O-U-I-S 427:11
L.D 321:24

M

machine 368:6
Mackenley 308:7 311:1 316:4
375:4 376:2,25 377:14 388:18
390:25 395:10,13 403:23 415:7
424:19 428:24 429:3,9 430:19
431:8,12 432:15,24 435:6 436:15
438:4,8 441:22 443:20 447:6

**M-A-T-H-I-S** 458:11

**N**

**name** 311:23 322:9,9,22 338:7
339:8 369:19 370:16 371:24
388:19 400:9,10 415:22 418:5,9
418:11 427:8,9,10,24 428:24
429:1 434:1,4 460:13,14 462:21
462:23 463:3,8,14 468:25 474:1
474:2,4,7,9,12,20 477:7 478:22
485:7 490:16,16 491:14 494:7,17
494:24 497:4 499:20,21 500:16

**Michigan's** 482:14
**microphone** 322:7,8 354:7 364:16
364:17 427:8 431:10 490:15
505:8
**middle** 355:14,15
**mid-2012** 491:10
**mike** 531:20
**military** 365:6,20,24 391:22,23
**mind** 317:21 321:17 330:14,20
331:1 363:18 456:3 486:9 488:11
488:12 493:8 495:23 496:6 516:5
525:25 526:22 541:17
**mine** 458:10
**minimum** 399:12
**minor** 488:25 489:7
**minus** 534:24
**minute** 447:5 497:15 522:1 525:24
**minutes** 317:19,20 328:7 363:24
441:4 465:21 479:9 489:25
530:10
**Miramar** 308:17,18
**missing** 387:7
**mix** 505:23
**moderation** 462:5 465:17 466:4,6
**moderators** 475:23
**Molly** 433:18,20,24 434:8,20 435:6
435:18,21
**mom** 331:15 333:16 457:24 458:5
493:21
**moment** 316:12 319:4 346:17
360:7 396:11,17 404:1 408:21
418:3 419:25 446:12 462:17
468:1 473:20 477:18 479:17
**Monday** 440:13,14
**money** 343:10 344:22 345:8,11
382:22,23,23 425:18 428:20
443:12 444:8 464:3 476:22 518:6
518:7,8,10 521:19,21,23 530:1,3
530:5,7
**monitor** 391:16
**month** 346:9 367:12,12 412:11,12
**months** 359:23 360:1 438:5 485:8
486:14
**morning** 312:3 320:9,10,17 321:4
321:14 322:16,17 327:10,12
332:22 337:3,4 363:14 365:1,2
397:6,7 409:14 457:6 529:16
532:18 541:7,20 542:5
**motel** 372:3,5 384:6 423:5 500:15
500:18,19,22 501:5,8,22,23
503:3,5,13 504:1,6 506:10
511:16 513:11,16 514:12 517:2
517:22 523:22 525:4 527:5,15,19
530:13 532:1,3 533:23 534:1
**mother** 321:24 329:22 330:16
340:23,24 343:21 344:9 349:18
372:23 377:9,10 381:13 396:12
457:16 485:3 486:8,10,12,21,25
488:11
**motherfucker** 393:3
**mother's** 325:19,19,25 326:19
343:7,9 354:16 355:11 356:3
486:15
**motion** 311:20
**motions** 311:8
**move** 329:17 432:1 456:25 471:11
491:10
**moved** 402:11
**moves** 503:16 535:3 536:24 539:5
539:9
**moving** 326:2 374:18 473:24
**muck** 488:18
**mug** 371:8
**multiple** 474:5
**muscles** 493:8
**music** 368:20 501:18
**musical** 461:8

**mad** 523:12
**Mafia** 312:13 313:13,20,23 314:10
314:15
**mail** 318:23 319:9,9,12
**main** 319:3 535:14 536:7
**maintain** 366:23
**makeup** 531:17
**making** 369:20 466:7 509:3
**male** 355:4
**man** 331:16 333:20 347:6 356:7,11
356:16 363:6 374:15 411:6
457:20 480:14 522:14,19 530:9
**Manchester** 395:1
**manner** 320:16
**March** 399:2,5,7,20
**marked** 309:25 467:24 471:1
**markets** 463:23
**marks** 487:8
**math** 323:10
**Mathis** 458:16 479:24
**matter** 311:1 451:2
**matters** 312:2,8 315:6 318:12
541:23
**mattress** 525:6
**ma'am** 322:16 323:8,21 328:6
326:23 346:22 349:20 352:5,18
360:14 361:23 362:24 363:11,23
384:19 428:9,11 429:2,4,23
430:6,14 431:5,19,25 432:12
433:14 436:2 437:5,15 448:14
455:10 489:25 534:4
**McDonalds** 351:1,1
**meals** 412:13
**mean** 324:4 336:18 341:10 351:13
356:17 380:17 383:19 392:9
418:21 420:14,17 432:13 433:23
441:21 448:7,12 453:22 455:21
461:20 463:21 465:1 466:17
469:3 472:23 473:15 475:5
484:10 492:9 522:4 537:19
**meaning** 398:25 524:21
**means** 313:10 434:7 443:18 472:24
473:16 541:16
**meant** 313:5 519:7
**meet** 438:13 495:19 519:9 537:24
**meeting** 520:24 531:3 541:10,11
**meetings** 421:5,7,11,11,14,18
**meets** 389:14
**member** 312:11,12,12,18 313:13
313:23 314:4,9 428:3 439:3,20
439:24 440:5 442:17
**members** 365:3 376:4 377:13
384:1 392:5 422:16 437:6 493:1
494:9 500:21 504:4 511:18
513:21 515:4 523:13 529:14
533:16 540:4
**men** 313:2 314:7
**mental** 356:24 410:14
**mention** 347:10 374:25 375:1
422:6 429:5,14 488:6 495:5
520:17
**mentioned** 337:5,19 347:8 356:14
365:13,20 375:10 382:11 383:23
394:12 403:2 415:15 416:5 418:5
423:19 463:18 485:19 494:12
499:6,15 517:1 525:14 536:5
540:6
**mentioning** 383:24
**mere** 488:6
**merits** 321:11
**mess** 384:3
**message** 385:3,16,21 386:9,13,19
386:24 387:13,22 388:1 390:24
392:3,6,17,25 393:6,9
**messages** 384:12,14 385:6,12
389:7,7 390:1,6,8 391:4,8,19
502:9,12
**messing** 380:18
**met** 375:14,16 468:7 494:6,9,11
495:24 519:12 521:5 537:24
**methods** 464:16
**MetroPCS** 388:15,19,24 389:5,12
**MF** 387:17
**Miami** 315:369:10
**Michigan** 458:9 479:25 480:2,8
482:8,11,13 483:16 484:3

**Michigan's** 482:14

**511:25** 512:3 513:23 514:1,3,9
518:15,22 519:18,18
**named** 369:13 373:24 400:4 434:18
537:25
**names** 317:17 365:11 440:8 519:17
**Nathan** 309:18 460:9,12,15
**National** 366:2
**natural** 407:6
**Naturally** 407:1
**nature** 332:24 387:18 441:18 442:9
511:2
**NE** 308:15
**near** 527:16,16
**necessarily** 496:6
**need** 319:6 333:24 354:7 364:17
386:15 397:2 405:21 431:9
434:10 440:19 450:21 462:20
479:9 489:23 541:23
**needed** 328:20 334:13 368:11,20
385:9 492:1 505:5
**needle** 505:25
**needs** 334:18 337:13 385:17
411:19 462:18 463:7
**neighborhood** 497:25
**never** 314:15 315:1 345:10,11
351:5 397:11 404:3 438:20
450:13 478:22 480:20 535:15,17
**new** 371:11 395:1
**news** 325:23
**newspaper** 541:16
**nice** 376:7,11 505:6 510:25 511:8
511:13 523:19 525:14
**Nick** 338:7,8,10 400:5 401:6,10
403:4,4
**nickname** 387:16 425:1 434:5
518:13 519:19
**nicknamed** 518:14
**right** 316:8 380:21 396:12 398:25
407:15 415:11 458:9 519:13
**noon** 541:9,11,11
**normal** 338:14 347:23 348:7 389:5
392:8 410:1,22,24 467:21 495:16
**normally** 327:21 408:5 428:4,4
434:1,3 437:1,1,2 440:1
**Northern** 482:24
**nose** 457:18 486:16
**note** 318:10 377:25 378:2,16 380:2
482:6
**notebook** 468:2
**notes** 376:2,5,8,11,14,24 377:21,21
378:13 379:15
**notice** 326:24
**noticed** 384:7
**notified** 403:7
**November** 311:24
**number** 325:3 327:19,20,21 331:19
331:19 334:6 356:5,14 366:14
369:9,11 370:21 372:22,24 373:3
373:6 376:6,20,23 377:4,4,7,9,11
377:22 378:24,25 384:5,25 385:2
388:22 392:2 393:10 462:21,23
463:4,6,10,22 474:7,14,14
480:22 481:13 482:11,22 499:8
499:15 510:8 514:1,4,10
**numbs** 493:7 510:22,23

