```
 1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                     FT. LAUDERDALE DIVISION
 3                      Case 12-60312-CR-COHN
 4
    UNITED STATES OF AMERICA,
 5
                 Plaintiff,
 6                                      FT. LAUDERDALE, FLORIDA
       vs.
 7                                      May 15, 2013
    MACKENLEY DESIR and GENET REMBERT,
 8
                 Defendants.
 9  _____
10                          VOLUME 4
11            TRANSCRIPT OF JURY TRIAL PROCEEDINGS.
               BEFORE THE HONORABLE JAMES I. COHN,
12                UNITED STATES DISTRICT JUDGE
13  APPEARANCES:
14  FOR THE GOVERNMENT:      FRANCIS VIAMONTES, A.U.S.A.
                            VANESSA JOHANNES, A.U.S.A.
15                          99 NE 4th Street, Suite 600
                            Miami, Fl 33132
16
    FOR DEFENDANT DESIR:     DERIC ZACCA, ESQ.
17                          ERGIO FERNANDEZ, ESQ.
                            12781 Miramar Parkway, Suite 303
18                          Miramar, Fl 33027-2908
19  FOR DEFENDANT REMBERT:   DARYL WILCOX, A.F.P.D.
                            One East Broward Boulevard
20                          Suite 1100
                            Ft. Lauderdale, Fl 33301
21
    REPORTED BY:             PAULINE A. STIPES, RPR-CM
22                          Official United States Court Reporter
                            Federal Courthouse
23                          299 E. Broward Boulevard
                            Ft. Lauderdale, FL  33301
24                                        954-769-5496
25
```

1                    TABLE OF CONTENTS

2                                                    Page

3  C.J. ................................................ 60

4       Direct Examination by Ms. Viamontes  ................. 60

5       Cross-Examination by Mr. Zacca  ..................... 118

6       Cross-Examination by Mr. Wilcox  .................... 219

7

8                       EXHIBITS

9                              Marked for           Received
                               Identification    in Evidence

10

   Description                Page    Line    Page    Line

11
Government Exhibit 12 ............................ 66        17

12
Government Exhibit 13 ............................ 67        19

13
Government Exhibits 1 through 7 .................. 90        11

14
Defense Exhibit  ................................ 164         5

15
Government Exhibit 17 ........................... 185         5
16

17

18

19

20

21

22

23

24

25

1      THE COURT:  All right.  All parties are present.

2      Yesterday I made a ruling and I need to state for the

3 record that the Court finds by a preponderance of the evidence

4 a conspiracy and the declaration was made in furtherance of the

5 conspiracy.

6      The declaration would not qualify as hearsay and not

7 violate Crawford versus Washington.

8      The record needs to be clear in that regard.

9      Are there any matters that we need to address before

10 we get started this morning?

11      MR. ZACCA:  No, judge.

12      Is there a sentencing?

13      THE COURT:  Yes, but the Defendant is late and I am

14 not going to delay this jury.

15      MS. VIAMONTES:  Nothing on behalf of the Government.

16      THE COURT:  All right.

17      MR. WILCOX:  Your Honor, the Government introduced 73.

18      MS. JOHANNES:  Your Honor, it was not on the witness

19 list.

20      THE COURT:  That is Backpage.com advertisement.

21      MS. JOHANNES:  Yes, it was Government 18, and when I

22 realized the full back page response to our subpoena, it wasn't

23 encompassed in 18.  I just renamed it an exhibit number.

24      MR. WILCOX:  I would like a copy of 73.

25      THE COURT:  All right.  I need to address this

1    sentencing matter.

2            (Thereupon, a short recess was taken.)

3            THE COURT:  Okay, the record will reflect that both

4    defendants are present represented by counsel.

5            Do we have all jurors here?

6            We are going to need the witness.

7            MS. VIAMONTES:  Yes, your Honor.

8            THE COURT:  Okay.  Mr. Wilcox, perhaps while the

9    witness is testifying, you might want to turn off your

10   microphone.  We are hearing conversations between you and

11   Ms. Rembert.

12           Let me instruct both defendants, don't be making faces

13   during the testimony.  That is not appropriate.

14           Let's bring the jury in.

15           (Thereupon, the jury returns to the courtroom.)

16           THE COURT:  All right.  Counsel may be seated.

17           Good morning.

18           THE JURORS:  Good morning.

19           THE COURT:  Let me once again commend you all.  You

20   all are a great group.  I love people who are on time.  To me,

21   that is very important.

22           Anyway, have any of you discussed this case with

23   anyone or otherwise communicated with anyone regarding the

24   case, received any information pertaining to the case other

25   than that which you received here in the courtroom or formed

1    any fixed opinions on the merits of the case?

2            THE JURORS:  No.

3            THE COURT:  The record will reflect there were no

4    affirmative responses.

5            Ms. C.J., good morning, let me remind you you are

6    still under oath and we will continue with direct examination

7    by Ms. Viamentes.

8            MS. VIAMONTES:  Thank you, your Honor.

9                    DIRECT EXAMINATION - CONTINUED

10   BY MS. VIAMONTES:

11   Q.  Good morning, C.J., how are you?

12   A.  Good.

13   Q.  Yesterday we talked about the first drug arrest.  Were you

14   familiar with the bonding process or the process of bailing or

15   bonding someone out of jail before?

16   A.  No.

17   Q.  So, when Mr. Desir or Daddy, as you knew him, told you that

18   he now would kill you, did you believe that?

19   A.  Yes, I did.

20   Q.  Did Daddy or Fire ever criticize you as a worker?

21           MR. WILCOX:  Your Honor, I object to the informality.

22   Her name is Ms. C.J..  I would like my client to be referred to

23   as Ms. Rembert and the co-defendant Mr. Desir.

24           MS. VIAMONTES:  What he likes?  Your Honor, that is

25   irrelevant.  That is how she knew them, Daddy and Fire.

```
 1            THE COURT:  The objection is overruled.
 2   BY MS. VIAMONTES:
 3   Q.  C.J., did they criticize you about your performance?
 4   A.  Yes.
 5   Q.  What did they tell you?
 6   A.  They told me how to act and how to be towards the client
 7   saying to -- Fire would tell me to, you know, to try the
 8   guys -- to get them to give me more money.
 9            If I did something wrong or wasn't acting the way they
10   wanted me to, they would yell at me.
11   Q.  Other than yell at you, were you punished any other way if
12   they thought you did something wrong with the clients?
13   A.  I get slapped.
14   Q.  By whom?
15   A.  By Daddy or if Daddy said to Fire to do it.
16   Q.  Did Daddy ever tell Fire to slap you?
17   A.  Yes.
18   Q.  Did she, in fact, do it?
19   A.  Yes.
20   Q.  We talked briefly about your arrest for drugs on June 16,
21   2012.
22            When the police arrived and they searched the motel
23   room and found drugs, did you initially admit that all the
24   drugs were yours?
25   A.  No.
```

```
 1              MR. ZACCA:  Judge, asked and answered.  We went over
 2   this yesterday regarding the arrest, following the arrest and
 3   drug possession.
 4              MS. VIAMONTES:  I don't believe these particular
 5   questions were asked.
 6              THE COURT:  Overruled, but let's avoid being
 7   repetitious.
 8              MS. VIAMONTES:  Yes, your Honor.
 9   BY MS. VIAMONTES:
10   Q.  Did you admit all the drugs were yours?
11   A.  Yes, I did.
12   Q.  Initially, did you?
13   A.  No.
14   Q.  So, ultimately, you claimed that all the drugs were yours?
15   A.  Yes.
16              MR. ZACCA:  Objection to leading.
17              THE COURT:  Sustained, disregard the response.
18   BY MS. VIAMONTES:
19   Q.  Were you asked if all the drugs were yours upon your
20   arrest?
21   A.  Yes.
22   Q.  And did you ultimately claim they were yours?
23   A.  Yes, I did.
24   Q.  Why?
25   A.  Because he -- Daddy had told me to.  if I was ever in that
```

```
 1  position, to claim -- whatever it was.  It would be worse if he
 2  were to go to jail than for me because he would be able to bail
 3  me out.
 4  Q.  While the case is being investigated out there on June 16,
 5  2012, did you speak with the police officer about Daddy bailing
 6  you out?
 7  A.  Yes.
 8  Q.  And did Daddy convey a message to you through the police
 9  officer?
10          MR. ZACCA:  Objection to leading, judge.
11          THE COURT:  Overruled.
12          THE WITNESS:  Yes.
13  BY MS. VIAMONTES:
14  Q.  What was that message?
15  A.  To claim --
16          MR. ZACCA:  Objection to hearsay.
17          A message from whom, how?  The declarant is not
18  Mr. Desir.  It is somebody else.  It is hearsay, judge.
19          MS. VIAMONTES:  It is not hearsay.  It is the
20  Defendant relaying a message to the witness.
21          THE COURT:  But the message that the witness received
22  is from someone other than Mr. Desir, correct?
23          MS. VIAMONTES:  Yes, your Honor.
24          THE COURT:  And that person is not here in court to
25  testify, correct?
```

```
 1              MS. VIAMONTES:  Yes.

 2              THE COURT:  The objection is sustained.

 3              MS. VIAMONTES:  Okay.

 4   BY MS. VIAMONTES:

 5   Q.  Without telling us what the officer told you, based on the

 6   message you received, what did you do?

 7   A.  I told them that I wanted -- that the drugs are mine.

 8   Q.  Did the Defendant Desir that you knew as Daddy, did he use

 9   hard drugs, like heroin or crack?

10   A.  No.

11   Q.  Fire or Genet Rembret, did she use hard drugs?  Did you

12   ever see her use hard drugs, like crack or heroin?

13   A.  No.

14   Q.  They gave you hard drugs but they didn't use them

15   themselves?

16   A.  Correct.

17              MR. ZACCA:  Asked and answered, judge.

18              THE COURT:  Overruled.

19   BY MS. VIAMONTES:

20   Q.  Yesterday we left off, C.J., discussing some of the

21   photographs of the Beach and Town Motel.

22              Do you remember that?

23   A.  Yes.

24   Q.  Okay.

25              MS. VIAMONTES:  May I approach, your Honor?
```

```
 1                THE COURT:  Yes, ma'am.

 2                MS. VIAMONTES:  Gentlemen, I will be using Government

 3     8 through 17.

 4     BY MS. VIAMONTES:

 5     Q.  C.J., I placed before you Government 12 for identification.

 6                Do you recognize it?

 7     A.  Yes.

 8     Q.  What is it?

 9     A.  It's the front door to the house, next to the motel.

10     Q.  The front door to the house that is behind the motel?

11     A.  Yes.

12     Q.  Okay.  Is that the house that has the efficiency attached?

13     A.  Yes.

14     Q.  Does that photograph actually show the way the door looked

15     back in June 2012?

16     A.  Yes, it does.

17                MS. VIAMONTES:  Your Honor, at this time I move

18     Government 12 into evidence.

19                THE COURT:  Any objection?

20                MR. ZACCA:  No, judge.

21                MR. WILCOX:  Judge --

22                THE COURT:  12 will be received.

23                MR. WILCOX:  One moment, your Honor, please.

24                MS. VIAMONTES:  Is there an objection?

25                THE COURT:  These pictures were all provided in
```

```
 1  discovery, correct?

 2          MS. VIAMONTES:  Yes, your Honor.

 3          THE COURT:  Did you not hear me?

 4          MR. WILCOX:  Yes, they were provided in discovery,

 5  your Honor.  I may want to voir dire the witness on this, on

 6  her recollection as to which door that was.  There were several

 7  doors at that location.

 8          THE COURT:  I think that is a proper subject matter

 9  for cross-examination.

10          MR. WILCOX:  Thank you, your Honor.

11          No objection.

12          THE COURT:  I don't think it would pertain to

13  admissibility.

14          MR. WILCOX:  Thank you.

15          THE COURT:  Exhibit 12 is received.

16          MS. VIAMONTES:  Thank you, your Honor.

17          [Government Exhibit 12 received in evidence.]

18  BY MS. VIAMONTES:

19  Q.  C.J., so, this is the front door to get into the house?

20  A.  Yes.

21  Q.  Would you use this door?

22  A.  No.

23  Q.  No, you would not?

24  A.  No.

25  Q.  Now, let me direct your attention to the other exhibit I
```

1  placed before you, Government 13 for identification.

2         Do you recognize it?

3  A.  Yes.

4  Q.  What is it?

5  A.  It is the inside of the house.

6  Q.  Does that photo accurately depict that door that we just

7  saw but from the inside view?

8  A.  Yes.

9  Q.  And is it accurate, to your recollection, back in June

10 2012?

11 A.  Yes.

12        MS. VIAMONTES:  Your Honor, at this time I move

13 Government 13 into evidence.

14        THE COURT:  Any objection?

15        MR. WILCOX:  No objection.

16        MR. ZACCA:  No objection.

17        THE COURT:  13 is received.

18        [Government Exhibit 13 received in evidence.]

19 BY MS. VIAMONTES:

20 Q.  C.J., on the right side of this photograph, this door, is

21 that the inside view of Government's 12?

22 A.  I don't understand.

23 Q.  Okay.  Is this door here in Government's 13.  Okay?

24 A.  Uh-hum.

25 Q.  Is that the same door we see in Government 12?

```
 1  A.  Yes.
 2  Q.  Is the picture taken from a different view?
 3  A.  Yes.
 4  Q.  What is this door here?
 5  A.  It is the door to the efficiency.
 6  Q.  Can you point to -- you had testified there was a deadbolt.
 7  Could you point to where the deadbolt was?
 8         And you are pointing right here (indicating)?
 9  A.  Yes.
10  Q.  Once you are in the efficiency that is attached to the
11  house after your arrest on June 16th and after you are bonded
12  out June 18th, does anybody join you in the efficiency?
13  A.  Yes.
14  Q.  Who is that?
15  A.  Her name was Annie.
16  Q.  Try to speak into the microphone.  Could you repeat your
17  answer?
18  A.  Her name was Annie.
19  Q.  And did Annie have any other names she went by?
20  A.  Yes, she is also known as Diamond and later Kayla.
21  Q.  Do you know what the names Diamond and Kayla were used for?
22  A.  That was the name that she was given.
23  Q.  She was given that name by whom?
24  A.  By either Fire or Daddy.
25  Q.  And what was the purpose of giving her the name Diamond or
```

1  Kayla?

2  A.  I'm not sure.

3  Q.  What were they using that name for?

4  A.  That is what they called her.

5  Q.  Can you describe Annie, how old was she, what did she look

6  like?

7  A.  She was about 20 years old, she had long black hair, dark

8  brown hair, and she was --

9  Q.  Do you know where she was from?

10  A.  She was from Baltimore.

11  Q.  And did you and Annie use drugs together?

12  A.  Yes, we did.

13  Q.  When did you first meet Annie?

14  A.  I first met her the day -- the day or the day after I first

15  met with Daddy.

16  Q.  And in what context did you meet her?  Do you remember

17  where you were when you met her?

18  A.  Yes.  We went out to a restaurant to get something to eat

19  and she was in the car.

20  Q.  She was in the car and did she also go to eat at the

21  restaurant with you?

22  A.  Yes.

23  Q.  What restaurant was that?

24  A.  It was an I-Hop.

25  Q.  How did you and Annie get along?

1  A.  It was kind of difficult, me and her.  Got along in the

2  beginning, and then we started not -- I wasn't able to trust

3  her or talk to her.

4  Q.  Why weren't you able to talk to her?  Why couldn't you

5  trust her?

6  A.  Ah, Daddy would like set us up.

7  Q.  What do you mean?

8  A.  He would tell me something and then tell her if I said

9  something to her about what he had said to me then he would --

10 that she would go back and tell him if I said --

11         MR. ZACCA:  Objection to hearsay with regard to this

12 Annie.  She is not here for cross-examination or confrontation.

13         It seems like her response is things she is hearing

14 from Annie, as well as, Mr. Desir.

15         I object to this line of questioning, because I can't

16 discern what is Annie and what is not.

17         MS. VIAMONTES:  I haven't elicited any statements that

18 Annie said.  It is the acts pitting one against the other.

19         MR. ZACCA:  But the responses naturally call for

20 hearsay, judge.

21         THE COURT:  I'll sustain the objection as to anything

22 Annie said, so you can go ahead and proceed with that caveat.

23         MS. VIAMONTES:  Thank you.

24 BY MS. VIAMONTES:

25 Q.  So, C.J., without telling us what Annie said, did something

1  cause you to not get along?

2  A.  Yes.

3  Q.  And who caused you to be at odds with each other?

4  A.  Daddy.

5  Q.  Did there come a time while you were residing in the

6  efficiency with Annie that you used drugs together?

7  A.  Can you rephrase that?

8  Q.  Okay, sure.

9       Did there come a time that Annie stole drugs from

10  Mr. Desir?

11  A.  Yes.

12  Q.  Okay.  Tell the members of the jury about that incident.

13  Let's talk about that.

14       How did it begin?

15  A.  Um-m-m, me and Annie were in the efficiency room together

16  and, um-m-m, Daddy and his -- Daddy and the other guy that was

17  in the car in the beginning, Zoe, they were in the house and

18  Daddy had fallen asleep and he left the door open with the

19  deadbolt in it between the house and the efficiency and Annie

20  had gone in and she had taken drugs from Daddy and she came

21  back in and she told me what she had --

22       MR. ZACCA:  Objection, hearsay.

23       MS. VIAMONTES:  Just don't tell us what she said.

24       THE COURT:  Sustained.

25  BY MS. VIAMONTES:

1   Q.  Did she give you drugs?

2   A.  Yes, she did.

3   Q.  Were you reluctant to take those drugs?

4   A.  Yeah.

5   Q.  Repeat that.

6   A.  Yes.

7   Q.  Why?

8   A.  Because -- I don't know.

9   Q.  Did you think it was a smart --

10          MR. WILCOX:  Objection, judge, leading.

11          THE COURT:  Sustained.

12  BY MS. VIAMONTES:

13  Q.  What did you think could happen if you accepted and used

14  those stolen drugs?

15          MR. ZACCA:  Calls for speculation, judge, objection,

16  what does she think could happen?

17          MS. VIAMONTES:  Judge, state of mind, as well.

18          THE COURT:  Overruled.

19  BY MS. VIAMONTES:

20  Q.  What were you thinking?

21  A.  I was -- I can't remember.

22  Q.  Did you, in fact, use the drugs with Annie?

23  A.  Yes, I did.

24  Q.  What type drug was it?

25  A.  It was the Dilaudid.

1  Q.  What happened after you used the Dilaudid with Daddy?

2  A.  We went back in and we got more drugs and we did drugs and

3  I fell asleep.

4  Q.  Were you woken up?

5  A.  Yes.

6  Q.  By whom?

7  A.  Daddy.

8  Q.  How did he wake you up?

9  A.  He was yelling and screaming.  He shook us by our ankles,

10  grabbed our ankles.

11  Q.  And then what happened?

12  A.  We got out of the bed and, you know, he asked us if we had

13  taken any drugs from him and we both said no.

14  Q.  And were you and Annie kept together at that point?

15  A.  No.

16  Q.  What happened then?

17  A.  I was taken into the house and Zoe was watching the other

18  room to make sure we didn't do anything --

19  Q.  When you refer to Zoe, can you describe who that person is?

20  A.  He's one of Daddy's like workers.

21  Q.  So, it is not the Defendant, Daddy?

22  A.  No.  No.

23  Q.  A different person?

24  A.  Yes.

25  Q.  So, this other person you knew as Zoe was watching you and

1   what happens?

2   A.   Daddy comes back into the room with Annie and he knew -- I

3   was blamed for taking the drugs and Zoe ended up talking to

4   Daddy and telling him what really happened, that she had went

5   in there first and that was --

6   Q.   After you were separated and you have this conversation

7   with Daddy and you tell him what really happens, what happens

8   then?

9   A.   Would you please repeat that?

10  Q.   After you have this conversation with Daddy when he found

11  out you guys had taken the drugs, what happens?

12  A.   We were taken -- He told us to lay down -- First he, ah,

13  you know he grabbed -- he hurt Annie.  He pulled her hair and

14  slapped her and she fell to the ground and he told us that guys

15  were going to be coming to the house to take care of us not in

16  a good way.

17  Q.   Did you believe that to be true?

18  A.   Yes.

19  Q.   How did that make you feel?

20  A.   I was scared.

21  Q.   What happened after that?  Do men actually come to the

22  house?

23  A.   No, they don't come.  He came in and told us to pack our

24  stuff and that he was moving us.

25  Q.   He being?

1  A.  Daddy.

2  Q.  Okay.  Does he tell you where he is moving you to?

3  A.  I can't remember.

4  Q.  Okay.  So, he tells you you are moving.  Do you pack up

5  your stuff?

6  A.  Yes.

7  Q.  Did you have a lot of stuff to pack up?

8  A.  No.

9  Q.  What belongings do you have?

10 A.  I had my purse and I think some makeup and I had gotten

11 some clothes in the efficiency.  There were a couple things in

12 the drawer.  I had, I think, a pair of shorts, a couple tank

13 tops.

14 Q.  You mentioned your purse.  Before this day, was there a

15 time that you realized not all the contents of your purse were

16 in there, what you arrived with?

17 A.  Yes.

18 Q.  Tell us about that.

19 A.  When I was in the motel, I left my purse out all the time

20 and I went to check it and my ID and my Social Security card

21 was gone.

22 Q.  All right.  Mackenley Desir, you knew as Daddy, tells you

23 to pack up your stuff.  You pack it up and then what happens?

24 A.  We get into the car.

25 Q.  Who gets into the car?

1  A.  It was me, Daddy, his worker, Zoe and Annie.

2  Q.  And where do you go?

3  A.  We drove to the Homing Inn to pick up Fire and he picked up

4  the cousin in the beginning.

5  Q.  When you say the cousin in the beginning, is that the

6  person you described yesterday as being his cousin?

7  A.  Yes.

8  Q.  Who was driving this car?

9  A.  Daddy.

10  Q.  Do you recall which car you were in?

11  A.  We were in the black car with the tinted windows.

12  Q.  Daddy is driving.  You say Zoe was in the car.  Do you

13  remember where he was sitting?

14  A.  He was sitting in the passenger seat.

15  Q.  Front passenger?

16  A.  Front passenger.

17  Q.  You and Annie were sitting in the rear?

18  A.  Yes.

19  Q.  When Fire gets in the car where does she sit?

20  A.  Inbetween us.

21  Q.  And the cousin, where did he sit?

22  A.  He sat in the front with the other Zoe.

23  Q.  Okay.  So, there are a lot of people in this car?

24  A.  Yes.

25  Q.  Then where do you go once you pick up Fire at the Homing

1  Inn?

2  A.  We drove to a convenient store.

3  Q.  And what happens when you get to the convenient store?

4  A.  We all get out except for Annie, and I can't remember if

5  Daddy stayed in the car or not.

6  Q.  Do you know why Annie doesn't get out of the car?

7  A.  No.

8  Q.  Can you describe Fire's demeanor when you swing by to pick

9  her up?  How does she act?

10  A.  She was nice immediately.

11  Q.  I am sorry?

12  A.  She wasn't really talking that much to us, just Daddy.

13  Q.  You mentioned that you met Annie at the very beginning and

14  you see her again now after your arrest on the 18th, so, during

15  that gap, do you know where Annie was?  Was she with you during

16  that gap of like six or seven days?

17  A.  No.  She's -- She was with Fire.

18  Q.  So she was with Fire, and who were you with?

19  A.  And I was with Daddy.

20  Q.  What is the purpose of you guys going to the convenient

21  store?  What do you go buy?

22  A.  We got some drinks.  We got something to drink and that was

23  it.

24  Q.  So, were you allowed to buy a drink?

25  A.  Yes.

1  Q.  Were you allowed to get a drink for Annie?

2  A.  No.

3  Q.  Why not?

4  A.  Daddy said if I want to get a drink but not for Annie,

5  don't get one for Annie.

6  Q.  Once you leave the convenient store, where do you go?

7  A.  We drove, we drove around and then the cousin from the

8  beginning and the other Zoe got out of the car and was just

9  dropped off in a neighborhood, kind of.

10  Q.  Just like in the middle of the street?

11  A.  Yes.

12  Q.  Once they get out of the car, where do you go?

13  A.  We continue driving.

14  Q.  Did you know where you were?

15  A.  I had no clue where I was.

16  Q.  Why not?

17  A.  Well, what happened was, we drove to like a -- I think it

18  was like a playground or something, and we parked in there and

19  then Daddy told us to put our heads down, me and Annie; so, me

20  and Annie put our heads down and Fire was in the middle of us,

21  and she held our heads down so we couldn't see where we were.

22  Q.  After you are told to put your head down down and Fire is

23  holding your head down and Annie's head down, what happens?

24  A.  The car -- we were moving and driving, and we got to -- we

25  stopped and Daddy said for me to get out of the car; so, he

1  came around and he got me, opened my door and got me out of the

2  car and brought me into an abandoned house that had boarded-up

3  windows on it and there wasn't any -- when we got inside, there

4  wasn't any furniture or anything in the house.  It was

5  completely abandoned.

6  Q.  You said that Daddy came around and opened your door from

7  the outside.  When he tells you to get out of the car, could

8  you just open your door and step out?

9  A.  I don't know.  He came around and opened it and I tried to

10 get out.

11 Q.  Once he opens the door, what does he do?  He takes you into

12 the house and what happens?

13 A.  And when I get into the house there was the cousin from the

14 beginning and the other Zoe waiting in there.

15 Q.  Does Daddy walk you into the house?

16 A.  Yeah, yes.

17 Q.  And where is Fire?

18 A.  She is still in the car with Annie.

19 Q.  So, you walk into this empty house.  You see little Zoe and

20 the cousin.  Does anybody else come into the house?

21 A.  Fire comes in a little while after.

22 Q.  Does Daddy stay in the house?

23 A.  No, he goes back to the car.

24 Q.  So, now, when Daddy goes back to the car and Fire goes into

25 the house, what happened?

1  A.  They started punching me and beating me up.  They put me in

2  the middle of the room and started circling around me and Fire

3  was holding me while the other two, the cousin and the other

4  Zoe, they were coming around and punching me and punching me.

5  Q.  Where were they punching you, C.J.?

6  A.  My legs and --

7  Q.  Did they avoid hitting your face?

8  A.  Yes.

9  Q.  And your legs, anywhere else they hit you?

10  A.  They were punching me in my ribs.

11  Q.  Other than punching you, were they hitting you any other

12  way?

13  A.  Fire had choked me.  She put her hands around my neck and

14  pressed on so I couldn't breath and I passed out.

15  Q.  Did she tell you why you were getting this beating?

16  A.  They were asking me questions while they were doing it, why

17  did you disrespect Daddy?

18  Q.  Who said why did you disrespect Daddy?

19  A.  Fire.

20  Q.  Do you recall anything else --

21        Well, when she tells you, why did you disrespect

22  Daddy, and begins punching you and choking you, how do you

23  react?  What do you do?

24  A.  I am just standing there and I told them that I was sorry,

25  and I didn't mean to and then they just kept -- they kept on

1  punching me and I couldn't answer.  They were yelling at me

2  because I wasn't answering.  They told me not to cry because it

3  would be 10 times worse.

4  Q.  Who told you not to cry?

5  A.  The other Zoe.

6  Q.  Did you bleed at all?

7  A.  My mouth was bleeding.  I got punched in my jaw and I spit

8  my tooth out and some blood.

9  Q.  How long do you endure this beating, C.J.?

10  A.  I don't know exactly how long it was but it felt like

11  forever.

12  Q.  And how does it stop?

13  A.  Um-m-m, Daddy comes in and he said, no no no, not her, you

14  are not supposed to do that to her, and they stopped and he

15  brought me out to the car.

16  Q.  So, once Daddy stops this beating and takes you out to the

17  car, what happens?

18  A.  He grabs Annie and Annie goes inside and he comes back out.

19  Q.  Does he talk to you when he comes back out?

20  A.  Um-m-m, I can't remember.

21  Q.  Do you know where Annie goes once Daddy takes her out of

22  the car?

23  A.  She goes into the house.

24  Q.  Do you see Fire come out of the house at some point?

25  A.  Yes, Fire came out.

1  Q.  Tell us about that.

2  A.  She was covered in sweat and breathing really heavy and she

3  asked if I had a needle on me, and I said no, I don't; and she

4  asked if Annie had one, and she went into the trunk to see if

5  Annie had one in her bag.

6  Q.  And do you see her pull anything out of the trunk?

7  A.  Um-m-m, I think that she had like that -- I remember seeing

8  a piece of string in her hand.

9  Q.  And where does she go when she retrieves the piece of

10  string?

11  A.  She goes back into the house.

12  Q.  Do you know how long Fire is back in the house with Annie?

13  A.  They are probably in there for like 10 minutes, maybe.  I

14  am not sure of the time.

15  Q.  While you are waiting for Annie to come back, what are you

16  doing inside the car?

17  A.  I had my head down.  He told me to keep my head down, Daddy

18  did, so I was just laying there.

19  Q.  Did he talk to you about the beating you got inside the

20  house?

21  A.  I can't remember.

22  Q.  Okay.  Do you see Annie come out of the house?

23  A.  Annie comes out with Fire.

24  Q.  Describe what you saw when Annie was coming out of the

25  house?

1  A.  I was laying down, so when they got to the car, I saw them,

2  and Annie just looked as bad as I did and scared and, um-m-m,

3  um-m-m, and Annie said --

4          MR. ZACCA:  Objection, hearsay.

5          THE COURT:  Sustained.

6  BY MS. VIAMONTES:

7  Q.  Without telling us what Annie told you, could she walk

8  easily?

9  A.  I can't remember.

10  Q.  Did she have any marks about her body?

11  A.  Yes.  She -- the bruises were already showing and she had

12  like a red mark around her neck.

13  Q.  Does everybody get back in the car then?

14  A.  Just Fire, Daddy, Annie and me.

15  Q.  Do you recall anything Daddy said now when you are all back

16  in the car?

17  A.  Yes.  He had said, um-m-m, he was just talking about --

18  telling Annie to thank me.

19  Q.  Why?

20  A.  Because if I wasn't around or if I wasn't there, he would

21  have killed her for what she had done.

22  Q.  Do you then leave that abandoned house?  Do you drive away?

23  A.  Yes.  We put our heads down and we drove back, and -- I

24  can't remember if we picked up the other two guys.

25  Q.  Okay.  Does Annie then return with you to the Beach and

```
 1  Town?
 2  A.   No.
 3  Q.   Where does she go?
 4  A.   We went back -- we went to a different hotel somewhere in
 5  Boynton and dropped Annie, Fire, and along the way we picked up
 6  another girl, her name was Candy.
 7  Q.   And does Candy go with you to the Beach and Town or is she
 8  dropped off?
 9  A.   No.   They all go to this other hotel in Boynton.
10  Q.   Does Daddy tell them where he is taking you?
11  A.   Yeah, he said he is taking me to Orlando.
12  Q.   Does he, in fact, take you to Orlando?
13  A.   No, he doesn't.
14  Q.   Where does he take you?
15  A.   He brought me back to the efficiency.
16  Q.   Tell the members of the jury what happens when you get back
17  to the efficiency.
18  A.   I get back there and he was talking to me -- Daddy was
19  talking to me, telling me that he is going to let me be on
20  vacation for a few days so I don't have to work, so I could
21  heal from the beating.
22  Q.   Does he give you any drugs?
23  A.   Yes.
24  Q.   What does he give you?
25  A.   He gave me Dilaudid.
```

1  Q.  Other than telling you, you know, you could take a few days

2  off, did he tell you anything else about the beating?

3  A.  He said that I wasn't -- it wasn't supposed to happen to

4  me, but I was part of it and I lied to him, so I deserved it.

5  Q.  C.J., at the time, did you believe you deserved it?

6  A.  At the time, yes.

7  Q.  Why?

8  A.  Because that is how he made me feel, that is how I felt

9  like he was making me feel.

10        MR. WILCOX:  I couldn't hear the answer.  I'm sorry.

11        THE COURT:  Could you please repeat that answer?

12        THE WITNESS:  That's how I felt.  That is how he was

13  making me feel.  I was afraid and I truly believed that I

14  deserved it.

15  BY MS. VIAMONTES:

16  Q.  Do you, in fact, take a couple days off?

17  A.  Yeah, I was able to remembers.

18  Q.  During this vacation, this rest time, are you able to go

19  about freely and do whatever you want?

20  A.  No, no, I am not.

21  Q.  C.J., were you wanting to stay there at this point?  Did

22  you want to stay at the efficiency after the beating?

23  A.  No.

24  Q.  Why not?

25  A.  I didn't want to be there at all.

1  Q.  After your couple days rest, do you then begin working

2  again?

3  A.  Yes, yes.

4  Q.  And how do you know you are going to start working again?

5  A.  Fire had called Daddy to tell him that I had an out call.

6  Q.  What is an out call?

7  A.  An out call is when you-- instead of the client coming to

8  see you, you go to see the client at a hotel or his house.

9  Q.  When the client comes to see you, where you are at, what is

10  that normally referred to as?

11  A.  An in call.

12  Q.  So, before this out call, had they ever set up an out call

13  for you before?

14  A.  No, I had never done an out call before.

15  Q.  Were you given any new instructions about the out call?

16  A.  Yes.

17  Q.  What were those?

18  A.  I was told, um-m-m, um-m-m, I was told to ask the guy that

19  I was seeing if he was a police officer, or if he was the

20  police.

21  Q.  Do you know why you were told to ask that?

22  A.  Because I -- because Fire said they have to tell you if

23  they are a police officer.

24  Q.  Um-m-m, do they instruct you about talking with this

25  client?

1   A.  I can't remember.

2   Q.  Okay, no problem.

3        Where were you supposed to meet that client?

4   A.  We were supposed to meet -- I met him at, um-m-m, a hotel

5   in Fort Lauderdale.

6   Q.  Did you speak with the client on the phone?

7   A.  No.

8   Q.  Who spoke with him?

9   A.  Fire did.

10  Q.  How did you get to the hotel in Fort Lauderdale from the

11  Beach and Town in Hollywood?

12  A.  Daddy drove me.

13  Q.  Did you, in fact, meet the guy?

14  A.  Yes, I did.

15  Q.  And did you get the money?

16  A.  I got the money.

17  Q.  And then what happened?

18  A.  He handed me the money and I counted it, and it wasn't all

19  there, so, I said however much the amount was, I can't

20  remember, so then he said, I'm sorry, and he gave me the rest

21  of it, and I put it in my purse and I started to get undressed

22  and he got undressed.  He left his boxers on, and then the

23  police came in.

24  Q.  Before the police came in, did you ask him if he was a

25  police officer?

1   A.   Yes, I did.

2   Q.   Tell us what happened when the police came in.

3   A.   They said I was under arrest.  And I got dressed and they

4   put me in cuffs and brought me into like another room that they

5   had set up with like computers and there was another girl in

6   there.

7   Q.   C.J., before going on this out call, did you take any

8   drugs?

9   A.   Yes, I had smoked some crack.

10   Q.   While you were with Daddy and Fire, were you using less

11   drugs, the same amount of drugs, or more drugs than you had

12   used before?

13   A.   Less drugs.

14   Q.   At the beginning, when you first met Mackenley Desir, like

15   the first day, Daddy, were you using less drugs, the same, or

16   more drugs than you were used to?

17   A.   I was using more drugs than I was used to.

18   Q.   At the beginning, you are using more, and then it begins to

19   diminish, decrease?

20   A.   Yes.

21          MR. ZACCA:  Objection to leading.

22          THE COURT:  Sustained.

23

24   BY MS. VIAMONTES:

25   Q.   How does it change?  In the beginning you are using more

1  and how does it change when you were with Mackenley Desir?

2  A.  He stops giving me that much.  He stops, like he has

3  control of the drugs, he has the drugs, so he hands them out.

4  Whatever I make, like, for the money, I deserve the drugs, so

5  he would hand out what I had made.

6  Q.  Did you keep any money from the prostitution dates?

7  A.  No.

8          MS. VIAMONTES:  Your Honor, may I approach the

9  witness?

10          THE COURT:  Yes.

11          MS. VIAMONTES:  Gentlemen, I will be showing

12  Government 1 through 7 for identification.

13  BY MS. VIAMONTES:

14  Q.  C.J., if you could, would you please flip through

15  Government Exhibits 1 through 7 for identification, and tell me

16  if you recognize those exhibits?

17  A.  Yes, I do.

18  Q.  What are they?

19  A.  They are pictures of me and the bruises all over my legs

20  and body.

21  Q.  Were those photos taken by the police upon your arrest?

22  A.  Yes.

23  Q.  On the 22nd of June?

24  A.  Yes, they were.

25  Q.  Do those photographs accurately show, C.J., how you looked

1  on June 22, 2012?

2  A.  Yes.

3         MS. VIAMONTES:  At this time, the Government moves 1

4  through 7 into evidence.

5         MR. ZACCA:  No objection.

6         MR. WILCOX:  No objection.

7         THE COURT:  1 through 7 will be received.

8         MS. VIAMONTES:  Permission to publish, your Honor.

9         THE COURT:  Granted.

10        [Government Exhibits 1 through 7 received in

11 evidence.]

12 BY MS. VIAMONTES:

13 Q.  C.J., what do you see on your left arm?

14 A.  Bruises.

15 Q.  Where did you get this shirt?

16 A.  Um-m-m, it was in the room.

17 Q.  Is that one of the shirts you retrieved from the suitcase?

18 A.  I can't remember.

19 Q.  All right.  C.J., I am showing you Government 2 in

20 evidence.

21        Is this a picture of you, too?

22 A.  Yes, it is.

23 Q.  And these marks here that we see on your hip area, what are

24 they?

25 A.  They are bruises.

1   Q.   How were these bruises caused?

2   A.   From the beating, when I was getting punched.

3   Q.   The beating you described earlier?

4   A.   Yes.

5   Q.   I am now placing on the elmo Government Exhibit 3 in

6   evidence, C.J., is that a photograph of your leg?

7   A.   Yes, it is.

8   Q.   And what are those marks?

9   A.   Those are bruises.

10  Q.   And those bruises, who caused those bruises?

11  A.   That is from when I was getting punched.

12  Q.   The same beating you described earlier?

13  A.   Yes.

14  Q.   Now I am showing you Government Exhibit 3 on the elmo, do

15  you see it, C.J.?

16  A.   Yes, I do.

17  Q.   And what marks do you see?  Is that a photograph of your

18  leg?

19  A.   Yes.

20  Q.   What do you see there?

21  A.   Bruises.

22  Q.   Were these bruises also caused in that beating?

23  A.   Yes, they were.

24  Q.   Before meeting Mackenley Desir, Daddy, and Genet Rembert,

25  Fire, was your body full of bruises?

```
 1   A.  No.
 2   Q.  Showing you on the elmo Government 5 in evidence, was that
 3   a photograph of the rear of your legs?
 4   A.  Yes.
 5   Q.  And the marks, you see along the back of your legs, how
 6   were those marks caused?
 7   A.  They were caused by the beating I was describing.
 8   Q.  Now, Government Exhibit 6 in evidence, do you see bruising
 9   on this exhibit?
10   A.  Yes, I do.
11   Q.  And were those -- How were those bruises caused, C.J.?
12   A.  From the beating.
13   Q.  Lastly, Government 7 in evidence on the elmo, do you see
14   marks and bruises on this exhibit, in this photograph?
15   A.  Yes, I do.
16   Q.  Are these bruises here that I am circling?
17   A.  Yes.
18   Q.  Okay.  How were those bruises caused?
19   A.  From the beating.
20   Q.  C.J., you actually had contact with law enforcement that
21   day, right?
22   A.  Yes, I did.
23   Q.  Did you tell the officers you are being held against your
24   will?
25   A.  No.
```

1  Q.  Why not, C.J.?

2  A.  I was afraid to.

3  Q.  Why?  Why were you afraid to?

4  A.  I was -- I believed that Daddy had people working for him

5  on the inside, like officers and people in the jail, and I was

6  afraid to say anything to anybody.

7  Q.  Why did you believe that?

8  A.  That is what -- He talked about it.

9  Q.  Mackenley told you that, Daddy?

10  A.  Yes.

11  Q.  Were you ever instructed or what to tell law enforcement if

12  you came in contact with them about Daddy and Fire?

13  A.  Yes.  Daddy talked to me one time and told me to not get

14  so -- to not be afraid of them, that they are just people like

15  you and me and he had said that he -- he casually was saying,

16  in fact, I was just meeting with one the other day, so I

17  figured that that was -- that he was selling him drugs or, I

18  don't know what it possibly could have been, but that is what I

19  was thinking in my head.

20  Q.  Do you remember meeting, aside from the local law

21  enforcement, do you remember meeting an FBI agent when you were

22  arrested on June 22nd for prostitution?

23  A.  Yes, I did.

24  Q.  Did you want to talk to them?

25  A.  Um-m-m, I wanted to and I thought about it but I was just

1  so afraid to say anything.  I didn't know what would happen,

2  how would that process go.

3  Q.  Did you, in fact, talk to an FBI agent?

4  A.  Yes, I did.

5  Q.  Did they tell you why they were there?

6  A.  They said that they were doing a sting operation trying to

7  find under age girls that were prostituting.

8  Q.  Did you know of any under age girls that were prostituting?

9  A.  No, I didn't.

10  Q.  Could you help them and give them any information about

11  under age girls?

12  A.  No.

13  Q.  Did they express any interest in helping you?

14  A.  No.

15  Q.  I didn't hear your answer.

16  A.  No.

17  Q.  Do you, in fact, get sent to jail?

18  A.  Yes, I did.

19  Q.  How do you get out of jail?

20  A.  Daddy bails me out.

21  Q.  How does Daddy react when he bails you out?  What does he

22  tell you?

23  A.  I can't remember.

24  Q.  Did you go back to the efficiency apartment?

25  A.  Yes, I did.

```
 1   Q.  Does there come a time that you stand up for yourself and
 2   you say I don't want to be here any more?
 3   A.  Yes, I did say that.
 4   Q.  Tell us about that.  What do you say?
 5   A.  I said I don't think that I can do this any more.
 6   Q.  Who did you tell that to?
 7   A.  I said that to Daddy.
 8   Q.  And what does he tell you?
 9   A.  He had said, you are -- He got angry with me and told me
10   that he legally has a hold on me.
11   Q.  Does Daddy begin to show frustration with you?
12   A.  Yes.
13   Q.  Did you sense a change from the beginning toward the end of
14   your stay with Daddy and his behavior?
15   A.  Yeah, he was acting, like, short with me and he wasn't as
16   nice as he was in the beginning.
17   Q.  What sort of things would he tell you that led you to
18   believe he was frustrated with you?
19   A.  He called me stupid or -- I just remember him calling me
20   stupid a lot, what are you thinking?
21   Q.  Who was in charge in this business?
22   A.  Daddy.
23   Q.  What was Fire's role in this operation?
24   A.  She was, like, the secretary.  Also, he would always say it
25   was like a big family, and he wants to try to take care of
```

```
 1  everybody.
 2  Q.  At some point, did you kind of believe you were in -- had
 3  joined this family?
 4  A.  Yes.
 5  Q.  Did they place an ad for you on the internet?
 6          MR. ZACCA:  Objection to they, be a little more
 7  specific.
 8  BY MS. VIAMONTES:
 9  Q.  Were ads posted of you on the internet?
10  A.  Yes.
11  Q.  Do you know who posted the ads?
12  A.  Fire.
13  Q.  When Daddy is telling you that you are stupid and you can't
14  follow the rules, how do you feel?
15  A.  I felt -- I don't know, I just felt like frustrated,
16  irritated with myself, why can't I just --
17          I don't know.
18  Q.  At any point, did Mackenley tell you that you owed him
19  anything?
20          MR. ZACCA:  Objection to leading.
21          THE COURT:  Overruled.
22          THE WITNESS:  Yes, he did.
23
24  BY MS. VIAMONTES:
25  Q.  Describe that, what did Daddy or Mackenley say?
```

1   A.  He told me I owed him for him bailing me out of jail twice

2   and for all the drugs that I was given.

3   Q.  Did he tell you what would happen if you left or if you

4   tried to run away?

5   A.  Um-m-m, that he could legally come after me and kill--

6           MR. ZACCA:  Objection, judge, asked and answered

7   several times.

8           THE COURT:  Overruled.

9   BY MS. VIAMONTES:

10  Q.  You can answer.

11  A.  That he would come and kill me, he knows where me and my

12  family live.

13          MR. WILCOX:  I object to they, your Honor.  I think

14  she needs to be specific as to who was threatening to kill her

15  family.

16          THE COURT:  Sustained.

17  BY MS. VIAMONTES:

18  Q.  Daddy -- Who is the one speaking to you telling you that he

19  or she knows where you live?

20  A.  Daddy.

21  Q.  Did you believe this to be true, he knew you were from

22  Vermont?

23  A.  Yes.

24  Q.  Why?

25  A.  Because they had my ID and my Social Security card and he

1    said I was from Vermont.

2    Q.  So, did you try to leave after knowing this?

3    A.  No, I did not -- no, I didn't.

4    Q.  At some point, C.J., do you reach out to your Mom?

5    A.  Yes, I did.

6    Q.  Tell us about how you are able to reach out to your Mom.

7    A.  Um-m-m, I used the phone that I was given and I just --

8    Q.  Who gave you that phone?

9    A.  Daddy.

10   Q.  And where was Daddy when you used the phone to call your

11   mother?

12   A.  He wasn't around.

13   Q.  Do you recall, more or less, what time of day it was?  Was

14   it early or late?

15   A.  Um-m-m, I think it was -- I can't remember what time it

16   was.

17   Q.  And why did you call your Mom?

18   A.  I just wanted to hear her voice and tell her what was going

19   on and, um-m-m, I didn't want to like freak her out, so I was

20   trying to call and say what was going on.  There is no calm way

21   of saying it, but I told her I had a plan because I was trying

22   to think of ways how I could get out of this.

23   Q.  Did you tell her anything about the phone number you were

24   calling from?

25   A.  I told her don't call it back.

```
1   Q.  Why did you say that?
2   A.  Because, if she called back, I could have been around Daddy
3   or Fire or somebody.
4   Q.  Did you have exclusive or complete control over that cell
5   phone all the time?  Were you the only person that used it?
6   A.  No.  No.
7   Q.  Aside from your Mom, did you reach out to any other family
8   or friends?
9   A.  I called my ex-boyfriend.
10  Q.  And what was the purpose of calling your ex-boyfriend?
11  A.  I just wanted to tell him what was happening and just talk.
12  Me and him were best friends so I always talked to him about
13  how I was feeling and what is going on with me.
14  Q.  Did you go to a hospital during this time?
15  A.  Yes, I was -- Daddy brought me to the hospital.
16  Q.  Why?
17  A.  My --
18          MR. ZACCA:  Objection.  Can we have a time frame as to
19  this time?
20          THE COURT:  Yes.
21  BY MS. VIAMONTES:
22  Q.  Do you know the specific date you went to the hospital?
23  A.  I don't.
24  Q.  Okay.
25          Was it before or after the beating?
```

```
 1  A.  It was after.
 2  Q.  Was it before or after your arrest for prostitution?
 3  A.  After.
 4  Q.  So, after your prostitution arrest, you go to the hospital,
 5  for what?
 6  A.  My throat was really swollen.  It was closing up.
 7  Q.  Do you get treated at the hospital?
 8  A.  Yeah, they gave me a shot and I can't remember if they gave
 9  me like prescription or anything.
10  Q.  C.J., did you tell anyone at the hospital what was going on
11  with you?
12  A.  No, I didn't.
13  Q.  Did they ask you about your bruising?
14  A.  I can't remember.
15  Q.  Did you become aware that your Dad came to Florida and was
16  looking for you at this point while you are in the hospital and
17  released from the hospital?
18  A.  No.
19  Q.  Did there come a time that the police came looking for you?
20          MR. ZACCA:  Objection to leading.
21          THE COURT:  Overruled.
22  BY MS. VIAMONTES:
23  Q.  Do you understand my question?
24  A.  A -- Repeat it.
25  Q.  Okay.  Let's go back.  So, you are at the hospital.
```

1          Are you released from the hospital?

2   A.   Yes.

3   Q.   So, you are not admitted?  You don't stay at the hospital?

4   A.   No,

5   Q.   When you are released, where do you go?

6   A.   Um-m-m, I waited outside for Daddy to come pick me up.

7   Q.   Does he come pick you up?  Daddy?

8   A.   Yes, he does.

9   Q.   And where do you go?

10  A.   We go back to the efficiency.

11  Q.   Once you get back to the efficiency, do you hear police

12  officers knocking on the efficiency door?

13  A.   Yes, yes.

14  Q.   Tell the members of the jury about that.

15  A.   Um-m-m, it was me, me, Daddy, Fire and Annie, we were in

16  the house and all of a sudden there was knocking on the door

17  and they said that they were the police and so Daddy had me and

18  Fire and Annie go to one of the rooms in the house and get down

19  and not to say anything or peek out the windows or do anything.

20  Q.   And do you follow Daddy's orders to stay down and not peek

21  out the window?

22  A.   I did peek out the window but I didn't see anything at that

23  time.

24  Q.   Do the police eventually leave?

25  A.   Yes.

```
 1   Q.   What does Daddy do after the police leave?
 2   A.   I can't remember.  I am having a hard time remembering
 3   right now.
 4            THE COURT:  How much longer do you anticipate you will
 5   be on direct?
 6            MS. VIAMONTES:  Half hour.
 7            THE COURT:  All right.  Let's take a ten minute break.
 8            Folks, remember, don't discuss the case, continue to
 9   keep an open mind.
10            (Thereupon, the jury leaves the courtroom.).
11            THE COURT:  Okay, see everybody back at 10:25.
12            (Thereupon, a short recess was taken.).
13            THE COURT:  All right.  The record will reflect that
14   the Defendants are both present represented by their respective
15   counsel.
16            Mr. Culuffo, would you bring in the jury.
17            (Thereupon, the jury returns to the courtroom.)
18            THE COURT:  Mr. Leslie, I didn't ask you this morning
19   about the stress level.  How are we doing, okay, blood pressure
20   under control?
21            THE JUROR:  It is under control.  Thanks.
22            THE COURT:  That is good to hear.
23            Ms. C.J., let me remind you you are still under oath.
24            We will continue with direct examination by
25   Ms. Viamontes.
```

```
 1              MS. VIAMONTES:  Thank you, your Honor.
 2   BY MS. VIAMONTES:
 3   Q.  C.J., I know this is difficult but we are almost done.
 4              You described yesterday you saw Mackenley Desir's gun
 5   at the beginning when you met him.
 6              Did you see it at the end?
 7   A.  Yes, I did.
 8   Q.  Would you tell the jury how you saw the gun toward the end
 9   of your stay there.
10   A.  I was sitting in the house and it was after the police had
11   come and he started asking me questions, like, what have you
12   done, did you do anything?  I kept saying, no, I haven't done
13   anything.  And he took the gun and put it at my face and he
14   kept on asking me, and I was crying, and I said, no, I didn't
15   do anything and --
16   Q.  Was anyone else there when this happened?
17   A.  No, it was just me and him in the room.
18   Q.  How did you feel when he pointed the gun at your face?
19   A.  At that point, I was just so defeated.  I felt like -- I
20   didn't want to be there any more.  I didn't want to have to
21   deal with this any more, and I was so worn out and beaten down,
22   I just couldn't even -- I didn't care if that gun went off.  I
23   wanted it to, I wouldn't have to endure that any more.
24   Q.  C.J. what would you have done if you knew your Dad was just
25   yards away on the other side of the door?
```

```
 1              MR. ZACCA:  Objection, calls for speculation, what she
 2   would have done.
 3              MR. WILCOX:  I join in the objection, your Honor.
 4              THE COURT:  I am not sure of the relevance.
 5   BY MS. VIAMONTES:
 6   Q.  Did you know your Dad was just yards away on the other side
 7   of the door?
 8   A.  No, I didn't.
 9   Q.  At any time, did Daddy tell you that your Dad was here in
10   Florida looking for you?
11   A.  He actually did.
12   Q.  When?
13   A.  It was a little while after -- I can't remember when,
14   exactly.  He said he was just kidding.
15   Q.  C.J., did you have some pretty horrible dates while you
16   were with Mr. Desir, Daddy, and Fire?
17   A.  Yes, I did.
18   Q.  I know it is hard, C.J., but can you tell us about some of
19   the worst prostitution dates you had?
20   A.  There were some of the clients that would hold me down and
21   choke me, slap me, just make me feel degraded, and like I
22   wasn't worth anything.
23              Um-m-m, I don't know.
24   Q.  Was there one client that came back repeatedly?
25   A.  Yes, there was one client that came -- he came two times.
```

```
 1  Q.  Tell us about that.
 2  A.  He would come in and -- sorry, um-m-m, he was the one that
 3  mostly hurt me.  He slapped me and tell me I am not even worth
 4  his time but he wanted to be with me, and he would hold me
 5  down.
 6  Q.  Did you tell him to get out?
 7  A.  No.
 8  Q.  Why not?
 9  A.  I don't know.
10  Q.  Would anything happen if you didn't get enough money from
11  the clients?
12          MR. ZACCA:  Objection, leading.
13          THE COURT:  Overruled.
14          Leading questions are permitted in order to develop
15  the testimony of the witness.  The objection is overruled.
16  BY MS. VIAMONTES:
17  Q.  Would anything happen if you didn't get enough money from
18  the client?
19  A.  Yes.  I would be in trouble.
20  Q.  Would you get punished?
21  A.  I can't remember.
22  Q.  C.J., let's talk briefly about the cell phone that you used
23  to reach out to your Mom.
24          Did you use that cell phone --
25          Who else did you communicate with using that cell
```

1    phone?  Let me clarify that.

2           Strike the question.

3           Why was the cell phone given to you?

4    A.  So I could answer when Fire set up the dates.

5    Q.  When the clients called to set up dates, would you speak to

6    them on the phone?

7    A.  Towards the end I would.  Fire would three way the call.

8    She would be on the other line, and I would just talk to them

9    to tell them where to meet me.

10   Q.  Would you ever text message with clients?

11   A.  No.

12   Q.  Were you allowed to talk to the other girls that worked for

13   the Defendants?

14   A.  I don't know if I was allowed to.  I can't remember if I

15   was told not to, but --

16          MS. VIAMONTES:  May I approach, your Honor?

17          THE COURT:  Yes, ma'am.

18   BY MS. VIAMONTES:

19   Q.  I am approaching with Government's 26.

20          Referring to page three of Government's 26, C.J., what

21   is Government's 26?

22   A.  It is text messages.

23   Q.  If you look at page three or four, do you see any text

24   messages there that you recall?  Did you author any of the text

25   messages on page three?

594

```
 1   A.   Yes.
 2           MR. ZACCA:   Judge, I don't believe this exhibit has
 3   been introduced into evidence and, by the nature of the
 4   questions, she is asking to read something that is not entered
 5   into evidence.
 6           I object to foundation.
 7           THE COURT:   This is an exhibit the Court determined
 8   would be admitted based on the proffer of the Government.
 9           MR. ZACCA:   Okay.  Is this the line of questioning you
10   are getting into?
11           MS. VIAMONTES:   Yes.
12           MR. ZACCA:   All right.  Judge, very well.
13           THE COURT:   All right.
14   BY MS. VIAMONTES:
15   Q.   C.J., you mentioned this phone was given to you to use.
16   Would you use it all the time?  Did you have this phone all the
17   time?
18   A.   Not the same phone number.
19   Q.   Okay.  Other than you, do you know if Mackenley Desir used
20   the phone?
21   A.   Yes.
22   Q.   Did anybody else use the phone besides you and Mackenley
23   Desir?
24   A.   With this phone number?
25   Q.   Right.
```

```
 1  A.  I don't know.
 2  Q.  Okay.  Look at page three, do you recognize some text
 3  messages that you authored?
 4  A.  Yes, I do.
 5  Q.  C.J., can you tell us which ones you recognize that you
 6  authored?
 7  A.  There's --
 8  Q.  Where do you think you begin writing text messages, if you
 9  can go to the far left and point to the date and time?
10  A.  Um-m-m, one second.
11  Q.  Take your time.
12  A.  Are you asking me to point out the first text message that
13  I see?
14  Q.  Yes.
15          MS. VIAMONTES:  May I approach, your Honor?
16          THE COURT:  Yes.
17  BY MS. VIAMONTES:
18  Q.  C.J., do you see a line at -- I will put it on the elmo and
19  you will see it better, okay?
20  A.  Okay.
21  Q.  I will point to the ones we are talking about.
22  Q.  What was your nickname or stage name while you were with
23  Mackenley Desir and Genet Rembert?
24  A.  Sorry, would you please repeat that.
25  Q.  What was the name Daddy and Fire called you?
```

```
 1  A.   Angel.
 2          MR. ZACCA:  Judge, has this record been entered into
 3  evidence officially?  Has the Government moved this into
 4  evidence?
 5          THE COURT:  No, it is not in evidence.
 6          MR. ZACCA:  It is being published to the jury.
 7          THE COURT:  Well, the Court has determined based on
 8  the proffer of the Government that it will be admitted, even
 9  though, technically, it is not in yet because it has not been
10  properly authenticated --
11          MR. ZACCA:  It is being published, that is the only
12  thing.
13          MS. VIAMONTES:  I thought it was early in the trial,
14  your Honor.
15          THE COURT:  I assume this is an objection.
16          MR. ZACCA:  Yes, sir, objection.
17          THE COURT:  Overruled.
18          MR. ZACCA:  Okay.
19          THE COURT:  Overruled.
20  BY MS. VIAMONTES:
21  Q.   You mentioned your name was Angel?
22  A.   Yes.
23  Q.   Do you see the text message June 27, 2012 at 10:46 p.m.
24  from the number of this phone, 786-332-0154 to 561-767-5687,
25  which reads:  "This is Angel.  Sorry, I want one, too, ha."
```

1          Do you remember writing that?

2   A.   Yes.

3   Q.   Tell the members of the jury what that was all about.

4   A.   Me and Annie were texting back and forth.  She wanted some

5   Dilaudid and I think she meant to text Fire or Daddy, but you

6   never knew who had the phone, it was always being switched

7   around.  I got the text, and I said, this is Angel, I want one,

8   too.

9   Q.   Do you know where Annie was when she was texting this?

10  A.   She was in the efficiency.

11  Q.   And where were you?

12  A.   I was in a room in the house.

13  Q.   Who were you with?

14  A.   With Fire.  Fire was sleeping.

15  Q.   Why are you texting Annie?  Why don't you walk over to the

16  efficiency and talk to her?

17  A.   Because Daddy had said to stay where we are and not to

18  leave the room.

19  Q.   And what was Annie's other name, the name that Fire and

20  Daddy called her?

21  A.   She had two names.  Diamond and Kayla.

22  Q.   So the text message before, "It's Kayla, I really don't

23  feel good, can we get our night thing, please."

24          Did you receive that message when you had the phone?

25  A.   Yes, I did.

1   Q.   And what did you believe that -- what did that mean?

2   A.   That meant, like, drugs he would give us, he would give us

3   times when we would get our drugs.

4   Q.   Had you gotten your nightly dosage that night?

5   A.   No.

6   Q.   Did you write this text message a little further down, now,

7   it's at the time, 2251, which is almost 11 p.m. to the same

8   number, 561-767-5687, "I don't know.  Try to stick it out,

9   like, a half hour.  I'll ask then.  I think we're leaving soon,

10  too."

11          Did you write that?

12  A.   Yes, I did.

13  Q.   And did you write this text message down here same day,

14  June 27th, it is now almost midnight, 2356:13, to 561-767-5687?

15  A.   Yes.

16  Q.   "He isn't even here.  Fire is sleeping.  I don't know what

17  to do.  Should I call him?

18  A.   Yes, that was me.

19  Q.   What is that all about?

20  A.   We still hadn't gotten the Dilaudid yet and I hadn't seen

21  or heard from Daddy, texting me back, and Fire was sleeping, so

22  Annie kept texting me.

23  Q.   Okay.  Does that number, then, text you telling you that

24  she is pretty sick?

25  A.   Yes.

1   Q.   What does she mean by that?

2   A.   She is sick.  When you get addicted to Dilaudid, it is

3   physically addictive.  When you don't have the drug, you start

4   to have withdrawal and it's like having the flu, so, um-m-m,

5   when she says that, she means that she is sick because she

6   hasn't had her drugs.

7   Q.   Do you see the conversation, the texting conversation

8   continuing between you and Annie towards the bottom of the page

9   now into June 28th?

10  A.   Yes.

11  Q.   Okay.  Did you want to wake Fire up to ask her for the

12  pills?

13  A.   I tried to wake her up, yeah.

14  Q.   And what happened?

15  A.   She didn't wake up.  She would just -- I think she was

16  talking to me in her sleep.

17  Q.   Let me show you page 4, 4 of 4.  I apologize, this is the

18  early morning hours of June 28th.  Are you still having

19  conversation shortly after midnight with Annie about getting

20  the Dilaudid?

21  A.   Yes.

22  Q.   Do you write this message on that day shortly after

23  midnight so it is 12:31 a.m., do you write this:  "Plus none of

24  us made any money, she said."

25          Did you write that?

```
 1  A.  Yes, I did.
 2  Q.  Who said that, that none of you made any money?
 3  A.  Fire.
 4  Q.  Is that why you are not getting the drugs?
 5  A.  Yes, prob -- yes.
 6  Q.  Do you see the text message from Annie back to you saying,
 7  "K, because we were doing shit all day."
 8          Do you see that?
 9  A.  Yes, I see that.
10  Q.  What did that mean?
11  A.  Meaning he was giving us our drugs during the day and
12  then --
13  Q.  Had you, in fact, made --
14          MR. WILCOX:  Objection, leading, that is leading,
15  judge.
16          THE COURT:  Sustained.
17          Rephrase your question.
18  BY MS. VIAMONTES:
19  Q.  Had you made any money the day before?
20  A.  I can't remember.
21  Q.  Would clients give you money in exchange for sex?
22  A.  Yes.
23  Q.  Who would that money go to?
24          MR. WILCOX:  Your Honor, this has been asked and
25  answered.
```

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  Daddy.

 3  BY MS. VIAMONTES:

 4  Q.  Do you see now toward the bottom of page 4 now text

 5  messages days later on June 30th at about 8 p.m., text messages

 6  to the phone number, 786-332-0154 from a number 802-747-8272?

 7  A.  Yes.

 8  Q.  That 802 number, whose number is that?

 9  A.  That is my Dad's number.

10  Q.  Back then in June, June 30, 2012, did you receive those

11  text messages?  Did you actually see them come to the phone?

12  A.  No, I didn't have the phone.

13  Q.  Who had the phone?

14  A.  Daddy had taken it from me.

15  Q.  C.J., do you remember being returned to the bondsman?

16  A.  Yes, I do.

17  Q.  Tell us about that day, what happened?

18  A.  Um-m-m, I had been with Fire all that day and Daddy was

19  coming in and out and --

20              MS. VIAMONTES:  Judge, if I may, could we go sidebar?

21              Sorry to cut you off, C.J..

22              THE COURT:  Yes.

23              (Sidebar discussion on the record.)

24              MS. VIAMONTES:  Your Honor, while the victim is

25  testifying, Genet Rembert is sitting there laughing.  It is
```

```
 1  visible, distracting, I don't know what is so funny.  That is

 2  not appropriate courtroom behavior.  It is a problem.  I am

 3  asking the Court and defense counsel --

 4           THE COURT:  You find it distracting?

 5           MS. VIAMONTES:  Absolutely, it is distracting the

 6  witness.  That is not appropriate.

 7           MR. WILCOX:  In Ms. Rembert's defense, I said

 8  something that made her laugh.

 9           THE COURT:  You want me to excuse the jury out while

10  you speak to her?

11           MR. WILCOX:  No, that won't be necessary.

12           THE COURT:  Okay.  You tell me if you observe

13  something and I will be vigilant to see if she is doing that

14  again, because, as you said, the Court has already forewarned

15  Ms. Rembert about her actions.

16           MS. VIAMONTES:  Thank you, your Honor.

17           (After sidebar.)

18  BY MS. VIAMONTES:

19  Q.  C.J., let me redirect you to where we were.

20           I asked you about being returned to the bondsman.  Can

21  you tell the jury about that?

22  A.  Yes.  Um-m-m, um-m-m, so, it was me, Fire, Daddy and Annie

23  and Annie was in the efficiency still, and me and Fire were in

24  the room of the house and she -- Fire had me get my stuff

25  together, the little things that I had, and she said that Daddy
```

1  was going to come pick all of us up and we were going to

2  move -- me and Annie were moving to Orlando.

3  Q.  Did you want to go to Orlando?

4  A.  No, I didn't.

5  Q.  Did you, in fact, go to Orlando?

6  A.  No, I didn't.

7  Q.  Where did you go?

8  A.  We ended up driving to Fort Lauderdale and I didn't think

9  anything of it because I don't know my way around here, so I

10  thought we were just going through, and we stopped -- we

11  stopped at a building.  He pulled into a parking lot and, a --

12  Q.  Did you know where you were, what kind of building, what

13  kind of business it was?

14  A.  No, I didn't.  I didn't see any signs or anything.  I

15  wasn't paying attention.

16  Q.  Did they tell you your Dad was in town looking for you at

17  this point?

18  A.  No, they didn't.

19  Q.  Did you get out of the car and go inside the business?

20  A.  No.  The guy comes out and introduces himself to me as the

21  bondsman that bonded me out the last two times and he said that

22  he is sorry he has to do this but he has to put me in handcuffs

23  because they messed up on my booking in the jail.

24  Q.  Are you cooperative with the bondsman?

25  A.  Yes.

1  Q.  Do you believe what he is telling you, in fact, they messed

2  up your fingerprinting, your booking in the jail?

3  A.  Yes, I believed it.

4  Q.  Why did you believe that?

5  A.  I just didn't think anything of it.  I thought maybe that

6  happened.  I had never been arrested before.  I didn't know how

7  it works, so --

8  Q.  Was there any conversation between Mackenley Desir, Daddy,

9  and Genet Rembert in the car over to the bondsman?

10  A.  Yes.

11  Q.  Tell us about that.

12  A.  It was me and Annie and Fire sitting in the back seat and

13  Daddy was driving and he kept looking at me in the rear-view

14  mirror and yelling at me, just saying how pathetic I was and

15  telling me that I looked pathetic, that he could see it in my

16  eyes.

17  Q.  Does Fire say anything?

18  A.  She doesn't say anything but Daddy asked her to slap me, so

19  she slapped me.

20  Q.  Where was Fire sitting in the back seat?

21  A.  She was sitting on the right side.

22  Q.  And where were you?

23  A.  I was in the middle.

24  Q.  What belongings did you have with you?

25  A.  I had my grocery bag of clothes that was in the trunk and I

```
 1  had my purse next to me.
 2  Q.  When the bondsman gets you out of the car, does he take you
 3  inside to his office?
 4  A.  Yes, he did.
 5  Q.  When you initially go up, do you have your purse with you?
 6  A.  No.
 7  Q.  Who goes to retrieve your purse?
 8  A.  Daddy goes to grab my purse.
 9  Q.  Did the bondsman ask you for identification?
10  A.  I can't remember.
11  Q.  Do you know if now your identification was in the purse?
12  A.  Um-m-m, no.
13           MS. VIAMONTES:  One second, your Honor.
14           Your Honor, at this time, I have no further questions.
15           THE COURT:   Mr. Zacca, cross-examination.
16                        CROSS EXAMINATION
17  BY MR. ZACCA:
18  Q.  Good morning, Ms. C.J..
19  A.  Good morning.
20  Q.  Ms. C.J., how old are you?
21  A.  I am 21.
22  Q.  How many years have you been abusing drugs?
23  A.  Seven, seven years.
24  Q.  So, since the age of 15 you have been abusing drugs?
25  A.  Um-m-m, 14.
```

```
 1   Q.   14, forgive me.
 2            Can you tell this jury what type of drugs you have
 3   been using?
 4   A.   Yes.  I have been using, um-m-m, pain pills, heroin,
 5   cocaine, um-m-m, I abused Xanex.  I smoked pot.
 6   Q.   That is a lot of drugs.
 7            Let's put some time context in that.
 8            Prior to coming to Florida, did you abuse heroin?
 9   A.   Yes.
10   Q.   Prior to coming to Florida, did you abuse cocaine?
11   A.   Yes.
12   Q.   Both powder and crack cocaine?
13   A.   Um-m-m, I smoked crack a couple times before.
14   Q.   Prior to coming to Florida, what drug did you abuse the
15   most?
16   A.   Heroin.
17   Q.   Terribly addictive drug, correct?
18   A.   Yes.
19   Q.   For how long prior to coming to Florida did you take
20   heroin?
21   A.   Well, I had gone to rehab before I went to Florida and I
22   had been out for three weeks and I had not --
23            MR. WILCOX:  Objection, judge, nonresponsive.  That
24   answer is nonresponsive to the question.
25            THE COURT:  Overruled.
```

```
 1   BY MR. ZACCA:
 2   Q.  Go ahead.
 3   A.  So it had been over a month before I had heroin before
 4   Florida.
 5   Q.  So you only took heroin for a month prior to coming to
 6   Florida?
 7   A.  It had been a month since I used heroin.
 8   Q.  It had been a month since you used heroin.  Prior to that,
 9   how long had you been abusing heroin?
10   A.  Three years.
11   Q.  Is that constantly for three years straight you had been
12   abusing heroin?
13   A.  No.
14   Q.  You were using other drugs instead of heroin during those
15   three years?
16   A.  No.  I went to rehab a couple times.
17   Q.  How many times have you gone to rehab prior to coming to
18   Florida?
19   A.  Twice and then I was in a detox.
20   Q.  How old were you when you first went to rehab?
21   A.  19.
22   Q.  How old were you when you went to rehab the second time,
23   prior to coming to Florida?
24   A.  20.
25   Q.  So, you went to rehab when you were 19, was that
```

1  residential?

2  A.  Yes.

3  Q.  Meaning you had to stay at the facility?

4  A.  Yes.

5  Q.  How long did you stay at the facility?

6  A.  28 days.

7  Q.  It didn't work, correct, the first time?

8  A.  Would you please repeat that?

9  Q.  Sure.  When you were 19, you did residential treatment for

10 28 days -- did you say 28 or 29 days?

11 A.  28.

12 Q.  28 days.

13      When you went to treatment for the first time, was it

14 because of the heroin?

15 A.  Yes.

16 Q.  Was it because of the crack cocaine?

17 A.  It was because of the physical addiction to --

18      MS. VIAMONTES:  I object at this point.  It is

19 irrelevant and beyond the scope of direct.

20      MR. ZACCA:  It is not.  We can go sidebar and I can

21 proffer to the Court where I am going with this.

22      THE COURT:  All right.  Come sidebar.

23      (Sidebar discussion on the record.)

24      MR. ZACCA:  First of all, it was elicited on direct

25 examination, so I am allowed to go into this on

1  cross-examination.

2          Number two, lays out her tendency to lie, the next

3  area of cross-examination.  That drug abuse, she lied about

4  that drug abuse and hid about what she was doing and plays into

5  what she was doing and lying about what she was doing prior to

6  meeting Desir, plays into down playing what she did when she

7  was with Desir, and she lied to the Government on three

8  occasions about prior prostitution before meeting Desir.  It is

9  that drug abuse that causes her to lie.

10         MS. VIAMONTES:  Your Honor, he is asking her

11  specifics.  He is asking her specifics about a particular drug

12  rehab and she was about to say the reason she got into drug

13  rehab is because of the physical abuse by the ex-boyfriend.

14         I think he is trying to open the door to what the

15  Court ruled upon that is not admissible.

16         It is well established, he could ask her, she was in

17  drug rehab and it didn't work.  To get into the specifics is

18  not appropriate.

19         MR. WILCOX:  May I be heard?

20         THE COURT:  Yes.

21         MR. WILCOX:  Your Honor, my reasoning for why this is

22  relevant is straight forward, your Honor, it goes to the heart

23  of our defense.  The heart of our defense is why were you

24  selling your body?  She was selling her body because she was

25  addicted to drugs and that outweighed any coercion the

1   Government is trying to show and, in order to show that, we

2   have to show how strong the addiction was, how bad the problem

3   was.

4          MR. ZACCA:  Amply put, better than I did.

5          MS. VIAMONTES:  And Mr. Zacca asked how many times

6   C.J. lied about prior prostitution, and I informed him I didn't

7   know exactly but I believe there were at least two, possibly

8   three times.  I want to clarify that.  That is what I told him.

9          THE COURT:  Look, I think prior drug useage and the

10  tendency to lie about it is certainly relevant to the witness'

11  credibility; however, I've already ruled that the incident back

12  in 2008 regarding the boyfriend and the restraining order is

13  not admissible.

14         MR. ZACCA:  I am not going there, judge.

15         THE COURT:  So, I don't want to see you ask a question

16  that would call for her to give a response relating to that

17  matter that the Court has already deemed inadmissible.

18         MR. ZACCA:  Absolutely.  My questions are strictly on

19  the drug addiction and the drug abuse she had leading up to

20  Florida.

21         I have every intention honoring your ruling and I

22  won't ask her about any physical abuse.

23         THE COURT:  Perhaps you want to ask very pointed,

24  leading questions so the door is not open.

25         MR. ZACCA:  Yes, sir.

1          THE COURT:  The only other thing I could do is send

2    the jury out and let the witness know she is not to mention

3    that.

4          I assume the Government told her about the ruling.

5          MS. VIAMONTES:  Yesterday.

6          MR. WILCOX:  That may not be a bad idea.

7          (After sidebar).

8          THE COURT:  Folks, I will ask you to step back in the

9    jury room a couple minutes.  I promise it won't be long, and

10   don't discuss the case.

11         (Thereupon, the jury leaves the courtroom.)

12         THE COURT:  Folks, you all can be seated.

13         Ms. C.J., the Court ruled yesterday that the incident

14   back in 2008 regarding your ex-boyfriend, Mr. Bigelow,

15   regarding the alleged violence on his part, that that is not

16   admissible in this trial; and, so, if any of the attorneys ask

17   you a question that you feel perhaps requires you to go into

18   that particular incident, I am instructing you not to go into

19   that incident because the Court has ruled that it is not

20   admissible.

21         Do you understand what I am referring to?

22         THE WITNESS:  Yes.

23         THE COURT:  The one where the restraining order was

24   obtained.

25         THE WITNESS:  Yes.

```
 1              THE COURT:  Do you have any questions about that?
 2              THE WITNESS:  No, I don't.
 3              THE COURT:  You are not to go into that.  Okay?  That
 4    is not relevant to this case.
 5              THE WITNESS:  Okay.
 6              THE COURT:  All right.
 7              Ms. Johannes.
 8              MS. JOHANNES:  One additional clarification.  The
 9    Court agreed one objection speaks for both of them.  We are on
10    cross-examination.  Mr. Wilcox made an objection,
11    nonresponsive, move to strike.
12              I don't want to have both counsel attack this witness.
13    If Mr. Zacca thinks it is not responsive, he should say so.
14    When he is objecting, I don't think is right.
15              THE COURT:  I think Mr. Wilcox has a right to make an
16    objection any time he wants when questions are being asked by
17    Mr. Zacca.
18              MS. VIAMONTES:  Will the Court allow me to speak to
19    the witness briefly?
20              THE COURT:  Regarding this issue?
21              MS. VIAMONTES:  Yes.
22              THE COURT:  In open court.
23              MS. VIAMONTES:  C.J., you didn't do anything wrong,
24    you understand that?
25              THE WITNESS:  Yes.
```

```
 1            MS. VIAMONTES:  The judge is letting you know if the
 2  question you think is about Mr. Bigelow, it is not.  Nobody is
 3  trying to confuse you.  You haven't done anything wrong, okay?
 4            THE WITNESS:  Okay.
 5            MS. VIAMONTES:  Thanks, judge.
 6            THE COURT:  All right.  Let's bring in the jury.
 7            (Thereupon, the jury returns to the courtroom.)
 8            THE COURT:  Folks, you all can be seated.
 9            Folks, let me ask you, is it warm in here?  How is the
10  temperature?
11            THE JURORS:  It is comfortable.
12            THE COURT:  That is good.  All of you agree.  That is
13  a good thing.
14            Ms. C.J., let me remind you you are still under oath.
15            We will continue with cross-examination by Mr. Zacca.
16  BY MR. ZACCA:
17  Q.  Ms. C.J., we are talking about --
18            By the way, if I say something that needs to be
19  corrected, correct me.  I will correct the question.
20            If you don't understand something, I will be happy to
21  rephrase it.
22  A.  Okay.
23  Q.  You mentioned when you were 19 years old you did your first
24  inpatient drug treatment, correct?
25  A.  Yes.
```

1  Q.  It didn't work, right?

2  A.  Um-m-m, I stayed sober for six months after I finished that

3  treatment.

4  Q.  At the end of those six months, what happened?

5  A.  Um-m-m, I had relapsed.

6  Q.  What did you relapse with -- what type drug did you relapse

7  with?

8  A.  I relapsed with Percocet.

9  Q.  Any other drug?

10  A.  Heroin.

11  Q.  The same, the same heroin, same type drug that you

12  initially abused prior to that first treatment, correct?

13  A.  Yes.

14  Q.  Any other drug besides Percocet and heroin?

15  A.  I can't remember.

16  Q.  Um-m-m, how long did you abuse Percocet and heroin?

17  A.  I had been using Percocet.  That is what I initially

18  started using when I was younger.

19  Q.  Perhaps my question was inartful.  Let me be more specific.

20       Six months you said you were sober.  You relapsed and

21  you abused Percocet and heroin, and then how long after that

22  did you abuse those drugs prior to entering your second rehab

23  program?

24  A.  I can't remember the exact time.

25       I can't remember how long it was.

1   Q.  Was it a few months, was it another year --

2          MS. VIAMONTES:  Objection, asked and answered, she

3   can't remember.

4          THE COURT:  Sustained.

5   BY MR. ZACCA:

6   Q.  Prior to entering the first treatment, how often did you

7   take heroin?

8   A.  Every day that I could.

9   Q.  How much?

10  A.  Um-m-m, about -- it all depended on how much money I had

11  and I tried to do it every day, but I would at least do one bag

12  of heroin.

13  Q.  One bag of heroin every day?

14  A.  Yes, and more, sometimes, if I had more money.

15  Q.  How often would you do cocaine prior to your first

16  treatment when you were 19?

17  A.  I was using it almost every day.

18  Q.  You are using cocaine and heroin every day?

19  A.  Almost every day.

20  Q.  You already testified about the first treatment.  You

21  stayed sober for six months and then you relapsed, started

22  taking heroin again and this time Percocet, correct?

23  A.  Yes.

24  Q.  Did you take cocaine, as well?

25  A.  Not after the second -- after the first treatment.

1   Q.   During the time period now, after the six months, after the

2   first treatment, how often did you take heroin?

3   A.   Would you please repeat that?

4   Q.   Sure, we are now just --

5           So we are clear here, what time period we are at, six

6   months passed, you testified you were clean after the first

7   treatment?

8   A.   Yes.

9   Q.   Then you started abusing drugs again.  This time Percocet

10  and heroin, correct?

11  A.   Yes.

12  Q.   How often were you taking heroin at this time period?

13  A.   Um-m-m, almost every day.

14  Q.   How often were you taking Percocet?

15  A.   I had only taken -- when I first relapsed, it was with

16  Percocet.  I did that for a day or two and then I just went

17  right to heroin.

18  Q.   How old were you when you did your second drug treatment?

19  A.   I was 20.

20  Q.   What caused you to enter drug treatment for the second

21  time?

22  A.   I wanted to try to get clean again and stop taking heroin.

23  Q.   How long were you in treatment the second time?

24  A.   I was in for 10 days.

25  Q.   Was this inpatient?

1  A.  Yes.

2  Q.  And do you recall when this was, the second treatment, what

3  year, the approximate month?

4  A.  It was, um-m-m, last year, in, um-m-m, March of last year.

5  Q.  Okay.

6       So the second treatment is the treatment you underwent

7  prior to entering the drug recovery center in Boca Raton?

8  A.  I'm sorry, could you please repeat that?

9  Q.  Sure.

10      The second treatment, this 10 days you talked about,

11 you said it was in March 2012, right?

12 A.  Yes.

13 Q.  That was in Vermont, correct?

14 A.  Yes.

15 Q.  And following that is when you went to Boca Raton, correct?

16 A.  Yes.

17 Q.  Now, the seven years when you abused drugs, we went over

18 the drugs, you had a tendency to lie to your parents about your

19 drug use, correct?

20 A.  Yes, I did.

21 Q.  You had a tendency to lie to your friends about your drug

22 use, correct?

23 A.  Yes.

24 Q.  All these drugs that you took for those seven years were

25 drugs that you took by choice, correct?

```
 1   A.   Yes.
 2   Q.   You take responsibility for that, correct?
 3   A.   For using the drugs?
 4   Q.   Yes.
 5   A.   Yes.
 6   Q.   No one forced you to take those drugs, right?
 7   A.   No, I was not forced.
 8   Q.   Is it fair to say that during those seven years you were a
 9   drug addict, correct?
10   A.   Yes.
11   Q.   You enter the drug recovery program on April 16, 2012 in
12   Boca Raton, correct?
13   A.   I don't remember the day that I got there.  I can't
14   remember.
15   Q.   If I were to say that the records show that you entered the
16   program April 16, 2012, do you have any reason to disagree with
17   that?
18   A.   No.
19   Q.   You came to Florida because it was your choice to come to
20   Florida, right?
21   A.   Yes.
22   Q.   You chose that recovery center, right?
23   A.   Yes, I did.
24   Q.   You could have done a program closer to home in Vermont,
25   correct?
```

1  A.  I could have.

2  Q.  You wanted to get away?

3          MS. VIAMONTES:  Excuse me, your Honor.

4          MR. ZACCA:  Bless you.

5          I thought I heard an objection.

6  BY MR. ZACCA:

7  Q.  Ms. C.J., isn't it true that the reason why you chose to

8  come to South Florida is because you wanted to get away from

9  your parents, correct?

10  A.  No, that is not true.

11  Q.  You wanted to get away from your family?

12          MS. VIAMONTES:  Objection, asked and answered.

13          THE COURT:  I think she just answered that.

14          MR. ZACCA:  Very well, I withdraw that question.

15  BY MR. ZACCA:

16  Q.  You agree there are other centers closer to Vermont, were

17  there not?

18  A.  Yes, there are centers all over America.

19  Q.  Now, I believe you testified on direct examination the

20  Bridge -- it was called the Bridge, right?

21  A.  Yes, uh-huh.

22  Q.  That the Bridge was like a halfway house.  I think that is

23  the word you used, is that right?

24  A.  Yes.

25  Q.  You stay at the center and you go to work, right?

```
 1  A.   Yeah.
 2  Q.   And you would work -- if I understood you correctly, you
 3  worked two different jobs, is that right?
 4  A.   Yes, I did.
 5  Q.   By the way, Ms. C.J., so the jury knows, we have never
 6  spoken before, correct?
 7  A.   No.
 8  Q.   This is the first time we are talking about this case,
 9  right?
10  A.   Yes.  Yes.
11  Q.   Now, you were asked to leave the program on May 12, 2012,
12  isn't that right?
13  A.   Yes, yes, that is true.
14  Q.   You were asked to leave the program because you relapsed,
15  correct?
16  A.   Um-m-m, they asked me to do a drug test and I told them
17  that I couldn't do it because I wouldn't pass.
18  Q.   Okay.  I believe you testified on direct examination you
19  wouldn't pass because you were taking the drug Dilaudid,
20  correct?
21  A.   Yes.
22  Q.   How did you get that Dilaudid?
23  A.   I can't even remember.  I got it from -- um-m-m, I can't
24  remember.
25  Q.   Did you buy it with money?
```

1  A.  Yes, I did, yes.

2  Q.  Prior to you entering the first treatment program when you

3  were 19 years old --

4          By the way, was that treatment program in Vermont?

5  A.  Yes, it was.

6  Q.  Okay.  Prior to you entering that treatment program in

7  Vermont, you testified earlier that you took heroin almost

8  every day, correct?

9  A.  I'm sorry, please repeat that.

10          MS. VIAMONTES:  Objection, judge, asked and answered.

11          MR. ZACCA:  I am going to another question.  I am

12  leading up to it.

13          THE COURT:  Overruled.

14  BY MR. ZACCA:

15  Q.  I will repeat the question.

16          You already testified that prior to your first

17  treatment in Vermont, when you were 19 years old, you would

18  take heroin every day leading up to that treatment program,

19  correct?

20  A.  Yes.

21  Q.  How did you acquire those drugs at that time?

22  A.  I would buy them.

23  Q.  Did you do the same thing inbetween the time of your first

24  treatment and second treatment?

25  A.  Yes.

622

1  Q.  You would buy them?

2  A.  Yes.

3  Q.  Were you working?

4  A.  Um-m-m, I had jobs inbetween, inbetween those years.

5  Q.  What type of jobs?

6  A.  I would work -- I worked at movie theaters in town and I

7  waitressed at a pizza shop, a couple pizza shops.  I worked at

8  fast food restaurants, waitressed at Denny's.

9  Q.  Were you spending all the money that you earned from these

10 various jobs on those drugs?

11 A.  Yes.

12 Q.  Every single cent?

13 A.  Almost.

14 Q.  You were asked to leave the Bridge program May 12, 2012,

15 because they asked you to do the drug test and you knew you

16 were going to fail, correct?

17 A.  I don't remember the exact date, but, yes.

18 Q.  How long before that date, the date that you were asked to

19 leave the program, were you taking the drug Dilaudid?

20 A.  Please repeat it.

21 Q.  Sure.  We've established that you started the program on

22 April 16, 2012, the Bridge program?

23 A.  Yes.

24 Q.  According to records, you were discharged May 12, 2012.

25 You have no reason to disbelief that, correct?

```
 1   A.   No.
 2   Q.   Okay.  You leave because you were asked to leave because
 3   you were taking the drug Dilaudid, correct?
 4   A.   Yes.  Yes.
 5   Q.   How long before that date, May 12, 2012, were you taking
 6   the drug Dilaudid?
 7   A.   Um-m-m, I had taken it, it had been approximately like
 8   three days.
 9   Q.   You leave the program.  Correct, you leave the Bridge?
10   A.   Yes, I do.
11   Q.   Okay.  When you left the program, what did you have on --
12   what did you have with you?
13   A.   Um-m-m, I got -- I am trying to remember, because I went
14   back to go grab the rest of my things.
15   Q.   You--
16   A.   I grabbed a bag.
17   Q.   The things that you had with you are the clothes that you
18   brought with you, correct?
19   A.   Yes.
20   Q.   Did you have money with you?
21   A.   Yes, I did.
22   Q.   Did you have your cell phone with you?
23   A.   Yes.
24   Q.   The cell phone number 802-353-1793?
25   A.   Yes.
```

624

1  Q.  The money that you had with you -- how did you get that

2  money?  From working?

3  A.  Yes, for waitressing.

4  Q.  So you had your clothes, you had the money, you had your

5  cell phone, right?

6  A.  Yes.

7  Q.  At that point, did you call your Dad and say, Dad, I need

8  to come home, I got discharged from the program?

9  A.  No, I didn't.

10  Q.  Did you call your Mom and say, Mom, I got discharged from

11  the program, I need to come home?

12  A.  No.

13  Q.  In fact, you chose to stay, correct?

14  A.  Yes.

15  Q.  You didn't want to go home, right?

16  A.  I did not want to go home.

17  Q.  You didn't want to go home because you wanted to continue

18  abusing drugs, correct?

19  A.  No.  I didn't want to go home because I didn't want to

20  disappoint my parents and let them know that I relapsed.

21  Q.  In fact, you lied to your parents telling them that you

22  were still at that program, right?

23  A.  Yes, I did.

24  Q.  You hid the fact that you were discharged, correct?

25         MS. VIAMONTES:  Objection, asked and answered.

```
 1            THE COURT:  Sustained.
 2  BY MR. ZACCA:
 3  Q.  You decided not to go home.  It was your choice.
 4            Where did you go?
 5  A.  I went to go live with a friend from work.
 6  Q.  Who was this friend?
 7            MS. VIAMONTES:  Objection, relevance.
 8            THE COURT:  Sustained.
 9  BY MR. ZACCA:
10  Q.  How long did you live with this friend?
11  A.  Um-m-m, I can't remember the time frame.
12  Q.  Okay.  Ms. C.J., the indictment in this case charges a time
13  period of June 11th to July 1, 2012.  Are you aware of that?
14  A.  Yes, I am.
15  Q.  Okay.  What I want to discuss now with this jury is that
16  time period, the time period between May 12, 2012 to June 11th,
17  2012.
18            We are talking about a month that you are on your own,
19  correct?
20  A.  Yes.
21  Q.  That is the area of questioning I want to talk about.
22            All right?
23  A.  Okay.
24  Q.  You said you went to live with a friend, right?
25  A.  Yes.
```

1  Q.  In fact, you lived with several friends, correct?

2  A.  Yes, that is true.

3  Q.  Different friends, right?

4  A.  Yes.

5  Q.  And during this time, you are living with several --

6         Strike that.

7         Different friends, you are taking drugs, right?

8  A.  Yes.

9  Q.  Tell this jury what drugs are you taking?

10 A.  I was taking Dilaudid.

11 Q.  What else?

12 A.  And I was smoking crack.

13 Q.  Anything else?

14 A.  No.

15 Q.  How often were you taking Dilaudid?

16 A.  Um-m-m, almost every day.

17 Q.  How often were you taking crack?

18 A.  Um-m-m, that only happened like -- I wasn't doing it every

19 day.

20 Q.  Well, understanding that you didn't do it every day, how

21 often were you taking it?

22 A.  Um-m-m, I don't know.  Like, I was doing it for like a

23 week.

24 Q.  Which week, do you remember?

25 A.  No, I do not remember.

```
 1   Q.  Well, let's break it down.

 2           Was it --

 3           MS. VIAMONTES:  Judge, objection, asked and answered.

 4   She doesn't remember.

 5           THE COURT:  Sustained.

 6   BY MR. ZACCA:

 7   Q.  Is there anything that would help refresh your recollection

 8   which week you were taking the crack cocaine?

 9   A.  Um-m-m, no.

10   Q.  Now, you said while you were at the Bridge you had two

11   jobs, correct?

12   A.  Yes.

13   Q.  And you were then asked to leave.  Were you still working

14   at those two jobs?

15   A.  I can't remember when I stopped working at one of the jobs,

16   but I still had my other job.

17   Q.  And what was that other job you had during this period

18   between May 12th and June 11th?

19   A.  I was hostessing.

20   Q.  When did you leave that job?

21   A.  I can't remember.

22   Q.  Okay.  If I were to show you a calendar, would that help

23   you remember when you left that job?

24   A.  No.

25   Q.  There is nothing I could show you or tell you to help you
```

1   remember when you left that job?

2            MS. VIAMONTES:  Objection, asked and answered.

3            MR. ZACCA:  That is a little different question,

4   judge.

5            THE COURT:  Overruled.

6   BY MR. ZACCA:

7   Q.  You can answer.

8   A.  I don't remember what the date was.

9   Q.  You eventually left that job, correct?

10  A.  Yes, I did.

11  Q.  And you had no job with which to earn money once you left

12  that job, right?

13  A.  Correct.

14  Q.  But when you left that job, you still had that addiction,

15  correct?

16  A.  Yes.

17  Q.  You still wanted those drugs, right?

18  A.  Yes.

19  Q.  So, at that point, you started to prostitute yourself for

20  money, correct?

21  A.  No.

22  Q.  How did you then get the money to get drugs?

23  A.  My Dad had wired me money through Western Union and my

24  grandmother mailed me a check, and --

25  Q.  All right.  How much money did your grandmother send you?

1    A.    I can't remember the exact amount.

2    Q.    How much did your Dad wire you?

3    A.    I don't remember.

4    Q.    At some point, that money ran out, correct?

5    A.    Yes.

6    Q.    So, there came a point in time that you still had this

7    addiction, but you had no money, right?

8    A.    Yes.

9    Q.    So you had to resort to something in order to get the drugs

10    you wanted, right?

11    A.    Yes.

12    Q.    And on direct examination you testified that at some point

13    you sold your body for money, correct?

14    A.    I had done it two times.

15    Q.    Two times.

16          Ms. C.J., in relation to the date June 11th, 2012, the

17    date on the indictment, when did you sell yourself for drugs?

18    A.    Um-m-m, I can't remember.  It was -- um-m-m, I don't know.

19    I can't remember.

20    Q.    Is there anything I could say or show you to help you

21    remember?

22    A.    No.

23    Q.    These two occasions, were they spread out over a few days?

24    A.    No.

25    Q.    Can you describe, were they back to back, the same day, two

1  days?

2  A.  One was one day, the next was the next day.

3  Q.  This was at, I believe you testified, the Homing Inn,

4  correct?

5  A.  Yes.

6  Q.  And you did this voluntarily, correct?

7  A.  Um-m-m, yeah, I did.

8  Q.  It was your choice, yes?

9  A.  I --

10          MS. VIAMONTES:  Objection, asked and answered.

11          THE COURT:  Sustained.

12  BY MR. ZACCA:

13  Q.  And the money that you received, you used it to buy drugs,

14  correct?

15  A.  I was given drugs.

16  Q.  So, on these two occasions, you weren't given money, you

17  were given drugs as payment?

18  A.  Yes.

19  Q.  Was that the agreement you struck with the person that you

20  ended up having sex with?

21          MS. VIAMONTES:  Objection, relevance.

22          THE COURT:  Overruled.

23  BY MR. ZACCA:

24  Q.  You can answer.

25  A.  Would you please repeat it?

```
 1   Q.   Sure.   You said you weren't paid money these two occasions,
 2   and to be absolutely clear, these are prior to ever meeting
 3   Mr. Desir or Ms. Rembert, correct?
 4   A.   Yes.
 5   Q.   At the two occasions at the Homing Inn in Boca Raton, when
 6   you had sex with these two individuals in exchange for drugs,
 7   is that the agreement you had with that person prior to having
 8   sex with him?
 9   A.   Yes.
10   Q.   Whose idea was it first for the form of payment?  Was it
11   yours or was it the first one you had sex with?
12   A.   I'm sorry, I don't understand.
13   Q.   I will rephrase the question, perhaps it was a little
14   confusing.  Let me rephrase it.
15            You already told us it was in exchange for drugs that
16   you had the sex with two individuals.
17            Were they two individuals, by the way?
18   A.   Yes, they were.
19   Q.   Was it your idea that the payment would be drugs or was it
20   the person that you had sex with?  Was it that person's idea
21   that the payment would be drugs?
22   A.   It was my idea.
23   Q.   It was your idea.  So, you offered yourself in exchange for
24   drugs?
25            MS. VIAMONTES:  Objection, asked and answered.
```

1          THE COURT:  Sustained.

2     BY MR. ZACCA:

3     Q.  Prior to June 11th, 2012, did there come a point in time

4     that you stayed for approximately a week at a person's who you

5     knew to be a drug dealer?

6          MS. VIAMONTES:  Objection, relevance.

7          MR. ZACCA:  Judge, we can argue sidebar.  I can

8     proffer where this is going.

9          THE COURT:  All right.  Come sidebar.

10         (Sidebar discussion on the record.)

11         MR. ZACCA:  What I can proffer to you, judge,

12    according to the 302, she lived approximately a week at a drug

13    dealer's home prior to meeting Mr. Desir.

14         Again, her choice, her volition.

15         It is relevant because the Government elicited

16    testimony on direct examination, at some point during the three

17    years she was with Mr. Desir, she didn't want to be there any

18    more, didn't want to do anything any more and she was forced to

19    do it.

20         The fact that she lived with a drug dealer, and this

21    case is premised on her doing drugs, Mr. Desir giving her

22    drugs, and the fact that she did it three weeks before meeting

23    Mr. Desir is relevant.

24         THE COURT:  Was she beaten by the drug dealer?

25         MR. ZACCA:  I don't know that.

1        MS. VIAMONTES:  No.  What defense counsel argued

2   propensity and shows a tendency, bad character evidence is

3   offered just to show propensity.

4        I don't believe it is admissible or relevant.

5        THE COURT:  When did this occur?  This one week

6   period, when was it?

7        MR. WILCOX:  Prior -- After she was discharged from

8   the Bridge program and prior to meeting Mr. Desir, and the 302

9   reads that she moved in with her drug dealer.  That is how the

10  302 is written.  She moved in with her drug dealer, judge.

11       THE COURT:  This is within a month of the charged

12  crime?

13       MS. VIAMONTES:  Yes, sir.

14       THE COURT:  I think it does have some relevance in

15  light of the fact that it is close in time to the crime

16  charged.

17       Again, it -- consistent with the Court's ruling on the

18  commercial sex acts that occurred immediately prior to the

19  crimes charged in the indictment, the Court finds that it does

20  bear on the issue of force, coercion or fraud, and its

21  exclusion would violate the Defendants' right of confrontation

22  under the 6th Amendment.

23       I am going to respectfully overrule the objection.

24       You can come back on redirect and say, did the guy

25  beat you?

```
 1        MS. VIAMONTES:  Right, judge.

 2        While we are at sidebar, I will move now defense

 3   counsel not be allowed to ask -- I will move over, the jury is

 4   looking at me -- not to ask if she had consensual sex with the

 5   drug dealer.  That would be violation of Federal Rule of

 6   Evidence 412.  It is not relevant, that doesn't go to show

 7   anything.  Totally irrelevant in this case if she had

 8   consensual sex with the drug dealer.

 9        MR. ZACCA:  That is the heart of the case.

10        MS. VIAMONTES:  The heart of the case is if she had

11   consensual sex?

12        MR. ZACCA:  In exchange for drugs.

13        MR. WILCOX:  In exchange for drugs.

14        THE COURT:  Look, again, I am trying to be consistent

15   and this is something that occurred within one month of the

16   crime charged.

17        The Court is going to overrule the objection.

18        MS. VIAMONTES:  Thank you, your Honor.

19        (After sidebar.)

20   BY MR. ZACCA:

21   Q.  Ms. C.J., before that break, I was asking about, again, to

22   bring us back to where we are at, we are talking about the time

23   period between the time you left the Bridge which is May 12,

24   2012 to June 11th, 2012, right?

25   A.  Yes.
```

1  Q.  Um-m-m, at some point during that time period, you moved in

2  and lived with the person who was giving you drugs, correct?

3  A.  Yes.

4  Q.  And you lived with your drug dealer, right, for about one

5  week, correct?

6  A.  Yes.

7  Q.  During that time period, did you have sex with the person

8  who was giving you drugs?

9  A.  Yes, I did.

10 Q.  And did you have sex in exchange for those drugs?

11 A.  No, I did not.

12 Q.  Well, during that week, was he giving you drugs?

13 A.  Yes, he was.

14 Q.  Were you giving him money in exchange for the drugs that he

15 was giving you?

16 A.  Yes, I was.

17 Q.  Do you recall when this one week period was in relation to

18 June 11th, 2012?

19 A.  No, I do not.

20 Q.  Okay.  At some point, you are at the Homing Inn and you

21 were looking for drugs at the Homing Inn, correct?

22 A.  Yes.

23 Q.  And we are now getting to the period of the time that you

24 met Mr. Desir, okay?

25 A.  Yes.

1  Q.  By the way, the indictment charges June 11th as the

2  beginning date of the conspiracy.  Did you come up with that

3  date?

4  A.  No, I did not.

5  Q.  Did you ever tell the Government that that is when you met

6  Mr. Desir?

7          MS. VIAMONTES:  Objection, judge, relevance.

8          THE COURT:  Sustained.

9  BY MR. ZACCA:

10  Q.  When I say the date June 11th, 2012, does it have any

11  significance in your mind?

12  A.  Yes, it does.  Yes, it does.

13  Q.  What is that significance?

14  A.  I remember Father's Day was in a few days, was coming up.

15  Q.  When was Father's Day in relation --

16          MR. WILCOX:  May I speak with counsel, judge,

17  momentary?

18          MR. ZACCA:  He wants to share with me some piece of

19  information.

20          THE COURT:  Okay.

21          It is just about twelve o'clock.  We are going to go

22  ahead and recess for lunch.

23          We will reconvene at 1:15 p.m.

24          Remember, do not discuss the case.  Don't do any

25  independent research, and continue to keep an open mind.

637

```
 1              (Thereupon, the jury leaves the courtroom.).

 2              THE COURT:  All right.  We are done, off the record.

 3              (Thereupon, a recess was taken 12:00 p.m.)

 4              (Thereupon, trial reconvened 1:15 p.m.)

 5              THE COURT:  The record will reflect that Mr. Desir and

 6   Ms. Rembert are both present represented by the respective

 7   counsel.

 8              If we have all jurors, let's bring them in.

 9              (Thereupon, the jury returns to the courtroom.)

10              THE COURT:  Okay, folks, please continue.

11              Ms. C.J., you are still under oath.  We will continue

12   with cross-examination by Mr. Zacca.

13              MR. ZACCA:  Thank you, judge.

14   BY MR. ZACCA:

15   Q.  Ms. C.J., we last left off where you are at the Homing Inn

16   and, according to your direct testimony, that is when you first

17   met Mr. Desir.

18              Okay?

19   A.  Yes.

20   Q.  I think that is where we last left off.

21              You told this jury on direct examination you were

22   crying and emotional at that time period, correct?

23   A.  Yes.

24   Q.  You were coming off a high, correct?

25   A.  Yes, I was.
```

1  Q.  So you were looking for another high, yes?  You were

2  looking for more drugs?

3  A.  Yeah.

4  Q.  You then testified that you were introduced to Mackenley

5  Desir, is that right?

6  A.  Yes.

7  Q.  Okay.  You asked somebody in the Homing Inn, hey, where can

8  I get some drugs, right?

9  A.  Yes.

10  Q.  And that person said, hold on and you said, at some point,

11  Mackenley Desir showed up at the Homing Inn.  Right?

12  A.  Yes.

13  Q.  You described a car that you went in as a car -- black car

14  with black tinted windows, is that right?

15  A.  Yes.

16  Q.  You described Mr. Desir in there, as well as, another

17  person who you know to be Zoe?

18  A.  Yes.

19  Q.  You get in the car, right?

20  A.  Yes, I do.

21  Q.  No one forced you to get in the car, correct?

22  A.  No, I wasn't forced into the car.

23  Q.  You chose to go into that car, right?

24          MS. VIAMONTES:  Objection, judge, asked and answered.

25          THE COURT:  Sustained.

```
 1  BY MR. ZACCA:

 2  Q.  You go in that car because you are looking to buy some

 3  drugs, correct?

 4  A.  Yes.

 5  Q.  How much money did you have with you at that point?

 6  A.  I had $30.00.

 7  Q.  Okay.  You were looking to buy heroin, right?

 8  A.  No.

 9  Q.  You were looking to buy what?  Dilaudid?

10  A.  I was looking for crack.

11  Q.  How much can $30.00 buy you of crack cocaine?

12  A.  You can get $30.00 worth.

13  Q.  So, you were looking to buy $30.00 worth of crack cocaine?

14  A.  Yes.

15  Q.  How long does that high last for $30.00 worth of crack

16  cocaine?

17  A.  Not very long.  I don't know how long it would last.

18  Q.  Well, you just gave an inconsistent answer.  You said not

19  very long and then you said, I don't know how long it would

20  last.

21          Which is it?

22          MS. VIAMONTES:  Judge, argumentative asked and

23  answered.

24          THE COURT:  Overruled.  Go ahead.

25  BY MR. ZACCA:
```

1   Q.  It doesn't last very long, does it?

2   A.  No, it doesn't.

3   Q.  It is a short high, correct?

4   A.  Yes.

5   Q.  And if $30.00 is all you have and that high only lasts a

6   short time, you have no more money to buy drugs, correct?

7   A.  Please repeat that.

8   Q.  Sure.

9           The high doesn't last that long.  You only had $30.00.

10  You are only looking to buy $30.00 worth of drugs, correct?

11  A.  Yes.

12  Q.  Once those $30.00 are spent, you have no more money,

13  correct?

14  A.  Correct.

15  Q.  So, at that point, in order to get drugs, you have to, as

16  you put it earlier in your direct testimony, have dates,

17  correct?

18          MS. VIAMONTES:  Objection, your Honor.  Misclassifying

19  the evidence.

20          THE COURT:  Sustained.

21  BY MR. ZACCA:

22  Q.  If you have no more money and you want to get drugs, you

23  have to sell yourself, correct?

24          MS. VIAMONTES:  Objection, speculation.

25          THE COURT:  It is a question.  The witness can answer.

```
 1          You can answer.

 2          THE WITNESS:  No, I don't have to sell myself.

 3   BY MR. ZACCA:

 4   Q.  Well, at that point in time, what was your plan to get more

 5   drugs once you spent those $30.00?

 6   A.  I didn't have a plan.  You don't think that far when you

 7   are doing drugs.  You think about the drugs you are doing.

 8   Q.  You get in the car and I think you testified you drive

 9   around, right?

10   A.  Yes.

11   Q.  You end up at the Beach and Town Motel, right?

12   A.  Yes.

13          THE COURT:  Excuse me, somebody has a cell phone or

14   electronic device.  It needs to be powered off, otherwise, it

15   is going to interfere with the audio system.

16          Okay, go ahead.

17   BY MR. ZACCA:

18   Q.  You can answer.

19   A.  Would you repeat the question?

20   Q.  You end up at the Beach and Town Motel, correct?

21   A.  Yes.

22   Q.  When you got to the Beach and Town Motel, you didn't leave,

23   correct?  You didn't leave the location, right?

24   A.  No, I didn't.

25   Q.  You willingly stayed there, correct?
```

642

1    A.   Yes.

2    Q.   You willingly stayed with Mr. Desir, correct?

3         MS. VIAMONTES:  Objection, your Honor.  If we could

4    have a time frame?

5    BY MR. ZACCA:

6    Q.   Fine, I will ask the question.

7         When did you get to the Beach and Town Motel?

8    A.   What are you-- I don't understand.

9    Q.   I will rephrase the question.

10        On what date did you get to the Beach and Town Motel?

11   A.   On June 11th.

12   Q.   June 11th.

13        I asked you before the lunch break the significance of

14   June 11th and you mentioned it sticks out in your mind because

15   of Father's Day, is that right?

16   A.   Yes.

17   Q.   Why does it stick out in your mind?  What is it about

18   Father's Day that makes June 11th significant in your mind?

19   A.   Because I remember it was a few days until Father's Day.

20   Q.   Okay.  Father's Day was June 17th, correct?

21   A.   I thought it was the 15th, but --

22   Q.   Okay.  Did you call your father on --

23        Strike that.

24        Did you call your father on Father's Day?

25   A.   No, I wasn't allowed to.

1  Q.  You weren't allowed to?

2          So, what is it about June 11th, just because of

3  Father's Day, that June 11th causes you to remember that is the

4  date you ended up at the Beach and Town?

5  A.  I don't understand.

6  Q.  Okay.  Father's Day helps you remember that June 11th is

7  the date you arrived at the Beach and Town, right?

8  A.  It gives me, like, a time frame, so I estimated it by phone

9  records.

10  Q.  So --

11          MR. WILCOX:  Your Honor, excuse me.  Can we take

12  judicial notice what date Father's Day was in 2012?  That

13  should be easy to verify.

14          MR. ZACCA:  That is fine, judge.

15          It is June 17th, the date, Father's Day in 2012.

16          MS. VIAMONTES:  The Government will stipulate.

17          THE COURT:  All right.

18          Folks, you are to consider Father's Day in 2012 was

19  June 17th, correct?

20          MR. ZACCA:  June 17th, judge, that is correct.

21          THE COURT:  All right.

22  BY MR. ZACCA:

23  Q.  So, you don't know for sure June 11th was the day you ended

24  up at Beach and Town.  You are estimating, right?

25  A.  At the time I didn't know.

1   Q.   So, you had to look at your phone records to approximate

2   that date?

3   A.   Um-m-m, I don't understand.

4   Q.   Okay.   What makes you estimate that June 11th is the date

5   you ended up at the Beach and Town?

6   A.   I don't know.

7   Q.   Did someone tell you that date?

8   A.   No.

9   Q.   But as you sit here now, you don't know why June 11th is

10  the date that you believe you arrived at the Beach and Town?

11  A.   Would you please repeat that?

12  Q.   As you sit here right now, you don't know why June 11th is

13  the date that you believe you arrived at the Beach and Town?

14  A.   Yes, yes.

15  Q.   Okay.   You arrive at the Beach and Town and, according to

16  your direct testimony, you say that Mr. Desir told you you

17  would be a secretary, is that right?

18  A.   Um-m-m, he didn't exactly say that, he just -- that is what

19  I was guessing.

20  Q.   What caused you to guess that you would be a secretary?

21  A.   Because he said something about answering phones.

22  Q.   Okay.

23  A.   Phone calls.

24  Q.   You arrive at the Beach and Town, where is the first place

25  you go to inside the Beach and Town Motel?

645

```
 1  A.   We went into a downstairs room in the motel.
 2  Q.   Okay.  So you are inside one of the rooms of the Beach and
 3  Town Motel, right?
 4  A.   Yes.
 5  Q.   And it is a regular motel room, right?
 6  A.   Yes.
 7  Q.   One bed, two beds?
 8  A.   I don't remember.
 9  Q.   But there is a land line in there, a land phone?
10  A.   Yes.
11  Q.   You go into the room and he tells you you will be answering
12  phones?
13  A.   Um-m-m, he didn't say at that point what that was.
14  Q.   Ms. C.J., at what point did he say to you that you would be
15  answering phones?
16  A.   I don't remember.
17  Q.   Well, was it the first day that you arrived at the Beach
18  and Town?  Was it the next day?
19  A.   It was the first day.
20  Q.   So, you do remember, it was the first day?
21  A.   It was the first day, yes.
22  Q.   So, he tells you you will be answering phones.
23       Does he tell you why you will be answering phones?
24  A.   No.
25  Q.   Okay.  All right.  But in your mind, you believe you will
```

1  be answering phones because you say you are going to be a

2  secretary?

3  A.  Yes.

4          It is hard -- I was thinking that -- I was thinking

5  that I was going to be answering phones.

6  Q.  Phones for what?

7  A.  I wasn't sure.  For maybe drug calls or something like

8  that.

9  Q.  And it is something that you were willing to do, right?

10  A.  Yes.

11  Q.  So, that is something that --

12          In fact, it wasn't just drug calls.  It was calls for

13  escort services, right?

14  A.  Well, I didn't know that.

15  Q.  Well, at some point you learned that, right?

16  A.  Yes, I did.

17  Q.  In fact, you learned it that same day, did you not?

18  A.  A few hours after I found out.

19  Q.  All right.  So you arrive at the Beach and Town, you--

20          By the way, you agreed to answer phone calls, right?

21  A.  Yes.

22  Q.  You agreed to answer phone calls for drugs, right?  For

23  what you believe were going to be drug sales, right?

24  A.  Yes.

25  Q.  You agreed to answer phone calls a few hours later, what

1  you believe to be calls for escort services?

2  A.  No, I didn't know that part was coming.

3        He told me that Fire answers the phones and that, I

4  don't know.  I am just --

5  Q.  Ms. C.J., you just stated within a few hours of arriving

6  you realized that you will be answering phone calls for escort

7  services, right?  You did state that, did you not?

8  A.  I am not answering the phone calls for escort services and

9  I didn't say that I was going to.

10  Q.  But you knew that same day that that was the reason why the

11  phone would be ringing?

12        MS. VIAMONTES:  Objection, asked and answered.

13        MR. ZACCA:  Judge, it hasn't been.

14        THE COURT:  Overruled.

15        THE WITNESS:  I guess I am not understanding what you

16  are asking me.

17  BY MR. ZACCA:

18  Q.  Okay.  At what point did you learn that prostitution was

19  occurring at the Beach and Town?

20  A.  I don't know.

21  Q.  Was it -- Well, on direct testimony --

22        If I understood you correctly, you remembered it being

23  the first day.  Now you don't remember it being on the first

24  day?

25  A.  I am trying to think back in the time frame, and I am just

1  like -- I am really nervous right now.

2  Q.  Take your time, Ms. C.J..

3          If you need a moment to have some water, take a break,

4  we will do that.

5          Are you ready?

6  A.  Uh-hum, yes.

7  Q.  Ms. C.J., you have already testified that you agreed to

8  answer phones for what you believe to be drug sales, correct?

9  A.  Yes.

10  Q.  At some point, you learned that there would be phone calls

11  for prostitution, correct?

12  A.  Yes, I did.

13  Q.  Did you learn that the first day?

14  A.  Yes.

15  Q.  And you agreed to it, did you not?

16  A.  Um-m-m, I --

17          MS. VIAMONTES:  Objection, vagueness, you agreed to

18  it.

19          MR. ZACCA:  I can rephrase the question.

20          THE COURT:  All right.  Rephrase.

21  BY MR. ZACCA:

22  Q.  And you agreed to answer phone calls for prostitution,

23  solicitation, correct?

24  A.  No.  I wasn't told -- after I found out about the phone

25  calls and the escort service that they were talking to me

1    about, I didn't agree that I was going to be making -- or

2    answering phone calls for that.

3    Q.  Okay.  Did you walk away?  Did you say, no, I am not going

4    to do this and walk away from the hotel?

5    A.  No, I didn't.

6    Q.  You stayed there?

7    A.  I stayed.  That was because I was now in the upstairs part

8    of the hotel and that is when he started telling me the rules.

9    Q.  Okay.

10          MR. ZACCA:  Judge, may I approach the witness?

11          THE COURT:  Yes.

12   BY MR. ZACCA:

13   Q.  Ms. C.J., I am going to show you a series of photographs?

14          THE COURT:  Something is very annoying.

15          MS. JOHANNES:  We don't have our phones, judge.

16          THE COURT:  Maybe we need Ms. Tompkins.  When she

17   hears this, she will figure it out.

18          THE JURORS:  Here she is.

19          THE COURT:  I guess whatever it was, heard you coming.

20          Well, apparently, it is gone.

21          Thank you, Mrs. Tompkins.

22          THE COURTROOM DEPUTY:  You are welcome.

23   BY MR. ZACCA:

24   Q.  Ms. C.J., I am going to show you a series of photographs.

25   I want you to look at it, and I want you to answer questions

1  about it.

2          THE COURT:  What exhibit numbers are these?

3          MR. ZACCA:  Defendant's Exhibit 7, composite

4  photographs.  I think it is missing on the exhibit list.

5          THE COURT:  So, Defendant Desir's Exhibit 7.

6          MR. ZACCA:  Yes, sir, composite exhibit of photographs

7  of a room in the Beach and Town Motel.

8  BY MR. ZACCA:

9  Q.  Have you had a chance to look at those photographs,

10  Ms. C.J.?

11  A.  Yes.

12  Q.  Do you recognize what those photographs show?

13  A.  Yes, the upstairs room.

14  Q.  Is that the upstairs room where you stayed at when you

15  arrived at the Beach and Town?

16  A.  Yes.  That was the second room that I was in.

17  Q.  The second room that you were in?

18          MR. ZACCA:  At this time, judge, defense moves

19  composite Exhibit 7 into evidence.

20          THE COURT:  Any objection?

21          MS. VIAMONTES:  No, judge.

22          THE COURT:  All right.  Defendant Desir's Exhibit 7

23  will be received.

24          [Defense Exhibit  7 received in evidence.]

25          MR. ZACCA:  Judge, may I retrieve the photographs?

```
 1              THE COURT:  Sure.
 2   BY MR. ZACCA:
 3   Q.  Before we show these photographs to the jury --
 4              Judge, may I continue the examination at the elmo?
 5              THE COURT:  Yes.
 6   BY MR. ZACCA:
 7   Q.  Before we show these photographs to the jury, Ms. C.J., I
 8   want to make sure I understand the sequence of events leading
 9   up to this room.  Okay?
10              You said it was the second room, did you not?
11   A.  Yes, I did.
12   Q.  Okay.
13              What was the first room that you went to when you
14   arrived at the Beach and Town?
15   A.  The motel room.
16   Q.  Do you remember the number of the motel room?
17   A.  No, I done.
18   Q.  How long did you stay in that particular room before you
19   went to this room?
20   A.  I'm not sure.  I don't know.
21   Q.  Was it a few hours, a day, a couple days?
22   A.  Um-m-m, a few hours.
23   Q.  Okay.  So, within a few hours, you were then taken to the
24   second room upstairs, right?
25   A.  Yes.
```

1  Q.  Room 32, right?

2  A.  Yes.

3  Q.  This is another photograph of the inside of room 32,

4  correct?

5  A.  Yes, it is.

6  Q.  That is another photograph of room 32 from a different

7  angle, correct?

8  A.  Yes.

9  Q.  And, again, that is your view outside room 32, correct?

10  A.  Yes.

11  Q.  And that is a shot, in that photograph, of the pool at the

12  Beach and Town, correct?

13  A.  Yes.

14  Q.  And that's the door from the inside of room 32, correct?

15  A.  Yes.

16  Q.  Now, you stayed in room 32 up until your arrest on June

17  16th, 2012, correct?

18  A.  Yes.

19  Q.  That is the room you stayed at?

20  A.  That is the room, yes.

21  Q.  Now, I want to point something out.

22       It may not be clearly depicted in this photograph, but

23  there is a land line in this room, correct?

24  A.  Yes, there is.

25  Q.  It is a land line that you could use to call to the outside

```
 1   world, correct?
 2   A.  No.  I tried to use it and you have to pay for the service
 3   for it.
 4   Q.  You know what 911 is, right?
 5   A.  Yes, I do.
 6   Q.  You can use that phone to call 911, can you not?
 7   A.  I could have, yeah.
 8   Q.  I will keep the inside of the room here and I will ask the
 9   next series of questions while that photograph is on the elmo.
10        You within a few hours -- You just testified, within a
11   few hours you were brought to this room, right?
12   A.  Yes.
13   Q.  And you've already testified that, within the first day,
14   you learned that phone calls would be received for
15   prostitution, correct?
16   A.  Yes.
17   Q.  When you were in this room was it that you learned about
18   that?
19   A.  Yes, it was.
20   Q.  And you had no problem with that, correct?
21        MS. VIAMONTES:  Objection, asked and answered.
22        THE COURT:  Sustained.
23   BY MR. ZACCA:
24   Q.  Did you answer any phone calls on that first day, talking
25   about the first day?
```

```
 1   A.  No, I didn't.

 2   Q.  Okay.  You testified that --

 3        Well, did you ever agree to answer any phone calls

 4   when you were in that room, room 32?

 5   A.  Um-m-m, no.

 6   Q.  When you say no, did you tell somebody, no, I don't want to

 7   answer any phone calls?

 8        MS. VIAMONTES:  Objection, asked and answered.

 9        THE COURT:  Overruled.

10   BY MR. ZACCA:

11   Q.  When you say no, that is no in your mind, or did you

12   verbally say that to somebody?

13   A.  They -- When I was talking to Fire on the phone, they

14   didn't tell me that I was going to be answering phone calls,

15   that I was going to be doing that.

16   Q.  Is that the first day?

17   A.  The first day, yeah.

18   Q.  You said you were talking to Fire on the phone.  Which

19   phone were you using to talk to Fire on the phone?

20   A.  Daddy called her on his phone and put me on the phone with

21   her.

22   Q.  This is the first day?

23   A.  Yes.

24   Q.  You took drugs in that room, room 32, correct?

25   A.  Yes, I did.
```

1  Q.  You took Dilaudid?

2  A.  Yes.

3  Q.  You took cocaine?

4  A.  Yes.

5  Q.  And you willingly took it, correct?

6  A.  Yes, I did.

7  Q.  You testified on direct that you were told about dates and

8  clients, correct?

9  A.  Yes.

10  Q.  Dates is having sex with a particular individual, correct?

11  A.  Yes.

12  Q.  Were you told about dates and clients on that particular

13  day when you were first brought up to that room, room 32?

14  A.  Yes.

15  Q.  When you were told about that, you never said, no, I don't

16  want to do that, I am leaving, did you?

17  A.  No, I didn't.

18  Q.  You agreed to it, right?

19  A.  I went along with what was going on.

20  Q.  The name Angel, that was the name you went by?

21  A.  Yes, the name they gave me.

22  Q.  The time period I want to focus on now is the time period

23  between June 10th and June 16th.

24          The reason I pick June 16th, that is the date of your

25  arrest for drugs, correct?

1   A.  Yes, yes, it is.

2   Q.  I want to focus in on that time period.

3        To be absolutely clear for this jury, during this time

4   period, you willingly had dates with men in exchange for drugs,

5   correct?

6   A.  I was going along with it, yes.

7   Q.  Ms. C.J., when you say you are going along with it, what

8   you really mean is you agreed to do it?

9   A.  Ah, yes.

10  Q.  Let's talk about June 16th.  Okay?

11  A.  Okay.

12  Q.  You testified that on June 16th, the date that you were

13  arrested, there was an issue with a particular client, is that

14  right?

15  A.  Yes.

16  Q.  And I think you testified that the client was upset that

17  you cut the time short, right?

18  A.  Yes.

19  Q.  On that particular date, you also testified that it was

20  Mr. Desir who told you to call the police, right?

21  A.  Yes.

22  Q.  At that particular time, you had a phone with you, right?

23  A.  Yes, I did.

24  Q.  Was that your phone, your personal phone that you had prior

25  to meeting Mr. Desir?

```
 1   A.  No, it wasn't his phone.

 2   Q.  It was a phone that worked fine, right?

 3   A.  Yeah.

 4   Q.  Up until that date, you never used that phone to call your

 5   father, right?

 6   A.  I didn't have the phone.

 7   Q.  Okay.  Well, did you make any --

 8            You didn't have the phone?

 9   A.  No.  It was Daddy's phone.

10   Q.  Well, there were times you had a phone with you during that

11   time period, correct?

12   A.  It was on him and he had the phone.

13   Q.  Well, on that particular date, he tells you to call the

14   police, right?

15   A.  Yes.

16   Q.  You dialed 911?

17   A.  Yes.

18   Q.  And the police arrive, correct?

19   A.  The police come.

20   Q.  They arrive to room 32?

21   A.  Yes.  And, um-m-m, the police had come, but Daddy had told

22   me to call the police back and tell them not to come, to say

23   never mind.

24   Q.  First of all, there wasn't a question pending.

25            That is okay, let's talk about that.
```

1          You never said that on direct examination.  All you

2   said was that Mr. Desir told to you call the police and the

3   police arrived, right?

4   A.  Yes.

5   Q.  And now you say that Mr. Desir also told you, no, never

6   mind, after telling you to call the police, is that what you

7   are saying right now?

8   A.  Yes, I am saying that.

9   Q.  Did you just forget to say that during your direct

10  testimony?

11  A.  Yes.

12  Q.  By the way, how many times have you met -- I actually, let

13  me break it down.

14          How many times have you spoken to a Government agent

15  about this case prior to today?

16  A.  I don't know how many times.

17  Q.  It is fair to say, though, it is more than three times,

18  correct?

19  A.  Um-m-m, yes.

20  Q.  And prior to today, you had met with the prosecutors in

21  this case, correct?

22  A.  Yes.

23  Q.  And you discussed your testimony with the prosecutors in

24  this case, correct?

25  A.  Yes, I did.

1  Q.   And it was on more than one occasion that you spoke with

2  the prosecutors in this case, correct?

3  A.   Yes.

4  Q.   And you discussed questions that would be asked of you,

5  correct?

6  A.   Yes.

7  Q.   And you discussed the answers that you would give in

8  response to those questions, correct?

9  A.   We talked about -- I answered questions that they were

10 asking.

11 Q.   The answer is yes, right?

12 A.   Yes.

13 Q.   You testified on direct examination --

14      Let me take a step back.  Two police officers came to

15 room 32, right?

16 A.   Um-m-m, there were three police officers who, when Daddy

17 opened the door, they didn't knock or anything.  We were about

18 to -- Daddy was about to leave or something and the police were

19 right there with their guns.

20 Q.   Mr. Desir --

21      By the way, did the prosecutors tell you to refer to

22 Mr. Desir as Daddy throughout your testimony?

23 A.   No.

24 Q.   Mr. Desir is the one who gave the police permission to

25 search the room, correct?

```
 1  A.  I -- I don't know that.

 2  Q.  Did you not testify to that on direct examination yesterday

 3  afternoon?

 4  A.  No, I didn't.

 5  Q.  It was Officer DeVega of the Hollywood Police Department

 6  that arrived at the room, correct?

 7  A.  Yeah, I had spoken with her.

 8  Q.  It was a female officer, right?

 9  A.  Yes.

10  Q.  And it was an Officer Burrows that arrived at the room,

11  correct?

12  A.  I don't know.

13  Q.  It was a male officer, right?

14  A.  Yes.

15  Q.  The drugs that were found in the room were your drugs,

16  right?

17  A.  I claimed them, yes.

18  Q.  You claimed them but they were yours, were they not?

19  A.  They weren't mine.

20  Q.  None of the drugs in the room were yours, is that your

21  testimony?

22  A.  No --

23          MS. VIAMONTES:  Objection, misstatement --

24          Judge, it is vague.  If we could classify what type

25  drugs.
```

```
 1              THE COURT:  Sustained.  Rephrase your question.
 2              MR. ZACCA:  Sure, judge.
 3   BY MR. ZACCA:
 4   Q.  Were there drugs in the room?
 5   A.  Yes, there was.
 6   Q.  Were there drugs in your purse?
 7   A.  There was a pill in my makeup bag.
 8   Q.  The pill that was in your makeup bag, was that yours?
 9   A.  That was mine, yes.
10   Q.  What was that drug?
11   A.  That was Dilaudid.
12   Q.  You claimed ownership of that drug, correct?
13   A.  Yes, I did.
14   Q.  Was there also crack cocaine in your makeup bag?
15   A.  No, there wasn't.
16   Q.  Is it your testimony that the other drugs found in the room
17   was not your drugs -- were not your drugs?
18   A.  Would you rephrase that, please?
19   Q.  Sure.  Is it your testimony the other drugs found in that
20   room, room 32, they were not your drugs?
21   A.  The crack wasn't mine.
22   Q.  Now, at that point, the police officers arrested you,
23   correct?
24   A.  Yes.
25   Q.  You said three officers, right?
```

1    A.  Yes.

2    Q.  We named two of them by name, Officer DeVega, a female

3    officer, and Officer Burrows?

4    A.  Yes.

5    Q.  And, at some point they took you to your police car, right?

6    A.  Yes.

7    Q.  Okay.  And they took you to the police station, right?

8    A.  Yes.

9    Q.  And they, for lack of a better word, booked you, arrested

10   you, right?

11   A.  Yes.

12   Q.  At no time, did you tell these officers, I am being held

13   against my will, correct?

14   A.  No, I didn't.

15   Q.  I am being forced to do things that I don't want to do, you

16   didn't say that, did you?

17   A.  I didn't say that.  I was also afraid to.

18   Q.  Well, what is clear, though, that according to your own

19   testimony, up until June 16th, you agreed to have sex, correct?

20   A.  I --

21   Q.  In exchange for drugs?

22   A.  I was agreeing with it but it is not something I wanted to

23   do, and I felt like I couldn't leave.

24   Q.  Ms. C.J., it is absolutely clear you wanted drugs, right?

25   A.  Yes, I wanted drugs.

```
 1  Q.  It was your decision and your choice to take drugs,

 2  correct?

 3  A.  Um-m-m, yes.

 4  Q.  When you were arrested, you had a phone with you, did you

 5  not?

 6  A.  I don't remember.

 7  Q.  You don't remember having a cell phone with you when you

 8  were arrested?

 9  A.  No, I don't.

10  Q.  If I showed you a form that you signed --

11          MS. VIAMONTES:  Objection, hearsay.

12          MR. ZACCA:  I am asking.  She doesn't remember, I am

13  trying to refresh her recollection.

14          THE COURT:  Overruled.

15          MR. ZACCA:  Okay.

16  BY MR. ZACCA:

17  Q.  If I showed you the Broward Sheriff's Office inmate

18  property declaration form with your signature about the

19  property that was with you when you were arrested, would that

20  help you remember if you had a cell phone with you when you

21  were arrested that day?

22  A.  No.

23  Q.  It wouldn't?

24  A.  No.  I don't remember.

25          MR. WILCOX:  May I have a moment?
```

```
 1              MR. ZACCA:  I will come to you.  I will come to you.

 2              Judge, I am going to mark this document as Government

 3    Exhibit 8 -- I am going to show it to the defense, to the

 4    Government.  I will ask a couple followup questions.

 5              THE COURT:  She said the document didn't refresh her

 6    recollection.  How can you go any further?

 7              MR. ZACCA:  I am going to ask her to authenticate a

 8    signature.  That is it.

 9              THE COURT:  All right.  That is permissible.

10              What exhibit number is that?

11              MR. ZACCA:  Government Exhibit 8 -- excuse me, Defense

12    Exhibit.

13              THE COURT:  All right.  Desir Exhibit 8.

14              MR. ZACCA:  May I approach the witness, your Honor?

15              THE COURT:  You may.

16    BY MR. ZACCA:

17    Q.  Ms. C.J., I am going to show you this document that is

18    marked as Defendant Desir's Exhibit 8.

19              Do you see your signature here on the bottom of the

20    document?

21    A.  Yes, I do.  Yes, I do.

22    Q.  I am going to ask you to turn the page over, please, the

23    first page over.  That is right.

24              Do you see your signature there on page two?

25    A.  Yes.
```

```
1        MR. ZACCA:  Judge, if I could have a moment?
2   BY MR. ZACCA:
3   Q.  Ms. C.J., before I go back, if you could look at the entire
4   document for a second.
5        MS. VIAMONTES:  Objection, your Honor.
6        MR. ZACCA:  Judge, I haven't even asked the next
7   question.
8        MS. VIAMONTES:  It is a hearsay document.  There is no
9   reason for her to be looking at it.
10       THE COURT:  She identified her signature.  She said
11  the document does not refresh her recollection.  I am not sure
12  where else you could go with the document.
13       MR. ZACCA:  Very well, judge.
14  BY MR. ZACCA:
15  Q.  Now, you were arrested on June 16, 2012.  You didn't get
16  out of jail until June 19, 2012, isn't that right?
17  A.  Um-m-m, I'm not sure of the date that I got out.
18  Q.  Okay.  Let me ask it this way, then.
19       Were you in jail for approximately three days before
20  you were bonded out?
21  A.  Um-m-m, I don't know.
22  Q.  You testified that while in jail, you attempted to call
23  your father, and I believe you said you ended up speaking with
24  your father's girlfriend, is that right?
25  A.  Yes.
```

```
 1   Q.  But the conversation was cut short?

 2   A.  It was 30 seconds long.

 3   Q.  Afterward, you didn't attempt to call your Mom, did you?

 4   A.  No, I didn't.

 5   Q.  You didn't attempt to call a friend, did you?

 6   A.  No, I didn't know anyone else that would come and bail me

 7   out.

 8   Q.  Well, at some point, you called your ex-boyfriend Nick

 9   Young, right?

10   A.  I did.

11   Q.  You didn't choose to call him at that particular moment,

12   did you?

13   A.  No.  He wouldn't have been able to bail me out.

14   Q.  Did you at least try?

15          MS. VIAMONTES:  Objection, asked and answered.

16          THE COURT:  She said she didn't call.

17   BY MR. ZACCA:

18   Q.  The next person you called is Mr. Desir, correct?

19   A.  Yes.

20   Q.  And you asked him to bond you out, right?

21   A.  No.  I asked him what was going on, and he said that he was

22   getting it taken care of.

23   Q.  Well, you didn't want to stay in jail, did you?

24   A.  No, I didn't.

25   Q.  You chose to call him, correct?
```

```
 1   A.  Yes.

 2   Q.  You eventually bonded out, right?

 3   A.  Yes.

 4   Q.  And did he pick you up at the jail?

 5   A.  Yeah, he picked me up.  You have to, like, walk a little

 6   ways, but --

 7   Q.  You chose to go into the car with him, correct?

 8   A.  Yeah.

 9   Q.  And you left with him, right?

10   A.  I did.

11   Q.  And you went back to the Beach and Town, correct?

12   A.  Um-m-m, yes, and then we -- and then he moved me over to

13   the house, the efficiency.

14   Q.  The reason why you agreed to go back --

15          Strike that.

16          The reason why you agreed to go with Mr. Desir back to

17   the Beach and Town is because you wanted more drugs, correct?

18   A.  No.

19   Q.  Well, you were still taking drugs even after that arrest on

20   June 16th, correct?

21   A.  Yes, I was.

22   Q.  All right.  Let's talk about that room.

23          Ms. C.J., right now I would like to ask you some

24   questions about exhibits, I think, 10 through 17.  It is the

25   photographs of this room.  Okay?
```

```
 1  A.  Okay.

 2          THE COURT:  You said 10 through 17?

 3          I don't believe the Government offered 16 and 17.

 4          I don't know if the Government intended to offer those

 5  or not.

 6          MS. VIAMONTES:  Correct, judge, the Government did

 7  not.

 8          MR. ZACCA:  Just so, judge, I do not want to publish a

 9  photograph that is not in.

10          THE COURT:  16 and 17 were never offered.  I believe

11  they were shown to the witness but the Government never offered

12  those.

13          MS. VIAMONTES:  That is correct, your Honor.

14          MR. ZACCA:  Okay.

15  BY MR. ZACCA:

16  Q.  This is Government Exhibit 10 which you were asked

17  questions about on direct examination.  You recognize that

18  photograph, right?

19  A.  Yes, I do.

20  Q.  Now, it was your testimony that that is an apartment --

21          Well, I might have misunderstood you.  What was the

22  significance of this apartment, this photograph?

23  A.  That is the picture of the front of the house.

24  Q.  Of the house?

25          Did you stay in this house?
```

1  A.   Some nights I stayed in there, one or two nights.

2  Q.   So, sometimes you stayed at the house, and sometimes you

3  stayed at the efficiency attached to the house, correct?

4  A.   That is where I was.

5  Q.   And the efficiency would be here (indicating)?

6  A.   Yes.

7  Q.   Here is another photograph, Government Exhibit 11.  We can

8  see it.

9        Is that the door to the efficiency?

10 A.   Yes.

11 Q.   And this would be the efficiency, correct?

12 A.   Yes.

13 Q.   So, sometimes you stayed here, and sometimes you stayed

14 here, correct (indicating)?

15 A.   I was mostly in the efficiency, and there is only one or

16 two nights I stayed in the other house, but, yes.

17 Q.   Now, Government Exhibit 14 is a photograph you were shown.

18        This is a door that separates the efficiency from the

19 apartment, is that your testimony?

20 A.   Yes.

21 Q.   Now, the only difference is you said back then there was a

22 deadbolt there, right?

23 A.   Yes.

24 Q.   Wasn't that deadbolt there to keep the room separated from

25 the -- the apartment from the efficiency?

1   A.   Yes.

2   Q.   Could you walk freely through that door?

3   A.   No.

4   Q.   Isn't it a fact that you walked freely through that door?

5   A.   Ah --

6          MS. VIAMONTES:  Objection, asked and answered.

7          THE COURT:  Sustained.

8          MR. ZACCA:  Judge, may I approach the witness?

9          THE COURT:  Yes, sir.

10  BY MR. ZACCA:

11  Q.   Showing you a photograph marked Government Exhibit 17.

12         Do you recognize what that photograph depicts.

13  A.   Yes.

14  Q.   What does that photograph depict?

15  A.   The outside door.

16  Q.   To what?

17  A.   To the efficiency.

18  Q.   To the efficiency?

19         That is a fair and accurate depiction of the outside

20  door to the efficiency?

21  A.   Yes.

22         MR. ZACCA:  Defense moves Government 17 into evidence.

23         THE COURT:  Any objection?

24         MS. VIAMONTES:  Your Honor, could we go sidebar?

25         THE COURT:  Just requires a yes or no.

1    MS. VIAMONTES:  Yes, your Honor.

2    THE COURT:  To give me the grounds for the objection,

3    you need sidebar?

4    MS. VIAMONTES:  Yes.

5    THE COURT:  All right.  Sidebar.

6    (Sidebar discussion on the record.)

7    THE COURT:  This is rather unusual, the Government

8    objecting to one of its own exhibits.

9    MS. VIAMONTES:  I think it is unusual for defense

10   counsel to try to be moving in my exhibits in my case in chief.

11   They have the opportunity in their case in chief --

12   THE COURT:  Is your objection based just on procedure

13   or is there a substantive reason?

14   MS. VIAMONTES:  It is based on procedure.

15   THE COURT:  Then I will overrule the objection.  You

16   know if he waits to put it in on his side then he doesn't have

17   access to the witness.

18   So it makes sense to let him do it now.

19   (After sidebar.)

20   THE COURT:  All right.  Government Exhibit 17 will be

21   received in evidence.

22   MR. ZACCA:  All right.

23   [Government Exhibit 17 received in evidence.]

24   MR. ZACCA:  With permission of the Court, I would like

25   to publish the photograph.

1       THE COURT:  You may do so.

2  BY MR. ZACCA:

3  Q.  Thank you.

4       Just to provide context here, this is the exterior

5  door to the efficiency which can be seen here in Government

6  Exhibit 11, right?

7  A.  Yes.

8  Q.  Okay.  You had free access to go in and out of that door,

9  right?

10      MS. VIAMONTES:  Objection, asked and answered.

11      MR. ZACCA:  I haven't asked that.

12      MS. VIAMONTES:  I apologize.  I withdraw the

13  objection.  It was the other door.

14 BY MR. ZACCA:

15 Q.  You can answer that question.

16 A.  No.

17 Q.  Was there some type physical restraint on you from walking

18 out that door?

19 A.  No.

20 Q.  So you could walk out that door, right?

21 A.  Physically, I could have walked out the door but I was told

22 that I couldn't, and that there is security all around where I

23 was.

24 Q.  You know, you mention this security that you believe was

25 around.  It's fair to say that you don't remember much of this

1  three week time period between June 11th and July first, isn't

2  that fair to say?

3  A.  Um-m-m, I mean, I don't remember some things, but --

4  Q.  Wouldn't you agree that much of your experience was a blur?

5  A.  Um-m-m, yeah.

6  Q.  Now, you get back, you bonded out, you are now placed in

7  the efficiency, the door which we see right there, correct?

8  A.  Yes.

9  Q.  And yesterday, in your direct testimony, you testified that

10 this is the point in time that -- I wrote down, I believe, what

11 you said, you didn't want to do it any more.

12         Is that what you said yesterday?

13 A.  Yeah, I said that.

14 Q.  When you say you did not want to do it any more, what you

15 are referencing is prostituting yourself, correct?

16 A.  No.  What I meant was I don't want to be, um-m-m -- I don't

17 want to be where I was and be with Daddy and want to prostitute

18 any more.

19 Q.  You didn't want to be with Mr. Desir, right?  And you

20 didn't want to prostitute yourself any more, correct?

21 A.  Correct.

22 Q.  You had sex with Mr. Desir on several occasions correct?

23 A.  Yes.

24 Q.  Consensual sex, correct?

25 A.  Yes.

```
 1            MR. WILCOX:  I didn't hear the answer, judge.
 2  BY MR. ZACCA:
 3  Q.  Correct?
 4  A.  Yes.
 5  Q.  And the sex you had with Mr. Desir -- the consensual sex
 6  you had with Mr. Desir spanned those three weeks, did they not?
 7  A.  Would you please rephrase that?
 8  Q.  Sure.  You had sex with Mr. Desir on several occasions,
 9  correct?
10  A.  Two times, yes.
11  Q.  Wasn't it more than two times?
12  A.  No, it was not more.
13  Q.  It wasn't more?
14  A.  No.
15  Q.  Was it two times before June 16th or after June 16th?
16  A.  There was once before June 16th and once after.
17  Q.  And the time that you had sex with Mr. Desir afterward, it
18  was consensual sex, was it not?
19  A.  Both times were.
20  Q.  The second time, you said it was after June 16th.  Was it
21  after the 22nd, the date of your arrest for prostitution?
22  A.  No, it was before.
23  Q.  It was inbetween June 16th and June 22nd?
24  A.  Um-m-m, I'm sorry, actually, no, it was after the 22nd.
25  Q.  So you had, the second time, just to clarify, the second
```

675

1  time you had consensual sex with Mr. Desir was after June 22nd?

2  A.  Yes.

3  Q.  So you wanted to stay with Mr. Desir even after your arrest

4  for drugs?

5           MS. VIAMONTES:  Objection, asked and answered.

6           THE COURT:  Overruled.

7           THE WITNESS:  Would you please repeat that?

8  BY MR. ZACCA:

9  Q.  Sure.

10          So you wanted to stay with Mr. Desir even after your

11 arrest for drugs on June 16th?

12 A.  I did not want to.

13 Q.  You had sex with him after June 22nd?

14          MS. VIAMONTES:  Objection, asked and answered.

15          THE COURT:  This is cross-examination.  Certain degree

16 of latitude must be accorded.

17          Overruled.

18 BY MR. ZACCA:

19 Q.  I will repeat the question.

20          MR. ZACCA:  Judge, I want to take a step back, I lost

21 my train of thought.

22 BY MR. ZACCA:

23 Q.  You wanted to stay with Mr. Desir even after your arrest on

24 June 16th for drugs, correct?

25 A.  No, I did not want to.

1   Q.   Okay, but you willingly had sex with him even after your

2   arrest on June 22nd, isn't that right?

3           MS. VIAMONTES:   Judge, asked and answered.

4           THE COURT:   That was the question that was objected to

5   and that is the question I overruled the objection.

6           MR. ZACCA:   Correct.

7           THE WITNESS:   Please repeat.

8   BY MR. ZACCA:

9   Q.   Okay.   You say you didn't want to be with him after June

10  16th, yet, you had consensual sex with him after June 22nd,

11  correct?

12  A.   I agreed to have sex, yeah.

13  Q.   You agreed to have sex --

14  A.   I didn't want to.

15  Q.   Well, you agreed -- He didn't force himself on you, right?

16  A.   No.

17  Q.   So you wanted to be with him, right?

18  A.   No, I didn't want to be with him.

19  Q.   You wanted to be with him because you wanted the drugs?

20  A.   No, I didn't the want to be with him.

21  Q.   You enjoyed being with him, didn't you?

22  A.   No.

23          MR. WILCOX:   Your Honor, I need a break.

24          THE COURT:   Right now?

25          MR. WILCOX:   I would appreciate it.

```
 1              THE COURT:  All right.  Folks, we will take a 10
 2   minute break now and then we will take another one later.
 3              Our afternoon today is longer.
 4              10 minutes, don't discuss the case.
 5              (Thereupon, the jury leaves the courtroom.).
 6              (Thereupon, a short recess was taken.).
 7              THE COURT:  All right.  Feel better, Mr. Wilcox?
 8              MR. WILCOX:  Yes, your Honor.
 9              THE COURT:  Good.
10              The record will reflect that both defendants are
11   present represented by counsel.
12              Let's bring in the jury, please, and the witness.
13              (Thereupon, the jury returns to the courtroom.)
14              THE COURT:  All right.  Please be seated.
15              Ms. C.J., let me remind you you are still under oath
16   and we will continue with cross-examination by Mr. Zacca.
17              MR. ZACCA:  Thank you, judge.
18   BY MR. ZACCA:
19   Q.  Thank you, judge.
20              You were at the point after you were bonded out, just
21   to bring us back after the break, were at the point after you
22   bonded out of jail, Mr. Desir bonded you out of jail, and you
23   are back at the efficiency.
24   A.  Yes.
25   Q.  Now, you talked about --
```

1          You stated on direct examination that Mr. Desir told

2   you that, if you leave, he could legally come after you.  He

3   said something to that effect, right?

4   A.  Yes.

5   Q.  You also stated that he could kill you, right?

6   A.  Yes.

7   Q.  Well, isn't it a fact that what was stated was you were out

8   on bond and you had to show up for court for this felony

9   arrest?

10  A.  Yes.

11  Q.  If you left, he is responsible because he is the one who

12  bonded you out?

13  A.  Yes.

14  Q.  Nothing more than that, correct?

15  A.  I'm sorry, would you repeat that?

16  Q.  He never threatened to kill you.  He just told you he was

17  responsible for you, correct?

18  A.  He said he could legally kill me.

19  Q.  Is that what you believe he said?

20  A.  No.  That is what he said.

21  Q.  Is that something you remember in the foggy state you were

22  in?

23  A.  Yes.

24  Q.  I asked you earlier if you recall you were bonded out on

25  June 19th, you don't recall, but how long a period do you

1   remember that you stayed at that efficiency between the time

2   you got out of jail from your first arrest to the point in time

3   that you were arrested for prostitution?  How many days was

4   that?

5   A.   I'm sorry, could you please rephrase that?

6   Q.   Sure.  How many days passed between the time you were

7   bonded out and the time you were arrested for prostitution?

8   A.   I am not understanding.  I am not understanding your

9   question.

10  Q.   Okay.  I will break it down.

11       You were bonded out, right?

12  A.   Yes.

13  Q.   Okay.  You don't remember the date that you were bonded

14  out, correct?

15  A.   Right.

16  Q.   But you spent at least a couple days in jail, correct?

17  A.   Yes.

18  Q.   All right.  At some point, you got to the efficiency, the

19  apartment, correct?

20  A.   Yes.

21  Q.   And, at some point after that, you were arrested for

22  prostitution, correct?

23  A.   Yes.

24  Q.   Okay.  How many days passed between the point in time

25  before you got to the efficiency attached to the apartment

1  until the time you got arrested?  Two days, three days, a few

2  days?

3  A.  I don't remember.

4  Q.  During that time period, you continued to take drugs,

5  correct?

6  A.  Yes.

7  Q.  You willingly took drugs, correct?

8  A.  Yes.

9  Q.  And you willingly took drugs and the payment that you made

10  to take those drugs is that you had more dates, correct?

11  A.  Yes.

12  Q.  And that is something that you chose to do, correct?

13         MS. VIAMONTES:  Objection, vague, compound question.

14         THE COURT:  Overruled.

15  BY MR. ZACCA:

16  Q.  You can answer.

17  A.  Would you repeat it, please?

18  Q.  Sure.  You chose to have dates in exchange for payment of

19  the drugs that you were taking, correct?

20  A.  I did not choose to do that.  I didn't want to do that.

21  Q.  But you wanted the drugs, you stated that?

22  A.  Yes, I did.

23  Q.  And the way to pay for those drugs is to have sex with

24  these men, correct?

25  A.  Yes.

1    Q.   June 22nd, 2012, you describe to this jury as an out call,

2    correct?

3    A.   Yes.

4    Q.   An out call is something where you go to a location to have

5    a date instead of the Beach and Town Motel, correct?

6    A.   Right.

7    Q.   And, in this case, you went to the Hampton Inn Fort

8    Lauderdale, correct?

9    A.   Yes.

10   Q.   You got in the car with Mr. Desir and he took you to the

11   Hampton Inn, correct?

12   A.   Yes, he did.

13   Q.   You willingly got in the car to go to the Hampton Inn,

14   correct?

15   A.   Yes.

16   Q.   And you willingly got out of the car to go to the room

17   where you were supposed to meet your date, correct?

18   A.   I was doing what I was told to do, yeah.

19   Q.   Ma'am, you were doing what you wanted to do, correct?

20   A.   I didn't want to do it.

21   Q.   But you chose to do it, correct?

22   A.   I didn't choose to do it, either.  I was being told to

23   do -- It was what I was being told to do.

24   Q.   Where was the room in the Hampton Inn, first floor, second

25   floor, third floor?

1    A.   It was up a few floors.

2    Q.   What room was it, do you remember?

3    A.   I have no idea.

4    Q.   You walked into the hotel room by yourself --

5              Strike that.

6              You walked into the hotel by yourself?

7    A.   Yes.

8    Q.   At no point did you turn back and run away?

9    A.   No.

10   Q.   You went to the elevator and pushed that button, right?

11   A.   Yeah.

12   Q.   And you got in that elevator, right?

13   A.   Yes, I did.

14   Q.   And you went into that room, right?

15   A.   Yes.

16   Q.   And you knocked on the door?

17   A.   He came down to the lobby to get me and then we went up to

18   the room.

19   Q.   It is your testimony that Mr. Desir was standing right next

20   to you as you knocked on the door?

21   A.   No.  The client came down to the lobby and got me and then

22   we went up to the room.

23   Q.   You willingly went up to that room, correct?

24   A.   Again, I was just doing what I was told to do.

25   Q.   You were doing what you chose to do?

683

```
 1              MS. VIAMONTES:  Objection, judge, asked and answered.
 2              THE COURT:  Sustained.
 3   BY MR. ZACCA:
 4   Q.  You go to the room and you are about to have a date with
 5   this gentleman, correct?
 6   A.  Yes.
 7   Q.  But it was no ordinary gentleman.  This time it was a
 8   police officer, correct?
 9   A.  Yes.
10   Q.  And it wasn't just one police officer, it was several
11   police officers on the scene, correct?
12   A.  Yes.
13   Q.  Detective Freely was one of them, correct?
14   A.  I am not sure of the names.
15   Q.  It was a female, Broward Sheriff's Detective, correct?
16   A.  I don't understand.
17   Q.  Okay, I will repeat.
18         One of the officers that appeared in the room was a
19   detective with the Broward Sheriff's Office, isn't that right?
20   A.  Yes.
21   Q.  And it was a female detective, isn't that true?
22   A.  Yes.
23   Q.  Her name was Detective Freely, correct?
24   A.  I am not sure of the name.
25   Q.  There was another Broward Sheriff's Officer there, and his
```

1  name was Detective Schultz, isn't that right?

2  A.  I am not sure of the name.

3  Q.  But it wasn't just Broward Sheriff's Officers present

4  there, there were FBI agents there, correct?

5  A.  Yes.

6  Q.  And these FBI agents, there were two agents, correct?

7  A.  I remember one.

8  Q.  You remember one agent?

9  A.  Yes.

10  Q.  This person identified himself to you, right?

11  A.  Yes, he did.

12  Q.  You answered my question, was it female or male?  It was a

13  male FBI agent?

14  A.  Yes.

15  Q.  He showed you his identification, right?

16  A.  Yeah.

17  Q.  Told you what he was there for, right?

18  A.  Yes.

19  Q.  He was there because they were doing an undercover

20  operation, or a sting operation as you testified to, right?

21  A.  Yes.

22  Q.  For under age girls being exploited, correct?

23  A.  Yes.

24  Q.  He explained that to you, right?

25  A.  Yes, he did.

```
 1  Q.  And you spoke to him for hours, did you not?

 2  A.  I did not.

 3  Q.  Did you speak to the police for hours?

 4  A.  I was sitting in the room for awhile.

 5  Q.  Did you ever --

 6          Let me ask it this way:  Did you speak with the police

 7  for a few hours?

 8          MS. VIAMONTES:  Objection, asked and answered.

 9          MR. ZACCA:  That is a different question, judge.

10          THE COURT:  Overruled.

11          THE WITNESS:  Repeat, please.

12  BY MR. ZACCA:

13  Q.  Did you speak to the police for a few hours?

14  A.  I sat in the room and they weren't speaking to me the whole

15  time for hours, but there was a couple conversations.

16  Q.  So, are you saying now you did not speak to them for a few

17  hours?

18  A.  Yes.

19  Q.  Okay.  Earlier I asked you if you had met with the

20  Government prior to your testimony today, correct?

21  A.  Yes.

22  Q.  And some of those sessions included meetings and interviews

23  with the FBI, correct?

24  A.  Yes.

25  Q.  One of those interviews took place on July 20, 2012,
```

1   correct?

2   A.   I'm not sure of the dates.

3   Q.   Well, one of them was with Agent Susan Funk Romash, present

4   in the courtroom, right?

5   A.   Yes.

6   Q.   You have spoken with her a few times, right?

7   A.   Yes, I have.

8   Q.   And isn't it true --

9           MS. VIAMONTES:  Objection, improper impeachment.

10          MR. ZACCA:  I haven't asked the question.

11          MR. WILCOX:  Sure hasn't.

12          THE COURT:  Let's have the question.

13   BY MR. ZACCA:

14   Q.   Isn't it true when you met with Agent Susan Funk Romash,

15   that you told her that --

16          MS. VIAMONTES:  Objection, improper impeachment.

17          MR. ZACCA:  Judge, she denied it.  I am trying to

18   complete the --

19          THE COURT:  Overruled.

20   BY MR. ZACCA:

21   Q.   Isn't it true when you met with Agent Susan Funk Romash,

22   that you told her that you spoke with the police for a few

23   hours?

24   A.   Um-m-m, I don't remember.

25   Q.   If I showed you the report of that interview with Agent

1  Susan Funk Romash, would it help refresh your recollection as

2  to whether you said that to her back on July 19, 2012?

3  A.   May help.

4           MR. ZACCA:   Okay.   Judge, may I approach the witness?

5           THE COURT:   You may.

6           MR. ZACCA:   Thank you.

7  BY MR. ZACCA:

8  Q.   It is a five page report.   Read the first paragraph on the

9  top.   When you are done, let me know and I will ask you the

10  question again.

11  A.   All right.   Okay.

12  Q.   Does that refresh your recollection as to you telling Agent

13  Funk Romash that you spoke to the police for a few hours?

14  A.   Yes.

15  Q.   So, in fact, you did speak to them for a few hours?

16  A.   I was sitting in the room with them for a few hours.   I

17  wasn't speaking to them the whole time.

18  Q.   The FBI at that point in time asked you whether you were

19  being forced to prostitute yourself, isn't that true?

20  A.   Um-m-m, I --

21           MS. VIAMONTES:   Judge, objection, vagueness, at that

22  point in time.   I don't know if it is the interview he is

23  referring to.

24           THE COURT:   What point in time?

25           MR. ZACCA:   Very well, judge.   I will rephrase the

1  question to clarify it.

2  BY MR. ZACCA:

3  Q.  When the --

4         Let me back up.

5         Let me back up.

6         I mentioned Detective Freely and Detective Burrows of

7  the Broward Sheriff's Office.

8         Did any officer from the Broward Sheriff's Office

9  interview you?

10  A.  I don't remember.

11  Q.  Okay.

12  A.  I mean, I just remember talking to them, I don't remember

13  it being like an interview.

14  Q.  Okay.  And apart from speaking to those officers from the

15  Broward Sheriff's Office, did you speak to any FBI agents,

16  separate and apart from them?

17  A.  The FBI agent sat in front of me and the officers were

18  behind him, not paying attention.

19  Q.  You were asked during that time that you were speaking to

20  the FBI agents, you were specifically asked whether at any

21  point in time were you being forced to prostitute yourself,

22  isn't that true?

23  A.  I don't remember them asking that.

24  Q.  At any point in time, did you tell the FBI agents that you

25  were in a situation that you did not want to be in?

1  A.  I did not.

2  Q.  You would agree with me that, if there was ever a time to

3  walk out of a situation that you did not want to be in, that

4  was the time?

5  A.  Thinking back on it now, that would have been the perfect

6  time; but, at the time that it was happening, that is not how I

7  felt.

8  Q.  And, that is precisely it, Ms. C.J., the reason why you

9  never said it is because you wanted to be in that situation.

10  You wanted to be with Mr. Desir, isn't that true?

11  A.  No, it is not true.

12  Q.  Ms. C.J. --

13  A.  I felt like I had no other choice --

14      I am sorry.  I felt like I had no other choice.

15  Q.  You did have a choice.  You could have told the FBI agent

16  that was speaking to you I am in a situation I don't want to be

17  in, help me, get me out of there.

18      You never did, did you?

19      MS. VIAMONTES:  Objection, asked and answered, judge.

20      THE COURT:  Sustained.

21  BY MR. ZACCA:

22  Q.  You were arrested that night, correct?

23  A.  Yes, I was.

24  Q.  Who took you to the jail?

25  A.  Um-m-m, I don't know who took me.

```
 1   Q.  I will rephrase the question.  Let me be a little more
 2   specific.
 3          Was it the FBI agent that spoke to you that took you
 4   to the jail?
 5   A.  No.
 6   Q.  It was another -- it was a police officer, correct?
 7   A.  I, I -- It was a van that I was put into.  I was put into
 8   the back of an officer van.  I am not sure what kind of van it
 9   was.
10   Q.  But it was the police that took you to the jail, correct?
11   A.  Yes.
12   Q.  At any point in time, in the ride to the jail, did you tell
13   the police officer that was taking you to the jail that you
14   were in a situation you did not want to be in?
15   A.  No.
16   Q.  You get to the jail and you are booked, correct?
17   A.  Yes.
18   Q.  How long were you in jail after you were arrested for
19   prostitution?
20   A.  I think I was in jail for two days.  It felt like --
21   Q.  You think it was two days?
22   A.  Yes, yeah.
23   Q.  This time when you were in jail the second time, the first
24   person you call is Mr. Desir, isn't that a fact?
25   A.  Um-m-m, I don't remember.
```

1   Q.   You do call Mr. Desir, don't you?

2   A.   Honestly, I don't remember.

3   Q.   Did you not say on direct examination that Mr. Desir bonded

4   you out?

5   A.   I did say that.

6   Q.   Okay.  That is a direct result of you calling him to bond

7   you out?

8          MS. VIAMONTES:  Objection, asked and answered.

9          THE COURT:  Sustained.

10  BY MR. ZACCA:

11  Q.   When you were arrested that night, you had a cell phone

12  with you, didn't you?

13  A.   Yes, I did.

14         MR. ZACCA:  Judge, may I approach the witness?

15         THE COURT:  You may.

16         MR. ZACCA:  Thank you, judge, I am going to show her a

17  document I am marking as Defense Exhibit Number 9.

18  BY MR. ZACCA:

19  Q.   Ms. C.J., I would like you to look at this document for a

20  second and I will ask you questions about it.  Okay?

21  A.   Okay.

22  Q.   If you could look at the second page, as well?

23  A.   Oh, yes.

24  Q.   Do you see your signature on the first page and then on the

25  second page?

1   A.   Yes, I do.

2   Q.   Do you recognize this document?

3   A.   Yes.

4   Q.   It is a document showing an inventory of a property you had

5   when you were arrested on June 22nd, correct?

6   A.   Yes.

7   Q.   And it is a document that you signed acknowledging -- it is

8   a document you signed acknowledging the property you had on you

9   when you were arrested on June 22nd, correct?

10  A.   Yes.

11  Q.   You eventually get bonded out, correct?

12  A.   Yes.

13  Q.   And you think it was about a couple days that you were in

14  jail before you were bonded out, right?

15  A.   Yes, yeah.

16  Q.   And you-- Mr. Desir at some point picks you up, is that

17  your testimony?

18  A.   Yes.

19  Q.   And you willingly go with him, correct?

20  A.   Well, he was there to pick me up so I got into car.

21  Q.   You didn't have to get in the car.  You could have done

22  something else, right?

23  A.   I could have.

24  Q.   But you chose to get in the car?

25  A.   Again, I was not choosing to.

1  Q.  You get in the car and you go back to the Beach and Town,

2  right?

3  A.  Yes --  Or, no, I go to the efficiency.

4  Q.  Next to the Beach and Town Motel?

5  A.  Yeah.

6  Q.  And you, you stated earlier that at some point after that

7  you had consensual sex with Mr. Desir, correct?

8  A.  Yes.

9  Q.  How long after, was it a couple days after returning?

10 A.  I don't remember.

11 Q.  When you get back, do you continue using drugs?

12 A.  Yes, I do.

13 Q.  You willingly use drugs, correct?

14 A.  Willingly do drugs, yes.

15 Q.  And the way you pay for these drugs is by having dates,

16 correct?

17 A.  If I have a date, then I can have a pill or drugs.

18 Q.  You testified on direct examination about a point in time

19 that there was a knock on the door and the police were outside

20 the door.

21      This was sometime after your second arrest for

22 prostitution, right?

23 A.  Yes.

24 Q.  You never answered the door, right?

25 A.  No.

1  Q.  In fact, you knew your father was on the other side of that

2  door, right?

3  A.  I didn't.

4  Q.  You chose not to have that door open, right?

5  A.  I did not choose that.

6  Q.  At some point, you testified that you went to the hospital,

7  right?

8  A.  Yes, I went to the hospital.

9  Q.  Mr. Desir dropped you off at the hospital, right?

10 A.  Ah, yes.

11 Q.  You said Memorial Regional Hospital, did I get that right?

12 A.  Um-m-m, I think that was the name of the hospital.

13 Q.  When was that?  When did you go to the hospital?

14 A.  Um-m-m, it was after -- after the second arrest.

15 Q.  How many days after the second arrest?

16 A.  Um-m-m, I'm not sure.

17 Q.  At that point in time, while you are at the hospital, did

18 you tell anyone that you were in a situation you didn't want to

19 be in?

20 A.  No, I did not.

21 Q.  When the police were knocking outside your door, wasn't

22 your Dad yelling for your name?

23 A.  Um-m-m, I don't remember that.

24 Q.  You didn't hear him?

25 A.  I heard voices that sounded like my Dad, but I was really

695

1  high and I was in disbelief that that could even be possible.

2  Q.  You heard voices that sounded like your Dad.  You just said

3  that, right?

4  A.  Yes, I did.

5  Q.  But you were high, correct?

6  A.  Yes, I was.

7  Q.  And you didn't want to open that door?

8  A.  That is not what I am saying.

9  Q.  But isn't it true?

10 A.  No, that is not true at all.  I would have loved to have

11 opened the door.  If I had known, I probably would have tried

12 to do something.

13 Q.  But you heard a voice that you believed was your father?

14 A.  Yeah, I did and I didn't believe it.  I thought I was just

15 hearing things.

16         I was so emotionally distraught at that time, it was

17 really a difficult time.

18         MR. ZACCA:  Judge, if I could have one moment?

19         THE COURT:  Yes.

20         MR. ZACCA:  Judge, may I cross-examine from the elmo.

21         THE COURT:  Yes, yes, sir.

22 BY MR. ZACCA:

23 Q.  Ms. C.J., I want to ask you some questions now about

24 Government Exhibit 26, the text messages.

25 A.  Okay.

```
 1   Q.   That was asked on direct examination?

 2   A.   Yeah.

 3   Q.   Before I ask you that, let me ask you this:  The phone that

 4   you had was a phone that you acquired from AT&T, correct?

 5   A.   My phone that I had when I came down to Florida?

 6   Q.   Yes, ma'am.

 7   A.   Yes.

 8   Q.   It was a prepaid phone, correct?

 9   A.   Yes, it was.

10   Q.   So you had to pay into it, pay into the account to get

11   minutes for that phone, right?

12   A.   Yes.

13   Q.   If you didn't pay into it, eventually, the minutes would

14   run out, correct?

15   A.   If you are using it.

16   Q.   If you are using it?

17   A.   The minutes would go away when you use the phone.

18   Q.   Right.  When you use the phone and the minutes get used up,

19   you have to pay more money into the account, right?

20   A.   Yes.

21   Q.   It was your responsibility to pay money into the account,

22   right?

23   A.   No.  My grandma paid for my cell phone.

24   Q.   Did she continually pay it every month?

25   A.   When I had it, she would pay it -- it wasn't monthly, it
```

1  was -- um-m-m, it was like $45.00 for unlimited talk and texts

2  up to 28 days, almost a month.

3  Q.  When was the last time your grandmother paid into the

4  account?

5  A.  I think it was -- I was still at the Bridge when she paid

6  for it, I believe.  That was the last time.

7  Q.  So, then, by June 11th, you had run out of minutes?

8  A.  Well, there were still minutes on it, I know that.  I am

9  probably getting the time wrong.

10  Q.  When you say you are getting the time wrong, what do you

11  mean by that?  The date wrong?

12  A.  Yeah.  The date wrong whenever my grandma paid it because I

13  know the phone was still on.

14  Q.  Isn't it a fact that the minutes ran out of your phone and

15  you used Mr. Desir's phone to make phone calls?

16  A.  No.

17  Q.  I am going to show you Government Exhibit 26, okay?  These

18  are the text messages.

19       The Government asked you about this number 786

20  322-0154, right?

21  A.  Yes.

22  Q.  That is the number that you knew it to be Mr. Desir's

23  phone, according to your direct testimony, right?

24  A.  Um-m-m, I don't know.  The number would always change.  It

25  wasn't always the same number.

1   Q.   In Vermont, the area code for Vermont is 802, right?

2   A.   Yes.

3   Q.   Let me see if I could make this a little larger so we all

4   can see it.

5           802, that is a Vermont number, is it not?

6   A.   Yes, it is.

7   Q.   Do you recognize that number?

8   A.   Yes, I do.

9   Q.   What number is that?

10  A.   That is my ex-boyfriend's number.

11  Q.   That is communication you had with your ex-boyfriend,

12  correct?

13  A.   Yes.

14  Q.   You had access to this phone throughout the time period you

15  were with Mr. Desir, isn't that true?

16  A.   Yes, I did, but he had told me that he would check the

17  phone, check the phone records.

18  Q.   You would agree that since you had access to this phone

19  through the approximately three weeks you were with Mr. Desir,

20  you could have dialed 911, right?

21  A.   I could have, yes.

22  Q.   But you never did?

23  A.   No, I was afraid to.

24  Q.   And you used this phone various periods to text people,

25  correct?

699

1  A.  Um-m-m, I would text like Fire, Daddy.  I never texted

2  anybody else.

3  Q.  You were -- You went by the name of Angel, correct?

4  A.  Yes, I did.

5  Q.  You identified yourself as Angel in these text messages,

6  did you not?

7  A.  Yes, I did.

8  Q.  The text message to 802 that we just talked about --

9  A.  Yes.

10  Q.  --this is a text message that followed a phone call you had

11  with your ex-boyfriend, Nick Young, correct?

12  A.  Yes.

13  Q.  I want to take you back to last week, Monday, May 6, 2013.

14       You met with the Government, correct?

15  A.  Um-m-m --

16  Q.  Actually, let me be more specific with that question,

17  Ms. C.J..

18  A.  Thank you.

19  Q.  You spoke last Monday, May 6, 2013, with Assistant United

20  States Attorney Ms. Francis Viamontes, correct?

21  A.  Yes, yes, I did.

22  Q.  And when you spoke with her, you also spoke with Special

23  Agent Susan Funk Romash, who is present here.  Correct?

24  A.  Yes, I did.

25  Q.  And they interviewed you on that date, correct?

1    A.  Yes.

2    Q.  And this interview was much like other interviews you had

3    with them prior to May 6, 2013, right?

4    A.  Um-m-m, yes.

5    Q.  I mean you talked about the case?

6    A.  Yes.

7    Q.  Prior to that date, they asked you--

8         Prior to that date, they asked you, did you ever

9    prostitute yourself prior to meeting Mr. Desir on at least two

10   occasions, correct?

11   A.  Will you please rephrase that?

12   Q.  Sure.  Prior to the date May 6, 2013, did anyone on behalf

13   of the Government ask you whether you ever prostituted yourself

14   prior to meeting Mr. Desir?

15   A.  I don't remember.

16   Q.  At any point in time prior to May 6, 2013, did you deny

17   ever prostituting yourself in exchange for drugs prior to

18   meeting Mr. Desir or Ms. Rembert?

19   A.  Can you please rephrase that?

20   Q.  Prior to May 6, 2013, did you ever deny prostituting

21   yourself in exchange for drugs to any Government agent?

22   A.  I don't remember.

23   Q.  Let me ask it this way:  Isn't it true that the first time

24   you admitted prostituting yourself in exchange for drugs before

25   meeting Mr. Desir was last Monday, May 6, 2013?

1  A.  Yes.

2  Q.  And is it your testimony you don't recall being asked that

3  prior to last Monday?

4  A.  Um-m-m, I just don't remember.  I could have.  I just don't

5  know.

6            MR. ZACCA:  Judge, one minute.

7  BY MR. ZACCA:

8  Q.  Those two arrests, one for prostitution, one for possession

9  of drugs, those two cases are still pending, are they not?

10  A.  Yes, they are.

11  Q.  One is a felony, right?

12  A.  Yes.

13  Q.  And the other one is a misdemeanor, correct?

14  A.  Yes.

15  Q.  The felony is the drug paraphernalia and the misdemeanor is

16  the prostitution?

17  A.  Yes.

18  Q.  On the felony case, you were supposed to participate in

19  drug court, correct?

20  A.  Yes.

21  Q.  Drug court is a program where you have to abide by the

22  conditions imposed by the Court, correct?

23  A.  Yes.

24  Q.  Conditions include undergoing treatment, correct?

25  A.  Um-m-m, yes.

1   Q.   And counseling, correct?

2   A.   Um-m-m, no.  What it was, the drug treatment down here is

3   like that.  They had to transfer it up to Vermont and in

4   Vermont we didn't have a -- we don't have exactly what they

5   were looking for me to do, so, we came up with me visiting a

6   licensed therapist two times a week and then go into the phases

7   like I was in drug court.

8   Q.   In other words, the treatment that you were supposed to

9   undergo for drug court was transferred to Vermont, correct?

10  A.   Yes.

11  Q.   And you were supposed to treat with a Katrin Hughes,

12  correct?

13  A.   Yes.

14  Q.   You failed to do that treatment, correct?

15  A.   No.

16  Q.   Well, there was a warrant for your arrest issued in January

17  of this year, right?

18  A.   Right.

19  Q.   And that warrant for your arrest issued by the drug court

20  remained outstanding up until last Thursday, correct?

21  A.   Yes.

22  Q.   With regard -- and, of course, and that case is here in

23  Broward County State Court, the drug case, correct?

24  A.   Yes.

25  Q.   The prostitution case is also here in Broward County State

1   Court, correct?

2   A.  Yes, it is.

3   Q.  You never showed up for court when you were required to do

4   so, correct?

5   A.  Yes.

6   Q.  Yes, you did, or, yes, you did not?

7   A.  I did not show up.

8   Q.  Okay.  You were supposed to go and show up for court in

9   August 2012, correct?

10  A.  Could you rephrase that?

11  Q.  Sure.  The date that you were supposed to show up for court

12  in the prostitution case was in August of 2012, correct?

13  A.  I didn't know that.  I didn't know what was going on with

14  the prostitution.

15  Q.  Well, you knew you had to show up for court, right,

16  according to your bond?

17  A.  Right.  I was assuming I would get something in the mail,

18  but I didn't have a -- my mailing address wasn't the one in

19  Vermont, so I didn't know how to handle that situation.

20  Q.  Well, did you ever call the Court and say, hey, I never got

21  a court date.  When is the next court date for my prostitution

22  case?  Did you ever follow up and call the judge?

23  A.  I actually followed up on it.  I asked my attorney and he

24  said he didn't see anything in the paperwork.

25  Q.  There was a warrant issued because you failed to show up

1  for court?

2  A.  Yes.  I didn't know about it so I didn't go.

3  Q.  And that warrant remained outstanding up until last week,

4  Thursday, correct?

5  A.  Yes.

6  Q.  So, just so we are all clear, as of last Thursday, you had

7  two warrants for your arrest, right?

8  A.  Yes.

9  Q.  You don't have those warrants any more, right?

10 A.  No, I do not.

11 Q.  In fact, when you arrived here, the Government assisted you

12 in getting out of jail, right?

13 A.  Can you rephrase that?

14 Q.  When you arrived here, you had to surrender yourself on

15 those warrants, correct?

16 A.  Yes.

17 Q.  And you had to report to the jail, correct?

18 A.  I don't understand what you mean, report to the jail.

19 Q.  Well, you were booked?

20 A.  Yes, I was, Thursday.

21 Q.  But you didn't have to post a bond on Thursday, right?

22 A.  No, I didn't.

23 Q.  The Government assisted you in being able to get out of

24 court without posting a bond, isn't that right?

25 A.  I don't know.

1  Q.  Well, as you sit here today, you didn't have to post a

2  bond, right?

3  A.  No.  I was released on my own -- I can't say the last word.

4  Q.  Recognizance?

5  A.  Yes.

6  Q.  I am having trouble, recognizance?

7  A.  Yes.

8  Q.  Means, basically, I just have to show up when asked to do

9  so, and there is no bond or bondsman that is looking after you

10  making sure that you show up at court.

11  A.  Yes.  And they send something to my right mailing address.

12  Q.  Ms. C.J., it is fair to say you still abuse drugs, correct?

13  A.  No, it is not.

14  Q.  You abused drugs, as late as last month you abused drugs?

15          MS. VIAMONTES:  Objection, relevance.

16          MR. ZACCA:  Judge, I can -- if we can go sidebar on

17  this.

18          I don't know if the Government -- if I could explain

19  myself.

20          THE COURT:  No.  No.  I am going to overrule the

21  objection.

22          MR. ZACCA:  Okay.

23  BY MR. ZACCA:

24  Q.  Did you abuse drugs last month?

25  A.  Yes, I did.

```
 1   Q.  What drugs were those?

 2   A.  I did a line of coke, cocaine.

 3           MR. ZACCA:  I have no further questions.

 4           THE COURT:  All right.  Mr. Wilcox, cross.

 5           MR. WILCOX:  Thank you, your Honor.

 6           May it please the court, counsel, co-counsel.

 7                       CROSS EXAMINATION

 8   BY MR. WILCOX:

 9   Q.  Good afternoon, Ms. C.J..

10   A.  Hi.

11   Q.  How are you feeling?

12   A.  Stressed out.

13   Q.  A little stressed out?

14   A.  Yes.

15   Q.  All right.  There was some testimony that, you know, you

16   are addicted to heroin and that --

17           Is that true, you were addicted to heroin?

18   A.  Yes.

19   Q.  Okay.  When was the last time you used heroin?

20   A.  It has been since the beginning of October of last year.

21   Q.  October 2012?

22   A.  Yes.

23   Q.  Are you-- Were you prescribed any other medication to help

24   you get off the drugs?

25   A.  Um-m-m, I was on medications.  I was prescribed
```

```
 1   medications, yes.
 2   Q.  Are you still prescribed those medications?
 3   A.  No.
 4   Q.  Ma'am?
 5   A.  No.
 6   Q.  No.  So, as you testified today, and as you were testifying
 7   yesterday, you weren't under the influence of any prescribed
 8   medications?
 9   A.  No.
10   Q.  I want to talk about your up bringing in Vermont.
11          How would you characterize it?  Would you charaterize
12   it as a normal up bringing?
13   A.  I am sorry, would you repeat that?
14   Q.  Would you describe your up bringing as a normal up
15   bringing?  Normal childhood?
16   A.  Yes.
17   Q.  Middle class?
18   A.  Yeah.
19   Q.  Okay.  Your schooling, I believe you finished the 11th
20   grade.  Did you finish the 11th grade?
21   A.  Yes, I did.
22   Q.  But you didn't go on to your senior year?
23   A.  No.  I was in alternative high school.  I dropped out of
24   high school in 10th grade and I went immediately into an
25   alternative high school.
```

1    Q.   I see.  You weren't in any -- You didn't have to take any

2    specific learning disability classes?

3    A.   No.

4    Q.   You don't have any -- You have never been diagnosed as

5    having any mental defects, have you?

6    A.   Um-m-m, yes.

7    Q.   You have?

8    A.   Yes.

9    Q.   And what are those.

10          MS. VIAMONTES:  Objection, your Honor, relevance.

11          THE COURT:  Overruled.

12   BY MR. WILCOX:

13   Q.   What mental defects have you been diagnosed with, ma'am?

14   A.   Anxiety, depression, post-traumatic stress disorder.

15   Q.   Are those recent diagnoses or were you diagnosed having

16   those mental problems while you were a teen-ager in Vermont?

17   A.   Um-m-m, I was diagnosed with anxiety and situational

18   depression when I was younger.

19   Q.   Prior to coming to Florida?

20   A.   Yes.

21   Q.   Were you prescribed medication to deal with those?

22   A.   Um-m-m, no.

23   Q.   What type of treatment, if any, did you receive for your

24   anxiety and situational depression?

25   A.   I saw a therapist.

1  Q.  So you were in -- how long did you see a therapist?

2  A.  I don't remember.

3  Q.  And were you taking -- I am sorry -- ingesting heroin while

4  you were seeing the therapist?

5  A.  Um-m-m, like when?  I don't understand.

6  Q.  I understand.

7          I think I can be a little more specific.

8          At what age did you start seeing your therapist for

9  anxiety and situational depression?

10  A.  Um-m-m, I started seeing a therapist at age seven, but I

11  don't know when they diagnosed me with those mental problems.

12  Q.  You indicated that you used heroin for approximately seven

13  years?

14  A.  No, I didn't use heroin --

15  Q.  You did not say that?

16  A.  No.  I used heroin for three years when I was 18.

17  Q.  You started using heroin when you were 18.

18          Prior to heroin, you used other drugs?

19  A.  Yes.

20  Q.  And just to refresh my recollection, my notes may be bad,

21  you were about 14 when you started using drugs?

22  A.  Yes.

23  Q.  Okay.  You used cocaine, is that right?

24  A.  Cocaine when I was 15.

25  Q.  You started with marijuana?

1  A.  Yes.

2  Q.  Okay.  Drink a little alcohol?

3  A.  Yeah, I drink.

4  Q.  And then Percocets?

5  A.  Yep.

6  Q.  Then cocaine?

7  A.  Yes.

8  Q.  Then heroin?

9  A.  Yes.

10  Q.  That is sort of like a natural progressive, right?

11  A.  Yes.

12  Q.  No crack cocaine in Vermont?

13  A.  I smoked it a couple times.

14  Q.  Okay.  The price of heroin in Vermont, would it be fair to

15  say that it is more costly there than it is down here?

16  A.  I never bought heroin down here so I wouldn't know the

17  price of it.

18  Q.  How much did it cost in Vermont?

19  A.  It was 25 to $30.00 for one bag.

20  Q.  25 to $30.00 a bag of heroin in Vermont?

21  A.  Yes.

22  Q.  And you used it when you were approximately 18 until you

23  came down here to the Bridge?

24  A.  Um-m-m, yeah.

25  Q.  You didn't use Dilaudid in Vermont?

711

1  A.  No, I didn't.

2  Q.  Now, the heroin, how did you use that in Vermont?  How did

3  you ingest that?  Did you snort it and mix it with water and

4  set it on fire and put in it in your arm?

5  A.  I would do it both ways.

6  Q.  You indicated, I believe you did, please correct me if I am

7  wrong, maybe you didn't, heroin is highly addictive, isn't it?

8  A.  Yes, it is.

9  Q.  Okay.  You indicated that --

10        Let me ask you, did you ever experience cold turkey,

11  or something like that when you were in Vermont between your

12  stints being addicted to heroin?

13  A.  Yes, I did.

14  Q.  How would you describe that experience?

15  A.  I felt like I had the flu.

16        I would get hot and cold.

17        I would have -- I would get sick to my stomach and I

18  wouldn't want to move, get out of bed.

19  Q.  Is it fair to say that if you wanted to avoid that feeling,

20  that hot and cold flu-like sick to your stomach feeling, you

21  would get another fix or inject yourself with additional

22  heroin?

23  A.  Yes.

24  Q.  And did that happen quite frequently with you, where you

25  would try to go cold turkey, and you understand what I say,

1   when I say cold turkey?

2        You understand what I mean?

3   A.  Yes, I do.

4   Q.  That means quit without any help, just to stop, right?

5   A.  Yes.

6   Q.  And would it be fair to say that you tried to stop and you

7   went cold turkey and then you end up using again?

8   A.  Yes.

9   Q.  Okay.

10        MR. WILCOX:  One moment, your Honor.

11   BY MR. WILCOX:

12   Q.  Now, in Vermont you always bought the heroin in the bags,

13   $30.00 bags?

14   A.  Yes.

15   Q.  And would you be able to tell me with respect to gram, half

16   a gram or how much, would you be able to give me a measurement

17   how much would be in a $30.00 bag?

18   A.  There was a 10th of a gram in each bag.

19   Q.  A 10th of a gram for $30.00.  That would be $300 for a

20   gram, simple math, right?

21   A.  Yes.

22   Q.  And how long would a fix last you, a $30.00 bag fix?

23   A.  Um-m-m, like six hours.

24   Q.  And and it lasts six hours, and how long between a fix and

25   just symptoms of withdrawal, how much time would lapse between

1  a fix and the withdrawal symptoms?

2  A.  Um-m-m, I don't know.

3  Q.  More than two days?

4  A.  Will you repeat the question?

5  Q.  I mean, I don't want to belabor the point, Ms. C.J., I know

6  you have been here for a long time.

7          What I am trying to figure out, how costly was this

8  habit that you were doing?  That is what I am trying to figure

9  out, can you answer that for me?

10  A.  It was pretty expensive.  I mean, I just -- I would have to

11  cut back or adjust my using so I wouldn't get sick.

12  Q.  Could you tell me -- I am hoping you can answer -- could

13  you tell me how much you spent a week on heroin?

14  A.  No.

15  Q.  No?

16  A.  No.  I can't do that.  I don't know.

17  Q.  Okay.  The only thing you can tell me is that you would --

18  that when you did use, you would buy $30.00 bag and that would

19  last six hours, we got that, right?

20  A.  Yes.

21  Q.  Okay.  How many bags did you buy a week?

22  A.  Depended on how much money I had.  Some days I would do one

23  bag, some days two.

24  Q.  Some days you could do two bags in one day?

25  A.  Uh-hum.

1    Q.   And, for a time, you were doing a bag a day?

2    A.   Could you rephrase that?

3    Q.   Were there times when you were in Vermont where you were

4    using a bag a day?

5    A.   Yes.

6    Q.   Okay.  So we know a week has seven days, right?

7    A.   Yes.

8    Q.   Okay.  So there were times when you were spending $210 a

9    week on heroin?

10   A.   Um-m-m, I mean, that is what it comes out to be.  There are

11   times when I didn't do heroin in one day, a day or so.

12   Q.   Ma'am, I understand.  There were times when you did it

13   every day.  There were some times when you couldn't afford to

14   do it every day, that is fair, right?

15   A.   Yeah.

16   Q.   But if you didn't do it for a substantial period of time,

17   then you would have withdrawal symptoms, right?

18   A.   Yes.

19   Q.   And, then, in order to relieve those symptoms, you would

20   have to get another bag?

21   A.   Yes.

22   Q.   Okay.  And it would cost you other things besides money

23   associated with this addiction?

24   A.   Would you repeat that?

25   Q.   There were other costs besides financial, right?

1   A.   A --

2   Q.   Cost you loss of the trust of your family?

3   A.   Yes.

4   Q.   Cost of your reputation among the community?

5   A.   Yes.

6   Q.   Your family was not the only ones who knew you were abusing

7   heroin in little Rutland, Vermont, right?

8   A.   No.

9   Q.   And there were instances where you had to lie to your

10  family about your drug use, is that correct?

11  A.   I did lie to my family about my drug use.

12  Q.   And around April 16th of last year, April 16th of 2012, you

13  came down here to Boca Raton, Florida, to enter into a sober

14  living community, am I saying it right?

15  A.   Yes, you are.

16  Q.   Okay.  But you had just completed drug rehab in Vermont, is

17  that right?

18  A.   Yes.

19  Q.   Okay.  And your father paid the deposit, is that right?

20  A.   Yes.

21  Q.   Do you remember how much that was?

22  A.   Um-m-m, no, I don't.

23  Q.   Do you know how much it was to stay there?

24  A.   Um-m-m, I don't remember.

25  Q.   How long were you supposed to stay?  Were you supposed to

1  be there indefinitely?

2  A.  No.

3  Q.  How long were you supposed to stay there?

4  A.  I can't remember that, either.

5  Q.  How long did you want to stay there?

6  A.  Um-m-m, for like three months, that is what I was planning.

7  Q.  That is what you planned to do.  You planned to stay there

8  three months, is that right?

9  A.  Yes.

10  Q.  And the reason you wanted to do that because you wanted to

11  get away from the environment in Vermont.  You have a change of

12  places and people, right?

13  A.  Yes.

14  Q.  That is what they tell you at the rehab place, people

15  places and things, right?  You heard that, right?

16  A.  Yes.

17  Q.  So, this sounded like a good move, right?  You are going to

18  change your place, be around different people and see new

19  things in Florida, right?

20  A.  Yes.

21  Q.  Now, how is this facility set up?

22  A.  Um-m-m, it was like, I don't know how you call it, what you

23  call it.

24  Q.  Dormitories?

25  A.  No.  It was a big building, separate buildings, with

apartments and stuff, like condo, sort of like.

Q.  Did you have a roommate?

A.  Yeah.

Q.  How many roommates?

A.  There were three other girls.

Q.  All right.  And you had a job?

A.  Yes.

Q.  Okay.  Now, you were only there from, I believe, April 16th to May 12th, does that sound right?

A.  Yes.

Q.  You were working while you were there?

A.  Yes.

Q.  And where were you working while you were there?

A.  I was working at two restaurants in Delray.

Q.  I see.  And the money that you made from those two restaurants at some point between April 16th and May 12th, you used some of that money to purchase the Dilaudid, is that right?

A.  Yes.

Q.  But you hadn't done any Dilaudid in Vermont?

A.  No.

Q.  How did you become familiar with Dilaudid?

A.  A friend.

Q.  A friend at the Bridge?

A.  No.  I can't remember where I met him.

1  Q.  Okay.  You described how you would use it, and I am going

2  to try to summarize.

3         You say you crush it up, is that right?

4  A.  Yes.

5  Q.  You mix it with water and make a solution with water,

6  right?

7  A.  Yes.

8  Q.  And then you take cotton?

9  A.  Yes.

10  Q.  And soak the solution in the cotton, right?

11  A.  Yes.

12  Q.  And then take a syringe and draw the solution out of the

13  cotton?

14  A.  Yes.

15  Q.  Okay.  Then the friend explained to you that is how you are

16  supposed to do it?

17  A.  I watched him do it.

18  Q.  I see.  All right.

19         So, in order to do this, I mean, in order to be

20  prepared to do it, you have to have works with you, right?  You

21  know what works are, right.

22  A.  No.

23  Q.  Okay.  You have to have a syringe with you?

24  A.  Yes.

25  Q.  You have to have your cotton, right?

1   A.   Yeah.

2   Q.   All right.  And a spoon, right?

3   A.   Yeah.

4   Q.   Okay.  You need to have that with you in order -- so, if

5   you are able to obtain Dilaudid, you can do what you need to do

6   to ingest it, right?

7   A.   Ah -- excuse me, ah, yes.

8   Q.   Okay.  So, you would have these things with you on a

9   regular basis, spoon, cotton and a syringe?

10  A.   No.

11  Q.   You wouldn't?

12  A.   No, I wouldn't.

13  Q.   Only when you were using Dilaudid or when you were trying

14  to obtain Dilaudid?

15  A.   If I knew I was getting it, yes.

16  Q.   Did you always have it near by?

17  A.   No.  I -- No.

18  Q.   Well, how often were you using Dilaudid after May 12, 2012

19  when you were discharged from the Bridge?

20  A.   Could you please repeat the question?

21  Q.   How often were you using Dilaudid after May 12, 2012 when

22  you were discharged from the Bridge?

23  A.   Um-m-m, I don't remember.

24          MR. WILCOX:  One moment, your Honor.

25  BY MR. WILCOX:

1  Q.  Please correct me if I misstate a fact.

2        When you were first discharged from the Bridge, you

3  lived with a friend by the name of David for about three weeks,

4  is that right?

5  A.  Yes.

6  Q.  Okay.  During that three week period, did you use Dilaudid?

7  A.  Yes, I did.

8  Q.  You did, okay.  Do you recall during that three week period

9  how much Dilaudid did you use?

10  A.  Um-m-m, like four, five times.

11  Q.  Four or five times in the three week period, you didn't get

12  sick?

13  A.  No.

14  Q.  So, I believe you testified on direct examination this

15  morning that Dilaudid was highly addictive.

16  A.  Yes.

17  Q.  Okay.  But you could go three or four days without having

18  it?

19  A.  Yes.  You-- what it is like, you make it build up in your

20  system so your body is used to that drug coming in, and it

21  stops, that is when your body has a reaction.

22  Q.  I didn't quite understand that.

23        When you say your body has to build up, what do you

24  mean by that?  Could you rephrase that, please.

25  A.  Like you have to use a lot of drugs for it to have -- to

1  make you feel sick if you don't have any of it.

2  Q.  I see.  Isn't it true, the longer you use a substance like

3  Dilaudid, the more you need to get to the high that you were

4  before?

5  A.  Yes.

6  Q.  Okay.  And did that happen with you?

7  A.  Um-m-m, yeah.

8  Q.  Now, this David was one of the cooks at the restaurant you

9  worked at, is that right?

10         MS. VIAMONTES:  Objection, relevance.

11         THE COURT:  Sustained.

12         MR. WILCOX:  Doesn't matter.

13         THE COURT:  That is why the objection is sustained.

14         MR. WILCOX:  I know.  I am not arguing with you,

15  judge.

16  BY MR. WILCOX:

17  Q.  That relationship ended at about three weeks, is that

18  right?

19  A.  Um-m-m, yes.

20  Q.  I mean, and then you-- If I am not mistaken, you began

21  living with a person that you refer to as your drug dealer, is

22  that right?

23  A.  Yes.

24  Q.  Okay.  Now, why do you call him your drug dealer?

25  A.  Because I bought drugs from him.

```
 1   Q.  How much and what kind?

 2   A.  Um-m-m, I bought Dilaudid and crack.

 3   Q.  I see, now, how much --

 4          Okay.

 5          Crack and Dilaudid are like opposite extremes, am I

 6   wrong?

 7   A.  No.  You are not wrong.

 8   Q.  Okay.  Crack has -- from what I hear, crack has you really

 9   excited and jittery and jumpy, is that right?

10   A.  Um-m-m, no, not exactly.

11   Q.  Okay.  How does crack made you feel?

12   A.  It made me feel -- My heart would start racing, and I would

13   get caught and my body would be numb.

14   Q.  But your heart would be beating fast, is that right?

15   A.  Yes.

16   Q.  Now, coming down off crack, tell me the withdrawals --

17          Could you explain the withdrawal symptoms with crack?

18   A.  I never felt any physical withdrawal symptoms from the

19   crack.

20   Q.  So you could smoke like one rock and have a hundred dollars

21   in your pocket and not need to spend any more?

22   A.  Well, no.

23   Q.  Huh?

24   A.  No.

25   Q.  Okay.  Generally, from what I hear, if you are smoking
```

1  crack, you are pretty much going to smoke all your money up?

2  A.  Yes.

3  Q.  And Dilaudid -- and Dilaudid, how did that make you feel?

4  A.  Um-m-m, numb.

5  Q.  So, the crack and the Dilaudid make you feel numb?

6  A.  Yeah, the pill would like -- the Dilaudid would make me

7  feel just comfortable.

8        It would make me feel tired and just relax me, relax

9  my muscles, and everything and -- is that what you are asking

10 me?

11 Q.  If that is all you have, that is all you have, okay.

12       Crack didn't relax you, though, right, you wouldn't

13 say that, would you?

14 A.  No.

15 Q.  How much did the crack cost?

16 A.  Um-m-m, it depends on how much you are buying.  You could

17 buy a 20 piece or 30 piece, 40, 50.

18 Q.  How long would that --

19       Let's say a 20 piece, how long would that last you,

20 and how would you smoke that?

21 A.  It would last one use, you know, like five minutes.

22 Q.  Just like that, right?

23 A.  Yes.

24 Q.  You smoke a $20.00 rock in about five minutes.  I say that

25 for the people on the jury -- for the benefit of the people on

1  the jury, is that what you said?

2  A.  Yes.

3  Q.  Okay.  How much would you spend on crack --

4          Let me ask you this:  Did you ever have, from what I

5  hear, one of these crack binges?

6  A.  Um-m-m, no.

7  Q.  No?

8  A.  No.

9  Q.  Never have one of those -- okay.

10          Have you been up more than eight hours straight doing

11  crack?

12  A.  Up, like in my life?

13  Q.  No, in -- no, when you were here in Florida?

14  A.  Um-m-m, I don't know.

15  Q.  You can't remember?

16  A.  No.

17  Q.  So you were -- When I was asking you, you moved in with

18  your drug dealer and did you-- you were still working when you

19  moved in with your drug dealer?

20  A.  Yes, I was.

21  Q.  And I believe you said you got your father to send you some

22  money and your grandmother may have sent you some money around

23  this period of time?

24  A.  Yes.

25  Q.  Okay.  And even though you were living with your drug

1  dealer, you were buying your drugs from him?

2  A.  Yes, I was.

3  Q.  Drug dealer was Jared --

4       MS. VIAMONTES:  Objection, relevance.

5       THE COURT:  Sustained.

6       All right.  Mr. Wilcox.

7  BY MR. WILCOX:

8  Q.  Well, how long did you live with your drug dealer?

9  A.  I don't know.  It was --

10  Q.  More than a week?

11       MS. VIAMONTES:  Judge, objection, relevance.

12       THE COURT:  I thought she testified she was with him

13  for a week.

14       MR. WILCOX:  I thought she said I don't know.

15       THE COURT:  That is what she said but it had been

16  asked before and she said a week.

17       MR. WILCOX:  Well, let me just -- let me -- your

18  Honor, can we stipulate that this is calendar for May 2012?

19       We can easily verify this.

20       THE COURT:  Has the Government seen it?

21       MS. VIAMONTES:  No, but I do know that Mother's Day

22  was May 13th, so I stipulate.

23       THE COURT:  You want the Court to take judicial notice

24  of it?

25       MR. WILCOX:  Yes.

```
 1          THE COURT:  The Court will take judicial notice of the
 2   May 2012 calendar presented by Defendant Rembert, and you may
 3   use it.
 4          MR. WILCOX:  Thank you.
 5          THE COURT:  As evidence.
 6          MR. WILCOX:  May I ask a couple questions from the
 7   elmo?
 8          THE JURORS:  Turn it around.
 9          MR. WILCOX:  I am low tech.
10   BY MR. WILCOX:
11   Q.  All right.  Okay.  So, you were out of the Bridge on May
12   12th, right?
13   A.  Yes.
14   Q.  Okay.  So you spent this first week with -- excuse me --
15   that first week with the cook, right?
16   A.  Yes.
17   Q.  And you spent the next week with the cook, is that right?
18          MS. VIAMONTES:  Objection, your Honor, asked and
19   answered.
20          THE COURT:  Sustained.
21          MR. WILCOX:  Okay.
22   BY MR. WILCOX:
23   Q.  So into June, is that right, before you move in with the
24   drug dealer?
25   A.  Yes.
```

1  Q.   Okay.  Would it be fair to say you were with the drug

2  dealer from June 1st to June 11th?

3          MS. VIAMONTES:  Your Honor, asked and answered.

4          THE COURT:  Sustained.

5  BY MR. WILCOX:

6  Q.   You left your -- There was also a point in time you said

7  you began to meet new people and stay at other people's house?

8  A.   I am sorry, I don't understand.

9  Q.   You indicated not only did you stay with the cook, with the

10  drug dealer, but there were also times you stayed at various

11  people's houses that you didn't describe?

12  A.   Um-m-m, yes.

13  Q.   And, then, at some point prior to meeting Mr. Desir you

14  were living at the Homing Inn, is that right?

15  A.   I wasn't living there but I was staying there.

16  Q.   Where were you living?

17  A.   I was couch hopping.

18  Q.   Excuse me?

19  A.   Couch hopping.

20  Q.   Couch hopping?

21  A.   Yes.

22  Q.   What does that mean?

23  A.   Staying at different friends' houses.

24  Q.   And during this period from May 12th to June 11th, I

25  believe, you--

```
 1              Let me go back.

 2              How did you buy drugs from drug dealers?

 3   A.   I paid for it.

 4   Q.   How did you first meet him?  How did he become your drug

 5   dealer?  What was your first deal?

 6              MR. WILCOX:  Judge, I will go sidebar on this one.

 7              THE COURT:  All right.  Sidebar.

 8              (Sidebar discussion on the record.)

 9              MR. WILCOX:  Ms. C.J. testified on direct that it was

10   common to buy drugs, get in the car and drive around the

11   corner.

12              I don't think that is common, judge.  I want to

13   explore that.

14              I don't think that is how you commonly purchase drugs

15   from a drug dealer.

16              She said -- Ms. Viamontes asked the question.  She got

17   in the car and he drove her around.

18              I did a lot of these cases in State Court, and my

19   experience is that you just come up to the corner, kind of wave

20   your hand, the guy walks up and you sell the drugs.  The drug

21   dealer doesn't put you in his car and drive you around.

22              MS. JOHANNES:  Why don't you ask her if it is common?

23   Why are you asking about this particular dealer?

24              MR. WILCOX:  I want to impeach her.

25              THE COURT:  Let me suggest you direct your comments to
```

1    the Court and not to counsel.

2         MS. JOHANNES:  Sorry, your Honor.

3         THE COURT:  I don't quite understand the relevancy.

4         MR. WILCOX:  The relevancy is that she said that she

5    gets into Desir's car, because some guy told her, I know some

6    guy to sell you drugs.

7         THE COURT:  That was the cousin.

8         MR. WILCOX:  Or the guy at the Homing Inn.

9         THE COURT:  She said it was the cousin.

10        MR. WILCOX:  Then he comes and asked her to get in the

11   car, and she says she thinks he is going to buy drugs.

12        I should be able to ask her-- Ms. Viamontes says is

13   that common?  And she says, yes, that is common.  I want to

14   say, no, it is not common, and you have not done that that way

15   before.

16        MS. VIAMONTES:  Even if with this particular drug

17   dealer she didn't get into the car, let's say she met him some

18   other way, that wouldn't negate what she previously stated.  So

19   I don't think it really is impeachment.

20        Furthermore, judge, I think it is irrelevant.

21        THE COURT:  That was my thinking.  I don't see the

22   relevance in this.

23        MR. ZACCA:  Judge, if I may --

24        THE COURT:  I will let you.  I let both prosecutors

25   talk.  So you could talk.

1        MR. ZACCA:  The other element into this line of

2  questioning is, while it is common to buy drugs on the corner

3  of the street and not get in the car, the fact she did get in

4  the car and drove around and went to Beach and Town is the

5  whole state of mind.

6        THE COURT:  That is argument, sustained.

7        (After sidebar.)

8  BY MR. WILCOX:

9  Q.  You indicated that just prior to meeting Mr. Desir, you

10  were at the Homing Inn with another gentleman, is that right?

11  A.  Yes, I was.

12  Q.  And you were using drugs with or around him, is that right?

13  A.  With who?  I don't understand your question.

14  Q.  The gentleman that you were with at the Homing Inn prior to

15  meeting Mr. Desir?

16  A.  But I don't understand the question.

17  Q.  Okay.  You spent some time at the Homing Inn prior to

18  meeting Mr. Desir, is that right?

19  A.  Yes.

20  Q.  In fact, Mr. Desir picked you up at the Homing Inn, right?

21  A.  Yes.

22  Q.  Mr. Desir picked you up at the Homing Inn after you went

23  looking for drugs and his cousin called him to sell you drugs?

24  A.  Yes.

25  Q.  What kind of drugs did you want to get from Mr. Desir?

1    A.   Crack.

2    Q.   Crack.  You were looking to buy crack?

3    A.   Yes.

4    Q.   And then you got in the car, is that right?

5    A.   Yes.

6    Q.   Why did you get in the car?

7    A.   Because I was getting drugs.

8    Q.   You could have said here is the money -- Did you have

9    money?

10   A.   Yes.

11   Q.   How much money did you have?

12   A.   $30.00.

13   Q.   You could have said here is the $30.00, give me the crack.

14   You could have done that, right?

15   A.   No.  I could have but that is not really how drug deals

16   work.

17   Q.   So you have done this before?

18   A.   I bought drugs before, yes.

19   Q.   And you have gotten in cars and rode around the block to

20   get the drugs?

21   A.   Yes.

22   Q.   And that is how it is commonly done in Vermont?

23   A.   Yes.

24   Q.   Okay, and at some point, he didn't give you the drugs -- at

25   some point when you got in the car Mr. Desir, at some point you

1  realized that you weren't -- sorry.

2       When you got in the car with Mr. Desir, he started

3  riding around, is that right?

4  A.  Well, I got the drugs first, before.

5  Q.  You got the drugs first?

6  A.  Before we --

7  Q.  How long were you in the car before you gave him $30.00 and

8  he gave you crack cocaine?

9  A.  I didn't give him $30.00 yet.

10  Q.  What kind of car is he driving again?

11  A.  A black, I don't know what kind of car, a black --

12  Q.  Full size car?

13  A.  Ah, like it has four doors.

14  Q.  Four-door sedan?

15  A.  I don't know.

16  Q.  Black?

17  A.  Black with --

18  Q.  Tinted windows?

19  A.  Yes.

20  Q.  You get in the car.  How long is it before he gives you the

21  drugs?

22  A.  Um-m-m, I don't know, a few seconds.

23  Q.  A few seconds, and he didn't ask you for the money?

24  A.  No.  I figured I was going to pay it to the cousin.

25  Q.  And you thought that Mr. Desir was going to take you back

1   and you were going to pay the money to the cousin?

2   A.   Yes.

3   Q.   And you have done it that way before?

4   A.   Yes, I have.

5   Q.   That didn't happen?

6   A.   No.

7   Q.   Okay.  And you were -- did you have your purse with you?

8   A.   Yes, I had my purse with me.

9   Q.   And your syringe and cotton and spoon?

10  A.   I don't remember if I had that stuff on me.

11  Q.   And you had on a T-shirt, is that right?

12  A.   Yes.

13  Q.   And what kind of shoes?

14  A.   Sandals.

15  Q.   And some sandals.  T-shirt, sandals and a purse and you get

16  in a car, black car with tinted windows.

17        Was Mr. Desir with somebody else?

18  A.   Yes, he was.

19  Q.   And he gives you drugs, right?

20  A.   Yes.

21  Q.   And then he drives you around?

22  A.   Yes.

23  Q.   What are you talking about?

24  A.   We are not talking.

25  Q.   How long -- Somebody starts talking at some point?

1   A.   Yes.

2   Q.   How long do you ride in the car before someone says

3   anything or before you say, hey, where we going?

4   A.   I don't know, within--

5   Q.   Did you say that, hey, where we going?

6   A.   Yes.

7   Q.   And what was his answer?

8   A.   I didn't get an answer.

9   Q.   And after you didn't get an answer, did you say, hey, where

10  we going, again?

11  A.   I don't remember if I repeated it or not, but I remember

12  him turning the music up.

13  Q.   When he turned the music up, why didn't you say, stop the

14  car and let me out?

15  A.   I don't know.  I was waiting to do the drugs.

16  Q.   You couldn't do the drugs outside the car?

17  A.   Yes, I could.  But I don't know, I don't know why I didn't.

18  Q.   There is no good reason for you not saying stop the car and

19  let me out?

20          MS. VIAMONTES:  Objection, your Honor, argumentative.

21          THE COURT:  Sustained.

22  BY MR. WILCOX:

23  Q.   You don't no.

24          Well, weren't you concerned that this guy was taking

25  you somewhere and all you wanted to do is just make a drug

1  deal?  Weren't you concerned?

2  A.  Yes.

3  Q.  Weren't you afraid?

4  A.  I wasn't afraid at that point.

5  Q.  You were concerned but not quite afraid?

6  A.  Yes.

7  Q.  So you were concerned but you didn't say stop the car and

8  let me out?

9  A.  No, I didn't.

10  Q.  Did you say that at any time?

11  A.  No, I did not.

12  Q.  You kind of wanted to see where this was going to take you?

13  A.  Yes.

14  Q.  Okay.  Kind of curious, right?

15  A.  Yes.

16  Q.  You were kind of curious because you were saying, hey,

17  maybe I could do some crack without having to come up with any

18  money?

19  A.  Yes.

20  Q.  So, it would be inaccurate to suggest that someone forced

21  you to stay in the car at that point, right?

22  A.  I am sorry.  I couldn't understand you.

23  Q.  It wouldn't be true for anyone to say that someone forced

24  you to stay in the car at that point?

25  A.  No.

1  Q.  Okay.  At that point, you were agreeable to being in the

2  car with Mr. Desir and cousin Zoe?

3  A.  Yes.

4  Q.  Well, that wasn't his cousin, he was just Zoe, right?

5  A.  Yeah.

6  Q.  At that point you knew Desir is Zoe-1 and the other guy

7  Zoe-2?

8  A.  Yes.

9  Q.  I see.  And at some point you get and you say at some point

10  you stop at a house, is that right?

11  A.  Yes.

12  Q.  Okay.  And you were going to use the crack, correct?

13  A.  Yes.

14  Q.  And then Zoe-2 said, no, don't do that here, is that right?

15  A.  Yes, that is correct.

16  Q.  You didn't even get a hit?

17  A.  I took one hit.

18  Q.  You took one hit?

19  A.  Yes.

20  Q.  Okay.  Mr. Desir comes back, is that right?

21  A.  Yes.

22  Q.  And then you all ride all the way down to the Beach and

23  Town?

24  A.  Yes.

25  Q.  That got to be about an hour drive, is that right?

```
 1  A.  I don't know.
 2  Q.  Well, it is about--
 3           Just a minute, your Honor.
 4  BY MR. WILCOX:
 5  Q.  It is about 40 miles from Boynton Beach to Hollywood?
 6           MS. VIAMONTES:  Objection, calls for speculation, your
 7  Honor, she said she doesn't know.
 8           THE COURT:  If she knows.
 9           MR. WILCOX:  That is something that is easily
10  verifiable, too.
11           THE COURT:  Ma'am, do you know how far it is from
12  Boynton Beach to Hollywood?
13           THE WITNESS:  No, I do not.
14           MR. WILCOX:  One moment, your Honor.
15  BY MR. WILCOX:
16  Q.  Now, you have your phone with you at this time?
17  A.  Yes, I do.
18  Q.  Did you text somebody?
19  A.  Yes.
20  Q.  And you texted somebody to say exactly what?
21  A.  Um-m-m, that something doesn't feel right.
22  Q.  How long was it before you texted someone and said it
23  didn't feel right?
24  A.  I'm not sure how long it was.
25  Q.  But you still didn't say, stop the car, I want to get out?
```

```
1  A.  No, I didn't.
2  Q.  Because even though it didn't feel right, you still want to
3  see if you could get some crack --
4          MS. VIAMONTES:  Objection, asked and answered.
5          THE COURT:  Well, overruled as to this point in time.
6          MR. WILCOX:  Thank you, judge.
7  BY MR. WILCOX:
8  Q.  Because even though it didn't feel right, because you
9  didn't start texting as soon as you got in the car, right?
10 A.  I don't know.
11 Q.  I mean, some time passed before you decided it didn't feel
12 right, is that right?
13 A.  Yes.
14 Q.  Even though it didn't feel right, you were still saying,
15 maybe I can get some crack without coming up with any money?
16 A.  That was one of the things going through my head, yes.
17 Q.  One of the things going through your head, and the other
18 thing was what are these two guys going to do to me?
19 A.  No, I wasn't.
20 Q.  You are in a T-shirt with flip-flops on in a car for a half
21 hour, at least.  Am I putting words in your mouth, was it at
22 least a half hour?
23 A.  Yeah.
24 Q.  To buy drugs, right, that you haven't paid for yet, just
25 say, yes, as I am going along, is that right?
```

1        MS. VIAMONTES:  Judge, I object.  I object to him
2  saying just say yes as I go along.
3        THE COURT:  Sustained as to the form of the question.
4        One question at a time.
5  BY MR. WILCOX:
6  Q.  What time of day was this?
7  A.  It was during the day, like afternoon.
8  Q.  In the afternoon.  Okay.  You are in a T-shirt, correct?
9  A.  Yes.
10 Q.  You are in a car with two men you don't know, is that
11 right?
12 A.  Yes.
13 Q.  You are a nice looking woman, right?  You have been told
14 that, right?
15 A.  Yes.
16 Q.  Okay.  You are there to buy crack, is that right?
17 A.  Yes, that is correct.
18 Q.  So you are in a car with a drug dealer, right?
19 A.  Yeah.
20 Q.  Okay.  And you are not wondering what they are going to do
21 to you?
22        MS. VIAMONTES:  Objection, asked and answered.
23        THE COURT:  Sustained.
24 BY MR. WILCOX:
25 Q.  Did you consider what you might have to do?

1   A.   No.

2   Q.   You didn't consider that you might have to have sex with

3   these guys?

4          MS. VIAMONTES:  Objection, judge, asked and answered.

5          MR. WILCOX:  That wasn't asked and answered.

6          THE COURT:  Overruled.

7   BY MR. WILCOX:

8   Q.   That didn't cross your mind, I might have to have sex with

9   these guys?

10  A.   No.  The only thing on my mind was doing drugs and, also,

11  as I said before, I was in an emotional bad state of mind and I

12  was really upset and I --

13          I don't know, that is all I can say.

14  Q.   So, you were emotionally distraught?

15  A.   Yes, I was.

16  Q.   And because you were so emotionally distraught, you didn't

17  say stop the car, I want to get out?

18  A.   No, I didn't.

19  Q.   Because you were emotionally distraught and you wanted the

20  drugs?

21  A.   Yes.

22  Q.   Eventually, you get to the Beach and Town Motel in

23  Hollywood?

24  A.   Yes.

25  Q.   And when you get to the Beach and Town Motel in Hollywood,

1  you pull into the parking lot?

2  A.  Um-m-m, yes.

3  Q.  Well, you don't go into the parking lot.  Mr. Desir, he is

4  driving, right?

5  A.  Yes.

6  Q.  He pulls into the parking lot?

7  A.  Yes.

8  Q.  You have your phone?

9  A.  Um-m-m, no.  I don't have it at that point.

10  Q.  Excuse me?

11  A.  I don't have it at that point.

12  Q.  On the way to the Beach and Town, he took your phone?

13  A.  Yes, he did.

14  Q.  Tell me how that happened.

15  A.  I was on it and texting and trying to talk on the phone.

16  The music was too loud.  I asked him to turn the music down and

17  he wouldn't, and, so, he told me that I talk too much and he

18  asked me for my phone.

19  Q.  You had just met this man, is that right?

20  A.  Yes, that is right.

21  Q.  You had known this man for 30 minutes, is that right?

22  A.  Yes.

23  Q.  And he takes your phone, is that right?

24  A.  Yes.

25  Q.  And tells you you talk too much, is that right?

1  A.   Yes.

2  Q.   And you don't say, stop the car, you crazy, let me out?

3  A.   No.   I was thinking maybe he thought I was texting, you

4  know he was paranoid.   Maybe he thought I was texting somebody

5  about him selling me drugs or something.

6  Q.   Did you tell him, look, I ain't the police?

7  A.   No.

8  Q.   You gave him your phone to assure him you weren't the

9  police?

10  A.   Yes.

11  Q.   And that appeared to be more reasonable than saying stop

12  the car -- At that point, it was more reasonable for you to

13  give him your phone to show him you weren't the police than to

14  say stop the car let me out?

15  A.   Yes.

16  Q.   He had already given you the drugs, is that right?

17  A.   Yeah.

18  Q.   Back at the Beach and Town he gets out of the car, is that

19  right?

20  A.   Yes.

21  Q.   He leaves the phone in the car, is that right?

22  A.   Yes.

23  Q.   You take the phone, is that right?

24  A.   Yes.

25  Q.   And then you start texting him again, is that right?

1    A.   Um-m-m, I can't remember.

2    Q.   Didn't you testify when he came back he saw you on the

3    phone and he said that is a test?

4    A.   I had the phone in my hand.  I don't know if I was using it

5    or not.

6    Q.   When he said that this was a test, didn't you become

7    alarmed or more concerned that this person might be dangerous?

8    A.   Um-m-m, sort of.  I was just --

9    Q.   Sort of what?

10   A.   I mean, I wasn't really thinking like that, thinking that,

11   like, he wasn't mean in the beginning about it, he was -- I

12   don't know.  I just --

13   Q.   It wasn't unusual -- you didn't find it unusual for him to

14   say it was a test to see if you would use the phone?

15   A.   Yeah, it was unusual for me, but I don't know -- I don't

16   know.  I was in a strange place.  I didn't know who I was or

17   who he was.  I just didn't think anything of it.  I wasn't in

18   the right state of mind, and it didn't come up for me.

19   Q.   It was obvious he didn't want you to use your phone, is

20   that right?

21   A.   Yes.

22   Q.   He didn't have a right to tell you you can't use your

23   phone, right?

24   A.   Yes.

25   Q.   It was your phone?

744

1   A.   Yes.

2   Q.   Who is he to tell you you couldn't use your phone?

3   A.   I don't know.

4   Q.   But you went along with it?

5   A.   Yes, I did.

6   Q.   You wanted that crack?

7   A.   Yes.

8   Q.   Did he snap the phone away from you?

9   A.   He took the phone and put it back in the --

10  Q.   What did he say, let me have the phone, please?

11  A.   Not please, he said let me see the phone.

12  Q.   And then he took it and put it in the console?  What did he

13  do with it after he took your phone?

14  A.   He put it in the middle console.

15  Q.   And you didn't say why are you putting my phone in the

16  console?

17  A.   No, I did not.

18  Q.   I can't hear you?

19  A.   No, I did not.

20  Q.   That would have been a reasonable response, don't you

21  think?  Would it have been unreasonable for you to ask him why

22  are you putting my phone in your console?

23  A.   Yeah.  I mean -- yeah.

24  Q.   So you are willingly following the instructions of a man

25  you have known for less than an hour at this point?

```
 1              MS. VIAMONTES:  Objection, asked and answered.

 2              THE COURT:  Sustained.

 3   BY MR. WILCOX:

 4   Q.   Then he tells you come on in the hotel with me, is that

 5   right?

 6   A.   Um-m-m, he comes and asks me to come to the hotel.

 7   Q.   Is there something important and significant him taking the

 8   phone from you and him asking to go into the hotel with you?

 9   A.   Can you rephrase that?

10   Q.   What happened, if anything, between the point he took your

11   phone from you and asked you to go into a hotel with him?

12   A.   Um-m-m, nothing happened.

13   Q.   Just chit-chat?

14   A.   We weren't talking.

15   Q.   What now?

16   A.   We weren't talking.

17   Q.   Okay.  So, from Boynton to Hollywood, there was no, like,

18   where you from, how long you be here, nothing like that?

19   A.   No.

20   Q.   Just shut up, you talk too much?

21   A.   He said you talk to much.

22   Q.   Excuse me?

23   A.   He said you talk too much.  I was asking a lot of

24   questions.  I was trying to talk.

25   Q.   You were talking?
```

746

1   A.   Yeah.

2   Q.   You were doing all the talking, he wasn't?

3   A.   There were a couple questions I was asking.

4   Q.   Like what?

5   A.   Like in the beginning I asked where are you going, where

6   are we, what are we doing,

7   Q.   And he didn't say, like, don't worry about it, everything

8   cool?

9   A.   No.  There was no response.

10  Q.   He didn't say anything?

11  A.   No.

12  Q.   Okay.  So, at some point after he picks you up in Boynton

13  for a drug deal, drives you to Hollywood, he asks you to go

14  into a motel room with him?

15  A.   Yeah.

16  Q.   He didn't force you?

17  A.   No.

18  Q.   He didn't threaten you?

19  A.   No.

20  Q.   He just asked you, come on, let's go in this room?

21  A.   Yes.

22  Q.   And you complied?

23  A.   Yes.  That is normal.  I have done that before.

24  Q.   Excuse me?

25  A.   That is normal.  I have done that before.

1  Q.  For drugs?

2  A.  No.  Just hanging out.

3  Q.  Just hanging out?

4  A.  Uh-hum.  Yes.

5  Q.  Go in a hotel room with a man you have known for only an

6  hour.  That is normal for you?

7  A.  Yeah, yes, I have done that before.

8  Q.  Just hanging out and getting high?

9  A.  Yeah.

10  Q.  At that point, you didn't think sex was involved in the

11  picture at all?

12  A.  That wasn't on my mind, no.

13  Q.  You get in and you all party, is that right?

14  A.  Yeah, he gave me -- he gave me drugs.

15  Q.  Okay.  What exactly did he give you?

16  A.  Um-m-m, Dilaudid and crack.

17  Q.  You had Dilaudid, so, did he have a syringe, the cotton and

18  the spoon?

19  A.  Um-m-m, I -- I am trying to remember.  I don't remember

20  clearly, but he would provide a -- clean needles when I was

21  with him.

22  Q.  That was later, right?

23  A.  Yes.

24  Q.  So, I am talking about this day, this first day, did you

25  ask him for Dilaudid?

1    A.   No.

2    Q.   He just happened to have Dilaudid for you?

3    A.   He asked me if there is anything else that I did.

4    Q.   And you replied Dilaudid?

5    A.   Yes.

6    Q.   And then he went out and got it?

7    A.   Um-m-m, he walked over to the -- out of the room and came

8    back in.

9    Q.   How long did that take?

10   A.   Like a minute.

11   Q.   Okay.  He came back with the Dilaudid and you prepared that

12   and injected yourself with it, right?

13   A.   Yes, I did.

14   Q.   And you-- did you smoke some crack, too?

15   A.   Yes.

16   Q.   Then what happened?

17   A.   Then I, ah, um-m-m, sorry.  One second, please.

18   Q.   Then what happened?

19   A.   Then he starts talking to me, asking me questions.

20   Q.   What kind of questions?

21   A.   He is asking me where I am from, what am I doing here, just

22   asking about my life.

23   Q.   And did you answer his questions?

24   A.   Yes, I did.

25   Q.   Do you ask him questions?

1  A.   No.

2  Q.   Do you tell him about wanting to get off drugs, you came

3  here for rehab.  Did you tell him about that?

4  A.   I did.

5  Q.   After you had smoked crack and shot Dilaudid with him, in

6  front of him, I'm sorry.

7  A.   Yes.

8  Q.   And he told you that he was going to, ah, help you get on

9  your feet?

10  A.   Yes.

11  Q.   And he was going to get you a job working for him as a

12  secretary?

13  A.   Yes.

14  Q.   What else did he tell you that sounded good to you?

15  A.   He would give me an apartment and, um-m-m, um-m-m --

16         I'm sorry, your Honor, could we have a break, please?

17         THE COURT:  Yes.  We are right at the end of the day,

18  so we will go ahead and recess for the day.

19         Folks, in looking at my calendar, tomorrow I also have

20  a court committee meeting at noon.  It just so happens this

21  week I happen to have two.

22         We will recess for lunch at 12 noon tomorrow and come

23  back 1:15 for the afternoon session.

24         We will start at nine o'clock as usual.

25         Remember, do not discuss the case or otherwise

1 | communicate with anyone regarding the case.  Don't do any

2 | independent research on the internet or otherwise.  Should

3 | there be something reported in the news media do not read watch

4 | or listen to it, and, by all means, continue to keep an open

5 | mind until the case is submitted to you to begin your

6 | deliberations.

7 |           We will see you nine o'clock tomorrow morning.

8 |           (Thereupon, the jury leaves the courtroom.).

9 |           THE COURT:  Folks, anything else before we call it a

10 | day?

11 |           MS. VIAMONTES:  Nothing from the Government.

12 |           THE COURT:  I have a sentencing again tomorrow morning

13 | at 8:45, so, if you have anything that you want to go over, be

14 | here 8:30, otherwise 8:45.

15 |           MR. ZACCA:  Okay, very well.

16 |           THE COURT:  See you tomorrow, have a nice evening.

17 |           (Thereupon, court recessed at 5:00 p.m.)

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

**A**

abandoned 566:2,5 570:22
abide 701:21
able 550:2 557:2,4 572:17,18 585:6
666:13 704:23 712:15,16 719:5
729:12
absolutely 602:5 610:18 631:2
656:3 662:24
abuse 606:8,10,14 609:3,4,9,13
610:19,22 614:16,22 705:12,24
abused 606:5 614:12,21 617:17
705:14,16
abusing 605:22,24 607:9,12 616:9
624:18 715:6
accepted 559:13
access 671:17 672:8 698:14,18
accorded 675:16
account 696:10,19,21 697:4
accurate 554:9 670:19
accurately 554:6 576:25
acknowledging 692:7,8
acquire 621:21
acquired 696:4
act 548:6 564:9
acting 548:9 582:15
actions 602:15
acts 557:18 633:18
ad 583:5
addict 618:9
addicted 599:2 609:25 706:16,17
711:12
addiction 608:17 610:2,19 628:14
629:7 714:23
addictive 599:3 606:17 711:7
720:15
additional 612:8 711:21
address 545:9,25 703:18 705:11
adjust 713:11
admissibility 553:13
admissible 609:15 610:13 611:16
611:20 633:4
admit 548:23 549:10
admitted 588:3 594:8 596:8 700:24
ads 583:9,11
advertisement 545:20
affirmative 547:4
afford 714:13
afraid 572:13 580:2,3,6,14 581:1
662:17 698:23 735:3,4,5
afternoon 660:3 677:3 706:9 739:7
739:8 749:23
afterward 666:3 674:17
age 581:7,8,11 605:24 684:22
709:8,10
agent 580:21 581:3 658:14 684:8
684:13 686:3,14,21,25 687:12
688:17 689:15 690:3 699:23
700:21
agents 684:4,6,6 688:15,20,24
agree 613:12 619:16 649:1 654:3
673:4 689:2 698:18
agreeable 736:1
agreed 612:9 646:20,22,25 648:7
648:15,17,22 655:18 656:8
662:19 667:14,16 676:12,13,15
agreeing 662:22
agreement 630:19 631:7
ah 557:6 561:12 656:9 670:5
694:10 719:7,7 732:13 748:17
749:8
ahead 557:22 607:2 636:22 639:24
641:16 749:18
ain't 742:6
alarmed 743:7
alcohol 710:2
alleged 611:15
allow 612:18
allowed 564:24 565:1 593:12,14
608:25 634:3 642:25 643:1
alternative 707:23,25
Amendment 633:22
America 543:4 619:18
amount 574:19 575:11 629:1
Amply 610:4
Angel 596:1,21,25 597:7 655:20
699:3,5
angle 652:7
angry 582:9
ankles 560:9,10

**Annie** 555:15,18,19 556:5,11,13,25
557:12,14,16,18,22,25 558:6,9
558:15,19 559:22 560:14 561:2
561:13 563:1,17 564:4,6,13,15
565:1,4,5,19,20 566:18 568:18
568:18,21 569:4,5,12,15,22,23
569:24 570:2,3,7,14,18,25 571:5
588:15,18 597:4,9,15 598:22
599:8,19 600:6 602:22,23 603:2
604:12
Annie's 565:23 597:19
annoying 694:11
answer 555:17 568:1 572:10,11
581:15 584:10 593:4 606:24
628:7 630:24 639:18 640:25
641:1,18 646:20,22,25 648:8,22
649:25 653:24 654:3,7 659:11
672:15 674:1 680:16 713:9,12
734:7,8,9 748:23
answered 549:1 551:17 584:6
600:25 615:2 619:12,13 621:10
624:25 627:3 628:2 630:10
631:25 638:24 639:23 647:12
653:21 654:8 659:9 666:15 670:6
672:10 675:5,14 676:3 683:1
684:12 685:8 689:19 691:8
693:24 726:19 727:3 738:4
739:22 740:4,5 745:1
answering 568:2 644:21 645:11,15
645:22,23 646:1,5 647:6,8 649:2
654:14
answers 647:3 659:7
anticipate 589:4
anxiety 708:14,17,24 709:9
anybody 555:12 566:20 580:6
594:22 699:2
Anyway 642:11
apart 688:14,16
apartment 581:24 668:20,22
669:19,25 679:19,25 749:15
apartments 717:1
apologize 599:17 672:12
apparently 649:20
APPEARANCES 543:13
appeared 683:18 742:11
appearing 676:25
approach 551:25 576:8 593:16
595:15 649:10 664:14 670:8
687:4 691:14
approaching 593:19
appropriate 617:3 641:1
approximate 617:3 644:1
approximately 623:7 632:4,12
665:19 698:19 709:12 710:22
717:8,16
area 577:23 609:3 625:21 698:1
argue 632:7
argued 633:1
arguing 721:14
argument 730:6
argumentative 639:22 734:20
arm 777:13 711:4
arrest 547:13 548:20 549:2,2,20
555:11 564:14 575:3 576:21
587:2,4 652:16 655:25 667:19
674:21 675:3,11,23 676:2 678:9
679:2 693:21 694:14,15 702:16
702:19 704:7
arrested 580:22 604:6 656:13
661:22 662:9 663:4,8,19,21
665:15 679:3,7,21 680:1 689:22
690:18 691:11 692:5,9
arrests 701:8
arrive 644:15,24 646:19 657:18,20
arrived 548:22 562:16 643:7
644:10,13 645:17 650:15 651:14
658:3 660:6,10 704:11,14
arriving 647:5
aside 580:20 586:7
asked 549:1,5,19 551:17 560:12
569:3,4 584:6 600:24 602:20
604:18 610:5 612:16 615:2
619:12 620:11,14,16 621:10
622:14,15,18 623:2 624:25 627:3
627:13 628:2 630:10 631:25
638:7,24 639:22 642:12 647:12
653:21 654:8 659:4 665:6 666:15
666:20,21 668:16 670:6 672:10
672:11 675:5,14 676:3 678:24

683:1 685:8,19 686:10 687:18
688:19,20 689:19 691:8 696:1
697:19 700:7,8 701:2 703:23
705:8 725:16 726:18 727:3
728:16 729:10 738:4 739:22
740:4,5 741:16,18 745:1,11
746:5,20 748:3
asking 567:16 590:11,14 594:4
595:12 602:3 609:10,11 634:21
647:16 659:10 663:12 688:23
723:9 724:17 728:23 745:8,23
746:3 748:19,21,22
asks 745:6 746:13
asleep 558:18 560:3
Assistant 699:19
assisted 704:11,23
associated 714:23
assume 596:15 611:4
assuming 703:17
assure 742:8
attached 552:12 555:10 669:3
670:25
attack 612:12
attempt 666:3,5
attempted 665:22
attention 553:25 603:15 688:18
attorney 699:20 703:23
attorneys 611:16
AT&T 696:4
audio 641:15
August 703:9,12
authenticate 664:7
authenticated 596:10
author 593:24
authored 595:3,6
avoid 549:6 567:7 711:19
aware 587:15 625:13
awhile 685:4
A.F.P.D 543:19
a.m 599:23
A.U.S.A 543:14,14

**B**

back 545:22 552:15 554:9 557:10
558:21 560:2 561:2 566:23,24
568:18,19 569:11,12,15 570:13
570:15,23 571:4,15,16,18 579:5
581:24 585:25 586:2 587:25
588:10,11 589:11 591:8 592:4
598:21 600:6 601:10 604:12,20
610:11 611:8,14 623:14 629:25
629:25 633:24 634:22 647:25
652:22 659:14 665:3 667:11,14
667:16 669:21 673:6 675:20
677:21,23 682:8 687:2 688:4,5
689:5 690:8 693:1,11 699:13
713:11 728:1 732:25 736:20
742:18 743:2 744:9 748:8,11
749:23
Backpage.com 545:20
bad 570:2 610:2 611:6 633:2
709:20 740:11
bag 569:5 604:25 615:11,13 623:16
661:7,8,14 710:19,20 712:17,18
712:22 713:18,23 714:1,4,20
bags 712:12,13 713:21,24
bail 550:2 666:6,13
bailing 547:14 550:5 584:1
bails 581:20,21
Baltimore 556:10
based 551:5 594:8 596:7 671:12,14
basically 705:8
basis 719:9
Beach 551:21 570:25 571:7 574:11
641:11,20,22 642:7,10 643:4,7
643:24 644:5,10,13,15,24,25
645:2,17 646:19 647:19 650:7,15
651:14 652:12 667:11,17 681:5
693:1,4 730:4 736:22 737:5,12
740:22,25 741:12 742:18
bear 633:20
beat 633:25
beaten 590:21 632:24
beating 567:1,15 568:9,16 569:19
571:21 572:2,22 578:2,3,12,22
579:7,12,19 586:25 722:14
bed 560:12 645:7 711:18
beds 645:7
began 721:20 727:7

**beginning** 557:2 558:17 563:4,5
564:13 565:8 566:14 575:14,18
575:25 582:13,16 589:22 636:2
706:20 743:11 746:5
begins 567:22 575:18
behalf 545:15 700:12
behavior 582:14 602:2
belabor 713:5
believe 547:18 549:4 561:17 572:5
580:7 582:18 583:2 584:21 594:2
598:1 604:1,4 610:7 619:19
620:18 630:3 633:4 644:10,13
645:25 646:23 647:1 648:8
665:23 668:3,10 672:24 673:10
678:19 695:14 697:6 707:19
711:6 717:8 720:14 724:21
727:25
believed 572:13 580:4 604:3
695:13
belongings 562:9 604:24
benefit 723:25
best 586:12
better 595:19 610:4 662:9 677:7
beyond 608:19
big 582:25 716:25
Bigelow 611:14 613:2
binges 724:5
black 556:7 563:11 638:13,14
732:11,11,16,17 733:16
blamed 561:3
bleed 568:6
bleeding 568:7
Bless 619:4
block 731:19
blood 568:8 589:19
blur 673:4
boarded-up 566:2
Boca 617:7,15 618:12 631:5 715:13
body 570:10 576:20 578:25 609:24
609:24 629:13 720:20,21,23
722:13
bond 666:20 678:8 691:6 703:16
704:21,24 705:2,9
bonded 555:11 603:21 665:20
667:2 673:6 677:20,22,22 678:12
678:24 679:7,11,13 691:3 692:11
692:14
bonding 547:14,15
bondsman 601:15 602:20 603:21
603:24 604:9 605:2,9 705:9
booked 662:9 690:16 704:19
booking 603:23 604:2
bottom 599:8 601:4 664:19
bought 710:16 712:12 721:25
722:2 731:18
Boulevard 543:19,23
boxers 574:22
boyfriend 610:12
Boynton 571:5,9 737:5,12 745:17
746:12
break 589:7 627:1 634:21 642:13
648:3 658:13 676:23 677:2,21
679:10 749:16
breath 567:14
breathing 569:2
Bridge 619:20,20,22 622:14,22
623:9 627:10 633:8 634:23 697:5
710:23 717:24 719:19,22 720:2
726:11
briefly 548:20 592:22 612:19
bring 546:14 589:16 613:6 634:22
637:8 677:12,21
bringing 707:10,12,14,15
brought 566:2 568:15 571:15 575:4
586:15 623:18 653:11 655:13
Broward 543:19,23 663:17 683:15
683:19,25 684:3 688:7,8,15
702:23,25
brown 556:8
bruises 570:11 576:19 577:14,25
578:1,9,10,10,21,22,25 579:11
579:14,16,18
bruising 579:8 587:13
build 720:19,23
building 603:11,12 716:25
buildings 716:25
Burrows 660:10 662:3 688:6
business 582:21 603:13,19
button 682:10
buy 564:21,24 620:25 621:22 622:1

630:13 639:2,7,9,11,13 640:6,10
713:18,21 723:17 728:2,10
729:11 730:2 731:2 738:24
739:16
**buying** 723:16 725:1

### C

**calendar** 627:22 725:18 726:2
749:19
**call** 557:19 573:5,6,7,11,12,14
573:15 575:7 585:10,17,20,25
593:7 598:17 610:16 624:7,10
642:22,24 652:25 653:6 656:20
657:4,13,22 658:2,6 665:22
666:3,5,11,16,25 681:1,4 690:24
691:1 699:10 703:20,22 716:22
716:23 721:24 750:9
**called** 556:4 573:5 582:19 586:2,9
593:5 595:25 597:20 619:20
654:20 666:8,18 730:23
**calling** 582:19 585:24 586:10 691:6
**calls** 559:15 591:1 644:23 646:7,12
646:12,20,22,25 647:1,6,8
648:10,22,25 649:2 653:14,24
654:3,7,14 697:15 737:6
**calm** 585:20
**Candy** 571:6,7
**can't** 557:15 559:21 562:3 564:4
568:20 569:21 570:9,24 574:1,19
577:18 581:23 583:13,16 585:15
587:8,14 589:2 591:13 592:21
593:1 600:20 605:10 614:15,24
614:25 615:3 618:13 620:23,23
625:11 627:15,21 629:1,18,19
705:3 713:16 716:4 717:25
724:15 743:1,22 744:18
**car** 556:19,20 558:17 562:24,25
563:8,10,11,12,19,23 564:5,6
565:8,12,24,25 566:2,7,18,23,24
568:15,17,22 569:16 570:1,13,16
603:19 604:9 605:2 638:13,13,13
638:19,21,22,23 639:2 641:8
662:5 667:7 681:10,13,16 692:20
692:21,24 693:1 728:10,17,21
729:5,11,17 730:3,4 731:4,6,25
732:2,7,10,11,12,20 733:16,16
734:2,14,16,18 735:7,21,24
736:2 737:25 738:9,20 739:10,18
740:17 742:2,12,14,18,21
**card** 562:20 584:25
**care** 561:15 582:25 590:22 666:22
**cars** 731:19
**case** 543:3 546:22,24,24 547:1
550:4 589:8 611:10 612:4 620:8
625:12 632:21 634:7,9,10 636:24
658:15,21,24 659:2 671:10,11
677:4 681:7 700:5 701:18 702:22
702:23,25 703:12,22 749:25
750:1,5
**cases** 701:9 728:18
**casually** 580:15
**caught** 722:13
**cause** 558:1
**caused** 558:3 578:1,10,22 579:6,7
579:11,18 616:20 644:20
**causes** 609:9 643:3
**caveat** 557:22
**cell** 586:4 592:22,24,25 593:3
623:22,24 624:5 641:13 663:7,20
691:11 696:23
**cent** 622:12
**center** 617:7 618:22 619:25
**centers** 619:16,18
**Certain** 675:15
**certainly** 610:10
**chance** 650:9
**change** 575:25 576:1 582:13
697:24 716:11,18
**character** 633:2
**characterize** 707:11
**charaterize** 707:11
**charge** 582:21
**charged** 633:11,16,19 634:16
**charges** 625:12 636:1
**check** 562:20 628:24 698:16,17
**chief** 671:10,11
**childhood** 707:15
**chit-chat** 745:13
**choice** 617:25 618:19 625:3 630:8

632:14 663:1 689:13,14,15
**choke** 591:21
**choked** 567:13
**choking** 567:22
**choose** 666:11 680:20 681:22
694:5
**choosing** 692:25
**chose** 618:22 619:7 624:13 638:23
666:25 667:7 680:12,18 681:21
682:25 692:24 694:4
**circling** 567:2 579:16
**claim** 549:22 550:1,15
**claimed** 549:14 660:17,18 661:12
**clarification** 612:8
**clarify** 593:1 610:8 674:25 688:1
**class** 707:17
**classes** 708:2
**classify** 660:24
**clean** 616:6,22 747:20
**clear** 545:8 616:5 631:2 656:3
582:19 624:16,6
**clearly** 652:22 747:20
**client** 547:22 548:6 573:7,8,9,25
574:3,6 591:24,25 592:18 656:13
656:16 682:21
**clients** 548:12 591:20 592:11 593:5
593:10 600:21 655:8,12
**close** 633:15
**closer** 618:24 619:16
**closing** 587:6
**clothes** 562:11 604:25 623:17
624:4
**clue** 565:15
**cocaine** 606:5,10,12 608:16 615:15
615:18,24 627:8 639:11,13,16
655:3 661:14 706:2 709:23,24
710:6,12 732:8
**code** 698:1
**coercion** 609:25 633:20
**COHN** 543:11
**coke** 706:2
**cold** 711:10,16,20,25 712:1,7
**come** 558:5,9 561:21,23 566:20
568:24 569:15,22 582:1 584:5,11
587:19 588:6,7 590:11 592:2
601:11 603:1 608:22 618:19
619:8 624:8,11 632:3,9 633:24
636:2 657:19,21,22 664:1,1
666:6 678:2 728:19 735:17
743:18 745:4,6 746:20 749:22
**comes** 561:2 566:21 568:13,18,19
569:23 573:9 603:20 714:10
729:10 736:20 745:6
**comfortable** 613:11 723:7
**coming** 561:15 567:4 569:24 573:7
601:19 606:8,10,14,19 607:5,17
607:23 636:14 637:24 647:2
649:19 708:19 720:20 722:16
738:15
**commend** 546:19
**comments** 728:25
**commercial** 633:18
**committee** 749:20
**common** 728:10,12,22 729:13,13
729:14 730:2
**commonly** 728:14 731:22
**communicate** 592:25 750:1
**communicated** 546:23
**communication** 698:11
**community** 715:4,14
**complete** 584:6 686:18
**completed** 715:16
**completely** 566:5
**complied** 746:22
**composite** 650:3,6,19
**compound** 680:13
**computers** 575:5
**concerned** 734:24 735:1,5,7 743:7
**conditions** 701:22,24
**condo** 717:1
**confrontation** 557:12 633:21
**confuse** 613:3
**confusing** 631:14
**consensual** 634:4,8,11 673:24
674:5,18 675:1 676:10 693:7
**consider** 643:18 739:25 740:2
**consistent** 633:17 634:14
**console** 744:12,14,16,22
**conspiracy** 545:4,5 636:2
**constantly** 607:11

**contact** 579:20 580:12
**contents** 544:1 562:15
**context** 556:16 606:7 672:4
**continually** 696:24
**continue** 547:8 565:13 589:8,24
613:15 624:17 636:25 637:10,11
651:4 677:16 693:11 750:4
**continued** 547:9 680:4
**continuing** 599:8
**control** 576:3 586:4 589:20,21
**convenient** 564:2,3,20 565:6
**conversation** 561:6,10 599:7,7,19
646:8 665:1
**conversations** 546:10 685:15
**convey** 550:8
**cook** 726:15,17 727:9
**cooks** 721:8
**cool** 746:8
**cooperative** 603:24
**copy** 545:24
**corner** 728:11,19 730:2
**corrected** 613:19
**correctly** 620:2 647:22
**cost** 710:18 714:22 715:2,4 723:15
**costly** 710:15 713:7
**costs** 714:25
**cotton** 718:8,10,13,25 719:9 733:9
747:17
**couch** 727:17,19,20
**couldn't** 557:4 565:21 567:14
568:1 572:10 590:22 620:17
662:23 672:22 714:13 734:16
735:22 744:2
**counsel** 546:4,16 589:15 602:3
612:12 633:1 634:3 636:16 637:7
671:10 677:11 706:6 729:1
**counseling** 702:1
**counted** 574:18
**County** 702:23,25
**couple** 562:11,12 572:16 573:1
606:13 607:16 611:9 622:7
651:21 664:4 679:16 685:15
692:13 693:9 710:13 726:6 746:3
**course** 702:22
**Courthouse** 543:22
**courtroom** 546:15,25 589:10,17
602:2 611:11 613:7 637:1,9
649:22 677:5,13 686:4 750:8
**Court's** 633:17
**cousin** 563:4,5,6,21 565:7 566:13
566:20 567:3 729:7,9 730:23
732:24 733:1 736:2,4
**covered** 569:2
**co-counsel** 706:6
**co-defendant** 547:23
**crack** 551:9,12 575:9 606:12,13
608:16 626:12,17 627:8 639:10
639:11,13,15 661:14,21 710:12
722:2,5,8,8,11,16,17,19 723:1,5
723:12,15 724:3,5,11 731:1,2,2
731:13 732:8 735:17 736:12
738:3,15 739:16 744:6 747:16
748:14 749:5
**Crawford** 545:7
**crazy** 742:2
**credibility** 610:11
**crime** 633:12,15 634:16
**crimes** 633:19
**criticize** 547:20 548:3
**cross** 605:16 706:4,7 740:8
**cross-examination** 544:5,6 553:9
557:12 605:15 609:1,3 612:10
613:15 637:12 675:15 677:16
**cross-examine** 695:20
**crush** 718:3
**cry** 568:2,4
**crying** 590:14 637:22
**cuffs** 575:4
**Culuffo** 589:16
**curious** 735:14,16
**cut** 601:21 656:17 666:1 713:11
**C.J** 544:3 547:5,11,22 548:3 551:20
552:5 553:19 554:20 557:25
567:5 568:9 572:5,21 575:7
576:14,25 577:13,19 578:6,15
579:11,20 580:1 585:4 587:10
589:23 590:2,24 591:15,18
601:15,21 602:19 605:18,20
610:6 611:13 612:23 613:14,17

### D

**Dad** 587:15 590:24 591:6,9 603:16
624:7,7 628:23 629:2 694:22,25
695:2
**Daddy's** 560:20 588:20 657:9
**Dad's** 601:9
**dangerous** 743:7
**dark** 556:7
**DARYL** 543:19
**date** 586:22 595:9 622:17,18,18
623:5 628:8 629:16,17 636:2,3
636:10 642:10 643:4,7,12,15
644:2,4,7,10,13 655:24 656:12
656:19 657:4,13 665:17 674:21
679:13 681:5,17 683:4 693:17
697:11,12 699:25 700:7,8,12
703:11,21,21
**dates** 576:6 591:15,19 593:4,5
640:16 655:7,10,12 656:4 680:10
680:18 686:2 693:15
**David** 720:3 721:8
**day** 556:14,14,14 562:14 575:15
579:21 580:16 585:13 598:13
599:22 600:7,11,19 601:17,18
615:8,11,13,17,18,19 616:13,16
618:13 621:8,18 626:16,19,20
629:25 630:2,2 636:14,15 642:15
642:18,19,20,24 643:3,6,12,15
643:18,23 645:17,18,19,20,21
646:17 647:10,23,24 648:13
651:21 653:13,24,25 654:16,17
654:22 655:13 663:21 713:24
714:1,4,11,13,14 725:21
739:6,7 747:24,24 749:17,18
750:10
**days** 564:16 571:20 572:1,16 573:1
601:5 608:6,10,10,12 616:24
617:10 623:8 629:23 630:1
636:14 642:19 651:21 665:19
679:3,6,16,24 680:1,1,2 690:20
690:21 692:13 693:9 694:15
697:2 713:3,22,23,24 714:6
720:17
**deadbolt** 555:6,7 558:19 669:22,24
**deal** 590:21 708:21 728:5 735:1
746:13
**dealer** 632:5,20,24 633:10 634:5
634:8 635:4 721:21,24 724:18,19
725:1,3,8 726:24 727:2,10 728:5
728:15,21,23 729:17 739:18
**dealers** 728:2
**dealer's** 632:13
**deals** 731:15
**decided** 625:3 738:11
**decision** 663:1
**declarant** 550:17
**declaration** 545:4,6 663:18
**decrease** 575:19
**deemed** 610:17
**defeated** 590:19
**defects** 708:5,13
**Defendant** 543:16,19 545:13
550:20 551:8 560:21 650:5,22
664:18 726:2
**defendants** 543:8 546:4,12 589:14
593:13 633:21 677:10
**Defendant's** 650:3
**defense** 544:14 602:3,7 609:23,23
633:1 634:2 650:18,24 664:3,11
670:22 671:9 691:17
**degraded** 591:21
**degree** 675:15
**delay** 545:14
**deliberations** 750:6
**Delray** 717:14
**demeanor** 564:8
**denied** 686:17
**Denny's** 622:8
**deny** 700:16,20
**Department** 660:5
**depended** 615:10 713:22

depends 723:16
depict 554:6 670:14
depicted 652:22
depiction 670:19
depicts 670:12
deposit 715:19
depression 708:14,18,24 709:9
DEPUTY 649:22
DERIC 543:16
describe 556:5 560:19 564:8
  569:24 583:25 629:25 681:1
  707:14 711:14 727:11
described 563:6 578:3,12 590:4
  638:13,16 718:1
describing 579:7
Description 544:10
deserve 576:4
deserved 572:4,5,14
Desir 543:7,16 547:17,23 550:18
  550:22 551:8 557:14 558:10
  562:22 575:14 576:1 578:24
  591:16 594:19,23 595:23 604:8
  609:6,7,8 631:3 632:13,17,21,23
  633:8 635:24 636:6 637:5,17
  638:5,11,16 642:2 644:16 656:20
  656:25 658:2,5 659:20,22,24
  664:13 666:18 667:16 673:19,22
  674:5,6,8,17 675:1,3,10,23
  677:22 678:1 681:10 682:19
  689:10 690:24 691:1,3 692:16
  693:7 694:9 698:15,19 700:9,14
  700:18,25 727:13 730:9,15,18,20
  730:22,25 731:25 732:2,25
  733:17 736:2,6,20 741:3
Desir's 590:4 650:5,22 664:18
  697:15,22 729:5
detective 683:13,15,19,21,23 684:1
  688:6,6
determined 594:7 596:7
detox 607:19
DeVega 660:5 662:2
develop 592:14
device 641:14
diagnosed 708:4,13,15,17 709:11
diagnoses 708:15
dialed 657:16 698:20
Diamond 555:20,21,25 597:21
difference 669:21
different 555:2 560:23 571:4 620:3
  626:3,7 628:3 652:6 685:9
  716:18 727:23
difficult 557:1 590:3 695:17
Dilaudid 559:25 560:1 571:25
  597:5 598:20 599:2,20 620:19,22
  622:19 623:3,6 626:10,15 639:9
  655:1 661:11 710:25 717:17,20
  717:22 719:5,13,14,18,21 720:6
  720:9,15 721:3 722:2,5 723:3,3,5
  723:6 747:16,17,25 748:2,4,11
  749:5
diminish 575:19
dire 553:5
direct 544:4 547:6,9 553:25 589:5
  589:24 608:19,24 619:19 620:18
  629:12 632:16 637:16,21 640:16
  644:16 647:21 655:7 658:1,9
  659:13 660:2 668:17 673:9 678:1
  691:3,6 693:18 696:1 697:23
  720:14 728:9,25
disability 708:2
disagree 618:16
disappoint 624:20
disbelief 622:25 695:1
discern 557:16
discharged 622:24 624:8,10,24
  633:7 719:19,22 720:2
discovery 553:1,4
discuss 589:8 611:10 625:15
  636:24 677:4 749:25
discussed 546:22 658:23 659:4,7
discussing 551:20
discussion 601:23 608:23 632:10
  671:6 728:8
disorder 708:14
disregard 549:17
disrespect 567:17,18,21
distracting 602:1,4,5
distraught 695:16 740:14,16,19
DISTRICT 543:1,1,12
DIVISION 543:2

document 664:2,5,17,20 665:4,8
  665:11,12 691:17,19 692:2,4,7,8
doesn't 564:6 571:13 604:18 627:4
  634:6 640:1,2 646:23 671:16
  721:12 728:21 737:7,21
doing 567:16 569:16 581:6 589:19
  600:7 602:13 609:4,5,5 626:18
  626:22 632:21 641:7,7 654:15
  681:18,19 682:24,25 684:19
  713:8 714:1 724:10 740:10 746:2
  746:6 748:21
dollars 722:20
door 592:9,10,14 553:6,19,21
  554:6,20,23,25 555:4,5 558:18
  566:1,6,8,11 588:12,16 590:25
  591:7 609:14 610:24 652:14
  659:17 669:9,18 670:2,4,15,20
  672:5,8,13,18,20,21 673:7
  682:16,20 693:19,20,24 694:2,4
  694:21 695:7,11
doors 553:7 732:13
Dormitories 716:24
dosage 598:4
downstairs 645:1
draw 718:12
drawer 562:12
dressed 575:3
drink 564:22,24 565:1,4 710:2,3
drinks 564:22
drive 570:22 641:8 728:10,21
  736:25
drives 733:21 746:13
driving 563:8,12 565:13,24 603:8
  604:13 732:10 741:4
dropped 565:9 571:5,8 694:9
  707:23
drove 563:3 564:2 565:7,7,17
  567:16 719:7 726:14 727:18
drug 547:13 549:3 559:24 599:3
  606:14,17 609:3,4,9,11,12,17
  610:19,19 613:24 614:6,9,11
  614:14 616:18,20 617:7,19,21
  618:9,11 620:16,19 622:15,19
  623:3,6 632:5,12,20,24 633:9,10
  634:5,8 635:4 646:7,12,23 648:8
  661:10,12 701:15,19,21 702:2,7
  702:9,19,23 715:10,11,16 720:20
  721:21,24 724:18,19,25 725:3,8
  729:16 731:15 734:25 739:18
  746:13

_____

E

E 543:23
earlier 578:3,12 621:7 640:16
  678:24 685:19 693:6
early 585:14 596:13 599:18
earn 628:11
earned 622:9
easily 570:8 725:19 737:9
East 543:19
easy 643:13
eat 556:18,20
effect 678:3
efficiency 552:12 555:5,10,12
  558:6,15,19 562:11 571:15,17
  572:22 581:24 588:10,11,12
  597:10,16 602:23 667:13 669:3,5
  669:9,11,15,18,25 670:17,18,20
  672:5 673:7 677:23 679:1,18,25
  693:3
eight 724:10
either 555:24 681:22 716:4
electronic 641:14
element 730:1
elevator 682:10,12
elicited 557:17 608:24 632:15
elmo 578:5,14 579:2,13 595:18
  651:4 653:9 695:20 726:7
emotional 622:24 740:11
emotionally 695:16 740:14,16,19
empty 566:19
encompassed 545:23
ended 561:3 603:8 630:20 643:4,23
  644:5 665:23 721:17
endure 568:9 590:23
enforcement 579:20 580:11,21
enjoyed 676:21
enter 616:20 618:11 715:13

entered 594:4 596:2 618:15
entering 614:22 615:6 617:7 621:2
  621:6
entire 665:3
environment 716:11
ERGIO 641:17
escort 646:13 647:1,6,8 648:25
ESQ 543:16,17
established 609:16 622:21
estimate 644:4
estimated 643:8
estimating 643:24
evening 750:16
events 651:8
eventually 588:24 628:9 667:2
  692:11 696:13 740:22
everybody 570:13 583:1 589:11
evidence 544:9 545:3 552:18
  553:17 554:13,18 577:4,11,20
  578:6 579:2,8,13 594:3,5 596:3,4
  595:5 633:2 634:6 640:19 650:19
  650:24 670:22 671:21,23 726:5
exact 614:24 622:17 629:1
exactly 568:10 591:14 610:7
  644:18 702:4 722:10 737:20
  747:15
examination 544:4 547:6,9 589:24
  605:16 608:25 619:19 620:18
  629:12 632:16 637:21 651:4
  658:1 659:13 660:2 668:17 678:1
  691:3 693:18 696:1 706:7 720:14
exchange 600:21 631:6,15,23
  634:12,13 635:10,14 656:4
  662:21 680:18 700:17,21,24
excited 722:9
exclusion 633:21
exclusive 586:4
excuse 602:9 619:3 641:13 643:11
  664:11 719:7 726:14 727:18
  741:10 745:22 746:24
exhibit 544:11,12,14,15 545:23
  553:15,17,25 554:18 578:5,14
  579:8,9,14 594:2,7 650:2,3,4,5,6
  650:19,22,24 664:3,10,11,12,13
  664:18 668:16 669:7,17 670:11
  671:20,23 672:6 691:17 695:24
  697:17
exhibits 544:8,13 576:15,16 577:10
  667:24 671:8,10
expensive 713:10
experience 673:4 711:10,14 728:19
explain 705:18 722:17
explained 684:24 718:15
exploded 684:22
explore 728:13
express 581:13
exterior 672:4
extremes 722:9
ex-boyfriend 586:9,10 609:13
  611:14 666:8 698:11 699:11
ex-boyfriend's 698:10
eyes 604:16

_____

F

face 567:7 590:13,18
faces 546:12
facility 608:3,5 716:21
fact 548:18 559:22 571:12 572:16
  574:13 580:16 581:3,17 600:13
  603:5 604:1 624:13,21,24 626:1
  632:20,22 633:15 646:12,17
  670:4 678:7 687:15 690:24 694:1
  697:14 704:11 720:1 730:3,20
fail 622:16
failed 702:14 703:25
fair 618:8 658:17 670:19 672:25
  673:2 705:12 710:14 711:19
  712:6 714:14 727:1
fallen 558:18
familiar 547:14 717:22
family 582:25 583:3 584:12,15
  586:7 619:11 715:2,6,10,11
far 590:5 641:6 737:11
fast 622:8 722:14
father 642:22,24 657:5 665:23
  694:1 695:13 715:19 724:21
father's 636:14,15 642:15,18,19,20
  642:24 643:3,6,12,15,18 665:24
FBI 580:21 581:3 684:4,6,13 685:23

687:18 688:15,17,20,24 689:15
  690:3
Federal 543:22 634:5
feel 561:19 572:8,9,13 583:14
  590:18 591:21 597:23 611:17
  677:7 721:1 722:11,12 723:3,5,7
  723:8 737:21,23 738:2,8,11,14
feeling 586:13 706:11 711:19,20
feet 749:9
fell 560:3 561:14
felony 678:8 701:11,15,18
felt 568:10 572:8,12 583:15,15
  590:19 662:23 689:7,13,14
  690:20 711:15 722:18
female 660:8 662:2 683:15,21
  684:12
FERNANDEZ 543:17
figure 649:17 713:7,8
figured 580:17 732:24
financial 714:25
find 581:7 602:4 743:13
finds 545:3 633:19
fine 642:6 643:14 657:2
fingerprinting 604:2
finish 707:20
finished 614:2 707:19
fire 547:20,25 548:7,15,16 551:11
  555:24 563:3,19,25 564:17,18
  565:20,22 566:17,21,24 567:2,13
  567:19 568:24,25 569:12,23
  570:14 571:5 573:5,22 574:9
  575:10 578:25 580:12 583:12
  586:3 588:15,18 591:16 593:4,7
  595:25 597:5,14,14,19 598:16,21
  599:11 600:3 601:18 602:22,23
  602:24 604:12,17,20 647:3
  654:13,18,19 699:1 711:4
Fire's 564:8 582:23
first 547:13 556:13,14,14 561:5,12
  575:14,15 595:12 607:20 608:7
  608:13,24 613:23 614:12 615:6
  615:15,20,25 616:2,6,15 620:8
  621:2,16,23 631:10,11 637:16
  644:24 645:17,19,20,21 647:23
  647:23 648:13 651:13 653:13,24
  653:25 654:16,17,22 665:15
  657:24 664:23 673:1 679:2
  681:24 687:8 690:23 691:24
  700:23 720:2 726:14,15 728:4,5
  732:4,5 747:24
five 687:8 720:10,11 723:21,24
fix 711:21 712:22,22,24 713:1
fixed 547:1
FI 543:15,18,20,23
flip 576:14
flip-flops 738:20
floor 681:24,25,25
floors 682:1
Florida 543:1 587:15 591:10
  606:8,10,14,19,21 607:4,6,18,23
  610:20 618:19,20 619:8 696:5
  700:17 715:13 716:19 724:13
flu 599:4 711:15
flu-like 711:20
focus 655:22 656:2
foggy 678:21
folks 589:8 611:8,12 613:8,9
  637:10 643:18 677:1 749:19
  750:9
follow 583:14 588:20 703:22
followed 699:10 703:23
following 549:2 617:15 744:24
followup 664:4
food 622:8
force 633:20 676:15 746:16
forced 618:6,7 632:18 638:21,22
  662:15 687:19 688:21 735:20,23
forever 568:11
forewarned 602:14
forget 658:9
forgive 606:1
form 631:10 663:10,18 739:3
formed 546:25
Fort 574:5,10 603:8 681:7
forth 597:4
forward 609:22
found 548:23 561:10 646:18
  648:24 660:15 661:16,19
foundation 594:6
four 593:23 720:10,11,17 732:13

**Four-door** 732:14
**frame** 586:18 625:11 642:4 643:8 647:25
**Francis** 543:14 699:20
**fraud** 633:20
**freak** 585:19
**free** 672:8
**freely** 572:19 670:2,4 683:13,23 688:6
**frequently** 711:24
**friend** 625:5,6,10,24 666:5 717:23 717:24 718:15 720:3
**friends** 586:8,12 617:21 626:1,3,7 727:23
**front** 552:9,10 553:19 563:15,16,22 668:23 688:17 749:6
**frustrated** 582:18 583:15
**frustration** 582:11
**Ft** 543:2,6,20,23
**full** 545:22 578:25 732:12
**Funk** 686:3,14,21 687:1,13 699:23
**funny** 602:1
**furniture** 566:4
**further** 598:6 605:14 664:6 706:3
**furtherance** 545:4
**Furthermore** 729:20

**G**

**gap** 564:15,16
**Generally** 722:25
**Genet** 543:7 551:11 578:24 595:23 601:25 604:9
**gentleman** 683:5,7 730:10,14
**Gentlemen** 552:2 576:11
**getting** 567:15 578:2,11 594:10 599:19 600:4 635:23 666:22 697:9,10 704:12 719:15 731:7 747:8
**girl** 571:6 575:5
**girlfriend** 665:24
**girls** 581:7,8,11 593:12 684:22 717:5
**give** 548:8 559:1 571:22,24 581:10 598:2,2 600:21 610:16 659:7 671:2 712:16 731:13,24 732:9 742:13 747:15 749:15
**given** 555:22,23 573:15 584:2 585:7 593:3 594:15 630:15,16,17 742:16
**gives** 643:8 732:20 733:19
**giving** 555:25 576:2 600:11 632:21 635:2,8,12,14,15
**go** 550:2 556:20 557:10,22 563:2 563:25 564:21 565:6,12 569:9 571:3,7,9 572:18 573:8 581:2,24 586:14 587:4,25 588:5,9,10,18 595:9 600:23 601:20 603:3,5,7 603:19 605:5 607:2 608:20,25 611:17,18 612:3 619:25 623:14 624:15,16,17,19 625:3,4,5 634:6 636:21 638:23 639:2,24 641:16 644:25 645:11 664:6 665:3,12 667:7,14,16 670:24 672:8 681:4 681:13,16 683:4 692:19 693:1,3 694:13 696:17 702:6 703:8 704:2 705:16 707:22 711:25 720:17 728:1,6 739:2 741:3 745:8,11 746:13,20 747:5 749:18 750:13
**goes** 566:23,24,24 568:18,21,23 569:11 605:7,8 609:22
**going** 545:14 546:6 561:15 564:20 571:19 573:4 575:7 585:18,20 586:13 587:10 603:1,1,10 608:21 610:14 621:11 622:16 632:8 633:23 634:17 636:21 641:15 646:1,5,23 647:9 649:1,3,13,24 654:14,15 655:19 656:6,7 664:2 664:3,7,17,22 666:21 691:16 697:17 703:13 705:20 716:17 718:1 723:1 729:11 732:24,25 733:1 734:3,5,10 735:12 736:12 738:16,17,18,25 739:20 746:5 749:8,11
**good** 546:17,18 547:5,11,12 561:16 589:22 597:23 605:18,19 613:12,13 677:9 706:9 716:17 734:18 749:14
**gotten** 562:10 598:4,20 731:19
**Government** 543:14 544:11,12,13

544:15 545:15,17,21 552:2,5,18 553:17 554:1,13,18,25 576:12,15 577:3,10,19 578:5,14 579:2,8,13 594:8 596:3,8 609:7 610:1 611:4 632:15 636:5 643:16 658:14 664:2,4,11 668:3,4,6,11,16 669:7 669:17 670:11,22 671:7,20,23 672:5 685:20 695:24 697:17,19 699:14 700:13,21 704:11,23 705:18 725:20 750:11
**Government's** 554:21,23 593:19 593:20,21
**grab** 605:8 623:14
**grabbed** 560:10 561:13 623:16
**grabs** 568:18
**grade** 707:20,20,24
**gram** 712:15,16,18,19,20
**grandma** 696:23 697:12
**grandmother** 628:24,25 697:3 724:22
**Granted** 577:9
**great** 546:20
**grocery** 604:25
**ground** 561:14
**grounds** 671:2
**group** 546:20
**guess** 644:20 647:15 649:19
**guessing** 644:19
**gun** 590:4,8,13,18,22
**guns** 659:19
**guy** 558:16 573:18 574:13 603:20 633:24 728:20 729:5,6,8 734:24 736:6
**guys** 548:8 561:11,14 564:20 570:24 738:18 740:3,9

**H**

**ha** 596:25
**habit** 713:8
**hadn't** 598:20,20 717:20
**hair** 556:7,8 561:13
**half** 589:6 598:9 712:15 738:20,22
**halfway** 619:22
**Hampton** 681:4 713:13,14
**hand** 569:8 576:5 728:20 743:4
**handcuffs** 603:20
**handed** 574:18
**handle** 703:19
**hands** 567:13 576:3
**hanging** 747:2,3,8
**happen** 559:13,16 572:3 581:1 584:3 592:10,17 711:24 721:6 733:5 749:21
**happened** 560:1,11,16 561:4,21 565:17 566:25 574:17 575:2 590:16 599:14 601:17 604:6 614:4 626:18 741:14 745:10,12 748:2,16,18
**happening** 586:11 689:6
**happens** 561:1,7,7,11 562:23 564:3 565:23 566:12 568:17 571:16 749:20
**happy** 613:20
**hard** 551:9,11,12,14 589:2 591:18 646:4
**hasn't** 599:6 647:13 686:11
**haven't** 557:17 590:12 613:3 665:6 672:11 686:10 738:24
**head** 565:22,23,23 569:17,17 580:19 738:16,17
**heads** 565:19,20,21 570:23
**heal** 571:21
**hear** 553:3 572:10 581:15 585:18 588:11 589:22 674:1 694:24 722:8,25 724:5 744:18
**heard** 598:21 609:19 619:5 649:19 694:25 695:2,13 716:15
**hearing** 546:10 557:13 695:15
**hears** 649:17
**hearsay** 545:6 550:16,18,19 557:11 557:20 558:22 570:4 663:11 665:8
**heart** 609:22,23 634:9,10 722:12,14
**heavy** 569:2
**held** 565:21 579:23 662:12
**help** 581:10 627:7,22,25 629:20 663:20 687:1,3 689:17 706:23 712:4 749:8
**helping** 581:13

**helps** 643:6
**heroin** 551:9,12 606:4,8,16,20 607:3,5,7,8,9,12,14 608:14 614:10,11,14,16,21 615:7,12,13 615:18,22 616:2,10,12,17,22 621:7,18 639:7 706:16,17,19 709:3,12,14,16,17,18 710:8,14 710:16,20 711:2,7,12,22 712:12 713:13 714:9,11 715:7
**hey** 638:7 703:20 734:3,5,9 735:16
**He's** 560:20
**Hi** 706:10
**hid** 609:4 624:24
**high** 637:24 638:1 639:15 640:3,5,9 695:1,5 707:23,24,25 721:3 747:8
**highly** 711:7 720:15
**hip** 577:23
**hit** 567:9 736:16,17,18
**hitting** 567:7,11
**hold** 582:10 591:20 592:4 638:10
**holding** 565:23 567:3
**Hollywood** 574:11 660:5 737:5,12 740:23,25 745:17 746:18
**home** 618:24 624:8,11,15,16,17,19 625:3 632:13
**Homing** 563:3,25 630:3 631:5 635:20,21 637:15 638:7,11 727:14 729:8 730:10,14,17,20,22 731:6
**Honesty** 691:2
**Honor** 545:17,18 546:7 547:8,21,24 549:8 550:23 551:25 552:17,23 553:2,5,10,16 554:12 576:8 577:8 584:13 590:1 591:3 593:16 595:15 596:14 600:24 601:24 602:16 605:13,14 609:10,21,22 613:6 634:18 640:18 642:3 643:11 664:14 665:5 668:13 670:24 671:1 676:23 677:8 706:5 708:10 712:10 719:24 725:18 726:18 727:3 729:2 734:20 737:3 737:7,14 749:16
**HONORABLE** 543:11
**honoring** 610:21
**hoping** 713:12
**hopping** 727:17,19,20
**horrible** 591:15
**hospital** 586:14,15,22 587:4,7,10 587:16,17,25 588:1,3 694:6,8,9 694:11,12,13,17
**hostessing** 627:19
**hot** 711:16,20
**hotel** 571:4,9 573:8 574:4,10 649:4 649:8 682:4,6 745:4,6,8,11 747:5 hour 589:6 598:9 736:25 738:21,22 744:25 747:6
**hours** 599:18 646:18,25 647:5 651:21,22,23 653:1,13,13 685:7,13,15,17 686:23 687:13,15 687:16 712:23,24 713:19 724:10
**house** 552:9,10,12 553:19 554:5 555:11 558:17,19 560:17 561:15 561:22 566:2,4,12,13,15,19,20 566:22,25 568:23,24 569:1,11,12 569:20,22,25 570:22 573:8 588:16,18 590:10 597:12 602:24 619:22 667:13 668:23,24,25 669:2,3,16 727:7 736:10
**houses** 727:11,23
**Hughes** 702:11
**Huh** 722:23
**hundred** 722:20
**hurt** 561:13 592:3

**I**

**idea** 611:6 631:10,19,20,22,23 682:3
**identification** 549:4 552:5 554:1 576:12,15 605:9,11 684:15
**identified** 665:10 684:10 699:5
**immediately** 564:10 633:18 707:24
**impeach** 728:24
**impeachment** 686:9,16 729:19
**important** 546:21 745:7
**imposed** 701:22
**improper** 686:9,16
**inaccurate** 735:20
**inadmissible** 610:17
**inartful** 614:19

**inbetween** 563:20 621:23 622:4,4 674:23
**incident** 558:12 610:11 611:13,18 611:19
**include** 701:24
**included** 685:22
**inconsistent** 639:18
**indefinitely** 716:1
**independent** 636:25 750:2
**indicated** 709:12 711:6,9 727:9 730:9
**indicating** 555:8 669:5,14
**indictment** 625:12 629:17 633:19 636:1
**individual** 655:10
**individuals** 631:6,16,17
**influence** 707:7
**informality** 547:21
**information** 546:24 581:10 636:19
**informed** 610:6
**ingest** 711:3 719:6
**ingesting** 709:3
**initially** 548:23 549:12 605:5 614:12,17
**inject** 711:21
**injected** 748:12
**inmate** 663:17
**Inn** 563:3 564:1 630:3 631:5 635:20 635:21 637:15 638:7,11 681:7,11 681:13,24 727:14 729:8 730:10 730:14,17,20,22
**inpatient** 613:24 616:25
**inside** 554:5,7,21 566:3 568:18 569:16,19 580:5 603:19 605:3 644:25 645:2 652:3,14 653:8
**instances** 715:9
**instruct** 546:12 573:24
**instructed** 580:11
**instructing** 611:18
**instructions** 573:15 744:24
**intended** 668:4
**intention** 610:21
**interest** 581:13
**interfere** 641:15
**internet** 583:5,9 750:2
**interview** 686:25 687:22 688:9,13 700:2
**interviewed** 699:25
**interviews** 685:22,25 700:2
**introduced** 517:14 594:3 638:4
**introduces** 603:20
**inventory** 692:4
**investigated** 550:4
**involved** 747:10
**irrelevant** 547:25 608:19 634:7 729:20
**irritated** 583:16
**isn't** 598:16 619:7 620:12 665:16 670:4 673:1 676:2 678:7 683:19 683:21 684:1 686:8,14,21 687:19 688:22 689:10 690:24 695:9 697:14 698:15 700:23 704:24 711:7 721:2
**issue** 612:20 633:20 656:13
**issued** 702:16,19 703:25
**it's** 552:9 597:22 598:7 599:4 672:25
**I'll** 557:21 598:9
**I'm** 556:2 572:10 574:20 617:8 621:9 631:12 651:20 665:17 674:24 678:15 679:5 686:2 694:16 737:24 749:6,16
**I've** 610:11
**I-Hop** 556:24

**J**

**jail** 547:15 550:2 580:5 581:17,19 584:1 603:23 604:2 665:16,19,22 666:23 667:4 677:22,22 679:2,16 689:24 690:4,10,12,13,16,18,20 690:23 692:14 704:12,17,18
**JAMES** 543:11
**January** 702:16
**Jared** 725:3
**jaw** 568:7
**jittery** 722:9
**job** 627:16,17,20,23 628:1,9,11,12 628:14 717:6 749:11
**jobs** 620:3 622:4,5,10 627:11,14,15

**Johannes** 543:14 545:18,21 612:7
612:8 649:15 728:22 729:2
**join** 555:12 591:3
**joined** 583:3
**judge** 543:12 545:11 549:1 550:10
550:18 551:17 552:20,21 557:20
559:10,15,17 584:6 594:2,12
596:2 600:15 601:20 606:23
610:14 613:1,5 621:10 627:3
628:4 632:7,11 633:10 634:1
636:7,16 637:13 638:24 639:22
643:14,20 647:13 649:10,15
650:18,21,25 651:4 660:24 661:2
664:2 665:1,6,13 668:6,8 670:8
674:1 675:20 676:3 677:17,19
683:1 685:9 686:17 687:4,21,25
689:19 691:14,16 695:18,20
701:6 703:22 705:16 721:15
725:11 728:6,12 729:20,23 738:6
739:1 740:4
**judicial** 643:12 725:23 726:1
**July** 625:13 673:1 685:25 687:2
**jumpy** 722:9
**June** 548:20 550:4 552:15 554:9
555:11,12 576:23 577:1 580:22
596:23 598:14 599:9,18 601:5,10
601:10 625:13,16 627:18 629:16
632:3 634:24 635:18 636:1,10
642:11,12,14,18,20 643:2,3,6,15
643:19,20,23 644:4,9,12 652:16
665:23,23,24 656:10,12 662:19
665:15,16 667:20 673:1 674:15
674:15,16,20,23,25 675:1,11,13
675:24 676:2,9,10 678:25 681:1
692:5,9 697:7 726:23 727:2,2,24
**JUROR** 589:21
**jurors** 546:5,18 547:2 613:11 637:8
649:18 726:8
**jury** 543:11 545:14 546:14,15
558:12 571:16 588:14 589:10,16
589:17 590:8 596:6 597:3 602:9
602:21 606:2 611:2,9,11 613:6,7
620:5 625:15 626:9 634:3 637:1
637:9,21 651:3,7 656:3 677:5,12
677:13 681:1 723:25 724:1 725:18

---

**K**

**K** 600:7
**Katrin** 702:11
**Kayla** 555:20,21 556:1 597:21,22
**keep** 569:17 576:6 589:9 636:25
653:8 669:24 750:4
**kept** 560:14 567:25,25 590:12,14
598:22 604:13
**kidding** 591:14
**kill** 547:18 584:5,11,14 678:5,16,18
**killed** 570:21
**kind** 557:1 565:9 583:2 603:12,13
690:8 722:1 728:19 730:25
732:10,11 733:13 735:12,14,16
748:20
**knew** 547:17,25 551:8 560:25
561:2 562:22 584:21 590:24
597:6 622:15 632:5 647:10 694:1
697:22 703:15 715:6 719:15
736:6
**knock** 659:17 693:19
**knocked** 682:16,20
**knocking** 588:12,16 694:21
**knowing** 585:2
**known** 555:20 695:11 741:21
744:25 747:5
**knows** 584:11,19 620:5 737:8

---

**L**

**lack** 662:9
**land** 645:9,9 652:23,25
**lapse** 712:25
**larger** 698:3
**Lastly** 579:13
**lasts** 640:5 712:24
**late** 545:13 585:14 705:14
**latitude** 675:16
**Lauderdale** 543:2,6,20,23 574:5,10
603:8 681:8
**laugh** 602:8
**laughing** 601:25
**law** 579:20 580:11,20
**lay** 561:12

---

**laying** 569:18 570:1
**lays** 609:2
**leading** 549:16 550:10 559:10
575:21 583:20 587:20 592:12,14
600:14,14 610:19,24 621:12,18
651:8
**learn** 647:18 648:13
**learned** 646:15,17 648:10 653:14
653:17
**learning** 708:2
**leave** 565:6 570:22 585:2 588:24
622:19 623:2,2,9,9 627:13,20
641:22,23 659:18 662:23 678:2
**leaves** 590:10 611:11 637:1 677:5
742:21 750:8
**leaving** 598:9 655:16
**led** 582:17
**left** 551:20 558:18 562:19 574:22
577:13 584:3 595:9 623:11
627:23 628:1,9,11,14 634:23
637:15,20 667:9 678:11 727:6
**leg** 578:6,18
**legally** 582:10 588:7 678:2,18
**legs** 567:6,9 576:19 579:3,5
**Leslie** 589:18
**letting** 613:1
**let's** 546:14 549:6 558:13 587:25
589:7 592:22 606:7 613:6 627:1
637:8 656:10 657:25 667:22
677:12 686:12 723:19 729:17
746:20
**level** 589:19
**licensed** 702:6
**lie** 609:2,9 610:10 617:18,21 715:9
715:11
**lied** 572:4 609:3,7 610:6 624:21
**life** 724:12 748:22
**light** 633:15
**likes** 547:24
**line** 544:10,10 557:15 593:8 594:9
595:18 645:9 652:23,25 706:2
730:1
**list** 545:19 650:4
**listen** 750:4
**little** 566:19,21 583:6 591:13 598:6
602:25 628:3 631:13 667:5 690:1
698:3 706:13 709:7 710:2 715:7
**live** 584:12,19 625:5,10,24 725:8
720:3
**lived** 626:1 632:12,20 635:2,4
**living** 626:5 715:14 721:21 724:25
727:14,15,16
**lobby** 682:17,21
**local** 580:20
**location** 553:7 641:23 681:4
**long** 556:7 568:9,10 569:12 606:19
607:9 608:5 611:9 614:16,21,25
616:23 622:18 623:5 625:10
639:15,17,17,19,19 640:1,9
651:18 666:2 678:25 690:18
693:9 709:1 712:22,24 713:6
715:25 716:3,5 723:18,19 725:8
732:7,20 733:25 734:2 737:22,24
741:18 748:9
**longer** 589:4 677:3 721:2
**look** 556:5 593:23 595:2 610:9
634:14 644:1 649:25 650:9 665:3
691:19,22 742:6
**looked** 552:14 570:2 576:25 604:15
**looking** 587:16,19 591:10 603:16
604:13 634:4 635:21 638:1,2
639:2,7,9,10,13 640:10 665:9
702:5 705:9 730:23 731:2 739:13
749:19
**loss** 715:2
**lost** 675:20
**lot** 562:7 563:23 582:20 603:11
606:6 720:25 728:18 741:1,3,6
745:23
**loud** 741:16
**love** 546:20
**loved** 695:10
**low** 726:9
**lunch** 636:23 642:13 749:22
**lying** 609:5

---

**M**

**Mackenley** 543:7 562:22 575:14

---

**576:1** 578:24 580:9 583:18,25
590:4 594:19,22 595:23 604:8
638:4,11
**mail** 703:17
**mailed** 628:24
**mailing** 703:18 705:11
**makeup** 562:10 661:7,8,14
**making** 546:12 572:9,13 649:1
705:10
**male** 660:13 684:12,13
**man** 741:19,21 744:24 747:5
**March** 617:4,11
**marijuana** 709:25
**mark** 570:12 684:2
**marked** 544:9 664:18 670:11
**marking** 691:17
**marks** 570:10 577:23 578:8,17
579:5,6,14
**math** 712:20
**matter** 546:1 553:8 610:17 721:12
**matters** 545:9
**ma'am** 552:1 593:17 681:19 696:6
707:4 708:13 714:12 737:11
**mean** 556:7 567:25 598:1 599:1
600:10 656:8 673:3 688:12
697:11 700:5 704:18 712:2 713:5
713:10 714:10 718:19 720:24
721:20 727:22 738:11 743:10,11
744:23
**Meaning** 600:11 608:3
**means** 599:5 705:8 712:4 750:4
**meant** 597:5 598:2 673:16
**measurement** 712:16
**media** 750:3
**medication** 706:23 708:21
**medications** 706:25 707:1,2,8
**meet** 556:13,16 574:3,4,13 593:9
681:17 727:7 728:4
**meeting** 578:24 580:16,20,21
609:6,8 631:2 632:13,22 633:8
656:25 700:9,14,18,25 727:13
730:9,15,18 749:20
**meetings** 685:22
**members** 558:12 571:16 588:14
597:3
**Memorial** 694:11
**men** 621:21 656:4 680:24 739:10
**mental** 708:5,13,16 709:11
**mention** 611:2 672:24
**mentioned** 562:14 564:13 594:15
596:21 613:23 642:14 688:6
**merits** 547:1
**message** 550:8,14,17,20,21 551:6
592:10 595:12 596:3 597:22,24
598:6,13 599:22 600:6 699:8,10
**messages** 593:22,24,25 595:3,8
601:5,5,11 695:24 697:18 699:5
**messed** 603:23 604:1
**met** 556:14,15,17 564:13 574:4
575:14 590:5 635:24 636:5
637:17 658:12,20 685:19 686:14
686:21 699:14 717:25 729:17
741:19
**Miami** 543:15
**microphone** 546:10 555:16
**middle** 565:10,20 567:2 604:23
707:17 744:14
**midnight** 598:14 599:19,23
**miles** 737:5
**mind** 559:17 589:9 636:11,25
642:14,17,18 645:25 654:11
657:23 658:6 730:5 740:8,10,11
743:18 747:12 750:5
**mine** 551:7 660:19 661:9,21
**minute** 589:7 677:2 701:6 737:3
748:10
**minutes** 569:13 611:9 677:4
696:11,13,17,18 697:7,8,14
723:21,24 741:21
**Miramar** 543:17,18
**mirror** 604:14
**Misclassifying** 640:18
**misdemeanor** 701:13,15
**missing** 650:4
**misstate** 720:1
**misstatement** 660:23
**mistaken** 721:20
**misunderstood** 668:21
**mix** 711:3 718:5
**Mom** 585:4,6,17 586:7 592:23

---

**624:10,10** 666:3
**moment** 552:23 648:3 663:25
665:1 666:11 695:18 712:10
719:24 737:14
**momentary** 636:17
**Monday** 699:13,19 700:25 701:3
**money** 548:8 574:15,16,18 576:4,6
592:10,17 599:24 600:2,19,21,23
615:10,14 620:25 622:9 623:20
624:1,2,4 628:11,22 629:4,7,13
629:4,7,13 630:13,16 631:1
635:14 639:5 640:6,12,22 696:19
696:21 713:22 714:22 717:15,17
723:1 724:22,22 731:8,9,11
732:23 733:1 735:18 738:15
**month** 607:3,5,7,8 617:3 625:18
633:11 634:15 696:24 697:2
705:14,24
**monthly** 696:25
**months** 614:2,4,20 615:1,21 616:1
616:6 716:6,8
**morning** 545:10 546:17,18 547:5
547:11 589:18 599:18 605:18,19
720:15 750:7,12
**motel** 548:22 551:21 552:9,10
562:19 641:11,20,22 642:7,10
644:25 645:1,3,5 650:7 651:15
651:16 681:5 693:4 740:22,25
**mother** 585:11
**Mother's** 725:21
**mouth** 568:7 738:21
**move** 552:17 554:12 603:2 612:11
634:2,3 711:18 716:17 726:23
**moved** 596:3 633:9,10 635:1
667:12 724:17,19
**moves** 577:3 650:18 670:22
**movie** 622:6
**moving** 561:24 562:2,4 565:24
603:2 671:10
**muscles** 723:9
**music** 734:12,13 741:16,16

---

**N**

**name** 547:22 555:15,18,22,23,25
556:3 571:6 595:22,25 596:21
597:19,19 655:20,20,21 662:2
683:23,24 684:1,2 694:12,22
699:3 720:3
**named** 662:2
**names** 555:19,21 597:21 683:14
**natural** 710:10
**naturally** 557:19
**nature** 594:3
**NE** 543:15
**near** 719:16
**necessary** 602:11
**neck** 567:13 570:12
**need** 545:2,9,25 546:6 624:7,11
648:3 649:16 671:3 676:23 719:4
719:5 721:3 722:21
**needle** 569:3
**needles** 747:20
**needs** 545:8 584:14 613:18 641:14
**negate** 729:18
**neighborhood** 565:9
**nervous** 648:1
**never** 573:14 597:6 604:6 620:5
655:15 657:4,23 658:1,5 668:10
668:11 678:16 689:19,18 693:24
698:22 699:1 703:3,20 708:4
710:16 722:18 724:9
**new** 573:15 716:18 727:7
**news** 750:3
**nice** 564:10 582:16 739:13 750:16
**Nick** 666:8 699:11
**nickname** 595:22
**night** 597:23 598:4 689:22 691:11
**nightly** 598:4
**nights** 669:1,1,16
**nine** 749:24 750:7
**nonresponsive** 606:23,24 612:11
**noon** 749:20,22
**normal** 707:12,14,15 746:23,25
747:6
**normally** 573:10
**notes** 709:20
**notice** 643:12 725:23 726:1
**numb** 722:13 723:4,5

number 545:23 585:23 594:18,24
596:24 598:8,23 601:6,6,8,8,9
609:2 623:24 651:16 664:10
691:17 697:19,22,24,25 698:5,7
698:9,10
numbers 650:2

## O

oath 547:6 589:23 613:14 637:11
677:15
object 547:21 557:15 584:13 594:6
608:18 739:1,1
objected 676:4
objecting 612:14 671:8
objection 548:1 549:16 550:10,16
551:2 552:19,24 553:11 554:14
554:15,16 557:11,21 558:22
559:10,15 570:4 575:21 577:5,6
583:6,20 584:6 586:18 587:20
591:1,3 592:12,15 596:15,16
600:14 606:23 612:9,10,16 615:2
619:5,12 621:10 624:25 625:7
627:3 628:2 630:10,21 631:25
632:6 633:23 634:17 636:7
638:24 640:18,24 642:3 647:12
648:17 650:20 653:21 654:8
660:23 663:11 665:5 666:15
670:6,23 671:2,12,15 672:10,13
675:5,14 676:5 680:13 683:1
685:8 686:9,16 687:21 689:19
691:8 705:15,21 708:10 721:10
721:13 725:4,11 726:18 734:20
737:6 738:4 739:22 740:4 745:1
observe 602:12
obtain 719:5,14
obtained 611:24
obvious 743:19
occasion 659:1
occasions 609:8 629:23 630:16
631:1,5 673:22 674:8 700:10
occur 633:5
occurred 633:18 634:15
occurring 647:19
October 706:20,21
odds 558:3
offer 668:4
offered 631:23 633:3 668:3,10,11
office 605:3 663:17 683:19 688:7,8
688:15
officer 550:5,9 551:5 573:19,23
574:25 660:5,8,10,13 662:2,3,3
683:8,10,25 688:8 690:6,8,13
officers 579:23 580:5 588:12
659:14,16 661:22,25 662:12
683:11,18 684:3 688:14,17
Official 543:22
officially 596:3
Oh 691:23
old 556:5,7 605:20 607:20,22
613:23 616:18 621:3,17
once 546:19 555:10 563:25 565:6
565:12 566:11 568:16,21 588:11
628:11 640:12 641:5 674:16,16
ones 595:5,21 715:6
open 558:18 566:8 589:9 609:14
610:24 612:22 636:25 694:4
695:7 750:4
opened 566:1,6,9 659:17 695:11
opens 566:11
operation 581:6 582:23 684:20,20
opinions 547:1
opportunity 671:11
opposite 722:5
order 592:14 610:1,12 611:23
629:9 640:15 714:19 718:19,19
719:4
orders 588:20
ordinary 683:7
Orlando 571:11,12 603:2,3,5
outside 566:7 588:6 652:9,25
670:15,19 693:19 694:21 734:16
outstanding 702:20 704:3
outweighed 609:25
overrule 633:23 634:17 671:15
705:20
overruled 548:1 549:6 550:11
551:18 559:18 583:21 584:8
587:21 592:13,15 596:17,19
601:1 606:25 621:13 628:15

630:22 639:24 647:14 654:9
663:14 675:6,17 676:5 680:14
685:10 686:19 708:11 738:5
740:6
owed 583:18 584:1
ownership 661:12
o'clock 636:21 749:24 750:7

## P

pack 561:23 562:4,7,23,23
page 544:2,10,10 545:22 593:20,23
593:25 595:2 599:8,17 601:4
664:22,23,24 687:8 691:22,24,25
paid 631:1 696:23 697:3,5,12
715:19 728:3 738:24
pain 606:4
pair 562:12
paperwork 703:24
paragraph 687:8
paranoid 742:4
paraphernalia 701:15
parents 617:18 619:9 624:20,21
parked 565:18
parking 603:11 741:1,3,6
Parkway 543:17
part 572:4 611:15 647:2 649:7
participate 701:18
particular 549:4 609:11 611:18
651:18 655:10,12 656:13,19,22
657:13 666:11 728:23 729:16
parties 545:1
party 747:13
pass 620:17,19
passed 747:14 616:6 679:6,24
738:11
passenger 563:14,15,16
pathetic 604:14,15
PAULINE 543:21
pay 653:2 680:23 693:15 696:10,10
696:13,19,21,24,25 732:24 733:1
paying 615:15 688:18
payment 630:17 631:10,19,21
680:9,18
peek 588:19,20,22
pending 657:24 701:9
people 546:20 563:23 580:4,5,14
698:24 716:12,14,18 723:25,25
727:7
people's 727:7,11
Percocet 614:8,14,16,17,21 615:22
616:9,14,16
Percocets 710:4
perfect 699:5
performance 548:3
period 616:1,5,12 625:13,16,16
627:17 633:6 634:23 635:1,7,17
635:23 637:22 655:22,22 656:2,4
657:11 673:1 678:25 680:4
698:14 714:16 720:6,8,11 724:23
727:24
periods 698:24
permissible 664:9
permission 577:8 659:24 671:24
permitted 592:14
person 550:24 560:19,23,25 563:6
586:5 630:19 631:7,20 635:2,7
638:10,17 666:18 684:10 690:24
721:21 743:7
personal 656:24
person's 631:20 632:4
pertain 553:12
pertaining 546:24
phases 702:6
phones 644:21 645:12,15,22,23
646:1,5,6 647:3 648:8 649:15
photo 554:6
photograph 552:14 554:20 578:6
578:17 579:3,14 652:3,6,11,22
653:9 668:9,18,22 669:7,17
670:11,12,14 671:25
photographs 551:21 576:25
649:13,24 650:4,6,9,12,25 651:3
651:7 667:25
photos 576:21
physical 608:17 609:13 610:22
672:17 722:18
physically 599:3 672:21
pick 563:3,25 564:8 588:6,7 603:1
655:24 667:4 692:20

picked 563:3 570:24 571:5 667:5
730:20,22
picks 692:16 746:12
picture 555:2 577:21 668:23
747:11
pictures 552:25 576:19
piece 569:8,9 636:18 723:17,17,19
pill 661:7,8 693:17 723:6
pills 599:12 606:4
pitting 557:18
pizza 622:7,7
place 583:5 644:24 685:25 716:14
716:18 743:16
placed 552:5 554:1 673:6
places 716:12,15
placing 578:5
Plaintiff 543:5
plan 585:21 641:4,6
planned 716:7,7
planning 716:6
playground 565:18
playing 609:6
plays 609:4,6
please 552:23 561:9 572:11 576:14
595:24 597:23 608:8 616:3 617:8
621:9 622:20 630:25 637:10
640:7 644:11 661:18 664:22
674:7 675:7 676:7 677:12,14
679:5 680:17 685:11 700:11,19
706:6 711:6 719:20 720:1,24
744:10,11 748:17 749:16
Plus 599:23
pocket 722:21
point 555:6,7 560:14 568:24
572:21 583:2,18 585:4 587:16
590:19 595:9,12,21 603:17
608:18 624:7 628:19 629:4,6,12
632:3,16 635:1,20 638:10 639:5
640:15 641:4 645:13,14 646:15
647:18 648:10 652:21 661:22
662:5 666:8 673:10 677:20,21
679:2,18,21,24 682:8 687:18,22
687:24 688:21,24 692:12 692:16
693:6,18 694:6,17 700:16 713:5
717:16 727:6,13 731:24,25,25
733:25 735:4,21,24 736:1,6,9,9
738:5 741:9,11 742:12 744:25
745:10 746:12 747:10
pointed 590:18 610:23
pointing 555:8
police 548:22 550:5,8 573:19,20,23
574:23,24,25 575:2 576:21
587:19 588:11,17,24 589:1
590:10 656:20 607:14,18,19,21
657:22 658:2,3,6 659:14,16,18
659:24 660:5 661:22 662:5,7
683:8,10,11 685:3,6,13 686:22
687:13 690:6,10,13 693:19
694:21 742:6,9,13
pool 652:11
position 550:1
possession 549:3 701:8
possible 695:1
possibly 580:18 610:7
post 704:21 705:1
posted 583:9,11
posting 704:24
post-traumatic 708:14
pot 606:5
powder 606:12
powered 641:14
precisely 689:8
premised 632:21
prepaid 696:8
prepared 718:20 748:11
preponderance 545:3
prescribed 706:23,25 707:2,7
708:2
prescription 587:9
present 545:1 546:4 589:14 637:6
677:11 684:3 686:3 699:23
presented 726:2
pressed 567:14
pressure 589:19
pretty 591:15 598:24 713:10 723:1
previously 729:18
price 710:14,17
prior 606:8,10,14,19 607:5,8,17,23
609:5,8 610:6,9 614:12,22 615:6
615:15 617:7 621:2,6,16 631:2,7

632:3,13 633:7,8,18 656:24
658:15,20 685:20 700:3,7,8,9,12
700:14,16,17,20 701:3 708:19
709:18 727:13 730:9,14,17
prob 600:5
probably 569:13 695:11 697:9
problem 574:2 602:2 610:2 653:20
problems 708:16 709:11
procedure 671:12,14
proceed 557:22
PROCEEDINGS 543:11
process 547:14,14 581:2
proffer 594:8 596:8 608:21 632:8
632:11
program 614:23 618:11,16,24
620:11,14 621:2,4,6,18 622:14
622:19,21,22 623:9,11 624:8,11
624:22 633:8 701:21
progressive 710:10
promise 611:9
propensity 633:2,3
proper 553:8
properly 596:10
property 663:18,19 692:4,8
prosecutors 658:20,23 659:2,21
729:24
prostitute 628:19 673:17,20 687:19
688:21 700:9
prostituted 700:13
prostituting 581:7,8 673:15 700:17
700:20,24
prostitution 576:6 580:22 587:2,4
591:19 609:8 610:6 647:18
648:11,22 653:15 674:21 679:3,7
679:22 690:19 693:22 701:8,16
702:25 703:12,14,21
provide 674:2 747:20
provided 552:25 553:4
publish 577:8 668:8 671:25
published 596:6,11
pull 569:6 741:1
pulled 561:13 603:11
pulls 741:6
punched 568:7 578:2,11
punching 567:1,4,4,5,10,11,22
568:1
punished 548:11 592:20
purchase 717:17 728:14
purpose 555:25 564:20 586:10
purse 562:10,14,15,19 574:21
605:1,5,7,8,11 661:6 733:7,8,15
pushed 682:10
put 565:19,20,22 567:1,13 570:23
574:23 592:10 593:18 595:18
603:22 606:7 610:4 640:16
654:20 671:16 690:7,7 711:4
728:21 744:9,12,14
putting 738:21 744:15,22
p.m 596:23 598:7 601:5 636:23
637:3,4 750:17

## Q

qualify 545:6
question 587:23 593:2 600:17
600:24 610:15 611:17 613:2,19
614:19 619:14 621:11,15 628:3
631:13 640:25 641:19 642:6,9
648:19 657:24 661:1 665:7
672:15 675:19 676:4,5 679:9
680:13 684:12 685:9 686:10,12
687:10 688:1 690:1 699:16 713:4
719:20 728:16 730:13,16 739:3,4
questioning 557:15 594:9 625:21
730:2
questions 549:5 567:16 590:11
592:14 594:4 605:14 640:18,24
612:1,16 649:25 653:9 659:4,8,9
664:4 667:24 668:17 691:20
695:23 706:3 726:6 745:24 746:3
748:19,20,23,25
quit 712:4
quite 711:24 720:22 729:3 735:5

## R

racing 722:12
ran 629:4 697:14
Raton 617:7,15 618:12 631:5
715:13
reach 585:4,6 586:7 592:23

react 567:23 581:21
reaction 720:21
read 594:4 687:8 750:3
reads 596:25 633:9
ready 648:5
realized 545:22 562:15 647:6 732:1
really 561:4,7 564:12 569:2 587:6
597:22 648:1 656:8 694:25
695:17 722:8 729:19 731:15
740:12 743:10
rear 563:17 579:3
rear-view 604:13
reason 609:12 618:16 619:7 622:25
647:10 655:24 665:9 667:14,16
671:13 689:8 716:10 734:18
reasonable 742:11,12 744:20
reasoning 609:21
recall 563:10 567:20 570:15 585:13
593:24 617:2 635:17 678:24,25
701:2 720:8
receive 597:24 601:10 708:23
received 594:9 546:24,25 550:21
551:6 552:22 553:15,17 554:17
554:18 577:7,10 630:13 650:23
650:24 653:14 671:21,23
recess 546:2 589:12 636:22 637:3
677:6 749:18,22
recessed 750:17
recognizance 705:4,6
recognize 552:6 554:2 576:16
595:2,5 650:12 668:17 670:12
692:2 698:7
recollection 553:6 554:9 627:7
663:13 664:6 665:11 687:1,12
709:20
reconvene 636:23
reconvened 637:4
record 545:3,8 546:3 547:3 589:13
596:2 601:23 608:23 632:10
637:2,5 671:6 677:10 728:8
records 618:15 622:24 643:9 644:1
698:17
recovery 617:7 618:11,22
red 570:12
redirect 602:19 633:24
refer 560:19 659:21 721:21
referencing 673:15
referred 547:22 573:10
referring 593:20 611:21 687:23
reflect 546:3 547:3 589:13 637:5
677:10
refresh 627:7 663:13 664:5 665:11
687:1,12 709:20
regard 545:8 557:11 702:22
regarding 546:23 549:2 610:12
611:14,15 612:20 750:1
Regional 694:11
regular 645:5 719:9
rehab 606:21 607:16,17,20,22,25
609:12,13,17 614:22 715:16
716:14 749:3
relapse 614:6,8
relapsed 614:5,8,20 615:21 616:15
620:14 624:20
relating 610:16
relation 629:16 635:17 636:15
relationship 721:17
relax 723:8,8,12
relaying 550:20
released 587:17 588:1,5 705:3
relevance 591:4 625:7 630:21
632:6 633:14 636:7 705:15
708:10 721:10 725:4,11 729:22
relevancy 729:3,4
relevant 609:22 610:10 612:4
632:15,23 633:4 634:6
relieve 714:19
reluctant 559:3
remained 702:20 704:3
Rembert 543:7;19 546:11 547:23
578:24 595:23 601:25 602:15
604:9 631:3 637:6 700:18 726:2
Rembert's 602:7
Rembret 551:11
remembered 647:22
remembering 589:2
remembers 572:17
remind 547:5 589:23 613:14
677:15
renamed 545:23

repeat 555:16 559:5 561:9 572:11
587:24 595:24 608:8 616:3 617:8
621:9,15 622:20 630:25 640:7
641:19 644:11 675:7,19 676:7
678:15 680:17 683:17 685:11
707:13 713:4 714:24 719:20
repeated 734:11
repeatedly 591:24
repetitious 549:7
rephrase 558:7 600:17 613:21
631:13,14 642:9 648:19,20 661:1
663:10 674:5 679:5 687:25 690:1
700:11,19 703:10 704:13 714:2
720:24 745:9
replied 748:4
report 686:25 687:8 704:17,18
reported 543:21 750:3
Reporter 543:22
represented 546:4 589:14 637:6
677:11
reputation 715:4
required 703:3
requires 611:17 670:25
research 636:25 750:2
residential 608:1,9
residing 558:5
resort 629:9
respect 712:15
respectfully 633:23
respective 589:14 637:6
response 545:22 549:17 557:13
610:16 659:8 744:20 746:9
responses 547:4 557:19
responsibility 618:2 696:21
responsible 678:11,17
responsive 612:13
rest 572:18 573:1 574:20 623:14
restaurant 558:18,21,23 721:8
restaurants 622:8 717:14,16
restraining 610:12 611:23
restraint 672:17
result 691:6
retrieve 605:7 650:25
retrieved 577:17
retrieves 569:9
return 570:25
returned 601:15 602:20
returning 693:9
returns 546:15 589:17 613:7 637:9
677:13
ribs 567:10
ride 690:12 734:2 736:22
riding 732:3
ringing 647:11
rock 722:20 723:24
rode 731:19
role 582:23
Romash 686:3,14,21 687:1,13
699:23
room 548:23 558:15 560:18 561:2
567:2 575:4 577:16 590:17
597:12,18 602:24 611:9 645:1,5
645:11 650:7,13,14,16,17 651:19
651:10,13,15,16,18,19,24 652:1
652:3,6,9,14,16,19,20,23 653:8
653:11,17 654:4,4,24,24 655:13
655:13 657:20 659:15,25 660:6
660:10,15,20 661:4,16,20,20
667:22,25 669:24 681:16,24
682:2,4,14,18,22,23 683:4,18
685:4,14 687:16 746:14,20 747:5
748:7
roommate 717:2
roommates 717:4
rooms 588:18 645:2
RPR-CM 543:21
Rule 634:5
ruled 609:15 610:11 611:13,19
rules 583:14 649:8
ruling 545:2 610:21 611:4 633:17
run 584:4 682:8 696:14 697:7
Rutland 715:7

### S

sales 646:23 648:8
sandals 733:14,15,15
sat 562:23 685:14 688:17
saw 554:7 569:24 570:1 590:4,8
708:25 743:2

saying 548:7 580:15 585:21 590:12
600:6 604:14 658:7,8 685:16
695:8 715:14 734:18 735:16
738:14 739:2 742:11
says 595:5 729:11,12,13 734:2
scared 561:20 570:2
scene 683:11
school 707:23,24,25
schooling 707:19
Schultz 684:1
scope 608:19
screaming 560:9
search 659:25
searched 548:22
seat 563:14 604:12,20
seated 546:16 611:12 613:8 677:14
second 595:10 605:13 607:22
614:22 615:25 616:18,20,23
617:2,6,10 621:24 650:16,17
651:10,24 665:4 674:20,25,25
693:21 694:14,15 748:17
seconds 666:2 732:22,23
secretary 582:24 644:17,20 646:2
749:12
security 562:20 584:25 672:22,24
sedan 732:14
see 551:12 554:25 564:14 565:21
566:19 568:24 569:4,6,22 573:8
573:8,9 577:13,23 578:15,17,20
579:5,8,13 588:22 589:11 590:6
593:23 595:13,18,19 596:23
599:7 600:6,8,9 601:4,11 602:13
603:14 604:15 610:15 664:19,24
669:8 673:7 691:24 698:3,4
703:24 708:1 709:1 716:18
717:15 718:18 721:2 722:3
729:21 735:12 736:9 738:3
743:14 744:11 750:7,16
seeing 569:7 573:19 709:4,8,10
seen 598:20 672:5 725:20
sell 629:17 640:23 641:2 728:20
729:6 730:23
selling 580:17 609:24,24 742:5
send 611:1 628:25 705:11 724:21
senior 707:22
sense 532:13 671:18
sent 581:17 724:22
sentencing 545:12 546:1 750:12
separate 688:16 716:25
separated 561:6 669:24
separates 669:18
sequence 651:8
series 649:13,24 653:9
service 648:25 653:2
services 646:13 647:1,7,8
session 749:23
sessions 685:22
set 557:6 573:12 575:5 593:4,5
711:4 716:21
seven 564:16 605:23,23 617:17,24
sex 600:21 630:20 631:6,8,11,16
631:20 633:18 634:4,8,11 635:7
635:10 655:10 662:19 673:22,24
674:5,5,8,17,18 675:1,13 676:1
676:10,12,13 680:23 693:7 740:2
740:8 747:10
share 636:18
Sheriff's 663:17 683:15,19,25
636:3 688:7,8,15
She's 684:7
shirt 577:15
shirts 577:17
shit 600:7
shoes 733:13
shook 560:9
shop 622:7
shops 622:7
shortly 599:19,22
shorts 562:12
shot 587:8 652:11 749:5
show 552:14 576:25 582:11 599:17
610:1,1,2 618:15 627:22,25
629:20 633:3 634:6 649:13,24
650:12 651:3,7 664:3,17 678:8
691:16 697:17 703:7,8,11,15,25
705:8,10 742:13

showed 638:11 663:10,17 684:15
686:25 703:3
showing 570:11 576:11 577:19
578:14 579:2 670:11 692:4
shown 668:11 669:17
shows 633:2
shut 745:20
sick 598:24 599:2,5 711:17,20
713:11 720:12 721:1
side 554:20 590:25 594:6 604:21
671:16 694:1
sidebar 601:20,23 602:17 608:20
608:22,23 617:7 632:7,9,10
634:2,19 670:24 671:3,5,6,19
705:16 728:6,7,8 730:7
signature 663:18 664:8,19,24
665:10 691:24
signed 663:10 692:7,8
significance 636:11,13 642:13
668:22
significant 642:18 745:7
signs 603:14
simple 712:20
single 622:12
sir 596:16 610:25 633:13 650:6
670:9 695:21
sit 563:19,21 644:9,12 705:1
sitting 563:13,14,17 590:10 601:25
604:12,20,21 685:4 687:16
situation 688:25 689:3,9,16 690:14
694:18 703:19
situational 708:17,24 709:9
six 564:16 614:2,4,20 615:21 616:1
616:5 712:23,24 713:19
size 732:12
slap 548:16 591:21 604:18
slapped 548:13 561:14 592:3
604:19
sleep 599:16
sleeping 597:14 598:16,21
smart 559:9
smoke 722:20 723:1,20,24 748:14
smoked 575:9 606:5,13 710:13
749:5
smoking 626:12 722:25
snap 744:8
snort 711:3
soak 718:10
sober 614:20 615:21 715:13
Social 562:20 584:25
sold 629:13
solicitation 648:23
solution 718:5,10,12
somebody 550:18 586:3 638:7
641:13 654:6,12 733:17,25
737:18,20 742:4
soon 598:9 738:9
sorry 564:11 567:24 572:10 574:20
592:2 595:24 596:25 601:21
603:22 617:8 621:9 631:12
674:24 678:15 679:5 689:14
707:13 709:3 727:8 729:2 732:1
735:22 748:17 749:6,16
sort 582:17 710:10 717:1 743:8,9
sound 717:9
sounded 694:25 695:2 716:17
749:14
South 619:8
SOUTHERN 543:1
spanned 674:6
speak 550:5 555:16 574:6 593:5
602:10 612:18 636:16 685:3,6,13
685:16 687:15 688:15
speaking 584:18 665:23 685:14
687:17 688:14,19 689:16
speaks 612:9
Special 699:22
specific 583:7 584:14 586:22
614:19 690:2 699:16 708:2 709:7
specifically 688:20
specifics 609:11,11,17
speculation 559:15 591:1 640:24
737:6
spend 722:21 724:3
spending 622:9 714:8
spent 640:12 641:5 679:16 713:13
726:14,17 730:17
spit 568:7
spoke 574:8 659:1 685:1 686:22
687:13 690:3 699:19,22,22

spoken 620:6 658:14 660:7 686:6
spoon 719:2,9 733:9 747:18
spread 629:23
stage 595:22
stand 582:1
standing 567:24 682:19
start 573:4 599:3 709:8 722:12
738:9 742:25 749:24
started 545:10 557:2 567:1,2
574:21 590:11 614:18 615:21
616:9 622:21 628:19 649:8
709:10,17,21,25 732:2
starts 733:25 748:19
state 545:2 559:17 647:7 678:21
702:23,25 728:18 730:5 740:11
743:18
stated 647:5 678:1,5,7 680:21
693:6 729:18
statements 557:17
States 543:1,4,12,22 699:20
station 662:7
stay 566:22 572:21,22 582:14
588:3,20 590:9 597:17 608:3,5
619:25 624:13 651:18 666:23
668:25 675:3,10,23 715:23,25
716:3,5,7 727:7,9 735:21,24
stayed 564:5 614:2 615:21 632:4
641:25 642:2 649:6,7 650:14
652:16,19 669:1,2,3,13,13,16
679:1 727:10
staying 727:15,23
step 566:8 611:8 659:14 675:20
stick 598:8 642:17
sticks 642:14
sting 581:6 684:20
stints 711:12
STIPES 543:21
stipulate 641:16 725:18,22
stole 558:9
stolen 559:14
stomach 711:17,20
stop 568:12 616:22 712:4,6 734:13
734:18 735:7 736:10 737:25
740:17 742:2,11,14
stopped 565:25 568:14 603:10,11
627:15
stops 568:16 576:2,2 720:21
store 564:2,3,21 565:6
straight 607:11 609:22 724:10
strange 743:16
street 543:15 565:10 730:3
stress 589:19 708:14
stressed 706:12,13
strictly 610:18
strike 593:2 612:11 626:6 642:23
667:15 682:5
string 569:8,10
strong 610:2
struck 630:19
stuff 561:24 562:5,7,23 602:24
717:1 733:10
stupid 582:19,20 583:13
subject 553:8
submitted 750:5
subpoena 545:22
substance 721:2
substantial 714:16
substantive 671:13
sudden 588:16
suggest 728:25 735:20
suitcase 577:17
Suite 543:15,17,20
summarize 718:2
supposed 568:14 572:3 574:3,4
681:17 701:18 702:8,11 703:8,11
715:25,25 716:3 718:16
sure 556:2 558:8 560:18 569:14
591:4 608:9 616:4 617:9 622:21
631:1 640:8 643:23 646:7 651:1
651:8,20 661:2,19 665:11,17
674:8 675:9 679:6 680:18 683:14
683:24 684:2 686:2,11 690:8
694:16 700:12 703:11 705:10
737:24
surrender 704:14
Susan 686:3,14,21 687:1 699:23
sustain 557:21
sustained 549:17 551:2 558:24
559:11 570:5 575:22 584:16
600:16 615:4 625:1,8 627:5

630:11 632:1 636:8 638:25
640:20 653:22 661:1 670:7 683:2
689:20 691:9 721:11,13 725:5
726:20 727:4 730:6 734:21 739:3
739:23 745:2
sweat 569:2
swing 564:8
switched 597:6
swollen 587:6
symptoms 712:25 713:1 714:17,19
722:17,18
syringe 718:12,23 719:9 733:9
747:17
system 641:15 720:20

T

TABLE 544:1
take 559:3 561:15 571:12,14 572:1
572:16 575:7 582:25 589:7
595:11 605:2 606:19 615:7,24
616:2 618:2,6 621:18 643:11
648:2,3 659:14 663:1 675:20
677:1,2 680:4,10 699:13 708:1
718:8,12 725:23 726:1 732:25
735:12 742:23 748:9
taken 546:2 555:2 558:20 560:13
560:17 561:11,12 576:21 589:12
601:14 616:15 623:7 637:3
651:23 666:22 677:6
takes 566:11 568:16,21 741:23
talk 557:3,4 558:13 568:19 569:19
580:24 581:3 588:1 592:22
593:8,12 597:16 625:21 654:19
656:10 657:25 667:22 697:1
707:10 729:25,25 741:15,17,25
745:20,21,23,24
talked 547:13 548:20 580:8,13
586:12 617:10 659:9 677:25
699:8 700:5
talking 561:3 564:12 570:17 571:18
571:19 573:24 595:21 599:16
613:17 620:8 625:18 634:22
648:25 653:24 654:13,18 688:12
733:23,24,25 745:14,16,25 746:2
747:24 748:19
tank 562:12
tech 726:9
technically 596:9
teen-ager 708:16
tell 548:5,7,16 557:8,8,10 558:12
558:23 561:7 562:2,18 567:15
569:3 571:10,16 572:2 573:5,22
575:2 576:15 579:23 580:11
581:5,22 582:4,6,8,17 583:18
584:3 585:6,18,23 586:11 587:10
588:14 590:8 591:9,18 592:1,3,6
593:9 595:5 597:3 601:17 602:12
602:21 603:16 604:11 606:2
626:9 627:25 636:5 644:7 645:23
654:6,14 657:22 659:21 662:12
688:24 690:12 694:18 712:15
713:12,13,17 716:14 722:16
741:14 742:6 743:22 744:2 749:2
749:3,14
telling 551:5 557:25 561:4 570:7,18
571:19 572:1 583:13 584:18
598:23 604:1,15 624:21 649:8
658:6 687:12
tells 562:4,22 566:7 567:21 645:11
645:22 657:13 741:25 745:4
temperature 613:10
ten 589:7
tendency 609:2 610:10 617:18,21
633:2
Terribly 606:17
test 620:16 622:15 743:3,6,14
testified 555:6 615:20 616:6
619:19 620:18 621:7,16 629:12
630:3 638:4 641:8 648:7 653:10
653:13 654:2 655:7 656:12,16,19
659:13 665:22 673:9 684:20
693:18 694:6 707:6 720:14
725:12 728:9
testify 550:25 660:2 743:2
testifying 546:9 601:25 707:6
testimony 546:13 592:15 632:16
637:16 640:16 644:16 647:21
658:10,23 659:22 660:21 661:16
661:19 662:19 668:20 669:19

673:9 682:19 685:20 692:17
697:23 701:2 706:15
text 593:10,22,23,24 595:2,8,12
596:23 597:5,7,22 598:6,11,23
600:6 601:4,5,11 695:24 697:18
698:24 699:1,5,8,10 737:18
texted 699:1 737:20,22
texting 597:4,9,15 598:21,22 599:7
738:9 741:15 742:3,4,25
texts 697:1
thank 547:8 553:10,14,16 557:23
570:18 590:1 602:16 634:18
637:13 649:21 672:3 677:17,19
687:6 691:16 699:18 706:5 726:4
738:6
Thanks 589:21 613:5
that's 572:12 652:14
theaters 622:6
therapist 702:6 708:25 709:1,4,8
709:10
There's 595:7
thing 596:12 597:23 611:1 613:13
621:23 713:17 738:18 740:10
things 557:13 562:11 582:17
602:25 623:14,17 662:15 673:3
695:15 714:22 716:15,19 719:8
738:16,17
think 553:8,12 559:9,13,16 562:10
564:13 585:15,22 595:8 597:5
598:9 599:15 603:8 604:5 609:14
610:9 612:14,15 613:2 619:13,22
633:14 637:20 641:6,7,8 647:25
650:4 656:16 667:24 671:9
690:20,21 692:13 694:12 697:5
709:7 728:12,14 729:19,20
743:17 744:17 747:10
thinking 559:20 580:19 582:20
646:4,4 689:5 729:21 742:3
743:10,10
thinks 612:13 729:11
third 681:25
thought 548:12 580:25 596:13
603:10 604:5 619:5 642:21
675:21 695:14 725:12,14 732:25
742:3,4
threaten 746:18
threatened 678:16
threatening 584:14
three 593:7,20,23,25 595:2 606:22
607:10,11,15 609:7 610:8 623:8
632:16,22 658:17 659:16 661:25
665:19 673:1 674:6 680:1 698:19
709:16 716:6,8 717:5 720:3,6,8
720:11,17 721:17
throat 587:6
Thursday 702:20 704:4,6,20,21
times 568:3 584:7 591:25 598:3
603:21 606:13 607:16,17 610:5,8
629:14,15 657:10 658:12,14,16
658:17 674:10,11,15,19 686:6
702:6 710:13 714:3,8,11,12,13
720:10,11 727:10
tinted 563:11 638:14 732:18
733:16
tired 723:8
today 658:15,20 677:3 685:20
705:1 707:6
told 547:17 548:6 549:25 551:5,7
558:21 561:12,14,23 565:19,22
567:24 568:2,4 569:17 570:7
573:18,18,21 580:9,13 582:9
584:1 585:21,25 593:15 610:8
611:4 620:16 631:15 637:21
644:16 647:3 648:24 655:7,12,15
656:20 657:21 658:2,5 672:21
678:1,16 681:18,22,23 682:24
684:17 686:15,22 689:15 698:16
729:5 739:13 741:17 749:8
tomorrow 749:19,22 750:7,12,16
Tompkins 649:16,21
tooth 568:8
top 687:9
tops 562:13
Totally 634:7
town 551:21 571:1,7 574:11 603:16
622:6 641:11,20,22 642:7,10
643:4,7,24 644:5,10,13,15,24,25
645:3,18 646:19 647:19 650:7,15
651:14 652:12 667:11,17 681:5

693:1,4 730:4 736:23 740:22,25
741:12 742:18
train 675:21
TRANSCRIPT 543:11
transfer 702:3
transferred 702:9
treat 702:11
treated 587:7
treatment 608:9,13 613:24 614:3
614:12 615:6,16,20,25 616:2,7
616:18,20,23 617:2,6,6,10 621:2
621:4,6,17,18,24,24 701:24
702:2,3,14 708:23
trial 543:11 596:13 611:16 637:4
tried 566:9 584:4 599:13 615:11
653:2 695:11 712:6
trouble 592:19 705:6
true 561:17 584:21 619:7,10 620:13
626:2 633:21 686:8,14,21 687:19
688:22 689:10,11 695:9,10
698:15 700:23 706:17 721:2
735:23
truly 572:13
trunk 569:4,6 604:25
trust 557:2,5 715:2
try 548:7 555:16 582:25 585:2
598:8 616:22 666:14 671:10
711:25 718:2
trying 581:6 585:20,21 609:14
610:1 613:3 623:13 634:14
647:25 663:13 686:17 713:7,8
719:13 741:15 745:24 747:19
turkey 711:10,25 712:1,7
turn 546:9 664:22 682:8 726:8
741:16
turned 734:13
turning 734:12
twelve 636:21
twice 584:1 607:19
two 567:3 570:24 591:25 597:21
603:21 609:2 610:7 616:16 620:3
627:10,14 629:14,15,23,25
630:16 631:1,5,6,16,17 645:7
659:14 662:2 664:24 669:1,16
674:10,11,15 680:1 684:6 690:20
690:21 700:9 701:8,9 702:6
704:7 713:3,23,24 717:14,15
738:18 739:10 749:21
type 559:24 606:2 614:6,11 622:5
660:24 672:17 708:23
T-shirt 733:11,15 738:20 739:8

U

uh-huh 619:21
Uh-hum 554:24 648:6 713:25 747:4
ultimately 549:14,22
undercover 684:19
undergo 702:9
undergoing 701:24
understand 554:22 587:23 611:21
612:24 613:20 631:12 642:8
643:5 644:3 651:8 683:16 704:18
709:5,6 711:25 712:2 714:12
720:22 727:8 729:3 730:13,16
735:22
understanding 626:20 647:15
679:8,8
understood 620:2 647:22
underwent 617:6
undressed 574:21,22
Union 628:23
United 543:1,4,12,22 699:19
unlimited 697:1
unreasonable 744:21
unusual 671:7,9 743:13,13,15
upset 656:16 740:12
upstairs 649:7 650:13,14 651:24
use 553:8,11,12,14 553:21 556:11
559:22 592:24 594:15,16,22
617:19,22 652:25 653:2,6 693:13
696:17,18 709:14 710:25 711:2
713:18 715:10,11 718:1 720:6,9
720:25 721:2 723:21 726:3
736:12 743:14,19,22 744:2
useage 610:9
usual 749:24

V

vacation 571:20 572:18

**vague** 660:24 680:13
**vagueness** 648:17 687:21
**van** 690:7,8,8
**VANESSA** 543:14
**various** 622:10 698:24 727:10
**verbally** 654:12
**verifiable** 737:10
**verify** 643:13 725:19
**Vermont** 584:22 585:1 617:13
618:24 619:16 621:4,7,17 698:1
698:1,5 702:3,4,9 703:19 707:10
708:16 710:12,14,18,20,25 711:2
711:11 712:12 714:3 715:7,16
716:11 717:20 731:22
**versus** 545:7
**Viamentes** 547:7
**victim** 601:24
**view** 554:7,21 555:2 652:9
**vigilant** 602:13
**violate** 545:7 633:21
**violation** 634:5
**violence** 611:15
**visible** 602:1
**visiting** 702:5
**voice** 585:18 695:13
**voices** 694:25 695:22
**voir** 553:5
**volition** 632:14
**VOLUME** 543:10
**voluntarily** 630:6
**vs** 543:6

**W**

**waited** 588:6
**waiting** 566:14 569:15 734:15
**waitressed** 622:7,8
**waitressing** 624:3
**waits** 671:16
**wake** 566:15,19 570:7 597:15 649:3
649:4 667:5 670:2 672:20 689:3
**walked** 670:4 672:21 682:4,6 748:7
**walking** 672:17
**walks** 728:20
**want** 546:9 553:5 565:4 572:19,22
572:25 580:24 582:2 585:19
590:20,20 596:25 597:7 599:11
602:9 603:3 610:8,15,23 612:12
624:15,16,17,19,19 625:15,21
632:17,18 640:22 649:25,25
651:8 652:21 654:6 655:16,22
656:2 662:15 666:23 668:8
673:11,14,16,17,17,19,20 675:2
675:20,25 676:9,14,18,20 680:20
681:20 688:25 689:3,16 690:14
694:18 695:7,23 699:13 707:10
711:18 713:5 716:5 725:23
728:12,24 729:13 730:25 737:25
738:2 740:17 743:19 750:13
**wanted** 548:10 551:7 580:25
585:18 586:11 590:23 592:4
597:4 616:22 619:2,8,11 624:17
628:17 629:10 662:22,24,25
667:17 675:3,10,23 676:17,19,19
680:21 681:19 689:9,10 711:19
716:10,10 734:25 735:12 740:19
744:6
**wanting** 572:21 749:2
**wants** 582:25 612:16 636:18
**warm** 613:9
**warrant** 702:16,19 703:25 704:3
**warrants** 704:7,9,15
**Washington** 545:7
**wasn't** 545:22 548:9 557:2 564:12
566:3,4 568:2 570:20,20 572:3,3
574:18 582:15 585:12 591:22
603:15 626:18 638:22 642:25
646:7,12 648:24 657:1,24 661:15
661:21 669:24 674:11,13 683:10
684:3 687:17 694:21 696:25
697:25 703:18 727:15 735:4
734:8 738:19 740:5 743:10,11,13
743:17 746:2 747:12
**watch** 750:3
**watched** 718:17
**watching** 560:17,25
**water** 648:3 711:3 718:5,5
**wave** 728:19
**way** 548:9,11 552:14 561:16 567:12

**571:5** 585:20 593:7 603:9 613:18
620:5 621:4 631:17 636:1 646:20
658:12 659:21 665:18 680:23
685:6 693:15 700:23 729:14,18
733:3 736:22 741:12
**ways** 545:22 667:6 711:5
**week** 626:23,24 627:8 632:4,12
633:5 635:5,12,17 673:1 699:13
702:6 704:3 713:13,21 714:6,9
720:6,8,11 725:10,13,16 726:14
726:15,17 749:21
**weeks** 606:22 632:22 674:6 698:19
720:3 721:17
**welcome** 649:22
**went** 549:1 555:19 556:18 560:2
561:4 562:20 569:4 571:4,4
586:22 590:22 606:21 607:16,20
607:22,25 608:13 616:16 617:15
617:17 623:13 625:5,24 638:13
645:1 651:13,19 655:19,20
667:11 681:7 682:10,14,17,22,23
694:6,8 699:3 707:24 712:7
730:4,22 744:4 748:6
**weren't** 557:4 630:16 631:1 643:1
660:19 685:14 707:7 708:1 732:1
734:24 735:1,3 742:8,13 745:14
745:16
**Western** 628:23
**we're** 598:9
**We've** 622:21
**Wilcox** 543:19 544:6 545:17,24
546:8 547:21 552:21,23 553:4,10
553:14 554:15 559:10 572:10
577:6 584:13 591:3 600:14,24
602:7,11 606:23 609:19,21 611:6
612:10,15 633:7 634:13 636:16
641:11 663:25 674:1 676:23,25
677:7,8 686:11 706:4,5,8 708:12
712:10,11 719:24,25 721:12,14
721:16 725:6,7,14,17,25 726:4,6
726:9,10,21,22 727:5 728:6,9,24
729:4,8,10 730:8 734:22 737:4,9
737:14,15 738:6,7 739:5,24
740:5,7 745:3
**willing** 646:9
**willingly** 641:25 642:2 655:5 656:4
676:1 680:7,9 681:13,16 682:23
692:19 693:13,14 744:24
**window** 588:21,22
**windows** 563:11 566:3 588:19
638:14 732:18 733:16
**wire** 629:2
**wired** 628:23
**withdraw** 619:14 672:12
**withdrawal** 599:4 712:25 713:1
714:17 722:17,18
**withdrawals** 722:16
**witness** 545:18 546:6,9 550:12,20
550:21 553:5 572:12 576:9
583:22 592:15 601:2 602:6
610:10 611:2,22,25 612:2,5,12
612:19,25 613:4 640:25 641:2
647:15 649:10 664:14 668:11
670:8 671:17 675:7 676:7 677:17
681:5 687:4 691:14 737:13
**woken** 560:4
**woman** 739:13
**wondering** 739:20
**won't** 602:11 610:22 611:9
**word** 619:23 662:9 705:3
**words** 702:8 738:21
**work** 571:20 608:7 609:17 614:1
619:25 620:2 622:6 625:5 731:16
**worked** 593:12 620:3 622:6,7 657:2
721:9
**worker** 547:20 563:1
**workers** 560:20
**working** 573:1,4 580:4 622:3 624:2
627:13,15 717:11,13,14 724:18
749:11
**works** 604:7 718:20,21
**world** 653:1
**worn** 590:21
**worry** 746:7
**worse** 550:1 568:3
**worst** 591:19
**worth** 591:22 592:3 639:12,13,15
640:10
**wouldn't** 590:23 620:17,19 663:23
666:13 673:4 710:16 711:18

**713:11** 719:11,12 723:12 729:18
735:23 741:17
**write** 598:6,11,13 599:22,23,25
**writing** 595:8 597:1
**written** 633:10
**wrong** 548:9,12 612:23 613:3
697:9,10,11,12 711:7 722:6,7
**wrote** 673:10

**X**

**Xanex** 606:5

**Y**

**yards** 590:25 591:6
**yeah** 559:4 566:16 571:11 572:17
582:15 587:8 599:13 620:1 630:7
638:3 653:7 654:17 657:3 660:7
667:5,8 673:5,13 676:12 681:18
682:11 684:16 690:22 692:15
693:5 695:14 696:2 697:12
707:18 710:3,24 714:15 717:3
719:1,3 721:7 723:6 736:5
738:23 739:19 742:17 743:15
744:23,23 746:1,15 747:7,9,14
**year** 615:1 617:3,4,4 702:17 706:20
707:22 715:12
**years** 556:7 605:22,23 607:10,11
607:15 613:23 617:17,24 618:8
621:3,17 622:4 632:17 709:13,16
**yell** 548:10,11
**yelling** 560:9 568:1 604:14 694:22
**Yep** 710:5
**yesterday** 545:2 547:13 549:2
551:20 563:6 590:4 611:5,13
660:2 673:9,12 707:7
**Young** 666:9 699:11
**younger** 614:18 708:18
**you've** 653:13

**Z**

**Zoe** 558:17 560:17,19,25 561:3
563:1,12,22 565:8 566:14,19
567:4 568:5 638:17 736:2,4
**Zoe-1** 736:6
**Zoe-2** 736:7,14

**$**

**$20.00** 723:24
**$210** 714:8
**$30.00** 639:6,11,12,13,15 640:5,9
640:10,12 641:5 710:19,20
712:13,17,19,22 713:18 731:12
731:13 732:7,9
**$300** 712:19
**$45.00** 697:1

**1**

**1** 544:13 576:12,15 577:3,7,10
625:13
**1st** 727:2
**1:15** 636:23 637:4 749:23
**10** 568:3 569:13 616:24 617:10
667:24 668:2,16 677:1,4
**10th** 655:23 707:24 712:18,19
**10:25** 589:11
**10:46** 596:23
**11** 544:13 598:7 669:7 672:6
**11th** 625:13,16 627:18 629:16
632:3 634:24 635:8 636:1,10
642:11,12,14,18 643:2,3,6,23
644:4,9,12 673:1 697:7 707:19
707:20 727:2,24
**1100** 543:20
**118** 544:5
**12** 544:11 552:5,18,22 553:15,17
554:21,25 620:11 622:14,24
623:5 625:16 634:23 719:18,21
**12th** 627:18 717:9,16 726:12
727:24
**12-60312-CR-COHN** 543:3
**12:00** 637:3
**12:31** 599:23
**12781** 543:17
**13** 544:12 554:1,13,17,18,23
**13th** 725:22
**14** 605:25 606:1 669:17 709:21

**15** 543:7 605:24 709:24
**15th** 642:21
**16** 548:20 550:4 618:11,16 622:22
665:15 668:3,10
**16th** 555:11 652:17 655:23,24
656:10,12 662:19 667:20 674:15
674:15,16,20,23 675:11,24
676:10 715:12,12 717:8,16
**164** 544:14
**17** 544:11,15 552:3 667:24 668:2,3
668:10 670:11,22 671:20,23
**17th** 642:20 643:15,19,20
**18** 544:5 621,23 709:16,17 710:22
**18th** 555:12 564:14
**185** 544:15
**19** 544:12 607:21,25 608:9 613:23
615:16 621:3,17 665:16 687:2
**19th** 678:25

**2**

**2** 577:19
**20** 556:7 607:24 616:19 685:25
723:17,19
**2008** 610:12 611:14
**2012** 548:21 550:5 552:15 554:10
577:1 596:23 601:10 617:11
618:11,16 620:11 622:14,22,24
623:5 625:13,16,17 629:16 632:3
634:24,24 635:18 636:10 643:12
643:15,18 652:17 665:15,16
681:1 685:25 687:2 703:9,12
706:21 715:12 719:18,21 725:18
726:2
**2013** 543:7 699:13,19 700:3,12,16
700:20,25
**21** 605:21
**219** 544:6
**22** 577:1
**22nd** 576:23 580:22 674:21,23,24
675:1,13 676:2,10 681:1 692:5,9
**2251** 598:7
**2356:13** 598:14
**25** 710:19,20
**26** 593:19,20,21 695:24 697:17
**27** 596:23
**27th** 598:14
**28** 608:6,10,10,11,12 697:2
**28th** 599:9,18
**29** 608:10
**299** 543:23

**3**

**3** 578:5,14
**30** 601:10 666:2 723:17 741:21
**30th** 601:5
**302** 632:12 633:8,10
**303** 543:17
**32** 652:1,3,6,9,14,16 654:4,24
655:13 657:20 659:15 661:20
**322-0154** 697:20
**33027-2908** 543:18
**33132** 543:15
**33301** 543:20,23

**4**

**4** 543:10 599:17,17,17 601:4
**4th** 543:15
**40** 733:17 737:5
**412** 634:6

**5**

**5** 544:14,15 579:2
**5:00** 750:17
**50** 723:17
**561-767-5687** 596:24 598:8,14

**6**

**6** 579:8 699:13,19 700:3,12,16,20
700:25
**6th** 633:22
**60** 544:3,4
**600** 543:15
**66** 544:11
**67** 544:12

**7**

**7** 544:13 576:12,15 577:4,7,10

760

579:13 650:3,5,19,22,24
**73** 545:17,24
**786** 697:19
**786-332-0154** 596:24 601:6

---
**8**

**8** 552:3 601:5 664:3,11,13,18
**8:30** 750:14
**8:45** 750:13,14
**802** 601:8 698:1,5 699:8
**802-353-1793** 623:24
**802-747-8272** 601:6

---
**9**

**9** 691:17
**90** 544:13
**911** 653:4,6 657:16 698:20
**954-769-5496** 543:24
**99** 543:15