```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                      FT. LAUDERDALE DIVISION
 3                       Case 12-60312-CR-COHN
 4
     UNITED STATES OF AMERICA,
 5
                 Plaintiff,
 6                                          FT. LAUDERDALE, FLORIDA
        vs.
 7                                          May 16, 2013
     MACKENLEY DESIR and GENET REMBERT,
 8
                 Defendants.
 9   ------------------------------------------------------------
10                            VOLUME 5
11               TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                  BEFORE THE HONORABLE JAMES I. COHN,
12                  UNITED STATES DISTRICT JUDGE
13   APPEARANCES:
14   FOR THE GOVERNMENT:      FRANCIS VIAMONTES, A.U.S.A.
                              VANESSA JOHANNES, A.U.S.A.
15                            99 NE 4th Street, Suite 600
                              Miami, Fl 33132
16
     FOR DEFENDANT DESIR:     DERIC ZACCA, ESQ.
17                            ERGIO FERNANDEZ, ESQ.
                              12781 Miramar Parkway, Suite 303
18                            Miramar, Fl 33027-2908
19   FOR DEFENDANT REMBERT:   DARYL WILCOX, A.F.P.D.
                              One East Broward Boulevard
20                            Suite 1100
                              Ft. Lauderdale, Fl 33301
21
     REPORTED BY:             PAULINE A. STIPES, RPR-CM
22                            Official United States Court Reporter
                              Federal Courthouse
23                            299 E. Broward Boulevard
                              Ft. Lauderdale, FL  33301
24                                             954-769-5496
25
```

1                          TABLE OF CONTENTS

2                                                              Page

3          Cross-Examination by Mr. Wilcox  .................... 755

4          Redirect Examination by Ms. Viamontes  .............. 823

5      Cindy Dookeran ......................................... 846

6          Direct Examination by Ms. Viamontes ................. 846

7          Cross-Examination by Mr. Fernandez .................. 855

8          Cross-Examination by Mr. Wilcox .................... 862

9          Redirect Examination by Ms. Viamontes ............... 864

10     Jessica DeVega ......................................... 870

11         Direct Examination by Ms. Viamontes ................. 870

12         Cross-Examination by Mr. Zacca ...................... 877

13         Redirect Examination by Ms. Viamontes ............... 885

14     Regino Chavez .......................................... 887

15         Direct Examination by Ms. Johannes .................. 887

16         Cross-Examination by Mr. Zacca ...................... 894

17         Cross-Examination by Mr. Wilcox .................... 900

18         Redirect Examination by Ms. Johannes ................ 904

19     Michael Bosillo ........................................ 907

20         Direct Examination by Ms. Johannes .................. 907

21         Cross-Examination by Mr. Fernandez .................. 928

22         Redirect Examination by Ms. Johannes ................ 936

23     William Powell ......................................... 945

24         Direct Examination by Ms. Johannes .................. 945

25         Cross-Examination by Mr. Fernandez .................. 969

1      Redirect Examination by Ms. Johannes ................. 971

2

3                           EXHIBITS

| Description | Marked for Identification | | Received in Evidence | |
|---|---|---|---|---|
| | Page | Line | Page | Line |
| Defense Desir Exhibit 8 .......................... | 782 | | | 11 |
| Defense Desir Exhibit 9 .......................... | 809 | | | 18 |
| Government Exhibit 21 ............................ | 850 | | | 3 |
| Government Exhibits 25, 26, 53 ................... | 914 | | | 10 |
| Government Exhibits 52-A and 52-B ............... | 959 | | | 18 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            THE COURT:  Any matters that we need to address this
 2   morning?
 3            If they there are not any we can hang loose.
 4            Here is Mr. Intensity.
 5            The record will reflect that Mr. Desir and Ms. Rembert
 6   are present and represented by counsel.
 7            Are we ready to proceed?
 8            MS. VIAMONTES:  Yes, the witness is outside.  I will
 9   have her come in.
10            THE COURT:  We are missing one juror but we can have
11   her come in.
12            All right.  Let's bring in the jury, please.
13            (Thereupon, the jury returned to the courtroom.).
14            THE COURT:  Folks, please be seated.
15            Good morning.  Once again I compliment you on your
16   punctuality.
17            Has anyone discussed the case, otherwise communicated
18   with anyone regarding the case, received any information
19   pertaining to the case other than that which you have received
20   here in this courtroom or formed any fixed opinions on the
21   merits of the case?
22            The record will reflect there were no affirmative
23   responses so we are ready to proceed.
24            Ms. C.J., good morning, let me remind you you are
25   still under oath and we will continue with cross-examination by
```

1   Mr. Wilcox.

2          Good morning, Mr. Wilcox.

3          MR. WILCOX:  Good morning, Your Honor.  I am trying to

4   get situated, please bear with me.

5                    CROSS-EXAMINATION - CONTINUED

6   BY MR. WILCOX:

7   Q.  Good morning, Ms. C.J..

8   A.  Good morning.

9   Q.  When we left off, we were still on the first day that you

10  met Mr. Desir and you were at the Beach and Town Motel.

11          Does that sound about right?

12  A.  Yes, it does, yes.

13  Q.  Okay.  And he had gone out to get you Dilaudid, is that

14  right?

15  A.  Yes.

16  Q.  And you had also smoked some crack cocaine?

17  A.  Yes.

18  Q.  Did you have a little pipe to smoke the crack cocaine?

19  A.  I did.

20  Q.  You did?

21  A.  Yes.

22  Q.  That was your own pipe, that was something you had with you

23  on a regular basis?

24  A.  Yes.

25  Q.  That night -- You said it was in the afternoon when this

1  first meeting took place?

2  A.  Yes.

3  Q.  Okay.  That afternoon, did there come a time when Mr. Desir

4  left you at the Beach and Town and went to run some errands?

5  A.  Yes.

6  Q.  He left you inside the room?

7  A.  He did.

8  Q.  Okay.  He was gone for a couple hours?

9  A.  No.

10  Q.  How long was he gone for?

11  A.  I don't know how long he was gone for.

12  Q.  You don't remember?

13  A.  No, I don't.

14  Q.  Was it at least one hour?

15  A.  I really don't know.

16  Q.  When he came back, you were outside the hotel room, is that

17  right?

18  A.  No, that is not right.

19  Q.  That is not correct?  You were still inside?

20  A.  Yes, I was.

21  Q.  When he left you inside the hotel room that first night,

22  you had time to leave if you chose to?

23  A.  Yes.

24  Q.  Okay.  He was gone long enough for you to leave if you had

25  wanted to leave?

```
 1            MS. VIAMONTES:  Objection, judge, asked and answered.
 2            THE COURT:  Sustained.
 3   BY MR. WILCOX:
 4   Q.  But you didn't leave?
 5   A.  No.
 6   Q.  You stayed there and waited for him?
 7   A.  Yes.
 8   Q.  Why?
 9   A.  To get more drugs.
10   Q.  Okay.  When he left, had you already had sex with him?
11   A.  No.
12   Q.  Okay.  So you say, when he left to get more drugs, this was
13   in addition to the Dilaudid he had already given you?
14   A.  Yes.
15   Q.  He left the hotel room twice, once to get Dilaudid, and
16   once to get more drugs, is that right?
17   A.  Yes.
18   Q.  Did you ask him to leave and get you more drugs?
19   A.  No, I didn't.
20   Q.  Okay.  How do you know he was going to get more drugs?
21   A.  Because he came back with more.
22   Q.  Okay.  When he left and didn't tell you where he was going,
23   did he say he would be right back?
24   A.  Yes, he said he would be right back.
25   Q.  And he told you to wait?
```

```
 1   A.  Yes.
 2   Q.  And you waited?
 3   A.  Yes, I did.
 4            MR. WILCOX:  One moment, Your Honor.
 5   BY MR. WILCOX:
 6   Q.  Ma'am, during this time, did you have your cell phone with
 7   you?
 8   A.  No, I didn't.
 9   Q.  Okay.  He had your cell phone?
10   A.  Yes.
11   Q.  It was still in his car?
12   A.  Yes.
13   Q.  Ma'am, at some point, you were -- you did text somebody
14   prior to him taking your phone that this was not right?
15   A.  Yes, I did.
16   Q.  Right?
17   A.  Yes.
18   Q.  And who was that that you were texting.
19            MS. VIAMONTES:  Objection, relevance.
20            THE COURT:  Overruled.
21            THE WITNESS:  It was my friend from the hotel before
22   in Boynton.
23   BY MR. WILCOX:
24   Q.  Why were you texting him to tell him it wasn't right?  Did
25   he know Mr. Desir?
```

1   A.  No, I don't believe so.

2   Q.  Why were you texting him?

3   A.  Because he was my friend that I was with.

4   Q.  Well, were you texting him because you were hoping he would

5   come and assist you or come get you?

6   A.  Um-m-m, I don't know.

7   Q.  You texted him to let him know you were in trouble?

8   A.  Yeah.

9   Q.  So you are texting somebody to let them know you are in

10  trouble but you choose to stay in the hotel room when Mr. Desir

11  leaves?

12          MS. VIAMONTES:  Objection, judge, asked and answered.

13          THE COURT:  Sustained.

14  BY MR. WILCOX:

15  Q.  While you were waiting for Mr. Desir to come back, did you

16  talk to any other females --

17  A.  No, I didn't --

18  Q.  --around the hotel?

19  A.  No, I didn't.

20  Q.  You stayed in the room the entire time?

21  A.  Yes.

22  Q.  And he came back and --

23          Okay.  When he came back, was this -- sorry, when he

24  left -- I'm sorry, ma'am.

25          When he left, was this after he told you he was going

1  to find you a job and get you an apartment and help you get

2  back on your feet?

3  A.   Yes, it was.

4  Q.   Okay.  And he came back and you spent the night with him,

5  is that right?

6  A.   Yes.

7  Q.   And he told you he had jobs like -- and you assumed that

8  you were going to be a secretary in the many businesses that he

9  told you he had, right?

10 A.   Yes.

11 Q.   But, at that point, the only thing he knew about you is

12 that you were from Vermont, is that right?

13 A.   Yes.

14 Q.   And that -- and that you had been to rehab and was trying

15 to get clean, right?

16 A.   Yes.

17 Q.   He didn't know -- I mean, you didn't tell him you had

18 secretarial skills or anything, right?

19 A.   No, I didn't.

20 Q.   You told him that you weren't in touch with your family, is

21 that right?

22 A.   Um-m-m, I don't know.

23 Q.   You may have told him that but you don't remember?

24 A.   No, I don't remember.

25 Q.   Okay.  Do you remember telling Agent Funk that you told him

1  that, that you told him on the night you met him that you

2  weren't in touch with your family?

3  A.  I don't remember.

4  Q.  And, at some point around this, and I will ask you to

5  specify, he told you that he wanted you to call him Daddy, is

6  that right?

7  A.  Yes.

8  Q.  At what point did he ask you to call him Daddy?

9  A.  Um-m-m, it had been when we were upstairs in the upstairs

10  hotel room.

11  Q.  Was this the first day that you met him?

12  A.  Um-m-m, I don't know.

13  Q.  Was it the following morning?

14  A.  Yes.

15  Q.  That he asked you to call him Daddy?

16  A.  Yes, it was within-- after I had found out what I was going

17  to be doing.

18  Q.  Okay.  Let's go back, then.

19      So you assume you were going to be a secretary.

20  Ms. Rembert told you, no, that is not quite the gig, is that

21  right, words to that effect?

22  A.  She did not -- She didn't say that, but, she did explain to

23  me what I was going to be doing.

24  Q.  You thought you were going to be doing one job but soon

25  thereafter Ms. Rembert explained to you that you were going to

762

1   actually be doing another job?

2   A.  Yes.

3   Q.  Ms. Rembert didn't come out and say you were going to be

4   prostituting, she didn't say that, did she?

5   A.  No, she didn't.

6   Q.  She said, look, we are going to have you escort men and

7   they are going to pay you for your time, words to that?

8   A.  Close to that.

9   Q.  Do you remember what she said?

10  A.  Not exactly.

11  Q.  Can you phrase it more accurately than I said it?

12  A.  She said I would be meeting with clients and she was

13  setting up dates.

14  Q.  Okay.  And, at that point, did you become aware that that

15  meant you were going to be a prostitute?

16  A.  Yes.

17  Q.  Okay.  So, when she said that, you understood that you were

18  going to be a prostitute for Daddy?

19  A.  Yes.

20  Q.  Okay.  How long had you known Mr. Desir at this point?

21  A.  I'm not sure on the time.

22  Q.  Was it the second day?  Was it more than 24 hours?

23  A.  I really don't know.

24  Q.  Did you speak to Ms. Rembert the second day?

25          You speak with him the first night.  The next night,

1  did you speak to Ms. Rembert?

2  A.  I don't know the time frame.

3          MR. WILCOX:  One moment, Your Honor.

4          THE COURT:  Yes.

5  BY MR. WILCOX:

6  Q.  Ms. Rembert wasn't there at the time -- at Beach and Town

7  when she explained to you that you were going to be an escort,

8  is that right?

9  A.  Yes, that is correct.

10 Q.  She was somewhere else?

11 A.  Yes.

12 Q.  Okay.  In fact, she was at the Homing Inn, right?

13 A.  I wasn't sure at that time where she was.

14 Q.  But she explained this to you by phone?

15 A.  Yes.

16 Q.  Had you-- between the time that you spoke -- that Mr. Desir

17 he led you to believe you were going to be a secretary, and

18 Ms. Rembert told you, no, that is not what you are going to be

19 doing, did you have sex with men for money?

20 A.  I am sorry, would you please rephrase that?

21 Q.  Between the time period --

22          At some point, Mr. Desir led you to believe or you

23 assumed you were going to work for him as a secretary in his

24 businesses, is that right?

25 A.  Yes, that is right.

1   Q.  Do you remember him saying that to you or do you remember

2   that conversation?

3   A.  Yes.

4   Q.  Okay.  Then there was a second conversation after that

5   where Ms. Rembert told you, no, you were not going to be a

6   secretary, you are, in essence, going to be an escort, but you

7   understand that to mean you were going to be prostituting,

8   right?

9   A.  Yes.

10   Q.  Between those two conversations, did you have sex with men

11   for money?

12   A.  No.

13   Q.  So you hadn't done any prostituting before you talked to

14   Ms. Rembert?

15   A.  No.

16   Q.  Okay.  So, when she told you that, you were agreeable, you

17   were, like, okay, fine, I will be a prostitute?

18   A.  Um-m-m, I wasn't agreeable.  I just --

19   Q.  You didn't say, no, I am not?

20   A.  No.

21   Q.  You didn't say, no, I'm not going to do that, you got the

22   wrong girl.  You didn't say that?

23   A.  No, I didn't.

24   Q.  So you acquiesced?

25   A.  I didn't understand you.

1   Q.  You consented?

2   A.  Yes, I did.

3   Q.  So, Ms. Rembert gave you some instructions.  Did Mr. Desir

4   ever mention to you that he had a car wash or something?

5   A.  He had mentioned that he was trying to get a business like

6   that together.

7   Q.  Did they ever, like, do -- I am taking a side track for a

8   moment.

9        Did they ever do car washes around the Beach and Town

10  and that little apartment and house next to the Beach and Town?

11  A.  I'm not sure.

12  Q.  Did you ever witness one?

13  A.  No, I didn't.

14  Q.  Okay.  You never participated -- okay, so you never

15  participated in a car wash near the Beach and Town?

16  A.  No, I didn't.

17  Q.  So, after you spoke to Ms. Rembert -- Ms. Rembert --

18       Let me deviate here.  You talked to Ms. Rembert often

19  while you were here working as a prostitute, is that right?

20  A.  She would call me to tell me I had a date.

21  Q.  She would call you, is that right?

22       So, she wasn't -- When you first started working as a

23  prostitute, Ms. Rembert wasn't living at the Beach and Town or

24  the house next to it?

25  A.  I didn't know where she was.

1   Q.   You didn't see her, did you?

2   A.   No, I didn't.

3   Q.   Those first couple times you engaged in sex for money, you

4   hadn't met Ms. Rembert face-to-face?

5   A.   No.

6   Q.   So she had nothing to do with it?

7   A.   She was the one calling and setting it up and telling me

8   where to meet them.

9   Q.   Okay.  At that point in time, no one had beaten you, is

10  that right?

11  A.   No.

12  Q.   And Ms. Rembert hadn't threatened to beat you, is that

13  right?

14  A.   No.

15  Q.   At that time you were doing those tricks, you weren't doing

16  them because you were afraid you were going to be beat?

17  A.   I was afraid.

18  Q.   Of who?

19  A.   Of Daddy.

20  Q.   You weren't afraid of Ms. Rembert, though?

21  A.   No.

22  Q.   Why were you afraid of Daddy?

23  A.   Because I was intimidated.

24  Q.   How?  How did he intimidate you?

25  A.   I'm not sure.

767

1   Q.  Okay.  You are not sure, but you are sure that you were

2   still getting drugs?

3   A.  Yes, I was.

4   Q.  Okay.  You are sure that you weren't paying rent?

5   A.  No, I wasn't.

6   Q.  You weren't paying rent?

7   A.  No.

8   Q.  You were being fed?

9   A.  Yes.

10  Q.  All of those things cost money, food, rent and drugs?

11  A.  Yes, they do.

12  Q.  Okay.  So, that was part --

13          Now you said you were intimidated.  You weren't sure

14  how you were intimidated, but you were also doing it for food,

15  rent and drugs, right?

16  A.  Could you rephrase that?

17  Q.  You said you were doing it because you were intimidated by

18  Mr. Desir, is that right?

19  A.  Yes.

20  Q.  You did the first one because you were intimidated by him,

21  is that right?

22  A.  The first what?

23  Q.  The first sex act for money while you were associated with

24  him.  The first one you did, did you do that because you were

25  intimidated by him?

1  A.  Yes.

2  Q.  How long between you meeting him and you doing your first

3  sex act for money, how much time lapsed?

4  A.  I don't understand the question.

5  Q.  You met him, you met him one night, one afternoon, you

6  spent the night with him.  Sometime thereafter you were engaged

7  in your first sex act for money, is that right?

8  A.  Yes.

9  Q.  How did he intimidate you between that time when you first

10  met him and you did your first sex act?

11  A.  It is when he was explaining the rules to me of his

12  business.

13  Q.  Okay.  And the rules were, you weren't to speak unless you

14  were spoken to, right?

15  A.  Yes, that was one of them.

16  Q.  You were going to call him Daddy, is that right?

17  A.  Yes.

18  Q.  And you were to give him the money?

19  A.  Yes.  And I was also not to open the door if somebody was

20  knocking, not to leave the room, to be respectful to him.

21  Q.  Right.  And when he gave you those rules, how much -- how

22  long had you known him?

23  A.  I don't know.

24  Q.  Why didn't you say, no, I am not going to do that?

25  A.  Because I was intimidated.

1  Q.  Why?

2          MS. VIAMONTES:  Objection, judge, asked and answered.

3          THE COURT:  Sustained.

4  BY MR. WILCOX:

5  Q.  Had he hit you at that point?

6  A.  No, he didn't hit me.

7  Q.  He hadn't hit you at that point?  No?

8  A.  No, I was mentally afraid.

9  Q.  What did he do to cause you to be mentally afraid?

10 A.  He had given me those rules and that in itself.  My cell

11 phone is gone.  I didn't have a way of getting ahold of

12 anybody.  I am afraid at this point.

13 Q.  You were afraid to say no, you didn't want to be a

14 prostitute?

15         MS. VIAMONTES:  Objection, judge, asked and answered.

16         THE COURT:  Overruled.

17         THE WITNESS:  Please repeat that.

18 BY MR. WILCOX:

19 Q.  You were afraid to say no, I don't want to be a prostitute?

20 A.  Yes, I was afraid.

21 Q.  But you weren't afraid to live with drug dealers and couch

22 hop?

23 A.  I did what I had to do.

24 Q.  Exactly.  That is why you stayed because you did what you

25 had to do to get drugs, food and rent, right?

1  A.   That is why I said yes to begin with and then I became

2  afraid.

3  Q.   Okay.  So, you agreed to be a prostitute to begin with but

4  later you became afraid, is that right?

5  A.   Yes.

6  Q.   Okay.  Do you remember the first time you had sex for money

7  while you were working with Mr. Desir?

8  A.   I do not.

9  Q.   You do not?

10  A.   No.

11  Q.   You don't remember how much you were paid?

12  A.   I really don't know.  I am -- It is not something that I am

13  trying to keep in my mind.

14  Q.   So, when you say it is not something that you are not

15  trying to keep in your mind, are you saying you kind of

16  intentionally try to forget that?

17  A.   Yes.

18  Q.   You intentionally want to wipe all this from your mind?

19  A.   Yes.

20  Q.   I understand that.

21       So, you don't remember whether or not you had to go

22  outside to meet the guy?

23  A.   I really -- I don't remember.

24  Q.   You don't remember whether or not he paid you the money

25  inside the room or not?

1    A.   I was given the money inside the room.

2    Q.   You remember that part?

3    A.   Yeah.

4    Q.   Okay.  That first date --

5         You don't remember how much you charged?

6    A.   No, I don't.

7    Q.   That first date, did you have sex with more than one man

8    for money?

9    A.   I don't remember.

10   Q.   Well, you indicated at some point you had sex with about 20

11   men.  Do you remember that?

12   A.   Um-m-m --

13   Q.   Do you remember telling --

14        Go ahead and answer the question, ma'am.

15   A.   Um-m-m, I really don't know how many people.

16   Q.   Do you remember telling Agent Funk Romash that you may have

17   had sex with about 20 men while you were associated with

18   Mr. Desir?

19   A.   Um-m-m, I don't remember.

20   Q.   You do remember being interviewed by Agent Funk Romash

21   around July 2012, right?

22   A.   It was when I had gotten back to Vermont when I spoke with

23   her.

24   Q.   She called you up in Vermont and spoke with you?

25   A.   Yes, she did.

1  Q.  And she asked you about what you were doing with Mr. Desir?

2  A.  She asked me to explain what happened to me.

3  Q.  And you explained to her about what happened with you and

4  Mr. Desir, is that right?  You told her that, right?

5  A.  Yes.

6  Q.  You told her what we are talking about now, right?

7  A.  Yes.

8  Q.  Okay.  And do you recall whether or not you told her how

9  many men you estimated or gave her a number to how many men you

10  may have slept with for money or had sex with for money?

11  A.  Yes, I estimated.

12  Q.  Huh?

13  A.  Yes, I estimated.

14  Q.  Do you remember what that estimate was?

15  A.  I do not.

16  Q.  Now, I want to talk with you about your relationship with

17  Ms. Rembert.

18        You indicated when you first started doing this,

19  Ms. Rembert was not near the -- you didn't see her around the

20  Beach and Town Motel?

21  A.  No, I didn't.

22  Q.  How many days were you in this activity before you actually

23  saw Ms. Rembert face-to-face?

24  A.  I don't remember.

25  Q.  Was it -- You got arrested for drugs on June 16th, is that

1  right?

2  A.  Yes, I got arrested for drugs.

3  Q.  Between the time that you started working with Mr. Desir

4  and June 16th, had you ever seen Ms. Rembert?

5  A.  Would you please rephrase the question?

6  Q.  You started working for Mr. Desir some point after you met

7  him and were instructed as to the rules, you had your first

8  encounter, your first sex for money encounter.

9          Do you remember that?

10  A.  Yes.

11  Q.  Okay.  Sometime -- on June 16th, you were arrested for

12  drugs, is that right?

13  A.  Yes.

14  Q.  Between -- During that time period -- and all this happened

15  at the Beach and Town Motel, right?

16  A.  Yes.

17  Q.  You got arrested at the Beach and Town, right?

18  A.  Yes, I did.

19  Q.  Okay.  Did you see Ms. Rembert?

20  A.  When?  Did I see Ms. Rembert when?

21  Q.  I am asking you, prior to being arrested on June 16th, had

22  you ever seen Ms. Rembert?

23  A.  I -- no.

24  Q.  Excuse me?

25  A.  No.

```
 1   Q.  No, you did not?

 2           So, you must have met Ms. Rembert sometime after June

 3   16th, is that fair to say?

 4   A.  Yes.

 5   Q.  Okay.  Now, at some time --

 6           Let's talk about your arrest on June 16th.

 7           Can we agree June 16th is five days after June 11th?

 8   A.  Yes.

 9   Q.  Okay.  I am going to ask you --

10           The reason I am mentioning June 11th, that is the date

11   alleged in the indictment that this offense took place.

12           The Government alleges the offense took place from

13   June 11th to June 30 -- July 1st, excuse me, July 1st.

14           I am trying to determine is there something that

15   happened June 11th that sticks out in your mind, is there?

16   A.  Um-m-m, I don't know.

17   Q.  You can't recall anything significant as it relates to this

18   case occurring on June 11th, is that a fair statement?

19   A.  Yes.

20   Q.  How about the 12th, 13th, or 14th?

21   A.  Well, I mentioned Father's Day was coming, and it was

22   between that time.

23   Q.  What was between that time?

24   A.  That I was with Daddy.

25   Q.  So, you are saying you were with him before Father's Day or
```

```
 1  after Father's Day?  Daddy?
 2  A.  Before.
 3  Q.  Before Father's Day.
 4         So, you got arrested one day before Father's Day?
 5  A.  Um-m-m --
 6  Q.  If Father's Day was June 17th, that means you got arrested
 7  before Father's Day?
 8  A.  Yes.
 9  Q.  The day before Father's Day.
10         So, that means you were in jail on Father's Day?
11  A.  Yes.
12  Q.  And, on Father's Day --
13         You hadn't been in jail before, had you?
14  A.  No.
15  Q.  So, on Father's Day you are in jail.
16         You don't think, maybe I have to have these people
17  call my father?
18  A.  I tried to call my Dad.
19  Q.  I understand, but you couldn't?
20  A.  I got a 30 second phone call with his girlfriend.
21  Q.  Okay, but, you didn't think to tell --
22         Let me rephrase that.
23         You did not ask anybody from the Sheriff's Office
24  or --
25         You went before a court, you had a magistrate hearing
```

```
 1   that morning.  Did you go before a court?
 2   A.  I don't remember.
 3   Q.  You signed a form -- The way it works, you got arrested for
 4   drugs, but there was also -- You had also accused a guy of rape
 5   initially, right?
 6   A.  Would you please rephrase that?
 7   Q.  June 16th you initially accused the guy of rape because
 8   Daddy told you to tell them that the guy tried to rape you,
 9   right?
10   A.  Yes.
11   Q.  He got arrested, right?
12   A.  I don't know.  No.
13   Q.  He accused you of robbery, stealing his money, right?
14   A.  That's correct.  That is what he was thinking.
15   Q.  And the police took you both to the station and you both
16   signed these forms saying you didn't want to press charges?
17   A.  I'm sorry, I don't --
18   Q.  You don't remember?
19   A.  No.
20   Q.  Everything else is true except you don't remember signing
21   the form about not wanting to press charges, right?
22           MS. VIAMONTES:  I object to the question.  This is
23   vague and compound.
24           THE COURT:  Sustained.
25   BY MR. WILCOX:
```

1    Q.  You told the police he raped you?

2    A.  Yes.

3    Q.  He told the police you robbed him, right?

4    A.  I don't know what he said.

5    Q.  You never got charged with robbery, right?

6    A.  No, I didn't.

7    Q.  You didn't get out of jail right away.  You had to spend a

8    day in jail?

9    A.  Yes.

10   Q.  You were in jail on Father's Day?

11   A.  Yes, I was.

12   Q.  You are in contact with Broward Sheriff's Deputies,

13   correct?

14   A.  Yes, I was.

15   Q.  You didn't say to any Broward Sheriff Deputy I am being

16   held against my will, I want to go home and see my people, I am

17   from Vermont, is that right?

18   A.  I didn't say that.  I didn't feel --

19   Q.  Threatened at that point?

20   A.  I didn't feel comfortable.

21   Q.  You didn't feel --

22   A.  No, I was afraid.

23   Q.  You were afraid to do what?

24   A.  To tell.

25   Q.  To tell the Broward Sheriff's Office that you were from

1    Vermont?

2    A.  No.  I was afraid to tell them I was being held against my

3    will.

4    Q.  Because you weren't being held against your will at that

5    time?

6    A.  I was --

7            MS. VIAMONTES:  Judge, asked and answered.

8            THE COURT:  Sustained.

9    BY MR. WILCOX:

10   Q.  You were afraid to tell the Broward Sheriff's Office that

11   you were being held against your will?

12           MS. VIAMONTES:  Objection, asked and answered.

13           THE COURT:  She already answered that question.

14   BY MR. WILCOX:

15   Q.  You were afraid to tell the Broward Sheriff's Office that

16   you were being kidnapped?

17           MS. VIAMONTES:  Objection, asked and answered.

18           THE COURT:  Kidnapped, being held against her will, is

19   there a difference?

20           Sustained.

21   BY MR. WILCOX:

22   Q.  You were afraid to tell the Broward Sheriff's Office you

23   were a victim of a crime?

24   A.  Yes.

25   Q.  And knowing that, if you didn't tell them, you would go

```
 1  back to being a victim of a crime?
 2  A.  Yes.
 3  Q.  So, you willingly decided to become a victim of a crime?
 4           MS. VIAMONTES:  Judge, argumentative.
 5           THE COURT:  Sustained.
 6  BY MR. WILCOX:
 7  Q.  Why were you afraid to tell the Broward Sheriff's Office
 8  that you were being kidnapped, that you were being held against
 9  your will?
10  A.  Because I was afraid of what Daddy had told me.
11  Q.  He told you not to tell the police?
12  A.  He told me that he had police working for him.  That is
13  what I was under the impression of believing.
14  Q.  You believe that the jailers at the Broward County jail
15  would go back and tell Daddy's people or tell Daddy that you
16  told them he was keeping you against your will?
17  A.  Yes, I was -- I truly believed that.
18  Q.  You truly believed that?
19  A.  I really did.
20  Q.  Now, you had a phone when you were arrested on June 16th,
21  right?
22  A.  I don't remember.
23  Q.  I am going to show you what I will mark as Defense Exhibit
24  1.
25           THE COURT:  Your Honor, I object, this is a hearsay
```

1   document.

2           MR. WILCOX:  We can go sidebar.

3           MS. VIAMONTES:  Something is being published --

4           THE COURT:  There is something --

5           MR. WILCOX:  Oh, I'm sorry.

6           THE COURT:  All right.  Counsel, come sidebar.

7           (Sidebar discussion on the record.)

8           MR. WILCOX:  One moment, Your Honor, I can't find -- I

9   will get it, I'll get it.

10          This is what I am going to seek to introduce.

11          This is the property receipt from that arrest.

12          THE COURT:  Isn't that something that Mr. Zacca went

13   into?

14          MS. VIAMONTES:  He went into it.

15          THE COURT:  I know it was not introduced.  It was

16   shown to the witness, but she didn't prepare the document.

17          I recognize she said her signature is on it.

18          MR. WILCOX:  Okay.  What is the objection so I know

19   what rule to cite?

20          MS. VIAMONTES:  That is a police report.  The

21   Government is not allowed to get police reports into evidence.

22          MR. WILCOX:  That is a property receipt.

23          THE COURT:  Who was the officer who prepared the

24   receipt?  Do you know?

25          MR. WILCOX:  No, I don't know.  Mr. Zacca knows.

```
 1            MR. ZACCA:  Judge, what I can tell the Court is that
 2   document was obtained by the Broward Sheriff's Office.  They
 3   keep it in regular course of business.  Enrique Rojas is the
 4   custodian from the Broward Sheriff's Office if I need to call
 5   him.
 6            That is a document kept in the regular course of
 7   business.  That is how I acquired it.
 8            THE COURT:  My question is, is the document going to
 9   ultimately come in?
10            MR. ZACCA:  Absolutely.
11            THE COURT:  If it is, to be consistent, I let the text
12   messages in based on the representation by the Government that
13   it was going to come in later.
14            MS. VIAMONTES:  That is fine, judge, I have no
15   objection.
16            THE COURT:  Okay.
17            MS. VIAMONTES:  Go ahead and move it in.
18            THE COURT:  This is marked as Desir's -- that is
19   Hollywood.
20            MR. ZACCA:  The document I showed her yesterday is the
21   same document.  It is BSO not Hollywood.
22            THE COURT:  It is Desir Exhibit 8.
23            MR. ZACCA:  I will get my exhibit list, judge.
24            THE COURT:  That is what I have.
25            MR. ZACCA:  I have it, yes, this is Desir's Exhibit
```

```
 1  8 --
 2          THE COURT:  That doesn't look -- I just did it today.
 3          MR. WILCOX:  We can use yours.
 4          THE COURT:  Why don't we do that.  We will mention it
 5  in the record, Desir's 8.
 6          (After sidebar discussion.).
 7          MR. WILCOX:  Judge, I move into evidence Defense
 8  Desir's Exhibit 8.
 9          THE COURT:  Okay, based on the representations made
10  sidebar, the exhibit will be received in evidence.
11          [Defense Desir Exhibit 8 received in evidence.]
12  BY MR. WILCOX:
13  Q.  Ms. C.M., would you take your time and look at Desir
14  Exhibit 8?
15  A.  Yes.
16  Q.  You had your phone with you on June 16th, right?
17  A.  I don't remember.
18  Q.  Okay.  Look at the document again, carefully.
19  A.  Yes, I am looking at it.
20  Q.  Okay.  Isn't it true that you had your phone with you on
21  that date?
22          MS. VIAMONTES:  Objection, judge, asked and answered.
23          THE COURT:  Overruled.
24          THE WITNESS:  I don't remember having my cell phone on
25  me.
```

1  BY MR. WILCOX:

2  Q.  What is that that you are holding now --

3          Your Honor, may I do the cross-examination from the

4  elmo?

5          THE COURT:  Sure.

6  BY MR. WILCOX:

7  Q.  What you have in your hand, ma'am --

8          THE COURT:  Mr. Wilcox --

9          MR. WILCOX:  I am low tech, judge.  I will get better,

10  though.

11  BY MR. WILCOX:

12  Q.  --Broward Sheriff Inmate Property Inventory and Transfer

13  form, right?

14  A.  Yes.

15  Q.  Do you remember filling this form out when you were

16  arrested?

17  A.  I remember signing it.

18  Q.  You remember signing it?

19  A.  Yes.

20  Q.  You signed it after somebody completed it, right?

21  A.  Yes.

22  Q.  The reason they had you sign it is because you can't come

23  back and say, hey, where is my diamond earring?

24          MS. VIAMONTES:  Objection, calls for speculation.  She

25  wouldn't know.

1         THE COURT:  Sustained.

2    BY MR. WILCOX:

3    Q.  Well, it is an inventory form, right?

4    A.  Yes.

5    Q.  You know what inventory means, right?

6    A.  Yes, I do.

7    Q.  Okay.

8         They said they have with you two silver metal rings.

9    Do you own two silver metal rings?

10   A.  Yes, I do.

11   Q.  And you had them on when you were arrested, right?

12   A.  Yes.

13   Q.  And you had some black hair ties, is that right?

14   A.  I don't remember.

15   Q.  Did you own some black hair ties?

16   A.  It says here, that is on there, so --

17   Q.  A pair of blue shoes.  Did you own a pair of blue shoes

18   around that time?

19   A.  I don't remember.

20   Q.  And it says a black cell phone.

21        Did you have a black cell phone?

22   A.  I do not remember.

23   Q.  The cell phone that Mr. Mackenley -- I mean Mr. Desir took

24   from you, what color was that?

25   A.  Um-m-m, it was black and silver.

1  Q.  It was black and silver?

2  A.  Yes.

3  Q.  Okay.  You do recall that sometimes they would allow you to

4  have a phone, is that right?

5  A.  Um-m-m, I --

6  Q.  When I say they, excuse me, I don't want to be vague.

7           While you were working with Mr. Desir, you were given

8  a phone, is that right?

9  A.  Once they said that they could trust me, yes.

10  Q.  Well, had they started trusting you by this point?

11  A.  I do not remember.

12  Q.  You can't say whether that is your phone here or a phone

13  that Mr. Desir had given you?

14  A.  I know my phone was taken from me the first day.  So --

15  Q.  Where is that phone now?

16  A.  I still have yet to see it.

17  Q.  Okay.  Nevertheless, you had a phone with you when you were

18  booked into the Broward County jail?

19  A.  I do not remember.

20  Q.  Okay.  When you got out of jail, you had to call somebody

21  to pick you up, right?

22  A.  They let you make a phone call.

23  Q.  The question was, when you get out of jail, you had to call

24  somebody to pick you up, right?

25  A.  Yes.

1   Q.   Okay.  So, you called someone to pick you up, is that

2   right?

3   A.   Yes.

4   Q.   Okay.  And you called whom?

5   A.   Daddy, because he was the one who bailed me out.

6   Q.   How did you know Daddy had bailed you out?

7   A.   Because that is what was said.

8   Q.   By whom?

9   A.   By him.

10  Q.   When you talked to him on the phone?

11  A.   Yes.

12  Q.   You talked to him on the phone from jail?

13  A.   Yes, I did.

14  Q.   You tried to call your father?

15  A.   Yes.

16  Q.   They gave you two, 30 second calls?

17  A.   To call Vermont, it was only a 30 second phone call.

18  Q.   So they gave you a second phone call?

19  A.   When you are in jail you could make more than one phone

20  call.

21  Q.   How many phone calls did you make?

22  A.   I made two phone calls.

23  Q.   The second one was not to Vermont, it was to Daddy?

24  A.   Yes.

25  Q.   You could have called your mother.  You knew her number by

1  memory, right?

2  A.  Yes, I did.

3  Q.  You chose not to?

4  A.  I wouldn't have been able to call.

5  Q.  Excuse me?

6  A.  I would not have been able to call.

7  Q.  What?

8  A.  I would not be able to call my Mom.

9  Q.  You were only able to make one long distance call?

10  A.  That is what I was told.

11  Q.  Were you-- well -- What were you told about your call to

12  Vermont?

13  A.  I was told you could only make one long distance phone call

14  for free.

15  Q.  You didn't know anybody else in Florida but Daddy?

16  A.  I didn't know any of the other numbers.

17  Q.  When you bonded out, you were let out outside the jail, is

18  that correct?

19  A.  Yes.

20  Q.  And you waited for Mr. Desir to come pick you up?

21  A.  Yes, I did.

22  Q.  This was -- Do you remember whether you were bonded out on

23  that Sunday or that Monday?

24  A.  I don't know.

25  Q.  Did you go into any businesses or ask to use the phone?

```
 1  A.  No.
 2  Q.  Where did you wait for Mr. Desir?
 3  A.  Outside of the jail.  Yeah, it was outside of the jail.
 4  Q.  Now, going to that arrest on April --
 5          You were outside the jail, you didn't see any
 6  sheriff's deputies outside the jail?
 7  A.  No, I didn't.
 8  Q.  The drugs that were found in the room on your arrest, that
 9  was found in a leopard print makeup bag?
10  A.  The pill was in my makeup bag and the crack was on the
11  floor in the room.
12  Q.  And you claimed ownership of the drugs?
13  A.  Yes, the day of the arrest, I claimed all of the drugs.
14  Q.  You had never been to jail prior to this, is that right?
15  A.  No, I hadn't.
16  Q.  But you knew you would go to jail if you claimed ownership
17  of the drugs?
18  A.  Um-m-m, yes.
19  Q.  And even after you spent two or three days in jail, you
20  voluntarily went back to work with Mr. Desir?
21  A.  Yes.  I was -- He was the one who bailed me out, so --
22  Q.  So what?
23  A.  So, I had no other choice.
24  Q.  Because he bailed you out?
25  A.  Yes.
```

1  Q.  Because he told you once -- At some point, he told you if I

2  bail you out, I could legally kill you?

3  A.  Yes.

4  Q.  And you believed that?

5  A.  Yes, I did.

6  Q.  With respect to that arrest, you didn't show up for court

7  when you were supposed to, right?

8  A.  That was in January when I didn't show up for one of my

9  court dates.

10  Q.  You had a habeas issued for your arrest or warrant issued

11  for your arrest?

12  A.  Yes, in January 2013.

13  Q.  You didn't clear that warrant up until last Thursday?

14  A.  Yes, that is true.

15  Q.  And you-- Ms. Viamontes helped you clear up that warrant,

16  right?

17  A.  No, she didn't.

18  Q.  Wasn't she with you at the jail?

19  A.  No.  I was in the -- I went to court that morning and

20  surrendered myself and told them where I was and what I was

21  doing and --

22  Q.  What did you tell them?

23  A.  Where I was in Vermont and what I was doing.

24  Q.  Here?

25  A.  No.

790

```
 1  Q.  What were you doing in Vermont?
 2  A.  That I was -- I had gone to rehab and I, um-m-m, I just
 3  didn't understand what I was supposed to do, and I wasn't
 4  getting any phone calls back, so the warrant was issued for my
 5  arrest.
 6  Q.  And then it was a no bond warrant, right?
 7  A.  It was -- I am not sure what kind of warrant it was; but,
 8  after court, I had got everything situated with my drug court
 9  and there was another warrant.
10  Q.  Ms. Viamontes or the FBI didn't help you with that at all?
11  A.  I don't know.  I saw them.
12  Q.  You saw them?
13  A.  Yes.
14  Q.  When?
15  A.  In the jail when I was arrested.
16  Q.  They just was there?
17  A.  They were making sure that I was okay.
18  Q.  Making sure you were okay?
19  A.  And I was released on ROR.
20  Q.  After you got out of jail on the drug arrest, you went to
21  live in the townhouse, correct -- I mean not the townhouse,
22  this house that is next to the motel, right?
23  A.  I'm sorry, I don't understand.
24  Q.  There is a little house, we saw pictures yesterday, and
25  there is an efficiency next to the house?
```

1  A.  Yes.

2  Q.  That is next to the motel?

3  A.  Yes.

4  Q.  After you got out of jail for the drug charge, you started

5  living in the efficiency, is that right?

6  A.  Yes.

7  Q.  Okay.  And you didn't tell --

8       You said something about you got a phone after they

9  realized they could trust you?

10  A.  Yes.

11  Q.  Okay.  Well, you went to jail and then Mackenley told you

12  that they thought they could trust you?

13  A.  Yes.

14  Q.  When you were brought back from jail, is that when you

15  lived in the efficiency?

16  A.  Yes.

17  Q.  Was Ms. Rembert there at that time when you got out of

18  jail?

19  A.  No, she wasn't.

20  Q.  Ms. Rembert was not there, just you and Mackenley?

21  A.  Yes.

22  Q.  Who else lived in the house slash efficiency with you and

23  Mr. Mackenley after you got out of jail on June 16th?

24  A.  I was just in the one room.  I don't know if anyone else

25  was there or not.

1   Q.  Did customers come there?

2   A.  Yes, they did --

3   Q.  Did you ever get to where you were posting your own ads?

4   A.  No.

5   Q.  You never posted your own ads?

6   A.  No, I didn't.

7   Q.  So, somebody was posting your ads for you still?

8   A.  Yes.

9   Q.  How long before you started back --

10       After you were released from jail, how long was it,

11  did you have like a couple days before you started engaging in

12  commercial sex acts?

13  A.  I don't remember.

14  Q.  But you had customers in the efficiency?

15  A.  Yes, I did.

16  Q.  You entertained clients in the efficiency?

17  A.  Yes.

18  Q.  Okay.  So, at this point in time, Ms. Rembert had not

19  slapped you yet?

20  A.  No, she hadn't.

21  Q.  Ms. Rembert had not done any force against you up to this

22  point in time?

23  A.  No.

24  Q.  Mr. Desir had not slapped you up to this point in time?

25  A.  Yes, he had.

793

1    Q.   When you got a customer while you were living at the

2    efficiency next to the Beach and Town, they would come there,

3    would you have to go outside and meet them?

4    A.   Um-m-m, yes.   I would be on the phone with Fire and she

5    would have three way called them and I would talk to them until

6    I could see them and hang up the phone.

7    Q.   And go outside and meet them?

8    A.   I was already outside.

9    Q.   You would be outside?

10   A.   On the phone with Fire.

11   Q.   So you weren't locked in the efficiency?

12   A.   Um-m-m, no, I wasn't.

13   Q.   You were still doing drugs?

14   A.   Yes, I was.

15   Q.   How much?   Were you doing at least one Dilaudid day?

16   A.   Yes.

17   Q.   Were you doing more than one Dilaudid a day?

18   A.   It depended on how many clients I had.

19   Q.   Explain that, please.

20   A.   I don't understand explain.

21   Q.   You said the amount -- whether you got one or two

22   Dilaudids -- I don't want to put words in your mouth -- whether

23   you got one or two Dilaudids would depend on how many clients

24   you saw.

25                Did I summarize what you said?

1    A.   Yes.

2    Q.   Okay.  How many clients would you have to see to get two

3    Dilaudids?

4    A.   I don't know.

5    Q.   Okay.

6         So, after you got out of jail, I want to understand

7    the living arrangement after you got out of jail.

8         You were living in the efficiency by yourself, right?

9    A.   Daddy was there, too.

10   Q.   In the efficiency, or he lived in a connecting place?

11   A.   He lived in the connecting place but he would stay with me

12   sometimes.

13   Q.   You all were still having sex?

14   A.   No.

15   Q.   He was just staying with you?

16   A.   Yes.

17   Q.   And Ms. Rembert lived somewhere else?

18   A.   Yes.

19   Q.   At some point, there came a time when you and this person

20   you know as Annie made Mr. Desir mad, is that right?

21   A.   Yes, we did.

22   Q.   Now, was it for stealing money or stealing drugs or for

23   stealing both?

24   A.   Stealing drugs.

25   Q.   Do you recall ever telling Agent Ramash that it was for

1  stealing money?

2  A.  I don't remember.

3  Q.  How much --

4        You don't remember whether you told her that?

5  A.  Yeah, I don't remember if I told her that.

6  Q.  Okay.  But you do remember having an interview with Agent

7  Ramash around July 2012?

8  A.  Yes, I do.

9  Q.  How many drugs -- But you are sure now it wasn't money, it

10  was only drugs?

11  A.  Yes.

12  Q.  You can remember that?

13  A.  I can remember that, yes.

14  Q.  How much do you think the drugs were worth?

15  A.  I really don't know.

16  Q.  How much drugs did you take?

17  A.  I don't even remember that.

18  Q.  What kind of drug did you take?

19  A.  It was Dilaudid and crack.

20  Q.  Dilaudid comes in different sizes or does it come in only

21  one size?

22  A.  There is different milligrams.

23  Q.  Different milligrams?

24        Did you always use the same milligrams, the same size

25  with Mr. Desir?  Did he always give you the same size?

```
 1   A.  Yes, he did.

 2   Q.  And that was what?

 3   A.  Eight milligrams.

 4   Q.  How much does eight milligrams go for?

 5   A.  They're like 25 to $30.00.

 6   Q.  How many Dilaudids did you take that day?

 7          MS. VIAMONTES:  Objection, judge, asked and answered.

 8          THE COURT:  Sustained.

 9   BY MR. WILCOX:

10   Q.  Did you take any drugs other than Dilaudid?

11   A.  Yes.

12   Q.  What else?

13   A.  We took crack.

14   Q.  How many rocks did you take?

15   A.  Like one and a half.

16   Q.  That is all you took?

17   A.  That is all.

18   Q.  Isn't it true -- Where were the drugs located?

19   A.  They were in the house.

20   Q.  In the house?

21   A.  Yes.

22   Q.  Whose house?

23   A.  Daddy's house.

24   Q.  The house that is directly connected to the efficiency?

25   A.  Yes.
```

1   Q.   You didn't have to go outside to get to the house?
2   A.   No.  The deadbolt was left open when he fell asleep.
3   Q.   He was still in there when you took the drugs?
4   A.   Yes, he was.
5   Q.   You don't recall there being a big problem about Daddy
6   having to pay somebody else for those drugs, those drugs
7   belonging to somebody that he hadn't paid for them yet?
8   A.   No, I don't.
9   Q.   You don't recall telling Daddy or Mr. Desir that if he took
10  you to Palm Beach, you would find -- you knew somebody that
11  would pay him for the drugs?
12  A.   I don't remember saying that.
13  Q.   And when you got to Palm Beach, you met Ms. Rembert for the
14  first time?
15  A.   Um-m-m, I'm not sure where Palm Beach is.  I don't
16  understand.
17  Q.   When you got to the place where the beating took place --
18  you described it as beating?
19  A.   Yes.
20  Q.   Is that where you met Ms. Rembert for the first time?
21  A.   No.
22  Q.   You met her sometime prior to that?
23  A.   Yes.
24  Q.   You definitely had to be taken to Ms. Rembert?
25  A.   What did you say?  Sorry.

```
 1   Q.  The day you were using the drugs, Ms. Rembert wasn't at the
 2   Beach and Town, right?
 3   A.  No.
 4   Q.  The day you stole the drugs, she wasn't living in the house
 5   or motel, right?
 6   A.  I didn't see her there.
 7   Q.  She had never lived there, right?
 8   A.  I didn't see her there.
 9          MS. VIAMONTES:  Objection, calls for speculation.
10          THE COURT:  Sustained.
11   BY MR. WILCOX:
12   Q.  You had never seen her around that time living there?
13   A.  No, I hadn't.
14   Q.  Okay.  But, because of this situation with the drugs, you
15   are taken somewhere where you pick up Ms. Rembert, is that
16   right?
17   A.  Yes.
18   Q.  Was there a cat in the house?
19   A.  Um-m-m, ah, I don't remember.
20   Q.  They had pets around the house, the little efficiency,
21   dogs, cats and pets?
22   A.  I remember there was a box of kittens, I think.
23   Q.  Kittens?
24   A.  Yes, baby kittens.
25   Q.  You don't remember having a conversation with Ms. Rembert
```

1  concerning your kittens?

2  A.  They weren't mine.

3  Q.  I am sorry, not yours, the kittens in the house?

4  A.  No, I don't remember.

5  Q.  Prior to this beating, you knew that Mr. Desir and

6  Ms. Rembert were married?

7  A.  No, I didn't.

8  Q.  You didn't find that out until afterwards?

9  A.  I didn't know.

10  Q.  You never knew they were married.

11  A.   No.

12  Q.  Prior to this beating, you had no reason to believe that

13  Ms. Rembert would have been jealous of you sleeping with

14  Mr. Desir?

15  A.  No.

16  Q.  You testified on direct that you and Annie got beat, is

17  that right?

18  A.  I did.

19  Q.  But after you were beat --

20        MR. WILCOX:  One moment, Your Honor.

21        THE COURT:  Yes.

22  BY MR. WILCOX:

23  Q.  After the beating took place, after you were beaten by --

24        You said you were beaten by Ms. Rembert, is that

25  right?

1    A.   Yes.

2    Q.   You were taken back to the Beach and Town, is that correct?

3    A.   Yes, I was.  Yes, I was.

4    Q.   And you were arrested again on June 22nd in a sting

5    operation, is that correct?

6    A.   Yes.

7    Q.   Between the time that the beating took place and your

8    arrest on June 22nd, did you have sex with men for money?

9    A.   Um-m-m, no, I didn't.

10    Q.   Okay.  So, did Ms. Rembert come back you guys?

11    A.   No, she was dropped back off.

12    Q.   So, after the beating, Ms. Rembert was not taken back to

13    the Beach and Town?

14    A.   No, she wasn't.

15    Q.   When you went out for the out call, Ms. Rembert was not

16    staying at the Beach and Town?

17    A.   No.  She was the one setting it up, calling me.

18    Q.   Just so -- Between the time, between the time you got

19    arrested on June 16th for the drugs and the time you got

20    arrested on June 22nd in that prostitution sting, Ms. Rembert

21    did not live with you and Mr. Desir at the efficiency at the

22    Beach and Town?

23    A.   No, she didn't.

24    Q.   Was she ever around there?

25    A.   I don't remember.

1  Q.  You don't remember?

2  A.  No.

3  Q.  So, when Ms. Rembert beat you, did she say anything like,

4  you need to make more money, that is why I am beating you?

5  A.  Um-m-m, no, she said you disrespected Daddy and how could

6  you do that?

7  Q.  Disrespected him by taking the drugs?

8  A.  Yes.

9  Q.  So you were beaten for stealing the drugs?

10  A.  Yes.

11      MR. WILCOX:  One moment, Your Honor, I need to confer

12  with co-counsel.

13      THE COURT:  Yes.

14  BY MR. WILCOX:

15  Q.  I want to talk to you about your arrest on June 22nd.  Do

16  you recall that?

17  A.  Yes, I do.

18  Q.  You described that as an out call, is that right?

19  A.  Yes, yes.

20  Q.  An out call would be where you have to go to the customer

21  as opposed to the customer coming to you?

22  A.  Yes.

23  Q.  The customer calls you-- Who told you about the out call?

24  A.  Daddy did.

25  Q.  Okay.  And did he take you over to the Hampton Inn?

1   A.  Yes, he did.

2   Q.  And did the John come down to meet you, I believe you

3   testified on direct?

4   A.  Excuse me -- Would you please repeat that?

5   Q.  The customer -- Actually, he was an undercover cop posing

6   as a customer, let's call him that.  The undercover cop posing

7   as a customer came down to meet you?

8   A.  Yes, he did.

9   Q.  And took you back upstairs?

10  A.  Yes.

11  Q.  Where was Daddy?

12  A.  He was in a parking lot outside of the hotel.

13  Q.  Did Mr. Desir come with you into the lobby?

14  A.  No, he didn't.

15  Q.  When you got into the lobby, was the undercover cop waiting

16  for you?

17  A.  No, he wasn't.

18  Q.  You called the undercover cop to come down?

19  A.  I called Fire to tell her that I don't know what room, so

20  she called him to come down to meet me.

21  Q.  Do they have people at the hotel, clerks, things like that

22  at the registration desk, right?

23  A.  Yes, they do.

24  Q.  Had you wanted to or had you chose to, you could have asked

25  the clerk to call the police, right?

1    A.   I could have but, again, I was afraid.

2    Q.   You get upstairs with the undercover cop that is posing as

3    a customer, is that right?

4    A.   Yes.

5    Q.   And you tell him how much it is, is that right?

6    A.   Um-m-m, I believe so.  I'm not --

7    Q.   You get the money?

8    A.   Yes.

9    Q.   He tells you what he wants, right?  I don't want to go into

10   specifics.  He tells you what he wants, right?

11   A.   I really don't remember.

12         MR. WILCOX:  Judge, may I approach?

13         THE COURT:  Yes.

14   BY MR. WILCOX:

15   Q.   I want you to look at your document, and I want you to tell

16   me, does that refresh your memory what happened in the room at

17   the Hampton Inn?

18   A.   Okay.

19         THE COURT:  Mr. Wilcox, I think the witness has

20   reviewed the document.

21   BY MR. WILCOX:

22   Q.   Does that refresh your recollection?

23   A.   Um-m-m, a little bit, yeah.

24   Q.   Okay.  So, you got into the room and he told you what he

25   wanted and you told him how much it would cost?

1    A.   Yes.

2    Q.   Okay.  And you started to get undressed?

3    A.   Yes.

4    Q.   Okay.  At this point in time, can you estimate how many

5    times you had done this?

6    A.   Um-m-m, no, I really can't.

7    Q.   You took the money?

8    A.   Yes, I did.

9    Q.   You started undressing?

10   A.   Yes.

11   Q.   Then you got arrested?

12   A.   Ah, yes.

13   Q.   It happened in that order, there may have been other things

14   that happened but that happened, right?

15   A.   Yes.

16   Q.   You got arrested and where did they take you right after

17   you got arrested?

18   A.   Can you please repeat that?

19   Q.   Where did they take you after the undercover cop pulled out

20   the customer, disclosed to you that he was an undercover cop?

21   A.   They took me to another room.

22   Q.   At the hotel?

23   A.   Yes.

24   Q.   At some point, they took photographs of you?

25   A.   Yes, they did.

```
 1   Q.  And those were the photographs --
 2           Those photographs depict or show the injuries that you
 3   received from the beating you had a few nights earlier?
 4   A.  Yes.
 5   Q.  They asked you where the bruises came from?
 6   A.  Yes, they did.
 7   Q.  Did you tell them it was from my pimp?
 8   A.  No, I said I got beat up.
 9   Q.  Did they ask you by whom?
10   A.  Um-m-m, I don't know.
11   Q.  You don't remember?
12   A.  No, I don't.
13   Q.  But you do remember that you didn't tell them that you were
14   being forced to be a prostitute?
15   A.  No, I didn't the say that.
16   Q.  And -- But you did say that Mackenley knew people, right?
17   A.  Yes.
18   Q.  At the first time you got arrested, you were afraid to tell
19   the Sheriff's Office people that Mackenley was forcing you to
20   do this or you were doing this against your will because you
21   thought he was connected with the police, right?
22   A.  Yes, I did.
23   Q.  So, when you got arrested this time, why didn't you say,
24   hey, it is okay, I am working for Mackenley?
25   A.  Because -- sorry.  I was afraid to say anything.
```

1  Q.  You didn't say, do you all know Mackenley Desir?  Do you

2  all know Daddy, do you all know Zoe?

3  A.  No, I did not.

4  Q.  You didn't say that because you knew he wasn't connected

5  with those police officers?

6  A.  No, I didn't say that.

7  Q.  The reason you didn't say it is because you knew that would

8  not have helped you get out of jail?

9  A.  Um-m-m, I was afraid to say anything.

10  Q.  At some point, you realized you were with the FBI?

11  A.  An FBI agent spoke to me, yes.

12  Q.  The FBI that spoke to you, was it a male or female?

13  A.  A male.

14  Q.  Excuse me?

15  A.  A male.

16  Q.  The FBI showed you the FBI credentials, right?

17  A.  Yes, he did.

18  Q.  And he asked you questions about this situation with you

19  and Mr. Desir?

20  A.  No, he didn't.

21  Q.  He didn't?

22         And you didn't tell him, did you?

23  A.  No, I didn't.

24  Q.  What did he ask you?

25  A.  He asked me if I knew of any under age girls that were

1  walking around the streets.

2  Q.  He never asked you, were you being forced to do this?

3  A.  I don't remember.

4  Q.  He may have asked you, but you don't remember?

5          MS. VIAMONTES:  Objection, calls for speculation,

6  judge.

7          THE COURT:  Sustained.

8  BY MR. WILCOX:

9  Q.  You were afraid to tell an FBI agent that you were being

10  forced to prostitute?

11          MS. VIAMONTES:  Objection, asked and answered.

12          MR. WILCOX:  No, it wasn't.

13          THE COURT:  Overruled.

14          THE WITNESS:  Can you rephrase that, please?

15          MR. WILCOX:  All right.

16  BY MR. WILCOX:

17  Q.  You were afraid to tell an FBI agent that you were being

18  forced to prostitute?

19  A.  Yes.

20  Q.  Because you thought Mackenley had connections with the FBI?

21  A.  No, I didn't.

22  Q.  You didn't think that --

23  A.  I just --

24          THE COURT:  Wait, you interrupted, Mr. Wilcox.  She

25  had not finished her response.

```
 1              MR. WILCOX:  I apologize.
 2              THE WITNESS:  I was afraid of the police that were in
 3   the room.
 4              I just didn't know -- I didn't feel like I could have
 5   said anything.  I didn't know what would have happened to me.
 6   BY MR. WILCOX:
 7   Q.  But you were also told to ask the undercover cop posing as
 8   a customer whether or not he was a cop?
 9   A.  Yes, I did.
10   Q.  If he was a cop, he had to tell you he was a cop, right?
11   A.  Yes.
12   Q.  And that would prevent you from getting arrested.  That is
13   what you believed, right?
14   A.  Um-m-m, yes.
15              THE COURT:  We are going to need to take a break at
16   some point.
17              MR. WILCOX:  This is a good time, judge.
18              THE COURT:  All right.  Folks, as you recall, we are
19   going to take our lunch recess at noon.
20              We are going to take a 15 minute break now.  If you
21   want to go get some fresh air, you may do so.
22              Don't discuss the case.
23              (Thereupon, the jury retired from the courtroom.)
24              (Thereupon, a short recess was taken.)
25              THE COURT:  The record will reflect that Mr. Desir and
```

```
 1  Ms. Rembert are present represented by counsel.
 2          Mr. Culuffo, would you please bring in the jury.
 3          (Thereupon, the jury returned to the courtroom.).
 4          THE COURT:  All right.  Folks, please be seated,
 5          Ms. C.J., let me remind you you are still under oath.
 6  We will continue with cross-examination by Mr. Wilcox.
 7  BY MR. WILCOX:
 8  Q.  I believe I had asked you about being afraid of the FBI and
 9  you already answered.
10          MR. WILCOX:  Your Honor, at this time, I would like to
11  introduce Government Exhibit 9 -- I mean Defendant's Exhibit 9,
12  I apologize to the Government.
13          THE COURT:  That is the June 22nd inventory?
14          MS. VIAMONTES:  No objection.
15          MR. WILCOX:  Has it already been introduced?
16          THE COURT:  No, it has not, but the Government doesn't
17  oppose, Desir Number 9 will be received.
18          [Defense Desir Exhibit 9 received in evidence.]
19  BY MR. WILCOX:
20  Q.  Ms. C.J., when you were arrested, you were booked into the
21  Broward County jail again, is that right?
22  A.  Yes, I was.
23  Q.  Now, at this time, you do recall having your phone, is that
24  right?
25  A.  Yes, I do.
```

1   Q.   And it is described as a Kyocera, Kyocera?

2   A.   I have no idea.

3   Q.   You see it?

4   A.   Yeah, I see it.

5   Q.   I can't pronounce it either.  K-y-o-c-e-r-a, for the

6   benefit of the Court Reporter?

7   A.   That is what it says.

8   Q.   All right.  So you had a phone that date, is that right?

9   A.   Yes, that is true.

10   Q.   And you got a phone from the jail again?

11   A.   Yes.

12   Q.   You were given an opportunity to make some phone calls from

13   the jail?

14   A.   Yes, I was.

15   Q.   Did you call Vermont?

16   A.   No, I didn't.

17   Q.   You didn't want to go back to doing this any more, did you?

18   A.   No, I didn't.

19   Q.   You didn't want to be a prostitute any more, right?

20   A.   I didn't, no.

21   Q.   This is the second time you had gone to jail in less than

22   10 days?

23   A.   Yes, that is true.

24   Q.   This has got to be getting old?

25   A.   Yes, that is true.

1  Q.  So, why didn't you call Vermont and tell somebody to come

2  get you?

3  A.  I had lost all hope at this point.

4  Q.  What do you mean when you say you lost all hope?

5  A.  I, um-m-m, mentally, I just wasn't -- I gave up on trying.

6  Q.  And this was on June 22nd?

7  A.  Yes, it was.

8  Q.  And how long had you known Mr. Desir at this point?  Can

9  you estimate?

10  A.  I had been there, um-m-m, um-m-m, almost two weeks.

11  Q.  Let's just say approximately two weeks, is that fair?

12  A.  Yes.

13  Q.  And after approximately two weeks, you had given up all

14  hope about having somebody from Vermont to come get you?

15  A.  Yes, yes, I did.

16  Q.  But did you call your mother, right, sometime near this

17  point in time, right, June 22nd?

18  A.  Yes.  After this point, I did call my Mom.

19  Q.  You told her you were in a bad place, words to that effect,

20  right?

21  A.  Yes.

22  Q.  But you were going to try to figure out how to get out of

23  it yourself?

24  A.  Yes, I told my Mom that.  To not worry, I had a plan, don't

25  call Dad.

1   Q.  Because you had a plan?

2   A.  Yes, I did.

3   Q.  What was your plan?

4   A.  To finish -- to go to the Court hearings that I had and

5   somehow escape after court.

6   Q.  So you had a plan to escape?

7   A.  Yes, I did.

8   Q.  That was your intent, was to escape?

9   A.  Yes.

10  Q.  Escape from Mackenley Desir?

11  A.  Yes.

12  Q.  And the influence he had on you?

13  A.  Yes.

14  Q.  But you didn't choose to employ the FBI in that plan?

15  A.  No, I didn't.

16  Q.  Or any other law enforcement officer?

17  A.  Um-m-m, no.

18  Q.  Now, where did you go after the June -- let me just --

19          How long did it take you to get out of jail after you

20  were arrested on June 22nd?

21  A.  Um-m-m, I know it was shorter than the first arrest.

22  Q.  Did you spend 24 hours there?

23  A.  Yes, I did.

24  Q.  It was at least a day, though?

25  A.  Yes, it was.

1  Q.  So you get out sometime after June 22nd?

2  A.  Yes.

3  Q.  And do you have any more dates or any more encounters with

4  men for money?

5  A.  Yes.

6  Q.  After June 22nd?

7  A.  Yes.

8  Q.  Where?

9  A.  Um-m-m, in the efficiency.

10  Q.  And Ms. Rembert wasn't there?

11  A.  No, she wasn't there.

12  Q.  Sometime after that, you were released, I mean from jail

13  after the -- being busted in that sting, I should say, getting

14  arrested in that sting.

15       You got sick and had to go to the hospital?

16  A.  Yes.

17  Q.  Now, isn't it true that you went to the hospital on the

18  bus?

19  A.  No, that is not true.

20  Q.  How did you get to the hospital?

21  A.  Daddy had drove me.

22  Q.  Ms. Rembert was not with you?

23  A.  She was in the house when we had left.

24  Q.  When you left for the hospital?

25  A.  Yes.

 1  Q.  And you get to the hospital and, by this time, you are

 2  trying to plan your escape?

 3  A.  No, no, I wasn't.

 4  Q.  But, before going to the hospital, you did have consensual

 5  sex with Mr. Desir, right?

 6  A.  I don't remember when it was.  It was after my arrest but I

 7  don't remember whether it was before or after the hospital.

 8  Q.  You go to the hospital and they diagnose you with strep

 9  throat?

10  A.  Yes.

11  Q.  You are in the emergency room?

12  A.  Yes.

13  Q.  How long were you waiting in the emergency room?

14  A.  Maybe an hour and a half, two hours.

15  Q.  You have your phone with you?

16  A.  Yes.

17  Q.  So, if you chose to, you could have called a number of

18  people to come and help you escape?

19  A.  I already -- I had a plan set.  I didn't want anybody

20  ruining -- yes, ruining my plan because I didn't want anyone

21  else to get hurt.

22  Q.  And the plan was you were going to take care of your court

23  hearing before you attempted to escape?

24  A.  Yes.

25  Q.  Your plan was you were going to go ahead and continue to

1   engage in commercial sex act until after your court dates?

2   A.   I was going to cooperate with Daddy so I wouldn't get

3   killed or beat again.

4   Q.   Well, I understand that.  And to do that, that meant you

5   would have to engage in commercial sex acts -- you would have

6   to engage in sex in exchange for money?

7   A.   Yes, that is true.

8   Q.   You were going to continue to do that until your court date

9   and then you were going to escape?

10          MS. VIAMONTES:  Objection, asked and answered.

11          THE COURT:  Sustained.

12  BY MR. WILCOX:

13  Q.   You didn't tell the emergency room physician examining you

14  that you were being held against your will?

15  A.   No, I didn't.

16  Q.   Did you think that Mackenley had connection with him?

17  A.   No.  I had my mind set on a plan --

18  Q.   The question was, did you think Mr. Desir had connections

19  with the emergency room physician?

20  A.   No, I didn't.

21  Q.   You got a prescription?

22  A.   I can't remember if they had given me a prescription, but

23  they had given me a shot when I was in there.

24  Q.   Do you recall getting a prescription filled at a pharmacy?

25  A.   No, I don't.

1   Q.  I want to show you a copy of Government Exhibit 26.

2           MR. WILCOX:  The Government agrees that this is a copy

3   of Government Exhibit 26, Your Honor.

4           THE COURT:  Both sides or all sides may use Exhibit 26

5   as if it were in evidence based on the representations made.

6           MR. WILCOX:  It is not out, judge.  It is not out

7   where I can get to it.

8           MS. VIAMONTES:  I have a copy of Government 26 if you

9   want it.

10          THE COURT:  All you have to do is ask.

11          MR. WILCOX:  I thought I had.

12          MS. VIAMONTES:  You just asked me a question.

13  BY MR. WILCOX:

14  Q.  Now, I believe that we established that this number 786

15  322-0154 is a number to the phone that you had access to?

16  A.  Um-m-m, yeah, sometimes I did.

17  Q.  Sometimes you did.  Did you have access to that phone when

18  you were in the hospital?

19  A.  Um-m-m, yes, I believe so.

20  Q.  Okay.  I want you to look at page 3.  I am going to hand

21  you a copy.

22          Well, let's see, I am not sure what I am doing.

23          These calls on 6/24, on June 24th, you see where I am

24  pointing at here?

25  A.  Um-m-m --

```
 1   Q.  Right here (indicating)

 2   A.  Yes, I see it.

 3   Q.  Now, that is how that works.

 4           Did you make any of those calls on June 24th -- did

 5   you make -- sorry.

 6           The question is, did you write any of those text

 7   messages?  Did you author any of those text messages?

 8   A.  No, I didn't.

 9   Q.  I want to direct your attention to the 561 number here.

10   A.  Yes.

11   Q.  Did you author that text message?

12   A.  No, I didn't.

13   Q.  So, you are saying that, on June 24th, you did not have

14   access to the phone?

15   A.  It was taken back and forth around the --

16   Q.  Among whom?

17   A.  Me, Daddy, Fire, and the other girls.

18   Q.  But you had it on June 27th, is that right?

19   A.  Um-m-m, I don't know.

20   Q.  Well, right, here we go, I think you testified that you had

21   it on June 27th?

22   A.  Yes, there are different times I had it.

23   Q.  This is one o'clock in the morning -- I'm sorry, this is 10

24   o'clock in the evening, right?  "Kayla, I really don't feel

25   good."
```

```
 1            June 27th, around -- between 10 and 11 o'clock at
 2   night, 2200 or 2300 hours, you are having a discussion with
 3   Kayla about drugs?
 4   A.  Yes.
 5   Q.  Who is Kayla again?
 6   A.  Kayla is Annie.
 7   Q.  Annie.  And goes on into the morning of June 28th, is that
 8   right?
 9   A.  A, yes.
10   Q.  Page 4.  You recognize this number here 802 747-8272?
11   A.  Um-m-m, yes.
12   Q.  Whose number is that?
13   A.  That is my Dad's number.
14   Q.  Okay.  And he calls you Chrissy?
15   A.  Yes, he does.
16            MR. WILCOX:  One moment, Your Honor.
17            THE COURT:  Yes.
18   BY MR. WILCOX:
19   Q.  Did you exchange texts with clients via this phone?
20   A.  No, I didn't.
21   Q.  You did not?
22   A.  No.
23   Q.  You only used the phone -- that phone to contact people
24   that were associated Mr. Desir?
25   A.  Um-m-m, Fire would call me on it and I called Daddy from
```

```
 1  it.
 2  Q.  And you never used it for anything else?
 3  A.  I had called my Mom.
 4  Q.  Okay.  Now, so, any time you had the phone, or you had
 5  access to the phone, you could have used it to call anybody
 6  that you wanted?
 7  A.  Ah, yes.
 8  Q.  Now, after that prostitution arrest, and before you went to
 9  the hospital, you told Mackenley you didn't want to do this any
10  more?
11  A.  Um-m-m, yes.
12  Q.  When I say Mackenley, I mean Mr. Desir.
13  A.  Yes.
14  Q.  What did you say to him?
15  A.  I don't want to do this any more.
16  Q.  And when you say you didn't want to do this any more, that
17  meant you didn't want to see anybody for commercial sex any
18  more?
19  A.  Yes, I didn't want to be with him any more.
20  Q.  What you really meant is that you just didn't want to be
21  beaten any more?
22          MS. VIAMONTES:  Objection, judge, asked and answered.
23          THE COURT:  Sustained.
24  BY MR. WILCOX:
25  Q.  But you indicated that your plan was -- was this before you
```

1  made your plan or after you had made your plan?

2  A.  I'm not sure, not sure.

3  Q.  Well, you just testified that your plan was to go to court,

4  finish up all your court stuff, and then escape?

5  A.  Yes, that was my plan.

6  Q.  But you don't know whether or not you told Mr. Mackenley --

7  I am sorry, Mr. Desir, that you didn't want to do this any more

8  before or after you made this plan?

9       MS. VIAMONTES:  Objection, asked and answered.

10       THE COURT:  Sustained.

11 BY MR. WILCOX:

12 Q.  Okay.  After you get out of the hospital, you are,

13 essentially, rescued by your father?

14 A.  Um-m-m, yeah.

15 Q.  Okay.  During the day that you are rescued, I am thinking

16 that was around June 30th, I am not sure, it is around that

17 approximate time, is that correct?

18 A.  Um-m-m, yes.

19 Q.  That is the day he -- Government 26, this is a copy of it,

20 where he is having this conversation with Mr. Desir on that

21 same phone number?

22 A.  Yes.

23 Q.  Right.  Okay.  So, around June 30th is the day that you

24 were rescued by your father?

25 A.  Um-m-m, I am not sure if there are 30 or 31 --

1    Q.  There are only 30?

2    A.  Okay.

3    Q.  Okay.  Now, that day there was a loud knock and the police

4    were knocking on the door of the efficiency.  Do you remember

5    that?

6    A.  Yes, I do.

7    Q.  You were in the house?

8    A.  Yes.

9    Q.  Do you remember holding the dog because the dog was

10   barking?

11   A.  There was no dog.

12   Q.  There was no pit bull?

13   A.  No, there wasn't.

14   Q.  And you were saying you were under the influence of drugs.

15   You didn't recognize whether one of the voices outside your

16   door was your father?

17   A.  Yes.

18   Q.  And Mr. Desir eventually took you to the bondsman?

19   A.  Yes, he did.

20   Q.  The bondsman found drugs in your purse?

21   A.  He actually asked me if I had any drugs in my purse and

22   told me if I did to go throw them away before I went to the

23   jail.

24   Q.  And you did that?

25   A.  Yes.

1   Q.  Do you remember that?

2   A.  Yes.

3   Q.  What drugs did you have in your purse?

4   A.  I had a needle that was half full with Dilaudid.

5   Q.  Any cocaine?

6   A.  I am not sure if there was any cocaine.  I don't think so.

7   Q.  And you went back to Vermont?

8   A.  Yes.  Eventually.

9   Q.  Maybe July 1st or July 2nd?

10  A.  Yes.

11  Q.  And you have been in Vermont since you have come down here

12  last week to testify in this case?

13  A.  Yes, I was.

14  Q.  And you had those warrants, right?

15          MS. VIAMONTES:  Objection, asked and answered.

16          THE COURT:  Sustained.

17  BY MR. WILCOX:

18  Q.  You never --

19          MR. WILCOX:  No further questions, Your Honor.

20          One moment, Your Honor, let me confer with my client.

21          THE COURT:  Okay.

22          MR. WILCOX:  No further questions, Your Honor.

23          THE COURT:  All right.  Ms. Viamontes, redirect.

24          MS. VIAMONTES:  Thank you, Your Honor.

25                      REDIRECT EXAMINATION

1  BY MS. VIAMONTES:

2  Q.  C.J., I will be as quick as I can.  Okay?

3  A.  Thank you.

4  Q.  When you got into that car with Mackenley Desir, did you

5  think you were going to have to prostitute?

6  A.  No, I did not.

7  Q.  When Mackenley Desir took your phone shortly after you met

8  him, did you know where you were?

9  A.  No, I didn't.

10  Q.  Was it your willing choice to stay after Genet Rembert beat

11  you?

12  A.  No, it was not.

13  Q.  The phone that Mackenley Desir took from you, could you

14  describe that phone?

15  A.  It was a black and silver AT&T go phone.

16  Q.  Did it say "AT&T go phone" on it?

17  A.  Yes.

18  Q.  So, is it either of the phones described on the property

19  receipts?

20  A.  No.

21  Q.  On cross-examination by one of the attorneys mentioned this

22  would assist you when you arrived at the Beach and Town, why?

23  How would your phone records assist you?

24  A.  Because when I saw him, outgoing calls were not connected

25  and there was nothing coming out of the phone, just coming in.

1  Q.  You weren't calling your family any more after meeting

2  Mackenley?

3          MR. WILCOX:  Leading.

4  BY MS. VIAMONTES:

5  Q.  Were you able to call your family after meeting Mackenley

6  Desir?

7  A.  No, I wasn't.

8  Q.  When did you first see Mackenley Desir's gun?

9  A.  Within a few days of meeting him.

10 Q.  How did that gun make you feel?

11 A.  Scared.

12 Q.  Defense attorneys asked you a lot of questions about the

13 out call on June 22nd.  C.J., did you want to go on the out

14 call?

15 A.  No, I didn't.

16 Q.  On direct examination, I asked you about some of the worst

17 dates you had, and you described one man in particular that

18 choked you and slapped you.

19         MR. ZACCA:  Objection, beyond the scope.

20         MR. WILCOX:  Objection, beyond the scope.  We didn't

21 go into that.

22         THE COURT:  Sustained.

23 BY MS. VIAMONTES:

24 Q.  They asked about your choice.  Was it your choice to

25 continue to meet with Johns that mistreated you?

```
 1  A.  I am sorry, repeat that.
 2  Q.  Did you want to meet with Johns that were slapping you and
 3  mistreating you?
 4  A.  No, I didn't.
 5  Q.  Why did you do it?
 6  A.  I felt if I didn't, I would be killed or hurt or something
 7  not good would happen to me.
 8  Q.  Were you afraid for your safety?
 9  A.  Yes, I was.
10  Q.  Other than your own safety, were you afraid for anyone
11  else?
12  A.  I was also afraid for my family.
13  Q.  Why?
14  A.  Because he had all my information.
15          MS. VIAMONTES:  May I approach, Your Honor?
16          THE COURT:  Yes, ma'am.
17  BY MS. VIAMONTES:
18  Q.  C.J., you mentioned you were missing your ID.
19          You see here on this property receipt from June 16,
20  2012, do you see a portion here where the officer can fill in
21  if you have a driver's license?
22  A.  Yes, I do.
23  Q.  Did you have a driver's license with you?
24  A.  No, I didn't.
25  Q.  You see the officer can fill in if you have an ID card?
```

```
 1   A.   Yes.
 2   Q.   Does the officer fill in there for an ID card?
 3   A.   No, he doesn't.
 4   Q.   Do you see where the officer writes down if you have any
 5   money, ones, fives, 10, 20, 50?  Do you see that?
 6   A.   Yes, I do.
 7   Q.   Did you have any money?
 8   A.   No.
 9   Q.   Without your ID, without your phone, without the money, did
10   you feel you could leave?
11   A.   No.
12   Q.   Let's go now to the property receipt, Government Exhibit
13   9 -- I'm sorry, Defense Exhibit 9 from June 22nd, and upon your
14   arrest for the prostitution charge on the out call.
15        Do you see the same thing, the officer can fill in if
16   you have a driver's license?
17   A.   Yes, I see that.
18   Q.   Did you have a driver's license?
19   A.   I didn't.
20   Q.   ID card, did you have an ID card?
21   A.   I didn't.
22   Q.   You see where the officer could fill in money?
23   A.   Yes, I do.
24   Q.   Did you have any money?
25   A.   I didn't have any money.
```

```
 1   Q.  Where was your ID card or your license?
 2   A.  I had it when I had met Daddy, but then it was gone when I
 3   went to check it one time.
 4   Q.  When you first learned that you were going to be engaging
 5   in commercial sex acts, sex for money, how high were you?
 6   A.  I don't know.  I was high, very high.
 7   Q.  After Mackenley Desir told you that he could legally kill
 8   you because he had bonded you out --
 9           MR. WILCOX:  Objection to leading, Your Honor.
10           THE COURT:  Overruled.
11   BY MS. VIAMONTES:
12   Q.  After Mackenley Desir told you he could legally kill you
13   because he bonded you out, were you voluntarily and willingly
14   having sex for money?
15   A.  No, I wasn't.
16   Q.  Why were you doing it?
17   A.  Because I felt threatened.  I felt like I didn't have any
18   choice otherwise I would die.
19   Q.  The text messages that we've shown you, Government Exhibit
20   26, did you have possession of this phone all the time?
21   A.  No, I didn't.
22   Q.  And you were asked whether you texted with clients or
23   Johns?
24   A.  Yes, I was.
25   Q.  Were you the one that texted with clients or Johns?
```

1  A.  No.

2  Q.  Who did that?

3  A.  Fire.

4  Q.  On page 3 of the document of the MetroPCS text messages,

5  Government 26, I am going to show it to you, do you see where

6  you first -- where you are having a conversation, the texting

7  conversation with Kayla and you let her know that it is Angel

8  that is communicating with her?  Do you see that?

9  A.  Yes, I do.

10  Q.  Is it right here at 1222 -- I am sorry, 2236:47:  "This is

11  Angel.  Sorry, I want one, too, ha"?

12  A.  Yes.

13  Q.  Why do you let Kayla know that you are the one who has the

14  phone?

15  A.  Because she thought she was texting Daddy because Daddy had

16  the phone earlier.

17  Q.  The phones that you had in your possession that are logged

18  on these property receipts, you said you don't remember

19  sometimes if you had the phone or not.

20          If you had the phone, who gave you the phone?

21  A.  Daddy did.

22  Q.  Why couldn't you just use the phone and call whoever you

23  wanted, call your boyfriend?

24  A.  He had told me that he would check the records.

25  Q.  When Daddy -- You know him as Mackenley Desir now?

```
 1   A.   Yes.
 2   Q.   When Mr. Desir bonded you out on the possession of
 3   narcotics, did you have an option to go somewhere else?
 4   A.   No, I didn't.
 5   Q.   Did the police tell you, hey, we could put you up in a
 6   halfway house.  Did you know anything like that?
 7   A.   No.
 8   Q.   On cross-examination by Mr. Zacca, you mentioned that some
 9   of this is a blur.  Do you remember that?
10   A.   Yes.
11   Q.   Although -- Tell us why is some of this a blur?
12   A.   Um-m-m, it is just -- I've tried so hard to keep this from
13   my mind so I could go on with my life.
14   Q.   And although, C.J., you may have tried to forget it, do you
15   remember the beating that Fire gave you?
16   A.   Yes, I do.
17   Q.   Do you remember being choked and slapped by that John?
18   A.   Yes, I do.
19   Q.   Do you remember Mackenley Desir telling Genet Rembert to
20   slap you?
21   A.   Yes.
22   Q.   Do you remember her slapping you?
23   A.   I remember exactly.
24   Q.   Do you remember whether drugs were withheld from you while
25   you were with Mackenley Desir?
```

1   A.  Yes, I do.

2   Q.  Do you remember Daddy or Mackenley Desir telling you you

3   couldn't leave?

4   A.  Yes.  I do.

5   Q.  And although you tried to forget and it was a little foggy

6   and a blur, do you remember this man seated right here,

7   Mackenley Desir, telling you that he could legally kill you?

8           MR. ZACCA:  Objection, asked and answered, and

9   leading.

10          THE COURT:  Sustained.  It has been asked and

11  answered.

12  BY MS. VIAMONTES:

13  Q.  After your first arrest, the one for possession of drugs

14  and after you were bonded out about June 18th, 2012, did you

15  have a conversation with Daddy about who you called from the

16  jail?

17  A.  Um-m-m, I don't remember.

18  Q.  Who would give you Dilaudid or other drugs after you

19  completed a date?

20  A.  Daddy would.

21  Q.  Would he always give it to you, right after a date give you

22  what you deserved?

23  A.  No.  Sometimes I had to wait.

24  Q.  When you were given phones by Mackenley Desir, was it

25  always the same phone or would it sometimes be different

1    phones?

2    A.   The look of it was the same, but it was a different number.

3    Q.   C.J., they asked you on cross-examination about the warrant

4    that you had cleared up last week.  Did you try and clear that

5    up from Vermont?

6    A.   Yes, I did.

7    Q.   Were you able to get it cleared up from Vermont?

8    A.   I wasn't, no.

9    Q.   Why not?

10   A.   Because they wanted me to come down to surrender and I also

11   called numerous times and left voice mails and I hadn't heard

12   back from anybody.

13   Q.   Did you call your attorney in that case?

14   A.   Yes, I did, yes.

15   Q.   Who represents you in that case?

16   A.   Um-m-m, Rudy Murrell I have been talking with.

17   Q.   Is he a Public Defender?

18   A.   Yes, yes, he is.

19   Q.   Did I promise you that I would help you out with that

20   warrant?

21   A.   No, you didn't.

22   Q.   Let's talk a little bit more about when you came to

23   surrender.  Okay?

24   A.   Okay.

25   Q.   You mentioned you went to court?

1  A.  Yes, I did.

2  Q.  Were you then booked in the County jail?

3  A.  Yes.

4  Q.  You mentioned that you saw me, Susan Funk, Agent Funk, and

5  Vanessa Johannes in the booking area of the jail?

6  A.  Yes, I do.

7  Q.  Do you know why we were there?

8  A.  No.

9  Q.  Did you see anyone else in the courtroom in the booking

10  area?

11  A.  Yes, I did.

12  Q.  Who?

13  A.  I saw Fire.

14  Q.  Tell us about that when you saw her.

15          MR. WILCOX:  Objection, relevance Your Honor.  How is

16  this relevant?

17          MS. VIAMONTES:  He opened the door.

18          THE COURT:  I think I need to hear a sidebar.

19          (Sidebar discussion on the record.)

20          MS. VIAMONTES:  Your Honor, I believe they opened the

21  door to it.

22          I sent both counsel an email explaining to them before

23  trial right after this happened last Thursday the reason I went

24  over there is because I learned in court that the defendants

25  were going to the same booking area that my victim was going

1   to.

2        I learned during our pretrial motions that the victim

3   had been taken into custody and she was being booked.

4        When I learned that these Defendants were also going

5   to that booking area, I was concerned that they would run into

6   each other.  I went there to inform law enforcement to keep

7   them separate.  It was for her safety, and they knew that.

8        MR. WILCOX:  May I --

9        THE COURT:  Wait.

10        MS. VIAMONTES:  He opened the door to that to make

11   this jury to believe I was doing this for special favors.

12        MR. WILCOX:  Let's get the email.  I read the email,

13   and I thought she went there to help her get bonded out.

14        Let's get it, let's read it and look at it.

15        THE COURT:  Okay.

16        MR. WILCOX:  "Gentlemen, I learned Tuesday that C.J.

17   had an outstanding habeas from her State Court case.  I called

18   C.J.'s attorney Oscar Snyder to inform him that she was in town

19   and wanted to clear up the outstanding warrant."

20        "I communicated with C.J.'s State Prosecutor to inform

21   her that C.J. is a victim in a Federal sex trafficking case,

22   was in town and willing to turn herself in.  Oscar Snyder

23   scheduled a hearing before Judge Tobin to request that C.J.'s

24   habeas be withdrawn.  C.J.'s felony was vacated, however, she

25   also had an outstanding warrant for misdemeanor arrest for

1    prostitution.  She was booked in the main jail and given a $300

2    bond.  I overheard the marshals in court the Desir and Rembert

3    were going to remain at the main jail.  When I learned that

4    C.J. had been taken into custody from court, I became concerned

5    that C.J. would run into the Defendants while she was being

6    processed in the main jail.  Agent Funk, my co-counsel and I

7    met with C.J. in the booking area to make sure she was safe and

8    she had not had contact with the Defendant.  While meeting with

9    C.J., we saw the Defendant Rembert snickered and made faces.

10   She did not have an opportunity to speak with her.

11          "We requested the correctional deputies keep C.J.

12   separate from Rembert and Desir.  I spoke with the prosecutor

13   to attempt to obtain a hearing on C.J.'s misdemeanor case.  The

14   felony drug prosecutor obtained a hearing this afternoon and

15   C.J. is ROR on the State prostitution charge."

16          When I read this, this is logical for me to think she

17   was there for her to help C.J. on the habeas.

18          I still take it that way.

19          I don't know what relevance it had that she saw

20   Rembert in the jail when Rembert just made a face and didn't

21   say anything to her.

22          MS. VIAMONTES:  Your Honor, he is implying that the

23   prosecutor, that I had done something wrong before this jury,

24   and I think if I am not allowed to correct that, this jury is

25   going to have the wrong impression.

1        MR. WILCOX:  We could have the judge instruct the

2   jury, I would agree to that.  I would not allow you to accuse

3   my client of threatening her.

4        THE COURT:  Explain to me how Mr. Wilcox' questioning

5   opened the door to Ms. Rembert being there.

6        MS. VIAMONTES:  He has implied to the jury that my

7   reason for being there is something other than for the victim's

8   safety.

9        The fact that she did, in fact, run into the Defendant

10  proves and shows the motive for me being there, my concern for

11  the victim's safety because they were going to be in the same

12  booking area.

13       MR. WILCOX:  Judge, to be --

14       THE COURT:  Really, what you have done, Mr. Wilcox, is

15  you put Ms. Viamontes in a position where she almost has to

16  testify in order to establish her reason for being at the jail.

17       MR. WILCOX:  No, judge --

18       THE COURT:  I don't know that questioning this

19  witness -- Well, it would get out the fact that Rembert was

20  there, but you are missing a link, the link being why you were

21  there.

22       MS. VIAMONTES:  Would defense counsel have an

23  objection to the Court giving a curative instruction --

24       MR. WILCOX:  No, absolutely not, I misinterpreted it.

25       MS. VIAMONTES:  So you would not have an objection?

```
 1              MR. WILCOX:  To be honest with you, I misinterpreted
 2   it.
 3              THE COURT:  Let's talk about an appropriate curative
 4   instruction.
 5              For the record, Mr. Wilcox implied that Ms. Viamontes
 6   was at the jail in order to --
 7              MR. WILCOX:  Assist with Ms. C.J.'s bond and helping
 8   her to get out of jail.
 9              THE COURT:  Right.  Okay, so that is the impression
10   that the jury has.
11              MR. WILCOX:  Apparently, that is a mistaken
12   impression.
13              I would suggest that the Court tell the jury flat out
14   that that was not why she was there -- that is not why she was
15   there, that she was at the jail to make sure that C.J. did not
16   run into Ms. Rembert or had no contact with Ms. Rembert and
17   Mr. Desir.
18              MS. VIAMONTES:  That is acceptable.
19              MS. JOHANNES:  That is fine.
20              MR. WILCOX:  I apologize.
21              MS. VIAMONTES:  If you want me to clarify she did not
22   see your client, I will.
23              MR. ZACCA:  Talking about opening door, there is an
24   argument we are going to make with regard to an open door.  I
25   would like to address it before she is dismissed.
```

```
 1                    MR. WILCOX:  We should address it now.

 2               It goes back --

 3               THE COURT:  You are saying that you are entitled to a

 4     recross?

 5               MR. ZACCA:  Yes, on a limited issue based on her

 6     redirect.

 7               THE COURT:  What is that?

 8               MR. ZACCA:  She asked specifically, you were asked a

 9     question why everything was a blur with you, her response was,

10     yes, I wanted to go on with my life, I wanted to forget this.

11               That implies that drugs caused her to be a blur and,

12     more importantly, this was an isolated experience never to be

13     repeated again, that this is one time in her life, that is why

14     it was a blur.

15               That is not the truth.  She is still prostituting

16     herself, and she is still prostituting herself, that is the

17     impression this jury has.

18               MR. WILCOX:  To wipe -- it is hard to wipe something

19     out of your mind when you are advertising on an escort website.

20               How can she be trying to wipe this out of her mind,

21     trying to forget this, and she is advertising on the escort

22     website?

23               MS. VIAMONTES:  There is a difference between what the

24     Defendant is put through during that time and acts later that

25     are voluntary.  That does not open the door to voluntary acts.
```

1        That does not open the door to acts nearly a year

2   later.

3        THE COURT:  I find that no good cause is being shown

4   to permit a recross examination.  Request is denied.

5        (After sidebar discussion.).

6        THE COURT:  Folks, having conferred with the lawyers

7   sidebar, let me advise you that Ms. Viamontes' purpose in being

8   at the jail was not to assist in any way in bonding Ms. C.J.

9   out.

10        It was simply to insure that there was no contact

11   between Ms. C.J. and Ms. Rembert.

12        All right.  You may proceed.

13        MS. VIAMONTES:  Thank you, Your Honor.

14   BY MS. VIAMONTES:

15   Q.  C.J., you didn't see Mackenley Desir at the jail when you

16   were booked, right?

17   A.  No, I didn't.

18   Q.  You mentioned on cross-examination that you were afraid of

19   Mackenley Desir.  Do you remember that?

20   A.  Yes, I do.

21   Q.  Did there ever come a time you became afraid of Genet

22   Rembert?

23   A.  Yes, there was.

24   Q.  When?

25   A.  Um-m-m, um-m-m, probably, I would have to say it was when I

1   knew that she was -- I knew she would do anything that Daddy

2   asked her to do.

3   Q.  Would she hesitate at all when Daddy --

4          MR. WILCOX:  Objection, that is my client's state of

5   mind.

6          THE COURT:  Let me hear the question, and then --

7   don't answer the question, Ms. C.J., until I rule.

8          MR. WILCOX:  I have an objection to the last answer

9   she made, I knew Rembert -- that Ms. Rembert would do anything

10   Daddy asked her.

11          I object to that.  I ask you to tell the jury to

12   disregard that.

13          THE COURT:  Does the Government wish to be heard?

14          MS. VIAMONTES:  That is what the witness believed.

15          MR. WILCOX:  Her belief is not relevant.

16          THE COURT:  Well, does it --

17          MS. VIAMONTES:  Goes to the witness' state of mind,

18   Your Honor.

19          THE COURT:  Well, is this the type of lay opinion that

20   would be admissible under 701?

21          MS. VIAMONTES:  Yes, sir.

22          THE COURT:  I am going to overrule the objection under

23   701.

24          MS. VIAMONTES:  Thank you.

25   BY MS. VIAMONTES:

1   Q.  Did you observe any hesitation on the part of Ms. Rembert

2   when Mr. Desir asked her to slap you?

3   A.  No, I didn't.

4   Q.  Did you observe any hesitation on the part of Ms. Rembert

5   when Mr. Desir had her take you into that abandoned house to

6   beat you?

7   A.  No.

8   Q.  When you were couch hopping with friends, was there any

9   reason for you to be afraid of them?

10  A.  No, no reason.

11  Q.  Did Ms. Rembert give you rules aside from the rules you had

12  already heard from Mackenley Desir?

13  A.  Yes.

14  Q.  What were those?

15  A.  Um-m-m --

16          MR. ZACCA:  Objection, beyond the scope, judge, rules

17  by the co-defendant.

18          THE COURT:  Ms. Viamontes, you wish to be heard?

19          MS. VIAMONTES:  I believe they got into it in cross,

20  but if the Court finds they didn't --

21          THE COURT:  Sustained.

22  BY MS. VIAMONTES:

23  Q.  You mentioned on cross-examination about phone calls, three

24  way phone calls between you, Fire and clients.  Do you remember

25  that?

```
 1   A.   Yes, I do.
 2   Q.   Can you tell us about some of those phone calls, what was
 3   said?
 4   A.   Um-m-m, she called me and tell me that she is going to
 5   connect it and she would tell me how much I would be getting
 6   from the client and she would tell me to try them so I could
 7   get more money from them.
 8   Q.   During these phone calls, did you ever have illicit
 9   conversations with the clients about what, in fact, you were
10   doing?
11   A.   No, I didn't, none.
12   Q.   Were there different prices for different acts?
13   A.   No, it was different prices for the time.
14   Q.   During these dates, where was Mackenley Desir?
15   A.   Sometimes sitting outside the door or he was always around.
16   Q.   Was Genet Rembert present when you slept with Mackenley
17   Desir?
18   A.   No, she wasn't.
19   Q.   Did you tell her you slept with Mackenley Desir?
20   A.   No, I didn't.
21   Q.   Would you ever talk to Mackenley Desir about what happened
22   on the dates?
23   A.   No.
24            MR. ZACCA:   Objection, beyond --
25   BY MS. VIAMONTES:
```

1   Q.  What was the purpose of you going to this out call at the

2   Hampton Inn June 22nd, 2012?

3   A.  I don't understand.

4   Q.  Why were you going to the Hampton Inn for an out call?

5   A.  To get -- to meet with a client.

6   Q.  What were you going to do with the client?

7   A.  Ah, have sex.

8   Q.  Who set up that date?

9   A.  Ah, Fire.

10  Q.  Who drove you there?

11  A.  Daddy.

12  Q.  Why were you going to wait until you went to court to try

13  and escape from Mackenley Desir and Genet Rembert?

14  A.  Because I wouldn't have that legal bind where he was --

15  where he had bailed me out.  I was thinking that it didn't

16  matter after that.

17  Q.  Had you ever gone through this process before or been on a

18  bond before?

19  A.  No, I hadn't.

20  Q.  So you thought after the first court date you are no longer

21  on bond?

22  A.  Yes, I thought that.

23  Q.  When you were arrested, did you tell the police officers

24  your true name?

25  A.  Yes, I did.

1    Q.   You mentioned on cross-examination how different people

2    used this phone that we reviewed the text messages of.   Who

3    determined who could use the phone?

4    A.   Daddy would.

5    Q.   You mentioned before meeting Mackenley Desir two dates you

6    had, were those different than the dates you had while you were

7    with Mackenley Desir and Genet Rembert?

8    A.   Yes, they were.

9    Q.   How were they different?

10   A.   I had a choice.   I had my cell phone and I wasn't -- I

11   didn't feel intimidated or threatened by the date.

12   Q.   You mentioned on cross-examination that you heard a voice

13   that appeared to be your dad's when he was here trying to find

14   you.

15   A.   Yes.

16   Q.   Why did you think -- You said, I believe you said, I

17   thought I was hearing things?

18   A.   Yes, yes, I did.

19   Q.   Why did you think that?

20   A.   Because I couldn't believe that that could be true.

21   Q.   You mentioned that Mackenley Desir at some point told you

22   your Dad was here looking for you?

23   A.   Yes.

24   Q.   Was that after you heard your Dad or before?

25   A.   I can't remember.

1  Q.  Were you allowed to walk out and greet your Dad?

2  A.  No, I wasn't.

3  Q.  Did you want to walk out and greet your Dad?

4  A.  Yes.

5  Q.  Did you, in fact, get in trouble for reaching out to your

6  family?  Were you punished in some way for contacting your Mom

7  and reaching out to Dad?

8       MR. ZACCA:  Objection, compound question.

9       MR. WILCOX:  Objection, compound.

10      THE COURT:  Sustained as to form.

11  BY MS. VIAMONTES:

12  Q.  Did Mackenley Desir do anything to you after you called

13  your Mom?

14  A.  I don't remember.

15  Q.  You mentioned seeing Mackenley Desir's gun on several

16  occasions.

17  A.  Yes.

18  Q.  Can you tell the members of the jury the last time you saw

19  that gun?

20  A.  The last time I saw that gun was after the police were

21  banging on the door the last day.

22  Q.  Why did you see it that day, that last day?

23  A.  Because he was asking me if I had done anything, and I just

24  repeated no, no, I was crying.

25  Q.  Who asked you if you had done anything?

```
 1  A.  Daddy did.

 2  Q.  And where did he have the gun?

 3  A.  It was pointed at my face.

 4          MS. VIAMONTES:  Your Honor, I have no further

 5  questions.

 6          THE COURT:  All right.  Thank you, Ms. C.J., you may

 7  step down.

 8          (Thereupon, the witness was excused.)

 9          THE COURT:  All right.  Folks, we are going to take

10  our lunch recess now.

11          We will reconvene at a quarter after one.  Remember,

12  don't discuss the case among yourselves or anyone else, don't

13  do any research on your smart phone or otherwise, and continue

14  to keep an open mind.

15          We will see you back 1:15.

16          (Thereupon, the jury retired from the courtroom.).

17          (Thereupon, a recess was taken 12:00 p.m.)

18          THE COURT:  The record will reflect Mr. Desir and

19  Ms. Rembert are present represented by counsel.

20          Mr. Culuffo, bring in the jury.

21          (Thereupon, the jury returns to the courtroom.)

22          THE COURT:  All right.  Folks, you all can be seated.

23          By the way, tomorrow we will be going back to our

24  regular lunch hour, 12:30.  It kind of makes the afternoons

25  easier.
```

 1             When we recess at noon and come back at 1:15, three
 2    hours and 45 minutes is a long time, especially after eating
 3    lunch.
 4             As I told you, I don't mind you bringing coffee and
 5    soft drinks in the courtroom.  I don't mind you doing that if
 6    you feel you are less than alert.
 7             All right.  With that, Ms. Viamontes, you may call
 8    your next witness.
 9             MS. VIAMONTES:  Thank you, Your Honor.  At this time
10    we call Cindy Dookeran.
11             THE COURT:  Ma'am, would you remain standing and raise
12    your right hand.
13             CINDY DOOKERAN, GOVERNMENT'S WITNESS, SWORN.
14             THE COURT:  Would you please be seated.  You can
15    adjust that microphone, if you like.
16             Would you please state your name and spell your last
17    name for the record.
18             THE WITNESS:  Cindy Dookeran, D-O-O-K-E-R-A-N.
19             THE COURT:  Ms. Viamontes, you may inquire.
20             MS. VIAMONTES:  Thank you, Your Honor.
21                        DIRECT EXAMINATION
22    BY MS. VIAMONTES:
23    Q.  Ms. Dookeran, where do you work?
24    A.  At the Beach and Town Motel.
25    Q.  How old are you?

```
 1   A.  34.
 2   Q.  What is your position?
 3   A.  Assistant manager.
 4   Q.  Do your parents own Beach and Town Motel?
 5   A.  Yes.
 6   Q.  Could you describe the Beach and Town Motel and the
 7   properties behind it to the jury?
 8           What is the Beach and Town?
 9   A.  A small motel.
10   Q.  How many rooms does it have?
11   A.  29.
12   Q.  Does it have a swimming pool?
13   A.  Yes.
14   Q.  Are there buildings behind the motel?
15   A.  Yes.
16   Q.  Do your parents own them?
17   A.  Yes.
18   Q.  Can you describe them?
19   A.  They are apartments in the back.
20   Q.  Is there a house that has an efficiency?
21   A.  Yes.
22   Q.  What are your primary duties as assistant manager at the
23   Beach and Town Motel?
24   A.  Assisting people checking in and bookwork and whatnot.
25   Q.  What is your schedule?  When do you work?
```

1  A.  7:00 to 3:00, Monday through Saturday.

2  Q.  And was it the same back in June 2012, 7:00 a.m. to 3:00

3  p.m.?

4  A.  Yes.

5  Q.  Can you please describe for the members of the jury the

6  process of someone checking in?

7  A.  When they come to check in, they need to present ID and I

8  put their information into the computer.

9  Q.  And do you give them a room key?

10 A.  Yes.

11 Q.  Do you keep receipts in the regular course of business?

12 A.  Yes.

13 Q.  Do the motel rooms have a telephone inside the motel room,

14 a land line?

15 A.  Yes.

16 Q.  Can you tell the members of the jury what customers need to

17 do in order to use the land line inside the rooms?

18 A.  They need to leave a deposit with whoever is at the front

19 desk, and they have -- whoever is at the front desk activates

20 the phone to the room.

21 Q.  So, if they don't leave a deposit, can they use the phone

22 to make phone calls?

23 A.  No.

24 Q.  What if their deposit runs out?  Say they left $5, and they

25 used up the $5, can they use the phone?

```
 1   A.  No.  Once they reach the limit, that is it.
 2           MS. VIAMONTES:  Your Honor, may I approach the
 3   witness?
 4           THE COURT:  Yes, ma'am.
 5   BY MS. VIAMONTES:
 6   Q.  Ma'am, I am approaching with Government Exhibit 21 for
 7   identification.
 8           Do you recognize Government Exhibit 21?
 9   A.  Yes.
10   Q.  What is it?
11   A.  It is a receipt.
12   Q.  How do you recognize that receipt?
13   A.  This is a receipt we provide to the customers, and it also
14   has the Beach and Town name on it.
15   Q.  Is that a regular business record that you keep?
16   A.  Yes.
17   Q.  Is that business record created at the time that it says at
18   the top of the receipt when the person checks in?
19   A.  Yes.
20   Q.  Is it kept in the regular course of your business?
21   A.  Yes.
22           MS. VIAMONTES:  Your Honor, at this time the
23   Government moves Government Exhibit 21 into evidence.
24           THE COURT:  Any objection?
25           MR. ZACCA:  No objection.
```

1    MR. WILCOX:  No objection, Your Honor.

2    THE COURT:  Government Exhibit 21 will be received.

3    [Government Exhibit 21 received in evidence.]

4    MS. VIAMONTES:  Permission to publish, Your Honor?

5    THE COURT:  Granted.

6  BY MS. VIAMONTES:

7  Q.  Is this the address of the Beach and Town Motel, 1010 South

8  Federal Highway, Hollywood, Florida?

9  A.  Yes.

10  Q.  And who is the renter of room 32 on June 19, 2012?

11  A.  It says Mackenley Dennis.

12  Q.  Do you know who that person is?

13  A.  Yes.

14  Q.  Do you see that person in the courtroom today?

15  A.  Yes.

16  Q.  Would you point him out and mention an article of clothing

17  he is wearing?

18  A.  He is in the business suit.

19    MS. VIAMONTES:  May the record indicate the witness

20  positively identified the Defendant Mackenley Desir?

21    THE COURT:  Yes, the record will so reflect.

22  BY MS. VIAMONTES:

23  Q.  How long was the stay June 13, 2012, in room 32?

24  A.  Seven nights.

25  Q.  And it was for two guests?

1  A.  Correct.

2  Q.  Ma'am, when a guest checks into the hotel and you generate

3  that receipt, do you give them keys for the room?

4  A.  Yes.

5  Q.  Can you describe what kind of keys --

6  A.  The regular --

7  Q.  -- the hotel uses?

8  A.  It is a regular key, not the card lock.

9  Q.  Not the ones that look like a credit card?

10  A.  No.

11  Q.  A traditional key?

12  A.  Right.  Correct.

13  Q.  How many keys does a guest get when they register at your

14  hotel?

15  A.  They get one set of keys.  It has two keys on it, one for

16  the gate and one for the room.

17  Q.  Can you describe the doors to the motel rooms?  Do these

18  doors close automatically after they are opened?

19  A.  No.

20  Q.  Does the Beach and Town service out-of-state customers?

21  A.  Yes.

22  Q.  Do you get customers from other countries like Canada?

23  A.  Yes.

24  Q.  How do you know Mackenley Desir?

25  A.  Because he stayed at the hotel -- motel.

1  Q.  Other than staying at the hotel, do you know if he actually

2  rents space, or rented space from your mom in the back rooms,

3  the rooms -- the apartments you described before behind the

4  motel?

5  A.  Yes.

6  Q.  So, residing in the back apartments, would he rent rooms in

7  the motel?

8  A.  Yes.

9  Q.  Do you know why he rented rooms in the motel?

10 A.  No.

11 Q.  Do you know somebody by the name of Genet Rembert?

12 A.  Yes.

13 Q.  Do you see that person in the courtroom today?

14 A.  Yes.

15 Q.  Can you point her out and mention an article of clothing

16 she is wearing?

17 A.  She is wearing a brown sweater.

18 Q.  Okay.

19     Under that sweater, what color?

20 A.  A black shirt.

21     MS. VIAMONTES:  May the record reflect the witness

22 positively identified the Defendant, Genet Rembert?

23     THE COURT:  Yes, ma'am, the record will so reflect.

24 BY MS. VIAMONTES:

25 Q.  How do you know Ms. Rembert?

1  A.  I know her through Mackenley.

2  Q.  Did she also reside in the apartments behind the motel?

3  A.  Yes.

4  Q.  Does your hotel -- does the motel very video surveillance?

5  A.  Yes.

6  Q.  Do you know if the motel had operational -- or a video

7  surveillance system that was working back in June 2012?

8  A.  I don't remember.

9  Q.  Did there come a time that your mother had a new video

10 surveillance system installed?

11 A.  Yes.

12 Q.  Do you know why she installed a new video surveillance

13 system?

14         MR. ZACCA:  Objection, calls for hearsay.

15         THE COURT:  What say the Government?

16         MS. VIAMONTES:  She works there, she may have personal

17 knowledge.

18         THE COURT:  Ask her if she has personal knowledge.

19 BY MS. VIAMONTES:

20 Q.  Do you have personal knowledge, do you know why a new video

21 surveillance system was installed?

22 A.  I don't remember.

23 Q.  Okay.

24         Do you know when the new video surveillance system was

25 installed?

```
 1  A.  Um-m-m, I am trying to think.  I am not sure.
 2          THE COURT:  Ma'am, you need to speak into the
 3  microphone.  I can hardly hear you.
 4          THE WITNESS:  Sorry.  I'm not sure.
 5  BY MS. VIAMONTES:
 6  Q.  Okay.
 7          Were you able -- were you able to provide the
 8  Government with video surveillance dating back to June 2012?
 9  A.  No.
10  Q.  Why not?
11  A.  Because it only holds up to 72 hours surveillance.
12  Q.  Do you know if there is a camera right outside room 32?
13  A.  No, there is not.
14  Q.  There is not, right?
15  A.  No.
16  Q.  And room 32, is that on the first or second floor?
17  A.  Second floor.
18  Q.  The receipt that I showed you earlier said room 32.  Is
19  that room 32 on the second floor?
20  A.  Yes.
21          MS. VIAMONTES:  May I approach, Your Honor?
22          THE COURT:  Yes, ma'am.
23  BY MS. VIAMONTES:
24  Q.  Ma'am, this receipt with Mackenley Desir, dated back to
25  June 13, 2012, does this show an activation for the phone in
```

1  the room?

2  A.  No.

3          MS. VIAMONTES:  No further questions, Your Honor.

4          THE COURT:  Cross?

5          MR. ZACCA:  Yes.  Mr. Fernandez is going to be doing

6  the cross-examination.

7          THE COURT:  Okay, all right.

8                          CROSS EXAMINATION

9  BY MR. FERNANDEZ:

10 Q.  Good afternoon, Ms. Dookeran.

11 A.  Good afternoon.

12 Q.  The hotel, the family owned hotel, this hotel is open to

13 the general public, correct?

14 A.  Correct.

15 Q.  Anyone can walk in and rent a room?

16 A.  Yes.

17 Q.  In fact, it is open to the sidewalk, to the street?

18 A.  Right.

19 Q.  You have tourists that come in from out-of-town?

20 A.  Yes.

21 Q.  Just as you have tourists that come from in town?

22 A.  Right.

23 Q.  You have families that stay with children?

24 A.  Yes.

25 Q.  You have couples that stay?

1   A.   Yes.

2   Q.   You have people who stay that are vacationing?

3   A.   Yes.

4   Q.   In other words, this is not some dark little motel hidden

5   in some corner off in town, it is open to the general public?

6   A.   Correct.

7   Q.   You told us it has 29 rooms, but there is a room 32?

8   A.   Correct.

9   Q.   How does the numbering go?

10  A.   Well, some of the rooms is for the manager, that is

11  including the office and whatnot, the laundry room, I think, is

12  included also, the manager's quarters.

13  Q.   So, does that mean those rooms don't count?  When you start

14  off the counting, does it start with room 1?

15  A.   Yes.

16  Q.   The manager's or laundry rooms, those do not couldn't

17  within that count?

18  A.   No.

19  Q.   All right.  Got it.

20       You said there was a laundry room.  Is that laundry

21  room open for the guests to go do their laundry?

22  A.   No.

23  Q.   Who does the laundry in the laundry room?

24  A.   The staff.

25  Q.   There is staff inside the hotel that does laundry for the

1  guests?

2  A.  No.  For the hotel.

3  Q.  For the hotel?

4  A.  Yes.

5  Q.  This would be staff who goes to the rooms and upkeep the

6  rooms?

7  A.  Yes.

8  Q.  Tell us about the staff; how often do they go in the rooms

9  to upkeep the rooms?

10  A.  The maid, she does room service daily.

11  Q.  How many times a day?

12  A.  One.

13  Q.  Morning, afternoon or evening?

14  A.  It depends on how many checkouts she has.  She does the

15  checkouts first, and then does the room service.

16  Q.  Does the maid have a key of her own to access the rooms?

17  A.  Yes.

18  Q.  Because, for example, there may be times when guests are

19  not there, so she needs to go in and do the room?

20  A.  Right.

21  Q.  Back in June of 2012, did you have maids doing the rooms at

22  the hotel?

23  A.  Yes.

24  Q.  So the procedure is if the maid were to knock on the door

25  and no one would answer, she could come in and do the room?

1    A.   Yes.

2    Q.   And doing the room requires what of the maid to do?

3    A.   Change the towels, make the bed, clean the bathroom, sweep

4    and mop the floor.

5    Q.   Who trains the maid service?

6    A.   Um-m-m, the owner.

7    Q.   Have you ever provided any training or instructions to the

8    maid service when it comes to what to do in upkeeping a room?

9    A.   Yeah.

10   Q.   Okay.

11         How about maintenance; when something breaks in a

12   room, is there a maintenance staff that can fix it?

13   A.   Yes.

14   Q.   Is this a maintenance staff that is on the premises or off

15   the premises?

16   A.   He is usually on the premises.

17   Q.   And this is a man?

18   A.   Yes.

19   Q.   Okay.

20         So, at any given day back in June 2012, in addition to

21   the staff at the front desk, there would have been a maid going

22   around the hotel, correct?

23   A.   Yes.

24   Q.   There would have been maintenance staff going around the

25   hotel, correct?

1   A.   Yes.

2   Q.   Okay.

3        And the maid would have access to all rooms, correct?

4   A.   Yes.

5   Q.   Let me ask you this:  Has there ever been an occasion in

6   your experience at your hotel where a maid has ever encountered

7   something inside a guest room that may have arisen some concern

8   about some criminal activity in the room, for example?

9   A.   No.

10  Q.   No?

11  A.   No.

12  Q.   Has a maid ever come to you or your staff and said, I just

13  cleaned a room --

14        MS. VIAMONTES:  Objection, Your Honor, hearsay.

15        MR. WILCOX:  Not offered for the truth, Judge.

16        MR. FERNANDEZ:  Thank you, Mr. Wilcox.

17        THE COURT:  Let me hear the rest of the question.

18  BY MR. FERNANDEZ:

19  Q.   Has there ever been an occasion where a maid has proceeded

20  to clean a room at your hotel and encountered, say, for

21  example, drugs?

22        MS. VIAMONTES:  Objection, hearsay, and calls for

23  speculation, what the maid saw.

24        THE COURT:  Sustained as to the question as phrased.

25        MR. FERNANDEZ:  Okay.

1          THE COURT:  You could rephrase it.

2   BY MR. FERNANDEZ:

3   Q.  Is there a procedure in place, doesn't have to be in

4   writing, just verbally communicated to your staff, your maid in

5   particular, is there a procedure in place as to what a maid is

6   to do if she walks into a room and finds, for example, drugs

7   that a guest may have left behind?

8   A.  Usually, if she finds it, she will let me know.

9   Q.  Correct.  And that was the point of my previous question.

10          She would let you know, correct?

11  A.  Right.

12  Q.  How about if that maid were to find, say, a firearm, would

13  she also let you know?

14  A.  Yes.

15  Q.  How about if that maid finds a girl unconscious, for

16  example, on the bed, would she let you know?

17  A.  Definitely, yes.

18  Q.  How about if the maid would find somebody in the room high

19  on drugs and nonresponsive, would she let you know?

20  A.  Yes.

21  Q.  Back in June 2012, did any maid come to you and report any

22  of these things I just asked you about?

23  A.  No.

24  Q.  And instead of going through all these questions again for

25  the maintenance man, what I am going to ask you, would the

1  maintenance man also do the same thing if he found any of these

2  things?

3  A.  Yes.

4  Q.  Now --

5          MR. FERNANDEZ:  May I approach the ELMO, Judge?

6          THE COURT:  Yes.

7  BY MR. FERNANDEZ:

8  Q.  On the exhibit that was introduced when the Government was

9  asking you questions, I believe it was Government Exhibit 21,

10 the actual date of arrival as to this Dennis Mackenley guest

11 would have been June 12th, correct?

12 A.  Correct.

13 Q.  Not June the 11th, but the 12th?

14 A.  Correct.

15 Q.  And the actual check-in time was 10:38 a.m., correct?

16 A.  Yes.

17 Q.  Not the afternoon of the day before, correct?

18 A.  No.

19 Q.  Not the evening of the day before, correct?

20 A.  No.

21 Q.  The main highway right across from your hotel is a Federal

22 highway, correct?

23 A.  Yes.

24 Q.  That is one busy highway, isn't it?

25 A.  Yes.

1    Q.  Lots of cars at all times?

2    A.  Yes.

3    Q.  Lots of people walking up and down the streets, correct?

4    A.  Yes.

5    Q.  At all hours of the day?

6    A.  Yes.

7    Q.  Thank you.

8             MR. FERNANDEZ:  I have nothing further, thank you.

9             THE COURT:  Mr. Wilcox, cross.

10                       CROSS EXAMINATION

11   BY MR. WILCOX:

12   Q.  I am going to show you what has been -- excuse me.

13            Good afternoon.  How are you?

14   A.  Good afternoon.

15   Q.  I am representing Ms. Rembert.

16            You say you recognize Ms. Rembert through Mackenley,

17   right?

18   A.  Yes.

19   Q.  She never worked at the hotel as a maintenance person or

20   housekeeper, did she?

21   A.  No.

22   Q.  You never contracted her to do any work at the hotel?

23   A.  No.

24   Q.  I am going to show you what have been marked -- I will show

25   you Government's exhibits in evidence 1 through 7.

1          What is Government Exhibits 1 through 7?  Do you
2     recognize it?
3     A.   I don't recognize the person in the picture.
4     Q.   You don't?
5     A.   No.
6     Q.   You never -- you don't recall ever seeing that person
7     before?
8     A.   No.  I don't recognize her.
9     Q.   You don't recall seeing that person in room 32 during the
10    time period reflected in this receipt?
11    A.   No.
12    Q.   Ms. Rembert stayed on the property.  Did she live on the
13    property next to the motel?
14    A.   Yes.
15    Q.   And do you recall whether she lived there in the month of
16    June of last year?
17    A.   I don't remember.
18    Q.   Were you aware of prostitution activity at the Beach and
19    Town Motel in June of 2012?
20    A.   No.
21    Q.   Do you remember the police coming there on June 16th of
22    2012?
23    A.   No.
24    Q.   You don't remember the police coming there in that month
25    regarding -- in reference to a robbery complaint?

```
 1   A.   Robbery complaint, no.

 2   Q.   Did the police come there often, or do you have contact

 3   with the police at the hotel?

 4   A.   Yes.

 5   Q.   For what --

 6   A.   I am sorry, repeat the question.

 7   Q.   Do the police come to the hotel to investigate criminal

 8   activity?  Do they come there often?

 9   A.   Do they come there often?  No.

10   Q.   Do you remember them coming there in June 2012?

11   A.   No.

12   Q.   During June of 2012, did the police ever come there and

13   investigate allegations of prostitution?

14   A.   No.

15   Q.   Do you recall the police ever coming to the Beach and Town

16   to investigate allegations of prostitution?

17   A.   No.

18            MR. WILCOX:  Nothing further, Your Honor.

19            THE COURT:  Redirect?

20            MS. VIAMONTES:  Yes, Your Honor.

21                        REDIRECT EXAMINATION

22   BY MS. VIAMONTES:

23   Q.   Ms. Dookeran, do guests sometimes tell you or the other

24   staff in the office, you know, I don't want my room cleaned,

25   can you hold the housekeeping?
```

1    A.   Yes.

2    Q.   If a guest asks you to not have the housekeeper clean the

3    room, would you honor that request?

4    A.   Yes.

5    Q.   Do you know if Mackenley Desir made that request for his

6    room not to be cleaned?

7    A.   No.

8    Q.   You don't know?

9    A.   I don't remember him saying that to me, that he does not

10   want his room cleaned.

11   Q.   Would the housekeeper clean Mr. Mackenley's apartment in

12   the back?

13   A.   No.

14   Q.   How long have you had the housekeeper -- what is her name?

15   I forget her name.

16   A.   Her name is Betsy.

17   Q.   How long has Betsy been working for you guys?

18   A.   Currently, I think it is almost two years.

19   Q.   You only have that one housekeeper, right, Betsy?

20   A.   Yes.

21   Q.   And back in June 2012, who was the maintenance man?

22   A.   That I don't remember.

23   Q.   Would Mr. Desir help your mom out around the property,

24   making repairs and that sort of thing?

25   A.   Not that I remember.

1  Q.  Aside from the one receipt we showed the jury dating back

2  to June 19, 2012, would Mr. Desir occasionally rent rooms in

3  the motel?

4  A.  Yes.

5  Q.  So he lived in the back, but at the same time he is living

6  in the back, he would rent rooms in the motel?

7  A.  Yes.

8          MR. WILCOX:  Judge, I believe this is beyond the scope

9  of cross.

10         THE COURT:  Sustained.

11 BY MS. VIAMONTES:

12 Q.  How many times do you recall Mr. Desir renting a room in

13 the motel?

14         MR. FERNANDEZ:  Same objection, beyond the scope.

15         MS. VIAMONTES:  Your Honor, they asked about the --

16         THE COURT:  Overruled.

17         THE WITNESS:  I don't know the exact number of times,

18 but I know it was a couple of times.

19 BY MS. VIAMONTES:

20 Q.  Do you like calling the police on your guests?

21 A.  No.

22         MS. VIAMONTES:  Nothing further, Your Honor.

23         THE COURT:  Thank you, Ms. Dookeran, you may step

24 down.

25         THE WITNESS:  Thank you.

 1          THE COURT:  All right.  The Government may call your

 2  next witness.

 3          MS. VIAMONTES:  Thank you, Your Honor.  At this time

 4  the Government calls Officer DeVega.

 5          THE COURT:  Ma'am, if you would, just step right over

 6  to the left of the witness stand, right over here.

 7          Please remain standing and raise your right hand.

 8          JESSICA DEVEGA, GOVERNMENT'S WITNESS, SWORN.

 9          THE COURT:  Would you please be seated.

10          THE WITNESS:  Thank you.

11          THE COURT:  Please state your name and spell your last

12  name for the record.

13          THE WITNESS:  Jessica DeVega, D-E-V-E-G-A.

14          THE COURT:  Ms. Viamontes, you may inquire.

15          MS. VIAMONTES:  We would like to approach sidebar.

16          THE COURT:  Yes, ma'am.

17          (Proceedings at sidebar.)

18          MS. VIAMONTES:  Do you want me to address it?

19          MR. ZACCA:  Yes.  I will respond.

20          MS. VIAMONTES:  Your Honor, I told counsel during the

21  lunch break I think the door was opened during C.J.'s

22  testimony.  The call on June 13, 2012 was a robbery by

23  Mackenley Desir.

24          Defense counsel, Mr. Wilcox, was asking C.J.,

25  asserting that C.J. was the one being accused of a robbery with

1    a gun, and that is false.

2              MR. WILCOX:  I never mentioned a gun, Judge.

3              MS. VIAMONTES:  He may not have mentioned a gun, but

4    he was mentioning robbery.  That is false.  The one being

5    accused of a robbery was Mackenley Desir.

6              The door was opened, and I let counsel know that I was

7    going to try to get into that, and I would approach sidebar.

8              MR. ZACCA:  First, I didn't open that door; and

9    secondly, it was a question that Mr. Wilcox asked.  He asked

10   C.J., you were accused of robbery?  She said no.  There is no

11   evidence right now of her being accused of robbery, because she

12   said no.

13             We all know the Court's instructions, a question asked

14   by a lawyer is not evidence.  Her answer is no, her not being

15   accused of robbery.  It is irrelevant, moreover, prejudicial to

16   suggest now that Officer DeVega investigated Mr. Desir for a

17   robbery.

18             It is irrelevant and immaterial, and the door is not

19   open.  There is no evidence of it.  She said no, and Mr. Wilcox

20   moved on.

21             MS. VIAMONTES:  Your Honor, it is inextricably

22   intertwined in our case.  Mr. Desir had a weapon and this is

23   part and parcel of the case.

24             THE COURT:  What is going to be DeVega's testimony as

25   to why she was there and what caused her to go to that

1  location?

2          MS. VIAMONTES:  She was there in response to a

3  robbery, that was her primary concern.

4          THE COURT:  Who did she receive the information from?

5          MS. VIAMONTES:  A 911 call by Mr. Sousa, the

6  complainant.

7          MR. ZACCA:  To be accurate, Officer DeVega didn't

8  speak to Sousa on the 911 call, the dispatcher did.  It is

9  double hearsay.  You can argue excited utterance for the first

10  statement, but the second statement would be hearsay.

11          THE COURT:  I think, under the circumstances, the

12  contents of the 911 call would not be admissible.

13          If you had the person who received the call, I guess

14  the dispatcher, whoever would have answered the call, and you

15  could lay the proper predicate for excited utterance, maybe it

16  would be, but under these circumstances, the substance of the

17  911 call would not be admissible, so I don't see how you can

18  get into that.

19          She was dispatched to this area, you don't have any

20  objection to say, regarding a robbery, alleged robbery?

21          MR. ZACCA:  Well, the affect on the listener --

22          MS. VIAMONTES:  Why she was there.

23          MR. ZACCA:  Any connection, reference or link to

24  Desir --

25          THE COURT:  I agree that the reference to the

```
 1   Defendant is hearsay.
 2           MS. VIAMONTES:  That is why I approached sidebar,
 3   Judge.
 4           THE COURT:  I am glad you did.  That is the
 5   appropriate way to handle the matter.  You are to be commended.
 6           (Sidebar concluded.)
 7                       DIRECT EXAMINATION
 8   BY MS. VIAMONTES:
 9   Q.  Officer, tell the jury where you work.
10   A.  City of Hollywood Police Department.
11   Q.  How long have you been a police officer for the City of
12   Hollywood?
13   A.  Two years.
14   Q.  What did you do before becoming a police officer for the
15   City of Hollywood?
16   A.  I worked as a service officer for Hallandale for two years.
17   Q.  Back in 2012, you had been a police officer for a year?
18   A.  Yes.
19   Q.  Were you on duty June 16, 2012?
20   A.  Yes.
21   Q.  Did you respond to the Beach and Town Motel in the City of
22   Hollywood?
23   A.  Yes, ma'am.
24   Q.  Without telling us what was told to you by dispatchers or
25   anyone else, why were you responding to the Beach and Town?
```

1    A.   We received two calls, one was a sexual battery call and

2    the other was a robbery call.

3    Q.   Was that attempted sexual battery?

4    A.   Attempted sexual battery.

5    Q.   Do you recall what room you responded to when you

6    reached -- when you got to the Beach and Town?

7    A.   Yes, room 32.

8    Q.   Was that on the second floor?

9    A.   Yes.

10   Q.   Can you tell the members of the jury how you responded to

11   room 32?

12   A.   All officers came with their guns drawn, came out as an

13   armed robbery, a robbery where one of the males had a gun.

14   Q.   Did you make entry into room 32?

15   A.   We knocked on the door, asked everybody to come out.

16   Q.   Who was in the room when you asked everybody to come out?

17   A.   At the time, a black male we later identified as Mr. Desir,

18   and C.J. and I believe a Spanish male, Michael Sousa.

19   Q.   When you responded to room 32, were you looking for

20   something?

21   A.   Yes, ma'am.  We responded to an armed robbery and we

22   received consent from the person renting the room, Mr. Desir.

23   Q.   How do you know Mr. Desir rented the room?

24   A.   Upon talking to him, he said he rented the room.

25   Q.   Was anyone with him?

```
 1   A.   Yes, the girlfriend, or the female with him.

 2   Q.   What was the girlfriend's name?

 3   A.   C.J.

 4   Q.   Did you ask him for consent to search the room?

 5   A.   Yes, we had written and oral consent.  We were looking for

 6   the weapon allegedly used in the robbery.

 7   Q.   Did you find the weapon?

 8   A.   No, ma'am.

 9   Q.   Did you find any illegal drugs in the room?

10   A.   Yes, ma'am.  Under one of the mattresses I found a little

11   vial containing crack cocaine.

12   Q.   Did you find any other drugs?

13   A.   Yes, in the bathroom under the sink I found a leopard purse

14   that contained syringes and a Dilaudid hydromorphine pill.

15   Q.   Did you speak with C.J.?

16   A.   Yes, ma'am.

17   Q.   Did you speak with Mackenley Desir?

18   A.   Yes, ma'am.

19   Q.   Did you speak with a gentleman by the last name Sousa?

20   A.   Yes.

21   Q.   When you found the pill, hydromorphine pill in the

22   bathroom, did C.J. --

23   A.   I --

24   Q.   Sorry.  Did she agree the purse was hers?

25   A.   She agreed the purse and pill was hers.
```

1  Q.  Did she initially claim the cocaine was hers?

2  A.  No, she didn't.

3          MR. WILCOX:  Judge, this is all hearsay.

4          THE COURT:  I agree.  Sustained.

5  BY MS. VIAMONTES:

6  Q.  Did you ultimately arrest C.J. for possession of the crack

7  cocaine and hydromorphine?

8  A.  Yes.

9  Q.  Why?

10  A.  After the fact, she admitted that it was hers.

11  Q.  Did you have a conversation --

12          MR. WILCOX:  Objection, Judge, hearsay.

13          I withdraw the objection.

14  BY MS. VIAMONTES:

15  Q.  Before C.J. admitted that the crack was hers, did you have

16  a conversation with Mackenley Desir?

17  A.  Yes, ma'am.

18  Q.  About the crack cocaine?

19  A.  Yes.  I was going to take both for constructive

20  possession -- I was going to take Mr. Desir and Ms. C.J. since

21  they were both in the room for constructive possession of

22  cocaine.

23  Q.  Why didn't you take Mr. Desir to jail for the cocaine?

24  A.  He told me to tell her -- basically for her to own up to

25  her crack, if they both go to jail, they can't be bailed out.

```
 1  He can't bail her out if they both go.
 2  Q.  Did you go to C.J. and convey the message that Mr. Desir
 3  told you to convey?
 4  A.  Yes.  Ultimately, I just wanted to know whose crack it was.
 5  Q.  You conveyed the message Desir gave you to convey to C.J.?
 6  A.  Yes, ma'am.
 7  Q.  After you conveyed the message Mr. Desir told you to convey
 8  to C.J., did she agree to the crack?
 9  A.  Yes, ma'am.
10  Q.  Can you describe C.J.'s demeanor when you arrived at the
11  Beach and Town Motel?
12  A.  Very quiet, timid type person, very reserved.  She wasn't
13  acting irrational or anything like that.
14  Q.  Did you later interact with a person that became known to
15  you as Aaron Johnson?
16  A.  Yes, ma'am.
17  Q.  Toward the latter part of June 2012?
18  A.  Yes, ma'am.
19  Q.  How did you interact with Mr. Johnson?
20  A.  I received another call, it came out as --
21          MR. ZACCA:  Objection to hearsay.
22          THE COURT:  Sustained.
23  BY MS. VIAMONTES:
24  Q.  Without telling us what people say, did you meet with
25  Mr. Johnson?
```

1  A.  Yes.

2  Q.  Do you know why Mr. Johnson was in Florida?

3  A.  Yes.

4          MR. ZACCA:  Objection, calls for hearsay, obviously.

5          THE COURT:  Sustained.

6  BY MS. VIAMONTES:

7  Q.  Without telling us what Mr. Johnson said, did you speak

8  with him?

9  A.  Yes.

10 Q.  After speaking with Mr. Johnson, did you go to the Beach

11 and Town Motel?

12 A.  Yes, ma'am.

13 Q.  What was the purpose of you going to the Beach and Town

14 Motel?

15         MR. ZACCA:  Objection, hearsay, based on what Aaron

16 Johnson told her.

17         THE COURT:  She can say why she went there, but you

18 can't divulge what Mr. Johnson told you.

19         MR. WILCOX:  She will divulge what Mr. Johnson told

20 her about explaining why she went the to the Beach and Town,

21 Your Honor.

22         THE COURT:  Well --

23         MR. WILCOX:  I join in Mr. Desir's objection.

24         THE COURT:  Well, if she can relate her response

25 without incorporating what Mr. Johnson said, then it is not

1    hearsay.

2    BY MS. VIAMONTES:

3    Q.   Officer DeVega, don't tell us what Mr. Johnson said.

4         Do you know why, after interviewing Mr. Johnson, you

5    were going to the Beach and Town Motel?

6    A.   We were looking for C.J.

7    Q.   What did you do?

8    A.   Went to room 32, looked around the building behind as well,

9    knocked on several doors to see if she was in one of the rooms

10   or one of the apartments in the back.

11   Q.   Did you find her?

12   A.   No.

13   Q.   As you are knocking on these doors in the rear of the

14   motel, the separate buildings behind the motel, are you

15   identifying yourself as law enforcement?

16   A.   I was in full uniform, yes.

17   Q.   Were you -- aside from your uniform, were you saying

18   anything to convey you are law enforcement?

19   A.   Yes, ma'am, banging on the door saying "Hollywood Police."

20   Q.   Were you alone?

21   A.   No.  I was with another officer, and her father as well.

22   Q.   Did anyone answer the door when you knocked on the house

23   toward the rear of the Beach and Town Motel?

24   A.   Yes.

25   Q.   Did Mackenley Desir ever answer a door?

```
 1   A.  No, ma'am.
 2           MS. VIAMONTES:  No further questions, Your Honor.
 3           THE COURT:  Cross?
 4           MR. ZACCA:  Yes, Judge.
 5                        CROSS EXAMINATION
 6   BY MR. ZACCA:
 7   Q.  Officer DeVega, good afternoon.
 8   A.  Good afternoon, sir.
 9   Q.  How long have you been a police officer?
10   A.  For two years.
11   Q.  As a police officer, you have to go through some training,
12   don't you?
13   A.  Yes, sir.
14   Q.  You go through the Police Academy, right?
15   A.  Yes, sir.
16   Q.  How long is the Police Academy?
17   A.  About six months.
18   Q.  Six months.  That is intensive training every day during
19   those six months?
20   A.  Yes, sir.
21   Q.  You are trained on various aspects of police investigation,
22   right?
23   A.  Yes, sir.
24   Q.  Arresting somebody is a significant event; would you agree?
25   A.  Yes, sir.
```

1  Q.  You deprive that person of their liberty, correct?

2  A.  Correct.

3  Q.  And it is your job to determine whether there is probable

4  cause to believe that an individual committed a crime, correct?

5  A.  Yes, sir.

6  Q.  Can you explain the concept of probable cause as you were

7  taught as a police officer to this jury?

8          MS. VIAMONTES:  Objection, Your Honor, hearsay.

9          THE COURT:  Overruled.

10 BY MR. ZACCA:

11 Q.  You can explain.

12 A.  I'm sorry, I don't understand.  What is probable cause is

13 what you are asking me?

14 Q.  Yes, probable cause, do you know what that is?

15 A.  Yes.  If you have beyond a reasonable suspicion, it is not

16 a hunch, I have enough evidence to believe a person has

17 committed a crime, I would take that person to jail.

18 Q.  In other words, you need probable cause, belief, reasonable

19 belief that a person committed a crime before you arrest them,

20 correct?

21 A.  Correct.

22 Q.  And you are not going to arrest anybody who you don't

23 believe has committed a crime, correct?

24 A.  Correct.

25 Q.  That is basic, right?

1    A.   Yes.

2    Q.   Now, you also learned something else at the Police Academy,

3    you learned how to document your investigations, correct?

4    A.   Correct.

5    Q.   You learn how to document your arrest rights, correct?

6    A.   Correct.

7    Q.   And during direct examination, you described the arrest of

8    C.J., correct?

9    A.   Correct.

10   Q.   And that arrest occurred June 16, 2012, right?

11   A.   Yes, sir.

12   Q.   As part of that arrest you created a report, correct?

13   A.   Yes, sir.

14   Q.   Which is standard practice whenever you arrest somebody,

15   right?

16   A.   Yes.

17   Q.   In fact, at the Police Academy you were taught how to draft

18   a police report, correct?

19   A.   Yes, sir.

20   Q.   And it is important to provide complete information on that

21   police report, right?

22   A.   Yes.

23   Q.   Because that police report serves many purposes, right?

24   A.   Yes.

25   Q.   One purpose is to document the events of that particular

1  day, right?

2  A.  Yes, sir.

3  Q.  To document the steps of your arrest, correct?

4  A.  Correct.

5  Q.  And also to help remember what happened back then when you

6  made that an arrest?

7  A.  Correct.

8  Q.  It serves all those purposes?

9  A.  Yes.

10  Q.  You drafted the police report for this particular case,

11  correct?

12  A.  Correct.

13  Q.  Now -- and when you drafted this police report in this

14  particular case, you followed all those rules, correct?

15  A.  Correct.

16  Q.  You wanted to document that arrest, correct?

17  A.  Correct.

18  Q.  Now, you testified on direct examination that you found --

19  I was taking notes here -- crack under the mattress, right?

20  A.  Correct.

21  Q.  And a leopard purse with Dilaudid and syringes in the

22  bathroom?

23  A.  Correct.

24  Q.  You also testified that you spoke with Mr. Mackenley Desir,

25  right?

1   A.   Yes, sir.

2   Q.   And you spoke with C.J., correct?

3   A.   Correct.

4   Q.   You also testified that you were going to arrest both

5   Mr. Desir and C.J., right?

6   A.   Correct.

7   Q.   Okay.

8        You didn't put that in your report?

9   A.   Correct.

10   Q.   Right?

11   A.   Correct.  In my report, okay --

12        MR. ZACCA:  Objection.  That is not responsive to the

13   question.  Is she writing the report, I asked her that.

14        THE WITNESS:  I did that.

15   BY MR. ZACCA:

16   Q.   I will come back to that.

17        You also stated that you conveyed -- that Mackenley

18   Desir conveyed a message to you?

19   A.   Yes.

20   Q.   And you were going to convey that -- in fact, you did

21   convey a message to C.J., correct?

22   A.   Correct.

23   Q.   Okay.

24        That is not in your report either?

25   A.   You are right.

1  Q.  I think you wanted to say to the jury why you didn't put

2  that in your report.  Go ahead.

3  A.  Okay.  When we write a report, we write a general summary

4  of what occurred, basically on why I made an arrest.

5          We don't document if he was wearing a blue shirt, we

6  don't document if she was wearing a pink shirt, specific,

7  specific details.

8          I did a summary.  I wrote in the report she denied

9  ownership and she did later on say it was hers.

10 Q.  We are not talking about a pink shirt, we are not talking

11 about whether he wore a blue shirt.

12 A.  Correct.

13 Q.  We are not talking about whether it was raining or sunny

14 that day, right?

15 A.  Right.

16 Q.  We are talking about a specific event?

17 A.  Correct.

18 Q.  You said Mr. Desir told you to tell C.J. to take ownership

19 of the drugs?

20 A.  Correct.

21 Q.  You were there to determine who owned the drugs?

22 A.  Correct.

23          That was not my specific purpose of the call

24 originally.

25 Q.  But at that point, you wanted to find out who owned those

1  drugs?

2  A.  Correct.

3  Q.  And you wanted to get it right?

4  A.  Right.

5  Q.  You didn't document any of the stuff you just testified to

6  on behalf of the Government?

7  A.  Like I said, I don't specifically write every word for word

8  that is told to me.  I summarize everything and put that in my

9  report.

10  Q.  Well, after you conveyed that message --

11  A.  Correct.

12  Q.  -- to C.J., she took ownership of the drugs?

13  A.  Yes.

14  Q.  And you arrested her, right?

15  A.  Yes.

16  Q.  You never arrested Mr. Desir, right?

17  A.  He was temporarily detained and I let him go.

18  Q.  The answer is, you didn't arrest him?

19  A.  No.

20  Q.  You detained him, but didn't arrest him?

21  A.  No.

22  Q.  You didn't arrest him because you didn't have probable

23  cause that he owned the drugs, right?

24  A.  She admitted to me they were hers, and I took her based on

25  the statement.

1  Q.  And you believed her, correct?

2  A.  Correct.

3  Q.  That is why you arrested her, right?

4  A.  Correct.

5        MR. ZACCA:  I have no further questions.

6        MR. WILCOX:  Your Honor, may I, before he sits down?

7        THE COURT:  Sure.

8  BY MR. ZACCA:

9  Q.  Just a follow-up here.

10       It was Mr. Desir that gave you consent to search that

11  room, correct?

12  A.  Yes, sir.

13  Q.  You found no gun in that room, correct?

14  A.  No.

15  Q.  When you spoke with C.J. -- I believe you testified on

16  direct examination you spoke with C.J.?

17  A.  Correct.

18  Q.  When you spoke with C.J., did she ever tell you she was

19  being held --

20       MS. VIAMONTES:  Objection, hearsay.

21       MR. ZACCA:  Judge, they opened the door.

22       THE COURT:  It's still hearsay.

23       MR. WILCOX:  Um-m-m, it has legal significance outside

24  whether or not -- it is not hearsay.  It is a verbal action or

25  inaction, it is not technically hearsay, a verbal action or

1  technically a verbal inaction.

2          MR. ZACCA:  Not being offered for the truth.

3          MR. WILCOX:  Verbal conduct or lack of verbal conduct,

4  not hearsay.

5          MR. ZACCA:  It is relevant for the purpose of being

6  asked, or stated, not for the truth of the matter asserted.

7          THE COURT:  Sustained.

8          MR. ZACCA:  Very well.  No further questions.

9          THE COURT:  Mr. Wilcox, cross.

10          MR. WILCOX:  No questions of this witness, Your Honor.

11          THE COURT:  Redirect.

12          MS. VIAMONTES:  Briefly, Your Honor.

13                        REDIRECT EXAMINATION

14  BY MS. VIAMONTES:

15  Q.  Officer DeVega, do you know how long it took you to respond

16  after you received the two 911 calls?

17  A.  I can't tell you the exact time, that is usually on the

18  reports.  Usually five to ten minutes.  That was not a cold

19  call, we respond with lights and sirens, so it is a fast

20  response.

21  Q.  Did you respond with lights and sirens because you thought

22  there were drugs in the room?

23  A.  No.

24  Q.  Possession of hydromorphine, is that a felony or a

25  misdemeanor?

1   A.   Felony.

2   Q.   Do you know what class of felony?

3   A.   No, ma'am.

4   Q.   Do you know if it is a third degree?

5   A.   I don't know.

6   Q.   Possession of crack cocaine, is that a felony?

7   A.   Yes, ma'am.

8   Q.   Is that the same, possession of hydromorphine or crack

9   cocaine?

10  A.   After it gets out of my hands, I don't know what the Court

11  system --

12  Q.   You said on cross-examination the purpose of you writing

13  the report is so you could remember the events?

14  A.   Yes.

15  Q.   Do you remember the conversation you had with Mackenley

16  Desir about C.J. taking ownership of the cocaine?

17  A.   Yes.

18  Q.   Do you remember him conveying that message to you?

19  A.   Yes.

20  Q.   You are not making this up --

21          MR. ZACCA:   Objection, leading.

22  BY MS. VIAMONTES:

23  Q.   Are you making this up now?

24  A.   No.

25  Q.   Did you think back in 2012, that the conversation you had

1   with Mackenley Desir was going to be significant?

2   A.  Not at all.

3   Q.  Do you remember C.J. being timid?

4   A.  Yes, ma'am.

5          MS. VIAMONTES:  No further questions.

6          THE COURT:  Thank you, Officer, you may step down.

7          How lengthy will your next witness be?

8          MS. JOHANNES:  Probably as long as this witness.

9          THE COURT:  Let's take another witness before we

10  break.

11         MS. JOHANNES:  The United States calls Special Agent

12  Regino Chavez.

13         THE COURT:  Sir, remain standing and raise your right

14  hand.

15         REGINO CHAVEZ, GOVERNMENT'S WITNESS, SWORN.

16         THE COURT:  Would you please be seated.  Please state

17  your name and spell your last name for the record.

18         THE WITNESS:  Yes, Regino Chavez, C-H-A-V-E-Z.

19         THE COURT:  Spell your first name also.

20         THE WITNESS:  R-E-G-I-N-O.

21                      DIRECT EXAMINATION

22  BY MS. JOHANNES:

23  Q.  Good afternoon.

24  A.  Good afternoon.

25  Q.  What agency do you work for?

1   A.   I am an FBI agent.

2   Q.   What agency do you work for?

3   A.   I am an FBI agent.

4   Q.   How long have you been an agent for the FBI?

5   A.   Approximately 10 years.

6   Q.   Are you currently assigned to any particular unit?

7   A.   Yes, I work with the crimes against children unit.

8   Q.   What is the focus of that unit?

9   A.   We focus on crimes against children, parental kidnappings,

10  child pornography.

11  Q.   When you say "children," persons under the age of 18?

12  A.   Correct.

13  Q.   How long have you been with that unit?

14  A.   Approximately five years.

15  Q.   In June of 2012, specifically June 22nd, did you conduct a

16  sting operation as part of your duties and responsibilities

17  with the FBI?

18  A.   Yes.

19  Q.   First of all, tell the jury what a sting operation is

20  within your unit.

21  A.   The way our sting operations work, there are different

22  types, but the most common one, we set up in a hotel, we have

23  several rooms.  One room is for interviewing people, one room

24  is where the tech equipment -- sort of the surveillance

25  equipment is set up, one room will be for the undercover agent,

1    and one room will be for the -- what we call the processing and

2    take-down team.

3         Basically, the way it all works is an undercover agent

4    who is a detective, law enforcement officer, will pose as a

5    john or client of prostitution.  They research where

6    prostitutions are advertising, generally on the internet.

7    Since we work crimes of children, we focus on the ads -- we

8    focus on the ads that depict young looking women or females we

9    know are under age.

10        The undercover agent places calls and sets up dates as

11   a normal prostitution client would.

12        The young lady comes over to the hotel, they meet,

13   they talk, they engage in the talk, basically they transact a

14   sexual deal, and before anything goes through, the young lady

15   is arrested or taken into custody.

16   Q.  Okay.

17        Now, you said that a law enforcement officer looks

18   through various ads?

19   A.  Yes.

20   Q.  You said the internet is a source of where he looks through

21   ads?

22   A.  Yes.

23   Q.  Are there any particular web sites?

24   A.  Yes, a lot of web sites, but one most popular is Backpage.

25   There are others, Craig's List, but we use Backpage.

1  Q.  Do you work with other agencies in doing this?

2  A.  Yes.

3  Q.  Tell us how that works.

4  A.  The FBI squad works in a task force, we pair up with local

5  law enforcement.  We work with Broward Sheriff's Office, Fort

6  Lauderdale, in Dade County, Miami-Dade PD, Miami, Miami Beach.

7  We work with a lot of police departments.

8  Q.  You explained there are a lot of rooms set up for the sting

9  operations?

10  A.  Yes.

11  Q.  The first room you talked about is an undercover room?

12  A.  Correct.

13  Q.  Is that where the law enforcement officer meets with the

14  young lady?

15  A.  Yes.

16  Q.  Now, the second room you mentioned is a processing room?

17  A.  Yes.

18  Q.  Tell the jury what that is.

19  A.  The processing room is a room of -- after the young lady is

20  arrested, she is taken to the next one, the processing room,

21  and they take all the information, date of birth, name, Social

22  Security.  The young lady is searched to make sure she doesn't

23  have anything illegal on her.

24  Q.  Are they interviewed in that room?

25  A.  No.

1  Q.  In the interview room, what happens there?

2  A.  In the interview room, FBI people are set up, and that is a

3  room where interviews take place, nothing else happens, kind of

4  a room where we bring them in, calm them down and talk to them.

5  Q.  You said the FBI set up there?

6  A.  Yes.

7  Q.  Is that where you would be?

8  A.  Yes.

9  Q.  You would be one of the people asking questions?

10  A.  Yes.

11  Q.  How long are these interviews?

12  A.  It depends.  If the young lady has information for us, it

13  could be hours.  If the young lady doesn't have information or

14  doesn't want to talk to us, it could be two minutes.

15  Q.  What do you mean, if they have information?

16  A.  Since we work crimes against children, and we focus on

17  child prostitution, we are looking for minors in prostitution.

18  That is the sole focus.  We look for information they have on

19  minors, girls 17, 15, 16, working prostitution.  That is our

20  sole focus.

21  Q.  You say that is your sole focus.  Is that all you ask

22  about?

23  A.  Yes.

24  Q.  Are you concerned with women over the age of 18?

25  A.  No.

1   Q.  Are you trying to figure out their problem?

2   A.  No.

3   Q.  Their situation?

4   A.  No.

5   Q.  Are you trying to help them?

6   A.  Not really.

7   Q.  Okay.

8           Now, you said if they don't have information about

9   minor women in prostitution, the interview could be two minutes

10  long?

11  A.  Correct.

12  Q.  I am sorry, I am not hearing you.  Make sure your mike

13  works.

14          What did you say?

15  A.  Correct.

16  Q.  After they leave the interview room, where do they go?

17  A.  When they leave the interview room, they go back to the

18  processing room where they are basically held, where a paddy

19  wagon or van can transport them back to the county jail.

20  Q.  When they are held before they are transported, this is not

21  an interview setting?

22  A.  No.

23  Q.  The process from the time the woman arrives and is

24  transported, can that take a long time?

25  A.  Yes.

1  Q.  Can it take a few hours?

2  A.  Yes.

3  Q.  During that whole time, is law enforcement chit-chatting

4  with these women?

5  A.  Not really.

6  Q.  Now, on June 22, 2012, do you recall what hotel the FBI was

7  conducting a sting operation out of?

8  A.  Yes.

9  Q.  What hotel is that?

10  A.  The Hampton Inn located on North Andrews, two blocks from

11  here.

12          MS. JOHANNES:  Your Honor, may I approach?

13          THE COURT:  Yes.

14  BY MS. JOHANNES:

15  Q.  I am going to show you what is already admitted as

16  Government Exhibit 1.

17          Do you recognize this girl to be one of the girls that

18  was part of the sting operation that day?

19  A.  I don't remember her that day, but I became acquainted with

20  her afterwards.

21  Q.  As you are sitting here today, do you recall this is the

22  day that she came to the room, June 22nd, do you know that now?

23  A.  Yes, I do.

24  Q.  Would you have asked this young lady the same sorts of

25  questions we went over just now?

1   A.   Correct.

2   Q.   Whether or not she knew about minors being prostituted?

3   A.   Yes.

4   Q.   Would you ask her if she herself was being forced to be

5   prostituted?

6   A.   No.

7   Q.   Would you ask her about her situation?

8   A.   No.

9            MS. JOHANNES:  No further questions.

10           THE COURT:  Cross.

11           MR. ZACCA:  Yes.

12                     CROSS EXAMINATION

13           MR. ZACCA:  Judge, with permission of the Court, may I

14   cross-examine from the ELMO?

15           THE COURT:  Sure.

16   BY MR. ZACCA:

17   Q.   Good afternoon, Agent Chavez.

18   A.   Good afternoon.

19   Q.   We never met before?

20   A.   No.

21   Q.   Did you do a report for this case?

22   A.   Yes, I did one, not for this case, for the operation in

23   question.

24           MR. ZACCA:  Judge, I don't have a report for this

25   agent.

1          MS. JOHANNES:  It doesn't pertain to this case, it is

2     to the operation.

3          THE WITNESS:  Specifically the report that day -- we

4     recovered a minor unrelated to this investigation, and the

5     report was generated for that minor, that operation, nothing to

6     do with this case.

7     BY MR. ZACCA:

8     Q.  You said you just became aware of this case recently; is

9     that right?

10    A.  Yes.

11    Q.  That was within the past month, right?

12    A.  Yes.

13    Q.  The prosecutor in this case contacted you and made you

14    aware of this case, right?

15    A.  Yes.

16    Q.  I want to go over a few things on your direct examination.

17    You talked about four rooms that were used at the Hampton Inn,

18    right?

19    A.  Yes.

20    Q.  One was the processing room, which is where someone who is

21    going to be arrested is processed?

22    A.  Yes.

23    Q.  And processing means information of that person, background

24    information, biographical information is put down on the

25    report, correct?

1  A.  Correct.

2  Q.  You described a tech room.  The tech room is what,

3  surveillance equipment?

4  A.  Correct.

5  Q.  And that is the room where the sting operation takes place,

6  right?

7  A.  Yes.

8  Q.  And then we have a fourth room, we have an interview room?

9  A.  Correct.

10  Q.  That is where anyone who comes into the sting room is then

11  transferred to the interview room and interviewed, correct?

12  A.  Correct.

13  Q.  And C.J. was interviewed on June 22, 2012, correct?

14  A.  I can't say specifically if she was there, and we would

15  have approached her, also.

16  Q.  Well, you don't deny that you spoke with her that night, do

17  you?

18  A.  The issue with these places, we may interview 10, 15, 20

19  girls.  If they don't give us any information, we won't

20  generate a report.  If they didn't speak to us, that is not

21  documented in any way.  We only document interviews where we

22  get answers.  If we have a dialogue with the person, those are

23  the only ones that are documented.

24  Q.  But is it your testimony -- I want to be absolutely clear

25  because I am unclear.

1           Are you saying you never spoke to C.J.?

2   A.  I don't recall, no.

3   Q.  You don't recall?

4   A.  Correct.

5   Q.  You could have spoken to her, but you don't remember?

6   A.  Correct.

7   Q.  I want to show you some photographs that have been

8   introduced by the Government and ask you some questions from

9   those photographs.  Okay?

10          I am going to show you Government Exhibit 3.  I would

11  like you to look at it and then I will ask you some questions.

12  Okay?

13  A.  Yeah.

14  Q.  The photographs were taken that night, correct?

15  A.  I can't speak to that.  I am not in the processing room,

16  and that is where the photographs were taken.

17          MR. WILCOX:  Excuse me, Judge, I didn't hear him.

18          Excuse me, I didn't hear him.

19          THE COURT:  Processing he said.  Is that what you

20  said?

21          THE WITNESS:  Yes.

22  BY MR. ZACCA:

23  Q.  Any photographs taken that night would have been taken in

24  the processing room?

25  A.  Correct.

1   Q.   Have you seen this photograph before?

2   A.   No.

3   Q.   Before today, this is the first time you have ever laid

4   eyes on this?

5   A.   Correct.

6   Q.   If a photograph was taken of bruises that night, it would

7   have been taken by one of the law enforcement officers there,

8   correct?

9   A.   Correct.

10  Q.   That was part of the protocol to document, correct?

11  A.   Yes.

12  Q.   Is it your testimony that a photograph was taken and no

13  questions were asked about the bruises that showed on this

14  photograph?

15  A.   No, I can't testify to the fact whether or not the

16  photograph was taken, and I can't testify to the fact as to

17  whether or not questions were asked about that.

18  Q.   But, naturally -- well, let me ask you this:  You, doing --

19  who was doing the interviews that night, you?

20  A.   Yes.

21  Q.   Was anyone else doing the interviews that night?

22  A.   Yes, there was another FBI agent.

23  Q.   I know you testified the focus was under age children.

24  A.   Correct.

25  Q.   Individuals under the age of 18?

1    A.   Yes.

2    Q.   You are a sworn law enforcement officer?

3    A.   Yes.

4    Q.   You are sworn to protect all?

5    A.   Correct.

6    Q.   If a victim came to you who was 35 and told you a story of

7    being victimized, you wouldn't say, no, I am sorry, that is not

8    the focus of my investigation?

9    A.   That is correct.

10   Q.   You would help them?

11   A.   Correct.

12   Q.   And the same for a 60 year old?

13   A.   Yes.

14   Q.   You would protect all who come to you?

15   A.   Yes.

16   Q.   Certainly someone showing you bruises like that and saying

17   I am victimized, you would help that person?

18   A.   Yes.

19   Q.   If that person said something, you would document it,

20   correct?

21   A.   Yes.

22   Q.   That would stand out in your mind?

23   A.   Yes.

24            MR. ZACCA:   Judge, if I could have a moment.

25            THE COURT:   Yes.

1    MR. ZACCA:  Judge, nothing further, thank you.

2    THE COURT:  Mr. Wilcox.

3                    CROSS EXAMINATION

4  BY MR. WILCOX:

5  Q.  How did you know she was over 18?

6  A.  I'm sorry?

7  Q.  How did you know she was over 18?

8  A.  They are asked their age when they are initially put

9  through the processing room.

10  Q.  Did she have ID on her?

11  A.  I can't recall that.

12  Q.  If she didn't have ID, did you take her word she is over

13  18?

14  A.  Law enforcement officers in the processing room, they

15  determine her age, check her background through our computer

16  systems, or if they do have ID, they determine their ID to some

17  point.

18  Q.  If a girl didn't want to deal with you, a minor, all they

19  have to say is I am over 18?

20  A.  Correct.

21  Q.  And there would be no other information?

22  A.  No.  We would still see if they had information on minors.

23  Q.  Okay.

24        So, if a girl who was 16 got caught up in this sting,

25  and you asked her her age and she said, I'm 20, then you ask

1   them, well, do you know of anybody that is under 18

2   prostituting and they say no, you let them go?

3           MS. JOHANNES:  Objection, relevance and argumentative.

4           MR. WILCOX:  This is in direct response to her

5   question, Judge.

6           THE COURT:  Overruled.

7   BY MR. WILCOX:

8   Q.   Is this how the operation was working?

9   A.   No.  We have different methods to try to determine a

10  person's age.  If a person is not being truthful about their

11  age, we try to find out their exact age.

12  Q.   How do you do that?

13  A.   There are different systems, we have one particular system,

14  the QCP, Quick Taps Platform.  It's a traveling fingerprint

15  device that we have with us, and if we feel somebody is being

16  untruthful about their age and potentially a minor, we could

17  fingerprint them on the spot and get corroboration who they

18  are.

19  Q.   Now, the person in that photograph, C.J., was called

20  because the ad that you saw, or somebody saw, suggested she was

21  under 18?

22  A.   Yes.

23  Q.   And she got there; is that right?

24  A.   Yes.

25  Q.   You are saying if somebody determined that she was over 18,

1   no further questions would have been asked?

2   A.  No, no.  We would still try to talk to her for information

3   on minors.

4   Q.  And if she was reluctant to give you any information, that

5   would be the end of it with respect to the FBI investigation?

6   A.  Yes.

7   Q.  Okay.

8           Now, you are aware that it is a Federal crime -- how

9   long have you been an FBI agent?

10  A.  10 years about.

11  Q.  You know it is a Federal crime to force somebody to engage

12  in a commercial sex act?

13  A.  Yes.

14  Q.  You saw those bruises, right?

15  A.  No, not that night.

16  Q.  You didn't see the bruises?

17  A.  No.

18  Q.  The picture was taken that night?

19  A.  Yes.

20  Q.  You didn't see the bruises?

21  A.  No.

22  Q.  You don't remember what she was wearing when she got there?

23  A.  No.

24  Q.  Somebody saw the bruises because the pictures were taken?

25  A.  Yes.

1  Q.  There was no investigation that night even though she

2  looked young enough for to you call there to see if she was

3  engaged -- forced into prostitution?

4  A.  That would be a focus by the local law enforcement.  They

5  would have focused on prostitution by force.

6  Q.  They would have focused on that?

7  A.  Yes.

8  Q.  So, the only Federal crime you were interested in that

9  night was prostitution of minors?

10  A.  Correct.

11  Q.  And you don't recall seeing the bruises?

12  A.  No.

13  Q.  And even though -- let me ask.

14       You don't recall seeing her -- now that you see these

15  pictures, you don't really recall seeing her, do you?

16       MS. JOHANNES:  Objection, asked and answered.

17       THE COURT:  Sustained.

18  BY MR. WILCOX:

19  Q.  Simply put, sir, if this woman told you she was forced to

20  be there and didn't want to be, somebody was forced to be there

21  engaging in prostitution and beating her and making her do

22  this, you would have helped her, right?

23  A.  Yes.

24       MR. WILCOX:  One moment, Your Honor.

25       No further questions, Judge.

```
 1              THE COURT:  Redirect?

 2              MS. JOHANNES:  Brief.

 3                      REDIRECT EXAMINATION

 4  BY MS. JOHANNES:

 5  Q.  Special Agent Chavez, you were asked how long you have been

 6  doing -- operating the unit crimes against children, and you

 7  said five years to Mr. Wilcox just now?

 8  A.  Yes.

 9  Q.  How many stings have you done?

10  A.  Probably close to 100.

11  Q.  That is a lot, right, sir?

12  A.  Yes.

13  Q.  This sting operation is a pretty big operation to set up?

14  A.  Yes.

15  Q.  A lot of moving parts going on?

16  A.  Yes.

17  Q.  You are not the only agent or officer on scene?

18  A.  No.

19  Q.  You have your eyes in different directions, correct, sir?

20  A.  Correct.

21  Q.  Now, I believe you said when a girl does not talk about

22  minor children, no report is generated; is that correct?

23  A.  Correct.

24  Q.  Is that why no report is generated here?

25  A.  Correct.
```

1   Q.   Specifically, did you ask -- if you can recall, did you ask

2   any of the girls that night if they were forced?

3   A.   No.

4   Q.   Did you ask any of them if they were forced?

5   A.   No.

6   Q.   Is your unit focused on that?

7   A.   Not at all.

8   Q.   Is there another unit that does focus on that?

9   A.   Yes.

10  Q.   What is that called?

11  A.   The CA squad, adult human trafficking by force.

12  Q.   There is another squad that focuses on this?

13  A.   Yes.

14  Q.   Was that squad there that night?

15  A.   No.

16  Q.   What agency was dealing with adult trafficking that night?

17  A.   That would have been BSO, Fort Lauderdale.

18  Q.   In the interview room you said there was you and another

19  agent.  Was that agent male or female?

20  A.   Female.

21  Q.   You were the only male FBI agent in that room?

22  A.   Correct.

23  Q.   Now, if a female is in there, have they already gone

24  through the processing area?

25  A.   They have.

1   Q.   Have they already gotten their photos taken?

2   A.   Yes.

3   Q.   Has the age been vetted or verified?

4   A.   Yes.

5   Q.   So, when they come to you, you know whether they are 18?

6   A.   Yes.

7   Q.   So, you know what questions to ask them then?

8   A.   Yes.

9   Q.   If the girls are timid to talk to you, do you force them to

10  talk to you?

11  A.   No.

12  Q.   Why not?

13  A.   Because these are woman who are sexually exploited.  We

14  don't have a confrontational environment, we approach them

15  calmly and rationally.

16          MS. JOHANNES:  No further questions.

17          THE COURT:  Folks, we will take a 10-minute break now,

18  and another break later in the afternoon.

19          Remember, don't discuss the case, keep an open mind.

20          (Thereupon, the jury leaves the courtroom.)

21          THE COURT:  All right.  We are in recess for 10

22  minutes.

23          (Thereupon, a short recess was taken.)

24          THE COURT:  All right.  The record will reflect that

25  the defendants are present represented by counsel.

```
 1             Let's bring in the jury.
 2             (Thereupon, the jury returns to the courtroom.)
 3             THE COURT:  Folks, you all can be seated.
 4             The Government may call its next witness.
 5  Ms. Johannes.
 6             MS. JOHANNES:  Yes, the United States calls a
 7  representative from MetroPCS.
 8             THE COURT:  Okay.  Sir, would you step over to the
 9  left of the witness stand.
10             THE WITNESS:  Yes, sir.
11             MICHAEL BOSILLO, GOVERNMENT'S WITNESS, SWORN.
12             THE COURT:  Would you please be seated.  Tell us your
13  name and spell your last name for the record.
14             THE WITNESS:  Michael Bosillo, B-O-S-I-L-L-O.
15             THE COURT:  All right.  Ms. Johannes, you may inquire.
16                          DIRECT EXAMINATION
17  BY MS. JOHANNES:
18  Q.  Good afternoon, Mr. Bosillo.
19  A.  Good afternoon, ma'am.
20  Q.  Sir, what do you do for a living?
21  A.  I am a record's custodian for MetroPCS in Dallas, Texas.
22  Q.  How long have you worked for MetroPCS?
23  A.  Since September, 2011.
24  Q.  Have you always been a record's custodian?
25  A.  No.  I started there at that.
```

```
 1   Q.   What other jobs have you had?

 2   A.   I am a retired homicide detective with Dallas.

 3   Q.   No, since MetroPCS, what other jobs have you had?

 4   A.   Just custodian of records.

 5   Q.   Prior to that, you were in law enforcement?

 6   A.   Yes, ma'am.

 7   Q.   I didn't get the agency.

 8   A.   I was with Dallas County, Arlington Police Department.

 9   Q.   What did you do?

10   A.   Worked patrol, worked homicide and went to the Dallas

11   D.A.'s Office where I worked and supervised the capital murder

12   section.

13   Q.   How long did you do that job for?

14   A.   25 years.

15   Q.   Now, you are still in Dallas, Texas with MetroPCS?

16   A.   Yes, ma'am.

17   Q.   Is that where MetroPCS is based out of?

18   A.   Yes, ma'am.

19   Q.   What does MetroPCS do?

20   A.   MetroPCS is a cell phone carrier, one of the five major

21   ones, and we've recently been absorbed by T Mobile.  Now there

22   is just four major ones, but we provide cell phone service

23   throughout the country.

24   Q.   Is there anything unique about the way MetroPCS provides

25   cell phones?
```

1    A.   Yes, we are a pay as you go, no contracts.  We don't verify

2    identification.  If a person wants to make a purchase, it is

3    monthly payments.  When you pay ahead of time, when your month

4    is expired, then you have to pay your next month, and just so

5    forth, and so on.

6    Q.   So you pay for a certain amount of usage?

7    A.   Yes, ma'am.

8    Q.   After that usage is done, you have to pay again?

9    A.   Correct.  There are no contracts involved.

10   Q.   So, really, the focus of MetroPCS is for you to pay your

11   bill and you provide the service?

12   A.   Yes.  We have unlimited minutes as well.

13   Q.   Now, you said you are custodian of records for MetroPCS?

14   A.   Yes, ma'am.

15   Q.   Please tell me what that job entails.

16   A.   As a custodian of records, I am responsible for the care,

17   custody and control of all records generated by Metro in the

18   normal course of business.

19          Information is provided to one of our store persons in

20   terms of who the subscriber is.  When they walk into a store

21   and want to make a purchase, they provide this to our intake

22   person.

23          Call detail information and text message information

24   is electronically recorded in our database.  All this

25   information is retrievable, is stored under lock and key, but

1  is retrievable upon a court order, either a state subpoena or

2  court odor, Federal subpoena or court order.

3          Once the information is received, the legal document

4  is authenticated with a Magistrate or Federal Judge's signature

5  or district attorney, then we verify the number actually is one

6  of ours, and we search out the number and typically the time

7  frame that they want all the toll call information provided to

8  them.

9          Once we get this back, we make sure it's as the order

10  has instructed us, and a copy goes to the requesting agency,

11  and a copy goes to one of four of the people in my unit, the

12  subpoena compliance unit, and we travel throughout the country

13  and testify in both state and Federal jurisdictions very much

14  like this one.

15  Q.  So, you said you are one of four custodian of records for

16  MetroPCS?

17  A.  That actually go out and testify.

18  Q.  That testify?

19  A.  Yes.  There are others that their job is actually -- they

20  are at headquarters, pulling and retrieving the documents.

21  Q.  Now, you said call detail information and text message

22  information is retrievable by MetroPCS?

23  A.  Yes, ma'am.

24  Q.  How long is that stored pertaining to a certain telephone

25  number?

911

1   A.   Call detail information and toll records are maintained for

2   six months, whereas text messages are maintained for 60 days.

3   We are mandated to keep the call detail records, but not the

4   text messages.   We do it as a gratuity for customers.

5   Q.   So, let's say you don't get a subpoena for text messages.

6          If someone were to delete some of the text messages,

7   would it still appear after the 60 days?

8   A.   No.   No.

9   Q.   And after the 60 days expires, and you get a subpoena for

10  the number, if there are still text messages for that phone,

11  would they still appear?

12  A.   No.   After the 60 days, they are erased in cyber space.

13  Q.   After 60 days, everything is completely washed?

14  A.   Yes, ma'am.

15  Q.   Now, were you sent any subpoenas in conjunction with this

16  case?

17  A.   Yes, ma'am.

18  Q.   Can you please explain to the jury what you were sent?

19  A.   Not having it in front of me, it was a document from the

20  Court requesting call detail record information and text

21  information on two numbers.

22          I could just recall the last four numbers of each of

23  the two numbers.   One is 0154, and the other was 5590.

24  Q.   Not a problem, it is not a memory contest.   I will give you

25  those documents.

1  A.  Okay.

2  Q.  Did you provide the Government with documents in response

3  to the subpoena we issued?

4  A.  Yes, we did.

5          MS. JOHANNES:  Your Honor, may I approach?

6          THE COURT:  You may.

7          MS. JOHANNES:  I hand to you Government Exhibits 25,

8  53 and 26.

9          Counsel, you should have all these in your binders.

10 BY MS. JOHANNES:

11 Q.  Starting with Government's Exhibit 25, sir, what is it?

12 A.  Government Exhibit 25 is a MetroPCS subscriber sheet and I

13 recognize and authenticate it because of the bold letters,

14 MetroPCS, emboldened on the top of the document, and it

15 contains a series of block information that pertains to this

16 particular record.

17 Q.  And where was that document kept?

18 A.  This document was kept in our -- what we call Amdoc

19 (phonetic) system, our secure system for all information, that

20 subscriber information, call detail information and text

21 information, basically under lock and key in Dallas.

22 Q.  That is a business record from MetroPCS?

23 A.  Yes, ma'am.

24 Q.  Moving to Government 26, what is Government 26?

25 A.  Government -- excuse me, Exhibit 26 is a MetroPCS, what we

913

1   call an SMS, short message system, or what is referred to as a

2   text message system, a series of four vertical columns

3   containing date, time, source; that is, the individual that is

4   actually punching in the information and then the number that

5   it is sending, the content of the text message.

6   Q.   How is this document generated?

7   A.   This document is generated -- once an individual actually

8   punches in whatever they punch in, the number, the content,

9   whatever it may be, that is all unedited, there is no spell

10  check, none of that.  What they punch into their hand set is

11  what immediately goes to the destination from the source.

12  Q.   And where would that document have been kept?

13  A.   This document also would be kept in our Amdoc (phonetic)

14  system under lock and key in Dallas, Texas as a business

15  record.

16  Q.   Now, moving on to Government Exhibit 53, what is that

17  document, sir?

18  A.   This is another MetroPCS subscriber document.  Again, I

19  recognize it and authenticate it as a result of the large

20  letters, MetroPCS, across the top of it, with a series of block

21  information pertaining to a particular search number and its

22  subscriber and other information such as serial numbers and

23  things of that nature.

24  Q.   Where was that document kept, sir?

25  A.   This document is kept in the Amdoc system under lock and

```
 1  key in Dallas, Texas, under lock and key in Dallas, Texas as a
 2  business record.
 3  Q.  Okay.
 4          MS. JOHANNES:  At this time, Your Honor, the United
 5  States would move to admit 25, 26, and 53 into evidence.
 6          THE COURT:  Is there any objection?
 7          MR. ZACCA:  No, Judge.
 8          MR. WILCOX:  No, Your Honor.
 9          THE COURT:  Government Exhibits 25, 26, and 53 may be
10  received.
11          [Government Exhibits 25, 26, 53 received in evidence.]
12          MS. JOHANNES:  May I approach, Your Honor?
13          THE COURT:  You may.
14          MS. JOHANNES:  May I publish, Your Honor?
15          THE COURT:  You may.
16  BY MS. JOHANNES:
17  Q.  Mr. Bosillo, let's start with Government 25.
18  A.  Yes, ma'am.
19  Q.  Can you please explain to the jury what they are looking
20  at?
21  A.  This is the subscriber information I spoke of earlier.  As
22  you can see, it is one of our documents, MetroPCS affixed
23  across the top of it, and then you see a series of fields of
24  information.
25  Q.  Okay, let's explain those various fields.
```

1          On the top area above the yellow line, what is that?

2  A.  That indicates the search type, you see MDN, that is the

3  mobile director number, or the target number.  We call it a

4  search number as well.

5          Directly across from that is the actual search number

6  in question, then the particular search date that the state or

7  the Government is requesting information on.  In other words,

8  we request you pull those records during that period of time,

9  we are interested in that.

10  Q.  Okay.

11          Now, for this particular telephone number there are

12  three boxes, if you will, categories of boxes that we see

13  beneath that; is that accurate?

14  A.  Yes, it is, but I need to explain, if I may, as far as the

15  search time.  That helps explain what we are looking at here.

16  Q.  Yes, sir, please do.

17  A.  The best way to understand it is look over here -- look

18  down to Jean Paul or Paul Jean.

19  Q.  If you touch your screen, it is a touch screen, you can

20  show the jury what you are pointing at.

21  A.  Right here, you see the actual activation date of that

22  account.  It is June 15th.  It shows on that account under the

23  number -- if you will go back up here -- our target number,

24  0154.  That was the date in which it was activated under Paul

25  Jean.

```
 1              It was terminated July 7th.  After July 7th, this is
 2    when you get into Joel Benitez.  He actually takes up the
 3    number after it is terminated on July 7th, he picks it up here
 4    on August 3rd.
 5    Q.  Okay.
 6              So, after July 3rd, someone else has been using the
 7    same telephone number?
 8    A.  Correct.
 9    Q.  Aside from Mr. Jean Paul?
10    A.  Correct.
11    Q.  Okay.
12              Now, the names we see here, Joel Benitez and Jean
13    Paul, do you know -- or does MetroPCS know if those are the
14    people using the number?
15    A.  No.  We don't confirm subscriber information.
16    Q.  So, when someone comes to get a phone, you don't take an
17    ID?
18    A.  No.
19    Q.  You give them the phone?
20    A.  Just give them the phone.
21    Q.  And the name here, who is that put by?
22    A.  Our input person.
23    Q.  Can it be totally made up?
24    A.  Of course.
25    Q.  Okay.  Now, there is about 77 pages as part of Government
```

1  Exhibit 25.

2           I want to focus your attention just on one page so you

3  could assist us with understanding the calls.  This is page 54

4  of 75, for the record, of Government Exhibit 25.

5           Mr. Bosillo, there are various columns here.  Do you

6  see that?

7  A.  Yes, ma'am.

8  Q.  Can you please explain to the jury what these columns mean?

9  A.  Across the very top you see the search number, again, this

10 is our target number we are speaking of.

11          You see the dates the search is requested from

12 beginning to end.  The very first line indicates the date,

13 which is reflected month, day and year; the time, which is

14 reflected in military time of 15 hours, 51 minutes and 56

15 seconds; duration, that is the actual length of the call.

16          That begins once you punch the number and hit the send

17 button, the clock begins, or if you receive a call, once you

18 answer it, that is when the clock begins on the incoming.

19          The next is direction, self-explanatory, in, you are

20 calling me, target number is calling you.

21          Next is the dialed number, the actual number punched

22 into the hand set.  Destination number is the number that is

23 actually reached.  Those are almost always one in the same.

24          Then the next is the status, again, self explanatory,

25 not answered or answered.

 1           Keep in mind an answer can be an individual answering

 2    the phone or it can go to voice mail.  If it goes to voice mail

 3    that is reflected as an answer.

 4           The next is status.  Those are special features, I

 5    should say special features and pitfalls, two or three

 6    different ones.  The most prominent one is the call forwarding,

 7    which is when a call rolls over to voice mail.

 8           The last one is caller ID on incoming calls, and that

 9    will provide the number of the individual that is actually

10    calling you.

11    Q.  Okay.

12           Now, with the special features column, even with the

13    first row there, I see something that says outside home switch.

14    A.  Yes, ma'am.

15    Q.  What does that mean?

16    A.  That means if an individual -- each phone has their own

17    home switch.  To explain, I have to explain how the system

18    works between the hand set, tower and home switch.

19    Q.  Please do.

20    A.  There are three ingredients you have to have for the system

21    to work, a hand set -- the hand set has a relatively weak

22    signal.  It sends out a signal, and goes to the strongest and

23    nearest tower.  We see them all over the place, up and down the

24    highways, on buildings, those sort of things.  Those towers,

25    derricks, are reached by way of antenna.

```
 1              And the third thing is the switch.  A signal goes to
 2    the tower, the tower has -- think in terms of circular
 3    coverage, think in terms of a big pie, and that tower will be
 4    divided into three or six sides.  If it is three sided, you
 5    have three 120 degree pieces of the pie.  If you have six, you
 6    have six 60 degree pieces of the pie.
 7              So, once it gets to that, then you have a series of
 8    numbers, it is authenticated and goes to the switch.  The
 9    switch is the gatekeeper of the call, it makes it work and
10    sends it to its destination.
11              Now, if I am outside my designated home switch, there
12    will be -- obviously, I am here in Florida, and I make a phone
13    call.  Well, immediately my home switch is not going to be
14    functioning because it is back in Texas, but we have other
15    switches for this very thing, very purpose, and they will let
16    my home switch know that, hey, Mike's number is calling someone
17    here in Florida.
18              So, it uses its own routing number to allow me to make
19    my call since I am not at the home switch.
20    Q.  Okay.
21              Now, turning to page 49 of 75, sir -- let me zoom out
22    a little bit -- do you see 6/25/2012?
23    A.  Yes, ma'am.
24    Q.  There is a line at 7:57?
25    A.  Yes, ma'am.
```

1  Q.  That 7:57 is the time you said?

2  A.  Correct.

3  Q.  Is that Central Time, Eastern Time?  What is that?

4  A.  No, this is going to be Eastern Time.  All the call detail

5  records are reflected in the time zone you are in.  The only

6  exception are the text messages; the text messages are recorded

7  in Central Standard Time because our server is maintained in

8  Dallas, Texas.

9  Q.  Now, there is a call outgoing, it appears to be for 44

10  seconds.  Sir, do you see that?

11  A.  Yes, ma'am.

12  Q.  There is a dialed number.  Does that mean this phone is

13  dialing out?

14  A.  Correct, the target number, 0154, is making an outgoing

15  call to 802-342-6162, and actually reached that same

16  destination number.

17  Q.  Okay.

18        Now, after that, on the same day, at 8:01 in the

19  morning --

20  A.  Yes, ma'am.

21  Q.  -- there is a call?

22  A.  Correct.

23  Q.  And that same number?

24  A.  Correct.

25  Q.  That is for approximately six minutes?

1   A.  Correct.

2   Q.  Okay.

3          Now, turning back to 54 of 75.

4   A.  Yes, ma'am.

5   Q.  On June 29, 2012, do you see that?

6   A.  Yes, ma'am.

7   Q.  Approximately eleven o'clock p.m.?

8   A.  Yes.

9   Q.  There was an outgoing call to an 802 number; is that

10  correct, sir?

11  A.  Correct.

12  Q.  Now, sir, what type of phones does MetroPCS sell?

13  A.  A variety of different brands.

14  Q.  Do you sell like -- I am going to spell this --

15  K-Y-O-C-E-R-A phones?

16  A.  Yes.  I have seen that several times.

17  Q.  Is that a common phone that MetroPCS sells?

18  A.  Yes.

19  Q.  And what is that, a flip phone?

20  A.  No.  I believe -- I am not familiar with all of them, but I

21  believe it is just a touch type of phone.

22  Q.  A regular telephone?

23  A.  Yes, ma'am.

24  Q.  Now, Government Exhibit 26, sir, you told us that these

25  were SMS messages, otherwise known as text messages?

1   A.   Correct.

2   Q.   Now, MetroPCS doesn't know who is sending this or receiving

3   this?

4   A.   No, ma'am.

5   Q.   You just know the number being accessed?

6   A.   Correct.

7   Q.   Now, lastly, sir, with Government Exhibit 53 --

8   A.   Yes, ma'am.

9   Q.   -- you've already explained these columns to us with

10  respect to this particular telephone number, 561-767-5687?

11  A.   Yes, ma'am.

12  Q.   Can you explain to us which subscribers had this phone in

13  the time period that you searched for?

14  A.   Yes, the subscriber's name is N/A N/A Mack Daddy.

15  Q.   And how long did Mack Daddy have this phone?

16  A.   The account was activated March 5, 2008, and terminated

17  December 6, 2008.

18  Q.   And I'm assuming MetroPCS didn't come up with the name Mack

19  Daddy?

20  A.   No, ma'am.

21  Q.   Who would have given that name?

22  A.   The individual who walked in the store and made the

23  purchase.

24  Q.   Now, going back to the switch towers, I want to point your

25  attention to a couple of calls.  I am confused how the switches

```
 1    work.
 2           On page 51 of 75 of Government Exhibit 25 --
 3    A.  Yes, ma'am.
 4    Q.  -- with respect to the first line where it says "outside
 5    home switch" and there is no caller ID there, what does that
 6    mean?
 7    A.  Okay.
 8           You have to -- you actually have to look at the two
 9    entries, the one below it, and the one above it, obviously,
10    start actually from the one directly below it.
11    Q.  Okay.
12    A.  And scroll all the way to the right, and you can see where
13    the caller ID.  That is the number that is incoming calling the
14    target number, the home switch routing system to make that
15    call, because the home switch -- the home target number was not
16    within their home switch.
17    Q.  Okay, I am confused.
18           The first two entries, outgoing call, that is not a
19    call going out?
20    A.  Correct, it is the switch that is not the home switch that
21    is actually identifying that someone is calling the target
22    number and letting them know the target number is not using
23    their home switch, they are using an out of home switch.
24    Q.  So, that is actually a tower, the first line here,
25    realistically a tower doing a switch?
```

```
 1  A.  Correct.

 2  Q.  That is read as an outgoing call?

 3  A.  Yes.

 4  Q.  That is an incoming call?

 5  A.  That is why you have to read both lines.

 6  Q.  Is that true for everything that has an outside home switch

 7  and a number beneath it?

 8  A.  Yes.

 9  Q.  Okay.

10       Sir, looking at page 54, right here on June 29, 2012,

11  we talked about this entry right here where it says outgoing

12  call that has an 802 number.  Do you see that?

13  A.  Yes, ma'am.

14  Q.  Okay.

15       That doesn't have an outside home switch line, does

16  it?

17  A.  No, ma'am.

18  Q.  Tell me how that would work.

19  A.  Okay.

20       Dated 6/29/2012, 10:57?

21  Q.  Yes.

22  A.  That is a standard outgoing call from the target number to

23  the 802-332-0154 number and it was answered for a minute and 8

24  seconds.

25  Q.  Why does that not have an outgoing switch if that is not a
```

1    Miami number?

2    A.  Let me look at this.

3            I can't answer that, I don't know.

4    Q.  But generally, it would have an outside switch line for a

5    number you are placing that is not in Miami?

6    A.  Right.

7    Q.  If you are placing a call to an 802 number -- which we

8    agree it is not a Miami area code?

9    A.  Correct.

10   Q.  It is two lines for that?

11   A.  Correct.

12   Q.  It appears a number is coming in to you?

13   A.  Right.

14   Q.  But it is going out?

15   A.  Yes.

16   Q.  Is it the same, vice versa, from an 802 number and you have

17   two lines?

18   A.  If you are out of the switch range, yes.

19   Q.  For an 802 area code calling or receiving, there may be

20   duplicate entries on paper than what occurred?

21   A.  Right.  It is a two-entry system to understand it.

22   Q.  It may look as if a person was calling out many times when

23   actually somebody was calling in from 802?

24   A.  Correct.

25   Q.  So, 802, sir, do you know if it is a Vermont area code?

1   A.  I have no idea.

2   Q.  If someone is calling in from that 802 number to someone in

3   Miami, it may look like it is going out on this sheet of paper?

4   A.  Correct.

5   Q.  Okay.

6           Because of the dual switch?

7   A.  Right.

8   Q.  Okay.

9           But no one would have been calling out from this

10  number?

11  A.  No.

12  Q.  Now, if you were to subtract all of the switching here --

13  and there is 75 pages of entries here, that is quite a bit.  If

14  you subtract all of the entries of the call coming into Miami

15  from an outside area code, there would be two entries for each

16  call, and you would have to limit it to one?

17  A.  Yes.

18  Q.  And it would be a number into the phone here?

19  A.  Right.

20  Q.  Nothing coming out?

21  A.  Yes.

22  Q.  It is a bit confusing how PCS does this, sir.

23          Now, do you know anything about the Kyocera phone we

24  talked about earlier?

25  A.  No, other than I have seen it on many subscriber sheets as

1  individuals making a purchase.

2  Q.  Okay.

3       But do you know if it has internet capabilities?

4  A.  I don't know.  I don't know.

5  Q.  Do you know if someone wanted internet capabilities on a

6  phone that MetroPCS has, is that an extra service?

7  A.  Yes.

8  Q.  It is not standard?

9  A.  I don't believe it is standard.

10 Q.  You have to activate it and pay for that?

11 A.  Yes.  Not generally.

12 Q.  It is generally just placing calls?

13 A.  A vanilla standard phone, basic phone, disposable phones.

14 Q.  Why do you call them disposable phones?

15 A.  Because they are relatively very simple and it has been our

16 experience people come in to make a purchase, they use it for a

17 month without providing authentication as to who they are, and

18 they just throw them away.

19 Q.  They are not trying to keep these phones for a long period

20 of time?

21 A.  No.  Not at all.

22       THE COURT:  Thank you, no further questions.

23       THE COURT:  Cross.

24       MR. ZACCA:  Mr. Fernandez will be doing the

25 cross-examination at this time, with permission of the Court.

```
 1                  THE COURT:  Okay.
 2                       CROSS EXAMINATION
 3  BY MR. FERNANDEZ:
 4  Q.  Good afternoon, sir.
 5  A.  Good afternoon.
 6  Q.  I concur with my colleague, it is a little confusing, what
 7  you explained.  Let me see if I understand it.
 8            MR. FERNANDEZ:  Your Honor, may I approach?
 9            THE COURT:  Yes.
10  BY MR. FERNANDEZ:
11  Q.  I will start on page 49 of 75.
12  A.  Yes, sir.
13  Q.  And I have highlighted for you the entry on that page.
14            On June 25 --
15            MR. WILCOX:  Which exhibit, counsel?
16            MR. FERNANDEZ:  The exhibit the Government just
17  admitted.
18            MS. JOHANNES:  This is Exhibit 26 -- no, 25.  I am
19  sorry.
20  BY MR. FERNANDEZ:
21  Q.  With regard to the two entries for June 25th, the first
22  entry says at 7:57, that would be a.m., correct?
23  A.  Correct.
24  Q.  There was an outgoing call from number 786-322-0154 to an
25  802 number, correct?
```

```
 1   A.   Correct.
 2   Q.   Now, I submit to you that is already in evidence, 802 is a
 3   Vermont area code.  Okay?
 4   A.   Yes, sir.
 5   Q.   Okay.
 6        And that phone call was answered, correct?
 7   A.   Correct.
 8   Q.   Now, if I understood -- or maybe misunderstood your
 9   testimony.  The entry right below that, that is also
10   highlighted, that would not be a duplication of the same entry
11   above, that would be a separate call and/or -- yes, a separate
12   call?
13   A.   Correct.
14   Q.   So we can agree that on June 25th, two phone calls went out
15   from this 786 number to Vermont?
16   A.   Correct.  Yes, sir.
17   Q.   Both calls were answered?
18   A.   Correct.
19   Q.   One call lasted 44 seconds, correct?
20   A.   Correct.
21   Q.   And one call lasted 6 minutes and 23 seconds, correct?
22   A.   Correct.
23   Q.   You would agree with me in your experience, 6 minutes and
24   23 seconds would be a little longer than leaving an answer on
25   an answer message -- on an answering machine, correct?
```

```
 1              MS. JOHANNES:  Objection, speculation.

 2              MR. FERNANDEZ:  He talked about leaving a message.

 3              THE COURT:  Overruled.

 4   BY MR. FERNANDEZ:

 5   Q.  You'd agree it takes less than 6 minutes and 23 seconds

 6   leaving a message on an answering machine?

 7   A.  Yes, I would.

 8   Q.  These are no doubt two different calls?

 9   A.  Correct.

10   Q.  Now, going to 53 of 75, that same exhibit, that would be

11   the next day, June 26th.  Do you see that?

12   A.  Yes, sir.

13   Q.  Military time, 2135, that would be 9:35 p.m.?

14   A.  Correct.

15   Q.  That was an outgoing call from 786-332-0154, correct?

16   A.  Yes, sir.

17   Q.  That is a call from Vermont?

18   A.  Yes.

19   Q.  That was answered?

20   A.  Yes.

21   Q.  That call lasted 16 minutes and 50 seconds, correct?

22   A.  Correct.

23   Q.  Now, between 6/25/2012, and 6/26/2012, we have three calls

24   to Vermont all totaling approximately 23 minutes or so?

25   A.  I would agree, yes, sir.
```

1   Q.   Okay.

2          And going back before I leave page 53, the fact that

3   there is or is not some type of duplication or second entry

4   does not invalidate your testimony that on June 26th there was

5   a call to Vermont for 16 minutes and 60 seconds, correct?

6   A.   That is correct.

7   Q.   Now we get to page 54 which starts on June 29, 2012.  Do

8   you see those highlights?

9   A.   Yes, sir.

10  Q.   Okay.

11         We have a first entry at 10:57 a.m., correct?

12  A.   Yes, sir.

13  Q.   That is an outgoing call to Vermont, correct?

14  A.   Correct.

15  Q.   To an 802 number, correct?

16  A.   Yes, sir.

17  Q.   From the 786 target number, correct?

18  A.   Yes, sir.

19  Q.   And that call was answered, correct?

20  A.   Yes, sir.

21  Q.   And it lasted a minute and 8 seconds, correct?

22  A.   Yes, sir.

23  Q.   Okay.

24         A couple of minutes later, there is a call at 10:59,

25  and that is the third entry.

```
 1              I didn't mean to highlight the entry inbetween.  I
 2   think the highlighter moved down for me.
 3              Skip the next entry and go to 10:59:08.  That would be
 4   an incoming call to 786-332-0154; is that correct?
 5   A.   Yes.
 6   Q.   And that comes from Vermont, an 802 area code, correct?
 7   A.   Correct.
 8   Q.   And that incoming call was answered, correct?
 9   A.   Let me have a minute.
10   Q.   Sure.
11   A.   Yes, sir.
12   Q.   And it lasted 5 minutes and 15 seconds, correct?
13   A.   Yes, sir.
14   Q.   So, by now, so far between the dates we discussed we have
15   approximately a half hour of live communication between Vermont
16   and this 786 number, correct?
17   A.   Correct.
18   Q.   And then we move to 6/29, 1415 hours.  That would be 2:15
19   p.m., correct?
20   A.   Yes, sir.
21   Q.   Another call to Vermont, correct?
22   A.   Yes, sir.
23   Q.   The call was answered?
24   A.   Yes, it was.
25   Q.   And that lasted 4 minutes and 9 seconds, correct?
```

1  A.  Correct.

2  Q.  Anything about these -- one, two, three -- anything about

3  these three entries that makes the testimony you just gave us

4  about incoming and outgoing and how long these calls lasted,

5  anything about that -- about the fact that there isn't a

6  duplicate entry unreliable?

7  A.  I am not sure I understand that.

8  Q.  Let me rephrase that.

9        In other words, you can state with certainty that the

10  outgoing and incoming calls, these three on this page, did in

11  fact take place?

12  A.  That is correct.

13  Q.  Then I will show you the following page, 54, that will be

14  page 55.

15        We go to June 30, 2012, and the first entry is at

16  1522.  That would be 3:22?

17  A.  Correct.  Yes.

18  Q.  That is an outgoing call from 786-332-0154?

19  A.  Correct.

20  Q.  That was answered?

21  A.  Yes, sir.

22  Q.  That lasted 14 minutes and 22 seconds, correct?

23  A.  Correct.

24  Q.  Right now we are close to 45 minutes so far of

25  communication between Vermont and the 786 number, correct?

1  A.  Correct.

2  Q.  The following entry underneath that has an incoming call

3  coming in to 786, correct?

4  A.  Correct.

5  Q.  From Vermont, right?

6  A.  Correct.

7  Q.  That went unanswered?

8  A.  Correct.

9  Q.  That is why it is so short, it is 26 seconds, correct?

10  A.  Yes, sir.

11  Q.  Now, those 26 seconds, would that be, in your experience, a

12  message that was left on a voice mail or just letting it ring?

13  A.  Well, it looks as though -- let me study this a second.

14      You have to go down another entry to 2027 and 32.

15  Q.  Okay.

16  A.  It says incoming, same Vermont number, and scroll back over

17  to your left.  It called the target number, correct.  You see

18  those three digits, 411, that precedes it, that means it went

19  to voice mail.

20  Q.  Went to voice mail?

21  A.  Yeah, that is a code, goes to voice mail.

22  Q.  Whatever message was left lasted 26 seconds?

23  A.  Yes.

24  Q.  Now we have a live message from someone from Vermont

25  calling this number and leaving a message, correct?

1  A.  Correct.

2  Q.  A message that the target phone could retrieve and somebody

3  could listen to it, correct?

4  A.  That is an option, they could, yes.

5  Q.  So, since the entry at 2027 dealt with the entry above, I

6  will move down to the entry at 2352.

7       That is an outgoing call from 786 to Vermont, correct?

8  A.  Correct.

9  Q.  And that went unanswered, correct?

10  A.  Correct.

11  Q.  Which is why it lasted three seconds, correct?

12  A.  Correct.

13  Q.  Enough time to leave a message?

14  A.  Possibly, but that small amount of time, I would say it

15  went unanswered.

16  Q.  Then 2352, that is 11:52 p.m.?

17  A.  Yes.

18  Q.  An outgoing call from Vermont?

19  A.  Yes.

20  Q.  That was answered?

21  A.  Yes.

22  Q.  That lasted 2 minutes and 22 seconds?

23  A.  Correct.

24  Q.  In the four pages we have discussed, we have approximately

25  one hour's worth of communication between Vermont and

1  786-332-0154 in the span of five days, correct?

2  A.  I believe so, yes.

3  Q.  Now, when the Vermont number, and for that matter, any

4  number calls in to 786, there would be a feature on that phone

5  that will leave some type of caller ID, identification about

6  the incoming number, correct?

7  A.  Yes.

8  Q.  So, presumably, if I am checking through the phone device,

9  I see an incoming number, 802, correct?

10 A.  Correct.

11 Q.  In fact, for every call that came in to 786 there would be

12 an identification of a phone call from Vermont, correct?

13 A.  From the 802 number?

14 Q.  Sure.

15 A.  Yes.

16         MR. FERNANDEZ:  Thank you, sir.

17         THE WITNESS:  Thank you.

18         THE COURT:  Mr. Wilcox, any cross?

19         MR. WILCOX:  No.

20         THE COURT:  Any redirect, Ms. Johannes?

21         MS. JOHANNES:  Briefly, Your Honor.

22                    REDIRECT EXAMINATION

23 BY MS. JOHANNES:

24 Q.  Mr. Bosillo, we are lumping -- defense counsel calls them

25 numbers, it is 802, within the five-day span.  They are

1  different numbers --

2  A.  Yes.

3  Q.  -- associated with the 802 area code?

4  A.  Yes.

5  Q.  Those numbers are for different phones?

6  A.  Correct.  They are different numbers with the exclusion of

7  the area code.

8  Q.  With the exclusion of the area code, correct.

9         On June 25th, there is a call made very early in the

10 morning, 7:57 a.m.?

11 A.  Yes.

12 Q.  That is 44 seconds?

13 A.  Yes, ma'am.

14 Q.  You don't know who is on the other end of that call, do

15 you?

16 A.  Oh, no, ma'am.

17 Q.  You don't know if the call is garbled or the person can't

18 hear it?

19 A.  No.

20 Q.  You don't know what the conversation is?

21 A.  No idea.

22 Q.  Okay.

23         There is another call almost immediately afterwards,

24 8:01.  Do you see that?

25 A.  Yes, I do.

1  Q.  That is the same exact number?

2  A.  Yes, ma'am.

3  Q.  Again, you don't know the content of that call?

4  A.  No, ma'am.

5  Q.  Whether or not someone can understand the person they are

6  speaking to?

7  A.  No.

8  Q.  What they are discussing?

9  A.  No.

10 Q.  And you don't know what number that 802 number here

11 pertains to?

12 A.  No, ma'am.

13 Q.  Now, the time -- when does the time start ticking?  Is it

14 immediately when you click the phone and it goes dee, dee, dee?

15 A.  The time in an outgoing call starts once you push send.

16 Q.  Immediately when I push send the time is ticking?

17 A.  The clock is running.

18 Q.  The fourth section here isn't necessarily pertaining to a

19 conversation?

20 A.  No.

21 Q.  None of these times, in fact, are pertaining to a

22 conversation?

23 A.  No.  You have to allow the time for the switch to make its

24 connection.

25 Q.  How long does it take for a switch to make a connection?

1    Is it a definitive time?

2    A.   There is not a definitive time.  Under ideal circumstances,

3    it might take probably an average of five to seven seconds.

4    Q.   Depends on how the towers are working?

5    A.   Sure.

6    Q.   Sometimes you look, hit send on the phone, pause and look

7    at it and say, what are they doing?

8    A.   You have things that affect the tower, population,

9    landmarks, building structures.

10   Q.   The 44 seconds there may have been something short,

11   correct?

12   A.   Correct.

13   Q.   Now, you were asked, before we move on, about messages when

14   there is a 411 number proceeding.  Do you see 411?

15   A.   Yes, ma'am.

16   Q.   That would have been a message?

17   A.   Yes, voice mail kicked in.  Two indications, special

18   features, they say call forwarding, that indicates voice mail,

19   and you see the number is preceded by three digits.

20   Q.   Does MetroPCS store voice messages?

21   A.   No.

22   Q.   Can you guys retrieve those messages?

23   A.   No, ma'am.

24   Q.   You were also asked by defense counsel, for example,

25   786-332-0154, if that makes a call, the number that it called,

1  for example, 802 would appear?

2  A.  Yes.

3  Q.  It would?

4  A.  Yes.

5  Q.  Could a user manually go through and delete a call?

6  A.  Delete a call and how --

7  Q.  Could you go in your phone and hit delete past calls?

8  A.  Yes.

9  Q.  You can do that so someone couldn't see who you were

10  calling?

11  A.  Exactly.

12  Q.  But it would still appear here?

13  A.  Yes, it would.

14  Q.  All right.

15        Now, sir, we see on June 26th a call to another 802

16  number.  Do you see that?

17  A.  Yes, ma'am, I do.

18  Q.  That is for approximately 16 minutes and 50 seconds.

19        Again, that time frame is an approximation, correct?

20  A.  Correct.

21  Q.  You don't know whether that pertains to actual talk time?

22  A.  Right.

23        It is the connection, the time the circuit made its

24  connection from pushing the send button on the sender and

25  answering it from the receiver.

941

```
 1   Q.   Okay.

 2        This is a new 802 number from the one we had seen

 3   before; is that right, sir?

 4   A.   I believe so, yes, ma'am.

 5   Q.   You don't know whose number that is?

 6   A.   Oh, no.

 7   Q.   Now, on the 29th of June, sir --

 8   A.   Yes, ma'am.

 9   Q.   -- do you see where it says there are a couple of calls

10   dealing with an 802 area code?  Do you see that?

11   A.   Yes, ma'am.

12   Q.   Now, the one that I have my finger pointed at, I believe

13   the second one listed here, ten o'clock -- 10:59 -- sorry, sir.

14   A.   Correct.

15   Q.   That says incoming call and outside home switch.  What does

16   that call mean?

17   A.   Okay, let me look at this a second.

18        Again, you've got to look at the two above and below

19   it.

20        The reason you know it is a home switch without even

21   going out there and looking at that entry, you can see you have

22   a call right above the 6/29/2012, 10:59:08.  The one above it

23   says 10:59:00.

24   Q.   Okay.

25   A.   That is eight seconds.
```

1          If you look there, you see a conversation took place

2    for 5 minutes and 23 seconds and 5 minutes and 15 seconds it

3    is, but those calls are connected.  Do you see?

4    Q.  I don't understand, sir.

5    A.  Okay.  This 802 --

6    Q.  Yes.

7    A.  -- is calling the target number.  Okay?

8    Q.  Okay.

9    A.  And it says home switch -- let me make sure -- home switch

10   because it would be impossible for the one entry between the

11   two highlighted entries -- this one right there that says

12   10:59;00.

13   Q.  Okay.

14          Oh, I understand, there is an eight second gap and one

15   looks like five minutes and another one five minutes?

16   A.  Right.  But these two calls are connected because it shows

17   that they are talking in excess of five minutes, okay, and it

18   is an outgoing call because you see 954-404-1710.  That is the

19   home switch routing number I spoke of earlier.  That is the

20   number that is authenticating it to work between 802 and our

21   target number.

22   Q.  Okay.

23          So, just in normal speak, sir, what is happening here?

24   A.  802 is calling the target number.

25   Q.  Okay.

1          And even though there may be multiple entries, this is

2     802 calling the target number?

3     A.  It is one call.

4     Q.  It is one call, okay.  I want to be clear on that.

5          Now, lastly, looking on page 55 of 75, there is a

6     series of calls on June 30th, between the 802 number and this

7     phone.  This is a new 802 number?

8     A.  That is correct.

9     Q.  We haven't seen this 802 number before, have we?

10    A.  No, ma'am.

11    Q.  The last 802 number, sir, we see with the phone number,

12    page 56 of 75, do you see that, July 1, 2012?

13    A.  Yes, ma'am.

14    Q.  That is an outgoing call.  That means this call is calling

15    a Vermont number on July 1, 2012.  Do you see that?

16    A.  That's correct.

17    Q.  And that is at approximately noon, mid day?

18    A.  Yes, ma'am.

19          MS. JOHANNES:  Thank you, sir, no further questions.

20          THE COURT:  All right.  Thank you, Mr. Bosillo, you

21    may step down.

22          Folks, I promised another 10-minute break and we will

23    take that break now.  Remember, do not discuss the case,

24    continue to keep an open mind.

25          (Thereupon, the jury leaves the courtroom.)

944

```
 1                THE COURT:  Who is going to be the Government's next
 2   witness?
 3                MS. JOHANNES:  A custodian of records for Craig's
 4   List.
 5                THE COURT:  All right.  We will take ten.
 6                Thank you all.
 7                (Thereupon, a short recess was taken.)
 8                THE COURT:  The record will reflect that both
 9   defendants are present represented by their respective counsel.
10                Ms. Viamontes, do you wish to be heard?
11                MS. VIAMONTES:  Yes.  Our next record's custodian is
12   the witness from Craig's List.
13                After that, we will call the witness, the second
14   victim.  Before she testifies I need to tell her about certain
15   rulings.
16                THE COURT:  I don't know that we will get to her
17   today.  We will do the Craig's List record's custodian and
18   start her tomorrow.  This has been a long day.
19                All right.  Are we ready?
20                Let's bring in the jury.
21                (Thereupon, the jury returns to the courtroom.)
22                THE COURT:  Folks, you can be seated.
23                The next witness will be the last witness of the day.
24   If we finish the witness before 5:00 we will leave a little
25   early today.
```

```
 1              Ms. Johannes, you may call your next witness.

 2              MS. JOHANNES:  Yes.  The next witness the Government

 3  will call is William Powell from Craig's List.

 4              THE COURT:  Mr. Powell, if you would step over there

 5  to the left of the witness stand.

 6              Please raise your right hand.

 7              WILLIAM POWELL, GOVERNMENT'S WITNESS, SWORN.

 8              THE COURT:  Please be seated.

 9              Please state your name and spell your last name for

10  the record.

11              THE WITNESS:  William Powell, P-O-W-E-L-L.

12              THE COURT:  All right.  Ms. Johannes, you may inquire.

13              MS. JOHANNES:  Thank you, Judge.

14                        DIRECT EXAMINATION

15  BY MS. JOHANNES:

16  Q.  Mr. Powell, what company do you work for, sir?

17  A.  I work for Craig's List.

18  Q.  How long have you worked for Craig's List?

19  A.  For a little over nine years.

20  Q.  What do you do?

21  A.  I serve as the company's director of customer service and

22  law enforcement relations.

23  Q.  Are you the custodian of records?

24  A.  Yes.

25  Q.  How long have you been the custodian of records for Craig's
```

1  List?

2  A.   For that same nine-year period.

3  Q.   What do you do?

4  A.   I serve as the company's primary liaison with law

5  enforcement.  Part of that duty involves responding to requests

6  for records via subpoena, search warrant, court order, etc.,

7  and I supervise the staff that prepares the records and returns

8  them to the requester.

9  Q.   What is Craig's List in the business of doing?

10 A.   Craig's List offers online classified ad services and

11 discussion forums in over 700 cities in the U.S. and

12 internationally.

13 Q.   Now, you says Craig's List offers ads.  Can you buy

14 products on Craig's List?

15 A.   Craig's List offers a service that allows individuals to

16 place ads and interact with other individuals.  So, people who

17 use the service are not interacting directly with Craig's List,

18 they are interacting with other users.

19 Q.   Craig's List functions as a broker system versus a

20 purchasing system?

21 A.   More of a classified ad service.

22 Q.   Tell me, how does someone go about placing an ad on to

23 Craig's List?

24 A.   One would need a computer that is connected to the internet

25 and the basic process is fairly simple.

1          One would go to the Craig's List site where they would
2   like to place their ad, Seattle, San Francisco, South Florida.
3          They would proceed through a series of steps again
4   online, complete a posting form that would list the title of
5   their ad, the category, the contents of the ad, and at the end
6   of that process, they would submit the ad.
7   Q.   Now, the ad -- when someone places the ad, let's say
8   someone is in Florida and they place an ad, where is that ad
9   physically held?
10  A.   Once a user completes the posting process, a record or an
11  entry is created on Craig's List's servers, which are
12  maintained in Arizona and California.
13  Q.   Are there any servers in Florida?
14  A.   No.
15  Q.   Is that a no?
16  A.   No.
17  Q.   Is that a no, sir?
18  A.   Yes, no.
19  Q.   When someone wants to set up an ad in Craig's List, what
20  sort of personal information do they have to provide?
21  A.   The two main pieces of information that a user would
22  provide for free listings are an email address and in some
23  cases, not always, a telephone number.
24  Q.   Do those -- now, we will get to each of those, but does the
25  email address have to be valid?

1   A.   Yes.

2   Q.   And how does Craig's List ensure it is a valid email

3   address?

4   A.   There is a process by which a user would either go through

5   a series of steps to complete their ad, receive an email back

6   from Craig's List, and the user would have to open that message

7   and act on the contents to finish the process.

8         The other option is for a user to have a Craig's List

9   user account and that process again involves a loop, if you

10  will, where the user has to receive the email message from

11  Craig's List, an automated message, and respond to it to set up

12  the process.

13  Q.   It is a complicated system, if you will?

14  A.   Correct.

15  Q.   I assume that is so someone cannot post an ad on behalf of

16  another person?

17  A.   That is correct.

18  Q.   You mentioned for some of the ads an individual has to

19  provide a valid telephone number?

20  A.   That is correct.

21  Q.   What sort of ads would you do that for?

22  A.   It is a mix of ads.  There, at various times, have been

23  specific categories that have required it.

24         In general, Craig's List's software systems make

25  decisions based on the information that we are getting from the

1  user while they are placing the ad, their IP address, which we

2  will get to later, their email address, how many times their ad

3  has been removed, and in some cases, if the Craig's List system

4  determines that the user needs to go through an extra step to

5  make sure that the post is not coming from some sort of

6  automated system, spam, if you will, that user is required to

7  go through this phone authentication process.

8  Q.  Okay.

9        You mentioned that one of the areas, sometimes numbers

10 are required for it, depends on the category that someone is

11 posting an ad?

12 A.  Correct.

13 Q.  Does Craig's List currently have an adult entertainment

14 erotic section?

15 A.  No.

16 Q.  Did Craig's List have an adult entertainment erotic

17 section?

18 A.  There were two categories, there was an erotic services

19 category which was in place up until, I believe it was May of

20 2009, and that was replaced at that time by an adult services

21 category, and that was in effect up through September of 2010.

22 Q.  So, after September 2010, Craig's List did not have

23 services for adult erotic services?

24 A.  Correct.

25 Q.  When Craig's List did have erotic services in May, 2009,

1  did a person have to provide a telephone number?

2  A.  Yes.

3  Q.  That was a category you had to give a valid number?

4  A.  Yes.

5  Q.  How did Craig's List assure it is a valid number?

6  A.  In the posting process, the user would be presented with a

7  message on the screen that indicated this phone authentication

8  process would be required.  A field was presented to the user

9  that they would need to enter a phone number into.

10       Once they proceeded through that step, our systems

11  would either call or send a text message, depending on the

12  preference of the user, and that user would have to have the

13  phone in hand in order to receive the call or receive the text

14  message.

15       That call or text message contained a unique code

16  number that the user would then need to put back onto the

17  screen to complete the authentication process.

18  Q.  So, someone verifying email, this verification was done to

19  make sure the phone number being used for this escort category

20  was valid?

21  A.  That is correct.

22  Q.  And belonged to a person who was trying to place the ad?

23  A.  It ensured that the person had that phone in hand.

24  Q.  All right.  Now, you mentioned that some ads could be free,

25  and some could be paid?

1   A.  Correct.

2   Q.  What ads did someone pay for?

3   A.  Currently, Craig's List charges for job ads in 30 cities,

4   we charge for brokered housing ads in New York City, and we

5   charge for therapeutic services ads in the United States.

6   Q.  In 2008, did Craig's List charge for any of the ads?

7   A.  In 2008, we charged for job ads in a subset of the cities

8   where there currently is a fee.  We charged for the housing

9   ads.

10        We did not charge for therapeutic services ads at that

11  time.

12  Q.  Did Craig's List charge for ads in the erotic services

13  section?

14  A.  At that time, no.

15  Q.  Okay.

16        When someone placed an ad, and this is in the erotic

17  service section, in 2008, when someone placed an ad, what would

18  have happened after the ads were placed prior to posting?

19  A.  I'm not sure I understand.

20  Q.  Does Craig's List monitor the ads?

21  A.  No.  At that time, Craig's List did not monitor the ads for

22  the erotic services category or other categories.

23  Q.  Did Craig's List ensure in any way the contents of the ads,

24  whether or not they were appropriate for their web site?

25  A.  Other than reports that were sent to Craig's List after ads

1    had been placed, there was no prior monitoring, no check before

2    ads were activated.

3    Q.   So, in 2008, an ad in the erotic services section would

4    just go out on the internet?

5    A.   That is correct.

6    Q.   Anyone in the world could have accessed Craig's List at the

7    time?

8    A.   Anyone who had a computer connected to the internet and did

9    not have a blocking system that prevented access to Craig's

10   List, right.

11   Q.   Did you receive a subpoena from the United States Attorneys

12   Office?  "You," being Craig's List.

13   A.   Yes.

14   Q.   Did Craig's List respond to the subpoena?

15   A.   Yes.

16   Q.   Did the subpoena request documents pertaining to two phone

17   numbers?

18   A.   I believe there were actually three phone numbers in the

19   original subpoena, and Craig's List found records for two of

20   the phone numbers.

21   Q.   I will show you 52-A and 52-B.

22           MS. JOHANNES:  Your Honor, may I approach?

23           THE COURT:  Yes.

24   BY MS. JOHANNES:

25   Q.   Sir, starting with Government 52-A, what is it?

1  A.  Government Exhibit 52-A contains records for three Craig's

2  List posts.

3  Q.  And what is the commonalty among the three Craig's List

4  posts?

5  A.  There are at least three main commonalties with respect to

6  the poster, actually four.

7        The email address for all three ads is the same.  The

8  user ID for all three is the same.  The IP address for all

9  three is the same, and the authenticating user phone for all

10  three is the same.

11  Q.  Where was Government 52-A kept?

12  A.  The records for this post were and are retained on Craig's

13  List's servers in Arizona and California.

14  Q.  How did you get these records?

15  A.  Craig's List staff is able to retrieve records from our

16  secure data bases using a series of internally developed tools

17  allowing us to pull records based on specific criteria.

18  Q.  These records at 52-A would be in the normal course of

19  business for Craig's List?

20  A.  That is correct.

21  Q.  Government 52-B, what is Government 52-B?

22  A.  Government's Exhibit 52-B contains records for six Craig's

23  lists posts.

24  Q.  And what is the commonalty among the six Craig's List

25  posts?

1  A.  As with the previous exhibit, there are four common factors

2  pertaining to the user who placed these posts.  The email

3  address for all six posts is the same.  The user ID for all six

4  posts is the same.  The IP address for all six posts is the

5  same, and the authenticating user phone number for all six

6  posts is the same.

7  Q.  Where was Government Exhibit 52-B kept by Craig's List?

8  A.  These records as well were and are maintained by Craig's

9  List on our servers in California and Arizona.

10 Q.  And would Government Exhibit 52-B have been kept in the

11 normal course of business for Craig's List?

12 A.  Yes.

13        MS. JOHANNES:  At this time the United States moves to

14 admit 52-A and B into evidence.  And so the record is clear, it

15 is in 52 collectively.

16        MR. FERNANDEZ:  Your Honor, Defendant Desir objects.

17 We would like to be heard sidebar.

18        (Proceedings at sidebar.)

19        MR. FERNANDEZ:  Your Honor, our objection is primarily

20 concerning 52-A, which would be the first two pages in your

21 binder.  Those are three particular ads.

22        If you look at -- it would be two telephone numbers on

23 each of the ads, one telephone number would be the telephone

24 number, authentication number, line 5 from the top, right here.

25        THE COURT:  Okay.

1        MR. FERNANDEZ:  The second phone number would be

2  contained in the body of the message where the johns call.

3        THE COURT:  Okay.

4        MR. FERNANDEZ:  None of these numbers in any of the

5  three ads are on the Government exhibit list as records that

6  either have been or will be authenticated and/or linked to

7  either defendant in this case.

8           In fact, all of these numbers are 561 numbers.  The

9  only 561 number that the Government has listed authentication

10  for is number 53, and it has been admitted.

11           This number is not any of these numbers on these three

12  ads.  They can't link it up.

13        MS. JOHANNES:  I think his objection is relevance.

14        MR. FERNANDEZ:  Admissibility in general, lack of

15  predicate.

16        MS. JOHANNES:  It is authentic.  I want to know what I

17  am addressing.

18           If the objection is relevance, Your Honor, 53-B is not

19  what they are objecting to, it is 52-A.  53-B is the other 561

20  number.

21           Commonalty between 52-A and B is clear, they share the

22  same IP address.  What this witness will explain, the IP

23  address is where you physically are posting the ad.  There is

24  only one IP address for one computer ever.  Both of these are

25  being placed at the same location.

```
 1            MR. FERNANDEZ:  I want to approach this witness and
 2   voir dire this witness.  This is a particular sign-in and it
 3   has to do with computer forensics.
 4            THE COURT:  I think that is a legitimate inquiry.  You
 5   may inquire.
 6            (Sidebar concluded.)
 7            THE COURT:  All right.  Mr. Fernandez, you may voir
 8   dire the witness.
 9            MR. FERNANDEZ:  Thank you, Your Honor.
10                      VOIR DIRE EXAMINATION
11   BY MR. FERNANDEZ:
12   Q.  Good afternoon, Mr. Powell.
13   A.  Good afternoon.
14   Q.  Sir, one of the things you told us, one of the information
15   in the ads is something called an IP address; is that correct?
16   A.  That is correct.
17   Q.  IP address is short for internet protocol, correct?
18   A.  That is correct.
19   Q.  Are you sure of that?  That is what it stands for?
20   A.  Yes.
21   Q.  Okay.
22            Now, internet protocol is something that is -- let me
23   back up, sir.
24            Do you have any specialized training in the field of
25   forensic sciences with regards to computers?
```

1   A.   No, I do not.

2   Q.   Have you undergone any studies, whether it be at a

3   university level or continuing education, having to do with

4   computer forensics?

5   A.   No.

6   Q.   Have you been trained in or received any specialized

7   knowledge in how the internet works, in particular how IP

8   addresses are created through the internet process?

9   A.   No, I have not.

10  Q.   Can you tell this jury how an IP address even comes to

11  exist in the internet world?

12  A.   I do not have specific knowledge of that, no.

13  Q.   Can you even tell us how to begin to trace an IP address to

14  any particular person?

15  A.   I have general knowledge of that, but not specific

16  knowledge.

17  Q.   Can you tell us how to trace an IP address to any

18  particular location in the world?

19  A.   Again, I have general knowledge, but not specific

20  knowledge.

21  Q.   Have you ever testified in any Court in the United States

22  with regards to the way the IP addresses are created?

23  A.   No.

24  Q.   Have you ever testified in any Court in the United States

25  with regards to how IP addresses function?

1    A.   In general terms, yes.

2    Q.   Have you ever been qualified as a witness, an expert

3    witness in the area of computer forensics?

4    A.   No.

5    Q.   And you would agree with me that the internet and IP

6    addresses fit into an area that we know as computer forensics?

7            MS. JOHANNES:   Objection, Your Honor, that is

8    speculation.   He doesn't know.

9            MR. FERNANDEZ:   They concede you don't know.

10           Judge, I am done with voir dire.

11           THE COURT:   Any additional questions of the

12   admissibility of 52-A and B?

13           MS. JOHANNES:   Yes, Your Honor.

14           THE COURT:   Okay.

15   BY MS. JOHANNES:

16   Q.   Mr. Powell, what is an IP address?

17   A.   An IP address is a unique number that is assigned by

18   companies that provide internet service to specific computers.

19   Q.   Okay.

20           You said it is a unique number provided by a company

21   to a specific computer.   How do you know that?

22   A.   Through my knowledge of working at Craig's List with

23   records like this for the past nine years.

24   Q.   Did you learn that through training Craig's List gave you?

25   A.   Yes, on-the-job training.

1    Q.  And so, experience?

2    A.  Yes.

3            MS. JOHANNES:  Your Honor, we can return to sidebar to

4    address this objection.  That is all I have.

5            THE COURT:  I can hear the argument from here.

6            MS. JOHANNES:  We are not offering the witness as an

7    expert.  This is authentic and kept in Craig's List's normal

8    course of business.  As a fact witness he should be able to do

9    that.

10           MR. FERNANDEZ:  The only way they will link up the ads

11   is through the IP address.  No other way.  This witness cannot

12   discuss IP addresses and link it up to this case or anyone in

13   this case.

14           THE COURT:  Well, he said an IP address is a unique

15   number assigned to a specific computer, and since the same IP

16   address is listed for both Exhibit 52-A and Exhibit 52-B, I

17   think it passes the preliminary question test under 104, and

18   therefore both 52-A and 52-B will be admitted.

19           [Government Exhibits 52-A and 52-B received in

20   evidence.]

21           MR. FERNANDEZ:  Okay.

22           THE COURT:  You may proceed.

23           MS. JOHANNES:  Thank you, Your Honor.  May I retrieve

24   the exhibits?

25           THE COURT:  Yes, ma'am.

1  BY MS. JOHANNES:

2  Q.  Mr. Powell, beginning with Government Exhibit 52-A -- let's

3  zoom out here -- go to the first database entry on this

4  document, Government 52-A.

5        Starting from the top, sir, can you please explain to

6  the jury what we are looking at?

7  A.  Certainly.

8        This represents the information retained in Craig's

9  List's database servers for a single Craig's List ad.  The

10  posting ID number listed there, 797197118 represents the unique

11  posting ID number assigned by Craig's List to this particular

12  ad.

13  Q.  Okay.

14        You said this is how it was retained by Craig's List.

15  Is that what you said?

16  A.  That is correct.

17  Q.  Is this what somebody would have seen on their computer?

18  A.  No.

19  Q.  What is different?

20  A.  The layout, format is different.  There are components of

21  this record that users viewing the ad would have seen in

22  different places.

23        For instance, the posting ID number I just mentioned

24  would likely have been in the bottom left corner of the ad as

25  it appeared on the internet.

1  Q.  Okay.

2       Just to be clear, where it says posting body, the

3  content below that, would someone on the internet be able to

4  see this portion?

5  A.  Yes.

6  Q.  Because is that the portion that is the real ad?

7  A.  That is the portion that the individual who submitted this

8  ad entered into the posting body field during the process by

9  which they created this ad.

10  Q.  Okay.

11       Now, the email address associated with the person who

12  posted this ad is getithowyoulive676767@yahoo.com; is that

13  right?

14  A.  That is right.

15  Q.  That is common among all the ads in 52-A?

16  A.  Correct.

17  Q.  We talked about the IP address.  Can you point to the jury

18  where the IP address could be found?

19       I will tell you your screen is a touch screen and if

20  you point to it, you can see it.

21  A.  Right here.

22  Q.  What does that number 65.19.136.520 mean?

23  A.  That IP address is the IP address that Craig's List

24  captured from the computer that the poster of this ad used to

25  submit the ad at the time that the ad was created.

1   Q.  Okay.

2           This is a computer location, sir, right?

3   A.  I'm not sure what you mean.

4   Q.  You said it is for a specific computer?

5   A.  Correct.

6   Q.  So it is for a specific tangible computer?

7   A.  It is for a specific tangible computer at that time.

8   Q.  Okay.

9           Going down, there is a phone number listed there.  Do

10  you see that?

11  A.  Yes.

12  Q.  Now, at the time, did Craig's List require a phone number

13  for this ad?

14  A.  Yes.

15  Q.  So, that would have been a working number?

16  A.  That's correct.

17  Q.  Now, this ad was placed in the erotic services section when

18  it then existed for Craig's List?

19  A.  Yes.

20  Q.  What area of the United States did this pertain to?

21  A.  This ad was placed in the South Florida listings.

22  Q.  Okay.

23          Was there any specific location within South Florida?

24  A.  There were two indicators of a more specific location.

25  South Florida is one of several Craig's List sites that

1   features a sub area.

2          In this case, Palm Beach County was chosen by the

3   user, and there is a field in the posting form when the user

4   creates the ad called specific area, or specific location, and

5   the user can answer any text that he or she wants to give

6   people who are viewing the ad a better idea of the precise

7   location of the goods or services or job or whatever it might

8   be.  In this case, the user entered Boynton as the geographic

9   area.

10  Q.  Okay.

11         What is the age that is indicated?

12  A.  That field is actually shared by two categories, two

13  category classes, rather, for sale and personal ads.  If the ad

14  is a for sale ad, it represents the price.

15         In this case, since it was a personals ad, it

16  represents the age that the person who placed the ad entered

17  and they want people who viewed the ad to see.

18  Q.  What is the age entered?

19  A.  18.

20  Q.  Now, the number in the context of this ad, sir, do you see

21  that?

22  A.  Yes.

23  Q.  That is not the same number that the authorized user put in

24  as a phone number?

25  A.  That's correct.

1   Q.   This would be for a different phone?

2   A.   Correct.

3   Q.   When did this ad live, if you will?

4   A.   This ad was posted on Thursday, August 14, 2008, at

5   17:28:16 which represents 5:28 p.m. Pacific time, or 8:28

6   Eastern time.

7   Q.   Okay.

8          How long did this ad stay up?

9   A.   The ad was active for just under three hours.

10  Q.   What happened to it?

11  A.   Down toward the bottom, there is a field titled posted date

12  and it indicates this ad was removed by Craig's List.

13  Q.   Do you know why?

14  A.   I do not.

15  Q.   But three hours after it was posted, Craig's List deleted

16  it?

17  A.   That is correct.

18  Q.   Going down to the second ad that is part of Government

19  Exhibit 52 -- we won't go over all the fields because I believe

20  you testified earlier they are generally the same, correct?

21  A.   That is correct.

22  Q.   Now, with respect to this ad, it was posted when?

23  A.   This ad was posted Thursday, August 14, 2008, at 1927 and

24  25 seconds, or 7:27 p.m. Pacific time, which translates to

25  10:27 Eastern time.

1   Q.   So it is the same date, roughly a few hours within the

2   first ad?

3   A.   That is correct.

4   Q.   Did this ad stay up very long?

5   A.   No.

6   Q.   Why not?

7   A.   The ad, as indicated in the posted state field down at the

8   bottom, was removed by Craig's List users, third flagging.

9   Q.   That is just people on the internet, somebody on the

10  Craig's List web site?

11  A.   Correct.

12  Q.   They flagged what?

13  A.   Craig's List has a system to allow users to essentially

14  vote on ads that they feel should be removed for some reason,

15  wrong category, prohibited content, etc.

16          When a post receives the requisite number of flags, it

17  is removed automatically by Craig's List's systems, by Craig's

18  List staff review.

19  Q.   These ads on the paper, they don't have any photographs, do

20  they?

21  A.   That is correct.

22  Q.   Does Craig's List maintain photographs associated with the

23  ad?

24  A.   Yes.

25  Q.   For how long?

1  A.  For 60 days.

2  Q.  After 60 days, what happens?

3  A.  After 60 days the images are removed from our servers.

4  Q.  Can they ever be -- are they purged forever or can they be

5  retrieved?

6  A.  They are purged forever.

7  Q.  Even if the ads had a photograph, you couldn't get them?

8  A.  That is correct.

9  Q.  Now, the third ad, part of Government 52-A, again, sir,

10  much of the contents in the top portion is the same; you would

11  agree with me?

12  A.  Yes.

13  Q.  When was this ad posted?

14  A.  This ad was posted Thursday, August 14, 2008, at 1935 and

15  19 seconds, which is 7:35 Pacific time, which translates to

16  10:35 p.m. Eastern time.

17  Q.  Roughly the same date, around the same times as the prior

18  two ads?

19  A.  That is correct.

20  Q.  And this ad did stay up for awhile; is that correct?

21  A.  That's correct.

22  Q.  It stayed up until September 29, 2008?

23  A.  That's correct.

24  Q.  Now, moving on to Government Exhibit 52-B, sir.  I believe

25  you said for Government 52-B there were six posts?

1   A.   Yes.

2   Q.   And they all have the email address

3   getmoney575757@yahoo.com?

4   A.   That's correct.

5   Q.   They share the same user ID as the other?

6   A.   Yes.

7   Q.   They are linked to 561-767-5590?

8   A.   That's correct, yes.

9   Q.   The IP address is the same for these ads as the ads that we

10  just reviewed; is that correct?

11  A.   Yes.

12  Q.   Okay.

13       What does that mean?

14  A.   That simply means that Craig's List captured the same IP

15  address for this group of ads that we did for the group of ads

16  that appeared in the other previous Government exhibit.

17  Q.   But in laymam's terms, what does this mean?  Is this the

18  same computer?

19  A.   It is possible.  We don't know that.

20  Q.   Okay.

21       Now, when was the first ad posted here, sir?

22  A.   This ad was posted Monday, August 11, 2008, 2046 and 55

23  seconds Pacific time, 8:46 p.m. -- or 11:46 p.m. Eastern time.

24  Q.   Okay.

25       The following five other ads associated with this

1   phone number here were posted afterwards?

2   A.   That is correct.

3   Q.   Now, much of the ads are the same, we are not going to go

4   over each of them.  I do want to focus your attention on the

5   entry at number 3, the third ad here.

6         When was this ad posted?

7   A.   The ad was posted Tuesday, August 12, 2008, at 2229 and 55

8   seconds Pacific time, 10:29 Eastern time.

9   Q.   Did this ad stay up for very long?

10  A.   The ad stayed up for just over two hours.

11  Q.   How did this ad come off the internet?

12  A.   This ad was removed by Craig's List's flagging system.

13  Q.   Now, this ad is also for someone purported to be 18 years

14  old, correct?

15  A.   That's correct.

16  Q.   And the title, what does the title of this ad say?

17  A.   The title is "Barely Legal," and a series of exclamation

18  points, with 4 M.

19  Q.   Does the content say "just turned 18"?

20  A.   Yes.

21  Q.   Does it give a name for the person supposedly advertising

22  the services?

23  A.   The text includes the words, "My name is Destiny."

24  Q.   And this ad was taken off of Craig's List?

25  A.   That is correct.

1             MS. JOHANNES:  Nothing further.

2             THE COURT:  All right.  Cross.

3                     CROSS EXAMINATION

4    BY MR. FERNANDEZ:

5    Q.  Hello again, Mr. Powell.

6    A.  Hello.

7    Q.  Did I hear you correctly when you just testified to the

8    fact that it is -- I quote -- possible that these IP addresses

9    belong to the same computer?

10            Did you use the word "possible" on direct?

11   A.  Yes.

12   Q.  The converse is also true, isn't it, that it is possible

13   that they are not from the same computer, correct?

14   A.  Yes, that is correct.

15   Q.  Now, what these papers do not tell us is the identity of

16   the person who is typing the ad, correct?

17   A.  That's correct.

18   Q.  Placing the ad, correct?

19   A.  Correct.

20   Q.  It doesn't tell us whether the person doing so is doing so

21   voluntarily, correct?

22   A.  That's correct.

23   Q.  It doesn't tell us whether or not the words that are being

24   used are true or false, correct?

25   A.  That's correct.

1  Q.  Somebody could say they are 18 and that could be a lie,

2  correct?

3  A.  That is possible, yes.

4  Q.  There are a lot of lies that go on in the ads, is there

5  not, in your experience?

6          MS. JOHANNES:  Objection, Your Honor, calls for

7  speculation.

8          THE COURT:  If you know, sir.

9          THE WITNESS:  I don't have any reason to believe there

10  are a lot of lies that go on in Craig's List ads.

11  BY MR. FERNANDEZ:

12  Q.  So, erotic ads being placed by people, men or women seeking

13  sex for money, in your opinion, some of that information could

14  be accurate, correct?  Some of the information in the ads could

15  be accurate?

16  A.  In general, the ads that are placed by the users are just

17  that, placed by the users, so Craig's List has no knowledge

18  whether the facts are correct or not.

19  Q.  Just as you have no knowledge who the e-mails belong to,

20  correct?

21  A.  That's correct.

22  Q.  Just like you have no knowledge if the IP addresses may or

23  may not be from the same computer?

24  A.  Correct.

25  Q.  Just like you have no knowledge who the phone numbers that

1  are in the body of the ads asking the johns to call in, who

2  those numbers belong to, correct?

3  A.   Craig's List does not have information as to the identity

4  of the user of that phone number.

5          MR. FERNANDEZ:  Thank you.

6          THE COURT:  Mr. Wilcox, any questions?

7          MR. WILCOX:  No, Your Honor.

8          THE COURT:  Any redirect, Ms. Johannes?

9          MS. JOHANNES:  Very, very short.

10                    REDIRECT EXAMINATION

11  BY MS. JOHANNES:

12  Q.   Mr. Powell, I believe you said IP address -- IP stands for

13  internet portal?

14  A.   Internet protocol.

15  Q.   This is how you access the internet?

16  A.   In order for the computer to connect to other computers,

17  send and receive email, view web pages, or in order to be able

18  to complete a posting form on Craig's List, that computer has

19  to be connected to the internet, and the method by which

20  computers do that is through the IP system.

21  Q.   When you put it in the computer, there is a line, internet

22  protocol?

23  A.   That is a simple way of putting it.

24  Q.   If you have a wireless router, all of the computers on a

25  router share the same IP address?

```
 1   A.   That is possible, right.
 2   Q.   Right.  Thank you.
 3            THE COURT:  Thank you, Mr. Powell, you may step down.
 4            Well, this was excellent timing.
 5            Folks, we will recess until 9:00 a.m. tomorrow
 6   morning.
 7            Remember, don't speak to anyone or otherwise
 8   communicate in any fashion with anyone.  Don't do any
 9   independent research.  Should there be something reported in
10   the news media, don't read, watch or listen to it, and by all
11   means, continue to keep an open mind.
12            We stand in recess until 9:00 a.m. tomorrow morning.
13            (Thereupon, the jury leaves the courtroom.)
14            (Thereupon, the court recessed at 5:00 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

## A

**Aaron** 874:15 875:15
**abandoned** 840:5
**able** 787:4,6,8,9 824:5 831:7 854:7
854:7 953:15 959:8 961:3 971:17
**absolutely** 781:10 835:24 896:24
**absorbed** 908:21
**Academy** 877:14,16 879:2,17
**acceptable** 836:18
**access** 816:15,17 817:14 819:5
857:16 859:3 952:9 971:15
**accessed** 922:5 952:6
**account** 915:22,22 922:16 948:9
**accurate** 869:7 915:13 970:14,15
**accurately** 762:11
**accuse** 835:2
**accused** 776:4,7,13 867:25 868:5
868:10,11,15
**acquainted** 893:19
**acquiesced** 764:24
**acquired** 781:7
**act** 767:23 768:3,7,10 815:1 902:12
948:7
**acting** 874:13
**action** 884:24,25
**activate** 927:10
**activated** 915:24 922:16 952:2
**activates** 848:19
**activation** 854:25 915:21
**active** 964:9
**activity** 772:22 859:8 863:18 864:8
**acts** 792:12 815:5 827:5 837:24,25
838:1 841:12
**actual** 861:10,15 915:5,21 917:15
917:21 940:21
**ad** 901:20 946:10,21,22 947:2,5,5,6
947:7,7,8,8,19 948:5,15 949:1,2
949:11 950:22 951:16,17 952:3
955:23 960:9,12,21,24 961:6,8,9
961:12,24,25,25 962:13,17,21
963:4,6,13,14,15,16,17,20 964:3
964:4,8,9,12,18,22,23 965:2,4,7
965:23 966:9,13,14,20 967:21,22
968:5,6,7,9,10,11,12,13,16,24
969:16,18
**addition** 757:13 858:20
**additional** 958:11
**address** 754:1 836:25 837:1 850:7
867:18 947:22,25 948:3 949:1,2
953:7,8 954:3,4 955:22,23,24
956:15,17 957:10,13,17 958:16
958:17 959:4,11,14,16 961:11,17
961:18,23,23 967:2,9,15 971:12
971:25
**addresses** 957:8,22,25 958:6
959:12 969:8 970:22
**addressing** 955:17
**adjust** 846:15
**admissibility** 955:14 958:12
**admissible** 839:20 869:12,17
**admit** 914:5 954:14
**admitted** 873:10,15 883:24 893:15
928:17 955:10 959:18
**ads** 792:3,5,7 889:7,8,18,21 946:13
946:16 948:18,21,22 950:24
951:2,3,4,5,6,7,9,10,12,18,20,21
951:23,25 952:2 953:7 954:21,23
955:5,12 956:15 959:10 961:15
963:13 965:14,19 966:7,18 967:9
967:9,15,15,25 968:3 970:4,10
970:12,14,16 971:1
**adult** 905:11,16 949:13,16,20,23
**advertising** 837:19,21 889:6
968:21
**advise** 838:7
**affect** 869:21 939:8
**affirmative** 754:22
**affixed** 914:22
**afraid** 766:16,17,20,22 769:8,9,12
769:13,19,20,21 770:2,4 777:22
777:23 778:2,10,15,22 779:7,10
803:1 805:18,25 806:9 807:9,17
808:2 809:8 825:8,10,12 838:18
838:21 840:9
**afternoon** 755:25 756:3 768:5
834:14 855:10,11 857:13 861:17
862:13,14 877:7,8 887:23,24
894:17,18 906:18 907:18,19
928:4,5 956:12,13

**afternoons** 845:24
**age** 806:25 888:11 889:9 891:24
898:23,25 900:8,15,25 901:10,11
901:11,16 906:3 963:11,16,18
**agencies** 890:1
**agency** 887:25 888:2 905:16 908:7
910:10
**agent** 760:25 771:16,20 794:25
795:6 806:11 807:9,17 832:4
834:6 887:11 888:1,3,4,25 889:3
889:10 894:17,25 898:22 902:9
904:5,17 905:19,19,21
**agree** 774:7 835:2 869:25 872:24
873:4 874:8 877:24 925:8 929:14
929:23 930:5,25 958:5 966:11
**agreeable** 764:16,18
**agreed** 770:3 872:25
**agrees** 816:2
**ah** 798:19 804:12 819:7 842:7,9
909:3
**ahead** 771:14 781:17 814:25 882:2
909:3
**ahold** 769:11
**air** 808:21
**alert** 846:6
**allegations** 864:13,16
**alleged** 774:11 869:20
**allegedly** 872:6
**alleges** 774:12
**allow** 783:8 835:2 919:18 938:23
965:13
**allowed** 780:21 834:24 844:1
**allowing** 953:17
**allows** 946:15
**Amdoc** 912:18 913:13,25
**AMERICA** 751:4
**amount** 793:21 909:6 935:14
**Andrews** 893:10
**and/or** 929:11 955:6
**Angel** 828:7,11
**Annie** 794:20 799:16 818:6,7
**answer** 771:14 839:7,8 857:25
868:14 876:22,25 883:18 917:18
918:1,3 925:3 929:24,25 963:5
**answered** 757:1 759:12 769:2,15
778:7,12,13,17 782:22 796:7
807:11 809:9 815:10 819:22
820:9 822:15 830:8,11 869:14
903:16 917:25,25 924:23 929:6
929:17 930:19 931:19 932:8,23
933:20 935:20
**answering** 918:1 929:25 930:6
940:25
**answers** 896:22
**antenna** 918:25
**anybody** 769:12 775:23 787:15
814:19 819:5,17 831:12 878:22
901:1
**apartment** 760:1 765:10 865:11
**apartments** 847:19 852:3,6 853:2
876:10
**apologize** 808:1 809:12 836:20
**Apparently** 836:11
**appear** 911:7,11 940:1,12
**APPEARANCES** 751:13
**appeared** 843:13 960:25 967:16
**appears** 920:9 925:12
**approach** 803:12 825:15 849:2
854:21 861:5 867:15 868:7
893:12 906:14 912:5 914:12
928:8 952:22 956:1
**approached** 870:2 896:15
**approaching** 849:6
**appropriate** 836:3 870:5 951:24
**approximate** 820:17
**approximately** 811:11,13 888:5,14
920:25 921:7 930:24 932:15
935:24 940:18 943:17
**approximation** 940:19
**April** 788:4
**area** 832:5,10,25 833:5 834:7
835:12 869:19 905:24 915:1
925:8,19,25 926:15 929:3 932:6
937:3,7,8 941:10 958:3,6 962:20
963:1,4,9
**areas** 949:9
**argue** 869:9
**argument** 836:24 959:5
**argumentative** 779:4 901:3
**arisen** 859:7
**Arizona** 947:12 953:13 954:9

**Arlington** 908:8
**armed** 871:13,21
**arrangement** 794:7
**arrest** 774:6 780:11 788:4,8,13
789:6,10,11 790:5,20 800:8
801:15 812:21 814:6 819:8
826:14 830:13 833:25 873:6
878:19,22 879:5,7,10,12,14
880:3,6,16 881:4 882:4 883:18
883:20,22
**arrested** 772:25 773:2,11,17,21
775:4,6 776:3,11 779:20 783:16
784:11 790:15 800:4,19,20
804:11,16,17 805:18,23 808:12
809:20 812:20 813:14 842:23
883:14,16 884:3 889:15 890:20
895:21
**Arresting** 877:24
**arrival** 861:10
**arrived** 823:22 874:10
**arrives** 892:23
**article** 850:16 852:15
**aside** 840:11 866:1 876:17 916:9
**asked** 757:1 759:12 761:15 769:2
769:15 772:1,2 778:7,12,17
782:22 796:7 802:24 805:5
806:18,25 807:2,4,11 809:8
815:10 816:12 819:22 820:9
821:21 822:15 824:12,16,24
827:22 830:8,10 831:3 837:8,8
839:2,10 840:2 844:25 860:22
866:15 868:9,9,13 871:15,16
881:13 885:6 893:24 898:13,17
900:8,25 902:1 903:16 904:5
939:13,24
**asking** 773:21 844:23 861:9 867:24
878:13 891:9 971:1
**asks** 865:22
**asleep** 797:2
**aspects** 877:21
**asserted** 885:6
**asserting** 867:25
**assigned** 888:6 958:17 959:15
960:11
**assist** 759:5 823:22,23 836:7 838:8
917:3
**assistant** 847:3,22
**Assisting** 847:24
**associated** 767:23 771:17 818:24
937:3 961:11 965:22 967:25
**assume** 761:19 948:15
**assumed** 760:7 763:23
**assuming** 922:18
**assure** 950:5
**attempt** 834:13
**attempted** 814:23 871:3,4
**attention** 817:9 917:2 922:25 968:4
**attorney** 831:13 833:18 910:5
**attorneys** 823:21 824:12 952:11
**AT&T** 823:15,16
**August** 916:4 964:4,23 966:14
967:22 968:7
**authentic** 955:16 959:7
**authenticate** 912:13 913:19
**authenticated** 910:4 919:8 955:6
**authenticating** 942:20 953:9 954:5
**authentication** 927:17 949:7 950:7
950:17 954:24 955:9
**author** 817:7,11
**authorized** 963:23
**automated** 948:11 949:6
**automatically** 851:18 965:17
**average** 939:3
**aware** 762:14 863:18 895:8,14
902:8
**awhile** 966:20
**A.F.P.D** 751:19
**a.m** 848:2 861:15 928:22 931:11
937:10 972:5,12
**A.U.S.A** 751:14,14

## B

**B** 954:14 955:21 958:12
**baby** 798:24
**back** 756:16 757:21,23,24 759:15
759:22,23 760:2,4 761:18 771:22
779:1,15 783:23 788:20 790:4
791:14 792:9 800:2,10,11,12
802:9 810:17 817:15 822:7

831:12 837:2 845:15,23 846:1
847:19 848:2 852:2,6 853:7
854:8,24 857:21 858:20 860:21
865:12,21 866:1,5,6 870:17
876:10 880:5 881:16 886:25
892:17,19 910:9 915:23 919:14
921:3 922:24 931:2 934:16 948:5
950:16 956:23
**background** 895:23 900:15
**Backpage** 889:24,25
**bad** 811:19
**bag** 788:9,10
**bail** 789:2 874:1
**bailed** 786:5,6 788:21,24 842:15
873:25
**banging** 844:21 876:19
**Barely** 968:17
**barking** 821:10
**based** 781:12 782:9 816:5 837:5
875:15 883:24 908:17 948:25
953:17
**bases** 953:16
**basic** 878:25 927:13 946:25
**basically** 873:24 882:4 889:3,13
892:18 912:21
**basis** 755:23
**bathroom** 858:3 872:13,22 880:22
**battery** 871:1,3,4
**Beach** 755:10 756:4 763:6 765:9,10
765:15,23 772:20 773:15,17
793:2 797:10,13,15 798:2 800:2
800:13,16,22 823:22 846:24
847:4,6,6,8,23 849:14 850:7
851:20 863:18 864:15 870:21,25
871:6 874:11 875:10,13,20 876:5
876:23 890:6 963:2
**bear** 755:4
**beat** 766:12,16 799:16,19 801:3
805:8 815:3 823:10 840:6
**beaten** 766:9 799:23,24 801:9
819:21
**beating** 797:17,18 799:5,12,23
800:7,12 801:4 805:3 829:15
903:21
**becoming** 870:14
**bed** 858:3 860:16
**beginning** 917:12 960:2
**begins** 917:16,17,18
**behalf** 883:6 948:15
**belief** 839:15 878:18,19
**believe** 759:1 763:17,22 779:14
799:12 802:2 803:6 809:8 816:14
816:19 832:20 833:11 840:19
843:16,20 861:9 866:8 871:18
878:4,16,23 884:15 904:21
921:20,21 927:9 936:2 941:4,12
949:19 952:18 964:19 966:24
970:9 971:12
**believed** 779:17,18 789:4 808:13
839:14 884:1
**believing** 779:13
**belong** 969:9 970:19 971:2
**belonged** 950:22
**belonging** 797:7
**beneath** 915:13 924:7
**benefit** 810:6
**Benitez** 916:2,12
**best** 915:17
**Betsy** 865:16,17,19
**better** 783:9 963:6
**beyond** 824:19,20 840:16 841:24
866:18 874 878:15
**big** 797:5 904:13 919:3
**bill** 909:11
**bind** 842:14
**binder** 954:21
**binders** 912:9
**biographical** 895:24
**birth** 890:21
**bit** 803:23 831:22 919:22 926:13,22
**black** 784:13,15,20,21,25 785:1
823:15 852:20 871:17
**block** 912:15 913:20
**blocking** 952:9
**blocks** 893:10
**blue** 784:17,17 882:5,11
**blur** 829:9,11 830:6 837:9,11,14
**body** 955:2 961:2,8 971:1
**bold** 912:13
**bond** 790:6 834:2 836:7 842:18,21

bonded 787:17,22 827:8,13 829:2
  830:14 833:13
bonding 838:8
bondsman 821:18,20
booked 785:18 809:20 832:2 833:3
  834:1 838:16
booking 832:5,9,25 833:5 834:7
  835:12
bookwork 847:24
Bosillo 752:19 907:11,14,18
  914:17 917:5 936:24 943:20
bottom 960:24 964:11 965:8
Boulevard 751:19,23
box 798:22
boxes 915:12,12
boyfriend 828:23
Boynton 758:22 963:8
brands 921:13
break 808:15,20 867:21 887:10
  906:17,18 943:22,23
breaks 858:11
Brief 904:2
Briefly 885:12 936:21
bring 754:12 809:2 845:20 891:4
  907:1 944:20
bringing 846:4
broker 946:19
brokered 951:4
brought 791:14
Broward 751:19,23 777:12,15,25
  778:10,15,22 779:7,14 781:2,4
  783:12 785:18 809:21 890:5
brown 852:17
bruises 805:5 898:6,13 899:16
  902:14,16,20,24 903:11
BSO 781:21 905:17
building 876:8 939:9
buildings 847:14 876:14 918:24
bull 821:12
bus 813:18
business 765:5 768:12 781:3,7
  848:11 849:15,17,20 850:18
  909:18 912:22 913:14 914:2
  946:9 953:19 954:11 959:8
businesses 760:8 763:24 787:25
busted 813:13
busy 861:24
button 917:17 940:24
buy 946:13
B-O-S-I-L-L-O 907:14

## C

CA 905:11
California 947:12 953:13 954:9
called 771:24 786:1,4,25 793:5
  802:18,19,20 814:17 818:25
  819:3 830:15 831:11 833:17
  841:4 844:12 901:19 905:10
  934:17 939:25 956:15 963:4
caller 918:8 923:5,13 936:5
calling 766:7 800:17 824:1 866:20
  917:20,20 918:10 919:16 923:13
  923:21 925:19,22,23 926:2,9
  934:25 940:10 942:7,24 943:2,14
calls 783:24 786:16,21,22 790:4
  798:9 801:23 807:5 810:12
  816:23 817:4 818:14 823:24
  840:23,24 841:2,8 848:22 853:14
  859:22 867:4 871:1 875:4 885:16
  887:11 889:10 907:6 917:3 918:8
  922:25 927:12 929:14,17 930:8
  930:23 933:4,10 936:4,24 940:7
  941:9 942:3,16 943:6 970:6
calm 891:4
calmly 906:15
camera 854:12
Canada 851:22
can't 774:17 780:8 783:22 785:12
  804:6 810:5 815:22 843:25
  873:25 874:1 875:18 885:17
  896:14 897:15 898:15,16 900:11
  925:3 937:17 955:12
capabilities 927:3,5
capital 908:11
captured 961:24 967:14
car 758:11 765:4,9,15 823:4
card 825:25 826:2,20,20 827:1
  851:8,9
care 814:22 909:16

carefully 782:18
carrier 908:20
cars 862:1
case 751:13 754:17,18,19,21 774:18
  808:22 822:12 831:13,15 833:17
  833:21 834:13 845:12 868:22,23
  880:10,14 894:21,22 895:1,6,8
  895:13,14 906:19 911:16 943:23
  955:7 959:12,13 963:2,8,15
cases 947:23 949:3
cat 798:18
categories 915:12 948:23 949:18
  951:22 963:12
category 947:5 949:10,19,21 950:3
  950:19 951:22 963:13 965:15
cats 798:21
caught 900:24
cause 769:9 838:3 878:4,6,12,14
  878:18 883:23
caused 837:11 868:25
cell 758:6,9 769:10 782:24 784:20
  784:21,23 843:10 908:20,22,25
Central 920:3,7
certain 909:6 910:24 944:14
Certainly 899:16 960:7
certainty 933:9
Change 858:3
charge 791:4 826:14 834:15 951:4
  951:5,6,10,12
charged 771:5 777:5 951:7,8
charges 776:16,21 951:3
Chavez 752:14 887:12,15,18
  894:17 904:5
check 827:3 828:24 848:7 900:15
  913:10 952:1
checking 847:24 848:6 936:8
checkouts 857:14,15
checks 849:18 851:2
check-in 861:15
child 888:10 891:17
children 855:23 888:7,9,11 889:7
  891:16 898:23 904:6,22
chit-chatting 893:3
choice 788:23 823:10 824:24,24
  827:18 843:10
choked 824:18 829:17
choose 759:10 812:14
chose 756:22 787:3 802:24 814:17
chosen 963:2
Chrissy 818:14
Cindy 752:5 846:10,13,18
circuit 940:23
circular 919:2
circumstances 869:11,16 939:2
cite 780:19
cities 946:11 951:3,7
City 870:10,11,15,21 951:4
claim 873:1
claimed 788:12,13,16
clarify 836:21
class 886:2
classes 963:13
classified 946:10,21
clean 760:15 858:3 859:20 865:2
  865:11
cleaned 859:13 864:24 865:6,10
clear 789:13,15 831:4 833:19
  896:24 943:4 954:14 955:21
  967:1
cleared 831:4,7
clerk 802:25
clerks 802:21
click 938:14
client 822:20 835:3 836:22 841:6
  842:5,6 889:5,11
clients 762:12 792:16 793:18,23
  794:2 818:19 827:22,25 840:24
  841:9
client's 839:4
clock 917:17,18 938:17
close 762:8 851:18 904:10 933:24
clothing 850:16 852:15
cocaine 755:16,18 822:5,6 872:11
  873:1,7,18,22,23 886:6,9,16
code 925:8,19,25 926:5 931:9,23
  932:6 934:21 937:3,7,8 941:10
  950:15
coffee 846:4
COHN 751:11
cold 885:18

colleague 928:6
collectively 954:15
color 784:24 852:19
column 918:12
columns 913:2 917:5,8 922:9
come 754:9,11 756:3 759:5,5,15
  762:3 780:6 781:9,13 783:22
  787:20 792:1 793:2 795:20
  800:10 802:2,13,18,20 811:1,14
  814:18 822:11 831:10 838:21
  846:1 848:7 853:9 855:19,21
  857:25 859:12 860:21 864:2,7,8
  864:9,12 871:15,16 881:16
  899:14 906:5 922:18 927:16
  968:11
comes 795:20 858:8 889:12 896:10
  916:16 932:6 957:10
comfortable 777:20
coming 774:21 801:21 823:25,25
  863:21,24 864:10,15 925:12
  926:14,20 934:3 949:5
commanded 815:25
commercial 792:12 815:1,5 819:17
  827:5 902:12
committed 878:4,17,19,23
common 888:22 921:17 954:1
  961:15
commonalties 953:5
commonalty 953:3,24 955:21
communicate 972:8
communicated 754:17 833:20
  860:4
communicating 828:8
communication 932:15 933:25
  935:25
companies 958:18
company 945:16 958:20
company's 945:21 946:4
complainant 869:6
complaint 863:25 864:1
complete 879:20 947:4 948:5
  950:17 971:18
completed 783:20 830:19
completely 911:13
completes 947:10
compliance 910:12
complicated 948:13
compliment 754:15
components 960:20
compound 776:23 844:8,9
computer 848:8 900:15 946:24
  952:8 955:24 956:3 957:4 958:3
  958:6,21 959:15 960:17 961:24
  962:2,4,6,7 967:18 969:9,13
  970:23 971:16,18,21
computers 956:25 958:18 971:16
  971:20,24
concede 958:9
concept 878:6
concern 835:10 859:7 869:3
concerned 833:5 834:4 891:24
concerning 799:1 954:20
concluded 870:6 956:6
concur 928:6
conduct 885:3,3 888:15
conducting 893:7
confer 801:11 822:20
conferred 838:6
confirm 916:15
confrontational 906:14
confused 922:25 923:17
confusing 926:22 928:6
conjunction 911:15
connect 841:5 971:16
connected 796:24 805:21 806:4
  823:24 942:3,16 946:24 952:8
  971:19
connecting 794:10,11
connection 815:16 869:23 938:24
  938:25 940:23,24
connections 807:20 815:18
consensual 814:4
consent 871:22 872:4,5 884:10
consented 765:1
consistent 781:11
constructive 873:19,21
contact 777:12 818:23 834:8
  836:16 838:10 864:2
contacted 895:13
contacting 844:6

contained 872:14 950:15 955:2
containing 872:11 913:3
contains 912:15 953:1,22
content 913:5,8 938:3 961:3
  965:15 968:19
contents 752:1 869:12 947:5 948:7
  951:23 966:10
contest 911:24
context 963:20
continue 754:25 809:6 814:25
  815:8 824:25 845:13 943:24
  972:11
CONTINUED 755:5
continuing 957:3
contracted 862:22
contracts 909:1,9
control 909:17
conversation 764:2,4 798:25
  820:20 828:6,7 830:15 873:11,16
  886:15,25 937:20 938:19,22
  942:1
conversations 764:10 841:9
converse 969:12
convey 874:2,3,5,7 876:18 881:20
  881:21
conveyed 874:5,7 881:17,18
  883:10
conveying 886:18
cooperate 815:2
cop 802:5,6,15,18 803:2 804:19,20
  808:7,8,10,10
copy 816:1,2,8,21 820:19 910:10
  910:11
corner 856:5 960:24
correctional 834:11
correctly 969:7
corroboration 901:17
cost 767:10 803:25
couch 769:21 840:8
couldn't 775:19 828:22 830:3
  843:20 856:16 940:9 966:7
counsel 754:6 780:6 809:1 832:22
  835:22 845:19 867:20,24 868:6
  906:25 912:9 928:15 936:24
  939:24 944:9
count 856:13,17
counting 856:14
countries 851:22
country 908:23 910:12
county 779:14 785:18 809:21
  832:2 890:6 892:19 908:8 963:2
couple 756:8 766:3 792:11 866:18
  922:25 931:24 941:9
couples 855:25
course 781:3,6 848:11 849:20
  909:18 916:24 953:18 954:11
  959:8
Courthouse 751:22
courtroom 754:13,20 808:23 809:3
  832:9 845:16,21 846:5 850:14
  852:13 906:20 907:2 943:25
  944:21 972:13
Court's 868:13
coverage 919:3
co-counsel 801:12 834:6
co-defendant 840:17
crack 755:16,18 788:10 795:19
  796:13 872:11 873:6,15,18,25
  874:4,8 880:19 886:6,8
Craig's 889:25 944:3,12,17 945:3
  945:17,18,25 946:9,10,13,14,15
  946:17,19,23 947:1,11,19 948:2
  948:6,8,11,24 949:3,13,16,22,25
  950:5 951:3,6,12,20,21,22,23,25
  952:6,9,12,14,19 953:1,3,12,15
  953:19,22,24 954:7,8,11 958:22
  958:24 959:7 960:8,9,11,14
  961:23 962:12,18,25 964:12,15
  965:8,10,13,17,17,22 967:14
  968:12,24 970:10,17 971:3,18
created 849:17 879:12 947:11
  957:8,22 961:9,25
creates 963:4
credentials 806:16
credit 851:9
crime 778:23 779:1,3 878:4,17,19
  878:23 902:8,11 903:8
crimes 882:19 889:7 891:16 904:6
criminal 859:8 864:7
criteria 953:17

**cross** 840:19 855:4,8 862:9,10
866:9 877:3,5 885:9 894:10,12
900:3 927:23 928:2 936:18 969:2
969:3
**cross-examination** 752:3,7,8,12
752:16,17,21,25 754:25 755:5
783:3 809:6 823:21 829:8 831:3
838:18 840:23 843:1,12 855:6
886:12 927:25
**cross-examine** 894:14
**crying** 844:24
**Culuffo** 809:22 845:20
**curative** 835:23 836:3
**currently** 865:18 888:6 949:13
951:3,8
**custodian** 781:4 907:21,24 908:4
909:13,16 910:15 944:3,11,17
945:23,25
**custody** 833:3 834:4 889:15
909:17
**customer** 793:1 801:20,21,23
802:5,6,7 803:3 804:20 808:8
945:21
**customers** 792:1,14 848:16 849:13
851:20,22 911:4
**cyber** 911:12
**C-H-A-V-E-Z** 887:18
**C.J** 754:24 755:7 809:5,20 823:2
824:13 825:18 829:14 831:3
833:16,18,20,21,23,24 834:4,5,7
834:9,11,13,15,17 836:7,15
838:8,11,15 839:7 845:6 867:21
867:24,25 868:10 871:18 872:3
872:15,22 873:6,15,20 874:2,5,8
874:10 876:6 879:8 881:2,5,21
882:18 883:12 884:15,16,18
886:16 887:3 896:13 897:1
901:19
**C.M** 782:13

**D**

**Dad** 775:18 811:25 843:22,24 844:1
844:3,7
**Daddy** 761:5,8,15 762:18 766:19
766:22 768:16 774:24 775:1
776:8 779:10,15 786:5,6,23
787:15 794:9 797:5,9 801:5,24
802:11 806:2 813:21 815:2
817:17 818:25 827:2 828:15,15
828:21,25 830:2,15,20 839:1,3
839:10 842:11 843:4 845:1
922:14,15,19
**Daddy's** 779:15 796:23
**Dade** 890:6
**dad's** 818:13 843:13
**daily** 857:10
**Dallas** 907:21 908:2,8,10,15 912:21
913:14 914:1,1 920:8
**dark** 856:4
**DARYL** 751:19
**data** 953:16
**database** 909:24 960:3,9
**date** 765:20 771:4,7 774:10 782:21
810:8 815:8 830:19,21 842:8,20
843:11 861:10 890:21 913:3
915:6,21,24 917:12 964:11 965:1
966:17
**dated** 854:24 924:20
**dates** 762:13 789:9 813:3 815:1
824:17 841:14,22 843:5,6 889:10
917:11 932:14
**dating** 854:8 866:1
**day** 755:9 761:11 762:22,24 774:21
774:25 775:1,3,4,4,6,7,9,9,10,12
775:15 777:8,10 785:14 788:13
793:15,17 796:6 798:1,4 812:24
820:15,19,23 821:3 844:21,22,22
857:11 858:20 861:17,19 862:5
877:18 880:1 882:14 893:18,19
893:22 895:3 917:13 920:18
930:11 943:17 944:18,23
**days** 772:22 774:7 788:19 792:11
810:22 824:9 911:2,7,9,12,13
936:1 966:1,2,3
**deadbolt** 797:2
**deal** 889:14 900:18
**dealers** 769:21
**dealing** 905:16 941:10
**dealt** 935:5

**December** 922:17
**decided** 779:3
**decisions** 948:25
**dee** 938:14,14,14
**defendant** 751:16,19 834:8,9 835:9
837:24 850:20 852:22 870:1
954:16 955:7
**defendants** 781:8 832:24 833:4
834:5 906:25 944:9
**Defendant's** 809:11
**Defender** 831:17
**defense** 753:6,7 779:23 782:7,11
808:18 824:12 826:13 835:22
867:24 936:24 939:24
**definitely** 797:24 860:17
**definitive** 939:1,2
**degree** 886:4 919:5,6
**delete** 911:6 940:5,6,7
**deleted** 964:15
**demeanor** 874:10
**denied** 838:4 882:8
**Dennis** 850:11 861:10
**deny** 896:16
**Department** 870:10 908:8
**departments** 890:7
**depend** 793:23
**depended** 793:18
**depending** 950:11
**depends** 857:14 891:12 939:4
949:10
**depict** 805:2 889:8
**deposit** 848:18,21,24
**deprive** 878:1
**deputies** 777:12 788:6 834:11
**Deputy** 777:15
**DERIC** 751:16
**derricks** 918:25
**describe** 823:14 847:6,18 848:5
851:5,17 874:10
**described** 797:18 801:18 810:1
823:18 824:17 852:3 879:7 896:2
**Description** 753:5
**deserved** 830:22
**designated** 919:11
**Desir's** 781:18,25 782:5,8 824:8
844:15 875:23
**desk** 802:22 848:19,19 858:21
**destination** 913:11 917:22 919:10
920:16
**Destiny** 968:23
**detail** 909:23 910:21 911:1,3,20
912:20 920:4
**details** 882:7
**detained** 883:17,20
**detective** 889:4 908:2
**determine** 774:14 878:3 882:21
900:15,16 901:9
**determined** 843:3 901:25
**determines** 949:4
**DeVega** 752:10 867:4,8,13 868:16
869:7 876:3 877:7 885:15
**DeVega's** 868:24
**developed** 953:16
**deviate** 765:18
**device** 901:15 936:8
**diagnose** 814:8
**dialed** 917:21 920:12
**dialing** 920:13
**dialogue** 896:22
**diamond** 783:23
**die** 827:16
**difference** 778:19 837:23
**different** 795:20,22,23 817:22
830:25 831:2 841:12,12,13 843:1
843:6,9 888:21 901:9,13 904:19
918:6 921:13 930:8 937:1,5,6
960:19,20,22 964:1
**digits** 934:18 939:19
**Dilaudid** 755:13 757:13,15 793:15
793:17 795:19,20 796:10 822:4
830:18 872:14 880:21
**Dilaudids** 793:22,23 794:3 796:6
**dire** 956:2,8,10 958:10
**direct** 752:6,11,15,20,24 799:16
802:3 817:9 824:16 846:21 870:7
879:7 880:18 884:16 887:21
895:16 901:4 907:16 945:14
969:10
**direction** 917:19
**directions** 904:19

**directly** 796:24 915:5 923:10
946:17
**director** 915:3 945:21
**disclosed** 804:20
**discuss** 808:22 845:12 906:19
943:23 959:12
**discussed** 754:17 932:14 935:24
**discussing** 938:8
**discussion** 780:7 782:6 818:2
832:19 838:5 946:11
**dismissed** 836:25
**dispatched** 869:19
**dispatcher** 869:8,14
**dispatchers** 870:24
**disposable** 927:13,14
**disregard** 839:12
**disrespected** 801:5,7
**distance** 787:9,13
**district** 751:1,1,12 910:5
**divided** 919:4
**DIVISION** 751:2
**divulge** 875:18,19
**document** 780:1,16 781:2,6,8,20
781:21 782:18 803:15,20 828:4
879:3,5,25 880:3,16 882:5,6
883:5 896:21 898:10 899:19
910:3 911:19 912:14,17,18 913:6
913:7,12,13,17,18,24,25 960:4
**documentation** 896:21,23
**documents** 910:20 911:25 912:2
914:22 952:16
**doesn't** 782:2 809:16 826:3 860:3
890:22 891:13,14 895:1 922:2
924:15 958:8 969:20,23
**dog** 821:9,9,11
**dogs** 798:21
**doing** 761:17,23,24 762:1 763:19
766:15,15 767:14,17 768:2 772:1
772:18 789:21,23 790:1 793:13
793:15,17 805:20 810:17 816:22
827:16 833:11 841:10 846:5
855:5 857:21 858:2 890:1 898:18
898:19,21 904:6 923:25 927:24
939:7 946:9 969:20,20
**Dookeran** 752:5 846:10,13,18,23
855:10 864:23 866:23
**door** 768:19 821:4,16 832:17,21
833:10 835:5 836:23,24 837:25
838:1 841:15 844:21 857:24
867:21 868:6,8,18 871:15 876:19
876:22,25 884:21
**doors** 851:17,18 876:9,13
**double** 869:9
**doubt** 930:8
**draft** 879:17
**drafted** 880:10,13
**drawn** 871:12
**drinks** 846:5
**driver's** 825:21,23 826:16,18
**dropped** 800:11
**drove** 813:21 842:10
**drug** 769:21 790:8,20 791:4 795:18
834:14
**drugs** 757:9,12,16,18,20 767:2,10
767:15 769:25 772:25 773:2,12
776:4 788:8,12,13,17 793:13
794:22,24 795:9,10,14,16 796:10
796:18 797:3,6,6,11 798:1,4,14
800:19 801:7,9 818:3 821:14,20
821:21 822:3 829:24 830:13,18
837:11 859:21 860:6,19 872:9,12
882:19,21 883:1,12,23 885:22
**dual** 926:6
**duplicate** 925:20 933:6
**duplication** 929:10 931:3
**duration** 917:15
**duties** 847:22 888:16
**duty** 870:19 946:5
**D-E-V-E-G-A** 867:13
**D-O-O-K-E-R-A-N** 846:18
**D.A** 908:11

**E**

**E** 751:23
**earlier** 805:3 828:16 854:18 914:21
926:24 942:19 964:20
**early** 937:9 944:25
**earring** 783:23
**easier** 845:25

**East** 751:19
**Eastern** 920:3,4 964:6,25 966:16
967:23 968:8
**eating** 846:2
**education** 957:3
**effect** 761:21 811:19 949:21
**efficiency** 790:25 791:5,15,22
792:14,16 793:2,11 794:8,10
796:24 798:20 800:21 813:9
821:4 847:20
**eight** 796:3,4 941:25 942:14
**either** 810:5 823:18 881:24 910:1
948:4 950:11 955:6,7
**electronically** 909:24
**eleven** 921:7
**elmo** 783:4 861:5 894:14
**email** 832:22 833:12,12 947:22,25
948:2,5,10 949:2 950:18 953:7
954:2 961:11 967:2 971:17
**emboldened** 912:14
**emergency** 814:11,13 815:13,19
**employ** 812:14
**encounter** 773:8,8
**encountered** 859:6,20
**encounters** 813:3
**enforcement** 812:16 833:6 876:15
876:18 889:4,17 890:5,13 893:3
898:7 899:2 900:14 903:4 908:5
945:22 946:5
**engage** 815:1,5,6 889:13 902:11
**engaged** 766:3 768:6 903:3
**engaging** 792:11 827:4 903:21
**Enrique** 781:3
**ensure** 948:2 951:23
**ensured** 950:23
**entails** 909:15
**enter** 950:9
**entered** 961:8 963:8,16,18
**entertained** 792:16
**entertainment** 949:13,16
**entire** 759:20
**entitled** 837:3
**entries** 923:9,18 925:20 926:13,14
926:15 928:21 933:3 942:11
943:1
**entry** 871:14 924:11 928:13,22
929:9,10 931:3,11,25 932:1,3
933:6,15 934:2,14 935:5,5,6
941:21 942:10 947:11 960:3
968:5
**environment** 906:14
**equipment** 888:24,25 896:3
**erased** 911:12
**ERGIO** 751:17
**erotic** 949:14,16,18,23,25 951:12
951:16,22 952:3 962:17 970:12
**errands** 756:4
**escape** 812:5,6,8,10 814:2,18,23
815:9 820:4 842:13
**escort** 762:6 763:7 764:6 837:19,21
950:19
**especially** 846:2
**ESQ** 751:16,17
**essence** 764:6
**essentially** 820:13 965:13
**establish** 835:16
**established** 816:14
**estimate** 772:14 804:4 811:9
**estimated** 772:9,11,13
**evening** 817:24 857:13 861:19
**event** 877:24 882:16
**events** 879:25 886:13
**eventually** 821:18 822:8
**everybody** 871:15,16
**evidence** 753:4 780:21 782:7,10,11
809:18 816:5 849:23 850:3
862:25 868:11,14,19 878:16
914:5,11 929:2 954:14 959:20
**exact** 866:17 885:17 901:11 938:1
**exactly** 762:10 769:24 829:23
940:11
**examination** 752:4,6,9,11,13,15,18
752:20,22,24 753:1 822:25
824:16 838:4 846:21 855:8
862:10 864:21 870:7 877:5 879:7
880:18 884:16 885:13 887:21
894:12 895:16 900:3 904:3
907:16 922:8 936:22 945:14
956:10 969:3 971:10
**examining** 815:13

976

example 857:18 859:8,21 860:6,16
939:24 940:1
excellent 972:4
exception 920:6
excess 942:17
exchange 815:6 818:19
excited 869:9,15
exclamation 968:17
exclusion 937:6,8
excuse 773:24 774:13 785:6 787:5
802:4 806:14 862:12 897:17,18
912:25
excused 845:8
exhibit 753:6,7,8 779:23 781:22,23
781:25 782:8,10,11,14 809:11,11
809:18 816:1,3,4 826:12,13
827:19 849:6,8,23 850:2,3 861:8
861:9 893:16 897:10 912:11,12
912:25 913:16 917:1,4 921:24
922:7 923:2 928:15,16,18 930:10
953:1,22 954:1,7,10 955:5
959:16,16 960:2 964:19 966:24
967:16
exhibits 753:3,9,10 862:25 863:1
912:7 914:9,11 959:19,24
exist 957:11
existed 962:18
experience 837:12 859:6 927:16
929:23 934:11 959:1 970:5
expert 958:2 959:7
expired 909:4
expires 911:9
explain 761:22 772:2 793:19,20
835:4 878:6,11 911:18 914:19,25
915:14,15 917:8 918:17,17
922:12 955:22 960:5
explained 761:25 763:7,14 772:3
890:8 922:9 928:7
explaining 768:11 832:22 875:20
explanatory 917:24
exploited 906:13
extra 927:6 949:4
eyes 898:4 904:19
e-mails 970:19

                    F
face 834:20 845:3
faces 834:9
face-to-face 764:4 772:23
fact 763:12 835:9,9,19 841:9 844:5
855:17 873:10 879:17 881:20
898:15,16 931:2 933:5,11 936:11
938:21 955:8 959:8 969:8
factors 954:1
facts 970:18
fair 774:3,18 811:11
fairly 946:25
false 868:1,4 969:24
familiar 921:20
families 855:23
family 760:20 761:2 824:1,5 825:12
844:6 855:12
far 915:14 932:14 933:24
fashion 972:8
fast 885:19
father 775:17 786:14 820:13,24
821:16 876:21
Father's 774:21,25 775:1,3,4,6,7,9
775:10,12,15 777:10
favors 833:11
FBI 790:10 806:10,11,12,16,16
807:9,17,20 809:8 812:14 888:1
888:3,4,17 890:4 891:2,5 893:6
898:22 902:5,9 905:21
feature 936:4
features 918:4,5,12 939:18 963:1
fed 767:8
Federal 751:22 833:21 850:8
861:21 902:8,11 903:8 910:2,4
910:13
fee 951:8
feel 777:18,20,21 808:4 817:24
824:10 826:10 843:11 846:6
901:15 965:14
feet 760:2
fell 797:2
felony 833:24 834:14 885:24 886:1
886:2,6
felt 825:6 827:17,17

female 806:12 872:1 905:19,20,23
females 759:16 889:8
Fernandez 751:17 752:7,21,25
855:5,9 859:16,18,25 860:2
861:5,7 862:8 866:14 927:24
928:3,8,10,16,20 930:2,4 936:16
954:16,19 955:1,4,14 956:1,7,9
956:11 958:9 959:10,21 969:4
970:11 971:5
field 950:8 956:24 961:8 963:3,12
964:11 965:7
fields 914:23,25 964:19
figure 811:22 892:1
fill 825:20,25 826:2,15,22
filled 815:24
filling 783:15
find 760:1 780:8 797:10 799:8
838:3 843:13 860:12,18 872:7,9
872:12 876:11 882:25 901:11
finds 840:20 860:6,8,15
fine 764:17 781:14 836:19
finger 941:12
fingerprint 901:14,17
finish 812:4 820:4 944:24 948:7
finished 807:25
Fire 793:4,10 802:19 817:17 818:25
828:3 829:15 832:13 840:24
842:9
firearm 860:12
first 755:9 756:1,21 761:11 762:25
765:22 766:3 767:20,22,23,24
768:2,7,9,10 770:6 771:4,7
772:18 773:7,8 785:14 797:14,20
805:18 812:21 824:8 827:4 828:6
830:13 842:20 854:16 857:15
868:8 869:9 887:19 888:19
890:11 898:3 917:12 918:13
923:4,18,24 928:21 931:11
933:15 954:20 960:3 965:2
967:21
fit 958:6
five 774:7 885:18 888:14 904:7
908:20 936:1 939:3 942:15,15,17
967:25
fives 826:5
five-day 936:25
fix 858:12
fixed 754:20
Fl 751:15,18,20,23
flagged 965:12
flagging 965:8 968:12
flags 965:16
flat 836:13
flip 921:19
floor 788:11 834:16,17,19 858:4
871:8
Florida 751:1,6 787:15 850:8 875:2
919:12,17 947:2,8,13 962:21,23
962:25
focus 888:8,9 889:7,8 891:16,18,20
891:21 898:23 899:8 903:4 905:8
909:10 917:2 968:4
focused 903:5,6 905:6
focuses 905:12
foggy 830:5
Folks 754:14 808:18 809:4 838:6
845:9,22 906:17 907:3 943:22
944:22 972:5
followed 880:14
following 761:13 933:13 934:2
967:25
follow-up 884:9
food 767:10,14 769:25
force 792:21 890:4 902:11 903:5
905:11 906:9
forced 805:14 807:2,10,18 894:4
903:3,19,20 905:2,4
forcing 805:19
forensic 956:25
forensics 956:3 957:4 958:3,6
forever 966:4,6
forget 770:16 829:14 830:5 837:10
837:21 865:15
form 776:3,21 783:13,15 784:3
844:10 947:4 963:3 971:18
format 960:20
formed 754:20
forms 776:16
Fort 890:5 905:17
forth 817:15 909:5

forums 946:11
forwarding 918:6 939:18
found 761:16 788:8,9 821:20 861:1
872:10,13,21 880:18 884:13
952:19 961:18
four 895:17 908:22 910:11,15
911:22 913:2 935:24 953:6 954:1
fourth 869:8 922:19
frame 763:2 910:7 940:19
FRANCIS 751:14
Francisco 947:2
free 787:14 947:22 950:24
fresh 808:21
friend 758:21 759:3
friends 840:8
front 848:18,19 858:21 911:19
Ft 751:2,6,20,23
full 822:4 876:16
function 957:25
functioning 919:14
functions 946:19
Funk 760:25 771:16,20 832:4,4
834:6
further 822:19,22 845:4 855:3
862:8 864:18 866:22 877:2 884:5
885:8 887:5 894:9 900:1 902:1
903:25 906:16 927:22 943:19
969:1

                    G
gap 942:14
garbled 937:17
gas 831:16
gatekeeper 919:9
general 855:13 856:5 882:3 948:24
955:14 957:15,19 958:1 970:16
generally 889:6 925:4 927:11,12
964:20
generate 851:2 896:20
generated 895:5 904:22,24 909:17
913:6,7
Genet 751:7 823:10 829:19 838:21
841:16 842:13 843:7 852:11,22
gentleman 872:19
Gentlemen 833:16
geographic 963:8
getithowyoulive676767@yahoo...
961:12
getmoney575757@yahoo.com
967:3
getting 767:2 769:11 790:4 808:12
810:24 813:13 815:24 841:5
948:25
gig 761:20
girl 764:22 860:15 893:17 900:18
900:24 904:21
girlfriend 775:20 872:1
girlfriend's 872:2
girls 806:25 817:17 891:19 893:17
896:19 905:2 906:9
give 768:18 795:25 830:18,21,21
840:11 848:9 851:3 896:19 902:4
911:24 916:19,20 950:3 963:5
968:21
given 757:13 769:10 771:1 785:7
785:13 810:12 811:13 815:22,23
830:24 834:1 858:20 922:21
giving 835:23
glad 870:4
go 761:18 770:21 771:14 776:1
777:16 778:25 779:15 780:2
781:17 787:25 788:16 793:3,7
796:4 797:1 801:20 803:9 808:21
810:17 812:4,18 813:15 814:8,25
817:20 820:3 821:22 823:15,16
824:13,21 826:12 829:3,13
837:10 856:9,21 857:8,19 868:25
873:25 874:1,2 875:10 877:11,14
882:2 883:17 892:16,17 895:16
901:2 909:1 910:17 915:23 918:2
932:3 933:15 934:14 940:5,7
942:21 947:1 948:4 949:4,7
952:4 960:3 964:19 968:3 970:4
970:10
goes 818:7 837:2 839:17 857:5
889:14 910:10,11 913:11 918:2
918:22 919:1,8 934:21 938:14
going 757:20,22 759:25 760:8
761:16,19,23,24,25 762:3,6,7,15

762:18 763:7,17,18,23 764:5,6,7
764:21 766:16 768:16,24 774:9
779:23 780:10 781:8,13 788:4
808:15,19,20 811:22 814:4,22,25
815:2,8,9 816:20 823:5 827:4
828:5 832:25,25 833:4 834:3,25
835:11 836:24 839:22 841:4
842:1,4,6,12 845:9,23 855:5
858:21,24 860:24,25 862:12,24
868:7,24 873:19,20 875:13 876:5
878:22 881:4,20 887:1 893:15
895:21 897:10 904:15 919:13
920:4 921:14 922:24 923:19
925:14 926:3 930:10 931:2
941:21 944:1 962:9 964:18 968:3
good 754:15,24 755:2,3,7,8 808:17
817:25 825:7 838:3 855:10,11
862:13,14 877:7,8 887:23,24
894:17,18 907:18,19 908:24,4,5
956:12,13
goods 963:7
gotten 771:22 906:1
Government 751:14 753:8,9,10
774:12 780:21 781:12 809:11,12
809:16 816:1,2,3,8 820:19
826:12 827:19 828:5 839:13
849:6,8,23,23 850:2,3 853:15
854:8 861:8,9 863:1 867:1,4
883:6 893:16 897:8,10 907:4
912:2,7,12,24,24,25 913:16
914:9,11,17 915:7 916:25 917:4
921:24 922:7 923:2 928:16 945:2
952:25 953:1,11,21,21 954:7,10
955:5,9 959:19 960:2,4 964:18
966:9,24,25 967:16
Government's 846:13 862:25
867:8 887:15 907:11 912:11
944:1 945:7 953:22
Granted 850:5
gratuity 911:4
greet 844:1,3
group 967:15,15
guess 869:13
guest 851:2,13 859:7 860:7 861:10
865:2
guests 850:25 856:21 857:1,18
864:23 866:20
gun 824:8,10 844:15,19,20 845:2
868:1,2,3 871:13 884:13
guns 871:12
guy 870:22 908:2
guys 800:10 865:17 939:22

                    H
ha 828:11
habeas 789:10 833:17,24 834:17
hadn't 764:13 766:4,12 769:7
775:13 788:15 792:20 797:7
798:13 831:11 842:19
hair 784:13,15
half 796:15 814:14 822:4 932:15
halfway 829:6
Hallandale 870:16
Hampton 801:25 803:17 842:2,4
893:10 895:17
hand 783:7 816:20 846:12 867:7
887:14 912:7 913:10 917:22
918:18,21,21 945:6 950:13,23
handle 870:5
hands 886:10
hang 754:3 793:6
happen 825:7
happened 772:2,3 773:14 774:15
803:16 804:13,14,14 808:5
832:23 841:21 880:5 951:18
964:10
happening 942:23
happens 891:1,3 966:2
hard 829:12 837:18
haven't 943:9
headquarters 910:20
hear 832:18 839:6 854:3 859:17
897:17,18 937:18 959:5 969:7
heard 831:11 839:13 840:12,18
843:12,24 944:10 954:17
hearing 775:25 814:23 833:23
834:13,14 843:17 892:12
hearings 812:4
hearsay 779:25 853:14 859:14,22

869:9,10 870:1 873:3,12 874:21
875:4,15 876:1 878:8 884:20,22
884:24,25 885:4
**held** 777:16 778:2,4,11,18 779:8
815:14 884:19 892:18,20 947:9
**Hello** 969:5,6
**help** 760:1 790:10 814:18 831:19
833:13 834:17 865:23 880:5
892:5 899:10,17
**helped** 789:15 806:8 903:22
**helping** 836:7
**helps** 915:15
**hesitate** 839:3
**hesitation** 840:1,4
**hey** 783:23 805:24 829:5 919:16
**hidden** 856:4
**high** 827:5,6,6 860:18
**highlight** 932:1
**highlighted** 928:13 929:10 942:11
**highlighter** 932:2
**highlights** 931:8
**highway** 850:8 861:21,22,24
**highways** 918:24
**hit** 769:5,6,7 917:16 939:6 940:7
**hold** 864:25
**holding** 783:2 821:9
**holds** 854:11
**Hollywood** 781:19,21 850:8 870:10
870:12,15,22 876:19
**home** 777:16 918:13,17,18 919:11
919:13,16,19 923:5,14,15,15,16
923:20,23,23 924:6,15 941:15,20
942:9,9,19
**homicide** 908:2,10
**Homing** 763:12
**honest** 836:1
**honor** 755:3 758:4 763:3 779:25
780:8 783:3 799:20 801:11
809:10 816:3 818:16 822:19,20
822:22,24 825:15 827:9 832:15
832:20 834:22 838:13 839:18
845:4 846:9,20 849:2,22 850:1,4
854:21 855:3 859:14 864:18,20
865:3 866:15,22 867:3,20 868:21
875:21 877:2 878:8 884:6 885:10
885:12 893:12 903:24 912:5
914:4,8,12,14 928:8 936:21
952:22 954:16,19 955:18 956:9
958:7,13 959:3,23 970:6 971:7
**HONORABLE** 751:11
**hop** 769:22
**hope** 811:3,4,14
**hoping** 759:4
**hopping** 840:8
**hospital** 813:15,17,20,24 814:1,4,7
814:8 816:18 819:9 820:12
**hotel** 756:16,21 757:15 758:21
759:10,18 761:10 802:12,21
804:22 851:2,7,14,25 852:1
853:4 855:12,12,16 856:25 857:2
857:3,22 858:22,25 859:6,20
861:21 862:19,22 864:3,7 888:22
889:12 893:6,9
**hour** 756:14 814:14 845:24 932:15
**hours** 756:8 762:22 812:22 814:14
818:2 846:2 854:11 862:5 891:13
893:1 917:14 932:18 964:9,15
965:1 968:10
**hour's** 935:25
**house** 765:10,24 790:22,24,25
791:22 796:19,20,22,23,24 797:1
798:4,18,20 799:3 813:23 821:7
829:6 840:5 847:20 876:22
**housekeeper** 862:20 865:2,11,14
865:19
**housekeeping** 864:25
**housing** 951:4,8
**Huh** 772:12
**human** 905:11
**hunch** 878:16
**hurt** 814:21 825:6
**hydromorphine** 872:14,21 873:7
885:24 886:8

**I**

**idea** 810:2 926:1 937:21 963:6
**ideal** 939:2
**identification** 753:4 849:7 909:2
936:5,12

**identified** 850:20 852:22 871:17
**identifying** 876:15 923:21
**identity** 969:15 971:3
**illegal** 872:9 890:23
**illicit** 841:8
**images** 966:3
**immaterial** 868:18
**immediately** 913:11 919:13 937:23
938:14,16
**implied** 836:6 836:5
**implies** 837:11
**implying** 834:22
**important** 879:20
**importantly** 837:12
**impossible** 942:10
**impression** 779:13 834:25 836:9
836:12 837:17
**inaction** 884:25 885:1
**inbetween** 932:1
**included** 856:12
**includes** 968:23
**including** 856:11
**incoming** 917:18 918:8 923:13
924:4 932:4,8 933:4,10 934:2,16
936:6,9 941:15
**incorporating** 875:25
**independent** 972:9
**indicate** 850:19
**indicated** 771:10 772:18 819:25
950:7 963:11 965:7
**indicates** 915:2 917:12 939:18
964:12
**indicating** 817:1
**indications** 939:17
**indicators** 962:24
**indictment** 774:11
**individual** 878:4 913:3,7 918:1,9
918:16 922:22 948:18 961:7
**individuals** 898:25 927:1 946:15
946:16
**inextricably** 868:21
**influence** 812:12 821:14
**inform** 833:6,18,20
**information** 754:18 825:14 848:8
869:4 879:20 890:21 891:12,13
891:15,18 892:8 895:23,24,24
896:19 900:21,22 902:2,4 909:19
909:23,23,25 910:3,7,21,22
911:1,20,21 912:15,19,20,20,21
913:4,21,22 914:21,24 915:7
916:15 947:20,21 948:25 956:14
960:8 970:13,14 971:3
**ingredients** 918:20
**initially** 776:5,7 873:1 900:8
**injuries** 805:2
**Inmate** 783:12
**Inn** 763:12 801:25 803:17 842:2,4
893:10 895:17
**input** 916:22
**inquire** 846:19 867:14 907:15
945:12 956:5
**inquiry** 956:4
**inside** 756:6,19,21 770:25 771:1
848:13,17 856:25 859:7
**installed** 853:10,12,21,25
**instance** 960:23
**instruct** 835:1
**instructed** 773:7 910:10
**instruction** 835:23 836:4
**instructions** 765:3 858:7 868:13
**insure** 838:10
**intake** 909:21
**Intensity** 754:4
**intensive** 877:18
**intent** 812:8
**intentionally** 770:16,18
**interact** 874:14,19 946:16
**interacting** 946:17,18
**interested** 903:8 915:9
**internally** 953:16
**internationally** 946:12
**internet** 889:6,20 927:3,5 946:24
952:4,8 956:17,22 957:7,8,11
958:5,18 960:25 961:3 965:9
968:11 971:13,14,15,19,21
**interrupted** 807:24
**intertwined** 868:22
**interview** 795:6 891:1,2 892:9,16
892:17,21 896:8,11,18 905:18
**interviewed** 771:20 890:24 896:11

896:13
**interviewing** 876:4 888:23
**interviews** 891:3,11 896:21 898:19
898:21
**intimidate** 766:24 768:9
**intimidated** 766:23 767:13,14,17
767:20,25 768:25 843:11
**introduce** 780:10 809:11
**introduced** 780:15 809:15 861:8
897:8
**invalidate** 931:4
**inventory** 763:12 784:3,5 809:13
**investigate** 864:7,13,16
**investigated** 868:16
**investigation** 877:21 895:4 899:8
902:5 903:1
**investigations** 879:3
**involved** 909:9
**involves** 946:5 948:9
**IP** 949:1 953:8 954:4 955:22,22,24
956:15,17 957:7,10,13,17,22,25
958:5,16,17 959:11,12,14,15
961:17,18,23,23 967:9,14 969:8
970:22 971:12,12,20,25
**irrational** 874:13
**irrelevant** 868:15,18
**isn't** 780:12 782:20 796:18 813:17
861:24 933:5 938:18 969:12
**isolated** 837:12
**issue** 837:5 896:18
**issued** 789:10,10 790:4 912:3
**it's** 884:22 901:14 910:9
**I'll** 780:9
**I'm** 759:24 762:21 764:21 765:11
766:25 776:17 780:5 799:22
797:15 803:6 817:23 820:2
826:13 854:4 878:12 900:6,25
922:18 951:19 962:3
**I've** 829:12

**J**

**jail** 775:10,13,15 777:7,8,10 779:14
785:18,20,23 786:12,19 787:17
788:3,3,5,6,14,16,19 789:18
790:15,20 791:4,11,14,18,23
792:10 794:6,7 806:8 809:21
810:10,13,21 812:19 813:12
821:23 830:16 832:2,5 834:1,3,6
834:20 835:16 836:6,8,15 838:8
838:15 873:23,25 878:17 892:19
**jailers** 779:14
**JAMES** 751:11
**January** 789:8,12
**jealous** 799:13
**Jean** 915:16,18,25 916:9,12
**Jessica** 752:10 867:8,13
**job** 760:1 761:24 762:1 878:3
901:3 909:15 910:19 951:3,7
963:7
**jobs** 760:7 908:1,3
**Joel** 916:2,12
**Johannes** 751:14 752:15,18,20,22
752:24 753:1 832:5 836:19 887:8
887:11,22 893:12,14 894:9 895:1
901:3 903:16 904:2,4 906:16
907:5,6,15,17 912:5,7,10 914:4
914:12,14,16 928:18 930:1
936:20,21,23 943:19 944:3 945:1
945:2,12,13,15 952:22,24 954:13
955:13,16 958:7,13,15 959:3,6
959:23 960:1 969:1 970:6 971:8
971:9,11
**john** 802:2 829:17 889:5
**johns** 824:25 825:2 827:23,25
955:2 971:1
**Johnson** 874:15,19,25 875:2,7,10
875:16,18,19,25 876:3,4
**join** 875:23
**judge** 751:12 757:1 759:12 769:2
769:15 778:7 779:4 781:1,14,23
782:7,22 783:9 796:7 803:12
807:6 808:17 816:6 819:22
833:23 835:1,13,17 840:16
859:15 861:5 866:8 868:2 870:3
873:3,12 877:4 884:21 894:13,24
897:17 899:24 900:1 901:5
903:25 914:7 945:13 958:10
**Judge's** 910:4
**July** 771:21 774:13,13 795:7 822:9

822:9 916:1,1,3,6 943:12,15
**June** 772:25 773:4,11,21 774:2,6,7
774:7,10,13,13,15,18 775:6
776:7 779:20 782:16 791:23
800:4,8,19,20 801:15 809:13
811:6,17 812:18,20 813:1,6
816:23 817:4,13,18,21 818:1,7
820:16,23 824:13 825:19 826:13
830:14 842:2 848:2 850:10,23
853:7 854:8,25 857:21 858:20
860:21 861:11,13 863:16,19,21
864:10,12 865:21 866:2 867:22
870:19 874:17 879:10 888:15,15
893:6,22 896:13 915:22 921:5
924:10 928:14,21 929:14 930:11
931:4,7 933:15 937:9 940:15
941:7 943:6
**jurisdictions** 910:13
**juror** 754:10
**jury** 751:11 754:12,13 808:23 809:2
809:3 833:11 834:23,24 835:2,6
836:10,13 837:17 839:11 844:18
845:16,20,21 847:7 848:5,16
866:1 870:9 871:10 878:7 882:1
888:19 890:18 906:20 907:1,2
911:18 914:19 915:20 917:8
943:25 944:20,21 957:10 960:6
961:17 972:13

**K**

**Kayla** 817:24 818:3,5,6 828:7,13
**keep** 770:13,15 781:3 829:12 833:6
834:11 845:14 848:11 849:15
906:19 911:3 918:1 927:19
943:24 972:11
**keeping** 779:16
**kept** 781:6 849:20 912:17,18
913:12,13,24,25 953:11 954:7,10
959:7
**key** 848:9 851:8,11 857:16 909:25
912:21 913:14 914:1,1
**keys** 851:3,5,13,15,15
**kicked** 939:17
**kidnapped** 778:16,18 779:4
**kidnappings** 888:9
**kill** 789:2 827:7,12 830:7
**killed** 815:3 825:6
**kind** 770:15 790:7 795:18 845:24
851:5 891:3
**kittens** 798:22,23,24 799:1,3
**knew** 760:11 786:25 788:16 797:10
799:5,10 805:16 806:4,7,25
833:7 839:1,1,9 894:2
**knock** 821:3 857:24
**knocked** 871:15 876:9,22
**knocking** 768:20 821:4 876:13
**knowing** 778:25
**knowledge** 853:17,18,20 957:7,12
957:15,16,19,20 958:22 970:17
970:19,22,25
**known** 762:20 768:22 811:8 874:14
921:25
**knows** 780:25
**Kyocera** 810:1,1 926:23
**K-y-o-c-e-r-a** 810:5 921:15

**L**

**lack** 885:3 955:14
**lady** 889:12,14 890:14,19,22
891:12,13 893:24
**laid** 898:3
**land** 848:14,17
**landmarks** 939:9
**lapsed** 768:3
**large** 913:19
**lasted** 929:19,21 930:21 931:21
932:12,25 933:4,22 934:22
935:11,22
**lastly** 922:7 943:5
**Lauderdale** 751:2,6,20,23 890:6
905:17
**laundry** 856:11,16,20,21,23,23
856:25
**law** 812:16 833:6 876:15,18 889:4
887:17 890:5,13 893:3 898:7
899:2 900:14 903:4 908:5 945:22
946:4
**lawyer** 868:14
**lawyers** 838:6

**lay** 839:19 869:15
**layman's** 967:17
**layout** 960:20
**leading** 824:3 827:9 830:9 886:21
**learn** 879:5 958:24
**learned** 827:4 832:24 833:2,4,16 834:3 879:2,3
**leave** 756:22,24,25 757:4,18 768:20 826:10 830:3 848:18,21 892:16,17 931:2 935:13 936:5 944:24
**leaves** 759:11 906:20 943:25 972:13
**leaving** 929:24 930:2,6 934:25
**led** 763:17,22
**left** 755:9 756:4,6,21 757:10,12,15 757:22 759:24,25 797:2 813:23 813:24 831:11 848:24 860:7 867:6 907:9 934:12,17,22 945:5 960:24
**legal** 842:14 884:23 910:3 968:17
**legally** 789:2 827:7,12 830:7
**legitimate** 956:4
**length** 917:15
**lengthy** 887:7
**leopard** 788:9 872:13 880:21
**letters** 912:13 913:20
**letting** 923:22 934:12
**let's** 754:12 761:18 774:6 802:6 811:11 816:22 826:12 831:22 833:12,14,14 836:3 887:9 907:1 911:5 914:17,25 944:20 947:7 960:2
**level** 957:3
**liaison** 946:4
**liberty** 878:1
**license** 825:21,23 826:16,18 827:11
**lie** 970:1
**lies** 970:4,10
**life** 829:13 837:10,13
**lights** 885:19,21
**limit** 849:1 926:16
**limited** 837:5
**line** 753:5,5 848:14,17 915:1 917:12 919:24 923:4,24 924:15 925:4 954:24 971:21
**lines** 924:5 925:10,17
**link** 835:20,20 869:23 955:12 959:10,12
**linked** 955:6 967:7
**list** 781:23 889:25 944:4,12,17 945:3,17,18 946:1,9,10,13,14,15 946:17,19,23 947:1,4,19 948:2,6 948:8,11 949:3,13,16,22,25 950:5 951:3,6,12,20,21,23,25 952:6,10,12,14,19 953:19,21 953:24 954:7,9,11 955:5 958:22 958:24 960:9,11,14 961:23 962:12,18,25 964:12,15 965:8,10 965:13,18,22 967:14 968:24 970:10,17 971:3,18
**listed** 941:13 955:9 959:16 960:10 962:9
**listen** 935:3 972:10
**listener** 869:21
**listings** 947:22 962:21
**lists** 953:23
**List's** 947:11 948:24 953:13 959:7 960:9 965:17 968:12
**little** 755:18 765:10 790:24 798:20 803:23 830:5 831:22 856:4 872:10 919:22 928:6 929:24 944:24 945:19
**live** 769:21 790:21 800:21 863:12 932:15 934:24 964:3
**lived** 791:15,22 794:10,11,17 798:7 863:15 866:5
**living** 765:23 791:5 793:1 794:7,8 798:4,12 866:5 907:20
**lobby** 802:13,15
**local** 890:4 903:4
**located** 796:18 893:10
**location** 869:1 955:25 957:18 962:2,23,24 963:4,7
**lock** 851:8 909:25 912:21 913:14 913:25 914:1
**locked** 793:11
**logged** 821:17
**logical** 834:16
**long** 756:10,11,24 762:20 768:2,22

787:9,13 792:9,10 811:8 812:19 814:13 846:2 850:23 865:14,17 870:11 877:9,16 885:15 887:8 888:4,13 891:11 892:10,24 902:9 904:5 907:22 908:13 910:24 922:15 927:19 933:4 938:25 944:18 945:18,25 964:8 965:4,25 968:9
**longer** 842:20 929:24
**look** 762:6 782:2,13,18 803:15 816:20 831:2 833:14 851:9 891:18 897:11 915:17,17 923:8 925:2,22 926:3 939:6,6 941:17 941:18 942:1 954:22
**looked** 876:8 903:2
**looking** 782:19 843:22 871:19 872:5 876:6 889:8 891:17 914:19 915:15 924:10 941:21 943:5 960:6
**looks** 889:17,20 934:13 942:15
**loop** 948:9
**loose** 754:3
**lost** 811:3,4
**lot** 802:12 824:12 889:24 890:7,8 904:11,15 970:4,10
**Lots** 862:1,3
**loud** 821:3
**low** 783:9
**lumping** 936:24
**lunch** 808:19 845:10,24 846:3 867:21

### M

**M** 968:18
**machine** 929:25 930:6
**Mack** 922:14,15,18
**Mackenley** 751:7 784:23 791:11,20 791:23 805:16,19,24 806:1 807:20 812:10 815:6 819:9,12 820:6 823:4,7,13 824:2,5,8 827:7 827:12 828:25 829:19,25 830:2,7 830:24 838:15,19 840:12 841:14 841:16,19,21 842:13 843:5,7,21 844:12,15 850:11,20 851:24 853:1 854:24 861:10 862:16 865:5 867:23 868:5 872:17 873:16 876:25 880:24 881:17 886:15 887:1
**Mackenley's** 865:11
**mad** 794:20)
**magistrate** 775:25 910:4
**maid** 857:10,16,24 858:2,5,8,21 859:3,6,12,19,23 860:4,5,12,15 860:18,21
**maids** 857:21
**mail** 918:2,2,7 934:12,19,20,21 939:17,18
**mails** 831:11
**main** 834:1,3,6 861:21 947:21 953:5
**maintain** 965:22
**maintained** 911:1,2 920:7 947:12 954:8
**maintenance** 858:11,12,14,24 860:25 861:1 862:19 865:21
**major** 908:20,22
**makeup** 788:9,10
**making** 790:17,18 865:24 886:20 886:23 903:21 920:14 927:1
**male** 806:12,13,15 871:17,18 905:19,21
**males** 871:13
**man** 771:7 824:17 830:6 858:17 860:25 861:1 865:21
**manager** 847:3,22 856:10
**manager's** 856:12,16
**mandated** 911:3
**manually** 940:5
**March** 922:16
**mark** 779:23
**marked** 753:4 781:18 862:24
**married** 790:8,9
**marshals** 834:2
**matter** 842:16 870:5 885:6 936:3
**matters** 754:1
**mattress** 880:19
**mattresses** 872:10
**ma'am** 758:6,13 759:24 771:14 783:7 825:16 846:11 849:4,6

851:2 852:23 854:2,22,24 867:5 867:16 870:23 871:21 872:8,10 872:16,18 873:17 874:6,9,16,18 875:12 876:19 877:1 886:3,7 887:4 907:19 908:6,16,18 909:7 909:14 910:23 911:14,17 912:23 914:18 917:7 918:14 919:23,25 920:11,20 921:4,6,23 922:4,8,11 922:20 923:3 924:13,17 937:13 937:16 938:2,4,12 939:15,23 940:17 941:4,8,11 943:10,13,18 945:19
**MDN** 915:2
**mean** 760:17 764:7 784:23 790:21 809:11 811:4 813:12 819:12 856:13 891:15 917:8 918:15 920:12 923:6 932:1 941:16 961:22 962:3 967:13,17 972:11
**means** 775:6,10 784:5 895:23 816:16 934:18 943:14 967:14 972:11
**meant** 762:15 815:4 819:17,20
**media** 972:10
**meet** 766:8 770:22 793:3,7 802:2,7 802:20 824:25 825:2 842:5 874:24 889:12
**meeting** 756:1 762:12 768:2 824:1 824:5,9 834:8 843:5 972:5
**meets** 890:13
**members** 844:18 848:5,16 871:10
**memory** 787:1 803:16 911:24
**men** 762:6 763:19 764:10 771:11 771:17 772:9,9 800:8 813:4 970:12
**mentally** 769:8,9 811:5
**mention** 765:4 782:4 850:16 852:15
**mentioned** 765:5 774:21 823:21 825:18 829:8 831:25 832:4 838:18 840:23 843:1,5,12,21 844:15 868:2,3 890:16 948:18 949:9 950:24 960:23
**mentioning** 774:10 868:4
**merits** 754:21
**message** 817:11 874:2,5,7 881:18 881:21 883:10 886:18 909:23 910:21 913:1,2,5 929:25 930:2,6 934:12,22,24,25 935:2,13 939:16 948:6,10,11 950:7,11,14,15 955:2
**messages** 781:12 817:7,7 827:19 828:4 843:2 911:2,4,5,6,10 920:6 920:6 921:25,25 939:13,20,22
**met** 755:10 761:1,11 766:4 768:5,5 768:10 773:6 774:2 797:13,20,22 823:7 827:2 834:7 894:19
**metal** 784:8,9
**method** 971:19
**methods** 901:9
**Metro** 909:17
**MetroPCS** 828:4 907:7,21,22 908:3 908:15,17,19,20,24 909:10,13 910:16,22 912:12,14,22,25 913:18,20 914:22 916:13 921:12 921:17 922:2,18 927:6 939:20
**Miami** 751:15 890:6,6 925:1,5,8 926:3,14
**Miami-Dade** 890:6
**Michael** 752:19 871:18 907:11,14
**microphone** 846:15 854:3
**mid** 943:17
**mike** 892:12
**Mike's** 919:16
**military** 917:14 930:13
**milligrams** 795:22,23,24 796:3,4
**mind** 770:13,15,18 774:15 815:17 829:13 837:19,20 839:5,17 845:14 846:4,5 899:22 906:19 918:1 943:24 972:11
**mine** 799:2
**minor** 892:9 895:4,5 900:18 901:16 904:22
**minors** 891:17,19 894:2 900:22 902:3 903:9
**minute** 808:20 924:23 931:21 932:9
**minutes** 846:2 885:18 891:14 892:9 906:22 909:12 917:14 920:25 929:21,23 930:5,21,24 931:5,24 932:12,25 933:22,24

935:22 940:18 942:2,2,15,15,17
**Miramar** 751:17,18
**misdemeanor** 833:25 834:13 885:25
**misinterpreted** 835:24 836:1
**missing** 754:10 825:18 835:20
**mistaken** 836:11
**mistreated** 824:25
**mistreating** 825:3
**misunderstood** 929:8
**mix** 948:22
**mobile** 920:11 915:3
**mom** 787:8 811:18,24 819:3 844:6 844:13 852:2 865:23
**moment** 758:4 763:3 765:8 780:8 799:20 801:11 818:16 822:20 899:24 903:24
**Monday** 787:23 848:1 967:22
**money** 763:19 764:11 766:3 767:10 767:23 768:3,7,18 770:6,24 771:1,8 772:10,10 773:8 776:13 794:22 795:1,9 800:8 801:4 803:7 804:7 813:4 815:6 826:5,7 826:9,22,24,25 827:5,14 841:7 970:13
**monitor** 951:20,21
**monitoring** 952:1
**month** 863:15,24 895:11 909:3,4 917:13 927:17
**monthly** 909:3
**months** 877:17,18,19 911:2
**mop** 858:4
**morning** 754:2,15,24 755:2,3,7,8 761:13 776:1 789:19 817:23 818:7 857:13 920:19 937:10 972:6,12
**motel** 755:10 772:20 773:15 790:22 791:2 798:5 846:24 847:4,6,9,14 847:23 848:13,13 850:7 851:17 851:25 852:4,7,9 853:2,4,6 856:4 863:13,19 866:3,6,13 870:21 874:11 875:11,14 876:5,14,14,23 mother 786:25 811:16 853:9
**motions** 833:2
**motive** 835:10
**move** 781:17 782:7 914:5 932:18 935:6 939:13
**moved** 868:20 932:2
**moves** 849:23 954:13
**moving** 904:15 912:24 913:16 966:24
**multiple** 943:1
**murder** 908:11
**Murrell** 831:16

### N

**name** 842:24 846:16,17 849:14 852:11 865:14,15,16 867:11,12 872:2,19 887:17,17,19 890:21 907:13,13 916:21 922:14,18,21 945:9,9 968:21,23
**names** 916:12
**narcotics** 829:3
**naturally** 898:18
**nature** 913:23
**NE** 751:15
**near** 765:15 772:19 811:16
**nearest** 918:23
**nearly** 838:1
**necessarily** 938:18
**need** 754:1 781:4 801:4,11 808:15 832:18 848:7,16,18 854:2 878:18 915:14 944:14 946:24 950:9,16
**needle** 822:4
**needs** 857:19 949:4
**never** 765:14,14 777:5 788:14 792:5 798:7,12 799:10 802:7 819:2 822:18 837:12 862:19,22 863:6 868:2 883:16 894:19 897:1
**Nevertheless** 785:17
**new** 853:9,12,20,24 941:2 943:7 954:4
**news** 972:10
**night** 755:25 756:21 760:4 761:1 762:25,25 768:5,6 818:2 896:16 897:14,23 898:6 912,21 902:15,18 903:1,9 905:2,14,16
**nights** 805:3 850:24

nine 945:19 958:23
nine-year 946:2
nonresponsive 860:19
noon 808:19 846:1 943:17
normal 889:11 909:18 942:23
  953:18 954:11 959:7
North 893:10
notes 880:19
numbering 856:9
numbers 787:16 911:21,22,23
  913:22 919:8 936:25 937:1,5,6
  949:9 952:17,18,20 954:22 955:4
  955:8,8,11 970:25 971:2
numerous 831:11
N/A 922:14,14

**O**

oath 754:25 809:5
object 776:22 779:25 839:11
objecting 955:19
objection 757:1 758:19 759:12
  769:2,15 778:12,17 780:18
  781:15 782:22 783:24 796:7
  798:9 807:5,11 809:14 815:10
  819:22 820:9 822:15 824:19,20
  827:9 830:8 832:15 835:23,25
  839:4,8,22 840:16 841:24 844:8
  844:9 849:24,25 850:1 853:14
  859:14,22 866:14 869:20 873:12
  873:13 874:21 875:4,15,23 878:8
  881:12 884:20 886:21 901:3
  903:10 914:6 930:1 954:19
  955:13,18 958:7 959:4 970:6
objects 954:16
observe 840:1,4
obtain 834:13
obtained 781:2 834:14
obviously 875:4 919:12 923:9
occasion 859:5,19
occasionally 866:2
occasions 844:16
occurred 879:10 882:4 925:20
occurring 774:18
odor 910:2
offense 774:11,12
offered 859:15 885:2
offering 959:6
offers 946:10,13,15
office 775:23 777:25 778:10,15,22
  779:7 781:2,4 805:19 856:11
  864:24 890:5 908:11 952:12
officer 780:23 812:16 825:20,25
  826:2,4,15,22 867:4 868:16
  869:7 870:9,11,14,16,17 876:3
  876:21 877:7,9,11 878:7 885:15
  887:6 889:4,17 890:13 899:2
  904:17
officers 806:5 842:23 871:12 898:7
  900:14
Official 751:22
Oh 780:5 937:16 941:6 942:14
old 810:24 846:25 899:12 968:14
once 754:15 757:15,16 785:9 789:1
  849:1 910:3,9 913:7 917:16,17
  919:7 938:15 947:10 950:10
ones 826:5 851:9 896:23 908:21,22
  918:6
online 946:10 947:4
on-the-job 958:25
open 768:19 797:2 836:24 837:25
  838:1 845:14 855:12,17 856:5,21
  868:8,19 906:19 943:24 948:6
  972:11
opened 832:17,20 833:10 835:5
  851:18 867:21 868:6 884:21
opening 836:23
operating 904:6
operation 800:5 888:16,19 893:7
  893:18 894:22 895:2,5 896:5
  901:8 904:13,13
operational 853:6
operations 888:21 890:9
opinion 839:19 970:13
opinions 754:20
opportunity 810:12 834:10
oppose 809:17
opposed 801:21
option 829:3 935:4 948:8
oral 872:5

order 804:13 835:16 836:6 848:17
  910:1,2,9 946:6 950:13 971:16
  971:17
original 952:19
originally 882:24
Oscar 833:18,22
outgoing 823:24 920:9,14 921:9
  923:18 924:2,11,22,25 928:24
  930:15 931:13 933:4,10,18 935:7
  935:18 938:15 942:18 943:14
outside 754:8 756:16 770:22
  787:17 788:3,5,6 793:3,7,8,9
  797:1 802:12 821:15 841:15
  854:12 884:23 918:13 919:11
  923:4 924:6,15 925:4 926:15
  941:15
outstanding 833:17,19,25
out-of-state 851:20
out-of-town 855:19
overheard 834:2
overrule 839:22
Overruled 758:20 769:16 782:23
  807:13 827:10 866:16 878:9
  901:6 930:3
owned 855:12 882:21,25 883:23
owner 858:6
ownership 788:12,16 882:9,18
  883:12 886:16
o'clock 817:23,24 818:1 921:7
  941:13

**P**

Pacific 964:5,24 966:15 967:23
  968:8
paddy 892:18
page 752:2 753:5,5 816:20 818:10
  828:4 917:2,3 919:21 923:2
  924:10 928:11,13 931:2,7 933:10
  933:13,14 943:5,12
pages 916:25 926:13 935:24
  954:20 971:17
paid 770:11,24 797:7 950:25
pair 784:17,17 890:4
Palm 797:10,13,15 963:2
paper 925:20 926:3 965:19
papers 965:19
parcel 868:23
parental 888:9
parents 847:4,16
parking 802:12
Parkway 751:17
part 767:12 771:2 840:1,4 868:23
  874:17 879:12 888:16 893:18
  898:10 916:25 946:5 964:18
  966:9
participated 765:14,15
particular 824:17 860:5 879:25
  880:10,14 888:6 889:23 901:13
  912:16 913:21 915:6,11 922:10
  954:21 956:2 957:7,14,18 960:11
parts 904:15
passes 959:17
patrol 908:10
Paul 915:18,18,24 916:9,13
PAULINE 751:21
pause 939:6
pay 762:7 797:6,11 909:1,3,4,6,8
  909:10 927:10 951:2
paying 767:4,6
payments 909:3
PCS 926:22
PD 890:6
people 771:15 775:16 777:16
  779:15 802:21 805:16,19 814:18
  818:23 843:1 847:24 856:2 862:3
  874:24 888:23 891:2,9 910:11
  916:14 927:16 946:16 963:6,17
  965:9 970:12
period 763:21 773:14 863:10 915:8
  922:13 927:19 946:2
permission 850:4 894:13 927:25
permit 838:4
person 739:19 849:18 850:12,14
  852:13 862:19 863:3,6,9 869:13
  871:22 874:12,14 878:1,16,17,19
  895:23 896:22 899:17,19 901:10
  901:19 909:22 916:22 925:22
  937:17 938:5 948:16 950:1,22,23
  957:14 961:11 963:16 968:21

969:16,20
personal 853:16,18,20 947:20
  963:13
persons 963:15
persons 888:11 909:19
person's 901:10
pertain 895:1 962:20
pertaining 754:19 910:24 913:21
  938:18,21 952:16 954:2
pertains 912:15 938:11 940:21
pets 798:20,21
pharmacy 815:24
phones 823:18 828:17 830:24
  831:1 908:25 921:12,15 927:13
  927:14,19 937:5
phonetic 912:19 913:13
photograph 898:1,6,12,14,16
  901:19 966:7
photographs 804:24 805:1,2 897:7
  897:9,14,16,23 965:19,22
photos 897:13
phrase 762:11
phrased 859:24
physically 947:9 955:23
physician 815:13,19
pick 785:21,24 786:1 787:20
  798:15
picks 916:3
picture 863:3 902:18
pictures 790:24 902:24 903:15
pie 919:3,5,6
pieces 919:5,6 947:21
pill 788:10 872:14,21,21,25
pimp 805:7
pink 882:6,10
pipe 755:18,22
pit 821:12
pitfalls 918:5
place 756:1 774:11,12 794:10,11
  797:17,17 799:23 800:7 811:19
  860:3,5 891:3 896:5 918:23
  933:11 942:1 946:16 947:2,8
  949:19 950:22
placed 951:16,17,18 952:1 954:2
  955:25 962:17,21 963:16 970:12
  970:16,17
places 889:10 896:18 947:7 960:22
placing 925:5,7 927:12 946:22
  949:1 969:18
Plaintiff 751:5
plan 811:24 812:1,3,6,14 814:2,19
  814:20,22,25 815:17 819:25
  820:1,1,3,5,8
Platform 901:14
please 754:12,14 755:4 763:20
  769:17 773:5 776:6 793:19 802:4
  804:18 807:14 809:2,4 846:14,16
  848:5 867:7,9,11 887:16,16
  907:12 909:15 911:18 914:19
  915:16 917:8 918:19 945:6,8,9
  960:5
point 758:13 760:11 761:4,8
  762:14,20 763:22 766:9 769:5,7
  769:12 771:10 773:6 777:19
  785:10 789:1 792:18,22,24
  794:19 804:4,24 806:10 808:16
  811:3,8,17,18 843:21 850:16
  852:15 860:9 882:25 900:17
  922:24 961:17,20
pointed 845:3 941:12
pointing 816:24 915:20
points 868:18
police 776:15 777:1,3 779:11,12
  800:21,22 802:25 805:21 806:5
  808:2 821:3 829:5 842:23 844:20
  863:21,24 864:2,3,7,12,15
  866:20 870:10,11,14,17 876:19
  877:9,11,14,16,21 878:7 879:2
  879:17,18,21,23 880:10,13 890:7
  908:8
pool 847:12
popular 889:24
population 939:8
pornography 888:10
portal 971:13
portion 825:20 961:4,6,7 966:10
pose 889:4
posing 802:5,6 803:2 808:7
position 815:15 847:2
positively 850:20 852:22

possession 827:20 828:17 829:2
  830:13 873:6,20,21 885:24 886:6
  886:8
possible 967:19 969:8,10,12 970:3
  972:1
Possibly 935:14
post 948:15 949:5 953:12 965:16
posted 792:5 961:12 964:4,11,15
  964:22,23 965:7 966:13,14
  967:21,22 968:1,6,7
poster 953:6 961:24
posting 792:3,7 947:4,10 949:11
  950:6 951:18 955:23 960:10,11
  960:23 961:2,8 963:3 971:18
posts 953:2,4,23,25 954:2,3,4,4,6
  966:25
potentially 901:16
Powell 752:23 945:3,4,7,11,16
  956:12 958:16 960:2 969:5
  971:12 972:3
practice 879:14
preceded 939:19
precedes 934:18
precise 963:6
predicate 869:15 955:15
preference 950:12
prejudicial 868:15
preliminary 957:12
premises 858:14,15,16
prepare 780:16
prepared 780:23
prepares 946:7
prescription 815:21,22,24
present 754:6 809:1 841:16 845:19
  848:7 906:25 944:9
presented 950:6,8
press 776:16,21
presumably 936:8
pretrial 833:2
pretty 904:13
prevent 808:12
prevented 952:9
previous 860:9 954:1 967:16
price 963:14
prices 841:12,13
primarily 954:19
primary 847:22 869:3 946:4
print 788:9
prior 758:14 773:21 788:14 797:22
  799:5,12 908:5 951:18 952:1
  966:17
probable 878:3,6,12,14,18 883:22
probably 838:25 887:8 904:10
  939:3
problem 797:5 892:1 911:24
procedure 857:24 860:3,5
proceed 754:7,23 838:12 947:3
  959:22
proceeded 859:19 950:10
proceeding 939:14
Proceedings 751:11 867:17 954:18
process 842:17 848:6 892:23
  946:25 947:6,10 948:4,7,9,12
  949:7 950:6,8,17 951:9 961:8,20
processed 834:6 895:21
processing 889:1 890:16,19,20
  892:18 895:20,23 897:15,19,24
  900:9,14 905:24
products 946:14
prohibited 965:15
prominent 918:6
promise 831:19
promised 943:22
pronounce 810:5
proper 869:15
properties 847:7
property 780:11,22 783:12 823:18
  825:19 826:12 828:18 863:12,13
  865:23
prosecutor 833:20 834:12,14,23
  895:13
prostitute 762:15,18 764:17 765:19
  765:23 769:14,19 770:3 805:14
  807:10,18 810:19 823:5
prostituted 894:2,5
prostituting 762:4 764:7,13 837:15
  837:16 901:2
prostitution 800:20 819:8 826:14
  834:1,15 863:18 864:13,16 889:5
  889:11 891:17,17,19 892:9 903:3

903:5,9,21
**prostitutions** 889:6
**protect** 899:4,14
**protocol** 898:10 956:17,22 971:14
971:22
**proves** 835:10
**provide** 849:13 854:7 879:20
908:22 909:11,21 912:2 918:9
947:20,22 948:19 950:1 958:18
**provided** 858:7 909:19 910:7
958:20
**provides** 908:24
**providing** 927:17
**public** 831:17 855:13 856:5
**publish** 850:4 914:14
**published** 780:3
**pull** 915:8 953:17
**pulled** 804:19
**pulling** 910:20
**punch** 913:8,10 917:16
**punched** 917:21
**punches** 913:3
**punching** 913:4
**punctuality** 754:16
**punished** 844:6
**purchase** 909:2,21 922:23 927:1
927:16
**purchasing** 946:20
**purged** 966:4,6
**purported** 968:13
**purpose** 838:7 842:1 875:13
879:25 882:23 885:5 886:12
919:15
**purposes** 879:23 880:8
**purse** 821:20,21 822:3 872:13,24
872:25 880:21
**push** 938:15,16
**pushing** 940:24
**put** 793:22 829:5 835:15 837:24
848:8 881:8 882:1 883:8 895:24
900:8 903:19 916:21 950:16
963:23 971:21
**putting** 971:23
**P-O-W-E-L-L** 945:11
**p.m** 845:17 848:3 921:7 930:13
932:19 935:16 964:5,24 966:16
967:23,23 972:14

## Q

**QCP** 901:14
**qualified** 958:2
**quarter** 845:11
**quarters** 856:12
**question** 768:4 771:14 773:5
776:22 778:13 781:8 785:23
815:18 816:12 817:6 837:9 839:6
839:7 844:8 859:17,24 860:9
864:6 868:9,13 881:13 894:23
901:5 915:6 959:17
**questioning** 835:4,18
**questions** 806:18 822:19,22
824:12 845:5 855:3 860:24 861:9
877:2 884:5 885:8,10 887:5
891:9 893:25 894:9 897:8,11
898:13,17 902:1 903:25 906:7,16
927:22 943:19 958:11 971:6
**quick** 823:2 901:14
**quiet** 874:12
**quite** 761:20 926:13
**quote** 969:8

## R

**raining** 882:13
**raise** 846:11 867:7 887:13 945:6
**Ramash** 794:25 795:7
**range** 925:18
**rape** 776:4,7,8
**raped** 777:1
**rationally** 906:15
**reach** 849:1
**reached** 871:6 917:23 918:25
920:15
**reaching** 844:5,7
**read** 833:12,14 834:16 924:2,5
972:10
**ready** 754:7,23 944:19
**real** 961:6
**realistically** 923:25
**realized** 791:9 806:10

**really** 756:15 762:23 770:12,23
771:15 779:19 795:15 803:11
804:6 817:24 819:20 835:14
832:6 893:5 903:15 909:10
**rear** 876:13,23
**reason** 774:10 783:22 799:12 806:7
832:23 835:7,16 840:9,10 941:20
965:14 970:9
**reasonable** 878:15,18
**recall** 772:8 774:17 785:3 794:25
797:5,9 801:16 808:18 809:23
815:24 863:6,9,15 864:15 866:12
871:5 893:6,21 897:2,3 900:11
903:11,14,15 905:1 911:22
**receipt** 780:11,22,24 825:19 826:12
849:11,12,13,18 851:3 854:18,24
863:10 866:1
**receipts** 823:19 828:18 848:11
**receive** 869:4 917:17 948:5,10
950:13,13 952:11 971:17
**received** 753:4 756:18,19 782:10
782:11 805:3 809:17,18 850:2,3
869:13 871:1,22 874:20 885:16
910:3 914:10,11 957:6 959:19
**receiver** 940:25
**receives** 965:16
**receiving** 922:2 925:19
**recess** 808:19,24 845:10,17 846:1
906:21,23 944:7 972:5,12
**recessed** 972:14
**recognize** 780:17 818:10 821:15
849:8,12 862:16 863:2,3,8
893:17 912:13 913:19
**recollection** 803:22
**reconvene** 845:11
**record** 754:5,22 780:7 782:5
808:25 832:19 836:5 845:18
846:17 849:15,17 850:19,21
852:21,23 867:12 887:17 906:24
907:13 911:20 912:16,22 913:15
914:2 917:4 944:8 945:10 947:10
954:14 960:21
**recorded** 909:24 920:6
**records** 823:23 828:24 908:4
909:13,16,17 910:15 911:1,3
915:8 920:5 944:3 945:23,25
946:6,7 952:19 953:1,12,14,15
953:17,18,22 954:8 955:5 958:23
**record's** 907:21,24 944:11,17
**recovered** 895:4
**recross** 834:7 838:4
**redirect** 752:4,9,13,18,22 753:1
822:23,25 837:6 864:19,21
885:11,13 904:1,3 936:20,22
971:8,10
**reference** 863:25 869:23,25
**referred** 913:1
**reflect** 754:5,22 808:25 845:18
850:21 852:21,23 906:24 944:8
**reflected** 863:10 917:13,14 918:3
920:5
**refresh** 803:16,22
**regard** 836:24 928:21
**regarding** 754:18 863:25 869:20
**regards** 956:25 957:22,25
**Regino** 752:14 887:12,15,18
**register** 851:13
**registration** 802:22
**regular** 755:23 781:3,6 845:24
848:11 849:15,20 851:6,8 921:22
**rehab** 760:14 790:2
**relate** 875:24
**relates** 774:17
**relations** 945:22
**relationship** 772:16
**relatively** 918:21 927:15
**released** 790:19 792:10 813:12
**relevance** 758:19 832:15 834:19
901:3 955:13,18
**relevant** 832:16 839:15 885:5
**reluctant** 902:4
**remain** 834:3 846:11 867:7 887:13
**Rembert** 751:7,19 754:5 761:20,25
762:3,24 763:1,6,18 764:5,14
765:3,17,17,18,23 766:4,12,20
772:17,19,23 773:4,19,20,22
774:2 791:17,20 792:18,21
794:17 797:13,20,24 798:1,15,25
799:6,13,24 800:10,12,15,20
801:3 809:1 813:10,22 823:10

**829**:19 834:2,9,12,20,20 835:5
835:19 836:16,16 838:11,22
839:9,9 840:1,4,11 841:16
842:13 843:7 845:19 852:11,22
852:25 862:15,16 863:12
**remind** 754:24 809:5
**removed** 949:3 964:12 965:8,14,17
966:3 968:12
**rent** 767:4,6,10,15 769:25 852:6
855:15 866:2,6
**rented** 852:2,9 871:23,24
**renter** 850:10
**renting** 866:12 871:22
**rents** 852:2
**repairs** 865:24
**repeat** 769:17 802:4 804:18 825:1
864:6
**repeated** 837:13 844:24
**rephrase** 763:20 767:16 773:5
775:22 776:6 807:14 860:1 933:8
**replaced** 949:20
**report** 780:20 860:21 879:12,18,21
879:23 880:10,13 881:8,11,13,24
882:2,3,8 883:9 886:13 894:21
894:24 895:3,5,25 896:20 904:22
904:24
**reported** 751:21 972:9
**Reporter** 751:22 810:6
**reports** 780:21 885:18 951:25
**representation** 781:12
**representations** 782:9 816:5
**representative** 907:7
**represented** 754:6 809:1 845:19
906:25 944:9
**representing** 862:15
**represents** 831:15 960:8,10 963:14
965:9 968:4 982:4
**request** 833:23 838:4 865:3,5
915:8 952:16
**requested** 834:11 917:11
**requester** 946:8
**requesting** 910:10 911:20 915:7
**requests** 946:5
**require** 962:12
**required** 948:23 949:6,10 950:8
**requires** 858:2
**requisite** 965:16
**rescued** 820:13,15,24
**research** 845:13 889:5 972:9
**reserved** 874:12
**reside** 853:2
**residing** 852:6
**respect** 789:6 902:5 922:10 923:4
953:5 964:22
**respectful** 768:20
**respective** 944:9
**respond** 867:19 870:21 885:15,19
885:21 948:11 952:14
**responded** 871:5,10,19,21
**responding** 870:25 946:5
**response** 807:25 837:9 869:2
875:24 885:20 901:4 912:2
**responses** 754:23
**responsibilities** 888:16
**responsible** 909:16
**responsive** 881:12
**rest** 859:17
**result** 913:19
**retained** 953:12 960:8,14
**retired** 808:23 845:16 908:2
**retrievable** 909:25 910:1,22
**retrieve** 935:2 939:22 953:15
959:23
**retrieved** 966:5
**retrieving** 910:20
**return** 959:3
**returned** 754:13 809:3
**returns** 845:21 907:2 944:21 946:7
**review** 965:18
**reviewed** 803:20 843:2 967:10
**rights** 879:5
**ring** 934:12
**rings** 784:8,9
**robbed** 777:3
**robbery** 776:13 777:5 863:25 864:1
867:22,25 868:4,5,10,11,15,17
869:3,20,20 871:2,13,13,21
872:6
**rocks** 796:14
**Rojas** 781:3

**rolls** 918:7
**Romash** 771:16,20
**rooms** 847:10 848:13,17 851:17
852:2,3,6,9 856:7,10,13,16 857:5
857:6,8,9,16,21 859:3 866:2,6
876:9 888:23 890:8 895:17
**ROR** 790:19 834:15
**roughly** 966:1 966:17
**router** 971:24,25
**routing** 919:18 923:14 942:19
**row** 918:13
**RPR-CM** 751:21
**Rudy** 831:16
**ruining** 814:20,20
**rule** 780:19 839:7
**rules** 768:11,13,21 769:10 773:7
840:11,11,16 880:14
**rulings** 944:15
**run** 756:4 833:5 834:5 835:9 836:16
**running** 938:17
**runs** 848:24
**R-E-G-I-N-O** 887:20

## S

**s** 833:18,20,23,24 834:13 836:7
867:21 874:10 908:11
**safe** 834:7
**safety** 825:8,10 833:7 835:8,11
**sale** 963:13,14
**San** 947:2
**Saturday** 848:1
**saw** 772:23 790:11,12,24 793:24
823:24 832:4,13,14 834:9,19
844:18,20 859:23 901:20,20
902:14,24
**saying** 764:1 770:15 774:25 776:16
797:12 817:13 821:14 837:3
865:9 876:17,19 897:1 899:16
901:25
**says** 784:16,20 810:7 849:17
850:11 918:13 923:4 924:11
928:22 934:16 941:9,15,23 942:9
942:11 946:13 961:2
**Scared** 824:11
**scene** 904:17
**schedule** 847:25
**scheduled** 833:23
**sciences** 956:25
**scope** 824:19,20 840:16 866:8,14
**screen** 915:19,19 950:7,17 961:19
961:19
**scroll** 923:12 934:16
**search** 872:4 884:10 910:6 913:21
915:2,4,5,6,15 917:9,11 946:6
**searched** 890:22 922:13
**seated** 754:14 809:4 830:6 845:22
846:14 867:9 887:16 907:3,12
944:22 945:8
**Seattle** 947:2
**second** 762:22,24 764:4 775:20
786:16,17,18,23 810:21 854:16
854:17,19 869:10 871:8 890:16
931:3 934:13 941:13,17 942:14
944:13 955:1 964:18
**secondly** 868:9
**seconds** 917:15 920:10 924:24
929:19,21,24 930:5,21 931:5,21
932:12,25 933:22 934:9,11,22
935:11,22 937:12 939:3,10
940:18 941:25 942:2,2 964:24
966:15 967:23 968:8
**secretarial** 760:18
**secretary** 760:8 761:19 763:17,23
764:6
**section** 908:12 938:18 949:14,17
951:13,17 952:3 962:17
**secure** 912:19 953:16
**Security** 890:22
**see** 766:1 772:19 773:19,20 777:16
785:16 788:5 793:6 794:2 798:6
798:8 810:3,4 816:22,23 817:2
819:17 824:8 825:16 826:20 826:4
826:5,15,17,22 828:5,8 832:9
836:22 838:15 844:22 845:15
850:14 852:13 869:17 876:9
900:22 902:16,20 903:2,14
914:22,23 915:2,12,21 916:12
917:6,9,11 918:13,23 919:22
920:10 921:5 923:12 924:12

signal 918:22,22 919:1
signature 780:17 910:4
signed 776:3,16 783:20
significance 884:23
significant 774:17 877:24 887:1
signing 776:20 783:17,18
sign-in 956:2
silver 784:8,9,25 785:1 823:15
simple 927:15 946:25 971:23
simply 838:10 903:19 967:14
single 960:9
sink 872:13
sir 839:21 877:8,13,15,20,23,25
878:5 879:11,13,19 880:2 881:1
884:12 887:13 903:19 904:11,19
907:8,10,20 912:11 913:17,24
915:16 919:21 920:10 921:10,12
921:24 922:7 924:10 925:25
926:22 928:4,12 929:4,16 930:12
930:16,25 931:9,12,16,18,20,22
932:11,13,20,22 933:4,17 934:10
936:16 940:15 941:3,7,13 942:4
942:23 943:11,19 945:16 947:17
952:25 956:14,23 960:5 962:2
963:20 966:9,24 967:21 970:8
sirens 885:19,21
site 947:1 951:24 965:10
sites 889:23,24 962:25
sits 884:6
sitting 841:15 893:21
situated 755:4 790:8
situation 798:14 806:18 892:3
894:7
six 877:17,18,19 911:2 919:4,5,6
920:25 953:22,24 954:3,3,4,5,6
966:25
size 795:21,24,25
sizes 790:20
skills 760:18
Skip 932:3
slap 829:20 840:2
slapped 792:19,24 824:18 829:17
slapping 825:2 829:22
slash 791:22
sleeping 799:13
slept 772:10 841:16,19
small 847:9 935:14
smart 845:13
smoke 755:18
smoked 755:16
SMS 913:1 921:25
snickered 834:9
Snyder 833:18,22
Social 890:21
soft 846:5
software 948:24
sole 891:18,20,21
somebody 758:13 759:9 768:19
783:20 785:20,24 792:7 797:6,7
797:10 811:1,14 852:11 860:18
877:24 879:14 901:15,20,25
912:14 903:20 925:23 935:2
960:17 965:19 970:1
soon 761:24
sorry 759:23,24 763:20 776:17
780:5 790:23 797:25 799:3
805:25 817:5,23 820:7 825:1
826:13 828:10,11 854:4 864:6
872:24 878:12 892:12 899:7
900:6 928:19 941:13
sort 865:24 888:24 918:24 947:20
948:21 949:5
sorts 893:24
sound 755:11
source 889:20 913:3,11
Sousa 869:5,8 871:18 872:19
South 850:7 947:2 962:21,23,25
SOUTHERN 751:1
space 852:2,2 911:12
spam 949:6
span 936:1,25
Spanish 871:18
speak 762:24,25 763:1 768:13
834:10 854:2 869:8 872:15,17,19
875:7 896:20 897:15 942:23
972:7
speaking 875:10 917:10 938:6
special 833:11 887:11 904:5 918:4
918:5,12 939:17
specialized 956:24 957:6

specific 882:6,7,16,23 948:23
953:17 957:12,15,19 958:18,21
959:15 962:4,6,7,23,24 963:4,4
specifically 837:8 883:7 888:15
895:3 896:14 905:1
specifics 803:10
specify 761:5
speculation 783:24 798:9 807:5
859:23 930:1 958:8 970:7
spell 846:16 867:11 887:17,19
907:13 913:9 921:14 945:9
spend 777:7 812:22
spent 760:4 768:6 788:19
spoke 763:16 765:17 771:22,24
806:11,12 834:12 880:24 881:2
884:15,16,18 896:16 897:1
914:21 942:19
spoken 768:14 897:5
spot 901:17
squad 890:4 905:11,12,14
staff 856:24,25 857:5,8 858:12,14
858:21,24 859:12 860:4 864:24
946:7 953:15 965:18
stand 867:6 899:22 907:9 945:5
972:12
standard 879:14 920:7 924:22
927:8,9,13
standing 846:11 867:7 887:13
stands 956:19 971:12
start 856:13,14 914:17 923:10
928:11 938:13 944:18
started 765:22 772:18 773:3,6
785:10 791:4 792:9,11 804:2,9
907:25
starting 912:11 952:25 960:5
starts 931:7 938:15
state 833:17,20 834:15 839:4,17
846:16 867:11 887:16 910:1,13
915:6 933:9 945:9 965:7
stated 881:17 885:6
statement 774:18 869:10,10
883:25
States 751:1,4,12,22 887:11 907:6
914:5 951:5 952:11 954:13
957:21,24 962:20
station 776:15
status 917:24 918:4
stay 759:10 794:11 823:10 850:23
855:23,25 856:2 964:8 965:4
966:20 968:9
stayed 757:6 759:20 769:24 851:25
863:12 966:22 968:10
staying 794:15 800:16 852:1
stealing 776:13 794:22,22,23,24
795:1 801:9
step 845:7 866:23 867:5 887:6
907:8 943:21 945:4 949:4 950:10
972:3
steps 880:3 947:3 948:5
sticks 774:23
sting 800:4,20 813:13,14 888:16,19
888:21 890:8 893:7,18 896:5,10
900:24 904:13
stings 904:9
STIPES 751:21
stole 798:4
store 909:19,20 922:22 939:20
stored 909:25 910:24
story 899:6
street 751:15 855:17
stretch 807:1 862:3
strep 814:8
strongest 918:22
structures 939:9
studies 957:2
study 934:13
stuff 820:4 883:5
sub 963:1
submit 929:2 947:6 961:25
submitted 961:7
subpoena 910:1,2,12 911:5,9
912:3 946:6 952:11,14,16,19
subpoenas 911:15
subscriber 909:20 912:12,20
913:18,22 914:21 916:15 926:25
subscribers 922:12
subscriber's 922:14
subset 951:7
substance 869:16
subtract 926:12,14

suggest 836:13 868:16
suggested 901:20
suit 850:18
Suite 751:15,17,20
summarize 793:25 883:8
summary 882:3,8
Sunday 787:23
sunny 882:13
supervise 946:7
supervised 908:11
supposed 789:7 790:3
supposedly 968:21
sure 762:21 763:13 765:11 766:25
767:1,1,4,13 783:5 790:7,17,18
795:9 797:15 816:22 820:2,2,16
820:25 822:6 834:7 836:15 854:1
854:4 884:7 890:22 892:12
894:15 910:9 932:10 933:7
936:14 939:5 942:9 949:5 950:19
951:19 956:19 962:3
surrender 831:10,23
surrendered 789:20
surveillance 853:4,7,10,12,21,24
883:11 888:24 896:3
Susan 832:4
suspicion 878:15
Sustained 757:2 759:13 769:3
776:24 778:8,20 779:5 784:1
796:8 798:10 807:7 815:11
819:23 820:10 822:16 824:22
830:10 840:21 844:10 859:24
866:10 873:4 874:22 875:5 885:7
903:17
sweater 852:17,19
sweep 858:3
swimming 847:12
switch 918:13,17,18 919:1,8,9,11
919:13,16,19 922:9,24 923:5,14,15
923:16,20,22,23,25 924:6,15
924:25 925:4,18 926:9 938:23,25
941:15,20 942:9,9,19
switches 919:15 922:25
switching 926:12
sworn 846:13 867:8 887:15 899:2,4
907:11 945:7
syringes 872:14 880:21
system 853:7,10,13,21,24 886:11
901:13 912:19,19 913:1,2,14,25
918:17,20 923:14 925:21 946:19
946:20 948:13 949:3,6 952:9
965:13 968:12 971:20
systems 900:16 901:13 948:24
950:10 965:17

---

**T**

T 908:21
TABLE 752:1
take 782:13 795:16,18 796:6,10,14
801:25 804:16,19 808:15,19,20
812:19 814:22 834:18 840:5
845:9 873:19,20,23 878:17
882:18 887:9 890:21 891:3
892:24 893:1 900:12 906:17
916:16 933:11 938:25 939:3
943:23 944:5
taken 785:14 797:24 798:15 800:2
800:12 808:24 817:15 833:3
834:4 845:17 889:15 890:20
897:14,16,23,23 898:6,7,12,16
902:18,24 906:1,23 944:7 968:24
takes 896:5 916:2 930:5
take-down 889:2
talk 759:16 772:16 774:6 793:5
801:15 831:22 836:3 841:21
889:13,13 891:4,14 902:2 904:21
906:9,10 940:21
talked 764:13 765:18 786:10,12
890:11 895:17 924:11 926:24
930:2 961:17
talking 772:6 831:16 836:23 871:24
882:10,10,13,16 942:17
tangible 962:6,7
Taps 901:14
target 915:3,23 917:10,20 920:14
923:14,15,21,24 929:22 931:17
934:17 935:2 942:7,21,24 943:2
task 890:4
taught 878:7 879:17
team 889:2

tech 783:9 888:24 896:2,2
technically 884:25 885:1
telephone 848:13 910:24 915:11
  916:7 921:22 922:10 947:23
  948:19 950:1 954:22,23,23
tell 757:22 758:24 760:17 765:20
  775:21 776:8 777:24,25 778:2,10
  778:15,22,25 779:7,11,15,15
  781:1 789:22 791:7 802:19 803:5
  803:15 805:7,13,18 806:22 807:9
  807:17 808:10 811:1 815:13
  829:5,11 832:14 836:13 839:11
  841:2,4,5,6,19 842:23 844:18
  848:16 857:8 864:23 870:8
  871:10 873:24 876:3 882:18
  884:18 885:17 888:19 890:3,18
  907:12 909:15 924:18 944:14
  946:22 957:10,13,17 961:19
  969:15,20,23
telling 760:25 766:7 771:13,16
  794:25 797:9 829:19 830:2,7
  870:24 874:24 875:7
tells 803:9,10
temporarily 883:17
ten 885:18 941:13 944:5
terminated 916:1,3 922:16
terms 909:20 919:2,3 958:1 967:17
test 959:17
testified 799:16 802:3 817:20
  820:3 880:18,24 881:4 883:5
  884:15 898:23 957:21,24 964:20
  969:7
testifies 944:14
testify 822:12 835:16 898:15,16
  910:13,17,18
testimony 867:22 868:24 896:24
  912:2 929:9 931:4 933:3
Texas 907:21 908:15 913:14 914:1
  914:1 919:14 920:8
text 758:13 781:11 817:6,7,11
  827:19 828:4 843:2 909:23
  910:21 911:2,4,5,6,10,20 912:20
  913:2,5 920:6,6 921:25 950:11
  950:13,15 963:5 968:23
texted 759:7 827:22,25
texting 758:18,24 759:2,4,9 828:6
  828:15
texts 818:19
thank 822:24 823:3 838:13 839:24
  845:6 846:9,20 859:16 862:7,8
  866:23,25 867:3,10 887:6 900:1
  927:22 936:16,17 943:19,20
  944:6 945:13 956:9 959:23 971:5
  972:2,3
That's 776:14 943:16 962:16
  963:25 966:21,23 967:4,8 968:15
  969:17,22,25 970:21
therapeutic 951:5,10
They're 796:5
thing 760:11 826:15 861:1 865:24
  919:1,15
things 757:10 802:21 804:13
  843:17 860:22 861:2 895:16
  913:23 918:24 939:8 956:14
think 775:16,21 795:14 798:22
  803:19 807:22 815:16,18 817:20
  822:6 823:5 832:18 834:16,24
  843:16,19 854:1 856:11 865:18
  867:21 869:11 882:1 886:25
  919:2,3 932:2 955:13 956:4
  959:17
thinking 776:14 820:15 842:15
third 886:4 919:1 931:25 965:8
  966:9 968:5
thought 761:24 791:12 805:21
  807:20 816:11 828:15 833:13
  842:20,22 843:17 885:21
threatened 766:12 777:19 827:17
  843:11
threatening 835:3
three 788:19 793:5 840:23 846:1
  915:12 918:5,20 919:4,4,5
  930:23 933:2,3,10 934:18 935:11
  939:19 952:18 953:1,3,5,7,8,9,10
  954:21 955:5,11 964:9,15
throat 814:9
throw 821:22 927:18
Thursday 789:13 832:23 964:4,23
  966:14
ticking 938:13,16

ties 784:13,15
times 766:3 804:5 817:22 831:11
  857:11,18 862:1 866:12,17,18
  921:16 925:22 938:21 948:22
  949:2 966:17
timid 874:12 887:3 906:9
timing 972:4
title 947:4 968:16,16,17
titled 964:11
Tobin 833:23
today 782:2 850:14 852:13 893:21
  898:3 944:17,25
told 757:25 759:25 760:7,9,20,23
  760:25 761:1,5,20 763:18 764:5
  764:16 772:4,6,8 776:8 777:1,3
  779:10,11,12,16 787:10,11,13
  789:1,1,20 791:11 795:4,5
  801:23 803:24,25 808:7 811:19
  811:24 819:9 820:6 821:22 827:7
  827:12 828:24 843:21 846:4
  856:7 867:20 870:24 873:24
  874:3,7 875:16,18,19 882:18
  883:8 899:6 903:19 921:24
  956:14
toll 910:7 911:1
tomorrow 845:23 944:18 972:5,12
tools 953:16
top 849:18 912:14 913:20 914:23
  915:1 917:9 954:24 960:5 966:10
totaling 930:24
totally 916:23
touch 760:20 761:2 915:19,19
  921:21 961:19
tourists 855:19,21
towels 858:3
tower 918:18,23 919:2,2,3 923:24
  923:25 939:8
towers 918:24 922:24 939:4
town 755:10 756:14 763:6 765:9,10
  765:15,23 772:20 773:15,17
  793:2 798:2 800:2,13,16,22
  823:22 833:18,22 846:24 847:4,6
  847:8,23 849:14 850:7 851:20
  855:21 856:5 863:19 864:15
  870:21,25 871:6 874:11 875:11
  875:13,20 876:5,23
townhouse 790:21,21
trace 957:13,17
track 765:7
traditional 851:11
trafficking 833:21 905:11,16
trained 877:21 957:6
training 858:7 877:11,18 956:24
  958:24,25
trains 858:5
transact 889:13
TRANSCRIPT 751:11
Transfer 783:12
transferred 896:11
translates 964:21 966:15
transport 892:19
transported 892:20,24
travel 910:12
traveling 901:14
trial 751:11 832:23
tricks 766:15
tried 775:18 776:8 786:14 829:12
  829:14 830:5
trouble 759:7 770:10 844:5
true 776:20 782:20 789:14 796:18
  810:9,23,25 813:17,19 815:7
  842:24 843:20 924:6 969:12,24
truly 779:17,18
trust 785:9 791:9,12
trusting 785:10
truth 837:15 859:15 885:2,6
truthful 901:10
try 770:16 811:22 831:4 841:6
  842:12 868:7 901:9,11 902:2
trying 755:3 760:14 765:5 770:13
  770:15 774:14 811:5 814:2
  837:20,21 843:13 854:1 892:1,5
  927:19 950:22
Tuesday 833:16 968:7
turn 833:22
turned 968:19
turning 919:21 921:3
twice 757:15
two 764:10 784:8,9 786:16,22
  788:19 793:21,23 794:2 811:10

811:11,13 814:14 843:5 850:25
  851:15 865:18 870:13,16 871:1
  877:10 885:16 891:14 892:9
  893:10 911:21,23 918:5 923:8,18
  925:10,17 926:15 928:21 929:14
  930:8 933:2 939:17 941:18
  942:11,16 947:21 949:18 952:16
  952:19 954:20,22 962:24 963:12
  963:12 966:18 968:10
two-entry 925:21
type 839:19 874:12 915:2 921:12
  921:21 931:3 936:5
types 888:22
typically 910:6
typing 969:16

## U

ultimately 781:9 873:6 874:4
um-m-m 759:6 760:22 761:9,12
  764:18 771:12,15,19 774:16
  775:5 784:25 785:5 788:18 790:2
  793:4,12 797:15 798:19 800:9
  801:5 803:6,23 804:6 805:10
  806:9 808:14 811:5,10,10 812:17
  812:21 813:9 816:16,19,25
  817:19 818:11,25 819:11 820:14
  820:18,25 829:12 830:17 831:16
  838:25,25 840:15 841:4 854:1
  858:6 884:23
unanswered 934:7 935:9,15
unclear 896:25
unconscious 860:15
undercover 802:5,6,15,18 803:2
  804:19,20 808:7 888:25 889:3,10
  890:11
undergone 957:2
underneath 934:2
understand 764:7,25 768:4 770:20
  775:19 790:3,23 793:20 794:6
  797:16 815:4 842:3 878:12
  915:17 925:21 928:7 933:7 938:5
  942:4,14 951:19
understanding 917:3
understood 762:17 929:8
undressed 804:2
undressing 804:9
unedited 913:9
uniform 876:16,17
unique 908:24 950:15 958:17,20
  959:14 960:10
unit 888:6,7,8,13,20 904:6 905:6,8
  910:11,12
United 751:1,4,12,22 887:11 907:6
  914:4 951:5 952:11 954:13
  957:21,24 962:20
university 957:3
unlimited 909:12
unrelated 895:4
unreliable 933:6
untruthful 901:16
upkeep 857:5,9
upkeeping 858:8
upstairs 761:9,9 802:9 803:2
usage 909:6,8
use 782:3 787:25 795:24 816:4
  828:22 843:3 848:17,21,25
  889:25 927:16 946:17 969:10
user 940:5 947:10,21 948:4,6,8,9
  948:10 949:1,4,6 950:6,8,12,12
  950:16 953:8,9 954:2,3,5 963:3,3
  963:5,8,23 967:5 971:4
users 946:18 960:21 965:8,13
  970:16,17
uses 851:7 919:18
usually 858:16 860:8 885:17,18
utterance 869:9,15
U.S 946:11

## V

vacated 833:24
vacationing 856:2
vague 776:23 785:6
valid 947:25 948:2,19 950:3,5,20
van 892:19
Vanessa 751:14 832:5
vanilla 927:13
variety 921:13
various 877:21 889:18 914:25
  917:5 948:22

verbal 884:24,25 885:1,3,3
verbally 860:4
verification 950:18
verified 906:3
verify 909:1 910:5
verifying 950:18
Vermont 760:12 771:22,24 777:17
  778:1 786:17,23 787:12 789:23
  790:1 810:15 811:1,14 822:7,11
  831:5,7 925:25 929:3,15 930:17
  930:24 931:5,13 932:6,15,21
  933:25 934:5,16,24 935:7,18,25
  936:3,12 943:15
versa 925:16
versus 946:19
vertical 913:2
vetted 906:3
vial 872:11
vice 925:16
victim 778:23 779:1,3 832:25 833:2
  833:21 899:6 944:14
victimized 899:7,17
victim's 835:7,11
video 853:4,6,9,12,20,24 854:8
view 971:17
viewed 963:17
viewing 960:21 963:6
voice 831:11 843:12 918:2,2,7
  934:12,19,20,21 939:17,18,20
voices 821:15
voir 956:2,7,10 958:10
VOLUME 751:10
voluntarily 788:20 827:13 969:21
voluntary 837:25,25
vote 965:14
vs 751:6

## W

wagon 892:19
wait 757:25 788:2 807:24 830:23
  833:9 842:12
waited 757:6 758:2 787:20
waiting 759:15 802:15 814:13
walk 844:1,3 855:15 909:20
walked 922:22
walking 807:1 862:3
walks 860:6
want 769:13,19 770:18 772:16
  776:17 776:18 785:6 793:22
  794:6 801:15 803:9,15,15 808:21
  810:17,19 814:19,20 816:1,9,20
  817:9 819:9,15,16,17,19,20
  820:7 824:13 825:2 828:11
  836:21 844:3 864:24 865:10
  867:18 891:14 895:16 896:24
  897:7 900:18 903:20 909:21
  910:7 917:2 922:24 943:4 955:16
  956:1 963:17 968:4
wanted 756:25 761:5 802:24
  803:25 819:6 828:23 831:10
  833:19 837:10,10 874:4 880:16
  882:1,25 883:3 927:5
wanting 776:21
wants 803:9,10 909:2 947:19 963:5
warrant 789:10,13,15 790:4,6,7,9
  831:3,20 833:19,25 946:6
warrants 822:14
wash 765:4,15
washed 911:13
washes 765:9
wasn't 758:24 763:6,13 764:18
  765:22,23 767:5 789:18 790:3
  791:19 793:12 795:9 798:1,4
  800:14 802:17 806:4 807:12
  811:5 813:10,11 814:3 821:13
  824:7 827:15 831:8 841:18
  843:10 844:2 874:12
watch 972:10
way 769:11 776:3 793:5 834:18
  838:8 840:24 844:6 845:23 870:5
  888:21 889:3 896:21 908:24
  915:17 918:25 922:12 951:23
  957:22 959:10,11 971:23
weak 918:21
weapon 868:22 872:6,7
wearing 850:17 852:16,17 882:5,6
  902:22
web 889:23,24 951:24 965:10
  971:17

**website** 837:19,22
**week** 822:12 831:4
**weeks** 811:10,11,13
**went** 756:4 775:25 780:12,14
788:20 789:19 790:20 791:11
800:15 813:17 819:8 821:22
822:7 827:3 831:25 832:23 833:6
833:13 842:12 875:17,20 876:8
893:25 908:10 929:14 934:7,18
934:20 935:9,15
**weren't** 760:20 761:2 766:15,20
767:4,6,13 768:13 769:21 778:4
793:11 799:2 824:1
**we've** 827:19 908:21
**whatnot** 847:24 856:11
**William** 752:23 945:3,7,11
**willing** 823:10 833:22
**willingly** 779:3 827:13
**wipe** 770:18 837:18,18,20
**wireless** 971:24
**wish** 839:13 840:18 944:10
**withdraw** 873:13
**withdrawn** 833:24
**withheld** 829:24
**witness** 754:8 758:21 765:12
769:17 780:16 782:24 803:19
807:14 808:2 835:19 839:14,17
845:8 846:8,13,18 849:3 850:19
852:21 854:4 866:17,25 867:2,6
867:8,10,13 881:14 885:10 887:7
887:8,9,15,18,20 895:3 897:21
907:4,9,10,11,14 936:17 944:2
944:12,13,23,23,24 945:1,5,7
945:11 955:22 956:1,2,8 958:2,3
959:6,8,11 970:9
**woman** 892:23 903:19 906:13
**women** 889:8 891:24 892:9 893:4
970:12
**won't** 896:19 964:19
**word** 883:7,7 900:12 969:10
**words** 761:21 762:7 793:22 811:19
856:4 878:18 915:7 933:9 968:23
969:23
**wore** 882:11
**work** 783:23 788:20 846:23 847:25
862:22 870:9 887:25 888:2,7,21
889:7 890:1,5,7 891:16 918:21
919:9 923:1 924:18 942:20
945:16,17
**worked** 862:19 870:16 907:22
908:10,10,11 945:18
**working** 765:19,22 770:7 773:3,6
779:12 785:7 805:24 853:7
865:17 891:19 901:8 939:4
958:22 962:15
**works** 776:3 817:3 853:16 889:3
890:3,4 892:13 918:18 957:7
**world** 952:6 957:11,18
**worry** 811:24
**worst** 824:16
**worth** 795:14 935:25
**wouldn't** 783:25 787:4 815:2
842:14 899:7
**write** 817:6 882:3,3 883:7
**writes** 826:4
**writing** 860:4 881:13 886:12
**written** 872:5
**wrong** 764:2 834:23,25 965:15
**wrote** 882:8

**Y**

**yeah** 759:8 771:3 788:3 795:5
803:23 810:4 816:16 820:14
859:8 897:13 934:21
**year** 838:1 863:16 870:17 899:12
917:13
**years** 865:18 870:13,16 877:10
888:5,14 902:10 904:7 908:14
945:19 958:23 968:13
**yellow** 915:1
**yesterday** 781:20 790:24
**York** 951:4
**young** 889:8,12,14 890:14,19,22
891:12,13 893:24 903:2
**You'd** 930:5
**you've** 922:9 941:18

**Z**

**Zacca** 751:16 752:12,16 780:12,25

781:1,10,20,23,25 824:19 829:8
830:8 836:23 837:5,8 840:16
841:24 844:8 849:25 853:14
855:5 867:19 868:8 869:7,21,23
874:21 875:4,15 877:4,6 878:10
881:12,15 884:5,8,21 885:2,5,8
886:21 894:11,13,16,24 895:7
897:22 899:24 900:1 914:7
927:24
**Zoe** 806:2
**zone** 920:5
**zoom** 919:21 960:3

**$**

**$30.00** 796:5
**$300** 834:1
**$5** 848:24,25

**0**

**0154** 911:23 915:24 920:14

**1**

**1** 779:24 856:14 862:25 863:1
893:16 943:12,15
**1st** 774:13,13 822:9
**1:15** 845:15 846:1
**10** 753:9 810:22 817:23 818:1
826:5 888:5 896:18 902:10
906:21
**10-minute** 906:17 943:22
**10:27** 964:25
**10:29** 968:8
**10:35** 966:16
**10:38** 861:15
**10:57** 924:20 931:11
**10:59** 931:24 941:13
**10:59:00** 941:23
**10:59:08** 932:3 941:22
**10:59:00** 942:12
**100** 904:10
**1010** 850:7
**104** 959:17
**11** 753:6 818:1 967:22
**11th** 774:7,10,13,15,18 861:13
**11:46** 967:23
**11:52** 935:16
**1100** 751:20
**12** 968:7
**12th** 774:20 861:11,13
**12-60312-CR-COHN** 751:3
**12:00** 845:17
**12:30** 845:24
**120** 919:5
**1222** 828:10
**1281** 751:17
**13** 850:23 854:25 867:22
**13th** 774:20
**14** 933:22 964:4,23 966:14
**14th** 774:20
**1415** 932:18
**15** 808:20 891:19 896:18 917:14
932:12 942:2
**15th** 915:22
**1522** 933:16
**16** 751:7 825:19 870:19 879:10
891:19 900:24 930:21 931:5
940:18
**16th** 772:25 773:4,11,21 774:3,6,7
776:7 779:20 782:16 791:23
800:19 863:21
**17** 891:19
**17th** 775:6
**17:28:16** 964:5
**18** 753:7,10 888:11 891:24 898:25
900:5,7,13,19 901:1,21,25 906:5
963:19 968:13,19 970:1
**18th** 830:14
**19** 850:10 866:2 966:15
**1927** 964:23
**1935** 966:14

**2**

**2** 935:22
**2nd** 822:9
**2:15** 932:18
**20** 771:10,17 826:5 896:18 900:25
**2008** 922:16,17 951:6,7,17 952:3
964:4,23 966:14,22 967:22 968:7

**2009** 949:20,25
**2010** 949:21,22
**2011** 907:23
**2012** 771:21 795:7 825:20 830:14
842:2 848:2 850:10,23 853:7
854:8,25 857:21 858:20 860:21
863:19,22 864:10,12 865:21
866:2 867:22 870:17,19 874:17
879:10 886:25 888:15 893:6
896:13 921:5 924:10 931:7
933:15 943:12,15
**2013** 751:7 789:12
**2027** 934:14 935:5
**2046** 967:22
**21** 753:8 849:6,8,23 850:2,3 861:9
**2135** 930:13
**22** 893:6 896:13 933:22 935:22
**22nd** 800:4,8,20 801:15 809:13
811:6,17 812:20 813:1,6 824:13
826:13 842:2 888:15 893:22
**2200** 818:2
**2229** 968:7
**2236:47** 828:10
**23** 929:21,24 930:5,24 942:2
**2300** 818:2
**2352** 935:6,16
**24** 762:22 812:22
**24th** 816:23 817:4,13
**25** 753:9 796:5 908:14 912:7,11,12
914:5,9,11,17 917:1,4 923:2
928:14,18 964:24
**25th** 928:21 929:14 937:9
**26** 753:9 816:1,3,4,8 820:19 827:20
828:5 912:8,24,24,25 914:5,9,11
921:24 928:18 934:9,11,22
**26th** 930:11 931:4 940:15
**27th** 817:18,21 818:1
**28th** 818:7
**29** 847:11 856:7 921:5 924:10
931:7 966:22
**29th** 941:7
**299** 751:23

**3**

**3** 753:8 816:20 828:4 897:10 968:5
**3:00** 816:4,6
**3:00** 848:1,2
**3:22** 933:16
**30** 774:13 775:20 786:16,17 820:25
821:1 933:15 951:3
**30th** 820:16,23 943:6
**303** 751:17
**31** 820:25
**32** 850:10,23 854:12,16,18,19
856:7 863:9 871:7,11,14,19
876:8 934:14
**322-0154** 816:15
**33027-2908** 751:18
**33132** 751:15
**33301** 751:20,23
**34** 847:1
**35** 899:6

**4**

**4** 818:10 932:25 968:18
**4th** 751:15
**411** 934:18 939:14,14
**44** 920:9 929:19 937:12 939:10
**45** 846:2 933:24
**49** 919:21 928:11

**5**

**5** 751:10 922:16 932:12 942:2,2
954:24
**5:00** 944:24 972:14
**5:28** 964:5
**50** 826:5 930:21 940:18
**51** 917:14 923:2
**52** 954:15 966:14
**52-A** 753:10 952:21,25 953:1,11,18
954:14,20 955:19,21 958:12
959:16,18,19 960:2,4 961:15
966:9
**52-B** 753:10 952:21 953:21,21,22
954:7,10 959:16,18,19 966:24,25
**53** 753:9 912:8 913:16 914:5,9,11
922:7 930:10 931:2 955:10
**53-B** 955:18,19

**54** 917:3 921:3 924:10 931:7
933:13
**55** 933:14 943:5 967:22 968:7
**5590** 911:23
**56** 917:14 943:12
**561** 817:9 955:8,9,19
**561-767-5590** 967:7
**561-767-5687** 922:10

**6**

**6** 922:17 929:21,23 930:5
**6/24** 816:23
**6/25/2012** 919:22 930:23
**6/26/2012** 930:23
**6/29** 932:18
**6/29/2012** 924:20 941:22
**60** 899:12 911:2,7,9,12,13 919:6
931:5 966:1,2,3
**600** 751:15
**65.19.136.520** 961:22

**7**

**7** 862:25 863:1
**7th** 916:1,1,3
**7:00** 848:1,2
**7:27** 964:24
**7:33** 966:15
**7:57** 919:24 920:1 928:22 937:10
**700** 946:11
**701** 839:20,23
**72** 854:11
**747-8272** 818:10
**75** 917:4 919:21 921:3 923:2
926:13 928:11 930:10 943:5,12
**755** 752:3
**77** 916:25
**782** 753:6
**786** 816:14 929:15 931:17 932:16
933:25 934:3 935:7 936:4,11
**786-322-0154** 928:24
**786-332-0154** 930:15 932:4 933:18
936:1 939:25
**797197118** 960:10

**8**

**8** 753:6 781:22 782:1,5,8,11,14
924:23 931:21
**8:01** 920:18 937:24
**8:28** 964:5
**8:46** 967:23
**802** 818:10 921:9 924:12 925:7,16
925:19,23,25 926:2 928:25 929:2
931:15 932:6 936:9,13,25 937:3
938:10 940:1,15 941:2,10 942:5
942:20,24 943:2,6,7,9,11
**802-332-0154** 924:23
**802-342-6162** 920:15
**809** 753:7
**823** 752:4
**846** 752:5,6
**850** 753:8
**855** 752:7
**862** 752:8
**864** 752:9
**870** 752:10,11
**877** 752:12
**885** 752:13
**887** 752:14,15
**894** 752:16

**9**

**9** 753:7 809:11,11,17,18 826:13,13
932:25
**9:00** 972:5,12
**9:35** 930:13
**900** 752:17
**904** 752:18
**907** 752:19,20
**911** 869:5,8,12,17 885:16
**914** 753:9
**928** 752:21
**936** 752:22
**952** 753:23,24
**954-404-1710** 942:18
**954-769-5496** 751:24
**959** 753:10
**969** 752:25
**971** 753:1

**99** 751:15