**O**

**oath** 526:16
**object** 419:2 424:12 468:13 511:2
**objected** 419:16
**objecting** 469:22
**objection** 311:10 315:23 317:13,15
319:23,25 328:9,24 329:18,18,19
333:4 345:14 349:16,20 352:14
355:7 357:3 360:4,24,25 362:6
362:14 370:5,10 372:25 377:15
385:8,15 387:18,24 395:5 396:15
401:12,22 402:2,8 403:13,24
404:10,24 405:1 408:11 409:7
411:10,17 418:1,12 419:23 420:1
420:3 421:8,15 422:7 430:1,1
432:3 435:17 436:9 445:13,21
446:10 447:9 449:6 450:7 451:16
452:7,21,22 453:5,6,11 454:2,6
455:13 468:8 471:13,14 489:20
496:5 503:18,19 508:16 509:5
514:16 515:21,24 518:19 535:4,6
536:25 537:1,2 539:11,12
**objectionable** 496:10

**objections** 330:3
**observations** 317:4 410:21
**observe** 423:20
**observing** 496:6
**obtaining** 351:10
**obviously** 340:20 390:15 488:9
**occasional** 421:12
**occasionally** 421:7
**occasions** 399:13
**occupation** 433:10,10 441:18
**occurred** 409:22
**ocean** 527:16
**odd** 327:12,14
**offer** 315:25 506:6
**offering** 459:19
**office** 415:1,2 423:1 437:13,17,19
438:13,14,15,21 439:14,16
444:10,17 446:15,16,18 447:7
448:7,10,12,13 453:15
**officer** 369:3 370:24 371:11 415:13
**officers** 316:13 371:3,5,15 374:16
374:20 375:14,16 415:11 423:20
423:22,23,25
**Official** 308:22
**oh** 316:8 335:19 351:15 359:17
434:9
**Ohio** 482:23,24
**old** 323:1 338:17 347:2,4 350:20
361:13 399:23 411:1,9 484:24
490:23
**once** 316:20 325:8 335:8 369:1
370:9,13 371:14 372:3,7 375:7
384:5 386:6 393:19 394:12 396:3
396:8,9 399:6,7 437:17 464:23
465:11,20 481:8 491:7 495:12
498:5 504:25 523:13 530:11
532:21 533:2,4
**ones** 468:23,24 470:8 513:3
**online** 460:23 461:1
**open** 321:17 363:18 373:14 419:5
456:3 504:13,15 511:5 522:9
525:25 537:11 538:10 541:17
**opened** 419:9,10,11 486:17 522:8
530:12
**opening** 389:1 458:25
**opinion** 404:17,21,23 405:24 406:1
406:6,16 408:1,3,23 409:4
479:16,19
**opinions** 313:14,19 321:10
**opponent** 378:7 379:3,23
**opportunity** 446:8 482:3 485:10
**opposed** 317:17 353:15,17 406:21
**option** 462:9 466:3
**order** 317:16 331:8 378:7 379:7
407:12 418:22 419:5 425:8
457:17,24 462:25 485:14 486:5,8
489:1,2,5,8,14
**ordinary** 495:15 497:20
**Oregon** 400:15
**organized** 324:11
**originally** 436:18
**outside** 318:4 456:25 468:13
446:18 499:23 523:6 537:13,20
537:21 538:8
**outweigh** 312:15 316:25
**outweighed** 489:18
**overly** 312:15
**overrule** 408:17 420:3
**overruled** 333:4 357:4 421:9
435:19 449:8 451:8 453:12 496:8
511:6 514:17 515:24
**owe** 443:12 444:8
**owned** 508:15
**o'clock** 332:20 392:20

**P**

**Pacific** 473:11
**packed** 394:17
**packet** 469:1 471:5
**page** 309:2 310:1,1 384:24 390:5
390:10 391:5,7,9 432:23 433:17
472:5 475:6,19 476:16
**pages** 390:4,5,8
**paid** 353:11 412:6,10,11,12 463:2
473:16,17 474:6,7 499:18 519:24
530:1,2
**pain** 493:2
**pair** 517:6,7
**Palm** 454:21 455:2

**pan** 332:15
**paper** 321:7 489:10
**paperwork** 437:3 439:19,23,25
441:14
**paraphernalia** 450:2 531:16
**parcel** 313:7
**Pardon** 422:2
**parentheses** 433:20,23 434:2,4
**parents** 332:19 405:12 458:2 486:6
489:1,3,6,10 507:19,22
**park** 373:8
**parked** 373:22 498:16,19
**parking** 372:14,15 373:12,21 497:1
497:2 501:7,7,9 503:11,13
523:15,17 536:11
**Parkway** 308:17
**part** 313:7 314:11 315:22 339:19
409:20 468:19 523:2 536:7
**participate** 492:16
**participated** 410:3
**particular** 370:18 396:11 399:25
400:6 480:23
**particularly** 482:23
**parties** 318:1,5,11,14,16 319:8
**partner** 446:25
**party** 378:7 379:3,23
**passenger** 498:21
**passing** 373:17
**Paul** 369:10,14 371:9 373:18,24
374:11,22 388:22 395:10,13
397:9
**PAULINE** 308:22
**pay** 412:8,9,19 428:5 462:15
463:19 464:3,16 491:22 498:22
498:24,25 513:15 520:4 530:7
**paying** 359:5 401:18 417:25 442:1
520:2
**payment** 464:20 474:11
**pays** 417:19 463:25
**pay-as-you-go** 499:22
**peace** 527:13
**peer** 401:9
**pending** 385:19 396:1 450:8 511:6
**people** 317:22 352:3,5 366:7
373:17 375:17 414:6 422:16,20
423:2,9,10 424:16 429:22 436:17
441:18 452:12 461:4,10,14
475:25 493:2 496:13 508:22
509:1,4 512:8 537:14,16,19,21
**people's** 437:10
**percent** 414:4 423:8 428:5
**period** 338:10 383:5 392:10 398:11
400:15,25 467:11 468:9,11 470:7
470:19 504:18
**permanently** 363:21
**permission** 317:11 384:18 391:6
432:7 441:8 503:23 532:1 535:7
**permit** 407:18
**person** 332:8,9,9,11 336:17,19,20
347:8 373:24 374:11,22 377:14
377:25 378:3,25 380:25 395:11
397:14 400:4,4,6 403:22 406:25
406:25 422:24 423:4,5,16 428:8
428:14,18 433:18 435:18 439:2
440:6 441:22,23,24,25 442:21,21
442:24 443:18,18 445:25 446:6
474:11 477:15 487:18 494:15,19
521:18,20 525:11 537:25
**personal** 507:3,7 513:24 516:3
528:25
**personally** 368:5 434:16
**person's** 378:20,22 523:3
**pertaining** 318:22
**petition** 416:14 459:22 484:6
485:14,15,23,24,25 486:22
488:23 489:13
**petitioned** 457:23
**phones** 351:5 508:8 516:2 529:8
533:17,17
**phonetic** 319:14
**photograph** 370:18 503:12 534:23
535:23 538:25 539:2
**photographs** 487:14 515:2,4
534:10
**phrase** 314:18
**physical** 457:19 458:4,24 459:4
486:17
**physically** 381:6 408:19,19 457:20
459:6,9 465:8 510:22,22,23
**pick** 413:23 517:18,19 526:13

533:6
**picked** 368:6 393:2 413:24 414:16
417:9 480:19 533:15
**picture** 371:9 375:18 424:9 503:3
534:12 538:23
**pictures** 462:14 487:8,11 515:6,6
515:14,15,17 534:9
**piece** 505:23
**pill** 493:2 505:19,21,23 510:5
**pills** 339:4 353:23 417:15
**pissed** 387:3
**pistol** 373:22 374:6,7,12,15
**pistols** 374:4
**place** 366:19 370:8 399:18 413:15
413:18 414:15,17,17 508:1
**placed** 463:23,24 464:4,23 468:14
469:5
**places** 491:17 500:8
**Plaintiff** 308:5
**plans** 315:21
**play** 378:19,23
**play** 348:16
**pleading** 394:10
**please** 320:6 322:1,6,6 331:18
364:12,15,16,17,18 376:4 392:5
427:7 429:5 430:16 431:21
439:21 451:23 460:13 466:24
490:10,14,16 493:1 494:9 495:5
520:17 526:17
**point** 325:25 329:17 330:20 334:22
335:22 343:16 354:23 368:3
373:8 374:25 375:1 377:16
381:19 382:18 384:12 390:11
395:25,25 399:11 400:20 403:22
414:25 416:4 429:14 444:6 446:8
446:15,18,21 447:7 459:22
462:16 472:1,2,7 482:12 495:5
498:1 504:14 506:19 508:5
510:14,16 511:1,9,10 515:16
520:6,17 535:21 537:6 540:20
**pointed** 375:25 423:16
**pointing** 375:18 416:22 423:14
537:8
**points** 338:12
**police** 315:20 316:13 368:12
370:24,25 371:2,4,5,14,14
374:16,20 375:7,10,13 376:19
380:18 384:3 392:10 414:25
415:4,6,8,9,10,10,11 424:20,23
480:15,20 483:23 530:17,19,20
530:21,22 531:12
**pool** 523:22 524:1,3,5,6,7,11,14,16
**portion** 389:23 432:23 464:12
472:15 473:18,21,24 476:19
**pose** 515:5
**position** 330:10 455:22 480:1
**positive** 483:21
**positively** 375:4 429:18 495:9
520:21
**possessed** 482:1
**possession** 432:20 529:9
**possible** 340:3 435:10 489:17
**possibly** 329:10 489:11
**post** 311:11 454:21 461:4,10 462:7
468:9,17,23 473:7
**posted** 382:19 465:11 466:12
468:9,17,23 473:7
**posting** 462:11,16,19 465:16,21
470:7 477:16
**posts** 468:12
**potentially** 366:23
**Pound** 312:12 313:11,23 314:4,10
314:15
**pounding** 415:13
**powder** 492:9,11 505:21
**power** 445:1
**powered** 337:13 411:20
**practice** 389:22
**precedent** 488:17
**predated** 485:7
**predates** 485:2
**predicate** 329:10,15,23 330:10
332:4,10 333:3 377:15 379:21
385:17 390:18
**preferred** 422:18
**prejudicial** 312:15 316:25 488:7
489:19
**preliminary** 458:6
**prematurely** 390:21
**premium** 428:5 431:7 432:20

**preponderance** 379:20 389:15
**prescribed** 493:2
**presence** 318:4 329:11 456:25
**present** 311:3,5 312:1 364:3
426:13 456:14 490:3 526:6
**pressing** 375:17
**pressure** 401:9 426:15,24
**pretrial** 468:6
**pretty** 327:11 348:4,7 365:19
376:10 380:13 402:13 438:12
462:16 500:12 514:14
**prevent** 313:3
**prevention** 462:5
**prevents** 488:7
**previous** 391:3
**previously** 328:2 453:3
**pre-marked** 502:24
**price** 476:24
**primarily** 323:12
**prior** 339:23 340:9,13,16,17 342:10
362:25 397:19,22 398:18,20
399:5,7 404:7 405:8 413:7
456:19 462:4 468:21,24 469:12
480:8,11,13,14,22,25 481:11,18
483:8 486:14 487:23 492:6,16,19
520:24
**priors** 428:15,15
**probably** 323:22 356:21 383:11
389:25 399:3 434:9,12 435:23
436:20 438:23 488:16
**probative** 312:15 316:25 489:17
**problem** 331:7,9 352:1 362:8
389:24 391:4 408:6 426:25 438:2
440:4 470:10 492:4
**problems** 409:21,22 410:13 507:24
**procedural** 318:9
**procedure** 428:1
**proceed** 391:13
**Proceedings** 308:11 329:3 377:18
388:12 396:23 405:5 419:1 468:5
**process** 368:22 434:20 461:21
462:6,8,16 464:20 465:15,21
**processed** 464:19
**produce** 467:17
**produced** 471:5
**proffer** 331:12 388:20 390:14,22
405:16 457:3,12 460:1
**proffered** 489:13
**proffers** 311:21
**program** 324:7,9,13,23 325:12
339:18 340:9 341:21 342:3 343:6
343:17,19 344:3,6 353:8,21
398:23 401:16 402:18,19,21
412:2 413:12,13 420:9,18 492:1
492:17
**programmed** 377:8
**programs** 412:4 491:20
**prolonged** 338:10
**promiscuous** 488:2
**promised** 397:1
**promises** 507:25
**prompted** 328:22 349:5 481:6
**prosperity** 419:15
**proper** 329:15 385:19 467:1
**proposition** 482:25
**prostitute** 405:13 406:12 459:10,15
**prostituted** 345:7,11,12 459:12
**prostituting** 344:21 345:4
**prostitution** 356:21 361:13,19,21
363:2 405:9,18 419:14 429:24
430:4,8,10,12,13,14,20 434:21
434:22,24 435:3,4,5 450:11
454:21 455:2,4,5,7,8 466:18
468:13 483:4 487:12,20 520:25
**protest** 448:15
**prove** 389:20 407:12
**proven** 480:10 483:18
**provide** 467:13 484:5
**provided** 463:16 499:21 517:3,14
517:16 528:4
**provider** 499:10
**providing** 381:23
**provision** 459:20
**psychological** 357:1,10 410:13
**psychologist** 357:6
**publish** 389:19 390:3,9,16 391:7
432:7 470:18 471:21 503:23
535:7,9
**published** 390:21 469:12
**pull** 316:5 322:6 364:16 372:10

374:12 425:14 427:7 435:10
442:4 490:14 500:23 501:6
505:24
**pulled** 372:13 373:12 374:20 458:9
488:15 494:13,21,22 501:7
523:16
**pulls** 373:21
**punctual** 320:11
**purchase** 517:12
**purpose** 353:20 366:21 491:12
**purse** 444:20 445:22,24 446:5
448:19,20,23 449:2 450:1 453:14
453:19 454:1,18,19 499:4 517:2
**pushed** 486:13
**put** 318:12 321:7 381:5 382:22,22
434:1,4 437:11 460:1 463:3
468:24 470:16 474:4 475:6
477:13 486:9,18,25 488:11
500:24 522:20 525:1,21,23
518:8,10 525:5
**puts** 455:22 469:1 474:2
**putting** 379:6 387:22
**p.m** 392:23 456:1,11 542:6

**Q**

**qualify** 311:12
**question** 320:19 331:11 332:3
341:11 342:13,25 343:4 345:2
349:10 362:7 385:17,19,20,20
387:19 396:1 403:15 406:5,20,22
407:6 410:19 420:5 430:16
436:23 450:7 451:22 452:2
455:14 495:22 496:11 501:16
511:6
**questioning** 419:17 511:3
**questions** 320:18 321:14 332:6
336:24 346:15 360:8 363:11
390:19 396:18 397:17 403:3
409:10 419:3 422:10 425:23
440:24 441:13,15,17 446:14
447:11,12 451:15 456:17,22
478:2 479:2,3 501:14 507:4,5,7
511:5 513:24 514:10
**queue** 465:18 466:5,6
**quick** 330:18
**quickly** 331:15 394:25
**quiet** 323:17,17 327:25,25 328:1,2
333:12 335:19 336:16,17,19
527:14
**quit** 349:12
**quite** 337:18 367:1 370:16 402:14
459:1
**quote** 361:16 446:12

**R**

**raise** 312:6 315:5 322:3 364:13
460:11 490:11
**raised** 396:20
**ran** 494:12
**random** 493:25
**range** 461:7
**rape** 458:19,20,22,23 480:2 481:10
481:23,25 482:10,14,17,19
483:22 530:23
**raped** 481:5
**rapidly** 330:17
**raping** 480:15
**rapist** 480:20
**rare** 439:4
**rarely** 440:7
**rational** 351:5
**Raton** 353:21 366:20,22 383:6
491:13 492:15,16
**reach** 313:10 326:13 368:8 372:22
374:11,15 389:8 502:8 532:18
533:19
**reached** 318:11 335:9 373:25 377:9
377:22 532:21
**reaches** 373:21
**reaching** 374:2
**react** 348:8 523:10
**read** 318:15 319:13 321:5,8 377:25
379:15 386:14 387:1,23 393:1,12
479:19 482:9 486:24 488:23
541:16
**reading** 385:14,15 387:24
**reads** 392:6
**ready** 321:18 337:15
**real** 356:21 452:2 461:8 463:5

519:18
realistic 332:15
realize 390:13
really 330:17 342:13,13,24 371:25
394:22 398:8 409:4 422:18
424:10 437:10 451:2 464:11
498:2 510:2 537:15 540:5,5
rear 536:18
reason 321:15 329:6 332:18 389:6
410:16,18,20 484:14
reasons 313:1 435:16,21 438:8
rebooked 439:12
recall 326:17 339:21 360:18 363:15
371:19 376:14 385:12,21,23
387:22 398:8 399:9 402:22
414:17 418:10 423:14 430:21
433:12 444:10,14,16 446:2 453:3
453:14,16 467:8 491:14 497:4
499:8,10 500:16 513:9 514:11,12
514:21 515:11 521:13 533:18
534:14
recant 483:21 484:13
recantation 484:7 489:13
recanted 458:5 459:7 483:6,10
484:9,12,14
receipt 431:7 476:3,6
receive 368:3 377:5 535:8
received 309:25 320:23,24 329:8
332:23 357:21,22 358:6 362:2
368:23 380:4 390:17 432:6,9,13
432:14 471:16,17 503:21,22
535:10 537:3,4 539:13,14
receives 377:22
receiving 333:7 420:19
reception 423:1
receptionist 370:19,22 417:1
recess 363:24,25 364:1 426:9,10
456:11,12 490:1 526:3,4 541:8
541:19
recessed 542:6
recessing 526:10,11
recognize 356:5 377:7 431:4,6
500:8 503:8 534:7,19 537:22
538:17
recollection 385:5,9 386:1,4,6,9,15
386:16
reconvene 456:1 526:2 541:7
reconvened 364:1 426:10 456:12
record 311:25 318:13,16 321:12,15
322:10 364:2,19 375:3,5 385:5
385:21 388:15,17 389:5,13,21
426:12 427:9 429:8,10,17,19
438:2 456:13 460:14 490:2,17
495:8,10 520:20,22 526:5
recorded 379:12
recordings 378:21
records 318:19,22 371:8 386:3
461:19,22,24 462:4 467:8,14,17
467:19 478:4,11,12,14,17,17,19
478:22
recovery 341:6,13,15 399:19
401:21 420:7,13,15,22 491:20
492:1
redact 317:12 469:20,21 470:3,5,11
470:17 471:12
redacted 470:9
redaction 471:13
redirect 309:7,12,17 360:9,11
422:11,13 451:16,18 479:4
refer 361:21 374:22 387:12 520:14
reference 312:9,10,11
referenced 441:19
references 312:14 315:19
referred 418:6
referring 317:10 384:2,8 437:24
438:3 494:21 512:4
reflect 311:25 321:12 364:2 375:3,5
426:12 429:10,17,19 456:13
468:17 474:7 476:21,23 490:2
495:10 520:20,22 526:5
reflects 468:18
refresh 385:5,25 386:3,15
refreshed 385:9 386:6,9,16
refrigerator 536:2
regard 319:19,24 320:2 404:18
408:23 441:13,17 457:13 486:24
regarding 320:20,23 389:17 407:17
408:7 489:13 541:14
registered 369:10
regular 339:21 340:7 431:14,24

regularly 410:5 436:23,25,25
rehab 325:16,20 339:22 340:7
352:2 355:17 366:4,5 396:10
413:12,13,14,15,18 420:2,5
507:16
rehabilitation 412:16
relapse 421:12
relapsed 325:18 419:21 493:11
494:3 507:17
relapses 417:11 421:7
relate 319:20 475:12
related 312:21 315:6 467:8
relates 332:23 488:20
relating 331:25 407:19 425:9,12
470:23 484:23 485:1
relation 425:6 446:3
relationship 311:22 323:23,24
324:1 340:13 365:18 400:12,14
407:10 452:18,25
relative 402:23
relaxes 433:8,8
release 476:10
released 370:23 394:6 396:4 466:5
466:19 533:4,22
relevance 316:2 357:3 360:5 405:2
411:10,17 419:23 421:8 435:17
relevancy 313:18 405:1,7 470:6
480:4 481:15
relevant 312:19 316:9,17,19,20
317:8 389:6,9,20 394:22 406:7
406:14,23 456:24 469:18,19
489:11,17
relied 482:14
relief 395:20
relieved 393:24,25 394:9
reluctant 452:4
relying 405:6
remain 322:3 364:12 490:11
remained 346:2
remaining 443:23
remains 474:21,23 482:15
Rembert 309:19 311:2,5,15 312:1
317:15 329:19 418:16 421:21
424:22 426:12 429:1,12,18
433:15 437:22 438:7 446:18
447:7 448:8 468:25 477:8,11
487:13 520:21 528:9
Rembert's 311:10
remember 325:13 361:8,14,16
363:17 366:19 367:5,6 370:16
371:24 375:23 376:6,22 381:12
387:2 416:20 418:10 426:6 430:6
430:7 433:25 434:2 435:8,11
435:12 437:2,7,8,12,14,19,25
438:7,10,10,18 439:1,7 440:15
444:24 446:1,4 447:20,22,23
449:3,4,10,16,19,21 453:7,21
454:16,23 455:3 456:1 467:13
500:1 504:9 506:8 507:12,21
510:17 512:22 513:2,10 514:24
514:25 515:1 516:19 518:23
519:17 525:13,21 528:22 530:5
530:16 531:10,12 540:19 541:4
541:13
remind 434:6 526:15
removed 354:20 538:25
rent 359:5 401:18
repeat 375:9 430:16 431:21 439:21
451:23 495:21 513:3
repeating 380:9
rephrase 341:11 349:10 362:8
403:15 404:19
report 467:1 483:23
REPORTED 308:22
reporter 308:22 317:11
repost 462:15 463:18 464:8
reposted 464:17 468:15,16 469:5
470:1,8
reposting 462:17 464:1,2 468:18
469:10,15 470:1 475:17
reposts 469:8
representative 320:1 388:24
389:12
represented 311:3,5,6 312:1 364:3
426:13 456:14 490:3 526:6
representing 315:2
reputation 406:1,5,7 407:10,16
408:1,23
request 330:2,7 381:2 441:8
requested 391:6 454:20

requesting 430:12,19
requests 461:21
require 388:20,25
required 441:25
requiring 319:25
rescind 457:23 485:25
rescue 368:25 375:8,12 425:20
458:6 541:15
research 321:17 371:15 456:2
residential 398:23 399:9
resides 436:24
resist 448:12,13
resolve 352:11
resolved 411:24
respect 311:10,20 318:19 330:10
361:25 383:24 469:10 515:22
respectful 511:22,23 513:8
respective 318:5,14
respond 374:16 478:6 501:18
responded 329:1 375:10 478:8
531:13
responding 316:14 375:7
response 371:21 378:2,13,15
385:20 387:4 467:14 471:6
478:14 501:16 507:23
responses 320:22 321:1,6,13
responsibility 478:6
responsible 428:21 439:3 441:23
442:1,21
responsive 478:19
rest 412:19
restaurant 326:4 343:13 344:19
351:22 355:1 367:16,17 519:16
519:20
restaurants 493:15,16
restraining 457:17,23 485:14 486:5
486:8 488:25 489:2,5,8,14
restroom 426:6 489:23
rests 488:13
result 484:21
resulted 484:19
retrieve 414:20 453:19,25 454:15
return 367:19 382:1 437:17 440:20
504:5,8,11
returned 396:8,9 437:4 453:15
504:23
returns 320:7 364:5 426:14 460:6
490:5 526:8
reunited 487:9,11
review 466:15 478:17
reviewable 476:7
reviewed 407:15 465:18 466:5,6
468:7 476:17
reviewing 466:22 475:25 478:22
revisit 420:1
revoke 437:8,10 438:11 439:18,22
440:2,15,23 444:4
revoked 438:5,9 439:9
revoking 440:3
ride 501:10
right-hand 474:1
ripped 531:11
risk 435:24 451:21 452:1,13,17
risks 452:13
road 372:8 373:15,20
robbery 481:2,6,22,24 483:22
role 515:19 516:1
Romash 454:24
room 335:23 370:21 375:19,25
376:15,17 417:3 422:21,24 423:4
424:1,24,25 479:10 505:2,3
506:19 509:18 511:21 513:12,16
514:12 521:15,18 522:10,20,24
523:3,5,10 525:4 527:22 528:2
529:25 530:11 531:17,18,24
532:1,3 533:23,24 535:25 536:2
rooms 424:5
Rosenthal 433:18,20,24 434:8,20
435:7,18,22
round 523:1
routinely 314:19
RPR-CM 308:22
rule 317:23,24 318:6 379:19 404:25
405:6,6,25 407:15 521:17
ruled 419:17
rules 406:16 459:20 511:19 512:23
513:2,9 521:16 523:19
ruling 311:8 404:14 419:12
run 375:11 394:1,14 472:24 494:15
494:15 540:14

running 452:6,11 527:13,18,24
530:14,15
runs 529:25
Rutland 322:19 339:20 347:13
365:4 366:9 491:3

S

s 311:22 312:10 323:5 327:2
331:23 334:19,22 347:22 380:8
380:16,20 396:8 409:19 451:20
451:25 453:14
safe 382:3,6 393:4,17,19 395:20
502:10
sandals 496:19
Sapphire 433:21,24 434:7
sat 373:14 522:9 523:6 538:6
satisfaction 483:25
save 334:18
saw 313:2 316:4,5 317:4 335:14
336:20 367:13,14 373:18 374:11
374:15 375:10 386:11,20 387:7
396:3 402:23 421:21 422:22
424:2 449:25 450:1,2 478:22
525:3 530:12,14 537:21 538:3,5
541:1
saying 337:24 338:22 361:17 370:3
372:16 379:7 380:8,11 381:4,7
381:12,24 395:20 406:23 434:16
437:7 438:3 446:2,4 457:24
458:5 486:24 487:3 489:4,8
502:9 530:1
says 315:15 316:22 363:7 405:20
432:24 466:25 474:1,1 475:3,9
475:19 481:13 482:7,9,12 483:12
483:17 486:15,21 488:19,24
489:9 494:16
scared 328:19 334:12 523:7 540:25
541:2
schedule 363:15
school 338:23 348:10,12 349:5,14
350:7,10,22 351:12,16,17 356:23
366:24,24 410:5 418:22 508:3
screaming 330:13 530:1
screen 471:4 472:9,9 535:20,21
screens 493:25 494:1
scuba 402:15
se 366:6
search 445:7 448:23 496:2 532:1
searched 445:10,12 448:20
searching 523:5
seat 498:12,21
seated 320:8 322:6 364:6,15 427:7
479:13 490:14 526:9
second 314:2 315:19 355:14
475:19 480:24 481:1,2 519:12
523:1,2 532:16
secretarial 351:5
secretary 508:8 516:2,4,9
section 461:9 466:8,10,12,22
471:25
security 499:5 508:23,24 514:1,4,9
537:14,15
see 312:5 317:21 320:22 321:1,6
321:25 324:5 335:3 354:11
355:19 357:10 372:10,11,15,20
374:8,16,22 380:24 381:7,8
384:24 385:2 386:17,18,19,23
387:9 391:17,19 392:2,7,17
393:2,9 394:5,8,9 412:19 419:4
419:11 423:5 425:17,21 426:25
429:3,12 433:18,21 434:10,11,11
460:3 464:6 466:22 472:10 473:3
473:13,13,18,21 475:7,10,19
477:7 495:3 496:10 502:12 518:9
518:11 520:14 524:25 525:2
530:11 532:19 535:12 536:17
537:19 538:2,4,23 542:4
seeing 375:23 449:21 481:23
520:11 529:17
seeking 390:3,9
seen 336:7,12 373:19 376:16
422:25 518:3 522:11 526:20
537:22 540:24
sees 316:13 466:25
sell 461:14
semiautomatic 374:8
send 384:12,14,16 386:10 463:15
sense 329:11 330:23,25
sent 318:23 357:6 385:2,6,12,21

390:25 391:19 392:2,25 412:1
415:11 427:1,2 465:16,24,24
466:3 467:4 476:3
**sentencing** 480:23
**Sentinel** 315:9 321:3,4
**separate** 378:23 399:13 424:4
**Sequestration** 317:25
**series** 475:16
**server** 464:20 465:1
**servers** 464:25 465:4 467:20
**serves** 463:12
**service** 499:10
**services** 461:10
**set** 383:5 412:15 423:12,13 462:20
465:15 469:8
**setting** 529:22
**seven** 427:21 480:13,22
**sex** 487:25 530:8,9 531:4,6
**sexual** 481:4 482:18,20
**shakes** 395:23
**shame** 409:2
**shape** 405:21
**shelter** 359:6,6
**Sheriff** 369:4
**Sheriff's** 415:1,2
**she's** 359:10
**shield** 482:10,15,20
**shocked** 361:18
**shocking** 330:15
**shoot** 527:3,4
**shooting** 315:16,20,22
**short** 363:25 383:5 426:9 490:1
526:4 529:18,19
**shortly** 367:9 374:15 436:7 437:13
505:10 506:10,19,24 511:15
531:3
**shorts** 515:7 517:6,8 524:10
**short** 315:18 316:8,13,18,21,24
317:3 371:8 380:19,21 381:21
415:15,17,19 416:1,7
**shots** 471:4
**show** 378:1 384:21 419:15 443:11
444:3 452:3 467:24 470:14 471:1
476:16 488:1,4,5 534:10,23
**showed** 367:15 375:18 424:9
444:22
**shower** 505:4 536:4
**showing** 332:10 443:9 487:15
496:15 502:24
**shown** 379:9
**shows** 328:25 444:10,17 483:25
**shy** 365:16
**sick** 335:21 352:6,7
**sickly** 396:5
**side** 329:11,14 336:3 373:15
473:25 503:11,13 535:23 536:13
538:7
**sidebar** 329:3 333:5 377:17,18
379:25 388:10,12 391:11 396:20
396:23,25 404:13 405:2,5 407:22
418:24 419:1,19 468:3,5 470:21
**sign** 318:18 428:5 442:18 473:2
534:15,24,25
**signal** 365:22 374:18
**signature** 440:6
**signed** 431:12,12,20,22 443:5
457:16 488:10
**significantly** 336:10
**signing** 441:22,25 442:21
**signs** 425:17,21 440:4 457:19
485:24 486:4,23 496:15
**silence** 326:15,21
**similar** 314:20 423:12 460:24 461:7
**similarities** 482:1
**simple** 462:8
**simultaneously** 506:12,14
**single** 463:23
**sir** 315:2 346:19 384:21 385:12,21
387:22 388:8 393:8 396:22
400:10 404:15 418:5 430:24
431:9 432:11 441:1,16,20 442:5
442:16,20 443:4,6,10,13,15,19
443:22 444:2,5,7,9,12,19,21
445:3,6,9,11,23 446:17,20,23
447:17 448:14,16 451:5,12
454:20 456:5 460:10 464:21
471:3 472:20 473:7 474:2 476:18
**sisters** 348:24
**sit** 339:10 345:1 398:15 401:20
**site** 460:23 461:1,9,14 462:9

465:20 469:12 475:3
**sitting** 421:22 498:12 502:7
**situation** 330:17 361:25 487:2
507:18,24
**six** 365:25 394:4,5 458:5 486:14
**skeptical** 371:6
**skills** 351:21
**slap** 525:12
**slapped** 523:20 525:11
**slapping** 525:12
**slept** 336:1
**sleep** 335:24
**sleeping** 327:16
**slow** 450:24
**sluggish** 450:23
**small** 316:5 366:9,11,12 374:3,12
462:15 501:7
**smiling** 451:1
**sobbing** 395:19
**sober** 491:13,14,18,18
435:3 457:23 480:7 486:11
495:23 496:16
**sobriety** 366:23
**Social** 499:5 514:1,4,9
**sofas** 525:6
**softball** 348:16
**sold** 462:13
**soldiers** 312:25 313:16 314:5
**solely** 461:1
**solicitation** 435:4,5,7,8,23,24
**soliciting** 434:23
**somebody** 337:10 356:18 363:6
369:13 388:15,21 411:19 423:1
428:13,24 429:1 435:4 440:4
442:17,18 444:25 445:2,4,7
450:25 476:1 494:6,12,15 513:18
513:23 522:11
**somebody's** 434:1 439:18
**someone's** 434:4 488:21
**somewhat** 511:4
**son** 367:20
**soon** 394:18 439:10 525:7,9
**sooner** 386:19 392:7,7
**sorry** 324:19 337:14,16 356:20
399:8 400:13 410:8,18 412:4
418:16 431:11 432:21 467:5
476:5 489:25 492:22 505:8
506:16 528:22 529:12 531:20
535:16
**sort** 368:23 376:4 382:12 425:17
428:12 467:1
**sought** 457:22
**sound** 325:25 353:8 363:9 411:2
**sounded** 326:1 328:19 334:12
356:20 383:16,22
**sounds** 362:7 389:10 434:19
**source** 395:6
**South** 362:25 394:19 418:17
420:14 436:4,19 477:11 491:10
491:12 492:17,19 507:13
**SOUTHERN** 308:1
**Southwest** 433:7
**so-called** 480:20
**speak** 322:7 334:19 354:7 380:22
380:24 397:11 402:5,11 414:23
431:9
**speaking** 328:4 330:17 362:5 367:5
383:14,20,21 454:23
**special** 365:22 438:21
**specific** 311:20 330:6 354:9 388:25
403:1 407:5,7,12,19 408:11
420:18 459:23 488:22
**specifically** 314:3 343:10 367:6
388:22 434:24 481:17 488:19
541:1,1
**specifics** 429:21
**specify** 509:1 540:15
**speculation** 314:11 349:17 401:23
402:2 409:7 418:1 421:15 436:9
454:2
**spell** 329:12 364:18 427:8 460:13
490:16
**spent** 398:25 521:19
**spoke** 312:8 325:7 331:15 362:10
397:14 402:22 415:10,10 485:3
**spoken** 404:3,5
**spoon** 449:21 450:2 505:22,22,24
**sports** 348:18
**ST** 477:10
**stack** 197:18 486:18
**staff** 375:25 422:16
**stage** 418:11

**stairs** 439:10 523:15
**stand** 322:2 427:5 460:10 526:3
541:19
**Standard** 473:11
**standing** 322:3 330:6 364:13
424:24 490:11
**standoffish** 425:19
**Star** 387:14,15 393:3 418:5,6,9,11
425:1
**staring** 373:16
**start** 318:4 320:15,17 386:23
400:12,14 500:8 506:25
**started** 324:1 350:6,9,12 374:18
375:17 394:10 399:23 400:16,20
411:5,13,15,15 478:11 497:15
516:5 523:5
**starter** 319:14
**starting** 511:19
**startling** 331:25
**state** 330:13,20 331:1 332:8,10
435:3 457:23 480:7 486:11
495:23 496:16
**stated** 337:19 380:2 481:17
**statement** 315:15 331:25 332:7,11
332:13 379:4 458:25
**statements** 379:22,23
**states** 308:1,4,12,22 319:11 321:21
364:10 436:17 467:6 471:6 490:9
**statute** 482:15
**stay** 344:17 352:25 367:2 381:7
395:22 412:14,15,17 498:20,20
502:4 504:18 523:20 524:11
525:8 532:3,4
**stayed** 336:3 352:4 399:18 401:21
411:8 498:21 502:2 532:3
**staying** 326:2 343:12 344:13 411:9
413:11 414:5 521:15
**stenographer** 317:16
**stenographic** 321:15
**step** 322:1 361:12 381:1,1 425:25
479:6,10 490:10 497:13 541:22
**stepfather** 331:21,22 486:9,13,25
488:11
**steps** 329:1,6 330:22 331:1 465:16
538:6
**stick** 394:20
**STIPES** 308:22
**stipulated** 388:16
**stipulating** 378:11
**stipulations** 318:11,15,17
**stop** 367:24 497:25
**stopped** 326:10,12 367:7,9,25
413:2 510:15
**storage** 465:2
**store** 375:15
**story** 330:21 480:16,18
**strangled** 457:18
**strangling** 486:19
**street** 308:15 372:14 375:15 433:8
439:16 510:5
**strep** 335:23 414:24
**stress** 332:1
**stressed** 426:17
**stressful** 332:24
**strike** 404:7 506:2 533:3
**stuff** 394:17 419:6 516:3 517:2
**subject** 314:23 515:23
**submit** 482:6
**submitted** 541:17
**subpoena** 461:21 467:4,5,8,11,15
471:6 478:8,15,20
**subpoenaed** 467:8
**subpoenas** 478:6
**subscriber** 319:12,20
**Subsection** 407:14
**subsequent** 419:13 468:22 470:1
485:15
**Subsequently** 457:22
**substantially** 316:25 489:18
**successful** 327:7,8
**sudden** 326:10,12
**sufficient** 333:3 379:20,21 389:10
484:17
**suggest** 451:10 483:1
**suggested** 366:7
**suicidal** 456:23
**suit** 429:7 495:7
**suitcases** 517:17,22,25 518:2,24
**Suite** 308:15,18,20
**summer** 411:8

**Sun** 315:8 321:3,3
**sunglasses** 429:7
**sunny** 394:19
**supplied** 461:22
**support** 407:13 492:2
**supported** 458:1,2 486:7
**supportive** 324:13
**supposed** 383:4 412:14,19 523:11
**Supreme** 482:13
**sure** 318:16 322:7 337:22 338:22
339:1,2 342:13 351:25 354:9
361:17 382:6 393:4 398:5 399:6
399:9 400:15,16 401:9 402:6
414:4 424:11 430:16 437:25
438:2 439:22 441:10 443:17
448:25 451:25 454:8 455:8
465:18 466:7,16 477:19 478:19
479:18 493:19 504:22 509:9
523:8 524:24 528:12
**surety** 442:25 443:16,18,20,20
**surgery** 493:3
**surprise** 345:2 459:2 485:9
**surprised** 445:11
**surrender** 444:25
**surrendered** 446:9 447:22,23,25
**surrounding** 422:4
**surroundings** 372:9
**surveillance** 373:9,13
**surveilling** 315:16
**Susan** 454:23
**sustained** 328:10 345:16 352:23
355:9 360:6,6 361:1 362:15
370:6,11 373:1 385:10 387:20
394:23 396:16 401:13,24 402:3,9
403:25 404:12 409:9 411:11,18
418:2,14 419:18,24 422:9 424:14
436:10 445:14 446:11 447:10
450:9 452:9,23 454:3,7 455:14
489:20 496:11 508:17 509:6
513:5 518:20
**sweet** 393:23
**swim** 523:25 524:4
**swimming** 523:24
**switch** 440:8 529:8
**switched** 439:2
**SWORN** 322:5 364:14 427:6 460:12
490:13
**syringe** 450:2
**syringes** 449:22

---

**T**

**TABLE** 309:1
**tables** 343:13 367:18
**take** 321:7 333:24 335:22 342:5
348:20,22 353:7 356:16 363:13
363:14,17 369:20 381:1 394:3,11
426:6 428:12 438:25 439:18,23
440:9,17,22 441:3,4 445:4 448:9
449:1 459:14 469:24 475:6 480:4
500:4 503:1 504:6 505:4 506:12
506:14 515:2 518:8 522:5 525:24
527:11 529:3,7 534:18
**taken** 363:25 386:21 426:9 456:11
486:8 489:5,8 490:1 500:23
509:13,17 515:15,16 523:15
526:4
**takes** 421:18 458:1
**talk** 311:16 324:5 332:16 334:19
340:18 380:16 381:4,6 382:6
383:6 422:20,21 482:22 507:13
511:20
**talked** 326:8,12 351:15 367:1 368:7
370:22,25 371:2 402:24 414:25
415:2,4 425:8 533:15
**talking** 326:7 333:7 337:21 346:25
350:19 361:14 378:3 400:4 401:2
414:3 416:4,5 435:17 451:1
472:10 476:13 484:20 507:2
513:7,22 514:23,24 520:12,12
522:11,12
**tank** 515:7 517:6,8 524:10
**tattoos** 515:6
**teen-age** 411:7
**Telecom** 365:8
**telephone** 513:11
**telling** 373:5 408:6 415:7 417:3
424:16 429:21 438:10 449:4,10
453:3 507:21,23 514:21 523:18
529:20 540:21

**tells** 381:21,22 443:23 444:3 508:1
**temperature** 347:18
**ten** 360:1 363:24
**tendency** 404:8 405:17,24 408:7 408:24
**ten-minute** 363:13,14,17
**term** 314:20
**terms** 314:15 465:19 466:7 482:1
**test** 389:15
**testified** 332:21 342:15 343:18 345:18 357:22 390:15 397:8 408:24 415:25 416:12 443:7 510:24
**testifies** 405:20 460:2
**testify** 331:12 458:12
**testifying** 455:11,17
**testimony** 317:3 318:3 329:16 340:15 389:11,17 397:9 403:2,14 403:17 441:3 457:1,14 485:5
**testing** 502:16
**Texas** 461:17
**text** 325:11 326:13 384:12,14 385:3 385:5,12,16,21 386:9,13,18,24 387:22 388:1 389:7 390:1,6,8 391:3,19 392:3,5,17,25 393:9 462:12 473:21,22 502:9,11
**texted** 390:16
**texting** 418:7
**thank** 318:7 321:25 322:13 327:22 330:8 331:6 333:17 336:23 346:15,17,23 363:11,12 364:9,23 379:24 393:13,14 409:15 425:24 427:13 456:10 460:17 477:20 479:6,23 490:8,20 526:18 541:25
**thankful** 393:25 395:19
**that's** 337:24 533:18 539:15
**theory** 405:7
**there's** 488:5 534:12
**thing** 313:8,10 315:4 317:9 329:5 329:25 332:14 333:16 356:10 360:14 378:20 419:6 465:23
**things** 319:18 362:22 368:24 392:7 418:20,21 428:12,14 436:14 440:17 448:25 473:25 511:16 514:6,13 516:12,13 525:20 526:9
**think** 312:14,18 313:15 319:20 332:5 333:1 334:1 339:2 343:13 343:18 348:5 349:16 350:23 352:14 353:23 356:15 363:5 368:7,17 371:20 375:21 378:16 382:25 388:19,24 389:14,22 395:25 399:7,14 406:14,20 407:16,20 420:2,16 424:5,24 434:18 440:16 441:5 443:16 444:3 446:21,21 449:18,20,22,24 453:9 470:2 484:23 487:2 497:5 499:21 504:21 516:9 518:16,18 523:8 528:15 540:6
**thinking** 381:5 414:3 498:25
**thought** 316:12,18 353:17 363:1,8 369:13 375:21,23 381:6 383:4 449:17,18 484:25 485:16 486:11 508:8 516:8
**threatened** 459:1
**threats** 395:4,7,9,15 487:4
**three** 312:17 329:9 332:19 335:1 338:3 348:25 350:18,19 365:10 375:16 410:7,11 423:2,8,10 442:11 456:24 457:10 462:3 463:6 480:25 485:17,21 487:13 487:22,22
**threw** 445:16,17
**throat** 335:23 414:24
**throw** 445:17,18,19
**tie** 389:2
**tied** 388:23
**times** 326:8,12 334:5 340:8 342:10 342:21 355:13,16,17 383:17 399:4 419:22 469:6 480:17 492:13 501:13 521:2 529:5 537:19 538:6
**timid** 327:25 335:19,24 336:14 362:10
**tinted** 499:14
**tired** 335:24
**title** 372:1 462:12
**titled** 472:5
**today** 315:8 339:10 374:23 398:15 401:20 423:5 426:15 429:13

**told** 312:18 314:3,14 316:10 317:1 325:21 328:2,17 331:3 333:10 339:12,12 342:4 343:14,20 344:6 344:19 345:10 354:20 355:1 356:7 358:3 369:5 372:24,25 373:5 380:8,16 403:12 413:21,22 416:1,7 436:18,21 437:13 438:8 439:10,11 443:8 449:16,18 453:4 455:8 484:25 485:11,16 494:2 497:15 498:8 502:16 505:4 507:17,22 508:22 512:2,3 513:23 514:14,22,25 515:12 516:4,23 517:18,19,22 518:3,4,5,16 520:4 523:20 524:15 526:24 528:25 530:22 531:7 539:24 540:1,8
**Tom** 333:24 369:19 372:17 373:18 373:19 423:3
**tomorrow** 541:7,8,12,19 542:4
**tone** 333:2 383:15,18,19
**tonight** 318:18
**top** 375:25 391:4 429:16,16 442:5 464:1,4 472:13,20 515:7 517:6,8 520:19 524:10
**total** 365:25
**touch** 327:1,2 369:3 472:9,10 535:20
**touched** 407:20 531:2
**town** 315:17 366:9,10,11,12 371:25 372:1,4,5,7 375:16 384:6 422:15 423:24 438:25 500:17,18,19,22 500:23 501:5,22 503:4,13 504:18 511:15 515:9 517:1,21 519:25 521:16 522:3,22 525:7 527:5,15,19 528:1
**trace** 369:11
**traced** 369:10
**transaction** 497:20
**transcript** 308:11 317:12
**transfer** 439:19,23,25
**traumatic** 348:4,5
**travel** 314:16
**treatment** 339:18,23 340:9 398:18 399:4,12,20 419:22
**trespass** 534:24
**trespassing** 534:15
**trial** 308:11 315:9 320:13,15 364:1 384:22 406:8 426:10 430:25 455:11 456:12 481:10,20 488:8
**trials** 411:23
**trick** 502:16
**tried** 326:13 338:13 372:10 381:11 498:7 507:16 513:15 530:23 532:17 533:19 540:14,16
**trip** 369:8 370:3 438:21
**trips** 372:13
**trouble** 319:13 334:12,17 356:21 363:2,7 368:20 488:2 505:8 523:9
**truck** 530:13
**true** 369:16 380:22 382:13 425:4,10 433:15 435:14 457:25 459:12 503:4 537:15 540:20
**truly** 503:12
**trust** 438:11 440:1
**truth** 408:6
**truthful** 406:23,24,25 408:2,5 459:24
**truthfulness** 406:18 407:13,17,17 408:24 488:20
**try** 328:11 331:17 363:8 375:8,12 381:16 502:8
**trying** 327:5 349:11 352:6,10 362:21 368:8,13,22 371:7,10 372:9 387:4 390:24 395:4 418:19 420:22 425:14 480:17,17 483:3 487:17,20 488:19,20,21 501:3 523:6,8
**Tucson** 465:5,9
**turn** 382:18 490:25 536:14
**turned** 383:7 416:9 501:18
**turning** 391:1
**Tuscon** 467:20
**TV** 336:2 536:3
**twice** 367:13 399:6 422:3 521:3
**two** 317:18 324:24 329:4 334:4 335:1 350:18,19 356:4 373:11 378:23,25 399:12 413:6 421:25 423:2,8,10 424:5 432:23 462:1 480:8,11,13 481:11,18,23 487:19

**type** 323:15 326:3 333:12 338:25 342:8 349:3 350:25 351:8,10 370:10 359:6 360:17 367:17 371:21 388:21 417:13 509:1 528:6
**typical** 326:20
**T-shirt** 496:19,20,20,23 517:2

**U**

**Uh-hum** 416:13 469:14
**ultimately** 327:9 480:5
**um-m-m** 323:17,22,24 324:16 333:22 338:18 339:12 359:6 365:22 366:19 367:6 369:9 385:14 386:11 396:5,10 399:6 422:18 452:2 468:6 493:5,7 496:19 509:16 510:22 512:25 513:22 514:14,22 517:17 519:12 521:15 524:15 525:4,21 529:16 530:16 533:11 534:9,12 535:15 536:1,17 537:19 540:13 541:4
**unaware** 401:17
**unclear** 484:18
**uncomfortable** 374:19 443:21,21 443:23 444:1 512:14 519:5
**underneath** 525:5,6
**understand** 313:6,17 330:20 341:10 342:13,25 383:17 390:15 418:11 420:16,16 430:17 469:3,9 470:6 472:9 486:10 489:11 505:19
**understandable** 409:18
**understanding** 390:24 413:17,20 416:10,11,11 436:5 440:21 469:17 484:22
**understands** 443:18
**understood** 314:13 353:20,23
**unfairly** 488:7
**United** 308:1,4,12,22 319:11 321:21 364:10 467:6 471:6 490:9
**untrue** 489:9
**untruthful** 406:10,11 407:2 425:9 425:11
**untruthfulness** 406:18 459:23 488:22 489:15
**unusual** 332:22
**upbeat** 326:1
**update** 474:5 476:9,23
**updating** 476:10
**upset** 376:10 437:8,9,12 438:12 529:24 531:13
**upstairs** 375:19 417:4 422:21,24 423:4,14,17 424:1 439:11 509:14 509:15,17 510:19 511:12 514:12 521:15 524:14,17 525:4
**urgently** 440:18
**usage** 406:11
**use** 317:17 338:14 342:18 350:9 361:8 391:14 404:22 406:13 408:25 409:1 411:5,14 444:25 460:4 465:19 466:7 493:4 498:6 501:3 505:17 506:22 513:14,15 528:8 529:1
**user** 400:1,2 465:17,24 466:3,25 473:6,23 474:3,25 475:3,8,22 476:3,8,11 477:3,14
**user's** 463:12
**uses** 406:9 417:14 468:25
**usually** 327:16 332:10 425:18 428:5 434:6 439:25 446:25
**utterance** 329:5,12,15,23 330:10 331:24 333:4
**U.S** 366:2

**V**

**vacation** 324:20 491:7
**valid** 462:21 463:7
**validity** 461:22
**value** 312:15 317:1 489:17 510:5
**Vanessa** 308:14 311:7
**varies** 464:9,10,14
**various** 464:16
**vehicle** 378:14 380:3 437:20
**veracity** 406:8
**verbatim** 385:24
**verdict** 321:8
**verification** 465:16,24 476:12,14
**verify** 461:22

**Vermont** 322:19,20 323:3 324:16 330:23 332:19 335:14,17 336:20 339:18,22,23 341:15 343:24 344:12 345:18,19 346:2 347:14 358:14,23,25 359:10,13 360:1 362:22 365:4,5 366:6,7,10 367:19,22 396:8,9 398:19 417:10 420:14 436:6,12,18,21 457:23 491:3,4 499:17 507:9,19,24
**Vero** 401:21
**versus** 311:18 458:11,16 479:24 482:23
**victim** 311:22 480:2,9,9 481:3,18 483:20 484:1 487:14
**victims** 312:21 313:9 317:10
**victim's** 482:20
**Victoria** 376:22 384:9 433:13
**view** 472:1,2,7,7 475:3
**viewable** 472:6
**viewed** 496:13
**violate** 419:5
**violation** 480:3,5,7 481:14
**violence** 481:25 482:1,2 487:4
**violent** 521:10,13
**visible** 496:3,5,15
**visit** 352:19 367:10 402:18,19 413:3 414:5,7,8,10
**visited** 367:8,19 402:16
**visiting** 367:20
**vocational** 351:11
**voice** 327:24,25 333:2,10 347:5 378:6,12,20,22 383:15,18
**VOLUME** 308:10
**volunteer** 427:19
**vs** 308:6

**W**

**wait** 321:8 383:8,10 440:13,14 494:13 497:15 502:5 522:2,2
**waited** 324:21 384:5 494:13 495:13
**waiting** 384:11 387:9 393:2 499:25 502:6,7 504:8,10 522:7
**Waitress** 326:5
**Waitressing** 493:17
**walk** 313:1 375:23 439:15 447:4 462:6 537:11 538:5 539:20
**walked** 446:22
**walking** 537:19,21
**walks** 374:17 394:12
**wallet** 499:4
**want** 314:17 318:16 319:17 320:11 331:17,18 333:16,23 336:5 343:21,23 347:13,22 351:14,24 353:7 361:5,21 378:17 390:20 391:14 392:13 394:3 395:22 397:17 438:2 440:5 441:13 443:17 444:8 455:21 456:15 457:5 473:25 476:16 486:4 489:8 530:24 540:2,6
**wanted** 317:10 332:18,19 363:9 380:15,16,22,23,24 381:4 381:6,7 382:6 412:18 438:9,11 459:14 478:19 492:2 506:4 522:12 528:6 530:23 539:21
**wanting** 351:15
**wants** 406:13 437:7 508:4
**ware** 534:24
**warm** 347:19
**Washington** 311:18 365:23
**wasn't** 324:14 325:24 327:19 329:12 338:2,15 339:23 340:6,25 343:4 352:2 370:21 373:12 380:21 381:6,20 382:3 394:2 400:25 413:13,15 414:4 416,6,15 424:10 433:11 440:22 452:4,6,15 452:17 457:24 459:13 504:22 507:22 511:20 515:7 521:9 522:13 523:7 527:22 528:3
**watch** 336:2
**water** 333:24 505:22
**way** 325:10 328:25 329:1,7,14 330:25 331:17 332:6,11,15 345:13 373:7,15 383:6 391:2 396:3 406:4,14,22 417:4 443:1 450:18 451:1 455:16 506:15 522:8 534:10,23 536:21 539:3 **ways** 329:4,9 378:21
**weak** 394:13
**weapon** 316:5

weapons 448:25
wear 514:22
wearing 375:1,1 429:6,7,15,16
434:5 495:6,7 496:18,19 520:18
520:19 524:9,10
web 460:23 461:1,9 462:8 469:12
website 475:7
week 325:8 352:4 437:14 448:1,2,3
448:4 509:10 517:24
weekend 319:11 438:23 440:12
weeks 326:18 355:18 359:19 360:2
436:22
weight 515:12
weird 327:19 512:16
went 315:19 336:5,5 339:20 341:6
345:19 352:19 358:4,7 367:22
370:17,19,21,22 371:4,14 374:14
374:20 375:13,16 394:16 396:11
414:1,20 415:13 418:5 424:2
425:20 439:10 453:19,25 454:15
481:21 499:24 500:25 505:2
519:13,20 522:9,20,25 523:6
525:10 526:22
weren't 325:23 340:3 344:2 351:25
376:11 457:9 531:25
wet 358:7
we've 407:20
whatsoever 480:16
whereabouts 440:22
whispering 333:12
white 473:13
wide 461:7
wife 409:25
Wilcox 308:19 309:6,11,16 311:5
314:17,18 315:4,8 317:21 328:24
329:19,21 330:4,5 331:4,6
346:16,17,21 349:18,25 350:1
352:24 355:10 357:5 360:7,24
361:12 362:6,14,24 363:3 378:17
389:22 390:8,11,23 394:21
395:24 396:15 409:11,13 411:12
411:25 418:3,4,15,24 419:8,9,11
419:20,25 420:4 421:10,17,20
422:10 431:1 432:5 447:12,13,15
449:9 450:10 451:7,9,13,22
452:7,22 454:2 471:14 479:3
489:22,24 496:5 503:20 508:16
511:10 515:21 518:19 535:6
537:2 539:12
willingly 345:7
Wilson 482:13,15,15
windows 499:14
withdraw 430:1 453:5
withholding 510:14 511:4
witness 316:3 318:4 319:6 321:20
321:23 322:2,5,11 331:23 337:14
337:16 349:19,21,24 352:18,19
352:21,22,22 364:8,14,20 375:3
377:20 378:14,24 379:5 385:8,24
390:6,16 394:21 395:23 407:12
407:13 418:13 426:2,2,5,20
427:5,6,10 429:8,18 431:11
452:8 453:7 456:6,8,10 458:14
460:1,8,12,15 469:7 479:7 490:7
490:13,18 495:9 520:21
witnessed 315:16,17 329:13
352:17
witnesses 317:23 318:1,5 331:8
WL 482:25
woman 416:22 417:5 458:21
woman's 359:6
women 402:20 423:12 430:11,13
430:20 468:15
wonderful 323:16
won't 392:10 526:12
wool 425:14
word 361:19,21 445:1
words 540:7
work 314:7 320:13 326:3,4 351:3,5
351:22,22 365:8 367:17 460:21
472:6 508:4 518:5
worked 343:12 351:1 359:17,22
360:2 416:15 462:2,5 508:13,19
519:9
working 326:1 344:19 350:22,23
355:1 359:3 367:16 417:21,22,25
493:12,14,15 508:7,22 509:2,4
516:24 520:4 531:20 537:14,16
537:20
works 443:1

worn 335:19 540:5
worried 326:23 362:13 504:12
worry 368:1
wouldn't 331:7,9 333:22 338:24
343:23 381:11 393:4 439:13
464:11 518:9,11 523:9
wound 457:19
wounds 458:16
wraps 462:16
write 386:13,24 535:20
writes 473:5,21
written 318:25 487:16 489:4
wrong 326:25 411:14
wrote 488:10

## Y

yeah 365:19 371:6 392:12 399:3,14
400:6 401:3,9,9 413:5 414:14
417:6 427:3 449:21,25 452:22
500:11,13 501:4,13 502:3 507:8
508:25 510:15 512:9 514:5 515:3
518:14 530:20 534:2 535:24
536:1 537:9 538:3,9
year 324:6 359:22 367:5 398:6,7,7
401:15 411:1 412:1,3,4
years 322:21 323:22 337:6,9,19,20
337:24 338:1,3 339:14 342:22
347:2,4 348:25 350:13,16,18,19
350:20 365:25 397:22 400:17,23
401:1,2 410:7,11 411:1,7 427:21
436:19 456:24 457:10 462:1,3
480:13,22,25 485:17,21 487:22
487:22
yelling 383:20 529:25
yellow 472:4,17 473:13
Yep 421:24
Yockey 309:18 460:9,12,15,20
470:23 477:20,25 479:6
young 338:7,8,10,15,17 340:22,25
350:3 400:5 401:6,10 403:4
411:6 485:2,3,7 488:3
younger 322:24
you've 334:18 487:8
Y-O-C-K-E-Y 460:15

## Z

Zacca's 330:22
Zero 340:10,11
Zoe 312:12,25 313:5,9,10,10,16,23
314:4,10,15,18,19 494:23,24
495:3 498:4,4 512:5,8 537:25
zoom 434:10 472:20

## $

$2100 442:7,15,25,25
$2200 382:24
$30.00 510:6
$7 476:25

## 1

1 359:20,21 477:10
1st 358:17 468:10
1:00 456:11
1:15 541:11
10 310:2,4 359:23 428:5 525:24
534:6,8,13,19 535:3,8,10,12
100 414:4 423:8
104 379:19 389:11
1065 433:7
11 310:5 457:21 485:25 536:14,16
536:24 537:3,4
11th 348:15 349:6,14 468:10
1100 308:20
1192 482:25
12 341:21 541:9,11,11
12-60312-CR-COHN 308:3
12:30 363:16 441:5 541:9
12781 308:17
14 308:7 310:6 538:16 539:9,13,14
539:15
15 310:4,6 400:16,16 441:4 473:8
539:7,10,13,14,16
16 353:7 411:3,4 486:23 531:11
17 411:1,3,4 534:6,8
1715:54 391:25
18 338:18 350:20 431:20,22 488:25
18th 447:21
183 311:21

## 19

19 310:6 338:18
1992 481:1 482:24 491:1
1995 481:1
1997 323:9

## 2

2 310:3
2d 458:16
2nd 433:7
2:15 456:1
20 347:2 392:23
2002 479:25
2007 311:24 401:2
2008 401:2 457:21 484:21 485:25
489:14
2009 457:22 485:25
2010 350:19
2011 353:5
2012 324:6 339:19 341:4,21 342:10
342:22 345:22 346:3 353:1,2,4,7
354:18 355:16 359:21,24 391:25
399:2,5,16,19 401:15 402:1,5,23
413:4,7,18 431:20,22 478:3
491:6 503:5,14 504:1 531:11
534:11,14,25 536:21 538:22
539:3
2013 308:7
202 458:16
2037 392:19
2037:19 392:16
2052:43 393:9
2100 442:6
22 310:2 430:25 431:2,4 432:2,6,9
441:14
22nd 413:23
2255 480:1
23 318:21 319:19,23
24 318:21 319:19,23
25 510:6
26 322:21 384:21 388:2,13 389:12
390:4 391:7 491:1
29th 358:17 359:21 413:24
299 308:23

## 3

3 308:10
30 391:25 465:21 485:25 532:15
30th 392:16
30's 339:3 353:24
300 432:20,22
302 315:19
303 308:18
322 309:3,4
3300 477:10
33000 477:10
33027-2908 308:18
33132 308:15
33301 308:21,24
337 309:5
345 309:6
353-1793 499:16
360 309:7
365 309:8,9
397 309:10

## 4

4th 308:15
4:30 526:2
400 308:15
403 312:14 315:23
409 309:11
412 419:14
422 309:12
427 309:13,14
43 347:20
432 310:2
44 475:4,7
441 309:15
447 309:16
451 309:17
460 309:18,19
47 319:7
472 309:20
48 319:7
485 309:21,22
498 310:3

## 5

5 526:10,11,12,14
5/11/08 485:17
5:00 542:6
5:15 392:1,2
529 310:4
531 310:5
533 310:6
551565 482:25
56 318:25 320:2
57 319:1 320:2

## 6

6 404:25 482:11
6/18/2012 443:3
60 319:9
608 404:25 405:7 406:1,18 407:16
608(b) 408:13 459:21 488:18,19,19
61 318:24 319:24
65 318:24 319:24
66 319:4

## 7

7 323:10 348:2 409:22 410:1
482:22
7:08 473:10
7:30 327:13,14 332:23
715 458:16
73 467:25 471:2,11,15,17 476:16
786-332-0154 392:3

## 8

8 310:3 502:25 503:1,17,21,22
8:00 392:23
8:37 392:21
8:45 542:4
80 473:2,2
802 499:15
802-333-4990 366:17
802-353-1793 499:9
802-683-6374 325:4
802-747-8272 366:15 377:6 392:2
803 330:11
803-2 333:3
803.6 389:13

## 9

9 310:3,5 502:25 503:7,17,21,22
9:00 541:7,19
911 319:5
92@hotmail.com 319:15
954-769-5496 308:24
99 308:15